**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE FARFETCH LIMITED SECURITIES LITIGATION | Case No.: 1:23-cv-10982-ER-KHP [rel. 1:24-cv-00532-ER] |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ................................................................................. 1

II.   JURISDICTION AND VENUE ........................................................................... 9

III.  PARTIES ............................................................................................................ 10

    A.    Plaintiffs .................................................................................................... 10

    B.    Defendants ................................................................................................. 10

IV.   FORMER EMPLOYEES CORROBORATING FACTUAL ALLEGATIONS ............. 13

    A.    FE1 ............................................................................................................ 13

    B.    FE2 ............................................................................................................ 14

    C.    FE3 ............................................................................................................ 14

    D.    FE4 ............................................................................................................ 15

    E.    FE5 ............................................................................................................ 15

    F.    FE6 ............................................................................................................ 16

V.    FACTUAL BACKGROUND .............................................................................. 16

    A.    Farfetch—The Low Cost, Low Risk Technology Company ................................. 16

    B.    Farfetch—The High Risk, Expense Heavy Brand Developer, Wholesale Distributor, Retail Store Owner, and More .......................................................... 19

    C.    Farfetch's Costly Acquisitions and Strategic Partnerships Required Significant Capital Exposing the Company to Mounting Debt ............................... 24

    D.    Farfetch Benefits from COVID-19 Restrictions as E-Commerce Sales Boom .... 30

    E.    Farfetch Experiences a Slowdown and/or Complete Halt in Growth in its Largest Markets and from its Top Luxury Brand .................................................. 34

    F.    Farfetch Refused to Address High Costs Associated with Direct Brand Partnerships in the Face of Rising Direct-to-Consumer Competition ................. 41

    G.    Farfetch Repeats Its Acquisition Pattern in an Attempt to Stimulate Growth, Boost Sales, and Reinforce Investor Confidence ............................................. 45

    H.    Farfetch's Ineffective Internal Controls Over Financial Reporting Went Unremediated for Years ....................................................................... 55

    I.    As Financial Conditions Worsened, Defendants Assured Investors of Farfetch's Liquidity Strength and Reinforced Near-Term Targets While Promoting Cost-Saving "Strategic Initiatives" .............................................................. 68

    J.    The Truth is Revealed Through a Series of Corrective Disclosures ..................... 70

    K.    Post-Class Period Events and Disclosures ............................................................. 76

        1.    The Fraudulent Conveyance of the Farfetch Business is Completed ....... 76

2. Coupang Reveals Farfetch Internal Control Issues Were Not Remedied, Drastically Decreases Value of the Farfetch Business, and Negotiates the Sale of NGG .......................................................................................... 78

3. Richemont Records a €1,263 Million Write Down of YNAP's Net Assets .......................................................................................................... 81

VI. FALSE AND MISLEADING STATEMENTS ........................................................ 83

VII. ADDITIONAL ALLEGATIONS OF SCIENTER ............................................... 165

    A. Core Operations ................................................................................. 165

    B. Individual Defendants Held Themselves Out as Knowledgeable ...... 166

    C. Neves' Control Over Farfetch ........................................................... 166

    D. Former Employee Accounts Corroborate Individual Defendants' Knowledge .. 167

    E. Suspicious Trading Activity and Financial Incentives ...................... 168

    F. Suspicious Timing and Departures of Company Executives .............. 171

    G. Corporate Scienter and *Respondeat Superior* .................................. 173

VIII. CLASS ACTION ALLEGATIONS .................................................................... 173

IX. LOSS CAUSATION AND ECONOMIC LOSS .................................................. 174

X. PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET ....................... 176

XI. FF HOLDINGS IS LIABLE FOR FARFETCH'S STATEMENTS AND REMAINES FARFETCH'S SUCCESSOR-IN-INTEREST ....................................................... 178

XII. NO SAFE HARBOR ......................................................................................... 182

XIII. PRAYER FOR RELIEF ................................................................................... 185

XIV. JURY TRIAL DEMANDED ............................................................................ 186

Co-Lead Plaintiffs Fernando Sulichin, individually and on behalf of Lyxor Overseas Holdings Ltd & Cinergy Advisors Ltd, and Yuanzhe Fu (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and their own acts, and upon information and belief as to all other matters based on, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, conversations with former employees of Farfetch Limited ("Farfetch" or the "Company"), a review of Farfetch's filings with the U.S. Securities and Exchange Commission ("SEC"), conference calls and announcements made by or about Farfetch, wire and press releases published by or about Farfetch, media and analyst reports pertaining to the Company, and other publicly available documents and readily obtainable information.

Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    <u>NATURE OF THE ACTION</u>

1.    This is a federal class action lawsuit on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Farfetch's publicly traded securities between February 24, 2022 and December 17, 2023, both inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, promulgated thereunder.

2.    Farfetch was founded as a technology company designed to support third-party sales of luxury goods to consumers worldwide via its digital marketplace platform.

3.    At all relevant times, Farfetch conducted its business and operations through various subsidiaries, including Defendant FF Realisations plc (f/k/a Farfetch Holdings plc) ("FF

Holdings"). The principal activity of FF Holdings was to act as a holding company for Farfetch, serving as the Company's main operating subsidiary.

4.      Farfetch and its many subsidiaries are collectively referred to herein as the "Farfetch Group" or the "Group" and the collective operating assets and financial obligations of the Group are referred to herein as the "Farfetch Business."

5.      Defendant José Manuel Ferreira Neves ("Neves") founded the Company in 2007 and at all relevant times, served as Chief Executive Officer ("CEO") and Chairman of the Board. Neves has also served as a director of FF Holdings since November 2023. At all relevant times, Neves maintained ultimate controlling authority over Farfetch and FF Holdings by virtue of holding the majority of voting rights in Farfetch.

6.      Defendant Elliot Gilbert Jordan ("Jordan") joined Farfetch in 2015 as Chief Financial Officer ("CFO") and served in this position until his departure from the Company, announced on February 23, 2023, effective August 31, 2023. Since its October 2019 inception, Jordan served as one of two directors and CFO of FF Holdings until his departure in August 2023.

7.      Defendant Stephanie Nadine Phair Kooij ("Phair") joined Farfetch in 2016 as Chief Strategy Officer ("CSO"), was promoted to Chief Customer Officer ("CCO") in 2019, and later assumed the role of Group President in 2022, and Chair of New Guards Group in June 2023. Since its October 2019 inception, Phair has served as one of two directors and CCO of FF Holdings.

8.      Farfetch operated as a private company for more than a decade before going public in September 2018. At the time of its initial public offering ("IPO"), Farfetch was sold to investors as a low-risk, third-party e-commerce fashion platform capitalizing on organic growth and extremely high take rates.

9.    For example, just before the Company's IPO, *Fortune* noted that "[w]hat makes Farfetch's business model appeal is that it does not own the inventory sold on its website, but instead offers the website to help the brands sell." Similarly, *The Business of Fashion*, wrote that Farfetch's "priority is going to be basically a platform, a dedicated provider of technology and services," which is "where the margin is the highest and potential growth is the highest as well."

10.    In reality, the online luxury business was suffering from continued brand reluctance to expand into e-commerce and as a result, Farfetch was struggling to generate significant revenue through its third-party sales and grow user engagement.

11.    This led to a monumental shift in the Company's business model shortly after going public, executed through a series of costly acquisitions of first-party retailers, operating independent e-commerce platforms and websites and brick-and-mortar storefronts. Beginning in December 2018 and continuing throughout the greater part of 2019, Farfetch spent hundreds of millions of dollars acquiring: (i) Stadium Goods, a sneaker and streetwear marketplace specializing in new and deadstock products; (ii) Toplife, a luxury e-commerce platform operating in the China market; and (iii) the New Guards Group ("NGG"), a luxury fashion house encompassing several brands' design, production, first-party sales, and distribution.

12.    Following the NGG Acquisition, Farfetch reorganized its business structure into three segments, including its: (1) Digital Platform—mostly comprised of third-party and first-party transactions between sellers, including Farfetch subsidiaries, and consumers conducted on the Group's technology platforms; (2) Brand Platform—comprised of production and wholesale distribution of brands owned and licensed by NGG, and includes franchised store operations; and (3) In-Store—comprised of the transactions conducted in the physical stores operated by the Company's various subsidiaries and certain brands in the NGG portfolio.

3

13.     Industry experts and investors were skeptical from the start, with the market reacting particularly harshly to the news of the NGG acquisition, which resulted in Farfetch's stock price falling more than 45% in a single trading day.

14.     While there was initial blowback from investors following this blatant deviation in business model and material assumption of significant risk, unfortunately for investors the true extent of damage done would not reveal itself until 2023, lying dormant just beneath the Company's surface while it reaped the benefits of an unprecedented, yet temporal, shift to online shopping in response to global shutdowns following the spread of COVID-19.

15.     Farfetch consistently maintained that its post-IPO acquisitions were in line with the Company's growth strategies, simply adding a new "layer" to its existing Farfetch marketplace platform by extending its proposition upstream and expanding its capabilities to include design, production, and brand development. Unbeknownst to investors, however, Farfetch failed to make any of the necessary changes to successfully integrate these businesses into the Company's existing platform and to ensure that the future cash needs of its new acquisitions would not have a negative impact on the Group's overall balance sheet and working capital.

16.     Following each of Farfetch's costly acquisitions, including *inter alia*, Stadium Goods and NGG, the acquired businesses continued to operate as standalone brands on the Farfetch platform, while also maintaining their own platforms, e-commerce websites, and physical storefronts, and were led by each of their own existing management teams. As a result, each of Farfetch's high risk, expense-heavy subsidiaries controlling two of the Company's business segments and significantly contributing to the third, was left to its own devices regarding operational management and spending, while also being afforded access to the Group's cash.

17.     Defendants' reckless disregard for proper integration of these acquired businesses and the Company's forward cash needs created an unworkable corporate environment, and as a result, Farfetch was experiencing company-wide inefficiencies, unprecedented operating costs, and significant pressures on cash flow.

18.     Worse yet, at all relevant times, Farfetch suffered from inapt oversight and material weaknesses in its internal controls over financial reporting, particularly within NGG, resulting in inaccurate and/or overstated revenue, Gross Merchandise Value ("GMV"), and receivables, costly inventory stockpiles, and duplicative operating expenses.

19.     The negative impacts of these acquisitions, however, were conveniently and swiftly covered up by the monumental shift to online shopping following worldwide shutdowns in response to the outbreak of COVID-19 beginning in early 2020.

20.     By the second quarter of 2020, Farfetch reported record-breaking dollar values of orders processed and claimed to have attracted more than half a million new customers – its highest quarterly customer acquisition ever. Thanks to the pandemic boom, Farfetch entered the year 2021 on a high as the Company continued reporting record sales and growing market capture throughout the first half of the year.

21.     Towards the second half of 2021, however, Farfetch began experiencing significant softening in its two largest markets, the U.S. and China, as global shutdowns lifted, physical storefronts began to re-open, and the tides of online shopping began shifting back towards pre-pandemic levels. In addition, the Company suffered a major blow following the untimely death of Off-White founder and creative director, Virgil Abloh, in November 2021, which caused the sales of NGG's top luxury brand to plumet.

22.     Then, in February 2022, the war in Ukraine halted all sales in the Company's third largest market, Russia, and strict zero-COVID restrictions implemented in China at the end of March 2022, and persisting throughout the year, nearly evaporated Farfetch's access to its second largest market, furthering impacting its already slowing growth in the region.

23.     Further, pandemic shutdowns brought a rise in direct-to-consumer competition from luxury brands themselves, not previously occupying the e-commerce space, complicating Farfetch's dependence on direct brand e-concessions, and resulting in Defendants' refusal to renegotiate unfavorable contract terms, negatively impacting the Company's operating expenses and profit margins.

24.     At the start of the Class Period (February 24, 2022), the writing on the wall was clear – the pandemic boom remained no more. Indeed, based on accounts from former employees, by the end of 2021 and continuing throughout 2022, internal forecast and guidance consistently showed Farfetch would not see the same growth or revenues generated during the pandemic.

25.     Moreover, Farfetch continued to suffer from unsustainable operating expenses and dwindling profit margins as a result of, Defendants' utter disregard for proper integration of the Company's acquired businesses, its forward cash needs, and material weaknesses in its internal controls over financial reporting, placing significant strains on Farfetch's overall financial condition and liquidity strength.

26.     Nevertheless, Defendants recklessly disregarded contrary internal guidance and forecasts to set unrealistic public expectations for continued growth, continued operating cost leverage from its investments, and profitability in the year ahead.

27.     In addition, instead of paring back operations to account for slowing revenue growth, already high operating expenses, and shrinking margins, Farfetch repeated its past

behavior of conducting an acquisition spree in an attempt to stimulate growth, boost in sales, and generate investor interest and confidence.

28.     For example, in January 2022, Farfetch announced the acquisition of luxury beauty retailer, Violet Grey, ahead of the launch of NGG Beauty, the Company's new venture into the beauty sector, scheduled for later in the year.

29.     In February 2022, the Company announced NGG's commercial agreement with Authentic Brands Group LLC (*i.e.*, Adidas) to become the exclusive partner to curate, create and bring to market Reebok's luxury collaborations, as well as a core operating partner for the brand across Europe, and distributor of premium Reebok products in the U.S., Canada, Europe and certain other key markets. The Reebok deal began generating some revenues for the Company in 2022, but Defendants assured investors that the real value was to come in 2023 following the completed integration on the Farfetch marketplace and with the launch of Reebok's premium line.

30.     In May 2022, Farfetch announced the strategic partnership with Neiman Marcus Group ("NMG") to integrate Farfetch's e-commerce technology, Farfetch Platform Solutions ("FPS"), into the online experience of the NMG's owned department store, Bergdorf Goodman. The expectation set by Defendants, throughout the second half of 2022, was that the NMG partnership would be a significant revenue and growth generator for Farfetch upon its completed integration in 2023.

31.     And in August 2022, Farfetch announced its plans to acquire a 47.5% stake in Yoox Net-a-Porter ("YNAP"), a leading online luxury and fashion retailer, from Farfetch backer and strategic partner, Richemont. Through this partnership, Richemont and YNAP were to utilize Farfetch's technology platform to advance their Luxury New Retail programme; Richemont and YNAP were to integrate FPS into their online platforms and/or websites; and Richemont's brand

portfolio was also join the Farfetch marketplace. Defendant Neves is quoted in the Company's announcement of this deal as saying, in relevant part: "This significant partnership unequivocally establishes FARFETCH as a pre-eminent global platform for luxury."

32.     Like the Company's acquisitions before, however, these acquisitions were overvalued and/or incapable of producing at unrealistic targets set by Defendants. For example, even before the acquisition was complete, Violet Grey was already experiencing significant financial hardships and declining growth, and therefore, did not support Farfetch's prospects in the beauty sector. In addition, Defendants' failure to conduct proper due diligence of the Reebok deal, resulted in higher-than-expected costs, low to negative profit margins, unsellable inventory impacting development and production of new products, and unsustainable growth and revenues following complete integration with the Company's platform. Moreover, this time Farfetch did not have the added benefit of the pandemic to prolong the realization of its failed acquisitions.

33.     Nevertheless, despite known macro-conditions having a sustained impact on revenue growth, and Defendants' utter disregard for proper integration of acquired businesses, resulting in excessive costs, heightened risks, and unsustainable cash burn, throughout the remainder of the Class Period, Defendants reassured the market of the Company's financial health, established strong guidance for 2023, and reinforced recent acquisition activities.

34.     Further, in an attempt to combat growing concerns, in August 2022, Defendant Neves announced "organizational evolutions" purportedly made to better Farfetch's position to achieve its long-term vision and reaccelerate growth in 2023, while also driving a more efficient operating structure. While these "strategic initiatives" were touted to the public as sufficient action to rectify costs while still pursuing growth strategies, they did not address the main drivers of Farfetch's cash burn, namely supply chain and inventory costs within NGG, and mounting VAT

costs on direct brand partnerships. Nor had the Company taken any meaningful action to remediate the foundational deficiencies in NGG's internal controls which were having a negative impact on the Company's operating expenses and profit margins. As a result, the Company was already experiencing a liquidity crisis and at material risk of insolvency.

35.    By the second half of 2023, Farfetch's slowed and/or stalled revenues were unable to sustain its expenses and coupled with its dwindling and/or non-existent margins, and mounting debt, caused the Company to implode under a full-blown liquidity crisis before succumbing to insolvency by December 2023.

36.    This action seeks to compensate Farfetch's shareholders for their losses that resulted from the revelation of Defendants' misleading conduct.

## II.    <u>JURISDICTION AND VENUE</u>

37.    The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j, 78t, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

38.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

39.    This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

40.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the

preparation and dissemination of materially false and/or misleading information, occurred in this District.

41.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiffs

42.     Plaintiff Fernando Sulichin, individually and on behalf of Lyxor Overseas Holdings Ltd & Cinergy Advisors Ltd, as set forth in his previously filed certification (ECF No. 17-1), purchased Farfetch securities during the Class Period, and as a result was damaged thereby. Sulichin's certification evidencing his transactions is incorporated by reference herein.

43.     Plaintiff Yuanzhe Fu, as set forth in her previously filed certification (*Ragan v. Farfetch Limited, et al.*, Case No. 1:24-cv-00532, ECF No. 38-2 (S.D.N.Y.)), purchased Farfetch securities during the Class Period, and as a result was damaged thereby. Fu's certification evidencing her transactions is incorporated by reference herein.

### B.    Defendants

44.     Defendant Farfetch was, at all relevant times, an exempted company incorporated under the laws of the Cayman Islands, with its principal executive offices at The Bower, 211 Old Street London EC1V 9NR, United Kingdom. Farfetch, at all relevant times, maintained its North America headquarters at 30 West 21st Street, New York, NY 10010, and maintained CT Corporation as its agent for services of process in the United States, located at 28 Liberty Street, New York, NY 10005. At all relevant times, Farfetch's Class A ordinary shares traded in an

efficient market, listed on the domestic exchange known as the New York Stock Exchange ("NYSE"), under the ticker symbol "FTCH."

45.     Farfetch was, at all relevant times, a holding company with no operations of its own and, as such, it depended on its subsidiaries for cash to fund its operations and expenses, including future dividend payments, if any. Through its various subsidiaries and operating entities (the Farfetch Group), Farfetch, at all relevant times, conducted business in the first- and third-party sale, wholesale, and distribution of luxury fashion worldwide through e-commerce platforms and websites and physical stores.

46.     Defendant FF Holdings was incorporated on October 23, 2019, as a public limited company organized under the laws of England and Wales and a wholly owned direct subsidiary of Farfetch. FF Holdings is the successor of Farfetch as the holding company for the Farfetch Group's operations and assets (*i.e.*, the Farfetch Business). During the Class Period, FF Holdings and Farfetch shared executives and directors, including Neves, Phair, Jordan with James L. Maynard serving as its corporate secretary (who also served as Farfetch's Chief Legal Officer). FF Holdings maintains its principal executive offices at Ship Canal House 8th Floor 98 King Street Manchester M2 4WU.

47.     At all relevant times, Farfetch conducted business through FF Holdings, which directly or by way of its subsidiaries, including *inter alia*, Farfetch UK Limited, Farfetch Italia S.r.l., Farfetch.com Limited, Farfetch US Holdings, Inc. ("FF US"), Farfetch.com US LLC, New Guards Group Holding S.p.A. (NGG), and NGG Beauty S.r.l. ("NGG Beauty"), held the majority, if not all, of Farfetch's operating assets and financial obligations (*i.e.*, the Farfetch Business). In turn, FF Holdings was responsible for and/or controlled Farfetch's communications and the

11

content therein. Consequently, FF Holdings "made" Farfetch's statements for the purposes of establishing liability under Section 10(b) of the Exchange Act.

48.     Defendant Neves, founder of Farfetch, at all relevant times, served as Farfetch's CEO and the Chaiman of the Company's Board of Directors. Neves, at all relevant times, held 71.1% or greater voting control over Farfetch. At all relevant times, Neves served as the ultimate controlling party of FF Holdings by virtue of holding the majority of voting rights in Farfetch. Neves has also served as a director of FF Holdings since November 13, 2023.

49.     Defendant Jordan served as Farfetch's CFO from 2015 until his resignation, effective August 31, 2023. Since its incorporation in October 2019, Defendant Jordan also served as CFO and one of two directors of FF Holdings until his departure on August 31, 2023.

50.     Defendant Phair, at all relevant times, served as Farfetch's Group President since August 2022 and Chair of New Guards Group since June 2023. Defendant Phair also served as the Company's CCO from August 2019 to August 2022 and CSO from November 2016 to August 2019. Since its incorporation in October 2019, Defendant Phair has also served as CCO and one of two directors of FF Holdings.

51.     Defendants Neves, Jordan, and Phair are collectively referred to herein as the "Individual Defendants." Farfetch, FF Holdings, and the Individual Defendants, are collectively referred to herein as "Defendants."

52.     The Individual Defendants possessed the power and authority to control the contents of Farfetch's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Farfetch's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions

with Farfetch, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

53.     The Individual Defendants were, at all relevant times, acting within their normal scopes of employment. Consequently, their intent and/or state of mind is imputed to Farfetch and/or FF Holdings under the doctrine of *respondeat superior* and common law principles of agency.

## IV.     FORMER EMPLOYEES CORROBORATING FACTUAL ALLEGATIONS

### A.     FE1

54.     Former Employee #1 ("FE1") worked at Farfetch from May 2021 to September 2022 as Director of eCommerce and Site Merchandising for Stadium Goods, a subsidiary of Farfetch acquired in December 2018. Toward the end of FE1's tenure, FE1 also took on the role of Vice President of Revenue at Stadium Goods. While with the Company, FE1 was based out of Stadium Goods' executive office located in New York City, New York, but often worked remotely.

55.     After the acquisition by Farfetch, Stadium Goods maintained its own separate platform for consigners and brands to list their goods for sale. FE1 was responsible for overseeing Stadium Goods' sales and profitability goals as an e-commerce platform under the Farfetch Business. During the better part of FE1's employment, FE1 reported to Emmanuelle Saal, Vice President of Revenue and Digital Marketing for Stadium Goods. After FE1 took over as Vice President of Revenue, FE1 reported to Stadium Goods' Chief Financial Officer and Chief Operating Officer, Alejandra Silva, and Chief Executive Officer, Laura Sartor, who reported to

Defendants Neves and Jordan.

**B.    FE2**

56.     Former Employee #2 ("FE2")[1] was Director of Global Indirect Tax at Farfetch from May 2021 to October 2023. While employed by Farfetch, FE2 was based in Portugal and reported to the Senior Vice President of Finance, Dave Murray, and then to Vice President of Financial Performance, Katie Cavanagh.

57.     As Director of Global Indirect Tax at Farfetch, FE2 was responsible for the oversight and filing of indirect taxes, which included sales taxes and value-added taxes (VAT), for business conducted in Europe, the United Kingdom, parts of the Middle East, and Singapore. FE2's team also prepared monthly reports about the status of indirect taxes at Farfetch, which included information about taxes paid, taxes due, and forecasts for when tax credits would be refunded to Farfetch.

**C.    FE3**

58.     Former Employee #3 ("FE3") worked in digital marketing at Farfetch from March 2018 to August 2022, and Farfetch's subsidiary, NGG, from February 2023 to July 2023. FE3 held the following positions at Farfetch: Affiliates & Partnerships Executive from March 2018 to February 2019; Senior Affiliates & Partnerships Executive from February 2019 to March 2020; Affiliates & Partnerships Lead – Greater China from March 2020 to March 2021; Affiliates & Partnerships Manager from March 2021 to August 2022. While employed in their various roles in digital marketing at Farfetch, FE3's job involved planning and executing advertisement buys for online locations, including websites, social media, other sales platforms, search engines, etc. While

---

[1] Plaintiffs' counsel was recently informed that FE2 passed away after agreeing to participate in this litigation and providing the relevant accounts included herein.

at Farfetch between March 2018 and August 2022, FE3 was based out of the Company's Shanghai, China location.

59.    In February 2023, FE3 returned to Farfetch as the Senior Digital Marketing Manager for NGGH++, which was the newly formed division of NGG to manage the Reebok acquisition. In this role, FE3 assisted with the transfer of the e-commerce platform of Reebok to Farfetch. As Senior Digital Marketing Manager, FE3 also was privy to Reebok sales and costs data provided by Adidas during the acquisition.

**D.    FE4**

60.    Former Employee #4 ("FE4") worked at Farfetch as Creative Manager from May 2021 to March 2022, and Production Operations Manager from March 2022 to June 2022. FE4 was based out of the Company's product studio located in Los Angeles, CA.

61.    As the Creative Manager, FE4 managed the creative team at the Company's Los Angeles photo studio. The creative team included photographers, stylists, and post-production employees. In March 2022, FE4 was promoted to Production Operations Manager and began to oversee all operations at the Company's Los Angeles studio.

62.    While employed at Farfetch, FE4 reported to the former Production Operations Manager, Terence Mahone, until FE4 took over Mahone's position, at which point they reported to Niten Kapadia, Vice President of Operations for North America and Managing Director for Violet Grey, following its acquisition in January 2022.

**E.    FE5**

63.    Former Employee #5 ("FE5") worked in internal controls at Farfetch from July 2023 to December 2023. FE5 was brought in by Company leadership to assist with the remediation of material weaknesses identified within NGG's internal controls over financial reporting. During

15

FE5's tenure at Farfetch, FE5 reported to Farfetch's Director of Internal Controls and Chief Internal Auditor.

64.     As a member of the internal controls team at Farfetch, FE5 was tasked with identifying, designing, and implementing financial and operational internal controls that would correct the material weakness so that NGG could generate accurate numbers and would ultimately bring Farfetch into compliance with SOX requirements.

### F.     FE6

65.     Former Employee #6 ("FE6") worked at Farfetch as a senior team member of Internal Controls from April 2023 to September 2023. During FE6's tenure at Farfetch, FE6 reported to Benjamin Kaye, Director of Internal Controls and Chief Internal Auditor, who, in turn, reported to Karen Jackson, Vice President of Financial Controls, who, in turn, reported to Defendant Jordan.

## V.     FACTUAL BACKGROUND

### A.     Farfetch—The Low Cost, Low Risk Technology Company

66.     Farfetch, founded as a technology company in 2007 by Defendant Neves, launched "an e-commerce marketplace for luxury boutiques around the world" in October 2008. From its inception, Farfetch promoted itself based on its unique business model in which the Company provided a marketplace platform that boutiques and brands could utilize to sell their own goods to consumers, allowing Farfetch to avoid taking on any inventory (and hence, risk)—entirely unlike the more traditional first-party e-commerce wholesale or retail sellers.

67.     The Farfetch Marketplace platform began by selling the stock of a few dozen brick-and-mortar luxury boutiques that were keen to reach a wider audience. The Company drew inspiration from YNAP as well as from Asos, one of the first online fast-fashion platforms. To

promote seller interest in the platform, Farfetch would ship and photograph inventory from the boutiques to its in-house photography studios, handle customer service, and returns.

68.    The way Farfetch earned money through its third-party marketplace was by taking a percentage of commission from each sale—a "take rate." Historically, Farfetch reported take rates of between 30% and 32%. This take rate was notably higher than those of many other platform businesses, such as Uber or Amazon. Essential to Farfetch's low risk, high yielding third-party marketplace platform model was the fact that it was the facilitator of sales between customers and luxury boutiques or brands, meaning Farfetch itself did not buy the product to sell, and thus, carried no inventory.

69.    In December 2017, *The New York Times* published an article about the growth of online retail in the luxury fashion space entitled "Death of Retail? 2017 Was All About the Empire of Luxury E-Tail." The article highlighted Farfetch and its unique business model, noting Defendant Neves "chose to create an online marketplace platform helping smaller brick-and-mortar stores enter the digital world and taking a commission on each purchase, freeing himself from the need to take on the significant inventory risk and working capital requirements of a traditional store (and Yoox Net-a-Porter)." Neves was quoted in the article as saying, "What makes us different is that everyone else is operating on a retail model, but we are a platform, not a shop, an enabler not a competitor, and are reaping all the advantages that such a position entails."

70.    After operating for more than a decade as a private company, in September 2018, Farfetch became a publicly traded company, with shares listed on the NYSE. At the time, investors and analysts were sold on a strategy of exponential growth akin to the growth achieved by other online platforms like Uber and Amazon, based on the Company's third-party marketplace platform design, that unlike YNAP, was free of the risks and expense associated with owning stock.

17

71.     For example, in the lead up to Farfetch's IPO, *Fortune* noted that "[w]hat makes Farfetch's business model appeal is that it does not own the inventory sold on its website, but instead offers the website to help the brands sell." Similarly, a respected luxury fashion industry publication, *The Business of Fashion*, wrote that Farfetch's "priority is going to be basically a platform, a dedicated provider of technology and services," which is "where the margin is the highest and potential growth is the highest as well."

72.     Consequently, even though the Company had never made a profit in its ten-year existence and had less than $400 million in revenue in 2017, Farfetch achieved a wildly successful IPO that raised over $1 billion and led to an $8 billion valuation.

73.     On September 21, 2018, *CNBC.com* reported on the Company's blockbuster offering, providing that "[s]hares of London-based luxury online marketplace Farfetch surged as much as 53 percent in their market debut as investors placed their bet on the company's technology and unique niche in high-end luxury." The article went on to add that, "With a $6.2 billion market price [based on the $20 IPO price] and $385 million in 2017 revenue, Farfetch is trading at a richer valuation than Amazon, JD.com as well as other traditional retailers," attributing this generous valuation to its third-party marketplace platform model, stating that "'[m]arketplace' companies often trade at a higher premium than traditional retailers, because they don't carry the risk [of] being stuck with unwanted product."

74.     That same day, *Forbes* published an article praising Neves and his uniquely designed inventory-free platform model in an article titled "Is Farfetch Founder Neves The Jeff Bezos of Fashion?" The article noted that, unlike Amazon, which had to "build mammoth physical warehouses and infrastructures," "Neves' Farfetch is a pure-play platform where its value is based upon creating 'value by facilitating exchanges between two or more independent groups, usually

consumers and producers.'" The article further highlighted how "Farfetch never takes physical control of the products it sells" supporting "great possibilities for Farfetch in the future" with its "platform business model [a]s the key to that success."

**B.    Farfetch—The High Risk, Expense Heavy Brand Developer, Wholesale Distributor, Retail Store Owner, and More**

75.    When the Company was listed in 2018, Farfetch's third-party marketplace platform accounted for 90 percent of its revenues, but it was struggling to become profitable while the problem of securing product remained.

76.    Online clothing sales became the top e-commerce product by 2015. However, the luxury clothing industry was slow to embed digital sales into its business model. Mark Tungate, a branding specialist, and author of "Fashion Brands: Branding style from Armani to Zara," wrote "Luxury brands have been slower than most to unlock the potential of e-retail. They have struggled to overcome the challenge of making their digital environments as alluring as their stores." Indeed, major labels remained reluctant to sell their stock through third-party websites, worried about image and the discounting that platforms, like Farfetch, were known to use to attract customers.

77.    Desperate to stimulate growth, generate revenue, and achieve profitability, Farfetch effectively turned its back on its unique and defining inventory-light, low risk third-party marketplace business model, taking on significantly more first-party sales (and therefore inventory) through a series of costly acquisitions of first-party retailers and wholesale distributors.

78.    Just three months after the Company's IPO, on December 12, 2018, Farfetch announced that it was acquiring Stadium Enterprises LLC (d/b/a Stadium Goods), a premium sneaker and streetwear marketplace specializing in new and deadstock (brand new, never been worn, second-hand) products, for $250 million. To counter the inevitable increase in operating costs and risks associated with its expansion in the first-party retail space, the Company claimed

19

it would benefit from Stadium Goods' significant brand authority and far-reaching social media following.

79.     On February 28, 2019, Farfetch announced it was acquiring Toplife, a luxury e-commerce platform owned by a then-existing partner JD.com, for $50 million. Under the agreement, Toplife merged into Farfetch China and was poised as a strategic expansion of the Company's existing partnerships designed to build a premier luxury gateway to China. In addition to acquiring Toplife, the agreement provided the Company with a "button" on JD.com linking customers to the Farfetch website.

80.     According to FE3, at the time, the deal "raised eyebrows" amongst Farfetch employees because JD.com was known for selling electronics, not luxury fashion and the "button" would not be seen by every customer – only those who purchased a high-cost item such as an iPhone. In addition, Farfetch had agreed to give JD.com 30 percent commission on every sale made through the "button" on JD.com. FE3 said the deal was a flop – after one year, Farfetch only saw about $1 million in sales, leading to the termination of the agreement.

81.     Then, on August 8, 2019, less than a year after the IPO, Farfetch announced that it was acquiring the New Guards Group (NGG), an Italian luxury fashion house encapsulating numerous luxury brands' design, production, first-party sales, and distribution, for $675 million—an amount greater than Farfetch's entire fiscal year 2018 revenue, and roughly 67% of the sum raised in its IPO. Farfetch billed the acquisition as adding a new "layer" to the Company's existing Farfetch Marketplace platform by extending its proposition upstream and expanding its capabilities to include design, production, and brand development.

82.    Following the NGG Acquisition, Farfetch reorganized its business structure into three segments – Digital Platform, Brand Platform and In-Store:

The Digital Platform segment activities include the Farfetch Marketplace, FPS, BrownsFashion.com, StadiumGoods.com, VioletGrey.com, Luxclusif, Farfetch Future Retail, and any other online sales channel operated by the Group, including the respective websites of the brands in the New Guards portfolio. It derives its revenues mostly from transactions between sellers and consumers conducted on our technology platforms, and primarily operates a revenue share model where we retain commissions and related income from these transactions. The Digital Platform segment also includes direct-to-consumer sales of owned product, referred to as "first-party sales," which include "first-party original" product developed by brands in the New Guards portfolio, through the Farfetch Marketplace and New Guards brands' owned e-commerce websites, for which we retain the full amount of the sale.

The Brand Platform segment is comprised of production and wholesale distribution of brands owned and licensed by New Guards, and includes franchised store operations.

The In-Store segment covers the activities of stores [the Farfetch Group] operate, including Browns, Stadium Goods, Violet Grey and certain brands in the New Guards portfolio. Revenues are derived from sales made in these physical stores.

83.    Under the new organization, Farfetch described its revenue streams as follows:

•**Digital Platform Services Revenue**, which primarily includes commissions and related income from third-party sales and to a lesser extent revenue from first-party sales. The revenue realized from first-party sales is equal to the GMV of such sales because we act as principal in these transactions, and thus related sales are not commission based. Digital Platform Services Revenue is included in our Digital Platform segment.

•**Digital Platform Fulfilment Revenue**, which is revenue from shipping and customs clearing services that we provide to our digital consumers, net of centrally Farfetch-funded consumer promotional incentives, such as free shipping and promotional codes. Digital Platform Fulfilment Revenue is included in our Digital Platform segment.

•**Brand Platform Revenue**, which is revenue relating to the New Guards operations less revenue from New Guards': (i) owned e-commerce websites, (ii) direct-to-consumer channel via our Marketplaces and (iii) directly operated stores. Revenue relating to its owned e-commerce websites and its direct-to-consumer channel is recognized as Digital Platform Services Revenue and revenue relating to its directly operated stores is recognized as In-Store Revenue. Revenue realized from Brand Platform is generally equal to GMV as such sales are not commission

based. However, revenue relating to royalties, commission and other fees arising on commercial arrangements may be recognized within Brand Platform Revenue and not Brand Platform GMV.

•**In-Store Revenue**, which is revenue generated in our retail stores which include Browns, Stadium Goods and New Guards' directly operated stores. Revenue realized from In-Store sales for Browns and New Guards' directly operated stores is equal to GMV of such sales because such sales are not commission based. Revenue realized from In-store sales for Stadium Goods does not equal GMV of such sales as a certain portion of those sales are third-party and are commission-based.

84.     From the beginning, Defendants asked investors to measure the Company's success against a slew of "Key Performance Indicators" ("KPIs"), self-defined operating and financial metrics that were purportedly tailored to Farfetch's unique characteristics and business model, including *inter alia*, Gross Merchandise Value ("GMV"), revenue, adjusted revenue, gross profit, gross profit margin, and adjusted EBITDA. Following the Company's post-IPO reorganization, Defendants expanded these KPIs to included results from each individual segment of Farfetch (Digital Platform, Brand Platform, and In-Store) as well as the "Consolidated Group" or "Group" (collectively referring to Farfetch and its subsidiaries, *i.e.*, the Farfetch Business).

85.     Farfetch defined some of these KPIs as follows:

"*Adjusted EBITDA*" means net profit/(loss) after taxes before net finance expense/(income), income tax expense/(benefit) and depreciation and amortization, further adjusted for share-based compensation expense, share of results of associates and items outside the normal scope of our ordinary activities (including other items, within selling, general and administrative expenses, losses/(gains) on items held at fair value and remeasurements through profit and loss, impairment losses on tangible assets, and impairment losses on intangible assets). Adjusted EBITDA provides a basis for comparison of our business operations between current, past and future periods by excluding items that we do not believe are indicative of our core operating performance. Adjusted EBITDA may not be comparable to other similarly titled metrics of other companies.

"*Brand Platform GMV*" and "*Brand Platform Revenue*" mean revenue relating to the New Guards operations less revenue from New Guards': (i) owned e-commerce websites, (ii) direct to consumer channel via Farfetch's Marketplaces and (iii) directly operated stores. Revenue realized from Brand Platform is generally equal to GMV as such sales are not commission based.

"**Digital Platform GMV**" means GMV excluding In-Store GMV and Brand Platform GMV. Digital Platform third-party GMV represents transactions on Farfetch's technology platforms (*i.e.*, Marketplaces) from third-party sellers, excluding fulfilment. Digital Platform first-party GMV represents sales of owned-product, including First-Party Original through our digital platform (*i.e.*, NGG sales on Farfetch's Marketplaces). The revenue realized from Digital Platform Services first-party sales, excluding fulfilment, is equal to the Digital Platform GMV from such sales.

"**Digital Platform Revenue**" means the sum of Digital Platform Services Revenue and Digital Platform Fulfilment Revenue.

"**Digital Platform Fulfilment Revenue**" means revenue from shipping and customs clearing services that we provide to our digital consumers, net of centrally Farfetch-funded consumer promotional incentives, such as free shipping and promotional codes. Digital Platform Fulfilment Revenue was referred to as Platform Fulfilment Revenue in previous filings with the U.S. Securities and Exchange Commission ("SEC").

"**Digital Platform Services Revenue**" means Revenue less Digital Platform Fulfilment Revenue, In-Store Revenue and Brand Platform Revenue. Digital Platform Services Revenue is driven by our Digital Platform GMV, including commissions from third-party sales and revenue from first-party sales.

"**First-Party Original**" refers to brands developed by New Guards and sold direct to consumers on the digital platform.

"**Free Cash Flow**" is comprised of Adjusted EBITDA, plus change in working capital less capital expenditure on technology and tangible assets.

"**Gross Merchandise Value**" ("GMV") means the total dollar value of orders processed. GMV is inclusive of product value, shipping and duty. It is net of returns, value added taxes and cancellations. First-party GMV is also net of promotions. GMV does not represent revenue earned by us, although GMV and revenue are correlated.

"**In-Store GMV**" and "**In-Store Revenue**" mean revenue generated in our retail stores, which include Browns, Stadium Goods and New Guards' directly operated stores. Revenue realized from In-Store sales for Browns and New Guards' directly operated stores is equal to GMV of such sales because such sales are not commission based. Revenue realized from In-store sales for Stadium Goods does not equal GMV of such sales as a certain portion of those sales are third-party and are commission based.

"**Third-Party Take Rate**" means Digital Platform Services Revenue excluding revenue from first-party sales, as a percentage of Digital Platform GMV excluding GMV from first-party sales and Digital Platform Fulfilment Revenue. Revenue

from first-party sales, which is equal to GMV from first-party sales, means revenue derived from sales on our platform of inventory purchased by us.

C.     **Farfetch's Costly Acquisitions and Strategic Partnerships Required Significant Capital Exposing the Company to Mounting Debt**

86.     In addition to operating in stark contrast to its original third-party marketplace platform business model, Farfetch's ever growing first-party business model, solidified its new reality of relying on exorbitant amounts of debt to supplement its cash balance.

87.     Farfetch was founded as a technology company. Its corporate structure was not designed to support a predominantly driven first-party retail business and all the added risks and costs that came along with it.

88.     Farfetch started as a platform like Etsy and eBay that merely enabled and processed transactions between sellers and buyers. At that time, the business model for Farfetch was inventory light. As the Company's business model shifted to what can only be described as inventory intensive, requiring Farfetch to purchase and hold its own inventory, the Company's new business model consequently also required an outlay of cash for purchases three to six months in advance and commitments to buy – obligating future cash – nine to 12 months ahead.

89.     And while Farfetch maintained that its post-IPO acquisitions were in line with the Company's growth strategies, it failed to make any of the necessary changes to successfully integrate these businesses into the Company's existing platform and to ensure that the future cash needs of a new acquisition would not have a negative impact on the Group's overall balance sheet and working capital.

90.     Following each of Farfetch's costly post-IPO acquisitions, the acquired businesses continued to operate as standalone brands on the Farfetch platform, while also maintaining their own platforms, e-commerce websites, and physical storefronts, and were led by each of their own existing management teams.

24

91.    As a result, each of Farfetch's high risk, expense-heavy subsidiaries controlling its Brand Platform segment, In-Store segment, and significantly contributing to its Digital Platform segment, was left to its own devices regarding operational management and spending, while also being afforded access to the Group's cash.

92.    For example, because of the lack of integration amongst the different segments of the Company, the separate entities that were operating within Farfetch, maintained their autonomy to make inventory purchase decisions without sign-off from higher levels at Farfetch.

93.    As such, the Company's lack of proper oversight of its acquired businesses and inadequate planning of inventory purchases resulted in liquidity problems and heightened risks of insolvency.

94.    Prior to going public, Farfetch had settled all its existing debts in 2017. Upon the completion of the Company's IPO, Farfetch's cash and cash equivalents balance amounted to approximately $1,043.5 million as of September 30, 2018.

95.    Following the Company's year of acquiring highly valued, expense-heavy companies, including Stadium Goods, TopLife, and NGG, Farfetch's cash and cash equivalents balance dropped to approximately $322.4 million as of December 31, 2019.

96.    Consequently, "to ensure adequate financial flexibility and liquidity going forward," Farfetch entered a commitment letter with J.P. Morgan Securities plc for a €300 million senior secured loan facility in connection with the NGG acquisition in August 2019.

97.    Shortly thereafter, on January 30, 2020, Farfetch announced that it had agreed to issue and sell, via a private placement, $250 million convertible senior notes in equal amounts to Tencent and Dragoneer Investment Group ("February 2020 Notes") to "supplement Farfetch's current liquidity position." The financing was agreed to in principle on December 19, 2019 and

the conversion price of $12.25 reflects a 31% premium to the 30-day VWAP at that time. The notes bore a 5.00% interest rate per year, payable quarterly in arrears on March 31, June 30, September 30, and December 31 of each year, commencing on March 31, 2020, and would mature on December 31, 2025. Upon the completion of this private placement, Farfetch canceled the secured loan facility with J.P. Morgan.

98.     On April 30, 2020, Farfetch closed another private offering, this time of $400 million in convertible senior notes ("April 2020 Notes"). The April 2020 Notes were issued pursuant to an Indenture, dated April 30, 2020, between the Company and Wilmington Trust, National Association, as trustee. The Indenture set forth certain types of bankruptcy or insolvency events of default involving the Company after which the April 2020 Notes would become automatically due and payable. The April 2020 Notes were senior, unsecured obligations of the Company, and were to mature on May 1, 2027. The Notes bore an interest at a rate of 3.75% per year payable semi-annually in arrears on May 1 and November 1 of each year, beginning on November 1, 2020.

99.     On November 17, 2020, Farfetch completed the placement of convertible senior notes to Alibaba Group Holding Limited ("Alibaba") and Richemont for total gross proceeds of $600 million ($300 million each) ("November 2020 Notes"). The November 2020 Notes were to mature on November 15, 2030, did not bear regular interest, and the principal amount did not accrete. If certain events that constituted a "fundamental change" (as defined in the indenture governing the terms of the November 2020 Notes) occurred, holders of the November 2020 Notes had the right to require the Company to repurchase all or some of their November 2020 Notes for cash at a repurchase price equal to 100% of their principal amount, plus all accrued and unpaid special interest, if any, to, and including, the maturity date.

100.    The Indenture for the November 2020 Notes defined a "fundamental change" as including, in relevant part, the following events:

***

(B) the consummation of (i) any sale, lease or other transfer, in one transaction or a series of transactions, of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole, to any Person, other than solely to the Company or one or more of the Company's Wholly Owned Subsidiaries; or (ii) any transaction or series of related transactions in connection with which (whether by means of merger, consolidation, share exchange, combination, reclassification, recapitalization, acquisition, liquidation or otherwise) all or substantially all of the Ordinary Shares are exchanged for, converted into, acquired for, or constitutes solely the right to receive, other securities, cash or other property; provided, however, that any merger, consolidation, share exchange or combination of the Company pursuant to which (x) a Permitted Party continues to beneficially own more than fifty percent (50%) of the voting power of all classes of common equity of the surviving, continuing or acquiring company or other transferee, as applicable, and (y) all other Persons (including Permitted Parties) that directly or indirectly "beneficially owned" (as defined below) any classes of the Company's common equity immediately before such transaction directly or indirectly "beneficially own," immediately after such transaction, more than fifty percent (50%) of all classes of common equity of the surviving, continuing or acquiring company or other transferee, as applicable, or the parent thereof, in substantially the same proportions vis-à-vis each other as immediately before such transaction will be deemed not to be a Fundamental Change pursuant to this clause (B);

(C) the Company's shareholders approve any plan or proposal for the liquidation or dissolution of the Company; provided that, if such plan or proposal for the liquidation or dissolution of the Company is approved in connection with an event described in clause (A) or (B) above, only such event described in clause (A) or (B) shall constitute a Fundamental Change; …

101.    Also in November 2020, Farfetch received $50 million in exchange for 1,889,338 Farfetch common stock to Artemis Capital, the holding company of the billionaire Pinault family, which owns Kering. Farfetch's cash and cash equivalents balance amounted to approximately $1,573.4 million as of December 31, 2020.

102.    Additionally, in November 2020, Alibaba and Richemont agreed to invest $500 million ($250 million each) in Farfetch China, taking a combined 25% stake in a new joint venture that would include Farfetch's marketplace operations in the China region. In addition, Alibaba and

27

Richemont would have the option to purchase a further combined 24% of Farfetch China after the third year of the joint venture's formation. On August 2, 2021, Farfetch announced that the $500 million strategic investment had been completed.

103.    Farfetch's cash and cash equivalents balance amounted to approximately $1,363.1 million as of December 31, 2021.

104.    As discussed in further detail below, the Company again engaged in an acquisition spree in the first half of 2022, including the costly additions to its Brand Platform with Reebok ($375 MM) and Violet Grey (~$55 MM), and a $200 million investment in a partnership with the Neiman Marcus Group ("NMG"). Thereafter, by second quarter of 2022, the three-month period ended June 30, 2022, Farfetch's cash and cash equivalents balance amounted to approximately $575.6 million, and approximately $487.4 million as of September 30, 2022.

105.    On October 20, 2022, Farfetch US Holdings, Inc. ("FF US"), an indirect subsidiary of Farfetch, as a direct subsidiary of FF Holdings, entered into a Credit Agreement with Defendant FF Holdings, JPMorgan Chase Bank, N.A., as administrative agent, Wilmington Trust, National Association, as collateral agent, J.P. Morgan Securities LLC, as the lead arranger and sole physical bookrunner, and certain banks and financial institutions party thereto as lenders and issuing banks (the "Credit Agreement"). The Credit Agreement provided for a $400 million term loan facility (the "Term Loan") which was issued with a 6.50% original issue discount and was due and payable on October 20, 2027 (unless payable earlier in accordance with the terms of the Credit Agreement). The Term Loan amortizes in quarterly installments of 0.25%, payable on the last Business Day (as defined in the Credit Agreement) of each fiscal quarter and on the Maturity Date, beginning with the fiscal quarter ending on March 31, 2023. The Term Loan bore interest at a rate equal to either the Base Rate (as defined in the Credit Agreement) plus 5.25% per annum or Term SOFR (as

defined in the Credit Agreement) plus 6.25% per annum. A Term Loan borrowed in Base Rate was subject to a 0% floor and a Term Loan borrowed in Term SOFR was subject to a 0.50% floor. FF US initially elected to make quarterly interest payments at a rate equal to the Term SOFR plus 6.25% per annum.

106.    Following this latest installment of mounting debt, Farfetch's cash and cash equivalents balance amounted to approximately $734.2 million as of December 31, 2022. But by June 30, 2023, Farfetch's cash and cash equivalents balance had dropped significantly once again, amounting to approximately $453.8 million at the end of the second quarter of 2023.

107.    Then, on August 11, 2023, FF US entered into a second amendment (the "Second Amendment") to the Credit Agreement, which amended the credit agreement entered into on October 20, 2022 (as also subsequently amended by the First Amendment on April 7, 2023). The Second Amendment provided for a $200 million delayed draw term loan facility (the "Delayed Draw Term Loan", together with the Initial Dollar Term Loans (as defined in the Credit Agreement), the "Term Loan"). The Delayed Draw Term Loan was to be issued with a 5.60% original issue discount and, to the extent drawn, would be due and payable on October 20, 2027 (the "Maturity Date"). The Delayed Draw Term Loan was fungible with the Initial Dollar Term Loans (as defined in the Credit Agreement) and would amortize in quarterly instalments of 0.2512562814% of the aggregate principal amount of the Dollar Term Loans on the Closing Date (from draw down of the Delayed Draw Term Loan), payable on the last Business Day (as defined in the Credit Agreement) of each fiscal quarter and on the Maturity Date.

108.    On September 11, 2023, FF US borrowed the full $200 million under the Delayed Draw Term Loan.

109.    In total, between February 2020 and September 2023, the Company, and its subsidiaries, received roughly $2.4 billion through various convertible notes, investments, and term loans, on top of the more than $1 billion raised in the Company's September 2018 IPO, and by December 2023, it was all gone.

110.    In other words, despite presenting itself as a cohesive group, offering complementary products or services to support a collective goal and execution plan, the Farfetch Business had always been splintered, operating as independent units irrespective of the next, all while sharing the same pool of funds of a Company lacking adequate controls to properly manage cash flow. As a result, the pandemic boom (described below) merely provided temporary support to a business riddled with inefficiencies, mounting expenses, and undisclosed excessive and/or heightened risks, teetering on the edge of a full liquidity crisis, and based on post-pandemic events, likely on the precipice of bankruptcy.

### D.    Farfetch Benefits from COVID-19 Restrictions as E-Commerce Sales Boom

111.    Farfetch's post-IPO acquisition activity did not go unnoticed. Analysts immediately raised concerns regarding the NGG acquisition and the resulting creation of an entirely new business division and set of company activities. For example, during the Company's investor call held on August 8, 2019, Luca Solca noted that Farfetch had "been laying up a very long list of acquisitions, starting with Stadium Goods, Toplife, New Guards Group and others" and expressed concern that "this is making your business model more complicated" as compared to the "original idea building an Uber of luxury and fashion[.]"

112.    On August 9, 2019, Wells Fargo issued an analyst report following the Company's news of the NGG acquisition and disappointing financial results for the second quarter of 2019, explaining that, "[u]nfortunately, the 2Q print raised far more questions than answers, both in terms

of the fundamentals of the core business, as well as another acquisition whose benefits are not immediately clear." It further stated, "[w]hat was supposed to be a simple investment thesis (industry leading top-line growth with structural industry tailwinds) has become increasingly complicated and controversial over the past few months." That same day, BTIG issued an analyst report noting that the NGG acquisition "adds a lot of non-marketplace characteristics to FTCH stock including fashion risk, potential channel conflict and future key man risk."

113.    Luca Solca also published an article in *The Business of Fashion*, on August 29, 2019, addressing the significant challenges the Company faced in the wake of this news. Specifically, Solca called into question the purported benefit and valuation of the NGG acquisition contrasting the Company's "bolt-on moves like the acquisition of streetwear marketplace Stadium Goods for $250 million" and "moves aimed at supporting geographic expansion like the acquisition of JD.com's luxury platform and Toplife for $50 million," stating that "acquiring New Guards for an enterprise value of $675 million, is a completely different matter." Solca further questioned, "*why should the market believe that Farfetch has the skills required to create brands, when its core business is distributing them online*?" (emphasis added).

114.    While the announcement of the NGG acquisition served as a catalyst for significant turnover in the Company's shareholder base, wiping $2 billion off its market value in a single day, concerns regarding the dramatic shift in business model quickly subsided as trends in the luxury market shifted to more online sales with the spread of COVID-19 and resulting shutdowns implemented in most, if not all, of the Company's largest markets beginning in early 2020, continuing throughout that year, and into the first half of 2021.

115.    On February 28, 2020, J.P. Morgan issued an analyst report entitled, "Better Than Expected 4Q & Outlook w/Early Resilience & Multiple Catalysts Through 2020; Reiterate OW &

$17 PT," in which the analyst highlighted the NGG acquisition stating that it "was controversial to the Street last August" but was "[s]howing top & bottom-line benefits." The report went to add that, "NGG generated $75M of Brand Platform Gross Profit in its 1st 5 months & Off-White sales on the FTCH Marketplace increased 80% Y/Y. NGG is accretive to both FCF & profits, and FTCH has begun to remove Off-White merchandise from some other online retailers."

116.    That same day, Morningstar, Inc. issued an analyst report stating, in relevant part, "[w]e maintain our fair value estimate of $16.8 per share for no-moat Farfetch as the company reported full-year revenues ahead of our estimates with 69% growth (we anticipated 57%). While recent acquisitions contributed positively to growth, its digital platform, GMV, grew by about 40% for the year, which is almost double the growth of the online luxury market for the year."

117.    By the second quarter of 2020, Farfetch reported record-breaking Digital Platform GMV at an all-time high of $651 million and claimed to have attracted more than half a million new customers – its highest quarterly customer acquisition ever. Defendant Neves is quoted in the Company's August 13, 2020 press release announcing its financial results for the second quarter of 2020 ("Q2 2020 Earnings Release") stating, in relevant part, "I believe this ongoing acceleration behind our business results from a paradigm shift in luxury shopping, as the industry undergoes a major acceleration of the secular online adoption I envisioned in founding Farfetch. We at Farfetch remain dedicated towards helping the global fashion community navigate these unprecedented times, connecting luxury's curators, creators and consumers now, and in the years to come."

118.    On August 14, 2020, following the Company's Q2 2020 Earnings Release, UBS Investment Bank issued a press release entitled "Paradigm Shift No Longer Farfetch'd," focusing in on Farfetch's purported success in "driving growth in supply & demand while managing investments" stating, in relevant part:

> Against a backdrop of less global travel, an uncertain consumer backdrop & other industries demonstrating online secular shifts, FTCH's Q2'20 EPS report demonstrated hallmarks of LT industry shifts we have discussed in the last 2 yrs. Key themes incl. a broadening of supply as luxury partners were limited in ability to sell offline, strong new customer growth while spending less on demand gen mkting, & frwd themes (exposure to China, New Guards, & enterprise oppty) showing their ability to move the business ahead. While the current envir. may produce volatility as macro stabilizes & tougher comps are approached a year from now, we think investors should focus on the LT narrative (which like many eComm platforms is playing out in an accelerated manner) – the shift of global luxury online w/ above avg topline growth, a sustained path toward profitability, emerging options based on recent M&A & industry strategic relationships. We reiterate our Buy rating & raise our PT from $28 to $35 to reflect raised ests.

119.    This positive outlook regarding the Company's growth strategies and capitalization of pandemic market shifts was carried into the fourth quarter of 2020. For example, on December 8, 2020, J.P. Morgan issued an analyst report following a recent meeting with Farfetch management, noting that:

> We believe Farfetch is very well-positioned to both capitalize on and drive the shift of global luxury online that has been accelerated by several years over just the past several months. Farfetch is the only global luxury marketplace at scale, & we believe its platform continues to strengthen through: 1) its direct brand relationships, which now account for 50%+ of supply; 2) partnership w/Alibaba & Richemont, which will provide greater access to China luxury shoppers through the Tmall Luxury Pavilion; & 3) the addition of 900k new customers over the past 2 quarters, who thus far exhibit better LTV characteristics than older cohorts.

120.    The report went on to describe key takeaways from the analyst's meeting with Farfetch, providing in pertinent part that, "[t]he luxury industry has been slow to move online, w/online penetration increasing 1 to 2 % points every year, most recently to 12% in 2019.

However, Bain suggests luxury e-commerce penetration will reach 23% in 2020 & online is set to be the leading channel for luxury purchases by 2025, likely then above 30% penetration."

121.    On February 26, 2021, Morningstar, Inc. issued an analyst report entitled, "Farfetch Delivers Strong Fiscal 2020 Results Helped by Accelerated Shift to Online Luxury Buying," noting, in relevant part, "We expect to increase our fair value estimate for no-moat Farfetch by a high single to low double-digit percentage as the company reported better-than-expected fourth-quarter and full-year 2020 results, helped by COVID-19 pandemic induced acceleration in online buying and market share gains against other online luxury retailers (such as [YNAP])."

### E.    Farfetch Experiences a Slowdown and/or Complete Halt in Growth in its Largest Markets and from its Top Luxury Brand

122.    While Farfetch's value peaked at approximately $24 billion in 2021, the year would not end on the same high as it started. Towards the second half of 2021 and leading into 2022, Farfetch saw significant softening and/or a complete halt in sales growth in its three largest markets, the U.S., China, and Russia, and experienced a material decline in sales from one of its top luxury brands, negatively impacting all three of the Company's revenue streams.

123.    The U.S. had long served as the Company's largest market. By the end of 2020, the Americas represented one-third of Farfetch's overall sales, with the U.S. serving as the largest segment within the 1/3 that is North and South America.

124.    According to the Company, mainland China was expected to become the largest luxury market and represent more than $100 billion in annual luxury sales by 2025. Farfetch first began its pursuit to penetrate the luxury market in China in 2015, investing heavily in its China operations between 2017 and 2020 through its "strategic partnership" with JD.com, announced in June 2017; its acquisition of CuriosityChina, an integrated marketing and social commerce company, announced in 2018; its acquisition of Toplife in 2019 (*see supra*, Section V.B.); and its

"strategic partnership" with Alibaba and Richemont to launch Farfetch shopping channels on Alibaba's platforms, Tmall Luxury Pavilion ("TLP") and Luxury Soho, China's premier luxury marketplace, announced in November 2020.

125.    In 2019, China had become the Company's second largest market, and by the end of 2020, the Asia Pacific region represented one-third of Farfetch's overall demand, with China serving as the largest segment within that region.

126.    In 2020, while the market for online luxury shopping was at an all-time high, Farfetch introduced its full funnel brand marketing campaign in four of the Company's key luxury markets, including the U.S. and China. During an investor call hosted by Farfetch on May 13, 2021, Defendant Phair discussed the Company's marketing campaign process providing, in relevant part, that:

> In China, one of the key markets where we have been investing in upper funnel marketing, we have seen awareness increase year-on-year, and consideration in Q1 was higher than any other Western competitor in the market. As we look at Western markets, Google share of search, which measures our portion of organic searches among our peer set is a strong proxy for consideration. In Q1, we have seen our share of search in our largest market, the U.S., increase by 36% year-on-year, which in combination with our brand survey results, demonstrate that our brand strategy is working.

127.    By the second half of 2021, however, as many pandemic-related restrictions around the world were lessened or lifted, the significant shift to online shopping seen across the luxury market began to soften and/or recede back towards pre-pandemic growth rates, negatively impacting the Company's growth in its two largest markets, the U.S. and China.

128.    Moreover, in addition to a softening of revenue growth following the recoil of online sales as global pandemic-related shutdowns subsided, Farfetch's growth in the China market was also experiencing a slowdown because of fierce competition and strict government regulation in the region. According to FE3, Farfetch might have been the most competitive of

western companies entering the China market, but the enormity of competing against the established Chinese companies who benefited from protectionist laws—measures taken by the Chinese government to restrict or limit international trade, including *inter alia*, tariffs, quotas, and/or subsidies—made it hard for Farfetch to successfully penetrate the luxury market in China.

129.    According to FE1 these larger market trends going into 2022, were pushing sales down significantly. FE1 said it was clear to FE1 and the rest of the finance team at Stadium Goods that the sky-high sales numbers realized during the pandemic were a thing of the past. FE1 added that the forecasts prepared by Stadium Goods for Farfetch showed the platform would not see those numbers again in 2022.

130.    FE3 also described the negative impact the slowdown in growth towards the end of 2021 and beginning of 2022 was having on the Company's business in China, specifically. According to FE3, the Company had already begun cutting the budget for its business in China before FE3 left in May 2022 and its continued budget cuts to the marketing division in China following the implementation of zero-COVID restrictions in that area (discussed below), partly influenced FE3's decision not to return to that region.

131.    The Company's downward shift in growth in the China market was only magnified by the extreme reversed course seen in that region with the implementation of 0-tolerance restrictions or "zero-COVID" beginning in late March 2022 and continuing throughout the year.

132.    A zero-COVID strategy, utilized by multiple countries across the globe since the start of the pandemic, consisted of two phases: (1) an initial suppression phase in which the virus is eliminated locally using aggressive public health measures, and (2) a sustained containment phase, in which normal economic and social activities resume and public health measures are used to contain new outbreaks before they spread widely.

133.    Experts have differentiated between zero-COVID, considered to be an elimination strategy, and mitigation strategies, as utilized in the U.S., which attempted to lessen the effects of the virus on society, but which still tolerated some level of transmission within the community. In comparison with mitigation strategies, zero-COVID strategies required, among others, stricter border controls in order to prevent reintroduction of the virus.

134.    By late 2021, due to changes in the increased transmissibility, but lower fatality of the Delta and Omicron variants as compared to original strains, and the arrival of COVID-19 vaccines, many countries previously utilizing zero-COVID, including *inter alia* Australia, Canada, New Zealand, and Vietnam, had completely phased out these strict policies. In contrast, however, mainland China continued utilizing zero-COVID restrictions, with increased severity, for more than a year after the others.

135.    In 2022, China faced unprecedented waves of infections, with daily cases reaching record highs in the thousands—levels not seen at any prior point in the pandemic. In response, in late March 2022, mainland China began implementing some of its strictest zero-COVID policies to date, including wholesale lockdowns.

136.    China's strict zero-COVID policies had a near immediate impact on Farfetch's business in the region which primarily relied on cross-border businesses' product to be delivered to customers in China. The zero-COVID strategy implemented in China, at that time, required a quarantine process and procedure for all parcels crossing the border into mainland China and in certain gateways, in addition to disinfection procedures for parcels, which led to longer lead times, stifling growth, and higher shipping costs for the Company.

137.    While Farfetch attempted to mitigate the fallout from zero-COVID, impacting sales growth and costs in its second largest market, with reassurances of recovering following eased

restrictions, the undisclosed slowdown seen in this market at the end of 2021 and early 2022, did not support these unrealistic expectations.

138.    For example, on May 26, 2022, during the Company's call with investors to discuss its financial results for the quarter ended March 31, 2022 ("Q1 2022 Earnings Call"), Defendant Neves addressed the near term impact China's zero-COVID policies were having on Farfetch's growth trajectory while also reassuring investors that "[o]ver the medium term, when COVID restrictions are eased, we also see an opportunity for Farfetch to capture pent-up demand, which we expect will shift more towards online channels, as customers will be more likely to avoid crowded stores, shopping malls and flights to other shopping destinations."

139.    As discussed above, however, the Company was already experiencing a slowdown in growth in China prior to the introduction of zero-COVID restrictions, therefore, then-existing information did not support a shift towards online channels but rather indicated a greater shift away from such channels once restrictions were lifted. This is exactly what happened.

140.    Despite the end of China's zero-COVID policies in early December 2022, Farfetch's business in the region did not recover nor did it grow. Indeed, in May 2023, the Company reported negative year-over-year growth for the first quarter of 2023 (as compared to the first quarter of 2022 which was already impacted by zero-COVID restrictions) and by August 2023 Farfetch was guiding mid-single-digit decline in the U.S. and China for the rest of 2023.

141.    Similarly, by the end of 2021, Russia had grown to become Farfetch's third largest market, representing 6 percent of total GMV and an even higher share of the Marketplace, where it posted more than 70 percent year-on-year growth. This growth came to an immediate halt when in February 2022, Russia invaded Ukraine, resulting in the termination of Farfetch's Russian operations, including deliveries to Russian customers and the closure of its Russian offices.

142.    FE1 identified the loss of business in Russia as a huge blow to Farfetch because, according to FE1, at the time of the shutdown, sales in Russia represented roughly 20 percent of the total sales on Farfetch Marketplace. At all relevant times, the Company's operations in Russia remained closed.

143.    Another major blow to the Company's sales came after the untimely death of Off-White founder and creative director, Virgil Abloh, in November 2021. When Farfetch acquired NGG, Off-White was already one of the Group's top luxury brands. Abhol was a singular fashion superstar, one of the first Black designers to break into luxury fashion, and who created strong worldwide demand for his products.

144.    According to FE3, roughly 75 to 80 percent of NGG total sales came from Off-White [Abloh's label], despite hosting a total of 10 luxury brands on its platform. Then, in November 2021, Abloh unexpectedly died at the age of 41 after quietly battling cancer. Due to the association that many buyers made between Off-White designs and Abloh, the brand lost significant appeal in the wake of his death, FE3 said.

145.    According to FE3, the Off-White business was tanking in the six to 12 months after Abloh's death. FE3 explained that everyone knew that after the designer died there was not as much interest in the brand from a wholesale perspective. But because NGG had been primarily dependent on the Off-White business, the other brands were unable to offset this loss, FE3 said. FE3 added, it would take years to develop NGG's other brands if they were to actually be successful. Unfortunately for investors, as later seen, Farfetch did not have years to develop these brands to successfully mitigate the loss of sales from the Off-White brand.

146.    Accordingly, as of the start of the Class Period (February 24, 2022), the writing on the wall was clear – the pandemic boom remained no more, the Company was already experiencing

slowed growth in its two largest markets, the U.S. and China, the war in Ukraine wiped out all prospects for growth in its third largest market, Russia, sales for the Company's top luxury brand, Off-White, were already experiencing a downward shift, and then by the end of March 2022, zero-COVID restrictions in China signaled further depletion of its market capture in that region.

147.    Going into 2022 and throughout much of that year, FE1 and Stadium Goods' financial team prepared monthly sales forecasts for Farfetch that consistently showed the platform would not meet the sales and financial goals set by Farfetch. FE1 said the forecasts were given to the CFO/COO and CEO of Stadium Goods, which were then reported to Defendant Jordan. Nevertheless, FE1 said Farfetch executives consistently responded with goals that remained unrealistic. FE1 described a back-and-forth between the executives at Stadium Goods and Farfetch in which each month Farfetch executives would respond to prepared forecasts by setting sales goals that Stadium Goods executives would contest saying the company could not meet those numbers and providing numbers they could meet which were significantly lower. FE1 said this monthly back and forth exchange of realistic versus unrealistic sales goals was ongoing at the time of their departure in September 2022.

148.    FE1 explained that one of the unrealistic goals that Farfetch set for Stadium Goods was its GMV goal. To meet GMV goals set by Farfetch, FE1 said Stadium Goods often had to offer discounts on the platform to drive sales to even come close to the GMV goals. FE1 said this was the same tactic frequently used on the Farfetch platform to meet its GMV goals. The discounts, however, often cut into the commission fees Farfetch collected. FE1 provided the following example: say there is a pair of sneakers on the platform selling for $1,000, and the seller is paying a 20 percent commission to Farfetch on sales. When that item sells, Farfetch collects a $200 commission fee. If Stadium Goods or Farfetch decided to discount the item by 20 percent, the

customer's $200 in savings in turn erases Farfetch's entire 20 percent commission. FE1 said in some cases when items were not selling, Farfetch approached the seller to discuss discounting the item on the seller's end, but if the seller was not interested in discounting the item at their own loss, or sharing the loss with the Company, Farfetch would cover the entire discount itself via lost commission in an attempt to hit GMV goals.

F.    **Farfetch Refused to Address High Costs Associated with Direct Brand Partnerships in the Face of Rising Direct-to-Consumer Competition**

149.    The unprecedented shift to online shopping seen during the pandemic boom was not all good news for the Company as the pandemic-related shutdowns also forced luxury brands, not previously occupying the online marketspace, to make the transition from offline to online themselves. Indeed, in response to the pandemic shutdowns, many luxury brands established their own e-commerce platforms or websites to sell their products directly to consumers. This direct-to-consumer approach posed a significant challenge for third-party e-retailers like Farfetch and threatened the Company's growing dependance on direct brand partnerships, as they were now faced the challenge of first competing with the brand's official channels on top of offering added value to justify their presence on the market.

150.    In addition, luxury brands routinely spend millions in marketing and visual merchandising to curate a one-of-a-kind shop floor experience prioritizing craftsmanship and exclusivity, which can be challenging to convey through an online platform. Online marketplaces, such as Farfetch, then faced the issue of balancing the brand's image of luxury and prestige in a digital environment while ensuring a seamless customer experience. As such, this direct-to-consumer competition further impacted the Company's costs as it required Farfetch to spend more on marketing and enhancing the customer experience. According to FE1, overall, with or without

the application of discounts discussed above, the profit margins on sales at Stadium Goods were left "super, super thin," if not non-existent, after marketing and other costs were added in.

151.    Historically, Farfetch relied on multi-brand boutiques to list luxury products on its marketplace. After going public in 2018, the Company prioritized direct brand e-concessions to secure supply for the Farfetch Marketplace. Through these direct brand partnerships, luxury brands would contract with Farfetch to list an agreed upon amount of inventory on the Farfetch Marketplace. The direct brand partners would continue to own their product until an offer to buy was received and were offered the right to control how the product was presented to customers on the Marketplace, including price and discount cadence. During the third quarter of 2019, Farfetch announced that its total direct brand e-concessions count was just under 500. As of August 2022, the Company had over 600 direct brand e-concessions on the Farfetch Marketplace.

152.    While these brand partnerships helped secure supply for the Farfetch Marketplace, accounting for approximately $4.4 billion in stock value available on Farfetch Marketplace going into the fourth quarter of 2021, but they also added to the Company's growing cash demand and with the rise of direct-to-consumer competition, put Farfetch in a precarious bargaining position.

153.    FE2 explained how the increase in stock from direct brand e-concessions versus multi-brand boutique sales had vastly different implications for the Company's Value Added Taxes ("VAT") payments and credits. Under the multi-brand boutique model where customers bought directly from sellers, with Farfetch acting as merely the platform that connects the buyer and seller, Farfetch was not otherwise involved in the purchase of the item from the seller and therefore did not have to pay the VAT when the product was sold in Europe. According to FE2, during their tenure with the Company (May 2021 to October 2023), roughly 20 to 30 percent of

the third-party sales on the Farfetch Marketplace came from stock offered and sold by multi-brand boutiques.

154.    The other, more predominant source of third-party sales on the Farfetch platform, came from stock offered and sold by direct brand e-concessions, based on long-standing contracts with numerous luxury brands located in Europe. Under this model, Farfetch would buy the product from the luxury brand that was ultimately being sold to the customer on Farfetch's platform. As a result, regardless of where the final buyer was located, Farfetch had to pay the VAT on the product because Farfetch is located in Europe and technically, at that point, the buyer. If the final buyer were outside of Europe, there would be no VAT due, meaning, the VAT paid by Farfetch would become refundable, or otherwise referred to as a tax credit. These types of transactions required Farfetch to request a refund for the VAT already paid, which according to FE2, could take anywhere from six months to a year to receive.

155.    FE2 described the Company's reliance on direct brand e-concessions for Marketplace supply as not sustainable from a cash flow point of view. FE2 gave the following example to illustrate: if Farfetch is charging a 30 percent commission on the sale of a product, but the VAT is 23 percent – as it is in Italy – then the VAT payment reduces the Company's commission to 7 percent right away. In a transaction when the commission rate is much lower, such as 8 percent – as FE2 saw on certain contracts with luxury brands – then at the point-of-sale when Farfetch is paying a 23 percent VAT, the Company is then at minus 15 percent – meaning the Company's cost to facilitate the sale is now higher than its take rate. While in some instances the Company may be able to recoup those costs via tax refunds, that process, again, could take six to 12 months. In the meantime, the Company's cash flow is without that money. FE2 pointed out that while many of the purchases on Farfetch's platform were from buyers outside of Europe, most

of the sellers were in Europe, especially France and Italy where the top luxury design houses are located, resulting in significantly high VAT costs for the Company. Worse yet, if the final buyer was in Europe, then the VAT paid by Farfetch was a sunken cost.

156.    To make matters worse, FE1 noted that not all sellers on Stadium Goods or Farfetch platforms paid the same commission rates. FE1 explained high-end luxury brands often negotiated for a lower rate than those offered to a boutique luxury goods store because of the exposure that the luxury brand offered Farfetch by being on its platform. FE1 said that during their tenure with the Company (May 2021 – September 2022), the lowest commission rates that FE1 saw at Farfetch were about 8 to 10 percent with the highest commissions rates being about 20 percent.

157.    During FE2's tenure at Farfetch, FE2 and their team suggested to Farfetch leadership that the Company change its business model relating to direct brand e-concessions so that Farfetch was not paying so much out in VATs, which in many instances it ultimately did not owe, but had to wait six months to a year to recoup. Specifically, in 2022, FE2's team prepared a paper on all the tax risks posed by Farfetch's business model, which outlined all the VAT risks. FE2 said the paper was given to the Company's finance leadership and Defendant Jordan. FE2 said that when FE2 and their team brought up the idea of changing the unsustainable direct brand e-concession model, they pointed to this report on numerous occasions. Despite this recommendation, FE2 said Farfetch leadership did not want to change the model because it would have required them to renegotiate long-standing contracts with the luxury brands.

158.    FE2 also noted that the Company's treasury leadership and working capital group met regularly with Defendant Jordan to discuss Farfetch's cash flow and working capital. While FE2 was not personally in attendance for these meetings, the group would occasionally ask FE2 for the status of Farfetch's VATs paid, tax credits received, and refunds owed prior to these

44

meetings, which indicated to FE2 that the group was discussing the impact of the Company's VAT situation on its cash flow. FE2 stated, the Company's unsustainable business model, demanding a significant amount of working capital to cover VAT costs, could have played a role in Farfetch's liquidity crisis and ultimate insolvency.

      **G.**    **Farfetch Repeats Its Acquisition Pattern in an Attempt to Stimulate Growth, Boost Sales, and Reinforce Investor Confidence**

159.    Despite these known market trends and unfavorable contract terms negatively impacting sales, operating expenses, and profit margins, Defendants recklessly disregarded contrary internal guidance and forecasts to set unrealistic public expectations of continued growth, reassured investors of the Company's liquidity strength, operating leverage, and maintained near-term fiscal targets of profitability.

160.    For example, on the first day of the Class Period (February 24, 2022), Farfetch issued its financial results for the fourth quarter of 2021, in which Defendant Jordan is quoted as saying, "Our investments continue to deliver significant operating cost leverage and we are well positioned for further market share capture and profitability gains in the year ahead."

161.    In addition, instead of paring back operations to account for slowing revenue growth, already high operating expenses, and shrinking margins, Farfetch took a play right out of the old handbook, doubling down on costly first-party acquisitions, in an attempt to stimulate growth, boost in sales, and generate investor interest and confidence. Like the Company's costly first-party acquisitions before them, these acquisitions were incapable of producing at the unrealistic targets set from the start, further impacting Farfetch's growth, expenses, and margins.

162.    First, on January 28, 2022, Farfetch announced that it would be acquiring the luxury beauty retailer, Violet Grey, ahead of the launch of NGG Beauty, which was scheduled for later in the year. According to the Company, the Violet Grey acquisition was to bring industry expertise

as well as a curated selection of products to be offered on the Farfetch Marketplace and would expand the beauty curator's reach to extend to the Company's global customer base. Farfetch described Violet Grey as "a renowned beauty destination and elevated content channel" that "has built a devoted community who love the brand for its expertise and the trust they've built amongst customers." The Company went on to add that for brand partners, Farfetch's expansion into Beauty would provide an opportunity to reach the Company's millions of engaged luxury customers through co-branding and marketing opportunities to target the global Luxury Beauty market, estimated to be almost $69 billion USD and the second largest category within the global Personal Luxury market, after Leather Goods, and ahead of Apparel.

163.    Defendant Phair is quoted in the Company's acquisition announcement as saying:

The acquisition of Violet Grey is an important step ahead of the launch of Beauty on FARFETCH later this year and will form part of our overall beauty strategy 'palette'. It will enable us to offer our informed and engaged customers a curated selection of the industry's most sought-after products on the FARFETCH Marketplace, joining a world of beauty brands, from the iconic leading global brands, to smaller brands with a cult following.

Our aim for Beauty on FARFETCH is to provide the world's most expansive, curated edit of the best products to serve customers across ages, races, cultures and genders in an 'Only on FARFETCH' way. We'll be able to show our customers an immersive crossover between fashion and beauty, leveraging our innovation capabilities to offer exciting features for our customers. FARFETCH will bring together niche and global brands to transform the beauty retail experience, creating an environment that offers beauty without boundaries.

As a Marketplace, we are uniquely positioned to be able to offer multiple points of view and voices in this important category, so customers can find the products and expertise that speak to them. The addition of Violet Grey and Cassandra Grey joining the team will form an important element of this overall strategy. Cassandra has built true authority in the beauty industry and has an incredible, intuitive understanding of where beauty is going and what customers want.

164.    On February 1, 2022, Farfetch completed the acquisition of Violet Grey for $49.4 million in cash, $1.3 million of reverse vesting shares, and $5 million of Farfetch RSUs based on Farfetch share price as at the acquisition date. Upon completion, Violet Grey founder, Cassandra

Grey, became a global advisor for Beauty on the Farfetch platform and Co-founder of NGG Beauty which launched in April 2022.

165.    According to FE4, however, even before the Violet Grey acquisition was complete, it was known that the company was struggling financially and needed funding to continue. Indeed, FE4 described Violet Grey's business by saying they were floundering.

166.    Shortly after the acquisition was complete, Farfetch's Vice President of Operations for North America and Managing Director for Violet Grey, Niten Kapadia, met with FE4 and expressed to FE4 that the Violet Grey acquisition "was even messier than he thought" it would be. During this meeting, Mr. Kapadia acknowledged noticing that FE4 was connected on LinkedIn with the former CFO of Violet Grey, Neil Kee. Mr. Kapadia proceeded to ask FE4 if they could provide Mr. Kee's contact information to him, indicating to FE4 that he wanted to speak with Kee to "pick his brain" about Violet Grey. According to FE4, their takeaway from this interaction with Mr. Kapadia was that he was asking FE4 for Kee's contact information to discuss the financial problems Violet Grey was having before the acquisition by Farfetch.

167.    FE4 went on to explain that, from the beginning, the acquisition of Violet Grey was part of Farfetch's strategy to expand into beauty products. According to FE4, Farfetch thought the acquisition could be beneficial to both Farfetch and Violet Grey, by providing beauty products on Farfetch's website and, in turn, by providing support to improve the failing Violet Grey's situation. But what happened was the opposite.

168.    In other words, Farfetch disregarded known risks associated with the Violet Grey business to pursue its venture into yet another area of first-party sales that the Company had no prior experience in. And based on the state of Violet Grey at the time of the acquisition, Farfetch

knew this area of the luxury market was experiencing a slowdown in demand and would be yet another drain on the Company's liquidity.

169.    In the end, Farfetch's expansion into the beauty realm was short-lived. In August 2023, less than a year and a half after its launch, Farfetch announced its decision to discontinue NGG Beauty and said it was "exploring strategic options for Violet Grey." By October 2023, reports confirmed that Farfetch had placed the beauty brand up for sale.

170.    Next, on February 22, 2022, Farfetch announced that NGG had entered into a commercial agreement with Authentic Brands Group LLC (*i.e.*, Adidas) to become the exclusive partner to curate, create and bring to market Reebok's luxury collaborations, as well as a core operating partner for the brand across Europe, and distributor of premium Reebok products in the United States, Canada, Europe and certain other key markets.

171.    Pursuant to the agreement, NGG would not have control of the supply chain lifecycle of the products it distributes as Reebok's core operating partner in Europe. Further, as part of the arrangement, NGG committed to minimum royalty payments of approximately $374 million (€329.9 million) over the 11-year life of the agreement.

172.    FE3 worked at Farfetch for more than five-and-a-half years—from March 2018 to May 2022 and from February 2023 to July 2023. During that time, the Company made several high-cost acquisitions and investments that, according to FE3, appeared ill-advised and overvalued and in some cases unnecessary. Notably, FE3 said that from the beginning, NGG was the most disorganized company they had ever seen, and the Reebok acquisition was no different.

173.    According to FE3, Farfetch failed to obtain detailed financial data from Adidas during the due diligence for the Reebok acquisition that would have revealed a far less rosy picture of its prospects. FE3 explained that prior to the Reebok acquisition, Adidas had provided sales

48

data to Farfetch. The financial data provided, however, was only topline data. It did not include details on key metrics such as discounts and logistics costs, FE3 said. Farfetch then provided this topline data to an independent consulting firm to assist with the due diligence and acquisition.

174.    In this process, the independent consulting firm prepared a historical P&L analysis and forecasts for Reebok sales, which showed significant growth and hundreds of millions in sales over the next few years. The data they relied on, however, did not include details that would have dramatically lowered the forecasts, FE3 said.

175.    FE3 learned what was provided by Adidas from two of the employees of the independent firm who worked on the acquisition and were subsequently hired by NGG to remain on the Reebok acquisition.

176.    FE3 explained how they later confirmed these problems through the completed integration of the Reebok e-commerce platform with the Farfetch platform on April 30, 2023. According to FE3, at that point, FE3 had full access to the platform and was able to see additional sales and cost data, which had not previously been available to FE3 as they were not on the finance team. FE3 was able to see that Adidas had been heavily discounting its Reebok products in 2022, which in turn, had boosted Farfetch's sales, sales growth, and revenue throughout the greater part of that year based on its partnership with Adidas, which commenced in March 2022. According to FE3, the information about the steep discounts (up to 70 percent) also revealed Farfetch had little to no room for profit margins at the discounted prices.

177.    FE3 also learned by the end of the second quarter of 2023 that the Company's marketing costs associated with the Reebok business was far higher than expected and cut so deeply into the margins that regardless of the price, discounted or not, the Reebok business would be operating in the negative.

178.     As a result, while the Reebok acquisition appeared beneficial for the Company at the onset, these gains were merely temporary and could not be repeated in 2023, following the completed integration of the Reebok platform. Furthermore, because of the steep discounts offered, Farfetch was not actually turning a profit on these purported gains. FE3 acknowledged that they were in marketing, yet they were able to clearly see this in the sales and costs data from that time and added that anyone in finance or with experience in forecasting should have been able to tell.

179.     In addition, Defendants' reckless disregard of pertinent information prior to the Reebok acquisition, resulted in Farfetch also being surprised by the amount inventory it received from Adidas, FE3 said. FE3 explained that the space the Reebok inventory took was much larger than Farfetch expected. While FE3 was not involved in inventory management, FE3 learned of the inventory problems during meetings attended by other management on the NGG team overseeing the Reebok acquisition.

180.     FE3 also noted that having too much old inventory was problematic for the Company. According to FE3, old inventory was difficult to move because buyers wanted new designs, not last year's products. Consequently, the accumulation of unsellable inventory negatively impacted Farfetch's operating costs. This problem only became more cumbersome over time.

181.     In addition, because the Company had so much old inventory occupying significant amounts of space in its warehouses, there was not enough room for new products, FE3 said. Due to the lack of space to store new products, Farfetch was consequently unable to launch new Reebok products on its platform, which limited its sales even further, FE3 said. According to FE3, the Company's inability to sell new Reebok products also prevented Farfetch from selling items at full price, which would have helped improve its profit margins.

182.    Indeed, when the Company announced the Reebok acquisition in February 2022, Farfetch touted the benefits of the deal, namely the profitability of bringing Adidas into the luxury space with the development of a premium line. Despite announcing that the development of a Reebok premium line had already begun as of December 1, 2022, it took until July 2023 for the Company to launch its first iteration of the premium line with the full launch of products and collaborations not expected until 2024.

183.    This unsustainable growth, outmatched by high operating costs, became evident following the Company's launch of the Reebok brand across Farfetch's direct-to-consumer and wholesale channels in May 2023. When selling Reebok products at full price, Farfetch was unable to reach the sales and growth numbers achieved through the steep discounts offered by Adidas in 2022. At full price, Farfetch was not able to move as many units as Adidas had been moving, nor could it obtain the revenue Adidas had been collecting.

184.    According to FE3, by the end of June 2023, FE3 could see financial data that already showed that the Reebok brand was not doing as well as it should be, and by the end of the second quarter of 2023, it was obvious to FE3 and others within the Company that the Reebok brand was not going to reach the sales, growth, and revenue as expected when acquired. FE3 reported their concerns about what FE3 was seeing in the financial data for Reebok to the Senior Vice President of NGG, Vladimir Stankovic.

185.    Third, in May 2022, Farfetch committed a $200 million equity investment in Neiman Marcus Group ("NMG"). Pursuant to the Company's new partnership with NMG, the plan was for NMG to integrate Farfetch's e-commerce technology, FPS, into the online experience of the NMG's owned department store, Bergdorf Goodman. The expectation set by the Company, throughout 2022, was that the NMG partnership would be a significant revenue and growth

generator for Farfetch upon its completed integration in 2023—without a definitive date of completion provided.

186.    During an investor call hosted by Farfetch on May 18, 2023, Defendant Neves discussed the much-anticipated launch with NMG, claiming the Company was "on track" and "on schedule" for the second half of 2023. During this same call, Defendant Jordan also discussed the Company's partnership with NMG, putting the expected launch "during the second half of the year, with most of the incremental impact expected in Q4."

187.    Then, during an investor call hosted by Farfetch on August 17, 2023, Defendant Neves claimed the NMG launch was "on track…for Q4" while boasting about the Company's ability to deliver against the "strategic initiatives" designed to lower operating costs (discussed below). In particular, Neves stated that it "is very pleasing to see is that we are absolutely delivering these new launches and on track whilst being able to actually reduce the planned SG&A to $800 million this year, which is $50 million less than last year."

188.    Unfortunately for investors, the purported benefits of this partnership would not come to fruition before the Company's full demise in the fourth quarter of 2023, with announcement of the transfer of all business and assets of Farfetch (discussed in detail below).

189.    Moreover, roughly two weeks after the Company was gutted of the Farfetch Business, on February 7, 2024, NMG announced that it was ending its commercial partnership with the Farfetch Group. Notably, the announcement indicated that the Company was, in fact, not "on track" or "on schedule" to launch this partnership in Q4, with a NMG representative telling *Women's Wear Daily* that, "the Bergdorf Goodman website and app will no longer be re-platforming onto Farfetch Platform Solutions" suggesting that, at the time of the announcement the integration of Farfetch's e-commerce technology had not yet been completed.

190.    Lastly, in August 2022, Farfetch announced its plans to acquire a 47.5% stake in YNAP from Farfetch backer and strategic partner, Richemont. In exchange, Richemont was to receive an 11% stake in Farfetch (via stock). Richemont would also receive another $250 million in stock on the fifth anniversary of the sign-off of the deal.

191.    Farfetch first confirmed discussions with Richemont, on November 12, 2021, providing insight into a potential expansion of their existing Luxury New Retail strategic partnership (established in November 2020 when Alibaba and Richemont agreed to invest $500 million in Farfetch China). Farfetch's November 2021 announcement explained that the parties were discussing a number of possible options, including the leveraging of FPS to power Richemont's Maisons and YNAP, the participation of Richemont's Maisons on Farfetch's marketplace, and a minority investment in YNAP by Farfetch.

192.    Farfetch had long been compared to YNAP, and prior to the Company's post-IPO acquisitions, was seen as the less risky, likely more profitable version of YNAP when comparing the Company's foundational inventory-light, third-party marketplace platform model. By the time the YNAP acquisition was announced, however, long were the days when Farfetch presented itself as a technology company operating in a different playing field than YNAP.

193.    When announcing the advancement of this strategic partnership, including Farfetch's acquisition of YNAP, on August 24, 2022, the companies joint press release provided that "[t]his represents a significant step in achieving Richemont's vision of making YNAP a neutral industry-wide platform, and…lays a path towards FARFETCH potentially acquiring the remaining shares in YNAP, bringing together these highly complementary businesses."

194.    Through this partnership, Richemont and YNAP were to leverage Farfetch's technology platform to advance their Luxury New Retail programme; YNAP would adopt FPS to

facilitate its shift towards a hybrid retail-marketplace model; Richemont would adopt FPS to

advance the delivery of the omnichannel strategy of its Maisons, Richemont's brand portfolio; and

Richemont Maisons would join the Farfetch Marketplace.

195.    The August 24, 2022 press release went on to add:

> YNAP operations will leverage FARFETCH's sophisticated technology. This
> technology will significantly advance the roll-out of YNAP's marketplace offering,
> as FARFETCH's platform is already connected with the inventory of many of
> YNAP's luxury brand partners. It will also enable YNAP's shift towards a hybrid
> business model which will be more asset-light, complementing YNAP's first-party
> curated inventory ownership with a third-party e-concession/marketplace offer.
> This shift is expected to improve YNAP's financial performance while customers,
> in turn, will enjoy an enriched shopping experience.

196.    On August 24, 2022, Richemont and Farfetch hosted an M&A call to discuss the

companies' recent announcement of the YNAP acquisition by Farfetch, during which Defendant

Neves stated, in relevant part:

> As a pioneer retailer, YNAP has been able to build great luxury and fashion
> businesses with over 4 million active consumers, delivering $2.6 billion in GMV,
> this is in dollars, in their most recent fiscal year. Its luxury business, which is
> comprised of Net-a-Porter and Mr. Porter, and represents 52% of its sales has
> developed very strong duration and brand recognition over the years with a strong
> focus on high net worth individuals.
>
> On the other side, the fashion business, which is comprised of the Outnet and Yoox
> and represents 48% of its sales, provides a great destination for our consumers
> looking for end of cycle and circular fashion. We also view these brands as
> complementary to our business model and believe there is opportunity to further
> develop and grow YNAP's businesses by leveraging our technology capabilities.
>
> The potential addition of YNAP's brands is highly complementary to our
> marketplace business. Fashion is all about individuality and this is the reason why
> the industry has a long tale of brands. Whereas we see the Farfetch brand as being
> in its infancy and with incredible growth potential as online luxury penetration
> increases, we also recognize that this is an industry where there will be different
> destinations, catering to different roles of shopping and customer profiles.
>
> Crucially, however, we believe the winners will not ultimately be wholesale-
> oriented businesses, but rather direct-to-consumer marketplace destinations. And
> herein lies the benefit of our strength as a sophisticated provider of direct-to-
> consumer e-concessions in the luxury space. After the closing of the initial stage of

this transaction and once the replatforming of YNAP into a portfolio of hybrid marketplace businesses, creates a fast-growing, cash efficient and profitable business. We intend to purchase the remaining shares in YNAP that Farfetch does not already own. We expect this to be circa 4 to 5 years from now, including the time needed for any relevant regulatory approvals.

***

In summary, this deal is a landmark partnership which advances our Luxury New Retail vision. It strengthens our relationship with a key luxury group, potentially unlocking high luxury for Farfetch. It adds significant scale to the Farfetch Platform, almost doubling our digital platform GMV. On boards Richemont Maisons on the Farfetch Marketplace, elevating and differentiating our luxury selection for consumers. Drives strong GMV and revenue impact expected from 2024 onwards. And open Cedar for participation in the upside potential of YNAP's transformation.

197.    This seemingly monumental milestone, while delayed by regulatory approval, would not come to fruition before the Company collapsed under the weight of its slowed and/or stalled revenue growth, unsustainable operating costs, and low to negative profit margins. Furthermore, as discussed below, the purported added benefit of the YNAP acquisition was significantly overplayed by Defendants.

### H.    Farfetch's Ineffective Internal Controls Over Financial Reporting Went Unremediated for Years

198.    Defendants' failure to properly integrate the Company's costly acquisitions that substantially deviated from its foundational third-party platform model, their reckless disregard of pertinent and/or adverse information at the time of these acquisitions contradicting the company's value and future prospects, their refusal to remedy unfavorable contract terms with direct brand partnerships, and their utter disregard for internal forecast and guidance and other non-public information demonstrating a decline in growth in the Company's largest markets and top luxury brand, all exposing Farfetch to heightened risks, mounting expenses, heavy debt, and growing losses, was all bad enough; but then on top of that, Defendants' years long failure to remediate

55

known material weaknesses within the Company's internal controls over financial reporting was the fatal blow.

199.    As a publicly traded company, Farfetch management, including the Individual Defendants, was responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act. Prior to the issuance of the Company's financial results, Farfetch management, including the Individual Defendants, was responsible for conducting an assessment of the effectiveness of Farfetch's internal control over financial reporting based on the criteria set forth in "Internal Control - Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission.

200.    A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim consolidated financial statements may not be prevented or detected on a timely basis.

201.    Farfetch historically lacked effective internal controls over financial reporting. Most notably, following the Company's August 2019 acquisition of NGG, and after purportedly establishing an internal control environment for the NGG business in 2020, Farfetch consistently reported material weaknesses in the operational and information technology control elements of NGG's internal controls over financial reporting.

202.    Farfetch first reported the material weaknesses within NGG in the Management's Report on Internal Controls over Financial Reporting of the Company's annual report for the year-ended December 31, 2020, filed on Form 20-F with the SEC on March 4, 2021 ("FY 2020 20-F"), stating, in relevant part:

> [A]s of December 31, 2020, *a material weakness existed in internal control over financial reporting related to the effective implementation of processes and review procedures and the formal documentation of the execution of key controls. Specific deficiencies were identified, regarding information technology controls, in particular deficiencies related to user access, change-management and information technology dependencies such as system-generated reports, inconsistent application of operational controls, segregation of duties and design gaps in the revenue process. …*

(emphasis added)

203.    As seen in the Company's later financial results, and through the reorganization of Farfetch's revenue streams following the NGG acquisition, the NGG business was a key component of the Company's financials. Indeed, within one year of its acquisition, the NGG business represented approximately 29% of the Company's consolidated revenue in 2020. Moreover, the Company's acquisitions of Violet Grey and Reebok were included within NGG. Nevertheless, from its first reporting of material weaknesses within NGG, Farfetch downplayed their significance making a point to state that "*these deficiencies were specific to the internal control over financial reporting of the New Guards business and, although they do not aggregate with our other business operations, constitute a material weakness for the New Guards business*" (emphasis added).

204.    The following year, Farfetch issued its annual report for the fiscal year ended December 31, 2021, filed on Form 20-F with the SEC on March 4, 2022 ("FY 2021 20-F"), which, in relevant part, addressed the two material weaknesses identified in the FY 2020 20-F and described the purported efforts taken to remediate these material weaknesses.

205.    When discussing the first identified material weakness, defined in the FY 2020 20-F as "the operation of effective controls over information technology systems, including access over those systems, managing system changes, and testing of system generated reports used in the execution of manual controls," the FY 2021 20-F claimed Farfetch management "made significant effort to implement effective controls over information technology systems" including "enhanced privileged user activity monitoring, user recertification supported by reliable and complete data sources, as well as stricter segregation of duties and monitoring around the change management of our core platform and corporate infrastructure." Notably, the FY 2020 20-F declared that based on these purported changes and updates:

> Management considers that an appropriate and robust framework of controls…has now been designed and implemented, and as a result of these actions, has concluded that all elements of (1) relating to *the design and operation of effective controls over information technology systems have been remediated* as of December 31, 2021, to the extent that they are no longer considered a material weakness.

(emphasis added)

206.    When discussing the second identified material weakness, defined in the FY 2020 20-F as "the implementation and documentation of internal control over financial reporting at the New Guards business," the FY 2021 20-F claimed that this "component material weakness…*covered both operational and IT general controls*" (emphasis added). As seen with the first material weakness, the FY 2021 20-F detailed "significant steps" taken by Farfetch management "to improve the control environment within the New Guards business" stating, in relevant part:

> For the operational control elements there has been a significant increase in awareness and implementation within the New Guards business regarding the standards required for effective internal control over financial reporting. New roles, responsibilities and compensating controls have been implemented to reduce the risk created by limited segregation of duties in some areas. Additionally, the quality of management review controls has been strengthened and the standard and availability of supporting documentary evidence has been improved. Regarding

information technology at the New Guards business, we made significant progress during 2021 to implement a robust control environment. This has meant extensive work to reconfigure systems, introduce detailed user profiling, vendor access restrictions, adequate user access segregation and monitoring as well as incident and change management workflows.

207.    Notably, the FY 2021 20-F declared that based on these changes and updates made to address the component material weakness, "***both operational and information technology controls are now considered to have been designed appropriately***, but there remains a need for these controls to be operating effectively for a period of time for the material weakness to be remediated. … Our expectation is that all controls will successfully test as effective in 2022" (emphasis added).

208.    Then, on March 8, 2023, Farfetch issued an annual report for its fiscal year ended December 31, 2022, on Form 20-F filed with SEC ("FY 2022 20-F"). As seen in the years prior, the FY 2022 20-F addressed the previously identified material weakness at NGG. Notably different, however, was the shift in tone regarding the severity of these deficiencies, stating, in relevant part that:

> The component material weakness relating to the New Guards business covered both operational and information technology controls. This material weakness could result in a misstatement of account balances and disclosures that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected.

209.    In addition, FY 2022 20-F went on to describe additional efforts made in 2022 to improve both operational and information technology controls despite previously considering such controls as "designed appropriately" stating, in relevant part:

> During 2022, we believe we made significant progress towards the remediation of the material weakness. Specifically, we designed and implemented a framework of information technology controls at the New Guards business. These changes and updates to our controls included privileged user access restrictions, a methodology to validate changes across the in-scope systems and back-end infrastructure, as well as user recertification supported by verified data sources and a stricter segregation

59

and allocation of duties. ***Our management has concluded that controls relating to information technology have been designed and are operating effectively***.

During 2022, we also designed and made significant progress towards implementing several additional operational controls at the New Guards business. These additional controls included reviewing and verifying information related to revenue to receivables, inventory, and procure to pay processes. ***As a result of improvements within our systems and processes we were able to identify and confirm key reports used in the operation of key controls.*** However, the complex nature of the design and implementation of these additional controls resulted in insufficient time to fully embed them within all applicable aspects of our business processes as of December 31, 2022.

(emphasis added)

210.    Moreover, the FY 2022 20-F also stated that, "***Notwithstanding the identified material weakness, management believes that the Consolidated financial statements included in this Annual Report on Form 20-F present fairly, in all material respects, our financial position, results of operations, and cash flows as of and for the periods presented in accordance with IFRS***."

211.    Notwithstanding the Company's years of purported efforts to remediate identified material weaknesses within NGG and multiple claims that controls relating to the business's information technology and operations were appropriately designed and/or operating effectively, at all relevant times, Farfetch's auditor, PricewaterhouseCoopers LLP ("PwC"), considered the Italian software system, known as Apache, used by NGG to process costs of goods, sales, purchases, taxes, and shipping—essentially everything, all the pertinent numbers used to prepare the company's financial reports—unreliable. According to FE5, the Apache system had not been certified and had presented a material weakness in internal control over financial reporting since even before Farfetch's acquisition of NGG was completed in 2019. Notably, because PwC had determined the numbers from NGG's Apache system lacked sufficient evidence of reliability,

which meant Farfetch's public financial reporting for each division of the Group, consequently lacked sufficient evidence of reliability, FE5 said.

212.    In particular, FE5 identified a significant point of unreliability in the Apache system relating to purchase orders. According to FE5, after an initial purchase order was entered into the system, it could be changed or manipulated by any number of NGG employees for a variety of reasons – changes in the number of items shipped, changes in discounts, changes in price, etc. From the time the purchase order was first entered into the system to the time the products arrived, the purchase order could have been altered numerous times by different people and as a result, it was difficult to trace what the changes were, who made them, when, or why. FE5 said this lack of internal control over purchase orders made it difficult for NGG to know what had happened between purchase order and delivery, if they were receiving the right amount of inventory, if the invoices were correct, and if they were paying the right amount. According to FE5, the lack of control over purchase orders within the Apache system meant that NGG employees had to alter, or "massage" numbers derived from the Apache system after extracting them into an Excel spreadsheet in order to "correct" what had not been accounted for in the dysfunctional processing system.

213.    In addition to NGG's unreliable processing system, NGG also maintained an internal weakness over how it compiled Excel spreadsheet reports based on the numbers collected from the processing system, *i.e.* the reports relied on for Farfetch's public financial statements, FE5 said. Because the Apache system was not able to run and/or generate certain types of financial reports, NGG employees electronically extracted numbers from the Apache system tables and transferred these tables into Excel files to generate different types of financial reports. NGG extracted the numbers from the system and "massaged" them into an Excel file, for example, to

"correct" what had not been accounted for in Apache's purchase order management system, then put these "massaged" numbers into another Excel file and "massaged" them again, to finally consolidate the twice-massaged numbers into a third Excel file which was then used for Farfetch's public financial reporting.

214. Based on FE5's experience, Farfetch should have discovered the Apache system had a material weakness and needed to be remediated to meet SOX compliance during its due diligence of NGG. FE5 said that a due diligence report prepared by Farfetch and/or its consultants prior to acquisition would have noted the material weakness within NGG at that time. FE5 added that the proper response to such a finding should have been for Farfetch to begin working on remediating the material weakness with internal controls over operational and financial reporting at NGG *before* finalizing the acquisition, and at a minimum, as soon as the transaction was complete. Yet, according to FE5, each of the material weaknesses reported in Farfetch's public financial statements concerning NGG all stemmed from the same foundational material weakness in NGG's Apache processing system.

215. Despite later claims of certain remediation efforts made by Farfetch, FE5 opined that Farfetch did not have enough employees within NGG to assist with implementing the necessary internal control changes in addition to the day-to-day work they were already doing. The lack of enough qualified Farfetch employees contributed to the Company's inability to fully remediate the material weaknesses by the end of 2023. In addition to the lack of employee resources within NGG, FE5 and their internal controls team at Farfetch were met with resistance from NGG employees to implementing the necessary internal control changes. Considering the lack of cooperation and lack of employee resources within NGG, FE5 said that initiating an effort

to change internal controls in July 2023 (when FE5 joined the Company) was too late to succeed at fully remediating the material weakness by the end of 2023.

216.    According to FE5, there is a well-established process and procedure for how a company can certify an operational system as reliable and bring it into SOX compliance, which includes *inter alia*, demonstrating that the numbers generated from the system are accurate. FE5 went on to explain that the job they were hired for, designing and implementing financial and operational internal controls to ensure the numbers in the Excel file used for Farfetch's public financial reporting were accurate, could not be done within six months based on the resources available from the Company. Based on FE5's experience, completely remediating the material weakness identified at NGG would take substantial time.

217.    Like FE5, FE6 explained that the material weakness in internal controls over financial reporting within NGG had persisted for five years (since the NGG acquisition).

218.    During FE6's tenure (April 2023 to September 2023), FE6 attended meetings with senior management and Farfetch's legal team, during which FE6 said the internal controls team came under intense pressure to fix the long-standing material weakness at NGG. FE6 said, in essence, the message from senior management and legal was that the Company could be forced to delist from the NYSE and/or might cease to exist if they did not fix the material weakness at NGG by the end of the year. The tone was, "resolve the material weakness. Otherwise, the business isn't viable," FE6 said.

219.    According to FE6, within the first few weeks of starting at Farfetch, around mid-April 2023, FE6 had a meeting with Defendant Jordan. During this meeting, Defendant Jordan told FE6 that shareholders were threatening to pull their money out of Farfetch because of the longstanding material weakness at NGG.

220.    During the same April 2023 meeting, FE6 told Defendant Jordan that the Company needed to force NGG management – perhaps by withholding financial benefits – to comply with implementing new controls and remediate the material weakness, but Jordan said such forceful measures were not the "Farfetch way."

221.    FE6 was put on a performance improvement plan ("PIP") in about mid-May 2023, soon after their meeting with Defendant Jordan. Benjamin Kaye, Director of Internal Controls and Chief Internal Auditor, told FE6 that the performance plan was "coming from Elliot [Jordan]."

222.    To make matters worse, FE6 said the entire internal controls team at Farfetch were dismissed just prior to Farfetch hiring FE6. According to FE6, making an entire team of employees at a company redundant at the same time is unusual. The new internals control team lacked knowledge about financials, which made it more of a challenge for them to develop and implement financial internal controls, FE6 said.

223.    Recognizing that Farfetch employees were unable to implement the needed internal controls at NGG on their own, FE6 said that the Company hired Deloitte to provide more resources and financial expertise to assist with the task. FE5 confirmed that Deloitte was hired to assist with internal controls at NGG. Based on the timing of FE5's and FE6's employment with the Company, Deloitte was hired sometime between July 2023 and September 2023.

224.    In addition to addressing the material weakness in the internal controls at NGG, FE6 was tasked with reviewing and approving the Company's internal controls for financial reporting. On May 18, 2023, Farfetch issued its financial results for the quarter ended March 31, 2023 (the "Q1 2023 Quarterly Report"). Although Ms. Jackson was the Company's VP of Financial Controls, she did not sign off on the Company's public financial statements for Q1 2023.

64

Instead, that task fell to FE6, who had only been with the Company for roughly a month and was subordinate to Ms. Jackson.

225.    FE6 expressed to members of the finance team that they were not happy about signing off on the internal controls for the company's Q1 2023 public financial reports because they did not have the time to even understand what the controls were. FE6 was given the Q1 financials to sign off on the day it went live. But Defendants Neves and Jordan continued changing the content of the quarterly reports in the hours and minutes before going live with the results.

226.    Further, FE6 said Farfetch did not have what they described as a legally required independent Internal Audit function, which is supposed to report directly to the Audit Committee and is supposed to be free of influence from company management. FE6 said Farfetch added "Internal Audit" to employee titles, including their own and Mr. Kaye's, because the Company wanted to create an impression for investors that it had an independent internal auditing function. But the title was in name only, FE6 said. FE6 said Internal Audit was never a part of their job at Farfetch.

227.    While FE6's primary focus at Farfetch was helping to remediate the material weaknesses within NGG, FE6 also discovered gaps in the internal control framework for the Farfetch marketplace. In about May 2023, FE6 discovered serious gaps around pricing in the internal controls framework for the Farfetch website that they believed were a bigger and more serious concern than the material weakness at NGG.

228.    FE6 said there was very little control around pricing on the Farfetch marketplace. According to FE6, there were large gaps in the framework that they picked up on that were not being discussed at the Company. FE6 said that the identified gaps were quite serious gaps around controls, and that access controls were not strong enough to mitigate the risk of fraud. FE6 found

that the Farfetch marketplace was not part of the framework of internal controls, meaning it was a complete gap, a complete oversight in internal controls. There was just nothing there, FE6 said. According to FE6, the controls were not part of the framework; they were never tested. To FE6, that was a huge issue. FE6 said that these internal controls gaps within the Farfetch website allowed a large number of employees to go in and change the prices whenever they wanted; no one checked who had access to different "buckets" within the website. According to FE6, Farfetch should have been checking that the right people have access in the right "buckets"; that makes operational sense, said FE6.

229.    As such, FE6's account confirms that the material weakness relating to pricing was not only impacting the financial reports generated by NGG, but also impacted the financial results of sales on the Farfetch marketplace. Around August 2023, FE6 ran a simple revenues vs costs calculation of the Company's finances overall that revealed a significant portion of products were being sold with little to no, and even below, margin. FE6 said their calculations indicated significant volumes being sold at significant markdowns. In addition, FE6 said the profit margin calculation indicated extreme levels of discounted products that appeared to represent more than normal levels of discounts. The discount amounts looked unreasonably high; it looked uncontrollably high, FE6 said. According to FE6, they know what margins look like and what is normal, but this, to FE6, did not look like normal activity. FE6 said the margin calculations indicated that more than markdown sales and employee discounts were to blame, which made them suspect fraud.

230.    According to FE6, many people in management working within Farfetch refused to cooperate in FE6's effort to implement internal controls and blocked FE6 from accessing

financial data. In particular, FE6 said the Head of IT Internal Control and Audit for the Farfetch marketplace, Mucha Matambanadzo, refused to meet with FE6 to discuss their concerns.

231.    Despite a concerted effort to find one, including within the HR handbook, FE6 was unable to locate a Whistleblower Hotline at Farfetch for employees to report concerns anonymously to the Board. Nevertheless, after failing to garner sufficient concern from senior leadership about the gaps, FE6 sent what they described as a whistleblower email to the Company's Director of Internal Controls and Chief Internal Auditor, Benjamin Kaye, and the VP of Financial Controls, Karen Jackson, describing the problems FE6 had identified. In the email, FE6 highlighted the lack of controls on pricing, their concern about its potential for fraudulent activity, and their opinion that an independent investigation should be conducted.

232.    Within days of sending the email, FE6 was called into a meeting with Vice President of Legal (North America) & Compliance, Morgan Levine, an independent forensic investigator, and one other person FE6 could not recall. When FE6 answered the investigator's questions, Ms. Levine repeatedly interrupted to add and/or suggest other innocuous explanations for FE6's concerns. Ms. Levine never let FE6 have a full sentence answer, never allowed FE6 to have a conversation with the investigator, FE6 said.

233.    The Company appeared to want to claim employees using their discounts was the cause of the problem, but FE6 said the Company could not conclude that without a deeper forensic investigation. FE6 observed that if the Company was selling at a loss or near loss for a significant amount of time and did not adjust its spending and budgets to account for lower-than-forecast revenues, then it would run into cash flow issues.

234.    Accordingly, despite Farfetch claiming in March 2022 that both operational and information technology controls within NGG were then-considered to have been designed

appropriately, former employee accounts confirm that these controls were, in fact, *not* designed appropriately at that time. Indeed, former employee accounts confirm that internal controls within NGG were considered ineffective since before Farfetch's acquisition of the company in 2019 and remained defective throughout the entirety of the Class Period. Further, despite claims year-over-year of making substantial efforts to remediate the problem, Defendants' utter disregard for proper integration of the acquired business prevented or impeded Farfetch's ability to implement any of the changes necessary, subjecting the Company to heightened risks and negatively impacting its financial condition.

235.    Moreover, despite declaring in March 2023 that the consolidated financial statements included the Company's FY 2022 20-F "present fairly, in all material respects, [Farfetch's] financial position, results of operations, and cash flows, of and for the periods presented," former employee accounts confirm that the unremediated material weaknesses in its internal controls made it impossible for Defendants to confirm the accuracy of the Company's financial reports for the periods presented (fiscal year ended December 31, 2020, 2021, and 2022), and in fact, the financial reports provided by NGG and used in these consolidated statements were considered unreliable. Furthermore, based on former employee accounts, known deficiencies in pricing controls across NGG and the Farfetch marketplace and identified discrepancies in the Company's reported revenues versus realized profit margins, indicated that the consolidated financial statements were, in fact, inaccurate and materially overstated.

I.    **As Financial Conditions Worsened, Defendants Assured Investors of Farfetch's Liquidity Strength and Reinforced Near-Term Targets While Promoting Cost-Saving "Strategic Initiatives"**

236.    As the Company's financial condition worsened, on August 25, 2022, Defendant Neves announced the Company's "organizational evolutions" purportedly made to better

Farfetch's position "to achieve our platform long-term vision and reaccelerate growth in 2023, while also driving a more efficient operating structure." Defendant Neves went on, adding:

> These reorganizations sees the Farfetch platform at the core of our entire business. This common platform services our 3 business units: Marketplaces, which includes our B2C activities; Platform Solutions, essentially composed of our B2B activities, mainly FPS, but also newly acquired SaaS companies that extend FPS' ecosystem; and brand platform, which consists of all NGG activities that are not included in the other 2 business units, i.e., all nondigital NGG activities, such as directly operated retail stores and select wholesale. We believe that this structure will allow us to drive cost efficiencies by scaling our business, enhancing our profitability and allowing us to invest in our technology and ops platforms at a larger scale.

> Historically, the marketplace has not had a single leader accountable for its entire P&L. But I am taking this opportunity to reinforce the platform philosophy across our organization, with clear accountability around each of the 3 BUs. As such, we have reorganized the business according to these principles and have created 2 new roles: Chief Marketplace Officer, who will be accountable for the performance of the marketplace's BU; and Group President, whose role is to position our Farfetch group capabilities to the industry, ensuring our 3 BUs work together to deliver on Farfetch's mission to be the platform for luxury.

> I am delighted to share that Edward Sabbagh, previously VP Marketplace, will take the post of Chief Marketplace Officer and that Stephanie Phair will be our Group President. I am excited with this new structure, and I believe it prepares us for the incredible growth ahead of us in 2023 and in years to come.

> One of the benefits of this work has been the identification of a number of duplications and overlaps across the previous arc. This means that we will be able to streamline our organization and reduce our headcount around overlapping functions and teams…

237.    While these "strategic initiatives" were touted to the public as sufficient action to rectify costs while still pursuing growth strategies, they did not address the main drivers of Farfetch's cash burn, namely supply chain and inventory costs within NGG, and mounting VAT costs on direct brand partnerships. As a result, the Company was already experiencing a liquidity crisis and at material risk of insolvency.

238.    Nevertheless, Defendants continued to downplay the negative impacts affecting the Company's revenue growth, cash position, and liquidity strength. For example, on November 17,

2022, Defendant Jordan is quoted in the Company's Q3 2022 quarterly report as stating, "we remain well capitalized to execute on our long-term vision, and I am confident we will return to profitable growth in 2023."

239.    Likewise, on May 18, 2023, Defendant Neves is quoted in the Company's Q1 2023 quarterly report as saying, "Our sequential improvement in GMV growth in the US and China, our two largest markets . . . indicate the strength and resilience of our core business. This, on top of our recent launches of . . . Reebok . . .confirm we remain on track to deliver on our plan for 2023."

240.    Internally, however, the future of the Company appeared far more dire than the public image portrayed by Defendants. The reality was, leading up to and throughout the Class Period, Defendants knew the Company would not see the revenues reached during the pandemic boom. In addition, because of Defendants' utter disregard for proper integration, refusal to address unfavorable contract terms, failure to remediate ineffective controls, and setting of unsupported and unrealistic expectations for GMV and revenue goals, the Farfetch Group had been selling at a loss or near loss, was suffering from unsustainable operating costs, and experiencing a full liquidity crisis. Yet, instead of adjusting its spending and budgets to account for lower-than-forecast revenues and growing expenses resulting in significant cash flow issues, Farfetch repeated past behaviors acquiring additional overvalued and underperforming businesses sending the Company into a downward spiral that could not be reversed by purported "strategic initiatives" not aimed at addressing the root issues.

### J.    The Truth is Revealed Through a Series of Corrective Disclosures

241.    While the pandemic boom in online shopping and luxury spending seemed to support the Company's dramatic shift in business model, as lockdown lavishness retrenched and markets normalized, the cracks of Farfetch's cobbled together, capital intensive, inventory-heavy, risky business model were laid bare.

**August 17, 2023 – Company Announcement**

242.    On August 17, 2023, during after-market hours, Farfetch issued a press release announcing its financial results for the second quarter of 2023 (the "Q2 2023 Earnings Release"). For the quarter, the Company reported, among other items, revenue of approximately $572 million, significantly less than the market consensus of $650.71 million, stating, in relevant part:

> Revenue decreased $7.3 million year-over-year from $579.3 million in second quarter 2022 to $572.1 million in second quarter 2023, representing a year-over year decrease of 1.3%. This decrease was primarily driven by a 42.2% decrease in Brand Platform Revenue to $67.4 million, as well as a 15.1% decrease in In-Store Revenue to $22.7 million.

243.    Farfetch also announced its decision to discontinue NGG Beauty as a category on the Group's marketplace and disclosed that it was "exploring strategic options for Violet Grey."

244.    Also on August 17, 2023, during after-market hours, Farfetch held a conference call with investors and analysts to discuss the Company's quarterly financial results (the "Q2 2023 Earnings Call"). During the Q2 2023 Earnings Call, Defendants disclosed that significant slowdowns in growth in the U.S. and China, onboarding challenges affecting the launch of the Reebok partnership, and issues with inventory and shipping had negatively impacted Farfetch's revenue and GMV for the quarter, as well forced the Company to rein in expectations for FY 2023.

245.    During the call, Defendant Phair also disclosed that because of "the initial transitional challenges" impacting the Reebok launch, the Company had revised its expected 2023 revenue from Reebok to approximately $200 million across both the brand and digital platforms.

246.    On August 18, 2023, during pre-market hours, media outlets reported that multiple analysts had downgraded Farfetch's shares based on the Company's poor Q2 2023 results and disappointing guidance for FY 2023. For example, an article published by investor news website

*SeekingAlpha*, entitled "Farfetch slides 39% as analyst downgrades pour in", reported, in relevant part:

> JPMorgan downgraded Farfetch (NYSE:FTCH) to a Neutral rating from Overweight on Friday after taking in the retailer's Q2 earnings report, which included a miss on the revenue line, sluggish GMV growth, and guidance below expectations.
>
> Analyst Doug Anmuth . . . noted that the "Year of Execution" is proving quite challenging given U.S. and China weakness, early Reebok partnership hiccups, and wholesale pressures.
>
> "Weakening trends through the back half of 2Q make it clear that FTCH has limited near-term visibility, & execution risk increases on a much bigger business once the YNAP-Richemont deal closes."
>
> JPMorgan slashed its price target on FTCH to $6.00 from $15.00.
>
> Elsewhere on Wall Street, KeyBanc Capital Markets downgraded Farfetch (FTCH) to Sector Weight from Overweight on what it sees as a less clear path to profitability.
>
> During the Farfetch's (FTCH) earnings call (transcript), executives pointed to a less buoyant luxury customer in the U.S. and similar macro dynamics in Mainland China. "The reality is that the recovery has not been as robust as we had expected when we reported our Q1 results," lamented CEO [Defendant] Neves.
>
> Shares of Farfetch (FTCH) fell 38.66% in premarket action on Friday to $2.92 and are on a path to open at their lowest trading level ever.

247.    Following the Company's August 17, 2023 Announcement and the subsequent market developments, Farfetch's stock price fell $2.15 per share, or 45.17%, to close at $2.61 per share on August 18, 2023.

248.   Despite the Company's August 17, 2023 Announcement, analyst believed Defendants' statements about rationalizing costs, the Company's investment benefits, and promise of new leadership. For example, on August 18, 2023, Wells Fargo Securities, LLC issued an analyst report entitled, "FTCH: One Step Forward, Two Steps Back; Macro Headwinds & Reebok Integration Issues Weigh on Model; Remain OW, $18 PT." The report stated, in relevant part:

> What Do We Think from Here? One step forward, two steps back; numbers once again coming down. FTCH's two largest markets (China & US) and Reebok integration issues are weighing on the model, and it is hard to get excited about the story in the ST. However, with costs being rationalized, new partnerships coming onboard, and new leadership in place (new CFO), we see a LT bull case. Tweaking FY23/24 GMV +8%/+45% and adj. EBITDA to $18.1M/$137.6M. Remain OW w/ $18 PT.

### November 28, 2023 – Company Announcement

249.   Then, on November 28, 2023, after market hours, Farfetch announced that it would not be disclosing its financial results for the quarter ended September 31, 2023 ("Q3 2023"), which were originally scheduled to be reported on November 17, 2023. In addition, the Company canceled its related conference call with investors and analysts scheduled for the following day, November 29, 2023.

250.   The Company's November 28, 2023 Announcement also disclosed that Farfetch would not be providing any forecasts or guidance going forward and that "***prior forecasts or guidance should no longer be relied upon***" (emphasis added).

251.   Following this announcement, Farfetch stock price fell $1.13 per share, or 53.8%, to close at $0.97 per share on November 29, 2023.

252.   Farfetch's November 28, 2023 Announcement followed reports by *The Telegraph* that Defendant Neves was attempting to take the Company private. *The Telegraph* article, which did not name sources, said that following "its short but calamitous stint on the New York Stock Exchange," Farfetch was considering a deal with the "tentative backing" partners.

73

253.    On November 29, 2023, Richemont acknowledged this news stating:

Following the recent media reports on and announcement made by FARFETCH on 28 November 2023, Richemont would like to remind its shareholders that it has no financial obligations towards FARFETCH and notes that it does not envisage lending or investing into FARFETCH. Richemont is carefully monitoring the situation, including reviewing its options in respect of its arrangements with FARFETCH announced on 24 August 2022, which remain subject to certain terms and outstanding conditions. Neither Richemont Maisons nor YOOX NET-A-PORTER ("YNAP") have currently adopted FARFETCH Platform Solutions and they continue to operate on their own platforms.

254.    Then, on November 30, 2023, the Company announced that J. Michael Evans, President of Alibaba since 2015, had resigned as a board member, effectively immediately, purportedly "in furtherance of the arm's length commercial relationship between Alibaba [] and the Company." Evans had served as a non-executive director of Farfetch since December 2020.

255.    Richemont had long been seen as the most likely candidate to throw Farfetch a lifeline, as a previous backer that was also party to the pending YNAP deal. With Richemont's announcement that it had no plans to lend or invest and was "reviewing options" for the later mooted deal, followed by Mr. Evans resignation from Farfetch's board, signaled to investors, analysts and market experts that previous supporters were stepping back from the Company.

**December 18, 2023 – Company Announcement**

256.    Finally, on December 18, 2023, Farfetch announced the agreement to transfer all of the business and assets of FF Holdings, Farfetch's main operating subsidiary and primary holder of all Company assets (*i.e.*, the Farfetch Business), to Coupang, Inc. ("Coupang"), in exchange for a $500 million bridge loan to continue operating until the consummation of the transfer (the "Transfer")—effectively gutting Farfetch as a publicly traded company, and leaving it in a significantly worse financial position than before.

257.    Indeed, the Company revealed that, upon the consummation of the Transfer, Farfetch expected holders of Class A and B ordinary shares and its convertible notes "will not

recover any of their outstanding investments in Farfetch", that Farfetch would be "delisted from the NYSE" and "liquidated."

258.    In addition, Farfetch announced the resignation of its independent members of the Company's Board of Directors and all committees thereof, effectively immediately, leaving Defendant Neves as the Company's only Board member overseeing the Transfer of the Farfetch Business and maintaining complete control over Farfetch.

259.    Farfetch also announced that it agreed to terminate, with immediate effect, FF Holdings' proposed acquisition of 47.5% of YNAP, the adoption of FPS by YNAP and Richemont and the launch of Richemont Maisons e-concessions on the Farfetch Marketplace.

260.    The Company's December 18, 2023 Announcement claimed that FF Holdings informed the Board of Directors of Farfetch that it had entered into (i) a Transaction Support Agreement (the "Support Agreement"), by and among, *inter alios*, FF Holdings, Farfetch, Surpique LP (f/k/a Athena Topco LP) ("Suprique"), and an ad hoc group of lenders (the "AHG") holding in excess of 80% of the outstanding aggregate principal amount of the Term Loans under the existing Credit Agreement, as amended on December 18, 2023; and (ii) a committed first lien delayed draw term loan facility in an aggregate principal amount of $500 million with certain direct and/or indirect subsidiaries of FF Holdings, including FF US, as borrowers and/or guarantors and Surpique, an entity owned by Coupang, and funds managed and/or advised by Greenoaks Capital Partners LLC, as lender, (the "Bridge Loans"). Pursuant to the Support Agreement, the Bridge Loans were established as a tranche of delayed draw term loans on a pari passu basis with the Term Loans under the Credit Agreement.

261.    According to the Company's announcement, in connection with the Support Agreement, the parties had agreed to support and implement a marketing process of the Farfetch

Business, undertaken by JPM on behalf of FF Holdings, with an exclusivity period through April 30, 2024 (the "Exclusivity Period"). The terms of the Support Agreement, however, made the prospect of any competing transaction unlikely.

262.    Indeed, pursuant to the Support Agreement, the Bridge Loans, except if the Transfer was consummated, were to become immediately due and payable, *inter alia*: (i) at the end of the Exclusivity Period, or (ii) in the event that a competing transaction was signed in relation to the Farfetch Business pursuant to the marketing process. Alternatively, if the Transfer was consummated, the Bridge Loans (to the extent funded) were to be exchanged by Surpique for all the business and assets of FF Holdings (*i.e.*, the Farfetch Business) and any commitments to pay thereunder were otherwise terminated. Further, following the closing of the Transfer, one or more obligors under the Term Loans were to make an offer to repurchase 10% of the outstanding principal amount of the Term Loans at par, pro rata amongst the lenders of the Term Loans.

263.    On this news, Farfetch's share price fell $0.60 per share, or 93.75%, to close at $0.04 per share on December 20, 2023. Consequently, that same day, the NYSE commenced delisting proceedings for Farfetch's Class A ordinary shares and trading was suspended, effective immediately.

264.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages

## K.    Post-Class Period Events and Disclosures

### 1. *The Fraudulent Conveyance of the Farfetch Business is Completed*

265.    Despite the Exclusivity Period extending to April 30, 2024, Farfetch announced that "following a robust marketing process undertaken by [JPM] on behalf of FF [Holdings] for the sale of [the Farfetch Business], which process did not result in a proposal for a competing

transaction, on January 30, 2024, Surpique [] consummated the purchase of [the Farfetch Business]" (*i.e.*, the Transfer).

266.    Indeed, on January 30, 2024, Defendant Neves, as the sole director of FF Holdings, appointed administrators from AlixPartners UK LLP, who upon appointment entered into a Sale and Purchase Agreement, dated as of January 30, 2024 (the "SPA"), with Surpique Acquisition Limited, a private limited company organized under the laws of England and Wales and an indirect, wholly owned subsidiary of Surpique, a Delaware limited partnership established for the sole purpose of acquiring all of the business and assets of FF Holdings, in connection with, Surpique Acquisition acquired the Farfetch Business.

267.    On February 2, 2024, Coupang announced that on January 29, 2024, Coupang as the borrower and certain of its subsidiaries, as guarantors, entered into the Fifth Amendment to Coupang's revolving credit and guaranty agreement, dated as of February 27, 2021, as amended as of June 29, 2023, and as supplemented by that certain Counterpart Agreement, dated as of January 29, 2024. Coupang provided that the Fifth Amendment, among other things: (i) extended the maturity date of Coupang's revolving credit facility thereunder to February 27, 2026; and (ii) permitted, and effected, the designation of Surpique as an unrestricted subsidiary for the purpose of acquiring the Farfetch Business.

268.    Following the announcement of the agreement with Coupang in December 2023, and upon the completion of the Transfer in January 2024, the Farfetch Business continued operations as usual under the same name and substantially the same leadership, including Defendant Neves, while Farfetch and its investors were left with nothing.

269.    Then, on February 15, 2024, *FashionUnited* reported that Defendant Neves was stepping down as CEO of the Farfetch Business. The report noted that his departure came as part

of a string of layoffs at the company, including CFO, Tim Stone; Chief Fashion and Merchandising

Officer, and CEO of Browns, Elizabeth Von Der Goltz; Chief Product Officer, Hélder Dias; Chief

Platform Officer, Kelly Kowal; Chief Operations Officer, Luis Teixeira; Chief Marketplace

Officer, Edward Sabbagh; Chief Marketing Officer, Nick Tran; and President, Americas, Sindhura

Sarikond. A spokesperson for Coupang confirmed the news to *FashionUnited*, stating: "As we

assessed key priorities and resources across the business, we made the difficult decision, but

necessary, decision to reduce global headcount and redundant roles."

270.    Then, in April 2024, the creative director and founder of County of Milan (one of

the major brands within NGG) stepped down from his role with the company.

### 2. Coupang Reveals Farfetch Internal Control Issues Were Not Remedied, Drastically Decreases Value of the Farfetch Business, and Negotiates the Sale of NGG

271.    Coupang's most recent quarterly report discussed Farfetch's disclosure of the

existence of material weaknesses in its internal control over financial reporting in Item 15 of its

Annual Report on Form 20-F for the year ended December 31, 2022. Specifically, Coupang's 10-

Q for the quarter ended March 31, 2024 ("Q1 2024 10-Q"), filed on May 8, 2024, stated, in relevant

part, that:

> A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our consolidated financial statements will not be prevented or detected on a timely basis. Farfetch disclosed the existence of material weaknesses in its internal control over financial reporting in Item 15 of its Annual Report on Form 20-F for the year ended December 31, 2022.
>
> **The unremediated material weakness identified and disclosed by Farfetch related to the operating effectiveness of certain business process and information technology controls in the New Guards business**. We are in the process of reviewing the operations of Farfetch and implementing Coupang's internal control structure over the acquired operations. While we did not include Farfetch in our assessment of internal control over financial reporting as of March 31, 2024, **we determined the material weakness previously disclosed by Farfetch was not fully remediated as of March 31, 2024** and could result in a

material misstatement of our annual or interim consolidated financial statements that will not be prevented or detected on a timely basis. We are actively engaged in the remediation efforts.

(emphasis added)

272.   In addition, Coupang's Q1 2024 10-Q provided a fair value of the Farfetch Business as of Coupang's acquisition date (January 29, 2024) that drastically differed from the financial position provided by the Company in its last publicly issued financial results for the quarter ended June 30, 2023 (the Q2 2023 Earnings Release), filed on August 17, 2023. Most notably is the variation between the companies' valuation of the Farfetch Business's intangible assets.

273.   The Company's FY 2022 20-F defined "intangible assets" as:

Intangible assets acquired separately are measured on initial recognition at cost. The cost of intangible assets acquired in a business combination is their fair value at the date of acquisition. Following initial recognition, intangible assets are carried at cost less any accumulated amortization and accumulated impairment losses. Internally generated intangibles, excluding capitalized development costs, are not capitalized and the related expenditure is reflected in profit or loss in the period in which the expenditure is incurred. The useful lives of intangible assets are assessed as either finite or indefinite.

Intangible assets with finite lives are amortized over the useful economic life and assessed for impairment whenever there is an indication that the intangible asset may be impaired. The amortization period and the amortization method for an intangible asset with a finite useful life are reviewed at least at the end of each reporting period. Changes in the expected useful life or the expected pattern of consumption of future economic benefits embodied in the asset are considered to modify the amortization period or method, as appropriate, and are treated as changes in accounting estimates. The amortization expense on intangible assets with finite lives is recognized in the Consolidated statement of operations in the expense category that is consistent with the function of the intangible assets. Other than goodwill, there are no intangible assets with indefinite useful lives.

274.    The Chart below demonstrates Coupang's valuation of the Farfetch Business as of

January 29, 2024 versus Farfetch's valuation of the Farfetch Business as of June 30, 2023:

|  | Farfetch | Coupang |
|---|---|---|
| **Assets** | (in thousands) | |
| Cash and Cash Equivalents | $453,820 | $126,000 |
| Accounts receivables, net | $ 501,225 | $288,000 |
| Inventories | $ 436,408 | $310,000 |
| Intangible assets | $1,503,925 | $325,000 |
| Right-of-use assets | $195,115 | $209,000 |
| Property and equipment, net | $92,632 | $95,000 |
| Other Current and Non-current assets | $314,829 | $451,000 |
| **Liabilities** | | |
| Accounts payable | $(829,662) | $(505,000) |
| Other current liabilities | $(139,614) | $(169,000) |
| Long-term debt | $(916,923) | $(557,000) |
| Operating lease obligations | $(194,584) | $(214,000) |
| Other non-current liabilities | $(811,000) | $(177,000) |
| **Net Assets** | **$606,171** | **$182,000** |

275.    Coupang's Q1 2024 10-Q also included the following chart depicting the

"identifiable intangible assets acquired" as:

| (in thousands, except years) | Weighted Average Useful Life | Estimated Fair Value |
|---|---|---|
| Brand trademarks | 5 years | $130,000 |
| Customer relationships | 5 years | $34,000 |
| Supplier relationships | 15 years | $61,000 |
| Developed technology | 3 years | $38,000 |
| Brand licenses | 8 years | $62,000 |
| **Total intangible assets** | | **$325,000** |

276.    For comparison, the FY 2022 20-F assigned a net book value of $888,675 (in

thousands) to Farfetch's brand trademarks and domain names, providing, in relevant part, that:

> As of December 31, 2022, *Brands, Trademarks and domain names* primarily
> includes: the Off-White licensed brand with a net carrying amount of $311.3
> million and a remaining life of 3 years, Stadium Goods brand with a net carrying
> amount of $86.0 million and a remaining life of 11 years, Heron Preston brand with
> a net carrying amount of $17.4 million and a remaining life of 4.6 years and Palm
> Angels brand with a net carrying amount of $111.0 million and a remaining useful
> life of 8.6 years.

277.    Further, articles as early as January 2024 confirmed Coupang is in negotiations with Style Capital regarding the potential sale of NGG, and according to articles released as late as April 2024, those negotiations are still ongoing. This is a stark difference from how NGG was treated under Farfetch. While in 2023 reports discussed the Company's interest in divesting its Browns, Stadium Goods, and Violet Grey businesses, there was never mention of divesting NGG.

278.    At all relevant times, NGG served as a vital component to the Farfetch Business. Indeed, following the NGG acquisition, Farfetch completely reorganized its business structure, dedicating one of three segments to the production and wholesale distribution of brands owned and licensed by NGG (the Brand Platform), which was considered the second largest division of Farfetch. In addition, the sale of NGG brands on NGG's own platform and e-commerce website, in addition to its sales on the Farfetch Marketplace, accounted for a significant portion of the Company's Digital Platform GMV. And lastly, the In-Store segment, which was comprised of transactions conducted in the physical stores operated by the Company's various subsidiaries and certain brands in the NGG portfolio, was largely dominated by sales generated from NGG.

### 3.    *Richemont Records a €1,263 Million Write Down of YNAP's Net Assets*

279.    In May 2024, Richemont announced its financial results for its fiscal year ended March 31, 2024, which included a write down of YNAP's asset valuation and a finance cost in relation to its Farfetch convertible note.

280.    Specifically, Richemont reported that its profit for the year from continuing operations was solid at €3,818 million. The €93 million decrease compared to the prior year included a €136 million improvement in net finance costs which amounted to €178 million. Net finance costs included net foreign exchange losses of €226 million on monetary items, partially mitigated by a €187 million net gain on the group's hedging program. Net interest expense of €22 million reflected a favorable €62 million variance compared to the prior year. However, this

positive variance was offset by a €269 million charge included in finance costs in relation to the Farfetch convertible note, valued at nil as of March 31, 2024.

281.    In addition, Richemont's reported loss for the year from discontinued operations amounted to €1,463 million. This incorporated a further reduction in the fair value of YNAP, reflecting a €1,263 million write down of the net assets held for sale, considering current levels of net working capital. According the Richemont, YNAP sales were down 14% in the period due to "a challenging environment for luxury ecommerce."

282.    During Richemont's call with investors to discuss its fiscal year financial results, analyst Luca Solca asked the following question about the company's multi-brand digital distribution platform, YNAP:

> We saw recently a couple of deals that made me think[] because, for example, the purchase of [matches.com] has been very difficult, and it has been basically going nowhere. And when Coupang bought what remained of Farfetch, we saw a number of big brands, for example, the Kering (EPA:PRTP) brands move out of the Farfetch assortment. So I'm thinking about what is your perspective on the divestiture of YNAP? Are you looking at a clean-cut divestiture? Are you looking at a more complex deal potentially like the one you had in place for Farfetch? And how do you see the difficulty of selling a company that loses money?

283.    To which Johann Rupert, Richemont's then-CEO, responded by saying:

> YNAP. All I can say about that is when I read the recent bloggers' comment that all the buyers have disappeared, I immediately called my son [Anton Rupert Jr.] and Burkhart [Grund, Richemont CFO] and they said, no, they haven't. So there are still more people interested. But we also have a moral obligation to the very many small people who are using it as a platform. You don't just dump people. So there will be a marketplace. ***If we made [a] mistake [it] was the business model of actually owning the stock … Because basically you're a speculator, you buy and you think you're going to sell it. And frankly, I didn't know how really short the fashion cycle is. If you ask people in the true fashion business how long things stay on full price in the stores. It's like this. So the Farfetch model*** … If in -- when I asked in 2015 for the whole industry to get together and to support a single platform instead of everybody trying to do their own thing, [YNAP] would have been a good platform. … Unfortunately, everybody went their own way. And today, we've learned an enormous amount….

## VI.    FALSE AND MISLEADING STATEMENTS

284.    Throughout the Class Period, Defendants issued a series of pervasive and material misstatements and/or omitted material facts necessary to make statements issued not misleading in light of the circumstances in which they were made. These material misstatements and omissions created a false impression as to Farfetch's equity, liabilities, accumulated deficit, and overall financial health. Defendants also concealed the severity of the Company's material weakness in internal controls over financial reporting. These material misrepresentations caused Farfetch's stock price to be artificially inflated throughout the Class Period. When the truth was revealed through multiple corrective disclosures, this artificial inflation dissipated, Farfetch's stock price dropped and as a result, caused significant damages to Plaintiffs and Class Members.

### February 24, 2022 – Q4 2021 Quarterly Report

285.    On February 24, 2022, Farfetch issued a press release announcing its Q4 2021 and full year 2021 financial results (the "Q4 2021 Earnings Release"), in which Defendant Jordan is quoted as saying:

> I am delighted with our fourth quarter 2021 results which demonstrate strong execution that delivered Digital Platform GMV growth at the high end of our expectations, and improved profitability margins. This completes a milestone year for Farfetch in which we added over $1bn in GMV, growing 33% year-over-year, and achieved our first full-year of profitability at the Adjusted EBITDA level. ***Our investments continue to deliver significant operating cost leverage and we are well positioned for further market share capture and profitability gains in the year ahead***.

(emphasis added)

286.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Jordan failed to disclose that: (i) Farfetch lacked proper oversight concerning the cash needs of its investments, including *inter alia*, NGG; (ii) Farfetch was already experiencing significant

83

challenges managing its operating costs relating to supply chain and inventory; (iii) Farfetch acquired Violet Grey as company that was already struggling to retain and grow customer engagement and required funding to continue; (iv) Farfetch was already experiencing a significant slowdown in growth in the U.S. and China, the Company's two largest markets; and (v) as a result, Farfetch's investments were not and would not "deliver significant operating cost leverage," and the Company was not "well positioned for further market share capture [or] profitability gains in the year ahead."

287.    The Q4 2021 Earnings Release also provided the Company's then-current "Outlook" stating:

> For Full Year 2022:
> •Digital Platform GMV growth of 28% to 32% year-over-year
> •Brand Platform GMV growth of 20% to 25% year-over-year
> •Adjusted EBITDA margin of 1% to 2%
>
> Uncertainties resulting from the COVID-19 pandemic, and the evolving nature of the situation, could have material impacts on our future performance and projections. Factors involving COVID-19 that could potentially impact our future performance include, among others:
> •Disruptions to our operations, fulfilment network, and shipments
> •weakened consumer sentiment and discretionary income arising from various macro-economic conditions
> •increased costs to support our operations
> •slowing e-commerce consumer activity as vaccinations gain acceptance and populations resume to pre-pandemic activities and lifestyles

288.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate internal controls over NGG's financial reporting of revenue and GMV; (iii) the Company was improperly

recognizing sales, (iv) as such, the Company's guidance or expectations were materially overstated; (v) the Company's large brand contracts had materially low take rates (between 8% and 10%) negatively impacting revenue and GMV; (vi) Farfetch was already experiencing a significant slowdown in growth in its first and second largest markets, the U.S. and China, respectively; and (vii) as a result, internal forecasts already showed a material impact on future performance and did not support the Company's outlook or projections.

289.    That same day, Farfetch hosted a conference call with investors and analysts to discuss its Q4 2021 and FY 2021 results (the "Q4 2021 Earnings Call"). During this call, Defendant Phair outlined the Company's "3 main areas of focus for 2022 on the customer front" stating, in relevant part:

> Finally, on Beauty. We remain on track to launch this category on the Farfetch marketplace in Q2. We will take a unique approach to beauty for both supply partners and customers, offering a differentiated experience and a curated offering.
>
> As you will have read in the ramp-up to this launch, we recently announced the acquisition of Violet Grey, which will bring industry authority as well as a curated selection of products to the marketplace. Violet Grey is a cult favorite beauty destination with elevated content, which has built a devoted community who trust and love the brand for its expertise.

290.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Phair failed to disclose that: (i) Violet Grey was already experiencing a slowdown in sales, growth, and revenue; (ii) at the time of the acquisition Violet Grey was struggling financially and required funding to continue operations; (iii) as such, Violet Grey was no longer "a cult favorite beauty destination" and did not support the Company's plans of improving customer retention.

291.    During the Q4 2021 Earnings Call, Defendant Jordan discussed the Company's "outlook for 2022" providing, in relevant part:

> Moving forward, we will align our guidance to this strategy, focusing our forward-looking statements on our annual targets rather than our quarterly outlook. We believe conversations with shareholders will be more productive if they are better matched with the way we operate and execute the business.

> As such, looking at the year ahead, we expect to see continued growth in digital platform GMV of 28% to 32% for continued market share capture. GMV growth will be lower in the first half. In Q1, we are comping against 60% growth from Q1 2021, which was achieved due to a boost from first-time adoption of consumers to Farfetch during COVID-19 lockdowns and the incremental trade from Harrods in its first full year as a platform client. Growth from this partner became like-for-like from Q2 2021. GMV growth on the brand platform is expected at 20% to 25% in 2022.

> We expect to see an improvement in unit economics over 2021 levels with digital platform order contribution margin in the range of 33% to 35%, driven by higher take rates on the platform and lower cost overall in relation to customer engagement and retention. Brand Platform gross margins are expected at 50% to 52%.

> We expect 2022 operating costs to continue to grow slower than adjusted revenue, achieving further operating cost leverage. This is despite a reinvestment of a proportion of brand platform profitability into important brand-building activities, including runway shows and seasonal campaign initiatives. Including our hotly anticipated shows in Milan and Paris in the coming weeks.

> Operating costs are expected to decline from 38% of adjusted revenue in 2021 to 35% to 37% of adjusted revenue in 2022. And therefore, in balancing growth, investment and overall profitability, we expect to see a further increase in adjusted EBITDA margins to 1% to 2% in 2022.

292.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Jordan failed to disclose that: (i) Farfetch lacked proper oversight concerning the cash needs of different divisions of the Farfetch Group, including *inter alia*, NGG; (ii) Farfetch was already experiencing significant challenges managing its operating costs relating to supply chain and inventory; (iii) direct brand contracts had materially low take rates (between 8% and 10%) and/or high VAT costs negatively impacting the Company's cash position, Adjusted EBITDA, and/or

gross margins; (iv) Farfetch acquired Violet Grey as company that was already struggling to retain and grow customer engagement and required funding to continue; (v) Farfetch was already experiencing a significant slowdown in growth in the U.S. and China, the Company's two largest markets; (vi) the Company's operational and information technology controls for NGG were not designed appropriately; (vii) the Company lacked adequate internal controls over NGG's financial reporting of revenue and GMV; (viii) the Company was improperly recognizing sales, and (ix) as such, the Company's guidance or expectations were materially overstated.

**March 4, 2022 – FY 2021 Annual Report**

293.    On March 4, 2022, Farfetch filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 ("FY 2021 20-F").

294.    Appended as exhibits to the FY 2021 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants Neves and Jordan certified that "[t]he [2021 20-F] fully complies with the requirements of Section 13(a) or 15(d) of the Exchange Act" and "[t]he information contained in the [2021 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company." Furthermore, Defendants Neves and Jordan certified that:

> 1. I have reviewed this Annual Report on Form 20-F of Farfetch Limited;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;
>
> 4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules

13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the Annual Report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5. The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the Audit Committee of the Company's Board of Directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

295.    The FY 2021 20-F included, in relevant part:

## Item 15. Controls and Procedures

### Management's Report on Internal Control over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act. Our management conducted an assessment of the effectiveness of our internal control over financial reporting based on the criteria

set forth in "Internal Control - Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements may not be prevented or detected on a timely basis.

As disclosed in our 2020 Annual Report, we identified two material weaknesses in the design and operation of our internal control over financial reporting from (1) the operation of effective controls over information technology systems, including access over those systems, managing system changes and testing of system-generated reports used in the execution of manual controls; and (2) the implementation and documentation of internal control over financial reporting at the New Guards business.

During 2021, we made a significant effort to implement effective controls over information technology systems as required in (1) above. These controls have been embedded into the environment to confirm consistent and continued operation. The changes and updates to our controls included enhanced privileged user activity monitoring, user recertification supported by reliable and complete data sources, as well as stricter segregation of duties and monitoring around the change management of our core platform and corporate infrastructure. Management considers that an appropriate and robust framework of controls particularly around access to our core platform and corporate infrastructure has now been designed and implemented, and as a result of these actions, has concluded that all elements of (1) relating to the design and operation of effective controls over information technology systems have been remediated as of December 31, 2021, to the extent that they are no longer considered a material weakness.

The component material weakness reported in 2020 relating to the New Guards business covered both operational and IT general controls. During 2021, we took significant steps to improve the control environment within the New Guards business. For the operational control elements there has been a significant increase in awareness and implementation within the New Guards business regarding the standards required for effective internal control over financial reporting. New roles, responsibilities and compensating controls have been implemented to reduce the risk created by limited segregation of duties in some areas. Additionally, the quality of management review controls has been strengthened and the standard and availability of supporting documentary evidence has been improved. Regarding information technology at the New Guards business, we made significant progress during 2021 to implement a robust control environment. This has meant extensive work to reconfigure systems, introduce detailed user profiling, vendor access restrictions, adequate user access segregation and monitoring as well as incident and change management workflows. ***As a result, both operational and information technology controls are now considered to have been designed appropriately, but there remains a need for these controls to be operating effectively for a period of***

89

***time for the material weakness to be remediated.*** Additionally, these deficiencies mean that the key reports generated by these systems and used in operational controls cannot be considered effective. Our expectation is that all controls will successfully test as effective in 2022.

As a result, as of December 31, 2021, management concluded that we had one material weakness relating to the operation of effective internal control over financial reporting at the New Guards business.

As permitted by related SEC staff interpretive guidance for newly acquired businesses, we have excluded from the scope of our assessment of internal control over financial reporting Jetti, Allure, Luxclusif and Alanui, collectively they represented less than 1% of our Group total assets and consolidated revenue as of and for the fiscal year ended December 31, 2021.

Based upon the above evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as a result of the material weakness described above, our internal control over financial reporting was not effective as of December 31, 2021.

(emphasis added)

296.    The foregoing statements were materially false or misleading when made because the Company's operational and information technology controls for NGG were not designed appropriately, and as a result, the Company lacked adequate internal controls over NGG's financial reporting of revenue and GMV.

**March 8, 2022 – Morgan Stanley Conference**

297.    On March 8, 2022, Farfetch presented at the Morgan Stanley Technology, Media and Telecom Conference 2022 ("Morgan Stanley Conference"). During the conference, analyst Lauren Elizabeth Cassel Schenk of Morgan Stanley, Research Division asked the following question:

So you guided to a 28% to 32% marketplace GMV growth for the full-year. I think that was better than people were expecting. Within that talk about sort of the assumption around the underlying luxury industry growth and then you have contributions from China, beauty, potentially new FPS partners. So sort of walk us through the bridge of how you get there?

298.    To which Defendant Jordan responded, in relevant part:

So I've always felt that the marketplace from the current distance that we have would grow at least as fast as the online market, if not more. ***And then as you said, you add in Beauty, which is a new category for us, it's $75 billion of the $300 billion market***. It's a category we've not played in until we launch this Q2 coming, so that will add incremental GMV. I think it's also got an amazing halo effect on the fashion and the accessories business as well because customers buy beauty more frequently and therefore Farfetch will be more front of mind to be able to buy clothing as well.

***And we expect that to drive a good level of customer retention and customer acquisition as we move forward for the year ahead.*** Plus on top of that, as you say, we have a pipeline of FPS clients that we're very confident we will see come to market later this year to help continue to drive growth. ***And on top of all that, we've been able to see that the China market take some really good learnings*** from the work we've done with Tmall over the last 12 months since we've been live ***and apply those learnings to see an acceleration of growth from that channel within a very important market over the next 12 months as well.***

***So overall, we're very confident that 28% to 32% is the right number.*** We've also sort of looked at it by customer cohort, by our retention levels, our expected AOV, our frequency of shop, the new customers that we're adding per quarter. We've been recently adding 500,000, 600,000 new customers per quarter. ***And when you add all that together plus what we see from FPS, 28% to 32% is absolutely the right number to go for.***

(emphasis added)

299.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Jordan failed to disclose that: (i) Violet Grey was already experiencing a slowdown in sales, growth, and revenue; (ii) at the time of the acquisition Violet Grey was struggling financially and required funding to continue operations; (iii) as such, Violet Grey did not support the Company's plans of driving customer retention and acquisition through NGG beauty; (iv) Farfetch was already experiencing a significant slowdown in growth in the U.S. and China, the Company's two largest markets; (v) the halt of sales in Russia, the Company's third largest market, had already negatively

impacted Farfetch's GMV; and (ix) as such, the Company's guidance or expectations were materially overstated.

300.    Ms. Schenk specifically asked about the war in Ukraine and its potential impact on the Company's previous guidance, stating:

> I think you disclosed in the 20-F that you have 6% GMV exposure to Russia. Talk about how you're navigating that. Europe is obviously a much bigger market for you broadly. Was that sort of contemplated at the time of the guide?

301.    To which Defendant Jordan responded:

> No, I mean it's obviously brand-new. We guided before we saw impact in that region. Obviously, we've ceased operations and moving our focus elsewhere. The sort of one benefit, I think of Farfetch to our clients is that we have a global customer base, when we've seen some markets struggle in the past, we've moved our demand generation spend, our focus around customer acquisition and retention to other markets to try and pick up some of that lost demand.

> Obviously, we've been very focused first and foremost on the people that are involved. We have a team in the area, which, obviously, we've been very focused on the well-being and looking after them. But as we've now sort of dealt with as much we can in that space, for the moment, we're now focused on where do we sort of try and drive demand elsewhere to pick up for loss trade from the Russian market.

> It's also important for our clients, obviously, the brands, boutiques, retailers that we support on the platform have also stopped trading into that market. They have product that we need to sell somewhere else for them. So we're very active to try and find demand elsewhere.

302.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Jordan failed to disclose that: (i) the halt of sales in Russia, the Company's third largest market, had already negatively impacted Farfetch's GMV; (ii) Farfetch was already experiencing a significant slowdown in growth in the U.S. and China, the Company's two largest markets; (iii) as such, alternative markets did not support a shift in demand; and (iv) as a result, the Company's guidance or expectations were materially overstated.

303.    Ms. Schenk went on to ask about the Company's recent acquisition, stating:

You recently announced the acquisition of Violet Grey within the beauty space, as well as one within the luxury resale sector as well. Can you talk a little bit more about the acquisitions? What drew you to them? And then how should we think about acquisitions going forward?

304.    To which Defendant Jordan responded, in relevant part:

Yes. I mean, we obviously look at acquisitions to be completely aligned to our strategy. And obviously, we've got a number of different avenues that we want to take. If we see acquisitions accelerating or providing us knowledge that we can't develop in-house. And the value is right in terms of what we see is accretive to shareholders longer term, then we will take those opportunities. Violet Grey, I think, is a good example of that, where we wanted to develop our beauty offering on the marketplace. It's a $75 billion industry, as we said earlier on, and we wanted to make sure we could start that with a pretty big splash.

We obviously want to focus on third-party beauty suppliers, and we signed up for a number of large, medium and small brands to go live in Q2 with us. But as we learn within fashion, owning a small retailer that allows you to understand how the customer works, how the supply chain works, how the dynamics of the basket works and also use your 1P supply chain to perhaps create exclusives or capture collections or maybe plug gaps with third-party stockers, not deep enough or not where we want it to be, like we've done with Browns on fashion, it is definitely the right thing to do to be able to have that mix of 1P and 3P. And so Violet Grey allows us to do that. We've got from the get-go, an amazing supply chain. They've got some cult brands, some Indie brands, the big brands as well. They really understand the customer in a way that we probably didn't know without that acquisition. And so we can use Violet Grey to really sort of accelerate and make sure that we start in that category from day 1 with a big splash.

305.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Jordan failed to disclose that: (i) Violet Grey was already experiencing a slowdown in sales, growth, and revenue; (ii) at the time of the acquisition Violet Grey was struggling financially and required funding to continue operations; (iii) as such, Violet Grey did not support the Company's plans of driving customer retention and acquisition through NGG beauty.

93

306.    Ms. Schenk then followed up by asking:

You've also recently announced that New Guards Group will be the core operating partner for Reebok in Europe with an exclusive license there. Could you talk about the decision behind that partnership and also sort of the financial mechanics in '22 and beyond?

307.    To which Defendant Jordan responded:

Yes. I mean, this is exactly what New Guards Group should be doing as a brand platform that can effectively develop and operate brands within the fashion space.

This is bread-and-butter type sort of stuff. Obviously, the distribution and operating platform for Reebok is big in itself and is attractive in terms of what we can do around GMV on the brand platform, perhaps also on the digital platform as we migrate some of the digital aspects of that brand on to Farfetch or indeed through the marketplace. So very exciting just on its own. But what got us super interested was that ABG, who have now bought the brand off Adidas, we're keen to develop the luxury end of Reebok. And obviously, you guys grew with angels with off-white. What we've done over recent years is an expert in turning that crossover between luxury and streetwear and have been able to drive growth in that market, which is obviously growing in terms of its popularity.

And so we really think we can expand the opportunity for that brand in terms of luxury collaborations, exclusive and really grow that end of the market for ABG over time. So yes, I'm super excited about the potential for that. And it does open the door for other opportunities for NGG to be able to partner with other brands to drive growth and how to operate the business in a low cost and very efficient fashion.

Now obviously be able to source, produce and retail the product both online and offline and use the leverage of the brand platform to drive that in a really good economical way and drive profitability for us.

This year, there's a transition year. So 2022, it's a little bit complicated. The brand is in transition. We don't pick up the operating license fully until next year. We'll obviously start to work with both Adidas and ABG to develop products and things like that. So profitability-wise, it doesn't necessarily flow through from stronger GMV or revenue. But there is a sort of a profit share aspect to it that we'll be able to put into the profitability this year. And then from next year on, we'd see things really shift across different lines of the P&L.

308.    The foregoing statements were materially false or misleading when made, or

omitted to state material facts necessary to make the statements not misleading because, Defendant

Jordan failed to disclose that: (i) Farfetch lacked proper oversight concerning the cash needs of

different divisions of the Farfetch Group, including *inter alia*, NGG; (ii) Farfetch was already experiencing significant challenges managing NGG's operating costs relating to supply chain and inventory; (iii) the Company failed to perform proper due diligence prior to the Reebok acquisition in February 2022; (iv) Reebok had been overvalued at the time of acquisition based on steep discounts offered by Adidas and was incapable of producing at expected rates under Farfetch's full price strategy.

### March 25, 2022 – Goldman Sachs Conference

309.    On March 25, 2022, Farfetch presented at the Goldman Sachs European Digital Economy Conference: Consumer Internet ("Goldman Sachs Conference"). During the conference, analyst Louise Susan Singlehurst of Goldman Sachs Group, Inc., Research Division asked about the Company's venture into Beauty following Defendant Neves' opening remarks, stating, in relevant part, "on Beauty, I think if we heard you correctly there, was that just talking about Chanel and Beauty in the same sentence for the Farfetch launch, if we understood correctly?"

310.    To which Defendant Neves responded, in relevant part:

Yes, yes. So we have a very powerful proposition for Beauty. Beauty is a $75 billion market, luxury beauty, where we're not present at all. And I think what we've developed is quite innovative, because there are no e-concessions for luxury beauty at the moment. So if you're a beauty brand, it is incredibly frustrating, because you have only wholesale routes to market, right? You are in department store dot-com or you're in Sephora or you're in Ulta, right? And either they don't have the positioning you want necessarily or is wholesale, with all the issues that wholesale has, lower margin, no control of promotions and pricing, et cetera, et cetera.

And Farfetch opens this route to market, which is direct-to-consumer, full control of merchandising and pricing, ability to advertise on our platform and really, launch products, and for beauty that's super important to have rich content and create events and power through advertising and through media, really, these new launches. And that's what we've seen from the brands, so like strong -- very strong adoption from the major luxury cosmetics and skin care brands, as well as the indie brands, which are super important in this sector and VIOLET GREY our acquisition was precisely to capture that opportunity in terms of strong, authoritative device in these new indie brands and to a very refined and sophisticated beauty public.

95

311.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Neves failed to disclose that: (i) Violet Grey was already experiencing a slowdown in sales, growth, and revenue; (ii) at the time of the acquisition Violet Grey was struggling financially and required funding to continue operations; (iii) as such, Violet Grey did not support the Company's plans of driving customer retention and acquisition through NGG beauty.

312.    Later in the conference, Ms. Singlehurst asked about market conditions stating, in relevant part:

> We're obviously -- at this point in time, we're all trying to navigate a little bit more uncertainty in the market. I suppose, putting your hat on what you've seen historically and how the business has performed during times of more turbulence where the consumer might be concerned, but also if they've seen – there's anything that you can share with us, any changes in terms of appetite by AOV, any changes in appetite by category that you're seeing across the platform.

313.    To which Defendant Neves responded:

> I think we -- as we said in our earnings call, we're very, very bullish. We think we have ahead of us an incredible opportunity in terms of – it's a pivotal time for the luxury industry. In most markets, we are now post-COVID or migrating to more of an endemic rather than pandemic situation. Consumers are -- have embraced, and this is not going to go back, not going to be reversed. It's now very clear they have embraced online shopping behaviors that are here to stay. The brands have been converted to digital, so they now know that they need best-in-class digital capabilities to stay ahead of the game and stay ahead of their competition. And this bodes well in terms of our ambitions, both in terms -- both as a platform and as a marketplace to continue acquiring market share. We entered 2022 with great momentum, with a great to far and with really strong prospects, short, medium, long term.
>
> Of course, it's not going to be a walk in the park this year. Russia evaporated as a market, essentially, because we decided to suspend operations there, and it was 6% of our GMV in 2021. And we remain vigilant in terms of other regions of the world. And if there is any impact, I think it's too early to say -- and you can think of it both ways, right? The situation in China with lockdowns and zero tolerance, is it a headwind or a tailwind? The reality is we don't know. And if it's like in the West, it's a major tailwind, right? The future will say in the next few quarters, because what happened in the West was when the lockdown started, there was huge uncertainty on whether people were going to buy luxury or not and what categories

and what will happen to AOVs. It's like, you remember that entire speculative exercise of trying to get a crystal ball, dust off our crystal balls and try to look into the future.

If we extrapolate what happened in the West, it ended up being a major tailwind, not long time after the lockdown started. But in China, it could be different, right? In China, it could be the opposite, and we could have impact to consumer sentiment, different from the West. So it's -- we don't have a crystal ball, we can't say. What we can say is that we have a track record of navigating one after another after another. We were talking -- we -- I launched Farfetch in 2008, 2 weeks before Lehman Brothers went bankrupt. And I couldn't raise any money until 2010 was the first round of VC funding. And since 2010, there were a number of other bumpy roads that we had to navigate. And this is in the DNA of the company where -- and we've proven also with COVID and we've proven it time after time.

So I know that I have the team, the technology, capabilities, the operational nimbleness to navigate whatever is thrown at us. And therefore, I remain incredibly confident and I think it's a very, very exciting time to be in this industry.

314.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Neves failed to disclose that: (i) the halt of sales in Russia, the Company's third largest market, had already negatively impacted Farfetch's sales and growth, encompassing roughly 20% of Marketplace sales; (ii) Farfetch was already experiencing a significant slowdown in growth in the U.S. and China, the Company's two largest markets; (iii) internal forecast already showed a material impact on future performance and did not support the Company's guidance or expectations; and (iv) as a result, the Company did not enter 2022 with "great momentum" and did not have "really strong strong prospects, short, medium, long term."

**May 26, 2022 – Q1 2022 Quarterly Report**

315.    On May 26, 2022, Farfetch issued a press release announcing its Q1 2022 financial results (the "Q1 2022 Earnings Release"), providing in relevant part:

• Q1 2022 Gross Merchandise Value ("GMV") and Digital Platform GMV increase 1.7% and 2.5% year-over-year, respectively, to $930.8 million and $809.5 million, respectively

• Q1 2022 Revenue increases 6.1% year-over-year to $514.8 million

• Q1 2022 Gross Profit Margin of 44.8% and Digital Platform Order Contribution Margin of 32.7%

• Q1 2022 Profit after Tax of $728.8 million (includes non-cash benefit arising from impact of lower share price on items held at fair value and remeasurements)

• Q1 2022 Adjusted EBITDA of $(35.8) million

316.    The Q1 2022 Earnings Release provided GMV results stating:

GMV increased by $15.2 million from $915.6 million in first quarter 2021 to $930.8 million in first quarter 2022, representing year-over-year growth of 1.7%. Digital Platform GMV increased by $19.5 million from $790.0 million in first quarter 2021 to $809.5 million in first quarter 2022, representing year-over-year growth of 2.5%. Excluding the impact of changes in foreign exchange rates, Digital Platform GMV would have decreased 0.7% year-over-year.

First quarter 2022 Digital Platform GMV growth reflects order growth across the Marketplace, an increase in AOV from $618 to $632, driven by increases in full-priced item mix and number of items per order, as well as strong growth in the Americas, Middle East and Korea. This was offset by softer demand in other key markets including Russia, where trade was suspended from March 2022 with no indication of when trade might resume, and China, where continuing local COVID-19 restrictions continue to impact orders in Mainland China.

Brand Platform GMV decreased by 11.2% to $99.7 million, due to continued delays in order shipments and resulting cancelations arising from the migration to a new warehouse partner. The transition was completed in May 2022, however, delayed shipments could negatively impact margins into second quarter 2022. The GMV decrease also includes a 4.5% decline due to changes in foreign exchange rates.

In-Store GMV increased by 62.0% to $21.5 million, driven by additional openings of New Guards brands stores in the last twelve months as well as growth from existing stores.

317.    The Q1 2022 Earnings Release provided Revenue results stating:

Revenue increased by $29.7 million year-over-year from $485.1 million in first quarter 2021 to $514.8 million in first quarter 2022, representing growth of 6.1%. The increase was primarily driven by 9.3% growth in Digital Platform Revenue to $395.6 million and a 74.8% growth in In-Store Revenue, offset by a 10.5% decrease in Brand Platform Revenue to $100.5 million.

Digital Platform Services Revenue increased by 10.8% ahead of the 2.5% overall growth in Digital Platform GMV, driven by first-party revenue, which increased 16.1%. Digital Platform Services third-party revenue increased ahead of GMV

growth at 7.8% reflecting a higher take rate and higher growth in advertising revenue.

Digital Platform Fulfilment Revenue represents the pass-through to consumers of delivery and duties charges incurred by our global logistics solutions, net of any Farfetch-funded consumer promotions, subsidized shipping and incentives. Digital Platform Fulfilment Revenue increased 3.5% year-over-year, slightly above Digital Platform GMV growth of 2.5%, reflecting an increased pass-through of such costs to consumers in first quarter 2022.

Brand Platform Revenue decreased 10.5% primarily reflecting the decrease in Brand Platform GMV, partially offset by the addition of revenue from the Reebok partnership which commenced in March 2022.

318.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate controls over NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing sales; and (iv) as such, the Company's financial results were materially overstated.

319.    The Q1 2022 Earnings Release also provided the Company's then-current "Outlook" stating:

For Full Year 2022:
•Digital Platform GMV growth of 5% to 10% year-over-year
•Brand Platform GMV growth of 10% to 15% year-over-year
•Adjusted EBITDA margin of 0% to 1%

Uncertainties resulting from the impact of the COVID-19 pandemic, macroeconomic factors and geopolitical turmoil, including the war in Ukraine, could have material impacts on our future performance and projections. These factors could potentially impact our future performance include, among others:
•Disruptions to our operations, fulfilment network, and shipments;
•weakened consumer sentiment and discretionary income arising from various macro-economic conditions;
•increased costs to support our operations;

•slowing e-commerce consumer activity as vaccinations gain acceptance and populations resume to pre-pandemic activities and lifestyles; and

•reduced demand for our offerings and services.

320.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate internal controls over NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing sales; (iv) as such, the Company's guidance or expectations were materially overstated; (v) Farfetch was already experiencing a significant slowdown in growth in its first and second largest markets, the U.S. and China, respectively, prior to 0-tolerance COVID restrictions in China; and (vi) as a result, internal forecasts already showed a material impact on future performance and did not support the Company's outlook even on reduced projections.

321.    The Q1 2022 Earnings Release quoted Defendant Jordan as stating, in relevant part, that the Q1 2022 results "demonstrate our underlying strength and ability to adapt to the changing macro environment whilst building on the momentum we have achieved over recent years. We have navigated unprecedented challenges, grown Digital Platform GMV 64% on a two-year basis, and continue to operate at scale in the global luxury market."

322.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Jordan failed to disclose that: (i) the Company lacked adequate internal operational controls, including controls over NGG's financial reporting of revenue and GMV; (ii) the Company was improperly recognizing sales; and (iii) as such, the Company's financial results were materially overstated.

323.    That same day, Farfetch hosted a conference call with investors and analysts to discuss its Q1 2022 results (the "Q1 2022 Earnings Call"). During this call, Defendant Neves discussed the NGG business stating, in relevant part:

> Beyond this, New Guards continues to drive newness and excitement behind our brand portfolio. With the fashion industry returning to the catwalk in person after 2 years, Palm Angels, Ambush and Off-White each held highly acclaimed shows to showcase their autumn/winter '22 collections. And Off-White became the first Farfetch business unit to begin accepting cryptocurrency, which is now live in the Paris, London and Milan flagships.
>
> The brand also announced the appointment of Ibrahim Kamara in the new role of Art & Image Director, where he will support image, design and styling for the brand. Ibrahim is also the Editor in Chief of Dazed, and his years of experience working with Virgil Abloh and the Off-White team to style their shows ideally position him to take the brand forward.
>
> In March, New Guards also completed its Reebok agreement with ABG and kicked off the yearlong collaboration with ABG and adidas to transition the brand and the New Guards. We believe this to be a profitable multi-hundred million dollar deal for NGG and also a great addition to our digital platform since we will prioritize a digital DTC strategy going forward.
>
> With our warehouse transition now resolved, we are expecting our brand platform to deliver stronger results through full year 2022 and continue to be a strategic driver of both organic customer acquisition and unique offerings on our marketplace.

324.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Neves failed to disclose that: (i) Farfetch lacked proper oversight concerning the cash needs of different divisions of the Farfetch Group, including *inter alia*, NGG; (ii) Farfetch was already experiencing significant challenges managing its operating costs relating to supply chain and inventory; (iii) the Company's operational and information technology controls for NGG were not designed appropriately; (iv) the Company lacked adequate internal controls over NGG's financial reporting of revenue and GMV; (v) the Company was improperly recognizing sales; (vi) NGG was already experiencing a significant drop in sales from the Group's primary revenue generator, Off-

White, following the untimely death of founder and creative director; (vii) the Company failed to perform proper due diligence prior to the Reebok acquisition in February 2022; (viii) Reebok had been overvalued at the time of acquisition based on steep discounts offered by Adidas and high operating costs related to inventory; (ix) as such, Reebok was incapable of producing at expected rates under Farfetch's full price strategy and left little to no profit margins for the Company.

325.    During the call, Defendant Jordan discussed the Company's Q1 2022 financial performance stating, in relevant part:

> Overall, we achieved group GMV of $931 million, an increase of 2% year-on-year and up 52% on a 2-year basis compared to Q1 2020. This position reflects 2.5% growth in digital platform GMV driven by strong growth in the Americas, the Middle East and Korea, offset by a decline in GMV in Russia, parts of Europe and Mainland China; an 11% decline in Brand Platform GMV due to a transition of our logistics operations, which has caused shipment delays during the main spring/summer '22 selling window and in-store GMV growth of 62% year-on-year as we saw an increase of customers engaging with our connected retail formats as well as contributions from new store openings.
>
> Adjusted revenue was slightly stronger in terms of year-on-year growth, up 7% to $436 million. Again, this revenue was driven by strong growth in stores, 16% first-party revenue growth, in line with the previous quarter, 89% year-on-year growth in revenue from our Media Solutions advertising business and higher underlying commission rates from our e-concession third parties on the digital platform.

326.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Jordan failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate controls over NGG's financial reporting of revenue and GMV; (ii) the Company was improperly recognizing sales; and (iii) as such, the Company's financial results were materially overstated.

327.    Defendant Jordan went on to discuss the Company's revised expectations for the

year 2022 providing, in relevant part:

> I'd now like to discuss our full year 2022 outlook. Given how our top line growth
> has been impacted by the change in demand from our second and third largest
> marketplace geographies, we are completing a review of business priorities. This
> means focusing on markets, categories and initiatives that show strength and
> rationalizing spend across parts of the business to match the new macro
> environment.
>
> We have already restricted planned headcount growth, reduce spend on projects
> with longer term payback and begun pruning back areas of the business that are not
> key to delivering our immediate goals or are not delivering intended results than
> the near term. This activity will mean we can continue to play to our strengths,
> leverage the investments we have made to date and ensure we can deliver the right
> balance between supporting future growth and focusing on stronger profitability
> and cash flow.
>
> As a result, we are revising our expectations for the full year, reflecting global
> demand expectations for the rest of the year with weakness in China, no sales from
> Russia and a balanced view on demand from other markets, we expect to grow
> Digital Platform GMV by 5% to 10% year-on-year, with stronger growth expected
> in the second half of the year versus the first half. Digital Platform order
> contribution margin is expected to be circa 30% of Digital Platform services
> revenue, assuming markdown activity continues on the first-party business in
> response to the slower top line growth.
>
> For the Brand Platform, we now expect 10% to 15% GMV growth, taking into
> account the Q1 result and continued demand for our luxury brands. We will limit
> operating cost growth to be below the level of growth in adjusted revenue,
> delivering leverage, and we will maintain our focus on being profitable at the
> adjusted EBITDA level, keeping margins at 0% to 1% of adjusted revenue.
>
> Finally, we expect to see an improvement in working capital for the rest of the year,
> as we reduce inventory holdings and normalize our receivables position. We aim to
> end the year with strong liquidity above $650 million as at December 2022.

328.    The foregoing statements were materially false or misleading when made, or

omitted to state material facts necessary to make the statements not misleading because, Defendant

Jordan failed to disclose that: (i) the Company's operational and information technology controls

for NGG were not designed appropriately; (ii) the Company lacked adequate internal controls over

NGG's financial reporting, including revenue, GMV, inventory holdings, and receivables position;

(iii) the Company was improperly recognizing sales; (iv) Reebok had been overvalued at the time of acquisition based on steep discounts offered by Adidas and high operating costs related to inventory; (v) as such, the Company's guidance or expectations were materially overstated; (vi) NGG was already experiencing a significant drop in sales from the Group's primary revenue generator, Off-White, following the untimely death of founder and creative director; (vii) as such, the Company's increased marketing spend on Off-White brand awareness did not support future growth, or stronger profitability and cash flow the Company; (viii) Violet Grey was already experiencing a slowdown in sales, growth, and revenue; (ix) as such, the Company's increased investment behind the launch of NGG Beauty did not support future growth, or stronger profitability and cash flow the Company; (x) Farfetch was already experiencing a significant slowdown in growth in its largest market, the U.S.; (xi) Farfetch was already experiencing a significant slowdown in growth in China prior to 0-tolerance restrictions and downplayed the negative impact on growth thereafter; (xii) as a result, internal forecasts already showed a material impact on future performance and did not support the Company's outlook or even reduced projections.

329.    During the Question-and-Answer portion of the call, analyst Douglas Till Anmuth of JP Morgan Chase & Co, Research Division, asked the following questions:

> First, I was just trying to understand on the top line guidance, just thinking about the underperformance for 1Q, but more so, I guess, for the full year, with the guide coming down, just how much is it related to the 3 big factors you mentioned versus potentially softer consumer in Europe and the U.S. and how you're thinking about that for the rest of the year?
>
> And then just secondly, the 0% to 1% adjusted EBITDA margin. Can you just walk us through some of the areas where you expect to rationalize some of the expenses and perhaps some examples of how you'll do that as you go through the year?

330.    To which Defendant Jordan responded, in relevant part:

Yes. I mean, broadly, ***first quarter was entirely down to the 3 factors that we've outlined earlier***. Russia and sort of adjacent countries, I guess, that have been impacted by what's going on there in Eastern Europe, the China lockdown and then there's quite a sudden acceleration on full price from our e-concession partners, which obviously we celebrate.

*** 

In terms of adjusting the spend versus original plans, we completed an entire review of business priorities from top to bottom. We've already restricted headcount growth, as I've said. And where we were going to put some money into projects that probably would have delivered more payback next year or the year after, we've decided to hold back on that spend and wait until things look better in terms of top line growth, and we see an acceleration into next year. ***Obviously, with the Reebok deal and then Neiman Marcus live next year as well, we're going to see much stronger growth in 2023***, and that's the time to invest in some of these longer-term initiatives that we definitely want to do. But no, this isn't the year to do it. So anything with longer-term payback, we're sort of phasing back.

(emphasis added)

331.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Jordan failed to disclose that: (i) Farfetch was already experiencing a significant slowdown in growth in its largest market, the U.S.; (ii) Farfetch was already experiencing a significant slowdown in growth in China prior to 0-tolerance restrictions and downplayed the negative impact on growth thereafter; (iii) NGG was already experiencing a significant drop in sales from the Group's primary revenue generator, Off-White, following the untimely death of founder and creative director; (iv) Reebok had been overvalued at the time of acquisition based on steep discounts offered by Adidas and high operating costs related to inventory; (v) as a result, Reebok was incapable of producing at expected rates under Farfetch's full price strategy and would not see stronger growth in 2023.

**August 25, 2022 – Q2 2022 Quarterly Report**

332.    On August 25, 2022, Farfetch issued a press release announcing its Q2 2022 financial results (the "Q2 2022 Earnings Release"), providing in relevant part:

•Q2 2022 Gross Merchandise Value ("GMV") increases 1.3% year-over-year (or increases 7.6% year-over-year at constant currency) to $1 billion

•Q2 2022 Digital Platform GMV decreases 3.3% year-over-year (or increases 1.6% year-over-year at constant currency) to $883.1 million

•Q2 2022 Brand Platform GMV growth of 47.3% year-over-year (or 68.4% year-over-year at constant currency) to $107.1 million

•Q2 2022 Revenue increases 10.7% year-over-year (or increases 20.7% year-over-year at constant currency) to $579.3 million

•Q2 2022 Gross Profit Margin of 46.2% and Digital Platform Order Contribution Margin of 31.7%

•Q2 2022 Profit after Tax of $67.7 million (includes non-cash benefit arising from impact of lower share price on items held at fair value and remeasurements)

•Q2 2022 Adjusted EBITDA of $(24.2) million

•Cash, Cash Equivalents, and Short-term Investments of $675.2 million as of June 30, 2022

333.    The Q2 2022 Earnings Release provided GMV results stating:

GMV increased by $12.6 million from $1,007.8 million in second quarter 2021 to $1,020.4 million in second quarter 2022, representing year-over-year growth of 1.3%. Digital Platform GMV decreased by $30.3 million from $913.4 million in second quarter 2021 to $883.1 million in second quarter 2022, representing a year-over-year decline of 3.3%. Excluding the impact of changes in foreign exchange rates, Digital Platform GMV would have increased 1.6% year-over-year.

Digital Platform GMV performance in the second quarter 2022 reflects continuing headwinds from suspension of trade in Russia, where trade has been ceased since March 2022, and China, where regional COVID-19 restrictions continue to impact orders in Mainland China. Additionally, while our shift to full-price continued in second quarter 2022, this was more than offset by a decline in markdown sales.

Brand Platform GMV increased year-over-year by 47.3% to $107.1 million or increased 68.4% year-over-year excluding the impact of changes in foreign exchange rates. This increase in GMV reflects a partial recovery from delayed shipments in first quarter 2022 and strong demand for New Guards' brands' Autumn-Winter 2022 collections.

In-Store GMV increased by 38.8% year-over-year to $30.2 million, driven by additional openings of New Guards brands' stores in the last twelve months as well as growth from existing stores. Excluding the impact of changes in foreign exchange rates, In-Store GMV would have increased 52.8% year-over-year.

334.    The Q2 2022 Earnings Release provided Revenue results stating:

Revenue increased by $56.0 million year-over-year from $523.3 million in second quarter 2021 to $579.3 million in second quarter 2022, representing year-over-year growth of 10.7%. The increase was driven by a 60.3% increase in Brand Platform Revenue to $116.6 million, a 52.0% growth in In-Store Revenue and an increase in Digital Platform Revenue of 0.7%. Excluding the impact of changes in foreign exchange rates, revenue would have increased 20.7% year-over-year.

Digital Platform Services Revenue increased by 2.0% year-over-year driven by first-party revenue. Digital Platform Services first-party revenue increased 8.7% primarily driven by increased markdown sales of Browns' products on the Marketplace. Digital Platform Services third-party revenue decreased by 2.5% year-over-year impacted by the same factors driving GMV, partially offset by growth in advertising revenue.

Digital Platform Fulfilment Revenue represents the pass-through to consumers of delivery and duties charges incurred by our global logistics solutions, net of any Farfetch-funded consumer promotions, subsidized shipping and incentives. Digital Platform Fulfilment Revenue decreased 4.7% year-over-year, above the overall Digital Platform GMV decline of 3.3%, as a portion of shipping cost efficiencies in second quarter 2022 were passed through to consumers.

Brand Platform Revenue increased by 60.3% year-over-year, which was at a faster rate than GMV growth, due to the addition to revenue of $9.4 million generated by the Reebok net economic benefit from the partnership which commenced in March 2022.

335.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate controls over NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing sales; and (iv) as such, the Company's financial results were materially overstated.

336.    The Q2 2022 Earnings Release also provided the Company's then-current "Outlook" providing:

> Uncertainties resulting from the impact of the COVID-19 pandemic, macroeconomic factors and geopolitical turmoil, including the war in Ukraine, could have material impacts on our future performance and projections. The factors that could potentially impact our future performance include, among others:
>
> •disruptions to our operations, fulfilment network, and shipments;
>
> •fluctuations in foreign exchange rates;
>
> •weakened consumer sentiment and discretionary income arising from macro-economic conditions;
>
> •increased costs to support our operations;
>
> •slowing e-commerce consumer activity as vaccinations gain acceptance and populations resume to pre-pandemic activities and lifestyles; and
>
> •reduced demand for our offerings and services.
>
> The following reflects Farfetch's expectations for Full Year 2022 as of August 25, 2022:
>
> •Digital Platform GMV growth of 0% to 5% year-over-year
>
> •Brand Platform GMV growth of 0% to 10% year-over-year
>
> •Targeting break-even Adjusted EBITDA

337.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate internal controls over NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing sales; (iv) as such, the Company's guidance or expectations were materially overstated; (v) Farfetch was already experiencing a significant slowdown in growth in its first and second largest markets, the U.S. and China, respectively, prior to zero-COVID restrictions in China; and (vi) as a result, internal forecasts already showed a material impact on future performance and did not support the Company's outlook even on reduced projections.

338.    Defendant Neves is quoted in the Q2 2022 Earnings Release as saying:

And while our eyes are fixed on our North Star, our feet remain planted firmly on the ground. We are navigating a volatile macro environment adeptly, continuing to post growth compounding on what has been a tremendous 3-year run for Farfetch, a period that saw our business double as measured by our GMV. This makes me extremely bullish for 2023, a year when we will lap our closure of our Russia operations, expect China to turn into a tailwind, and will start to see the fruits of large deals signed this year with Reebok, Neiman Marcus Group and Salvatore Ferragamo. These 2023 vectors of growth, combined with the rationalisation of costs we are implementing this year, make me very confident about our 2023 top line, profitability and cash generation.

339.    The Q2 2022 Earning Release also quotes Defendant Jordan as saying:

In second quarter 2022 Farfetch demonstrated our ability to navigate macro challenges while delivering robust underlying growth and managing resources effectively. We achieved revenue growth, on a constant currency basis, of 21% year-on-year, and expanded gross profit margins with strong unit profitability. We remain focused on continuing to navigate the near-term macro environment, and I am excited about the multiple levers of growth and drivers of profitability in 2023 and beyond.

340.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendants failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate controls over NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing sales; (iv) as such, the Company's financial results were materially overstated; (v) Farfetch was already experiencing a significant slowdown in growth in its largest market, the U.S.; (vi) Farfetch was already experiencing a significant slowdown in growth in China prior to 0-tolerance restrictions and downplayed the negative impact on growth thereafter; (vii) as a result, internal forecasts already showed a material impact on future performance and did not support the Company's outlook or even reduced projections for 2022; (viii) Reebok had been overvalued at the time of acquisition based on steep discounts offered by Adidas and high operating costs related

to inventory; (ix) as a result, Reebok was incapable of producing at expected rates under Farfetch's full price strategy and would not see stronger growth in 2023; and (x) as a result, the Company's so-called "vectors of growth" did not a positive top line, profitability or cash generation in 2023 or beyond.

341.    That same day, Farfetch hosted a conference call with investors and analysts to discuss its Q2 2022 results (the "Q2 2022 Earnings Call"). During this call, Defendant Neves discussed the Company's Q2 2022 financial results stating, in relevant part:

> More recently, whilst we've been executing on our unwavering pursuit of this luxury new retail vision, we have also continued to deliver on our core business performance, as evidenced in our underlying Q2 results. Excluding Russia and Mainland China, each of our 3 marketplace regions, Americas, EMEA and APAC, delivered high single-digit growth over a tough Q2 '21 comp, when overall marketplace GMV was up around 40%. Additionally, on a 3-year basis, marketplace GMV growth, excluding Russia and China, accelerated versus Q1 '22.
>
> ***
>
> Outside of these 3 factors, which were expected and discussed on our Q1 2022 call, Q2 underlying performance remained very strong, with full-price marketplace GMV, excluding Russia and Mainland China, growing circa 20% year-on-year for the second consecutive quarter. This is before accounting for FX volatility. In fact, I'd like to point out that all the figures I've shared do not take into account the significant foreign exchange rate volatility, which impacted our reported results in Q2. At constant FX, on a year-on-year basis, Digital Platform GMV increased 2%, Brand Platform GMV grew 68% and revenue increased 21%.

342.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Neves failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate controls over NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing sales; and (iv) as such, the Company's financial results were materially overstated.

343.     During the Q2 2022 Earnings Call, Defendant Jordan discussed the Company's

financial results stating, in relevant part:

> Finally, our profitability is also impacted because the positive contribution to adjusted EBITDA from our profitable foreign entities is reduced on translation to U.S. dollars. As a result, across Q2, we achieved revenue of $579 million, an increase of 11% year-on-year or 21% on a constant currency basis. Gross merchandise value of $1 billion, twice the GMV of Q2 2019, and up 1% year-on-year or 8% on a constant currency basis. Our gross profit growth outpaced revenue growth to deliver an expanded gross margin of 46.2% versus 44% in Q2 '21.

> Our adjusted EBITDA was a loss of $24 million versus a loss of $21 million last year, and we remain well funded with $675 million in cash, cash equivalents and short-term investments.

> The major drivers of reported GMV and revenue growth included high single-digit growth in the marketplace, outside China and Russia, including growth in full price of 20% year-on-year. Our Brand Platform growing GMV at 47% year-on-year from strong demand for Off-White and Palm Angels and a catch up on the lost sales in Q1 2022. And our in-store GMV growing 39% year-on-year.

> I'd now like to discuss these factors in more detail starting with performance across the Digital Platform. Reported Digital Platform GMV declined year-on-year by 3% to $883 million, but grew 2% year-on-year at a constant currency, which was slightly lower than the Q1 2022 constant currency growth of 5% year-on-year as Q2 had a full quarter of impact from reduced trade in Russia and China.

> By region, for the Marketplace, GMV from China was down year-on-year due to COVID-19 restrictions. However, we have seen strong engagement from customers including during our 6.18 event in the China market and year-on-year growth on Tmall, which means we remain optimistic about the China market and our overall proposition moving forward. We expect this market to return to growth over the next 12 months.

> ***

> The Americas overall continued to show resilience, and GMV from this region is now 87% higher than 2019.

> ***

> Now I'd like to move on to our Brand platform. During the second quarter, we resolved the warehouse issues impacting our operations in Q1 and alongside strong demand for NGG brands, Off-White and Palm Angels, delivered Brand platform GMV of $107 million, an increase of 47% year-on-year or 68% on a constant currency basis. Year-to-date, Brand platform GMV has grown 12% year-on-year or 22% on a constant currency basis. Brand Platform revenue was $117 million,

reflecting the GMV position, and $10 million of revenue from our new partnership with Reebok, which commenced in March 2022.

344.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Jordan failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate controls over NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing sales; (iv) as such, the Company's financial results were materially overstated; (v) Farfetch was already experiencing a significant slowdown in growth in its largest market, the U.S.; (vi) Farfetch was already experiencing a significant slowdown in growth in China prior to 0-tolerance restrictions and downplayed the negative impact on growth thereafter; (vii) NGG was already experiencing a significant drop in sales from the Group's primary revenue generator, Off-White, following the untimely death of founder and creative director; and (viii) direct brand contracts had materially low take rates (between 8% and 10%) and/or high VAT costs negatively impacting the Company's cash position, Adjusted EBITDA, and/or gross margins.

345.    Defendant Jordan also discussed the Company's "outlook" for the full year 2022 providing, in relevant part:

> I'd now like to cover our outlook for the rest of the year. As the Q2 results highlight, *we are successfully managing many factors across the business and achieving strong underlying revenue growth and improved gross margins*. We are also progressing our cost-saving initiatives to focus resources on areas of the business that are delivering stronger near-term payback and on achieving our strategic initiatives, including those announced yesterday.

> On a constant currency basis, our H2 outlook remains largely unchanged from last quarter. However, we expect the stronger U.S. dollar will continue to impact our reported growth and profitability for the rest of the year. As a result, our full year expectations are Digital Platform GMV growth of 0% to 5% year-on-year, Brand platform GMV growth of 0% to 10% year-on-year, Digital Platform order contribution margin above 30% and Brand Platform gross margins above 50%.

In addition, ***our cost-saving initiatives allow us to target breakeven adjusted EBITDA for the second consecutive year***. I will reiterate that ongoing currency movements may adversely impact our reported figures. In terms of reserves, which are largely held in U.S. dollars, we continue to closely manage our liquidity position. ***H2 profitability and improving working capital position as we exit the year means that cash and cash equivalents is expected to close above $650 million at year-end***.

(emphasis added)

346.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Jordan failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate internal controls over NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing sales; (iv) as such, the Company's guidance or expectations were materially overstated; (v) direct brand contracts had materially low take rates (between 8% and 10%) and/or high VAT costs negatively impacting the Company's cash position, Adjusted EBITDA, and/or gross margins; (vi) the "cost-saving initiatives" taken was no match for its exorbitant and unsustainable cash burn and did not support breaking even on adjusted EBITDA; (vii) the Company failed to take action to cut costs until the end of 2022 at which point such action too late; (viii) at the beginning of 2022 the Company made a series of costly acquisitions of overvalued companies that were already experiencing financial constraints and/or left little to no profit margins for the Company; and (ix) as a result, the Company's working capital position was *not* improving, rather the Company was experiencing a liquidity crisis and was at material risk of insolvency.

**November 17, 2022 – Q3 2022 Quarterly Report**

347.    On November 17, 2022, Farfetch issued a press release announcing its Q3 2022 financial results (the "Q3 2022 Earnings Release"), providing in relevant part:

•Q3 2022 Revenue increases 1.9% year-over-year (or increases 14.1% year-over-year at constant currency) to $593.4 million

•Q3 2022 Gross Merchandise Value ("GMV") decreases 4.9% year-over-year (or increases 4.2% year-over-year at constant currency) to $967.4 million

•Q3 2022 Digital Platform GMV decreases 5.0% year-over-year (or increases 2.6% year-over-year at constant currency) to $787.4 million

•Q3 2022 Brand Platform GMV decline of 10.4% year-over-year (or increases 4.9% year-over-year at constant currency) to $148.1 million

•Q3 2022 Gross Profit Margin of 44.9% (an increase of 160 bps year-over-year) and Digital Platform Order Contribution Margin of 32.4% (an increase of 580 bps year-over-year)

•Q3 2022 Loss after Tax of $274.9 million (includes non-cash loss on items held at fair value and remeasurements)

•Q3 2022 Adjusted EBITDA of $(4.1) million

•Cash and Cash Equivalents of $487.4 million as of September 30, 2022

348.    The Q3 2022 Earnings Release provided GMV results stating:

GMV decreased $49.9 million from $1,017.3 million in third quarter 2021 to $967.4 million in third quarter 2022, representing a year-over-year decline of 4.9%. Excluding the impact of changes in foreign exchange rates, GMV would have increased 4.2% year-over-year. Digital Platform GMV decreased $41.1 million from $828.5 million in third quarter 2021 to $787.4 million in third quarter 2022, representing a year-over-year decline of 5.0%. Excluding the impact of changes in foreign exchange rates, Digital Platform GMV would have increased 2.6% year-over-year.

Digital Platform GMV performance in third quarter 2022 reflects continuing headwinds from the suspension of trade in Russia, where trade has been ceased since March 2022, and mainland China, where regional COVID-19 restrictions continue to impact trade. Digital Platform GMV performance also reflects a decrease in Marketplace AOV from $593 to $530 due to the translation impact of the strengthening of the US Dollar, as well as a decline in average selling price, which was partially offset by an increase in the number of items per order.

Brand Platform GMV decreased 10.4% year-over-year to $148.1 million. Excluding the impact of changes in foreign exchange rates, Brand Platform GMV would have increased 4.9% year-over-year. The increase on a constant currency

basis was driven by continued demand for our New Guards' brands' Autumn-Winter 2022 collections.

In-Store GMV increased 35.3% year-over-year to $31.9 million. Excluding the impact of changes in foreign exchange rates, In-Store GMV would have increased 54.1% year-over-year. The increase on a constant currency basis was driven by additional openings of New Guards brands' stores in the last twelve months as well as strong like-for-like growth from key existing stores.

349.    The Q3 2022 Earnings Release provided Revenue results stating:

Revenue increased $10.8 million year-over-year from $582.6 million in third quarter 2021 to $593.4 million in third quarter 2022, representing year-over-year growth of 1.9%. The increase was driven by an increase in Digital Platform Revenue of 1.6%, a 39.7% growth in In-Store Revenue, offset by a 2.1% decrease in Brand Platform Revenue to $161.8 million. Excluding the impact of changes in foreign exchange rates, revenue would have increased 14.1% year-over-year.

Digital Platform Services Revenue increased 1.7% year-over-year driven by first-party revenue. Digital Platform Services first-party revenue increased 4.0% as compared to the previous year, primarily driven by increased sales of Browns' products on the marketplace, supported by increased clearance activity. Digital Platform Services third-party revenue remained flat year-over-year, at an increase of 0.1% impacted by the same factors driving GMV, offset by growth in advertising revenue. Excluding the impact of changes in foreign exchange rates, Digital Platform Services Revenue would have increased 11.9% year-over-year.

Digital Platform Fulfilment Revenue represents the pass-through to consumers of delivery and duties charges incurred by our global logistics solutions, net of any Farfetch-funded consumer promotions, subsidized shipping and incentives. Digital Platform Fulfilment Revenue increased 1.0% year-over-year, above the overall Digital Platform GMV decline of 5.0%, resulting from an increased pass-through of such costs to consumers in third quarter 2022.

Brand Platform Revenue decreased 2.1% year-over-year, which was slower than the decline in GMV, due to the addition to revenue of $13.7 million generated by the net economic benefit from the Reebok partnership that commenced in March 2022. Excluding the impact of changes in foreign exchange rates, Brand Platform Revenue would have increased 14.3% year-over-year.

350.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate controls over

NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing

sales; and (iv) as such, the Company's financial results were materially overstated.

351.    The Q3 2022 Earnings Release quotes Defendant Neves as stating:

Luxury is an incredible industry that has proven to be resilient, and Farfetch's global platform for luxury is on pace to broadly double its size over three years, despite navigating an unprecedented series of global events. Through it all, our focus has remained on our mission to be the global platform for luxury while also taking the opportunity to fundamentally re-structure our organization and streamline our cost base. *As a result, Farfetch is further positioned to seize the significant announced milestones and future opportunities ahead, and emerge from this period as an even stronger business set to deliver profitability and free cash flow.*

(emphasis added)

352.    The Q3 2022 Earnings Release quotes Defendant Jordan as stating:

Our third quarter results show Farfetch is successfully navigating an unprecedented macro environment, with constant currency GMV and Revenue growth, significant gross margin and order contribution margin improvements year-on-year and the early financial benefits from our recent initiatives to rationalize our cost base, which are ongoing.  Whilst we continue to manage through the current environment, *we remain well capitalized to execute on our long-term vision, and I am confident we will return to profitable growth in 2023*.

(emphasis added)

353.    The foregoing statements were materially false or misleading when made, or

omitted to state material facts necessary to make the statements not misleading because,

Defendants failed to disclose that: (i) the fundamental restructure and streamline of Farfetch's cost

base was no match for its exorbitant and unsustainable cash burn; (ii) the Company failed to take

action to cut costs until the end of 2022 despite internal forecasts contradicting projected revenue

growth and depicting unsustainable capital spend; (iii) at the beginning of 2022 the Company made

a series of costly acquisitions of overvalued companies that were already experiencing financial

constraints; (iv) direct brand contracts had materially low take rates (between 8% and 10%) and/or

high VAT costs negatively impacting the Company's cash position, Adjusted EBITDA, and/or

116

gross margins; (v) as such, Farfetch was *not* "further positioned to seize the significant announced milestones;" and (vi) as a result, Farfetch did *not* "remain well capitalized to execute on [its] long-term strategies" nor was it "set to deliver profitability and free cash flow," rather the Company was experiencing a liquidity crisis and was at material risk of insolvency. Furthermore, (i) the Company lacked adequate internal operational controls, including controls over NGG's financial reporting of revenue and GMV; (ii) the Company was improperly recognizing sales, and (iii) as such, the Company's GMV, revenue growth, gross margins, and order contribution margins were materially overstated.

354.    The Q3 2022 Earning Release provide the Company's then-current "Outlook" stating:

> Uncertainties resulting from the impact of the COVID-19 pandemic, macroeconomic factors and geopolitical turmoil, including the war in Ukraine, could have material impacts on our future performance and projections. The factors that could potentially impact our future performance include, among others:
>
> •disruptions to our operations, fulfilment network, and shipments;
>
> •fluctuations in foreign exchange rates;
>
> •weakened consumer sentiment and discretionary income arising from macro-economic conditions;
>
> •increased costs to support our operations;
>
> •slowing e-commerce consumer activity as vaccinations gain acceptance and populations resume to pre-pandemic activities and lifestyles; and
>
> •reduced demand for our offerings and services.
>
> The following reflects Farfetch's expectations for Full Year 2022 as of November 17, 2022:
>
> •Digital Platform GMV decline of 5% to 7% year-over-year
>
> •Brand Platform GMV broadly flat
>
> •Targeting Adjusted EBITDA margin of (3)% to (5)%

355.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate internal controls over NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing sales; (iv) as such, the Company's guidance or expectations were materially overstated; (v) Farfetch was already experiencing a significant slowdown in growth in its first and second largest markets, the U.S. and China, respectively, prior to 0-tolerance COVID restrictions in China; (vi) Reebok had been overvalued at the time of acquisition based on steep discounts offered by Adidas and high operating costs related to inventory, which left little to no profit margins for the Company; and (vii) as a result, internal forecasts already showed a material impact on future performance and did not support the Company's outlook even on reduced projections.

356.    That same day, Farfetch hosted a conference call with investors and analysts to discuss its Q3 2022 results (the "Q3 2022 Earnings Call"). During the call Defendant Jordan discussed the Company's Q3 2022 results stating, in relevant part:

> There are 4 numbers to focus on, all on a constant currency basis. First, our Q3 revenue grew 14% year-on-year. Our digital platform GMV grew 10%, excluding Russia. Our brand platform revenue grew 14% year-on-year. And our stores grew revenue 54% year-on-year. At the same time, our 3 business segments expanded gross margins year-on-year and we started to crystallize the financial benefits of our actions to rationalize the cost base. ***These results indicate a business successfully adapting to the current environment whilst continuing to deliver underlying growth***.

(emphasis added)

357.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Jordan failed to disclose that: (i) the Company's operational and information technology controls

for NGG were not designed appropriately; (ii) the Company lacked adequate internal controls over

NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing

sales; (iv) Reebok had been overvalued at the time of acquisition based on steep discounts offered

by Adidas and high operating costs related to unsellable inventory stockpiles; (v) as such, the

Company's sales and revenue growth seen in 2022 could not be replicated under Farfetch's full

price strategy and left little to no profit margins for the Company; (vi) direct brand contracts had

materially low take rates (between 8% and 10%) and/or high VAT costs negatively impacting the

Company's cash position, Adjusted EBITDA, and/or gross margins; (vii) the Company failed to

take action to cut costs until the end of 2022 despite internal forecasts contradicting projected

revenue growth and depicting unsustainable capital spend; (viii) as such, the Company's "action

to rationalize the cost base" was no match for its exorbitant and unsustainable cash burn; and (ix)

as a result, these results were materially overstated, unstainable, and did *not* "indicate a business

successfully adapting to the current environment whilst continuing to deliver underlying growth."

358.    Defendant Jordan went on to add:

> And GMV was flat year-on-year in the Americas **_with GMV in the U.S. down, the_**
> **_impact of a deliberate decision to reduce demand generation spend by 20% year-_**
> **_on-year to focus on higher-margin profitability from this key market._** Despite
> these headline figures, I'm pleased to report underlying order growth of 13% ex
> Russia and 9% year-on-year growth in active consumers. Active consumers
> increased quarter-on-quarter with gross adds up over 500,000, offset by circa
> 100,000 fewer active consumers due to the Russia market closure. In parallel, we
> have achieved significant efficiencies in our customer acquisition costs, which were
> down 18% year-on-year.

(emphasis added)

359.    The foregoing statements were materially false and misleading when made or

omitted to state material facts necessary to make the statements not misleading because, Defendant

Jordan failed to disclose that the Company was already experiencing slowdown in growth in the

U.S. separate and apart from any purported deliberate decision to reduce demand generation spend.

360.    During the Question-and-Answer portion of the call, analyst Lauren Elizabeth

Cassel Schenk of Morgan Stanley, Research Division, asked the following question:

> I wanted to ask about the reorganization and expense discipline. When do you
> expect the full effects of that to be seen? And is there any quantification around the
> gross savings that you're expecting there? And then are there any sort of further
> actions that you think can be taken? Or are all the changes are behind us and now
> it's just about them flowing through the P&L?

361.    To which Defendant Jordan responded, in relevant part:

> Lauren, Yes. I mean we've -- as José said earlier on, we've done a top to bottom
> review of the overall structure of the business. And the first output of that is
> effectively the new reporting structure, the new ownership of the various aspects of
> the platform. So we have clear ownership over FPAs, the marketplaces and the
> brand platform. And then in terms of the supporting platforms to deliver against
> those profitable and growing units, we have arranged ourselves around the
> operations, the technology and our business services, all again with clear
> ownerships. And what that's delivered is significant opportunities for cost savings,
> particularly around streamlining those various aspects of the business globally.

> Some of those are already in there. You've seen a decline in terms of spend quarter-
> on-quarter of $8 million. The risks continue to flow through over the next few
> quarters as we work through the sort of continued changes across the business and
> aligning ourselves around those structures. I think what's important is if you look
> at our numbers, we are driving a leverage in some areas of the business again this
> quarter. And as we move into next year, we'll be driving leverage across all areas
> of our spend through 2023. So if you look at technology year-on-year for Q3,
> including the capitalized element, only up 1.6% in terms of spend, driving operating
> leverage.

> Platform operations, spend was down quarter-on-quarter, driving operating
> leverage year-on-year. Our brand spend came down year-on-year -- sorry, it came
> down quarter-on-quarter and, again, driving operating leverage year-on-year.
> Spend on warehousing because of the efficiencies driven from the logistics team
> down quarter-on-quarter and driving leverage year-on-year. And of course, I
> touched on our customer acquisition spend down 18% year-on-year driving
> significant operating leverage and demand generation savings driving order
> contribution up there as well. So we're seeing the effects come through. There will
> be more to flow through.

> There are actions that are ongoing to see that flow through and savings step up as
> we move through the next few quarters. I don't want to quantify that exact number
> because we are using some of those savings to reinvest where we're seeing near-
> term growth. Clearly, the partnership with Reebok has started off well, and we will
> start to see trade from that relationship across Q2 next year. And we're also

obviously focused very heavily on the fantastic new clients that FPS will be going live with starting across H1 and into H2 next year as well. So there is some reinvestment of the savings. But there is leverage coming through now and very pleasing to see.

362.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Jordan failed to disclose that: (i) the Company's reorganization and expense discipline were no match for its exorbitant and unsustainable cash burn and failed to address the most inefficient and inadequate controls within Farfetch; (ii) as a result, the Company's working capital position was *not* improving, rather the Company was experiencing a liquidity crisis and was at material risk of insolvency; (iii) Reebok had been overvalued at the time of acquisition based on steep discounts offered by Adidas and high operating costs related to inventory; (iv) Reebok was incapable of producing at expected rates under Farfetch's full price strategy and left little to no profit margins for the Company; and (v) as a result, despite Farfetch's claim that "Reebok has started off well," it would *not* "see trade from that relationship across Q2 next year."

**December 1, 2022 – Capital Markets Day**

363.    On December 1, 2022, Farfetch hosted an analyst/investor day ("Capital Markets Day") to the Company's operations since going public in 2018 and provide guidance and expectation going forward.

364.    During the Capital Markets Day, Defendant Jordan stated, in relevant part:

I think you will agree with me as well that, that presents us a significant opportunity from the numbers that we have been delivering over the last 12 months. And this is a real tipping point for Farfetch as we are now set to see the business start to accelerate its growth and deliver a second phase of growth, moving forward.

Importantly, that growth this time comes with significant profitability and free cash flow. This is because we have invested heavily in the business to date. And these business investments are starting to pay off and are set to accelerate that return of investment, moving forward.

121

***

We've delivered 10x our GMV position to 2021. Our revenue has grown 20x over the same time period. We've scaled our investments and brought down our operating costs by half over the same time period. And we've achieved on our path to profitability, delivering EBITDA-positive results in 2021. Importantly, we also achieved free cash flow -- positive free cash flow in 2020, and I'll come back to that in a minute.

We're now operating at scale. In 2022, we expect to achieve $4 billion in GMV. We'll continue to grow revenue despite the current macro environment to achieve $2 billion in adjusted revenue. Our gross margins are solid at 50% and have been increasing year-on-year across all parts of the business. And our order contribution on the Digital Platform is firmly above 30%.

Whilst these results are impressive, the best is yet to come. This is because our pace of growth moving forward, as I said earlier on, is not just about driving GMV growth but delivering sustainable profitability and positive free cash flows.

***

And then lastly, simply incorporating the GMV that we will deliver for our partners on FPS and the Brand Platform. Again, I want to reiterate, this is just our signed contracts that we're currently working to develop in terms of rollout. There's no pipeline expectations built in and this, therefore, is a $500 million GMV position across the business.

It's important that you'll see there from the impact on our adjusted EBITDA margins that these initiatives and projects are profitable in year 1, despite the fact that particularly within Reebok, we will have to put some investment into the infrastructure on a P&L basis, particularly around logistics, in terms of warehousing, in terms of understanding the customer base in terms of gross margins, and in terms of building out the team needed to drive further expansion of the categories that Davide talked about before.

So for Reebok, we're expecting medium single-digit EBITDA margins from this business in year 1, with those margins expanding as the contract matures in the coming 10 years. The result means we will deliver $4.9 billion of GMV at a group level and adjusted EBITDA margins of 1% to 3%. That GMV growth rate ends up being 20% to 22%, 8% to 10% underlying and the new contract additions taking us above 20%.

365.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendants failed to disclose that: (i) the Company's operational and information technology

122

controls for NGG were not designed appropriately; (ii) the Company lacked adequate controls over NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing sales; (iv) as such, the Company's financial results, guidance and/or expectations were materially inaccurate and/or overstated; (v) Farfetch lacked proper oversight concerning the cash needs of its investments, including *inter alia*, NGG and Reebok; (vi) Farfetch was already experiencing significant challenges managing its operating costs relating to supply chain and inventory; (vii) Reebok was incapable of producing at expected rates under Farfetch's full price strategy and left little to no profit margins for the Company; and (xi) as a result, the Reebok launch expected in Q2 2023 would *not* deliver guided GMV.

### February 23, 2023 – Q4 2022 Quarterly Report

366.    On February 23, 2023, Farfetch issued a press release announcing its Q4 2022 and full year 2022 financial results (the "Q4 2022 Earnings Release"), providing in relevant part:

- Record Revenue in 2022 of $2.3 billion, up 3% year-over year (or up 12% year-over-year at constant currency)

- 2022 GMV decreases 4% year-over-year to $4.1 billion (or increases 2% year-over-year at constant currency)

- Q4 2022 Revenue decreases 5% year-over-year (or increases 2% year-over-year at constant currency) to $629 million

- Q4 2022 Gross Merchandise Value ("GMV") decreases 12% year-over-year (or decreases 5% year-over-year at constant currency) to $1.1 billion

- Q4 2022 Digital Platform GMV decreases 12% year-over-year (or decreases 6% year-over-year at constant currency) to $1.0 billion

- Q4 2022 Brand Platform GMV decreases 15% year-over-year (or decreases 3% year-over-year at constant currency) to $100 million

- Q4 2022 Gross Profit Margin of 41.1% (a decrease of 600 bps year-over-year) and Digital Platform Order Contribution Margin of 31.5% (a decrease of 90 bps year-over-year)

- Q4 2022 Loss after Tax of $177 million

- Q4 2022 Adjusted EBITDA of $(35) million

- Cash and Cash Equivalents of $734 million as of December 31, 2022

367.    The Q4 2022 Earnings Release provided GMV results stating:

GMV decreased $149.2 million from $1,289.1 million in fourth quarter 2021 to $1,139.9 million in fourth quarter 2022, representing a year-over-year decline of 11.6%. Excluding the impact of changes in foreign exchange rates, GMV would have decreased 5.3% year-over-year. Digital Platform GMV decreased $133.7 million from $1,146.2 million in fourth quarter 2021 to $1,012.5 million in fourth quarter 2022, representing a year-over-year decline of 11.7%. Excluding the impact of changes in foreign exchange rates, Digital Platform GMV would have decreased 6.0% year-over-year.

Digital Platform GMV performance in fourth quarter 2022 reflects continuing headwinds from the suspension of trade in Russia, where trade has been ceased since March 2022, and mainland China, where regional COVID-19 restrictions continued to impact trade during the fourth quarter. Digital Platform GMV performance also reflects a decrease in Marketplace AOV from $635 to $549 driven by the currency translation impact of the strengthening of the US Dollar, as well as a decline in average selling price, which was partially offset by an increase in the number of items per order.

Brand Platform GMV decreased 14.5% year-over-year from $117.2 million in fourth quarter 2021 to $100.2 million in fourth quarter 2022. Excluding the impact of changes in foreign exchange rates, Brand Platform GMV would have decreased 3.4% year-over-year. The decrease on a constant currency basis was driven by a change in the delivery schedule in shipping of the Spring-Summer 2023 collections.

In-Store GMV increased 5.6% year-over-year from $25.8 million in fourth quarter 2021 to $27.3 million in fourth quarter 2022. Excluding the impact of changes in foreign exchange rates, In-Store GMV would have increased 16.8% year-over-year. The increase on a constant currency basis was driven by additional openings of New Guards brands' stores in the last twelve months, as well as like-for-like growth from existing stores.

368.    The Q4 2022 Earnings Release provided Revenue results stating:

Revenue decreased $36.5 million year-over-year from $665.7 million in fourth quarter 2021 to $629.2 million in fourth quarter 2022, representing year-over-year decline of 5.5%. The decrease was driven by a decrease in Digital Platform Revenue of 3.7% to $506.4 million, a 16.2% decrease in Brand Platform Revenue to $98.2 million, partially offset by 9.3% growth in In-Store Revenue to $24.5 million. Excluding the impact of changes in foreign exchange rates, revenue would have increased 2.2% year-over-year.

Digital Platform Services Revenue decreased 2.1% year-over-year driven by third-party revenue. Digital Platform Services first-party revenue increased 11.5% as compared to the previous year, primarily driven by increased sales of first-party products on the marketplace supported by increased clearance activity. Digital

Platform Services third-party revenue decreased year-over-year by 10.2% impacted by the same factors driving GMV, partially offset by growth in advertising revenue. Excluding the impact of changes in foreign exchange rates, Digital Platform Services Revenue would have increased 4.4% year-over-year.

Digital Platform Fulfilment Revenue represents the pass-through to consumers of delivery and duties charges incurred by our global logistics solutions, net of any Farfetch-funded consumer promotions, subsidized shipping and incentives. Digital Platform Fulfilment Revenue decreased 11.0% year-over-year, less than the overall Digital Platform GMV decline of 11.7%, resulting from a slight increase in pass-through of such costs to consumers in fourth quarter 2022.

Brand Platform Revenue decreased 16.2% year-over-year, which was greater than the decline in GMV, due to the reduction of revenue of $1.9 million generated by the net economic loss from the Reebok partnership that commenced in March 2022. Excluding the impact of changes in foreign exchange rates, Brand Platform Revenue would have decreased 5.0% year-over-year.

369.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate controls over NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing sales; and (iv) as such, the Company's financial results were materially overstated.

370.    The Q4 2022 Earnings Release quoted Defendant Neves as saying, in relevant part:

I am proud to report Farfetch adeptly navigated unprecedented macro headwinds throughout 2022 to deliver growth on a constant currency basis, with full year GMV of $4.1 billion. Our performance also means we captured market share on a 3-year stack basis, with GMV nearly doubling since the onset of the COVID-19 pandemic - a truly remarkable accomplishment.

Farfetch enters 2023 as a significantly more efficient business following our strategic reorganization and cost rationalizations. Our solid start to the year gives me confidence 2023 will be a Year of Execution with growth building throughout the year as we comp the previous year's macro headwinds and launch exciting new partners to deliver strong growth, Adjusted EBITDA and positive free cash flow.

371.    The Q4 2022 Earnings Release quoted Defendant Jordan as saying:

I'm pleased to report our fourth quarter 2022 results which demonstrate that we continue to deliver solid underlying performance, are managing to navigate unprecedented external factors and are clearly focused on the actions needed to return the business to profitability and generating positive free cash flow in 2023. Our long term trajectory has been one of strong GMV growth, operating cost leverage and improving full year Adjusted EBITDA margins. We expect to return to this position by the end of 2023, which will be a great year for Farfetch.

372.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendants failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate controls over NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing sales; (iv) as such, the Company's financial results were materially overstated; (v) the Company had *not* "adeptly navigated unprecedented macro headwinds" as it was already experiencing significant slowdown in growth in its two largest markets, the U.S. and China, based on responses to the pandemic; (vi) the Company's reorganization and cost rationalizations were no match for its exorbitant and unsustainable cash burn and failed to address the most inefficient and inadequate controls within Farfetch; (vii) direct brand contracts had materially low take rates (between 8% and 10%) and/or high VAT costs negatively impacting the Company's cash position, Adjusted EBITDA, and/or gross margins; (viii) as such, the Company had *not* entered 2023 "as a significantly more efficient business;" (ix) Reebok had been overvalued at the time of acquisition based on steep discounts offered by Adidas and high operating costs related to inventory; (x) Reebok was incapable of producing at expected rates under Farfetch's full price strategy and left little to no profit margins for the Company; and (xi) as a result, the Reebok launch expected in Q2 2023 would *not* deliver strong growth, Adjusted EBITDA or positive free cash flow.

373.    The Q4 2022 Earnings Release provided the Company's then-current "Outlook" stating:

> Uncertainties resulting from the impact of the COVID-19 pandemic particularly in the China region, suspension of trade in Russia, macroeconomic factors and geopolitical turmoil could have material impacts on our future performance and projections. Several factors that could potentially impact our future performance include, among others:
>
> •disruptions to our operations, fulfilment network, and shipments;
>
> •fluctuations in foreign exchange rates;
>
> •weakened consumer sentiment and discretionary income arising from macro-economic conditions;
>
> •increased costs to support our operations;
>
> •slowing e-commerce consumer activity as vaccinations gain acceptance and populations resume to pre-pandemic activities and lifestyles; and
>
> •reduced demand for our offerings and services.
>
> The following reflects Farfetch's expectations for Full Year 2023 as of February 23, 2022:
>
> •Group GMV of approximately $4.9 billion
>
> •Digital Platform GMV of approximately $4.2 billion
>
> •Brand Platform GMV of approximately $0.6 billion
>
> •Adjusted EBITDA margin of 1% to 3%

374.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate internal controls over NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing sales; (iv) Farfetch was already experiencing a significant slowdown in growth in its first and second largest markets, the U.S. and China, respectively, prior to 0-tolerance COVID restrictions in China; and (v) as a result, the Company's guidance or expectations were inaccurate and/or materially overstated.

375. That same day, Farfetch hosted a conference call with investors and analysts to discuss its Q4 2022 results (the "Q4 2022 Earnings Call"). During the call, Defendant Neves discussed the Company's financial results stating, in relevant part:

> I'm pleased to report that in Q4, we delivered group GMV in line with our expectations to achieve $4.1 billion of GMV and $2.3 billion of revenue for full year 2022. I want to highlight that in spite of unprecedented macro headwinds throughout the year, this result means, Farfetch has continues to capture market share on a 3-year stack basis with an approximate doubling of our GMV since the onset of the COVID-19 pandemic.

376. The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Neves failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate internal controls over NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing sales; (iv) Farfetch was already experiencing a significant slowdown in growth in its first and second largest markets, the U.S. and China, respectively, prior to 0-tolerance COVID restrictions in China; and (v) as a result, the Company's guidance or expectations were inaccurate and/or materially overstated.

377. Defendant Neves went on to discuss the Company's reorganization and cost rationalization completed in 2022 stating, in relevant part, "***Farfetch begins the year as an even stronger and more efficient organization, which is why I'm more confident than ever about our prospects to deliver growth, profitability and positive free cash flow in 2023 and beyond***."

378. The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Neves failed to disclose that: (i) the fundamental restructure and streamline of Farfetch's cost base completed in the second half of 2022 was no match for its exorbitant and unsustainable cash burn;

(ii) the Company failed to take action to cut costs until the end of 2022 despite internal forecasts contradicting projected revenue growth and depicting unsustainable capital spend; (iii) at the beginning of 2022 the Company made a series of costly acquisitions of overvalued companies that were already experiencing financial constraints; (iv) direct brand contracts had materially low take rates (between 8% and 10%) and/or high VAT costs negatively impacting the Company's cash position, Adjusted EBITDA, and/or gross margins; (v) as such, Farfetch was *not* "begin[ning] the year as an even stronger and more efficient organization;" and (vi) as a result, Farfetch's market condition, operating costs, and capital management did *not* support "growth, profitability and positive free cash flow in 2023 and beyond," rather the Company was experiencing a liquidity crisis and was at material risk of insolvency.

379.    During the call, Defendant Jordan discussed the Company's Q4 2022 and full year 2022 results stating, in relevant part:

> Let's look at the full year 2022 results, which, despite the significant macro challenges we faced, we maintained group GMV of $4 billion, a slight 4% decrease year-on-year on a reported basis, but up 2% year-on-year on a constant currency basis. We also achieved 4% growth in adjusted revenue, which was up 13% year-on-year on a constant currency basis. Digital Platform order contribution margin increased by 40 basis points to 32% despite an increasingly promotional environment across the latter part of the year and our need to take clearance action on stock ordered well before the global demand challenges we faced. In addition, our third-party take rate for 2022 was 32.1%, up 190 basis points year-on-year, reflecting the strong value we deliver to our partners on the digital platform.

> We focused our efforts on moderating growth in our operating cost base, consisting of G&A and technology expenses, despite continuing to build our platform to support new clients and new categories and added costs from acquired businesses, overall technology and G&A costs came in at $850 million as guided. And we delivered adjusted EBITDA margin of minus 4.9%, in line with our most recent guidance. Turning to Q4. Group GMV decreased 12% year-on-year to $1.1 billion, which is a decrease of 5% on a constant currency basis. Revenue decreased 6% year-on-year to $629 million, which is an increase of 2% on a constant currency basis. And adjusted EBITDA margin was minus 6.3%.

> By region, the Americas was flat year-on-year with a softer performance in the U.S. following our decision to reduce our U.S. marketing spend by circa 30%, knowing

that higher discounting from large bricks-and-mortar players would reduce payback on such spend…

\*\*\*

Finally, a point on our first-party business, we have completely revisited our first-party ordering plans given the ongoing challenges around first-party sell-through and therefore, first-party gross margins and adjusted EBITDA margin. We expect this will have a significant positive impact on first-party gross margins as we trade through 2023 and into 2024.

Moving to the Brand Platform, where we saw softer performance year-on-year, down 3% on a constant currency basis, with reported GMV of $100 million, which is down 15% year-on-year and brand platform revenue of $98 million, down 16% year-on-year. As stated earlier, we have seen a shift in the scheduling of some deliveries to our brand platform, wholesale partners from Q4 2022 into Q1 2023. I'll note the Brand Platform gross margin of 44% was lower than the full year average of 49.1% due to actions we have taken in Q4 to clear excess inventory levels through lower margin channels. In 2023, we expect Brand Platform gross margin to be in the range of 48% to 50% over the full year.

\*\*\*

Overall, our adjusted EBITDA was minus $35 million in Q4 2022, and we had a loss after tax of $177 million. We had $734 million in cash and cash equivalents at year end. We achieved a broadly neutral free cash flow position in Q4 as we largely offset our negative EBITDA position and capital expenditure with a $71 million favorable working capital movement within the quarter. The working capital benefit was not as high as we forecast due to higher than expected inventory and receivable balances at year end and was lower versus Q4 '21 due to the decline year-on-year in marketplace GMV, which means our trade and other payables balance reduced year-on-year.

380.     The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Jordan failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate internal controls over NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing sales; (iv) Farfetch was already experiencing a significant slowdown in growth in its first and second largest markets, the U.S. and China, respectively, prior to 0-tolerance COVID restrictions

in China; and (v) as a result, the Company's guidance or expectations were inaccurate and/or

materially overstated.

381.    Defendant Jordan went on to discuss the Company's 2023 expectations stating, in

relevant part:

> Secondly, our expectations for 2023 are unchanged with a return to GMV growth, operating cost leverage and adjusted EBITDA profitability, plus we have several working capital initiatives in place. This will ensure we end the year with cash and cash equivalents in line with where we exited 2022. Finally, the 4 quarters of 2023, all have unique characteristics, making the financial results for each quarter different from our usual shape to the year. In particular, we will still see the impacts of external headwinds across Q1 and Q2. We'll comp headwinds and anticipate building momentum across our larger markets within the marketplace in Q3 and then in Q4, and we will see positive impact on GMV as we start going live with our new client operations in Q2 and throughout the second half across the brand platform and FPS. This means growth, profitability and cash generation is expected to be significantly higher in the second half than in H1.

> ***

> Our working capital initiatives for 2023 are well underway, and we expect to achieve strong free cash flow across the full year, helped by reducing inventory levels on an absolute basis, shortening terms on trade receivables and a return to growth in the marketplace, which delivers favorable working capital dynamics…

> Turning to our outlook. Our expectations for the full year on a reported basis remain the same as those provided at our recent Capital Markets Day. For full year 2023, we expect group GMV of circa $4.9 billion, inclusive of Digital Platform GMV of circa $4.2 billion, Brand Platform GMV of circa $0.6 billion and in-store GMV of circa $0.1 billion. I'd like to note that under the current reporting structure, results from our new Reebok partnership will be split between the Digital Platform and the Brand Platform. For 2023, we expect digital platform order contribution margin to be in the range of 33% to 35%. Operating costs are estimated to be circa $950 million. Adjusted EBITDA margin is expected to expand from minus 4.9% in 2022 to be in the range of plus 1% to 3% in 2023. And cash and cash equivalents are expected to remain in line with where we exited 2022.

382.    The foregoing statements were materially false or misleading when made, or

omitted to state material facts necessary to make the statements not misleading because, Defendant

Jordan failed to disclose that: (i) the Company's operational and information technology controls

for NGG were not designed appropriately; (ii) the Company lacked adequate internal controls over

NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing sales; (iv) Farfetch was already experiencing a significant slowdown in growth in its first and second largest markets, the U.S. and China, respectively, prior to 0-tolerance COVID restrictions in China; and (v) as a result, the Company's guidance or expectations were inaccurate and/or materially overstated.

383.    During the Q4 2022 Earnings Call, analyst Lauren Elizabeth Cassel Schenk of Morgan Stanley, Research Division asked the following question:

> I was just wondering if you could help us think through the breakdown of Reebok between Brand and Digital Platforms. Just thinking about the $450 million base going to $600 million, how much of that is core growth versus Reebok?

384.    To which Defendant Jordan responded:

> Lauren, we're not breaking that out at this stage. As I said earlier on, it is split between Digital and Brand. I think the Brand Platform is going to grow quite strongly in Q1. As we sort of said in the opening remarks, there have been some delays from Q4 into Q1. So we'll see the brand platform in growth. And on an underlying basis, we're very confident with the plans. We're not aggressive in that space, though. So I think we're being cautious about the retail position for the year ahead. So we're actually reducing our distribution to some retailers, shifting more of that the brand sales from NGG across other direct channels. Obviously, that drives improved order contribution improved gross margins across the group and also means we'll be improving our stock turn by focusing on those inventory levels. So the Brand Platform is in a very good place, but some strategic initiatives means that it will not be growing at the same sort of levels as maybe the marketplace on an underlying basis, but certainly with the addition of Reebok delivering strong growth.

385.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Jordan failed to disclose that: (i) NGG was already experiencing a significant drop in sales from the Group's primary revenue generator, Off-White, following the untimely death of founder and creative director; (ii) Reebok had been overvalued at the time of acquisition based on steep discounts offered by Adidas and high operating costs related to inventory; and (iii) as a result,

Reebok was incapable of producing at expected rates under Farfetch's full price strategy and would

not see stronger growth in 2023.

386.    During the Q4 2022 Earnings Call, analyst Kunal Madhukar UBS Investment Bank,

Research Division asked the following question:

> Just a quick one on '23 outlook, when we look at the increase in SG&A costs from
> $850 million to $950 million that kind of implies higher cost of about $185 million.
> And that was something that you kind of attributed to the FPS business as well as
> the new partnerships and the brand partnerships that you're going to spend. Can
> you talk about the nature of the investments? And can you also talk about how much
> of debt expense you expect to capitalize in '23?

387.    To which Defendant Jordan responded:

> Kunal, so the bulk of that spend, yes, those numbers are absolutely right. It's exactly
> the same as we outlined in December Capital Markets Day. And -- but the numbers
> are more related to our Reebok operations than FPS….
>
> In terms of the SG&A position, -- we -- it is mostly Reebok. We have additional
> cost of warehousing associated with bringing that product in. We will be building
> out our teams within NGG to deal with new vendors, with new distribution clients.
> We obviously want to ensure that we get merchandising and buying and design and
> styling right. The exciting thing about Reebok is as we expand into luxury -- the
> luxury end of the space. And we're really looking forward to launching new
> initiatives. I wouldn't put too much in terms of financial numbers in for that, this
> year, but certainly 2024 and we want to make sure, we've got a great team in place
> there under very, very strong leadership within New Guards Group. So those --
> what those costs are.

388.    The foregoing statements were materially false or misleading when made, or

omitted to state material facts necessary to make the statements not misleading because, Defendant

Jordan failed to disclose that: (i) Reebok had been overvalued at the time of acquisition based on

steep discounts offered by Adidas and high operating costs related to unsellable inventory

stockpiles; and as a result, the Company's plans of generating growth through new luxury lines for

Reebok were materially impacted.

389.    During the Q4 2022 Earnings Call, analyst Edward James Yruma of Piper Sandler

& Co., Research Division asked the following question:

And then as a follow-up, on the NGG business, thank you for all the color, how quickly can you get kind of the production side rationalize, I guess, ex Reebok so that you kind of control some of the ex inventory condition given the softer demand?

390.    To which Defendant Jordan responded:

Look, I think I'd probably just draw your attention back to what we talked about at the Capital Markets Day, where we gave you targets for 2025, where NGG overall will be continuing to deliver 20% plus EBITDA margins. And I think that shows you that the build out of Reebok and the continued growth of the underlying business, plus new brands as the team develop them, we'll continue to deliver very, very strong EBITDA margins and be accretive to the overall position within the next couple of years. So I'm very excited about what's happening there. Obviously, this is a year of investment, as Kunal noted in terms of SG&A for Reebok, but quite quickly next year and then to 2025, very strong EBITDA margins across the Brand Platform and the rest of the NGG business

391.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Jordan failed to disclose that: (i) Farfetch lacked proper oversight concerning the cash needs of different divisions of the Farfetch Group, including *inter alia*, NGG; (ii) Farfetch was already experiencing significant challenges managing its operating costs relating to supply chain and inventory; (iii) the Company's operational and information technology controls for NGG were not designed appropriately; (vii) the Company lacked adequate internal controls over NGG's financial reporting of revenue and GMV; (viii) following the Reebok acquisition the Company saw significantly higher costs relating to inventory; (ix) Reebok had been overvalued at the time of acquisition based on steep discounts offered by Adidas and was incapable of producing at expected rates under Farfetch's full price strategy; and (x) as a result, the Reebok launch did not support, very strong EBITDA margins across the Brand Platform and the rest of the NGG business quickly next year and then to 2025.

### March 8, 2023 – FY 2022 Annual Report

392.    On March 8, 2023, Farfetch filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2022 (the "FY 2022 20-F").

393.    Appended as exhibits to the FY 2022 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants Neves and Jordan certified that "[t]he [FY 2022 20-F] fully complies with the requirements of Section 13(a) or 15(d) of the Exchange Act" and "[t]he information contained in the [FY 2022 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company." Furthermore, Defendants Neves and Jordan certified that:

> 1. I have reviewed this Annual Report on Form 20-F of Farfetch Limited;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;
>
> 4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:
>
>> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>>
>> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the Annual Report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5. The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the Audit Committee of the Company's Board of Directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

394.    The FY 2022 20-F included, in relevant part:

**Item 15. Controls and Procedures**

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act. Our management conducted an assessment of the effectiveness of our internal control over financial reporting based on the criteria set forth in "Internal Control - Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements may not be prevented or detected on a timely basis.

As disclosed in our 2021 Annual Report, we identified one material weakness relating to the operation of effective internal control over financial reporting at the New Guards business.

The component material weakness relating to the New Guards business covered both operational and information technology controls. This material weakness could result in a misstatement of account balances and disclosures that would result

136

in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected.

During 2022, we believe we made significant progress towards the remediation of the material weakness. Specifically, we designed and implemented a framework of information technology controls at the New Guards business. These changes and updates to our controls included privileged user access restrictions, a methodology to validate changes across the in-scope systems and back-end infrastructure, as well as user recertification supported by verified data sources and a stricter segregation and allocation of duties. ***Our management has concluded that controls relating to information technology have been designed and are operating effectively***.

***During 2022, we also designed and made significant progress towards implementing several additional operational controls at the New Guards business. These additional controls included reviewing and verifying information related to revenue to receivables, inventory, and procure to pay processes.*** As a result of improvements within our systems and processes we were able to identify and confirm key reports used in the operation of key controls. However, the complex nature of the design and implementation of these additional controls resulted in insufficient time to fully embed them within all applicable aspects of our business processes as of December 31, 2022.

As permitted by related SEC staff interpretive guidance for newly acquired businesses, we have excluded from the scope of our assessment of internal control over financial reporting Violet Grey and Wannaby, which, collectively represented less than 1% of our Group total assets and 1% of our Group consolidated revenue as of and for the fiscal year ended December 31, 2022.

Based upon the above evaluation, our management, including our Chief Executive Officer and Chief Financial Officer, concluded that, as a result of the material weakness described above, our internal control over financial reporting was not effective as of December 31, 2022. ***Notwithstanding the identified material weakness, management believes that the Consolidated financial statements included in this Annual Report on Form 20-F present fairly, in all material respects, our financial position, results of operations, and cash flows as of and for the periods presented in accordance with IFRS.***

395.    The foregoing statements are materially false and misleading because (i) the Company's information technology controls were not designed appropriately and were not operating effectively; (ii) the operational controls previously identified in the Company's FY 2021 20-F were not designed appropriately; (iii) the additional operational controls identified in the FY 2022 20-F were not designed appropriately; (iv) the Company lacked adequate internal controls

137

over NGG's financial reporting, including revenue, GMV, inventory holdings, and receivables position; (v) as a result, the Consolidated financial statements included in the FY 2022 20-F did *not* present fairly, in all material respects, Farfetch's financial position, results of operations, or cash flows as of and for the periods presented in accordance with IFRS, including year ended December 31, 2020, 2021, and 2022.

### May 3, 2023 – Press Release

396.    On May 3, 2023, Farfetch issued a press release announcing that the Company had commercially launched its Reebok partnership. The press release quoted Defendant Neves, who stated, in relevant part:

> Launching the partnership with Reebok is an important execution milestone in FARFETCH's plans for 2023. ***We are delighted that the NGG++ and FARFETCH Platform Solutions teams have ensured Reebok's wholesale and e-commerce operations are up and running on time and on budget.*** We look forward to delivering on further milestones for Reebok throughout our partnership.

(emphasis added)

397.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) Farfetch lacked proper oversight concerning the cash needs of different divisions of the Farfetch Group, including *inter alia*, NGG; (ii) following the Reebok acquisition the Company saw significantly higher costs relating to inventory; (iii) Reebok had been overvalued at the time of acquisition based on steep discounts offered by Adidas and was incapable of producing at expected rates under Farfetch's full price strategy; (iv) as such, Reebok's wholesale and e-commerce operations were, in fact, not "on budget."

138

398.    The Company's press release also included a quote from then-current CEO of

NGG, Davide De Giglio, stating:

> Helping streetwear brands evolve into new luxury and lifestyle houses is part of our
> core skill set. ***In addition to generating significant revenues***, this partnership will
> help us further support our existing brands and nurture new talent. We believe
> ***NGG++ will deliver growth for Reebok*** and for our other NGG brands - all
> celebrating the combination and collaboration of sports and culture. Under
> Cristiano, NGG++ will create something unexpected, inspirational and profitable,
> while also promoting diversity, inclusion and sustainability.

(emphasis added)

399.    The foregoing statements were materially false or misleading when made, or

omitted to state material facts necessary to make the statements not misleading because, the

Company failed to disclose that Reebok had been overvalued at the time of acquisition based on

steep discounts offered by Adidas and a surplus of old unsellable inventory stockpiles; as a result,

Reebok was incapable of "generating significant revenues" or "deliver[ing] growth" under

Farfetch's full price strategy.

## May 18, 2023 – Q1 2023 Quarterly Report

400.    On May 18, 2023, Farfetch issued a press release announcing its Q1 2023 financial

results (the "Q1 2023 Earnings Release") providing, in relevant part:

> •Q1 2023 Revenue increases 8% year-over-year (or increases 12% year-over-year
> at constant currency) to $556.4 million
>
> •Q1 2023 Gross Merchandise Value ("GMV") increases 0.1% year-over-year (or
> increases 4% year-over-year at constant currency) to $931.7 million
>
> •Q1 2023 Digital Platform GMV decreases 1% year-over-year (or increases 2%
> year-over-year at constant currency) to $799.7 million
>
> •Q1 2023 Brand Platform GMV increases 10% year-over-year (or increases 15%
> year-over-year at constant currency) to $109.7 million
>
> •Q1 2023 Gross Profit Margin of 43.2% (a decrease of 160 bps year-over-year) and
> Digital Platform Order Contribution Margin of 32.4% (a decrease of 30 bps year-
> over-year)
>
> •Q1 2023 Loss after Tax of $174 million

• Q1 2023 Adjusted EBITDA of $(35) million

401.    The Q1 2023 Earnings Release provided GMV results stating:

GMV increased 0.1% in first quarter 2023 at $931.7 million, compared to $930.8 million in first quarter 2022. Excluding the impact of changes in foreign exchange rates, GMV would have increased 3.6% year-over-year. Digital Platform GMV decreased $9.9 million from $809.5 million in first quarter 2022 to $799.7 million in first quarter 2023, representing a year-over-year decline of 1.2%. Excluding the impact of changes in foreign exchange rates, Digital Platform GMV would have increased 1.9% year-over-year.

Digital Platform GMV performance in first quarter 2023 reflects continuing headwinds from the suspension of trade in Russia, where trade ceased in March 2022, and mainland China, where demand has not yet fully recovered following the relaxation of regional COVID-19 restrictions. These factors were partially offset by growth in other markets. Digital Platform GMV performance also reflects a decrease in Marketplace AOV from $632 to $566 driven by an increased mix of markdown sales, the currency translation impact of a strengthened US Dollar and a shift in customer demand towards lower-priced products, partially offset by an increase in the number of items per order.

Brand Platform GMV increased 10.0% year-over-year from $99.7 million in first quarter 2022 to $109.7 million in first quarter 2023. Excluding the impact of changes in foreign exchange rates, Brand Platform GMV would have increased 15.4% year-over-year. This increase was due to a larger portion of the Spring-Summer collections being shipped in first quarter 2023 than in first quarter 2022.

In-Store GMV increased 3.8% year-over-year from $21.5 million in first quarter 2022 to $22.3 million in first quarter 2023. Excluding the impact of changes in foreign exchange rates, In-Store GMV would have increased 10.0% year-over-year. The increase was driven by additional openings of New Guards brands' stores in the last twelve months, as well as like-for-like growth from existing stores.

402.    The Q1 2023 Earnings Release provided Revenue results stating:

Revenue increased $41.6 million year-over-year from $514.8 million in first quarter 2022 to $556.4 million in first quarter 2023, representing a year-over-year increase of 8.1%. The increase was driven by an increase in Digital Platform Revenue of 6.5% to $421.5 million, a 13.9% increase in Brand Platform Revenue to $114.5 million, as well as a 9.6% increase in In-Store Revenue to $20.5 million. Excluding the impact of changes in foreign exchange rates, revenue would have increased 11.8% year-over-year.

Digital Platform Services Revenue increased 7.7% year-over-year driven by first-party revenue. Digital Platform Services first-party revenue increased 28.2% as compared to the previous year, as continued stock clearance activity drove

increased sales of first-party products on the Marketplace. Digital Platform Services third-party revenue decreased 5.0% year-over-year driven by a decline in third-party Digital Platform GMV, partially offset by an increased third-party Take Rate. Excluding the impact of changes in foreign exchange rates, Digital Platform Services Revenue would have increased 11.0% year-over-year.

Digital Platform Fulfilment Revenue represents the pass-through to consumers of delivery and duties charges incurred by our global logistics solutions, net of any Farfetch-funded consumer promotions, subsidized shipping and incentives. Digital Platform Fulfilment Revenue increased 1.7% year-over-year, exceeding the overall Digital Platform GMV decline of 1.2% due to the growth in duties and delivery charges, which was greater than the change in Digital Platform GMV.

Brand Platform Revenue increased 13.9% year-over-year, which is greater than the increase in Brand Platform GMV due to $4.8 million net economic benefit from the Reebok partnership that commenced in March 2022. Excluding the impact of changes in foreign exchange rates, Brand Platform Revenue would have increased 20.0% year-over-year.

403.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate controls over NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing sales; and (iv) as such, the Company's financial results were materially overstated.

404.    The Q1 2023 Earnings Release quoted Defendant Neves, who represented that Farfetch was on track to deliver on its 2023 goals, as demonstrated by its GMV growth in the U.S. and China, as well as the launch of its Reebok partnership, stating, in relevant part:

I am delighted to report that Farfetch was back to growth in [Q1] 2023. Our [Q1] results represent the first step towards achieving our plan for 2023, our Year of Execution, and demonstrate our strong execution in the face of continued macro headwinds. ***Our sequential improvement in GMV growth in the US and China, our two largest markets . . . indicate the strength and resilience of our core business. This, on top of our recent launches of [inter alia] . . . Reebok . . . confirm we remain on track to deliver on our plan for 2023***.

(emphasis added)

141

405.    In addition, the Q1 2023 Earnings Release quoted Defendant Jordan, who likewise represented that Farfetch was delivering on its goals for 2023, despite "unprecedented macro challenges," which the Company had purportedly successfully navigated, stating, in relevant part:

> We have delivered what we set out to achieve, with accelerating underlying growth, disciplined cost control and improved cash flows. We have successfully navigated through unprecedented macro challenges, and through continued focused execution, we remain on track to deliver a year of luxury market-beating growth, a return to profitability and positive free cash flow.

406.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendants failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate controls over NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing sales; (iv) as such, the Company's financial results were materially overstated; (v) Reebok had been overvalued at the time of acquisition based on steep discounts offered by Adidas and high operating costs related to inventory; (vi) Reebok was incapable of producing at expected rates under Farfetch's full price strategy and left little to no profit margins for the Company; and (vi) as a result, the Company was *not* "on track to deliver a year of luxury market-beating growth, a return to profitability [or] positive free cash flow" rather Farfetch was experiencing a liquidity crisis and was at material risk of insolvency.

407.    The Q1 2023 Earnings Release provided the Company's then-current "Outlook" stating:

> The following reflects Farfetch's expectations for Full Year 2023 as of May 18, 2023:
> •Group GMV of approximately $4.9 billion
> •Digital Platform GMV of approximately $4.2 billion
> •Brand Platform GMV of approximately $0.6 billion

•Adjusted EBITDA margin of 1% to 3%

408.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) the Company's operational and information technology controls for NGG were not designed appropriately; (ii) the Company lacked adequate internal controls over NGG's financial reporting of revenue and GMV; (iii) the Company was improperly recognizing sales; (iv) Farfetch was already experiencing a significant slowdown in growth in its first and second largest markets, the U.S. and China, respectively, prior to 0-tolerance COVID restrictions in China; and (v) as a result, the Company's guidance or expectations were inaccurate and/or materially overstated.

409.    That same day, Farfetch hosted a conference call with investors and analysts to discuss its Q1 2023 results (the "Q1 2023 Earnings Call"). On the Q1 2023 Earnings Call, Defendant Neves represented that Farfetch had delivered on, or was on schedule to deliver on, its 2023 goals related to, *inter alia*, its Reebok partnership launch, stating, in relevant part:

> We had set 2023 to be our year of execution. And I'm delighted that we are absolutely delivering as reflected in our Q1 results as well as recent milestone launches. Our key 2023 launches, including Reebok . . ., have either been delivered or remain on schedule for launch later this year[.]
>
> * * *
>
> [O]ur new brand platform license, Reebok, went live this month, thanks to FPS' launch of the European e-commerce channel and the brand platforms kickoff of wholesale operations.

410.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) Farfetch lacked proper oversight concerning the cash needs of different divisions of the Farfetch Group, including *inter alia*, NGG; (ii) following the Reebok

acquisition the Company saw significantly higher costs relating to inventory; (iii) Reebok had been overvalued at the time of acquisition based on steep discounts offered by Adidas and was incapable of producing at expected rates under Farfetch's full price strategy; (iv) as such, Rebook's wholesale and e-commerce operations were, in fact, not "on budget."

411.    Also during the Q1 2023 Earnings Call, Defendant Neves touted Farfetch's growing market in China, as well as China's purported return to normality and appetite for luxury products following COVID-19 lockdowns, stating, in relevant part:

> With respect to China, we saw a marked improvement in Q1 Mainland China GMV. While still in decline, it was to a lesser extent than in Q4 2022. And I'm pleased to share that performance has continued to ramp up as we expected, with GMV back to growth quarter-to-date.
>
> ***
>
> China is expected to represent more than 25% of the luxury industry by 2030, and with Mainland China at less than 10% of our overall business. This means we have significant potential for further growth as the recovery in this market accretes positively to our overall 2023 plans.

412.    The foregoing statements were materially false or misleading when made or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that, Farfetch was already experiencing a significant slowdown in growth in China prior to 0-tolerance COVID restrictions, and as a result, the current ramp up was not indicative of continued growth.

413.    With respect to Farfetch's U.S. market, Defendant Neves stated the following, in relevant part, on the Q1 2023 Earnings Call:

> Turning to the U.S. in Q1, GMV declines as expected, as a result of our reduction of U.S. online marketing investment by more than 20% over the last three quarters in light of the heightened promotional environment, and our increased focused on optimizing for profitability. But we're pleased to see that we have actually increased the active customer count and others by high single digits, and at U.S. GMV declined to a lesser extent in Q1 than in Q4 2022.

414.    Defendant Jordan likewise discussed purported positive trends in Farfetch's U.S. market on the Q1 2023 Earnings Call, while simultaneously downplaying the negative impact of continued softness in that market, stating, in relevant part, that although grown in the Americas was "partially offset by continued softness in the U.S. as a result of the promotional environment", the Company had "specifically tailored our demand generation expense in this market to drive efficiencies."

415.    The foregoing statements were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because, Defendants failed to disclose that the Company was already experiencing slowdown in growth in the U.S. separate and apart from any purported deliberate decision to reduce demand generation spend.

416.    Defendant Jordan also discussed purported positive trends in Farfetch's China market on the Q1 2023 Earnings Call, while simultaneously downplaying the negative impact of continued softness in that market, stating, in relevant part, "Asia Pacific improved quarter-on-quarter with an improvement in China, albeit still lower year-on-year. As [Neves] mentioned, this important market is back to growth in Q2 to-date, in line with the ramp up that we expected for the full year."

417.    The foregoing statements were materially false or misleading when made or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that, Farfetch was already experiencing a significant slowdown in growth in China prior to 0-tolerance COVID restrictions, and as a result, the current ramp up was not indicative of continued growth.

418.    In addition, Defendant Jordan discussed Farfetch's purported "tightening [of its] inventory balances" on the Q1 2023 Earnings Call, while providing FY 2023 revenue guidance of $2.9 billion, stating, in relevant part:

> Compared to Q1 2022, th[e] improvement [in cash and cash equivalents] was a result of a reduction in investment spend, and actions taken to improve our working capital position, including tightening our inventory balances. We expect each quarter of 2023 to be stronger in terms of use of cash than the equivalent of 2022, due to stronger adjusted EBITDA, reducing our first-party inventory balances, reversing the post-Brexit buildup of our VAT receivables, due in from European governments, which currently stands at over $200 million and expanding our marketplace creditor position as we return to growth. This means we expect to close Q4 '23 in line with the closing Q4 2022 position.

> That leads nicely to [FY] guidance. And I wanted to remind everyone of the guidance we set for 2023, which remains unchanged . . . . We expect revenue of $2.9 billion up circa 25%. Stable year-on-year margins including brand platform gross profit margin of 48% to 50% and digital platform order contribution margin of 33% to 35%.

419.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Jordan failed to disclose that: (i) the Company lacked adequate internal operational controls, including controls over NGG's financial reporting of revenue and GMV; (ii) the Company was improperly recognizing sales, (iii) the Company's "strategic initiatives" producing temporary relief were no match for its exorbitant and unsustainable cash burn; and (iv) as such, the Company's guidance or expectations were materially overstated.

420.    During the Question-and-Answer portion of the call, analyst Douglas Till Anmuth asked the following questions:

> Can you talk more about the sequential improvement you're seeing in the U.S. despite tougher macro environment. And then just more broadly, as we are roughly halfway through Q2, are you seeing growth accelerate nicely on the easier comps and some of the new partnerships.

421.    To which Defendant Neves responded, in relevant part:

Look, we started 2023 as our year of execution and I'm really happy with delivering against that. Q1 was a quarter where we were back to growth and a quarter of acceleration in our top methods both U.S. and China, but also other markets. And it was a quarter of launches and key launches, landmark launches, Reebok is live on budget and on schedule.

* * *

And just to elaborate a little bit more in terms of U.S. Look in Q3, we shared with you when we noticed that the market was becoming very promotional in the U.S., retailers, luxury retailers, had built inventory levels. And we were starting to see a high promotional activity and therefore, we took the decision to prioritize profitability and reduce our demand generation spend to the tune of circa 20%, since then quarter, every quarter.

And as expected, we saw a decline in Q1, although we saw an sequential acceleration from Q4. And in fact, in terms of customers and others, we are growing in the U.S. So active customers grew high-single digits, others grew high-single digits. And the decrease in GMV is the result of lower AOVs, as the customers are slightly trading down, and taking advantage of the promotional environment elsewhere, and therefore, have become slightly more price sensitive.

* * *

And now for the second half, we do think there's a probability of inventories being more managed by retailers and lower inventories across the industry, less promotional environment. And one thing we know for sure is that the comps will get much easier for us in Q3 and Q4. And that gives us confidence that we're going to go back to growth in the U.S. And that will also be supported by our broad exposure to other geographies. China is, as expected, recovering. We're actually positive year-on-year quarter-to-date in Q2. And also, I think we're demonstrating that our very global business and the investment we've done in internationalization is paying off…

422.    During the call, analyst Geoffroy Thibault Antoine Victor De Mendez of BofA

Securities, Research Division asked the following question:

I just wanted to come back on the guidance for this year. On the underlying basis, I think Elliot you just mentioned that the guidance for this year was between 8% and 10%. But I think initially, when you guided for these numbers, you had in mind that China would only come back to growth in the second half of the year, and you didn't really have a clear view on where the U.S. would be in 2023.

And then today, you're now saying that China is already back to positive in Q2 to date. And if I understood correctly, you're also saying that the U.S. should be up in the second half of the year. So does that mean that you're thinking that the underlying growth could be faster than the initial guidance? Or is it not -- if not, then what the offsetting factor here?

423.    To which Defendant Jordan responded, in relevant part:

So we don't want to get ahead of ourselves in terms of where numbers may or may not be versus that original plan, I think the plan of underlying eight to 10% is still the right plan, in terms of by geography, we are seeing China back to growth, absolutely Q2, that will pick up across the rest of the year, we obviously are still expecting a moderate ramp back up the Q, sorry, the numbers for this year for China will be lower than 2021.

So we aren't seeing a full recovery back to 2021 levels in our expectations for China. But we are obviously seeing growth from the rest of the year now as we move forward. On the U.S., obviously, we are seeing a better position from where we were in Q4. And I think that will improve as we trade through Q2, whether that will get to positive territory in the U.S. is yet to be seen. So I think second half growth for U.S. is probably what you should have in your numbers. And that obviously, will allow us to deliver this 8% to 10% underlying.

424.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, Defendant Jordan failed to disclose that: (i) Farfetch was already experiencing a significant slowdown in growth in the U.S. and China, the Company's two largest markets; (ii) Farfetch lacked proper oversight concerning the cash needs of different divisions of the Farfetch Group, including *inter alia*, NGG; (iii) Reebok had been overvalued at the time of acquisition based on steep discounts offered by Adidas and was incapable of producing at expected rates under Farfetch's full price strategy; (iv) as such, Rebook's wholesale and e-commerce operations were, in fact, not "on budget."

**August 17, 2023 – Q2 2023 Quarterly Report**

425.    On August 17, 2023, Farfetch issued a press release announcing its financial results for the three-month period ended June 30, 2023 (the "Q2 2023 Earnings Release"). While the Q2

2023 Earnings Release revealed poor results and lower than expected guidance for FY 2023, Defendant continued to conceal material information relating to Farfetch's internal control issues, unsustainable cash burn, growing liquidity crisis, and as a result, maintained unrealistic expectations for FY 2023.

426.    The Q2 2023 Earnings Release provided, in relevant part:

> •*Digital Platform GMV and Digital Platform Services Revenue growth accelerate to 7% and 10% year-over-year*
> •Strong supply growth of over 40% year-over-year on the Farfetch Marketplace
> •Record Active Consumers of 4.1 million, up 7% year-over-year
> •*Operating cost base reduced year-over-year, delivering operating cost leverage*
> •*Progress on strategic initiatives underpins 2023 expectations for strong growth, Adjusted EBITDA profitability and positive Free Cash Flow*

(emphasis added)

427.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) the Company lacked adequate internal operational controls, including controls over NGG's and Farfetch's financial reporting; (ii) the Company was improperly recognizing sales, and (iii) as such, the Company's financial results were materially overstated. Furthermore, the Company's "strategic initiatives" were no match for its exorbitant and unsustainable cash burn, and was, in fact, at material risk of insolvency. As a result, the Company's $50 million reduction in Y/Y operating costs would not deliver any leverage towards maintaining a healthy cash balance and its "strategic initiatives" did not "underpin[] 2023 expectations for strong growth, Adjusted EBITDA profitability [or] positive Free Cash Flow."

428.    The Q2 2023 Earnings Release also provided the Company's "Outlook" stating, "the following reflects Farfetch's expectations for Full Year 2023 as of August 17, 2023":

> •Group GMV of approximately $4.4 billion, up from $4.1 billion in 2022

149

•Digital Platform GMV of approximately $3.85 billion, up from $3.5 billion in 2022

•Brand Platform GMV of approximately $0.45 billion, broadly flat compared to 2022

•Revenue of approximately $2.5 billion, up from $2.3 billion in 2022

•Digital Platform Order Contribution Margin of 33% to 35%, up from 32% in 2022

•Positive Adjusted EBITDA Margin up to 1%, improving from (5)% in 2022

•Positive Free Cash Flow, improving from negative in 2022

429.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) the Company lacked adequate internal operational controls, including controls over NGG's and Farfetch's financial reporting; (ii) the Company was improperly recognizing sales, and (iii) as such, the Company's financial results were materially overstated. As a result, and as later admitted by Farfetch, these statements concerning its forecasts or guidance for fiscal 2023 were unreliable.

430.    When discussing the Company's "Liquidity and Capital Resources," the Q2 2023 Earnings Release stated, in relevant part, that: "We believe that **cash flow** generated from operations and our cash, cash equivalents and marketable securities balances, as well as borrowing arrangements, **will be sufficient to meet our anticipated operating cash needs for at least the next twelve months**" (emphasis added).

431.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) the Company lacked adequate internal operational controls, including controls over NGG's and Farfetch's financial reporting; (ii) the Company was improperly recognizing sales, and (iii) as such, the Company's cash flow generated from operations were materially overstated. Further, Farfetch's revenue had been significantly strained

150

by the softening of its U.S. and China markets and the complete halt of sales in Russia. The

Company's financial condition only worsened with the acquisition of Reebok and Violet Grey,

which were both overvalued at acquisition and were underperforming. Reebok carried high costs

associated with inventory stockpiles and was incapable of producing at expected rates under

Farfetch's full price strategy. As a result, the Company's "cash flow" was not sufficient to meet

its anticipated operating cash needs for at least the next twelve months. In fact, the Company's

cash flow proved insufficient in just four short months.

432.    The Q2 2023 Earnings Release quoted Defendant Neves, who represented that

Farfetch was on track to deliver on its 2023 goals, stating, in relevant part:

> Our Q2 results show Farfetch is growing, becoming more efficient, and executing
> on our key strategic priorities. ***We have also taken decisive action to adapt to the***
> ***macro environment of the last 18 months. 2023 is set up to be a great year for***
> ***Farfetch, toward strong GMV growth, Adjusted EBITDA profitability and***
> ***positive free cash flow.*** All the while we remain steadfast on delivering our
> strategic vision of becoming the global platform for luxury.

(emphasis added)

433.    The Q2 2023 Earnings Release also quoted Defendant Jordan, who represented that

Farfetch's second quarter performance "***demonstrates our progress towards delivering profitable***

***growth and positive free cash flow in 2023***," adding, in relevant part:

> Our Digital Platform has performed particularly well, returning to growth while
> maintaining a stable order contribution margin. This, coupled with significant
> savings in the cost base across all areas of the business, means our digital platform
> is more profitable than last year. ***We enter the second half well positioned to***
> ***achieve faster levels of growth, with a lower cost base and strong liquidity***.

(emphasis added)

434.    The foregoing statements were materially false or misleading when made, or

omitted to state material facts necessary to make the statements not misleading because, the

Company failed to disclose that: (i) the "decisive action" taken was no match for its exorbitant and

151

unsustainable cash burn; (ii) the Company failed to take action to cut costs until the end of 2022 at which point such action too late; (iii) at the beginning of 2022 the Company made a series of costly acquisitions of overvalued companies that were already experiencing financial constraints; and (iv) as a result, 2023 was, in fact, not "set up to be a great year for Farfetch" but rather the Company was experiencing a liquidity crisis and was at material risk of insolvency. Furthermore, (i) the Company lacked adequate internal operational controls, including controls over NGG's and Farfetch's financial reporting; (ii) the Company was improperly recognizing sales, and (iii) as such, the Company's GMV growth, Adjusted EBITDA profitability, and positive free cash flow were materially overstated.

435.    The Q2 2023 Earnings Release provided GMV results stating:

GMV increased 1.2% in second quarter 2023 to $1,032.6 million, compared to $1,020.4 million in second quarter 2022. Excluding the impact of changes in foreign exchange rates, GMV would have increased 0.8% year-over-year. Digital Platform GMV increased $61.2 million from $883.1 million in second quarter 2022 to $944.3 million in second quarter 2023, representing a year-over-year increase of 6.9%. Excluding the impact of changes in foreign exchange rates, Digital Platform GMV would have increased 6.6% year-over-year.

Digital Platform GMV performance in second quarter 2023 reflects a return to growth as the prior year period no longer includes Russia following the March 2022 stoppage of our operations in the region. Digital Platform GMV performance also reflects an increase in Marketplace orders and growth of FPS GMV. These were partially offset by a decrease in Marketplace AOV from $596 to $561 driven largely by an increased mix of markdown sales, as well as a continued decrease in Digital Platform GMV in the U.S. and China.

Brand Platform GMV decreased 40.8% year-over-year from $107.1 million in second quarter 2022 to $63.4 million in second quarter 2023. Excluding the impact of changes in foreign exchange rates, Brand Platform GMV would have decreased 41.9% year-over-year. The decrease was primarily due to the timing of shipments and a decline in wholesale orders. The decline in second quarter 2023 Brand Platform GMV also reflects an uplift in second quarter 2022 Brand Platform GMV from a partial recovery of delayed first quarter 2022 shipments. This decrease was partially offset by Brand Platform GMV from the European partnership with Reebok, which was commercially launched in May 2023.

152

In-Store GMV decreased 17.5% year-over-year from $30.2 million in second quarter 2022 to $24.9 million in second quarter 2023. Excluding the impact of changes in foreign exchange rates, In-Store GMV would have decreased 18.6% year-over-year. The decrease was primarily driven by lower sales in stores in the U.S., partially offset by growth in stores in Europe.

436.    The Q2 2023 Earnings Release provided Revenue results stating:

Revenue decreased $7.3 million year-over-year from $579.3 million in second quarter 2022 to $572.1 million in second quarter 2023, representing a year-over-year decrease of 1.3%. This decrease was primarily driven by a 42.2% decrease in Brand Platform Revenue to $67.4 million, as well as a 15.1% decrease in In-Store Revenue to $22.7 million. These decreases were partially offset by an increase in Digital Platform Revenue of 10.5% to $482.0 million. Excluding the impact of changes in foreign exchange rates, revenue would have decreased 2.1% year-over-year.

Digital Platform Services Revenue increased 9.9% year-over-year, reflecting a 14.6% increase in first-party revenue and a 6.3% increase in third-party revenue. Digital Platform Services first-party revenue increased as continued stock clearance activity drove increased sales of first-party products on the Marketplace. The increase in Digital Platform Services third-party revenue was driven by growth in third-party Digital Platform GMV, alongside an increased Third-Party Take Rate. Excluding the impact of changes in foreign exchange rates, Digital Platform Services Revenue would have increased 9.2% year-over-year.

Digital Platform Fulfilment Revenue represents the pass-through to consumers of delivery and duties charges incurred by our global logistics solutions, net of any Farfetch-funded consumer promotions, subsidized shipping and incentives. Digital Platform Fulfilment Revenue increased 13.5% year-over-year, due to an increase in duties and a decrease in Farfetch-funded promotions.

Brand Platform Revenue decreased 42.2% year-over-year primarily due to the same reasons as Brand Platform GMV. In addition, second quarter 2022 included a full quarter of net economic benefit from Reebok, compared to second quarter 2023, where we recognized lower net economic benefit from Reebok following the commercial launch of the European partnership in May 2023. Excluding the impact of changes in foreign exchange rates, Brand Platform Revenue would have decreased 43.3% year-over-year.

437.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) the Company lacked adequate internal operational controls, including controls over NGG's and Farfetch's financial reporting; (ii) the Company was

153

improperly recognizing sales, and (iii) as such, the Company's financial results were materially overstated.

438.    The Q2 2023 Quarterly Report provided Farfetch's unaudited condensed consolidated statement of financial position, as follows:

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

| Unaudited condensed consolidated statement of financial position | | |
|---|---|---|
| (in $ thousands) | | |
| | December 31, 2022 | June 30, 2023 |
| **Non-current assets** | | |
| Other receivables | 21,204 | 40,069 |
| Derivative financial assets | - | 721 |
| Deferred tax assets | 19,566 | 19,342 |
| Intangible assets | 1,547,830 | 1,503,925 |
| Property, plant and equipment | 91,141 | 92,632 |
| Right-of-use assets | 187,640 | 195,115 |
| Investments | 218,977 | 217,505 |
| Investments in associates | 138 | 276 |
| **Total non-current assets** | **2,086,496** | **2,069,585** |
| | | |
| **Current assets** | | |
| Inventories | 345,969 | 436,408 |
| Trade and other receivables | 492,565 | 501,225 |
| Current tax assets | 16,193 | 25,945 |
| Derivative financial assets | 472 | 10,971 |
| Cash and cash equivalents | 734,221 | 453,820 |
| **Total current assets** | **1,589,420** | **1,428,369** |
| **Total assets** | **3,675,916** | **3,497,954** |
| | | |
| **Liabilities and equity** | | |
| **Non-current liabilities** | | |
| Provisions | 12,166 | 15,636 |
| Deferred tax liabilities | 127,348 | 88,596 |
| Lease liabilities | 178,247 | 194,584 |
| Employee benefit obligations | 2,930 | 3,833 |
| Derivative financial liabilities | 206,564 | 206,967 |
| Borrowings | 892,700 | 916,923 |
| Put and call option liabilities | 169,218 | 208,610 |
| Other financial liabilities | 298,244 | 287,358 |
| **Total non-current liabilities** | **1,887,417** | **1,922,507** |
| | | |
| **Current liabilities** | | |
| Trade and other payables | 740,848 | 829,662 |
| Provisions | 12,053 | 8,427 |
| Current tax liability | 6,075 | 6,503 |
| Lease liabilities | 36,996 | 41,614 |
| Employee benefit obligations | 2,403 | 2,051 |
| Derivative financial liabilities | 22,041 | 4,934 |
| Put and call option liabilities | 26,029 | 30,194 |
| Other financial liabilities | 36,433 | 45,891 |
| **Total current liabilities** | **882,878** | **969,276** |
| **Total liabilities** | **2,770,295** | **2,891,783** |
| | | |
| **Equity** | | |
| Equity attributable to owners of the parent | 748,214 | 460,568 |
| Non-controlling interests | 157,407 | 145,603 |
| **Total equity** | **905,621** | **606,171** |
| **Total equity and liabilities** | **3,675,916** | **3,497,954** |
| | | |

155

439.    The foregoing statements were materially false and misleading when made because Farfetch's financial position materially overstated the value of its intangible assets, and as a result, materially overstated the Company's total assets and equity. In the above financial statement, Farfetch represented that its intangible assets as of June 30, 2023 were worth approximately $1.5 billion. They were not. In fact, according to Coupang's valuation of the same assets just months later, Farfetch's intangible assets were worth approximately $325 million, or 80% less than represented by Defendants. As seen in Coupang's valuation of the Farfetch Business upon consummation of the Transfer, Farfetch's financial position and overall value was significantly lower than the Company stated.

440.    That same day, Farfetch hosted a conference call with investors and analysts to discuss its Q2 2023 results (the "Q2 2023 Earnings Call"). During the call, Defendant Neves discussed the Q2 2023 results, providing that:

> I am delighted to be taking you through our Q2 results, a quarter which saw an acceleration of our Digital Platform growth as well as further progress across key strategic priorities for 2023. And ***thanks to the decisive actions we've already taken in terms of fixed costs, we are confident we remain on track to be adjusted EBITDA profitable and free cash flow positive for full year '23***.
>
> ***
>
> Our group outlook for 2023 also factors in recent developments in NGG's business, which Stephanie will discuss. Overall, I am delighted to confirm Farfetch is growing. ***Our key strategic initiatives remain on track. And thanks to the decisive actions we've already taken in terms of fixed costs, we are confident about our objective to be profitable at the adjusted EBITDA level and generate positive free cash flow for full year 2023***.

(emphasis added)

441.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) the "decisive action" taken was no match for its exorbitant and

unsustainable cash burn; (ii) the Company failed to take action to cut costs until the end of 2022 at which point such action too late; (iii) at the beginning of 2022 the Company made a series of costly acquisitions of overvalued companies that were already experiencing financial constraints; (iv) the Company lacked adequate internal operational controls, including controls over NGG's and Farfetch's financial reporting; (v) the Company was improperly recognizing sales; (vi) as such, the Company's financial results were materially overstated; and (iv) as a result, the Company was, in fact, not "on track to be adjusted EBITDA profitable and free cash flow positive for full year '23" but rather the Company was experiencing a liquidity crisis and was at material risk of insolvency.

442.    During the Q2 2023 Earnings Call, Defendant Phair discussed recent developments within NGG providing, in relevant part, that:

> …Four years ago, we acquired NGG because we saw great potential behind combining its culturally relevant content creation platform with the Farfetch technology platform, and *it has been a successful combination*…
>
> ***
>
> Starting with Q2 performance. In Q2, Brand Platform GMV decreased 41% to $63 million. ***This decline was driven by a phasing of deliveries from Q2 as wholesale accounts, predominantly department stores and retailers in the U.S. and U.K., reduced intake deliveries due to heightened inventory positions, resulting from the challenging macro environment. The phasing of shipments was also due to some onboarding challenges with the launch of Reebok, which have resulted in a slower ramp-up.*** However, we expect a strong recovery of these deliveries to result in Q3 Brand Platform GMV of over $150 million.
>
> ***
>
> Moving on to NGG's organization changes. Since taking this role, following the recent transition of the NGG founders, I have been spending time with the team in Milan reviewing the business strategy and operations and ***have begun implementing actions to streamline NGG and allocate resources to optimize profitability***.
>
> First, we have cemented a strong and capable leadership who have been at NGG over the past few years. ***We also restructured NGG to function more efficiently as***

157

*an operating platform* to service existing and future brands within the portfolio. This, along with our plans to further integrate NGG with the Farfetch platform has enabled us to reduce NGG's head count to 2021 levels.

Going forward, we will also focus our resources and efforts on the brands with the greatest scale and profitability profile. *As a result of these actions, direct G&A for full year 2023 at NGG is expected to decrease double-digit percentage as compared to our original expectations for the year*, and we expect some of these savings to carry into 2024 for a stronger profitability profile.

***

We're also excited to have launched in July, the first iteration of Reebok's premium line. This line is the prologue of the full launch of products and collaborations expected next year. *Overall, we continue to see significant strength within NGG, a business that has contributed to the growth and profitability of Farfetch, delivering GMV growth at a 20% CAGR from 2018 to 2022, ahead of luxury industry growth of 7% over the same period.* We believe that brands within the NGG portfolio will continue to be forces of culture in the industry and *that our recent organizational changes led by a very strong management team will also allow NGG to operate more efficiently, drive profitable growth and unlock further synergies with the overall Farfetch Group*.

(emphasis added)

443.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) Farfetch lacked proper oversight of its subsidiaries, including NGG; (ii) the Company failed to perform proper due diligence prior to the Reebok acquisition in February 2022; (iii) following the Reebok acquisition the Company saw significantly higher costs relating to inventory; (iv) Reebok had been overvalued at the time of acquisition and was incapable of producing at expected rates; (v) the Company lacked adequate internal operational controls, including controls over NGG's and Farfetch's financial reporting; (v) the Company was improperly recognizing sales; (vi) as such, the Company's financial results were materially overstated; (vii) the Company had failed to remediated known material weaknesses in its internal controls; and (vii) as a result, the NGG acquisition was, in fact, not "a successful combination"

and would not "operate more efficiently, drive profitable growth [or] unlock further synergies with the overall Farfetch Group."

444.    During the Q2 2023 Earnings Call, Defendant Jordan discussed the Company's near-term expectations, providing, in relevant part:

> Looking ahead, we are adjusting our near-term expectations across H2 to reflect an updated assessment of the luxury market in the U.S. and China. This means moderating our GMV growth expectations. ***However, our focus on operating the business off a lower cost base means we continue to expect to deliver profitability in 2023 with up to 1% adjusted EBITDA margin***.
>
> ***
>
> ***On G&A and technology costs, we're now guiding to circa $800 million this year, which is a $150 million saving compared to the initial guidance as we continue to drive cost savings across the business. This should result in cost $50 million lower than last year, which delivers a return to operating cost leverage***.
>
> ***Revenue growth is expected at 8% to 10%.*** On margins, our forecast for Digital Platform order contribution margin remains higher year-on-year at 33% to 35%. This position is supported by anticipated improving gross margins and more efficiency in demand generation expense versus 2022. Inventory actions and a higher Reebok mix means gross margin on the Brand Platform is now expected at 46% to 48%.
>
> On cash, we expect to deliver positive free cash flow and have taken the opportunity to expand our existing term loan B facility with expected net proceeds of approximately $180 million boosting our overall liquidity. ***We now expect to deliver cash and cash equivalents of over $800 million at year-end. This position is driven from higher GMV growth and profitability compared to H1 and further improvements in our working capital position, particularly within Q4***.

(emphasis added)

445.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) the Company lacked adequate internal operational controls, including controls over NGG's and Farfetch's financial reporting; (ii) the Company was improperly recognizing sales, and (iii) as such, the Company's financial results were materially

overstated and growth expectations unreliable. Furthermore, the Company's guidance or expectations for its cash and cash equivalents were false. Farfetch's overstated GMV growth and profitability and inapt improvement in working capital position were no match for its exorbitant and unsustainable cash burn, and as a result, the Company was, in fact, experiencing a liquidity crisis and at material risk of insolvency.

446.    During the Question-and-Answer portion of the Q2 2023 Earnings Call, analyst Oliver Chen of TD Cowen, Research Division, asked the following question:

> Regarding the Brand Platform, what's ahead with inventory management and inventory relative to sales? And how should we think about merchandise margins and promotions there, given less than expected revenues there? And on the Digital Platform order contribution margins, what -- how are you thinking about demand generation and also the headwinds as we model that going forward?

447.    To which, Defendant Jordan responded:

> So on the Brand Platform, there's a couple of things happening here. Obviously, the delayed shipments from Q2 going into the second half has had an impact on revenue, a flow-through down to profitability and, of course, on our inventory balance at the end of June, which is higher than that would have been had we shipped those orders.

> So once those orders clear through across the Q3, we would expect that balance to come down, plus also as we ramp up our sales for Reebok, the initial inventory that we brought in as part of the handover from the previous operators of Reebok, we'll start to sell through that inventory and push through shipments of that inventory, bringing down the balance. Also, that's on hand at the end of June as that position starts to build.

> On top of that, we are having to do a little bit of additional provisioning and clearance. And you can see that in the adjusted guidance with the gross margins for the Brand Platform having now come down. We are expecting those -- that position now to be that sort of 46% to 48% gross margin versus the 49% we delivered last year. So that is already factored in our forecast in terms of the profitability of the Brand Platform.

> The expectation is that, that balance of inventory will be significantly reduced as we trade into the end of the year, which obviously helps drive some of the working capital benefit that you see in the forecast for the second half as well. So all sort of points to much tighter inventory going into next year. Obviously, with the reduction in expected orders for the Brand Platform, we are also producing less and getting

160

factories to produce less as we start to fulfill those orders going into next year. So that again helps bring our inventory position down by December.

In terms of the Digital Platform, still very pleased with the overall position of order contribution margins there, just down 50 basis points year-on-year. And for the full year expectations, we are maintaining guidance there of 33% to 35% order contribution margin, which will be a step up from 32% last year. And that is down to savings within demand generation. We're becoming significantly more efficient within our demand generation engine. We have pulled back, of course, as you would expect, in the 2 markets that we're seeing broader macro challenges. So in the U.S. and China, we continue to retreat in terms of spend. That drives efficiency in our ability to deploy money elsewhere.

And demand generation for Q2 just gone, you saw that number come down by $4 million on an absolute basis despite the fact that the GMV on the Digital Platform was up 7%. And for the rest of the year, we're expecting this sort of 7.5% of GMV level, which is what we achieved in Q2 to carry on, which means a saving versus last year. Last year, the demand generation was 7.8% and of GMV. So we're driving this 10% growth for the full year with a lower level of demand generation spend as a percentage of GMV, which is coming through from the efficiencies.

The offset here, of course, is the first-party gross margins. Again, that's under pressure year-on-year in Q2 as we clear through some inventory. We're starting to see that improve towards the back end of the year, and it helps drive up our overall order contribution margin.

And then lastly, as the clients on Farfetch Platform Solutions ramp up Ferragamo already live, Bergdorf Goodman coming later this year. Of course, that product, the business-to-business product runs at a higher gross margin, and a higher order contribution margin on the Digital Platform, driving that 33% to 35% overall for the full year. So very confident in those numbers.

448.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) Farfetch lacked proper oversight of its subsidiaries, including NGG; (ii) the Company failed to perform proper due diligence prior to the Reebok acquisition in February 2022; (iii) following the Reebok acquisition the Company saw significantly higher costs relating to inventory; (iv) Reebok had been overvalued at the time of acquisition and was incapable of producing at expected rates; (v) the Company lacked adequate internal operational controls, including controls over NGG's financial reporting of revenue and GMV; (v) the Company was

improperly recognizing sales; (vi) as such, the Company's financial results were materially

overstated; and (vii) the Company had failed to remediated known material weaknesses; and (viii)

as a result, the Company's expectations or guidance were unreliable, as later admitted.

449.    During the Question-and-Answer portion of the Q2 2023 Earnings Call, analyst

Edward James Yruma of Piper Sandler & Co, Research Division, inquired about the performance

and health of the Off-White brand now that it was a couple of years past the untimely passing of

the brand's founder and creative director.

450.    To which, Defendant Neves responded:

> We don't break out performance on the brand by brand, but *the consumer demand
> around Off-white and Palm Angels remains very strong.* What we see is 2
> different pictures in terms of wholesale versus direct-to-consumer, so wholesale
> always overshoot in both directions. *So we saw a very fast expansion of our
> wholesale business, as we said, 20% CAGR from '18 to '22.*

> The brands are very popular in the U.S. and in the U.K. So we have great customers
> in the American departmental stores and also boutiques in the U.K. and Europe.
> And with the macro headwinds hitting U.S. department stores and U.K., naturally,
> these customers are reducing their orders across the entire luxury spectrum. And
> you saw this in multiple commentary from practically all 3 luxury players in terms
> of the health of the wholesale segment, especially in the U.S. but also in the U.K.

> *So if you look at direct to consumer, the in aggregate, the NGG direct-to-
> consumer digital sales are up double digits.* And I think this shows that there are
> 2 stories here. There's 1 story in terms of the consumer appetite for these brands,
> which remains strong. They continue to be in the list of top our rents. And also the
> new direction has been evolving with ecomera now firmly installed as Creative
> Director activating his community, obviously Palm Angels nothing changes, we
> have Francesco Ragazzi and Stefano who created a brand really from scratch to
> what is one of the success stories in past years.

> *So the portfolio is very strong.* Reebok, we're very excited with Reebok. We did a
> small preview of Reebok luxury collections to some luxury boutiques this summer
> and was extremely well received. This is a brand that hasn't done anything really
> in the premium space. So it's greenfield and -- is greenfield for 2024 and beyond.
> And NGG with Cristiano, having been over 20 years at Nike in their premium
> luxury, Nike collaboration department and now over 3 years at NGG, he's the right
> guy to really make Reebok make sneaker history here.

And therefore, we remain very confident over the long-term plans for NGG and for the Brand Platform. And we're going to navigate this very short-term in the case of Reebok, one-off transition issues from adidas and in the case of Off-White, Palm Angels and other brands really a wholesale headwind, which we were always -- we always say that the future of the brands is more direct-to-consumer than wholesale. So our focus is really on ongoing direct consumer precisely because wholesale always has these movements of overshooting in one direction and another. So this continues to be the strategic direction for the group.

(emphasis added)

451.    The foregoing statements were materially false or misleading when made, or omitted to state material facts necessary to make the statements not misleading because, the Company failed to disclose that: (i) the Company lacked adequate internal operational controls, including controls over NGG's financial reporting of revenue and GMV; (ii) the Company was improperly recognizing sales; and (iii) as such, the Company's financial results were materially overstated. In addition, as confirmed by former employees identified above, the Off-White brand had *not* "remain[ed] very strong" in the years following the untimely death of Abloh, the brand's founder and creative director, and was, in fact, floundering—having a material impact on NGG sales. Furthermore, the Company failed to disclose that: (i) Farfetch lacked proper oversight of its subsidiaries, including NGG; (ii) the Company failed to perform proper due diligence prior to the Reebok acquisition in  February 2022; (iii) following the Reebok acquisition the Company saw significantly higher costs relating to inventory; (iv) Reebok had been overvalued at the time of acquisition and was incapable of producing at expected rates; and (v) as a result, the NGG portfolio was *not* "very strong" but rather was experiencing shrinking revenue growth while realizing growing operating expenses.

452.    During the Question-and-Answer portion of the Q2 2023 Earnings Call, analyst Edward James Yruma of Piper Sandler & Co., Research Division asked for a follow-up on the YNAP acquisition, specifically questioned the value of the deal stating, "I know that there is a

mechanism to reduce the dilution from the transaction. I guess given that the stock is at a very

different point than when the transaction was announced, does that still hold? Is there a certain

time that deal needs to be closed by to make sure that those mechanisms hold in place?"

453.    To which Defendant Neves responded, in relevant part:

On YNAP, I can absolutely confirm the share price has -- and the share count has
been fixed. So we don't have any extra dilution and it's around 11% of dilution for
Farfetch for 47.5% of share capital at YNAP, that's what's been – that's what's on
the deal, and that's what's going to be executed independently of where the share
price is as soon as we get regulatory approval.

And of course, you have other guardrails in this transaction in terms of the ability
to -- the option to require the remaining of the company over 5 years with the
requirement for the company to be profitable for full consolidation in terms of a
[indiscernible] year and 5. So those strong guardrails absolutely remain in place.

We think this is a great partnership, and we're very excited with launching -- re-
platforming, not just NET-A-PORTER but also cartier.com, which are going to be
the 2 first launches where the teams are working around the cloud, building these
great new platforms for these flagship brands. And after that, we'll continue with
the rest of the Richemont and YNAP portfolios, which obviously, this time next
year means that Farfetch -- the Farfetch platform will power the largest online
destination in luxury. That's Farfetch. The second largest online destination in
luxury, that's YNAP, 1 of the 3 largest luxury conglomerates in the world that's
Richemont and 2 of the most iconic luxury department stores in the U.S. and Europe
as Harrods and Bergdorf Goodman. So this is an incredible roster of clients for best-
in-class luxury SaaS platform, and that's what we're excited to be delivering
against.

454.    The foregoing statements were materially false or misleading when made, or

omitted to state material facts necessary to make the statements not misleading because, the

Company failed to disclose that: (i) the value of the YNAP acquisition was significantly overstated

given the then-current state of the luxury e-commerce market; (ii) the fixed value of the YNAP

acquisition no longer reflected a fair value consideration; and (iii) as a result, as structured the

YNAP acquisition was *not* a "great partnership" as it would have left Farfetch in a financially

worse position had the deal closed without reconsideration.

## VII.  ADDITIONAL ALLEGATIONS OF SCIENTER

455.    Defendants acted with scienter in that they knew that the financial statements issued or disseminated in the Farfetch name during the Class Period were false and/or materially misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants participated in the fraudulent scheme alleged herein by virtue of their possession of and/or access to information reflecting the true facts regarding Farfetch's financial health, liquidity strength, and internal controls over financial reporting.

### A.  Core Operations

456.    The fraud alleged herein relates to the core business and operations of Farfetch, therefore, knowledge thereof may be imputed to the Individual Defendants. NGG was a primary contributor to the Company's revenue and GMV. Indeed, portions of NGG's sales were reported in all four of the Company's revenue streams. Cash management, inventory management, revenue reporting, and receivables were essential elements of each of the Company's business lines. In addition, as a company on a mission to scale, improving gross margins, meeting existing demand, and recruiting new customers was essential to the Company's survival. Accordingly, it is appropriate to presume that the Individual Defendants were apprised of, had access to, or had actual knowledge of all material information related to Farfetch's business operations and financial condition during the Class Period, including the material adverse information that was improperly withheld and/or misrepresented to investors.

457.    Indeed, the Individual Defendants' "strategic cost-saving initiatives" had a significant impact on Farfetch's core business operations—*i.e.*, GMV, revenue, capital management, and liquidity—supporting a strong inference of scienter.

### B.    Individual Defendants Held Themselves Out as Knowledgeable

458.    The Individual Defendants knew investors and analysts were acutely interested in the Company's GMV, revenue, capital management, sales growth, and liquidity strength, because they were repeatedly asked about such key metrics throughout the Class Period on various investor calls and at analyst conferences. As detailed in Section VI., *supra*, the Individual Defendants consistently spoke to those subjects with authority, indicating that they either had actual knowledge of the subject matters discussed (and thus the truthful information omitted) or were reckless to the likelihood of misleading investors by speaking with authority as to subjects about which they actually were uninformed.

### C.    Neves' Control Over Farfetch

459.    At all relevant times, Defendant Neves maintained significant control over Farfetch and its subsidiaries. As the Company acknowledges in its public filings with the SEC:

> Neves, has considerable influence over important corporate matters due to his ownership of us. Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share in respect of matters requiring the votes of shareholders, while holders of Class B ordinary shares are entitled to twenty votes per share, subject to certain exceptions. … Due to the disparate voting powers associated with our two classes of ordinary shares, Mr. Neves holds approximately 71.1% of the aggregate voting power of our Company. As a result, Mr. Neves has considerable influence over matters such as electing or removing directors, approving any amendments to our Articles and approving material mergers, acquisitions or other business combination transactions. In addition, under our Articles, our Board of Directors will not be able to form a quorum without Mr. Neves for so long as Mr. Neves remains a Director.

166

460.    Defendant Neves' control over Farfetch supports the inference that he had direct knowledge of material adverse information regarding the Company's business and operations at the time of the alleged false and misleading statements.

**D.    Former Employee Accounts Corroborate Individual Defendants' Knowledge**

461.    In addition to former employee accounts detailed in Section V., *supra*, the following former employee accounts confirm the Individual Defendants' knowledge of material adverse information concealed from the public throughout the Class Period.

462.    According to FE2, Farfetch leadership micromanaged operations, recalling on a typical day, attending roughly 10 meetings with executives to discuss all aspects of the Farfetch business. The problem with these meetings, however, is that there was real resistance to change from the top, FE2 said. FE2 said employees had a lack of decision-making power and that when projects or changes were initiated or proposed, everything to the very last detail had to be discussed with and approved by leadership. For example, FE2 described how they, as Director of Global Indirect Tax for Farfetch, proposed changes to how the Company operated with regards to indirect taxes (*i.e.*, VAT), which ultimately had a negative impact on Farfetch's operating costs and liquidity, but despite their persistent recommendations to leadership, FE2 made very little headway on this issue.

463.    According to FE5, while working to address known material weaknesses in NGG's internal controls over financial reporting (July 2023 to December 2023), Director of Internal Controls and Chief Internal Auditor, Benjamin Kaye, met weekly with Defendant Jordan to report on their progress. FE5 was involved in preparing slide presentations about their progress that Mr. Kaye provided to Defendant Jordan during their weekly meetings. The slides communicated which internal controls at NGG were of concern, what changes the internal controls team were

implementing to remediate the problems, and the status of the team's efforts. When CFO Tim Stone was hired by Farfetch in July 2023, FE5 and their team began to meet weekly with Mr. Stone to provide the same type of slide presentations and weekly reports on the status of their efforts to remediate the material weakness at NGG. FE5 said the Company's focus on FE5's and the internal control team's efforts to remediate the material weakness within NGG were priority matters.

### E.    Suspicious Trading Activity and Financial Incentives

464.    At all relevant times, the compensation for each of Farfetch's executive officers comprised of the following elements: a base salary, an annual incentive tied to achievement of Company and individual performance, contractual benefits, and pension contributions; except that Defendant Neves did not receive a base salary.

465.    Total cash compensation paid and benefits in kind provided to Farfetch's executive officers and members of its Board of Directors, including the Individual Defendants, for the year ended December 31, 2021 was $2,491,865. In addition, excluding the CEO PSU Grant (defined below), Farfetch's executive officers and board members were granted an aggregate of 9,072,806 shares (equivalent to a value of $115,511,850, based on the accounting fair value as of the grant date), comprised of restricted stock units and shares subject to stock options, in the year ended December 31, 2021 pursuant to the 2018 Farfetch Employee Equity Plan. The exercise price of the stock options granted during the year ended December 31, 2021 was $61.27. These stock options were subject to varying vesting schedules over a multi-year period.

466.    In May 2021, Defendant Neves was granted a long-term incentive grant of performance-based restricted stock units which vest over an eight-year period based on the achievement of certain stock price hurdles (the "CEO PSU Grant"). The grant was for 8,440,000 performance-based restricted stock units and had a fair value upon grant of $99 million. As of

December 31, 2022, zero performance-based restricted stock units had vested based on the achievement of the specified stock price hurdle goals.

467.    In connection with the CEO PSU Grant, Mr. Neves also entered into a letter agreement pursuant to which he agreed to waive any cash and equity incentive compensation (other than the CEO PSU Grant) from 2021 through December 31, 2028.

468.    Total cash compensation paid and benefits in kind provided to Farfetch's executive officers and members of its Board of Directors, including the Individual Defendants, for the year ended December 31, 2022 was $4,212,329. In addition, the Company's executive officers and board members were granted an aggregate of 1,539,818 shares (equivalent to a value of $11,064,257, based on the accounting fair value as of the grant date), comprised of restricted stock units and shares subject to stock options, in the year ended December 31, 2022 pursuant to the 2018 Farfetch Employee Equity Plan. The exercise price of the stock options granted during the year ended December 31, 2022 was $23.18-$30.13. These stock options were subject to varying vesting schedules over a multi-year period.

469.    On May 18, 2023, the Board of Directors of Farfetch and Defendant Neves, agreed to surrender one-half of the number of the Company's ordinary shares Mr. Neves was eligible to earn under the long-term performance-based restricted share unit award granted to him on May 28, 2021 (the "Original Award"). The Original Award consisted of 8,440,000 performance share units (the "CEO Performance Share Units") divided into eight tranches that are eligible to vest over an eight-year period based on the achievement of share price hurdles during each performance period, measured based on the average of the closing price of the Company's ordinary shares over a 90-trading day trailing average. As agreed, one-half of the CEO Performance Share Units subject to each tranche will be surrendered, representing a surrender of 4,220,000 CEO Performance Share

Units under the Original Award, with the remaining CEO Performance Share Units eligible to be earned if the applicable performance targets are met in accordance with the terms of Mr. Neves' existing performance-based restricted share unit agreement.

470.    In connection with the surrender of 4,220,000 CEO Performance Share Units under the Original Award, on May 18, 2023, the Board granted Mr. Neves a replacement equity award under the 2018 Farfetch Employee Equity Plan with an aggregate value of approximately $9,000,000 (based on the accounting fair value as of the grant date). This equity award is comprised of (i) 1,382,361 restricted share units which vest in substantially equal annual installments over three years and (ii) performance share units with respect to an on-target number of 169,204 shares (representing 100% target attained) (the "On-Target PSU Amount"), with a performance multiplier of 0-180% applied to the On-Target PSU Amount based on the achievement of specified performance goals linked to Mr. Neves' performance and the Company's financial performance over an approximately one year period.

471.    Accordingly, the Individual Defendants' compensation during their tenure at Farfetch was heavily dependent on the value of Farfetch securities. Thus, the Individual Defendants were incentivized to conceal material adverse non-public information if the release of such information would have had a negative effect on Farfetch's stock price. By concealing the material adverse information complained of herein, the Individual Defendants were attempting to keep Farfetch's stock price artificially inflated in hopes of meeting the performance targets necessary to achieve lucrative bonuses through their equity compensation packages and maintain a high fair value of shares granted thereunder.

### F.    Suspicious Timing and Departures of Company Executives

472.    On August 25, 2022, Farfetch announced that Chief Marketing Officer, Gareth Jones; as well as Chief Commercial and Sustainability Officer, Giorgio Belloli, would be "transitioning out of the business." The two executives were succeeded by Senior Vice President, Commercial, Stephen Eggleston, with Belloli remaining on board to help with the transition until the end of 2022, and then in an advisory capacity through the end of 2023.

473.    Giorgio Belloli first joined Farfetch as Chief Commercial and Sustainability Officer in 2013. During his tenure with the Company, Belloli was responsible for the commercial strategy and development of Farfetch, overseeing merchandising, business development, account management and brand relations, as well as the Farfetch Black & White business.

474.    Gareth Jones joined Farfetch as Chief Marketing Officer in March 2020. During his two-year tenure at the Company, Jones' responsibilities were broad and included digital performance and demand generation investment; CRM and the scaling of data driven personalization; strategy and insights; marketing experiences and channel diversification; brand and content, and media sales.

475.    On January 18, 2023, Farfetch announced that Chief Brand Officer, Holli Rogers, and Chief Growth Officer, Martin Avetisyan, were leaving the Company "to pursue other opportunities."

476.    Holli Rogers first joined Farfetch serving as CEO of Browns since its 2015 acquisition by the Company. In 2019, Farfetch announced that Rogers' role at the Company had been expanded, naming her Chief Brand Officer across all the Farfetch Business. On April 1, 2021, Rogers stepped down from her position as CEO of Browns, transitioning to a chair position, to purportedly focus on her role as Chief Brand Officer.

477.    On March 19, 2021, *FashionUnited* reported on Rogers' new focus at Farfetch stating the move "comes as the company is continuing to do impressively well." The article went on to note that, "[d]espite a global pandemic dealing a major blow to most retail and fashion companies, Farfetch still came out with 41 percent year/year top-line growth."

478.    Martin Avetisyan first joined Farfetch in 2014, serving as the Company's Chief Growth Officer and a board member of FF Holdings. In addition, Mr. Avetisyan is the founder of iMall, an award-winning fashion marketplace, and served as iMall's CEO from inception in 2012 until its acquisition by Farfetch in 2015.

479.    On February 23, 2023, Farfetch announced that Defendant Jordan would be stepping down as CFO by the end of 2023 after more than eight years with the Company. On August 1, 2023, Farfetch announced that Tim Stone had joined the Company and would become CFO effective September 1, 2023. The announcement provided that, "after a handover period, including the reporting of FARFETCH's second quarter 2023 results scheduled for August 17, 2023, Mr. Jordan will leave the Company on August 31, 2023."

480.    On June 1, 2023, Farfetch announced that NGG co-founder and CEO, Davide De Giglio, alongside NGG's other co-founder, Executive Director and Off-White CEO, Andrea Grilli, were stepping down from their roles at the Company. Defendant Phair was named as their replacement through her appointment as Chair of NGG, while also maintaining her position as Group President of Farfetch.

481.    Then, on November 30, 2023, Farfetch announced that J. Michael Evans had tendered his resignation from the Board of Directors of Farfetch with immediate effect. Farfetch claimed his resignation was "in furtherance of the arm's length commercial relationship between Alibaba [] and the Company." However, Evans had served as a non-executive director of Farfetch

since December 2020. At the time, he had also been serving as the President of Alibaba since September 2015 and has served on its board since September 2014.

### G.    **Corporate Scienter and *Respondeat Superior***

482.    Each of the Individual Defendants was a high-ranking management-level employee that either (i) made the false and misleading statements alleged herein; (ii) approved the false and misleading statements alleged herein; or (iii) approved the making or issuance of the false and misleading statements alleged herein. In so doing, each was acting in his/her role as an executive employee and representative of Farfetch and/or FF Holdings. The scienter of each of these individuals and all other management-level employees of the Farfetch Group, is therefore imputed to Defendants Farfetch and/or FF Holdings.

## VIII.    CLASS ACTION ALLEGATIONS

483.    Plaintiffs bring this action on behalf of all persons and entities who purchased or acquired publicly traded Farfetch securities during the Class Period. Excluded from the Class are the Individual Defendants, members of the immediate families of each Defendant, Farfetch (including its subsidiaries) and its officers and directors at all relevant times, any entity in which any excluded party has or had a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, heirs, successors or assigns of any such excluded party.

484.    The members of the Class are so numerous that joinder of all members is impracticable. At all relevant times, Farfetch's stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Farfetch or its transfer agent and may be notified of the pendency of this

action by mail, using the form of notice similar to that customarily used in securities class actions.

485.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

486.    Plaintiffs have and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

487.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a.    whether the federal securities laws were violated by Defendants;

      b.    whether the price of Farfetch's securities during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

      c.    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

488.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    LOSS CAUSATION AND ECONOMIC LOSS

489.    Throughout the Class Period, Defendants made materially misleading statements and omissions, which artificially inflated the price of Farfetch's securities and operated as a fraud

or deceit on Class Period purchasers or acquirers of these securities. As the truth began to emerge, as a result of multiple corrective disclosures and/or materializations of the risks, the prior artificial inflation was removed from Farfetch's stock price and Plaintiffs and other members of the Class suffered foreseeable economic losses, which were proximately caused by Defendants materially misleading the investing public.

490.    The market for Farfetch's securities was open, well-developed, and efficient at all relevant times. Defendants' material misrepresentations and omissions created a false impression in the market as to Farfetch's internal controls over financial reporting, generally and, in particular, its liabilities, equity, accumulated deficit, and overall financial health. In turn, this caused Farfetch securities to be overvalued and artificially inflated during the Class Period.

491.    Reasonably relying on the integrity of the market price for Farfetch securities and market information relating to Farfetch's financial health and business, Plaintiffs and other members of the Class purchased or otherwise acquired Farfetch securities to their detriment as they sustained damages resulting from the revelation of corrective information and/or materialization of the risks, as discussed in Section V.J., *supra*.

492.    As detailed above, when the truth about Defendants' misrepresentations and omissions were revealed, the value of Farfetch securities declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in price of Farfetch securities was a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market through the above identified corrective disclosures and/or materialization of the risks concerning the material information concealed by Defendants' fraudulent conduct.

493.    The timing and magnitude of the price declines of Farfetch securities negate any inference that the loss suffered by Plaintiffs and other members of the Class was caused by changed

175

market conditions, macroeconomic or industry factors or company-specific facts unrelated to the Defendants' fraudulent conduct. Therefore, the damages suffered by Plaintiffs and other members of the Class were foreseeably and proximately caused by Defendants' fraudulent scheme to artificially inflate Farfetch's stock prices and the subsequent significant declines in the value of Farfetch securities when Defendants' prior misrepresentations and omissions were revealed.

## X.    PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

494.    Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

    a.    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    b.    the omissions and misrepresentations were material;

    c.    Farfetch securities traded in an efficient market;

    d.    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Farfetch securities; and

    e.    Plaintiffs and the other members of the Class purchased Farfetch securities between the time Defendants misrepresented and/or failed to disclose material information and the time the truth was disclosed and/or risks materialized, without knowledge of the misrepresented or omitted facts.

495.    At all relevant times, the market for Farfetch securities was an efficient market for the following reasons, among others:

    a.    Farfetch securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

    b.    During the Class Period, Farfetch securities were actively traded,

demonstrating a strong presumption of an efficient market;

c.      As a regulated issuer, Farfetch filed with the SEC periodic public reports during the Class Period;

d.      Farfetch regularly communicated with public investors via established market communication mechanisms;

e.      Farfetch was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

f.      Unexpected material news about Farfetch was rapidly reflected in and incorporated into Farfetch's share price during the Class Period.

496.     As a result of the foregoing, the market for Farfetch securities promptly digested current information regarding Farfetch from all publicly available sources and reflected such information in the Company's share price. Under these circumstances, all purchasers and acquirers of Farfetch securities during the Class Period suffered similar injury through their purchase of Farfetch securities at artificially inflated prices, and a presumption of reliance applies.

497.     Alternatively, reliance need not be proven in this action because the action involves material omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because a reasonable investor would have considered Farfetch's financial statements,

financial health, and adequacy of internal controls over financial reporting and related disclosures to be important when deciding whether to purchase and/or sell Farfetch securities.

## XI.    FF HOLDINGS IS LIABLE FOR FARFETCH'S STATEMENTS AND REMAINES FARFETCH'S SUCCESSOR-IN-INTEREST

498.    FF Holdings is liable for Farfetch's fraudulent actions because the reorganization of Farfetch.com Limited ("Farfetch.com") and its subsidiaries was nothing more than a name change and continuation of Farfetch's business, undertaken to defraud Farfetch's creditors. At all relevant times, Farfetch was a holding company with no independent operations; FF Holdings was responsible for all action taken by Farfetch, including but not limited to Farfetch's public statements.

499.    Farfetch historically conducted its business through Farfetch.com. In connection with the Company's September 2018 IPO, Farfetch carried out reorganization transactions (the "Reorganization Transactions") whereby Farfetch.com became a wholly owned subsidiary of Farfetch, an exempted company incorporated with limited liability under the Companies Law (2018 Revision) of the Cayman Islands. The steps to restructure the Group had the effect of Farfetch being inserted above Farfetch.com as the holder of the Farfetch.com share capital. The Reorganization Transactions were treated as a capital reorganization. The Group was thereafter presented as if Farfetch had always owned Farfetch.com.

500.    The Company's historical consolidated financial statements prior to the Reorganization Transactions reflected the results of operations of Farfetch.com and, following the Reorganization Transactions, reflected the results of operations of Farfetch. Farfetch's consolidated financial statements were the same as Farfetch.com's consolidated financial statements, as adjusted for the Reorganization Transactions. Following the Reorganization Transactions, the Company retroactively reflected the Reorganization Transactions in Farfetch's

178

consolidated financial statements. Following the Reorganization Transactions, the Company's business was conducted through Farfetch and its subsidiaries.

501.    The steps taken to restructure the Group were as follows. On September 18, 2018, all holders of warrants over Farfetch.com shares, except a holder of 189,995 warrants, exercised their warrants into the applicable class of shares and the outstanding shares of Farfetch.com and were exchanged for shares of Farfetch with equivalent rights. Following the exchange, the £0.10 British Pound Sterling dominated ordinary shares and the preference shares held by the shareholders of Farfetch were converted into $USD denominated $0.20 ordinary shares of Farfetch and subsequently exchanged, one for five, for $0.04 Class A ordinary shares and Class B ordinary shares, as applicable. Outstanding options of Farfetch.com were released in exchange for the grant of options with equivalent rights over Class A ordinary shares of Farfetch.

502.    The Company's FY 2020 20-F provided that: "except where the context otherwise requires or where otherwise indicated, the terms 'Farfetch,' the 'Company,' 'we,' 'us,' 'our,' 'our company' and 'our business' refer, prior to the Reorganization Transactions, to Farfetch.com and, after the Reorganization Transactions, to Farfetch Limited, in each case together with its consolidated subsidiaries as a consolidated entity."

503.    The creation of FF Holdings, and its rise to power as the umbrella organization for all Farfetch.com's business and assets, was but a continuation of Farfetch's business. Defendant Neves controlled both entities and retained ultimate authority over each entity's respective actions.

504.    Just like Farfetch.com before it, FF Holdings was a privately held company, wholly owned by Farfetch. With the reorganization of Farfetch's subsidiaries changing little but the name of its umbrella organization for its business and assets, and with Farfetch under immense pressure following the NGG acquisition and the Company's stock price at an all-time low following the

IPO and at the time of the reorganization, the purpose of the reorganization was simple – to avoid liability to the extent possible. In such a setting, Farfetch knew that the assets available at Farfetch, by way of Farfetch.com following the Reorganization Transactions, would be put in jeopardy. In order to have the best chance at protecting these assets, Farfetch took the unprecedented step of dethroning itself and placing newly created FF Holdings in charge of all operations and assets of the Group.

505.    The FY 2020 20-F also described Farfetch as a holding company with no operations of its own, dependent on its subsidiaries to fund its operations and expenses, providing:

> As a holding company, our principal source of cash flow will be distributions or payments from our operating subsidiaries. Therefore, our ability to fund and conduct our business, service our debt and pay dividends, if any, in the future will depend on the ability of our subsidiaries and intermediate holding companies to make upstream cash distributions or payments to us, which may be impacted, for example, by their ability to generate sufficient cash flow or limitations on the ability to repatriate funds whether as a result of currency liquidity restrictions, monetary or exchange controls or otherwise. ***Our operating subsidiaries and intermediate holding companies are separate legal entities, and although they are directly or indirectly wholly owned and controlled by us, they have no obligation to make any funds available to us, whether in the form of loans, dividends or otherwise***. To the extent the ability of any of our subsidiaries to distribute dividends or other payments to us is limited in any way, our ability to fund and conduct our business, service our debt and pay dividends, if any, could be harmed.

(emphasis added)

506.    Pursuant to the strategic report for the period ended December 31, 2020, filed by FF Holdings on August 31, 2021, with the Registrar of Companies for England and Wales, the reorganization was completed sometime between the incorporation of FF Holdings on October 23, 2019 and December 31, 2020. However, Farfetch's annual report for the fiscal year ended December 31, 2020 (the FY 2020 20-F), filed with the SEC on March 4, 2021, made no mention of the reorganization and in fact, still listed Farfetch.com as a direct holding with FF Holdings listed as an indirect holding of Farfetch.

507.    The Company's annual report for the fiscal year ended December 31, 2021 (the FY 2021 20-F), filed with the SEC on March 4, 2022, made no mention of the reorganization including the transfer of all business and assets to FF Holdings other than through the reclassification of Farfetch's direct and indirect holdings. For the first time, Farfetch no longer included Farfetch.com as a direct subsidiary, rather it listed FF Holdings as the only direct subsidiary of Farfetch.

508.    In addition, the FY 2021 20-F limited its acknowledgement of the Reorganization Transactions and capital organization of Farfetch and Farfetch.com merely stating, "On May 15, 2018, Farfetch Limited was incorporated under the laws of the Cayman Islands to become the holding company of Farfetch.com Limited and its subsidiaries. When we refer to the 'Consolidated Group' or 'Group' we are referring to Farfetch Limited and its consolidated subsidiaries."

509.    Numerous facts lead to the conclusion that the transfer of all business and assets to FF Holdings was fraudulent. To begin with, there is no indication that *any* consideration, let alone adequate or fair consideration, was provided by FF Holdings in exchange for the business and assets it received from Farfetch. Rather, the reorganization was merely a transfer of assets and business from one of Farfetch's holding companies to another, with Farfetch controlling the property both before and after the conveyance, like a person transferring money from her checking account right to her own savings account. And because FF Holdings had merely taken Farfetch.com's place as the consolidator of the entire Farfetch Business, the entities involved in the reorganization not only share a close relationship with each other but are essentially one and the same. Further, the reorganization was highly unusual in that Farfetch.com was the flagship company from which the larger Farfetch holding company was born, only to be hastily pushed aside at the same time Defendants' make a blatant deviation from the Company's foundational business model, jeopardizing the entire operation.

510.     Furthermore, Defendants knew and intended that the agreement to transfer of all business and assets of FF Holdings to Coupang in December 2023 would leave Farfetch with insufficient funds to pay back the debts owed to creditors, including losses suffered by Plaintiffs and other members of the Class.

## XII.   NO SAFE HARBOR

511.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the misrepresentations and/or omissions alleged in this Complaint.

512.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

513.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Farfetch who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (*Against All Defendants*)

514. Plaintiffs incorporate and re-allege each and every preceding paragraph as though fully set forth herein. This Count is alleged against Farfetch, FF Holdings, and the Individual Defendants.

515. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

516. Defendants violated Section 10(b) of the Exchange Act (15 U.S.C. §78j(b)) and Rule 10b-5 (17 C.F.R. §240.10b-5) in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers and acquirers of Farfetch securities during the Class Period.

517. Plaintiffs and other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Farfetch securities. Plaintiffs and other members of the Class would not have purchased Farfetch securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Defendants' misleading statements and/or omissions.

518.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Farfetch securities during the Class Period.

519.    By operation of law as a successor to Defendant Farfetch, Defendant FF Holdings is jointly and severally liable with its co-defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
(*Against the Individual Defendants*)

520.    Plaintiffs repeats and re-alleges each and every allegation contained above as if fully set forth herein. This Count is alleged against the Individual Defendants.

521.    During the Class Period, the Individual Defendants participated in the operation and management of Farfetch, and conducted and participated, directly and indirectly, in the conduct of Farfetch's business affairs. Because of their senior positions, they knew the adverse non-public information about Farfetch financial statements, financial health, and internal controls over financial reporting.

522.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Farfetch's Class A redeemable shares, additional paid-in capital, accumulated loss, and shareholders' equity, and to promptly correct any public statements issued by Farfetch which had become materially false or misleading.

523.    Because of their positions of control and authority as senior officers, directors, and/or controlling shareholders, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Farfetch disseminated in

the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Farfetch to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Farfetch within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Farfetch securities.

524.    Each of the Individual Defendants, therefore, acted as a controlling person of Farfetch. By reason of their senior management positions and/or being directors or controlling shareholders of Farfetch, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Farfetch to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Farfetch and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

525.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Farfetch and/or FF Holdings.

## XIII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Determining this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as Class Representatives, and designating Co-Lead Counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with prejudgment and post-judgment interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## XIV.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial.

Dated:  June 21, 2024

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*
Adam M. Apton
Devyn R. Glass (*pro hac vice* forthcoming)
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
aapton@zlk.com
dglass@zlk.com

*Counsel for Co-Lead Plaintiff Fernando Sulichin and
Co-Lead Counsel for the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Lucas E. Gilmore (admitted *pro hac vice*)
Reed R. Kathrein (*pro hac vice* forthcoming)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
lucasg@hbsslaw.com
reed@hbsslaw.com

Steve W. Berman (*pro hac vice* forthcoming)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Counsel for Co-Lead Plaintiff Yuanzhe Fu and
Co-Lead Counsel for the Class*