**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE FARFETCH LIMITED SECURITIES LITIGATION | Case No.: 1:23-cv-10982-ER-KHP [rel. 1:24-cv-00532-ER] |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | <u>**ORAL ARGUMENT REQUESTED**</u> |

**MEMORANDUM OF LAW IN SUPPORT OF THE INDIVIDUAL DEFENDANTS'**
<u>**MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**</u>

LATHAM & WATKINS LLP

Jeff G. Hammel
Jason C. Hegt
Jooyoung Yeu
Andrej Novakovski
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200

*Attorneys for Individual Defendants*
*José Neves, Elliot Jordan, and Stephanie Phair*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................3

    A.    Post-IPO, Farfetch Invests In Strategic Growth And Incurs Substantial Debt
................................................................................................................................4

    B.    After Pandemic-Era Trends Helped Push Farfetch To Its First Annual Profit
In 2021, Farfetch Projects Measured Future Growth For 2022 ...............................5

    C.    Farfetch Faces Unprecedented Macro-Economic Headwinds In 2022...................6

    D.    Farfetch Enters 2023 Cautiously Optimistic About Future Prospects ....................8

    E.    Farfetch Reports Growth In Q1 2023 And Remains Cautiously Optimistic
For 2023 Following Slower Recovery Than Expected In Q2 2023.........................9

    F.    Farfetch Addresses Internal Controls At New Guards ..........................................11

    G.    A Global Downturn In Luxury Fashion Causes A Liquidity Crisis ....................12

    H.    This Action.............................................................................................................13

ARGUMENT ......................................................................................................................13

I.    THE AC FAILS TO PLEAD A SECTION 10(B) CLAIM .........................................13

    A.    Plaintiffs Fail To Plead A False Or Misleading Statement....................................14

        1.    The AC Is An Impermissible Puzzle Pleading ..........................................14

        2.    Many Of The Challenged Statements Are Inactionable Puffery ...............15

        3.    Forward-Looking Statements Regarding Farfetch's Financial
Outlook And Prospects Are Not False Or Misleading...............................16

        4.    The Challenged Statements Are Inactionable Opinion Statements ...........20

        5.    Farfetch's Quarterly Financial Results Are Not False Or Misleading
...................................................................................................................22

        6.    Statements Regarding Farfetch's Acquisitions And Strategic
Partnerships Are Not False Or Misleading ................................................24

        7.    Statements Regarding NGG Are Not False Or Misleading ......................25

    B.    Plaintiffs Fail To Plead A Strong Inference Of Scienter ......................................26

i

1.      Plaintiffs Fail To Plead A Cognizable Motive..........................................27

2.      Plaintiffs Fail To Plead Conscious Misbehavior Or Recklessness ...........28

II.     PLAINTIFFS' SECTION 20(A) CLAIMS FAIL .............................................................35

CONCLUSION.....................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abely v. Aeterna Zentris Inc.*,
2013 WL 2399869 (S.D.N.Y. May 29, 2013) .........................................................................28

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995).........................................................................................................34

*ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007).......................................................................................................35

*Avon Pension Fund v. GlaxoSmithKline PLC*,
343 F. App'x 671 (2d Cir. 2009) .............................................................................................28

*Brodsky v. Yahoo! Inc.*,
630 F. Supp. 2d 1104 (N.D. Cal. 2009) ...................................................................................32

*Charas v. Sand Tech. Sys. Int'l, Inc.*,
1992 WL 296406 (S.D.N.Y. Oct. 7, 1992) ..............................................................................26

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008) ......................................................................................29

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009).........................................................................................14, 27, 28

*Fadem v. Ford Motor Co.*,
2003 WL 22227961 (S.D.N.Y. Sept. 25, 2003)........................................................................26

*Fait v. Regions Fin. Corp.*,
655 F.3d 105 (2d Cir. 2011)......................................................................................................23

*Fogel v. Wal-Mart de México SAB de CV*,
2017 WL 751155 (S.D.N.Y. Feb. 27, 2017) ............................................................................16

*Francisco v. Abengoa, S.A.*,
481 F. Supp. 3d 179 (S.D.N.Y. 2020) ...............................................................22, 23, 24, 34

*Francisco v. Abengoa, S.A.*,
559 F. Supp. 3d 286 (S.D.N.Y. 2021) ......................................................................................33

*Francisco v. Abengoa, S.A.*,
624 F. Supp. 3d 365 (S.D.N.Y. 2022) ...............................................................................23, 27

*Frankfurt-Trust Inv. Luxemburg AG v. United Techs. Corp.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018) ...................................................................23

*Gavish v. Revlon, Inc.*,
  2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004)........................................................22

*Harris v. AmTrust Fin. Servs., Inc.*,
  135 F. Supp. 3d 155 (S.D.N.Y. 2015) ...................................................................23

*Holbrook v. Trivago N.V.*,
  2019 WL 948809 (S.D.N.Y. Feb. 26, 2019)...........................................................31

*Hubiack v. Li-Cycle Holdings Corp.*,
  2024 WL 2943959 (S.D.N.Y. June 10, 2024) ........................................................32

*In re Adient plc Sec. Litig.*,
  2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)..........................................17, 20, 21

*In re Allied Cap. Corp. Sec. Litig.*,
  2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003).........................................................26

*In re Anheuser-Busch InBev SA/NV Sec. Litig.*,
  2020 WL 5819558 (S.D.N.Y. Sept. 29, 2020).........................................................21

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018) ...................................................................20

*In re AT&T/DirecTV Now Sec. Litig.*,
  480 F. Supp. 3d 507 (S.D.N.Y. Aug. 18, 2020)......................................................35

*In re Athenex, Inc. Sec. Litig.*,
  2023 WL 7690175 (W.D.N.Y. Sept. 29, 2023) ......................................................28

*In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*,
  2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ........................................................15

*In re BHP Billiton Ltd. Sec. Litig.*,
  276 F. Supp. 3d 65 (S.D.N.Y. 2017) .....................................................................18

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004) ...................................................................28

*In re Canopy Growth Sec. Litig.*,
  2024 WL 3445436 (S.D.N.Y. July 17, 2024).....................................................29, 30

*In re China Mobile Games & Ent. Grp., Ltd Sec. Litig.*,
  2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) ...........................................................18

*In re Citigroup Inc. Sec. Litig.*,
   753 F. Supp. 2d 206 (S.D.N.Y 2010) ....................................................................20

*In re Express Scripts Holding Co. Sec. Litig.*,
   2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017)....................................................13, 16

*In re Farfetch Ltd. Sec. Litig.*,
   2021 WL 4461264 (S.D.N.Y. Sep. 29, 2021)...................................................18, 20

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014) ......................................................................26

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
   26 F. Supp. 3d 278 (S.D.N.Y. 2014) ................................................................22, 26

*In re MELA Scis., Inc. Sec. Litig.*,
   2012 WL 4466604 (S.D.N.Y. Sept. 19, 2012).......................................................28

*In re MINISO Grp. Hldg. Ltd. Sec. Litig.*,
   2024 WL 759246 (S.D.N.Y. Feb. 23, 2024).....................................................*passim*

*In re MRU Holdings Sec. Litig.*,
   769 F. Supp. 2d 500 (S.D.N.Y. 2011) ....................................................................28

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
   423 F. Supp. 2d 364 (S.D.N.Y. 2006) ....................................................................16

*In re PetroChina Co. Ltd., Sec. Litig.*,
   120 F. Supp. 3d 340 (S.D.N.Y. 2015) ..............................................................14, 32

*In re Plug Power Inc., Sec. Litig.*,
   2023 WL 5577276 (S.D.N.Y. Aug. 29, 2023)...................................................31, 33

*In re Plug Power, Inc. Sec. Litig.*,
   2022 WL 4631892 (S.D.N.Y. Sept. 9, 2022)............................................21, 27, 28

*In re Salomon Analyst Level 3 Litig.*,
   350 F. Supp. 2d 477 (S.D.N.Y. 2004) ....................................................................21

*In re UBS AG Sec. Litig.*,
   2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012).......................................................34

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
   2016 WL 2757760 (S.D.N.Y. May 11, 2016) ...................................................19, 23

*In re Weight Watchers Int'l. Inc. Sec. Litig.*,
   504 F. Supp. 3d 224 (S.D.N.Y. 2020) ....................................................................26

*Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*,
    445 F. App'x 368 (2d Cir. 2011) ........................................................31

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ..............................................................35

*Kemp v. Universal Am. Fin. Corp.*,
    2007 WL 86942 (S.D.N.Y. Jan. 10, 2007) ........................................16

*Lipow v. Net1 UEPS Techs., Inc.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015) ........................................28, 33

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
    518 F. Supp. 3d 772 (S.D.N.Y. 2021) ...............................................31

*Mills v. Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993) ..............................................................14

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ..............................................................13

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996) ....................................................................26

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015) ...........................................................................21

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ........................................................14, 16

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009) ..........................................................27, 29

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996) .................................................................16

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977) ...........................................................................26

*Schaffer v. Horizon Pharma PLC*,
    2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ................................16, 32

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ........................................................16, 20

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010) ..............................................................17

*Tabor v. Bodisen Biotech, Inc.*,
    579 F. Supp. 2d 438 (S.D.N.Y. 2008) ..................................................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................26, 27, 35

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) .................................................21

*Villare v. Abiomed, Inc.*,
    2021 WL 4311749 (S.D.N.Y. Sep. 21, 2021) ..............................17, 18

*Wilbush v. Ambac Fin. Grp., Inc.*,
    271 F. Supp. 3d 473 (S.D.N.Y. 2017) .....................................29, 34

*Wilson v. Merrill Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011) .................................................24

*Woodley v. Wood*,
    2022 WL 103563 (S.D.N.Y. Jan. 11, 2022) ...............................32, 34

*Woolgar v. Kingstone Cos., Inc.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020) .....................................29, 30

*Wyche v. Advanced Drainage Sys., Inc.*,
    2017 WL 971805 (S.D.N.Y. Mar. 10, 2017) ...............................31, 32

*Xerion Partners, I LLC v. Resurgence Asset Mgmt., LLC*,
    474 F. Supp. 2d 505 (S.D.N.Y. 2007) .....................................23, 24

## STATUTES

15 U.S.C. § 78u-4 ........................................................14, 17, 27

## RULES

Fed. R. Civ. P. 9(b) ........................................................13

## TABLE OF ABBREVIATIONS

The following terms are used in this memorandum:

| | |
|---|---|
| AC | Consolidated Amended Class Action Complaint (ECF No. 34) |
| Class Period | February 24, 2022 through December 17, 2023, inclusive |
| Defendants or Individual Defendants | José Neves, Elliot Jordan, and Stephanie Phair* <br> *The AC names as defendants two entities that are not represented and have not joined this motion.* |
| Exchange Act | Securities Exchange Act of 1934 |
| EBITDA | Earnings before interest, taxes, depreciation, and amortization |
| Farfetch or the Company | Farfetch Limited |
| FE | Former Employee |
| GMV | Gross Merchandise Value, total dollar value of orders processed |
| IPO | Initial Public Offering |
| IT | Information technology |
| NGG | New Guards Group, a subsidiary of Farfetch Ltd. |
| Plaintiffs | Co-Lead Plaintiffs Fernando Sulchin, individually and on behalf of Lyxor Overseas Holdings Ltd & Cinergy Advisors Ltd (ECF No. 17-1), and Yuanzhe Fu |
| PSLRA | The Private Securities Litigation Reform Act of 1995 |
| SEC | U.S. Securities and Exchange Commission |
| SG&A | Selling, general, and administrative |
| YNAP | Yoox Net-a-Porter, a first-party retailer and Farfetch's top online competitor |

Defendants respectfully submit this memorandum of law in support of their motion to dismiss the AC (cited as "¶ _").[1]

## PRELIMINARY STATEMENT

This is a lawsuit in search of a viable legal theory. What began in the original complaint as a claim based on an earnings shortfall for a single quarter has now expanded to challenge more than 80 different disclosures about dozens of different topics during a nearly two-year period. Despite this flailing about, the AC pleads no viable theory of securities fraud and should be dismissed.

From its inception in 2007, Farfetch was a pioneer at the intersection of luxury fashion and e-commerce. As Farfetch disclosed, it was purely a holding company for a diverse set of businesses, and its operating subsidiaries faced significant challenges operating and growing in these volatile sectors. Farfetch incurred losses for almost its entire existence. And in December 2023, when it was unable to secure additional financing, its operating subsidiaries were sold, and the holding company was eventually placed into liquidation.

The crux of Plaintiffs' claim is that, because of this ending, Farfetch and its executives must have intentionally lied to investors about nearly every aspect of Farfetch's business and operations for nearly two years prior, even though those very same executives were substantially *increasing* their holdings of Farfetch stock during this period and suffered substantial losses themselves when the Company was liquidated. This theory makes no sense. This case should be dismissed with prejudice for at least the following reasons:

---

[1] Unless otherwise noted herein, all internal citations and quotations marks are omitted, emphasis is added, and citations to "Ex. _" refer to exhibits attached to the Declaration of Jason C. Hegt, submitted herewith.

*First*, Plaintiffs have not pled an actionable misstatement or omission. Throughout the alleged Class Period, Farfetch made detailed and measured disclosures about growth in its business and the risks it was facing. To this day, neither Farfetch nor anyone other than Plaintiffs has ever said that any of these statements was incorrect. As a result, the 189-page AC sends readers on a scavenger hunt through large block quotations excerpted from more than 80 different disclosures over a nearly two-year period. Some of these excerpts are several paragraphs (and even pages) long, followed by a conclusory assertion that all of the statements were false or misleading for the same generalized reasons. This "puzzle pleading" is an independent reason to dismiss these claims, but Plaintiffs' kitchen-sink approach also highlights that even Plaintiffs cannot reasonably identify a particular statement they believe was false and misleading, much less explain why. Indeed, nearly all of the challenged statements are (i) inactionable expressions of corporate optimism, (ii) forward-looking statements protected by the PSLRA safe harbor, and/or (iii) opinion statements. And Plaintiffs ignore that in many instances the information they contend was not disclosed was, in fact, disclosed elsewhere. This leaves Plaintiffs to rest on an assortment of critiques from six former employees, but each of them held roles far-removed from both Defendants and the relevant Farfetch operations, such that their views add nothing to Plaintiffs' theory that any particular statement was false or misleading. *See* Section I.A.

*Second*, and independently dispositive, Plaintiffs do not and cannot plead any particularized facts establishing the requisite "strong" inference that any Defendant acted with fraudulent intent, or "scienter." As a matter of law and logic, Defendants' significant *increase* of their holdings of Farfetch stock throughout the purported Class Period undermines any inference of fraudulent intent. So, too, does the fact that Farfetch expressly (and repeatedly) disclosed each of the risks and uncertainties that eventually came to pass and that Defendants collectively lost

hundreds of millions of dollars in their stockholdings after the alleged "truth" came out. Because not one of the FEs is alleged ever to have had any relevant contact with any Defendant, Plaintiffs resort to familiar, fact-free "must have" or "should have" theories of scienter that have been repeatedly rejected by this Court and others in this Circuit. The far more compelling inference—required to be considered under Supreme Court law—is that Defendants believed their statements that Farfetch would be successful, but (like many others in the luxury fashion and e-commerce sectors during this period) things did not turn out as they hoped. Lack of scienter is another basis for dismissal. *See* Section I.B.

Nothing about this case even hints at securities fraud. The AC should be dismissed.

## STATEMENT OF FACTS

Mr. Neves founded Farfetch in 2007, and it ultimately grew to become the leading global marketplace for the luxury fashion industry. Ex. 1, 2022 Form 20-F, at 68.[2] Through its subsidiaries, Farfetch operated the world's largest online marketplace for personal luxury goods, connecting millions of consumers from over 190 countries with merchandise from over 1,400 luxury sellers. *Id.* As Farfetch repeatedly disclosed, this business operated at the intersection of two highly volatile and competitive industries—luxury fashion and online retail. *E.g.*, *id.* at 15. Because "[l]uxury products are discretionary purchases for consumers," Farfetch warned that "worldwide macroeconomic conditions . . . ha[ve] had and may continue to have" a direct impact on the Company's "financial performance and results of operations." *Id.* at 11. Farfetch further warned that "[t]he luxury fashion industry can be volatile and difficult to predict," and the "global

---

[2] Mr. Neves served as the Company's CEO and Chairman of the Board from 2007 to 2023. ¶ 5. Mr. Jordan served as the Company's CFO beginning in 2015, and announced his departure from the Company in February 2023, which became effective August 2023. ¶ 6. Ms. Phair served as the Company's Group President from 2022 to 2023, and previously served as its Chief Strategy Officer (2016-2019) and Chief Customer Officer (2019-2022). ¶ 7.

retail industry is intensely competitive," particularly in the case of "rapidly evolving . . . online retail," where Farfetch competed, *inter alia*, with "technology enablement companies, marketplaces, platforms [and] luxury sellers." Ex. 2, 2021 Form 20-F, at 9, 14, 21.

### A.    Post-IPO, Farfetch Invests In Strategic Growth And Incurs Substantial Debt

Apart from a brief period in 2021, Farfetch never posted a profit because it was investing heavily in its own organic growth and growth through strategic acquisitions and partnerships. *See, e.g.*, Ex. 2, 2021 Form 20-F, at 21, 33-35. Among other investments, it acquired Stadium Goods (a premium sneaker and streetwear marketplace) for $250 million, Toplife (a luxury e-commerce platform) for $50 million, and NGG (an Italian luxury fashion house with numerous luxury brands' design, production, first-party sales, and distribution) for $675 million. ¶¶ 78-81. In order "to ensure adequate financial flexibility and liquidity going forward," Farfetch incurred substantial debt to continue funding its growth and operations. ¶ 96. For instance, in August 2019, Farfetch took on a €300 million senior secured loan facility in connection with the NGG acquisition. *Id.* In 2020, Farfetch raised $1.25 billion through three private placements of convertible notes to, *inter alia*, "supplement Farfetch's current liquidity position." *See* ¶¶ 97-99. Likewise, in August 2021, Alibaba and Richemont invested $500 million in Farfetch China, a new joint venture that included Farfetch's operations in China. ¶ 102.

These investments paved the way for significant growth in 2020 and 2021. Ex. 2, 2021 Form 20-F, at 83. Farfetch's GMV, which was the "total dollar value of orders [it] processed," *id.* at 7, grew from $2.139 billion in 2019 to $4.2 billion in 2021, and its revenues increased from $1.021 billion to $2.256 billion during that same time frame. *Id.* at 83. But this growth came at a cost and, even prior to the putative Class Period, Farfetch spent more cash than it generated, including losses after tax of $393.5 million in 2019 and $3.315 billion in 2020. *Id.* at 14, 83.

In the lead-up to the Class Period, Farfetch's growth was fueled by a shift to online shopping during the COVID-19 pandemic. *Id.* at 13. And the Company leveraged these additional revenues to continue pursuing strategic transactions designed to drive growth. In February 2022, a Farfetch subsidiary completed its acquisition of Violet Grey, a luxury beauty online retailer, for approximately $44.4 million. ¶ 104. And that same month, a different Farfetch subsidiary (NGG) also acquired the distribution rights for Reebok footwear and apparel within Europe, agreeing to pay a minimum of $374 million in royalty payments over an 11-year agreement. *Id.*; Ex. 2, 2021 Form 20-F, at F-86.

**B.    After Pandemic-Era Trends Helped Push Farfetch To Its First Annual Profit In 2021, Farfetch Projects Measured Future Growth For 2022**

Given its "strong growth" in 2021, and its posting of a modest annual profit at the adjusted EBITDA level for the first time in its history, Ex. 3, Q4 2021 Earnings Call, at 4, Farfetch had every reason to be optimistic about its prospects for 2022. In February 2022, Farfetch disclosed a "forward-looking" outlook projecting year-over-year growth of roughly 20 to 30% in GMV, but again warned that it operated "in a very competitive and rapidly changing environment," and that "[u]ncertainties resulting from the COVID-19 pandemic . . . could have material impacts on [its] future performance." Ex. 4, Q4 2021 Earnings Release, at 9, 20. Farfetch also explained that its business could be impacted by "weakened consumer sentiment and discretionary income [] from various macro-economic conditions" and "slowing e-commerce consumer activity as . . . populations resume to pre-pandemic activities and lifestyles." *Id.* at 9. In reminding investors that these forecasts "should be considered forward-looking statements," Farfetch emphasized "the volatility and difficulty in predicting the luxury fashion industry" and directed investors to a range of risks and uncertainties detailed in its Annual Report. *Id.* at 20.

For instance, while Mr. Neves expressed his "excite[ment] about" the Reebok deal and Ms. Phair highlighted the "acquisition of Violet Grey," which she described as "a cult favorite beauty destination" that "will bring industry authority as well as a curated selection of products to the marketplace," Ex. 3, Q4 2021 Earnings Call, at 6-8, the Company repeatedly warned about significant challenges.  In its 2021 Annual Report (filed on March 4, 2022), the Company explained that, while it had "seen the increased adoption of online channels by luxury consumers during the COVID-19 pandemic," this revenue growth was due to one-time factors, was "not indicative of our future performance," and that revenue growth "may decline." Ex. 2, 2021 Form 20-F, at 13.  The Company also warned that it was taking on substantial debt to fuel growth, explaining that this "indebtedness could adversely affect [its] financial health" and "increases the risk that [it] may be unable to generate cash sufficient . . . to enable [it] to pay [its] indebtedness or to fund [its] other liquidity needs."  *Id* at 57.[3]

### C.    Farfetch Faces Unprecedented Macro-Economic Headwinds In 2022

Despite the optimistic start to the year, substantial "macro challenges" quickly emerged. ¶¶ 313, 339.  ***First***, after Russia invaded Ukraine in late February 2022, ¶ 141, Mr. Jordan reported on March 8, 2022, that Farfetch "ceased operations" in Russia and that its guidance for 2022 had been issued "before we saw impact in that region," ¶ 301.  Farfetch repeatedly updated investors

---

[3] Among other warnings contained in nearly 50 pages of risk factors were the warnings that "expansion increases [the business'] complexity," and the Company "may not be able to manage [its] growth effectively."  Ex. 2, 2021 Form 20-F, at 21.  Farfetch also warned that its strategic partnerships, such as Reebok, "***may not provide the anticipated benefits***," *id.* at 33, and its acquisitions, including Violet Grey, "***may not achieve the anticipated benefits*** . . . due to a number of factors, including . . . unanticipated and substantial costs or liabilities . . . [and] challenges in incorporating multiple acquired businesses," *id.* at 34.  And as to existing business lines, including Browns, Stadium Goods, and NGG, Farfetch warned of challenges in "manag[ing] inventory levels" and noted that "[o]verestimating consumer demand" or failing to "engage in promotional activity" could materially harm the business.  *Id.* at 41, 47, 81.

on the impact of the Russia closure, which Mr. Neves explained was significant because Russia— which was Farfetch's "third largest marketplace" at 6% of GMV in 2021—had unexpectedly "***evaporated as a market***." ¶ 313; Ex. 5, Q1 2022 Earnings Call, at 5; *see also, e.g.*, ¶¶ 327, 333, 336, 338, 343, 348, 354, 358, 367, 373, 401.

 ***Second***, at roughly the same time, China (which was the Company's second-largest market, ¶ 22) implemented strict zero-COVID restrictions. ¶¶ 135-36. In March 2022, Mr. Neves explained that "we don't know" if "[t]he situation in China with lockdowns" is "a headwind or a tailwind," because it is an "***entire[ly] speculative exercise***" to "try to look into the future." ¶ 313. But by May 2022, Farfetch reported seeing "softer demand in other key markets including . . . China, where continuing local COVID-19 restrictions continue to impact orders." ¶ 316. Farfetch also "revis[ed its] expectations for [2022], reflecting . . . weakness in China," ¶ 327, and continued to provide real-time updates on China during the Class Period. *E.g.*, ¶¶ 343, 348, 367.

 ***Third***, although Farfetch saw "strong growth in the Americas" in Q1 2022, ¶ 325, and the "Americas . . . continued to show resilience" in Q2 2022, ¶ 343, softness in other regions led to increased competition in the U.S. and a build-up of inventory in the second half of the year. As Mr. Neves explained during a November 17, 2022, earnings call, "we're seeing continued digital media cost inflation for luxury, especially in the U.S. as well as reports of higher inventories indicating we're going to be heading to a very promotional environment." Ex. 6, Q3 2022 Earnings Call, at 5. Mr. Jordan confirmed that Farfetch "started to see across Q3 [] a heightened level of promotional activity," and that sales in the U.S. "were down" due to the "deliberate decision to reduce demand generation spend . . . to focus on higher-margin profitability." *Id.* at 7, 13. Mr. Jordan warned that "Q4 is going to get worse" because of significant build-up of "inventory" by competitors and "promotions," which "Farfetch won't be following." *Id.* at 13. When Farfetch

reported its results for 2022, Mr. Jordan again disclosed the "softer performance in the U.S. following our decision to reduce our U.S. marketing spend by circa 30%." ¶ 379.

In short, as Mr. Neves predicted at the start of the year, 2022 was "not . . . a walk in the park." ¶ 313. Despite the many headwinds, Farfetch still managed to grow in 2022 on a constant-currency basis (*i.e.*, excluding the effects of foreign currency fluctuations), reaching $4.1 billion in GMV and $2.3 billion in revenue. ¶¶ 370, 375. But this growth caused a substantial burn of the Company's cash reserves. Farfetch started 2022 with $1.363 billion in cash and cash equivalents and was down to $487.4 million by September 30, 2022—a reduction of almost $900 million in just nine months. *Compare* ¶ 103, *with* ¶ 104. Although this trend continued, one of the Company's subsidiaries was able to borrow $400 million in October 2022, and the Company ultimately ended 2022 with $734.2 million (including the $400 million loan). ¶¶ 105-06.[4]

**D.    Farfetch Enters 2023 Cautiously Optimistic About Future Prospects**

Despite the choppy 2022, Farfetch explained that it believed it was turning a corner. During 2022, Farfetch "reduced [] headcount," ¶ 236, "restricted planned headcount growth" and "reduce[d] spend on projects with longer term payback," ¶ 327, implemented various "cost-saving initiatives," ¶ 345, and performed a reorganization of its business to "streamlin[e] those various aspects of the business," ¶ 361. And on the revenue side, Mr. Neves explained that he was bullish

---

[4] As Farfetch explained, retailers generally experience greater losses in the first part of the year (*e.g.*, the Company's $900 million cash decline during first nine months of 2022 noted above) and perform better later in the year (*e.g.*, excluding loan proceeds, as noted above, cash decline of just $153 million in final three months of 2022). *See* Ex. 2, 2021 Form 20-F, at 33 ("Our business is seasonal and historically we have realized a disproportionate amount of our revenue and earnings for the year in the fourth quarter as a result of the holiday season . . . ."); *see also* Don Vaughan, *Why Is It Called Black Friday?*, BRITANNICA, https://www.britannica.com/story/why-is-it-called-black-friday (explaining that the term "Black Friday," the day after Thanksgiving, is often believed to "derive[] from the concept that businesses operate at a financial loss, or are 'in the red,' until the day after Thanksgiving, when massive sales finally allow them to turn a profit," but also noting that, "[i]n truth, most stores s[ee] their largest sales on the Saturday before Christmas").

8

for 2023 because, among other reasons, the Company would begin making sales under its new Reebok partnership and saw signs that the thaw in the China market was ending.  ¶ 338; *see also* ¶¶ 307 (explaining Reebok license did not come online until 2023), 343 (noting expectation that China would "return to growth over the next 12 months").[5]  Having taken measures to streamline costs and with a line of sight on increased revenue, Mr. Neves stated on February 23, 2023, that he was "more confident than ever about our prospects to deliver growth, profitability and positive free cash flow in 2023 and beyond."  ¶ 377.  This prediction was accompanied by detailed discussion during the Company's earnings call about the various headwinds it faced, *see* Ex. 7, Q4 2022 Earnings Call, at 7-9, and followed closely by an even more detailed discussion of these factors in Farfetch's 2022 Annual Report.  *See, e.g.*, Ex. 1, 2022 Form 20-F, at 12-15 (warning of impact from the war in Ukraine/loss of Russia market, and the COVID-19 restrictions in China), 22 (describing "cost rationalization initiatives" and headcount reductions, but warning that "the estimated cost savings may be lower than [] forecasted"), 55 (explaining that Farfetch subsidiary NGG "does not have control of the supply chain lifecycle," and "will be bearing certain costs and expenses . . . in support of launching the [Reebok] partnership"), 64-65 (warnings regarding substantial indebtedness).

### E.    Farfetch Reports Growth In Q1 2023 And Remains Cautiously Optimistic For 2023 Following Slower Recovery Than Expected In Q2 2023

In early 2023, Farfetch was making progress on these goals.  The Company officially launched the Reebok partnership on time in May 2023, ¶ 409, reported growth in revenue and

---

[5] Mr. Jordan and Mr. Neves provided regular updates on the progress and impact of the Reebok partnership, ¶¶ 317, 343 ("$10 million of revenue from our new partnership with Reebok"), 349 ("$13.7 million generated by the net economic benefit from the Reebok partnership"), and disclosed that Farfetch "will have to put some investment into the infrastructure," ¶ 364, and that they expected $100 million increase in SG&A costs due to "cost of warehousing" and "building out our teams" to support it, ¶¶ 386-87.

GMV, ¶¶ 400-01, and saw "sequential improvement in GMV growth in US and China," ¶¶ 404, 411, 413, 421 ("sequential acceleration from Q4"). The Company's rate of cash burn also improved, with cash and cash equivalents decreasing by roughly $250 million in Q1 2023 (as compared to a decrease of roughly $425 million in Q1 2022). *Compare* Ex. 8, Q1 2023 Earnings Release, at 10, *with* Ex. 9, Q1 2022 Earnings Release, at 10. The Company ended the first quarter with $485.9 million in cash, but given this progress said that it expected "each quarter of 2023 to be stronger in terms of" cash "than the equivalent of 2022." ¶ 418.

During the second quarter of 2023, the business grew "sequentially better" as compared to the prior quarter, but "the recovery [was] not [] as robust as [] expected" at the start of the year. Ex. 10, Q2 2023 Earnings Call, at 6; *see also* ¶¶ 435-36, 438, 442, 444, 447. Likewise, the Company disclosed that while "direct-to-consumer" sales in NGG "grew double digits," the division as a whole was down for the quarter because of "onboarding challenges with the launch of Reebok" and "wholesale accounts, predominantly department stores and retailers in the U.S. and U.K.[] reduc[ing] intake." ¶ 442; Ex. 10, Q2 2023 Earnings Call, at 7. At the same time, the Company "expect[ed] . . . recovery of these deliveries to result in Q3" sales being double that of Q2. *Id.* Taking all of this together, Farfetch "adjust[ed] near-term expectations" for the second half of the year, lowering full year revenue guidance by approximately $400 million, and "moderating [its] GMV growth expectations" down to $4.4 billion from its previous outlook of $4.9 billion. *Compare id.* at 8, *with* Ex. 8, Q1 2023 Earnings Release, at 11. On the expense side, losses were substantially narrowed with Farfetch's cash decreasing by only $30 million as of June 30, 2023. *Compare* Ex. 8, Q1 2023 Earnings Release, at 10 ($485.9 million cash and equivalents),

*with* Ex. 11, Q2 2023 Earnings Release, at 10 ($453.8 million cash and equivalents).[6]  On August 11, 2023, Farfetch entered into a delayed draw term loan facility for $200 million to help fund operations.  ¶ 107.

With losses slowing substantially, a fresh loan, and the holiday shopping season on the horizon, Farfetch told investors that it "believe[d] that cash flow generated from operations and our cash, cash equivalents and marketable securities balances, as well as borrowing arrangements, will be sufficient to meet our anticipated operating cash needs for at least the next twelve months," but warned that "any projections of future cash needs and cash flows *are subject to inherent uncertainty*."  Ex. 11, Q2 2023 Earnings Release, at 10.

### F.    Farfetch Addresses Internal Controls At New Guards

In parallel to navigating these market challenges, Farfetch was also working on upgrading its internal controls over financial reporting.  In 2021, Farfetch reported two material weaknesses in internal controls related to: (i) the operation of IT systems across the Company, and (ii) implementation and documentation of internal control over financial reporting at its NGG subsidiary in particular.  Ex. 2, 2021 Form 20-F, at 128-29.  At the start of the Class Period, Farfetch reported that following a "significant effort" to address these matters, the IT-related control was no longer considered a material weakness.  *Id.* at 129.  As of March 2022, Farfetch reported that NGG's controls were "now considered to have been designed appropriately, but there remain[ed] a need for these controls to be operating effectively for a period of time" to conclude they were effective.  Ex. 2, 2021 Form 20-F, at 129.  In March 2023 (in its 2022 Annual Report), Farfetch disclosed that it had "made significant progress towards the remediation" of this issue

---

[6] By way of comparison, Farfetch had experienced cash losses of $248.3 million between December 31, 2022, and March 31, 2023.  Ex. 8, Q1 2023 Earnings Release, at 10.  And it had experienced net cash losses of $628.9 million for the twelve months ended December 31, 2022.  Ex. 12, Q4 2022 Earnings Release, at 12.

and that many of NGG's internal controls were now "designed **and** operating effectively." Ex. 1, 2022 Form 20-F, at 133-34. Farfetch devoted significant resources to the NGG-related controls, including by "dismiss[ing]" the team previously responsible for them and hiring replacement personnel and Deloitte to help improve them. *See, e.g.*, ¶¶ 218, 222-23. However, the Company also reported that for certain controls the "design and implementation" was complex and that resulted in "insufficient time to fully embed them within" the business and evaluate whether they were operating effectively during 2022. Ex. 1, 2022 Form 20-F, at 133-34.

### G.    A Global Downturn In Luxury Fashion Causes A Liquidity Crisis

Despite making progress on all of these efforts, the end of the putative Class Period was— as Plaintiffs acknowledge—"a challenging environment for luxury ecommerce." ¶ 281. As Forbes reported, the "personal luxury market's explosive growth from 2019 through 2023 . . . ha[d] come to an end" as the "pandemic roller coaster" ebbed when "luxury consumers hit the pause button" on online shopping.[7] The luxury industry fell "off a 3-year surge" with many luxury retailers, such as "Balenciaga, Gucci, and YSL," among others, reporting slumping sales in mid-2023.[8] Although Farfetch had successfully weathered numerous storms prior to and during the Class Period, Farfetch was unable to secure additional liquidity for the Company and its subsidiaries on terms that were acceptable to its existing lenders. On December 18, 2023, Farfetch announced that, despite "a thorough and extensive process to secure additional liquidity," it could not acquire such additional funds. Ex. 13, Press Release (Dec. 18, 2023), at 1. As a result, the Company's principal

---

[7] Ex. 26, Pamela N. Danzinger, *$387 Billion Luxury Market Remains Turbulent. Here Are The Bright Spots*, FORBES (Feb. 20, 2024), https://www.forbes.com/sites/pamdanziger/2024/02/19/387-billion-luxury-market-remain-turbulent-here-are-the-bright-spots.

[8] Ex. 27, Serena Wong, *The Luxury Slump: What's Happening With The World's Largest Fashion Houses?*, VANGUARD THINK TANK (Mar. 13, 2024), https://vanguardthinktank.org/the-luxury-slump-whats-happening-with-the-worlds-largest-fashion-houses.

operating subsidiary, Farfetch Holdings plc, entered into a three-way transaction with: (i) its lenders, and (ii) a joint venture owned by Coupang, Inc. and funds managed by Greenoaks Capital Partners LLC, which agreed to provide additional liquidity.  *Id.* at 1-2.  Farfetch Holdings plc was then placed into administration in the English courts (akin to bankruptcy in the U.S.) and its core business was sold to the joint venture.  *Id.*  On February 9, 2024, the Grand Court of the Cayman Islands placed Farfetch into liquidation.  *See* ¶ 257.

### H.    This Action

After two substantially identical complaints asserting claims under Sections 10(b) and 20(a) of the Exchange Act against Farfetch and Defendants were filed in the District of Maryland and in this Court in October and December 2023, respectively, the cases were consolidated in this Court on February 26, 2024.  ECF No. 57.  Following two requests for an extension, Plaintiffs filed the AC on June 21, 2024.  ECF No. 34.

## ARGUMENT

## I.    THE AC FAILS TO PLEAD A SECTION 10(B) CLAIM

To state a claim under Section 10(b) of the Exchange Act, Plaintiffs must plead **with particularity** facts showing that: "(1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.*, a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss."  *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *10 (S.D.N.Y. Aug. 1, 2017) (Ramos, J.).

Securities fraud claims under Section 10(b) are subject to "stringent" pleading requirements.  *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).  First, Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state *with particularity* the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The Second Circuit has interpreted Rule 9(b) as requiring

13

plaintiffs to: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). Second, to curb abusive securities litigation filed merely on the "announcement of bad news"—and not "evidence of fraud"—Congress enacted the PSLRA, which requires Plaintiffs (i) to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading"; and (ii) "with respect to each [alleged] act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" (or scienter). 15 U.S.C. §§ 78u-4(b)(1)-(2); *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Noncompliance with these requirements mandates dismissal. 15 U.S.C. § 78u-4(b)(3).

The AC fails to state a claim for multiple, independent reasons.

### A. Plaintiffs Fail To Plead A False Or Misleading Statement

Plaintiffs challenge over 80 statements concerning every aspect of Farfetch's business and operations over a nearly two-year period on behalf of a putative class of purchasers of Farfetch stock from February 2022 to December 2023. But Plaintiffs "must do more" than allege statements were false or misleading, "they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). The AC fails to meet that requirement.

### 1. The AC Is An Impermissible Puzzle Pleading

As this Court has observed, the law in the Second Circuit is clear that "district courts should not have to search the long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements were false and how other facts might show a strong inference of scienter." *In re PetroChina Co. Ltd., Sec. Litig.*, 120 F. Supp. 3d 340, 356 (S.D.N.Y. 2015) (Ramos, J.). Yet, that is exactly what the AC asks this Court to do here.

The AC "contains large block quotations taken directly from" *80* different disclosures over a nearly *two-year period*, many of which "are several paragraphs long" and are followed "by a conclusory assertion that they were falsely made" due to a laundry list of generalized reasons. *Id.* As just one example, Plaintiffs challenge the entirety of an approximately eight-paragraph long excerpt from remarks at an investor conference, *see* ¶ 364, and then list nine generalized reasons for why the "foregoing statements were materially false or misleading when made," ¶ 365. This alleged "misstatement" spans myriad topics, including growth expectations, cash flow, investments, GMV, operating costs, revenues, and the impact of contracts and warehousing. ¶ 364. Yet, Plaintiffs make no attempt to tie any of their generalized claims of falsity to any portion of this eight-paragraph long alleged misstatement (which itself is approximately 500 words). This deficient pleading tactic is repeated throughout the AC. *See* ¶¶ 285-454. Because Plaintiffs' "[p]uzzle pleading" fails to "demonstrate with specificity why and how each statement is materially false or misleading," that failure "alone warrants dismissal" of the AC. *In re MINISO Grp. Holding Ltd. Sec. Litig.*, 2024 WL 759246, at *20 n.35 (S.D.N.Y. Feb. 23, 2024) (Ramos, J.); *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 453 (S.D.N.Y. 2008) ("[L]arge block quotes . . . followed by generalized explanations of how the statements were false or misleading [do] not . . . satisfy the heightened pleading requirements.").

### 2. Many Of The Challenged Statements Are Inactionable Puffery

Although the AC's puzzle pleading obscures precisely which statements Plaintiffs wish to challenge, much of the text in the many block-quotes are mere expressions of corporate optimism that are inactionable because they are "too general to cause a reasonable investor to rely upon them." *In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, 2009 WL 4823923, at *11 (S.D.N.Y. Dec. 14, 2009). For instance, Plaintiffs highlight statements that (i) Farfetch was "on track to deliver on our plan for 2023," ¶ 404; (ii) Reebok was "on budget and on schedule," ¶¶ 409, 421;

(iii) China was "back to growth," ¶¶ 411, 416, 423; and (iv) the U.S. had "continued softness," but "gives us confidence that we're going to go back to growth," ¶¶ 413-14, 421, 423.[9]  These are "textbook cases of corporate puffery or optimism," which are inactionable as a matter of law. *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *9 (S.D.N.Y. Jan. 18, 2018).[10]  Plaintiffs cannot circumvent this long line of cases by asserting these general expressions are actionable because there was "writing on the wall" that the business would face challenges.  ¶¶ 24, 146.

The AC repeatedly highlights the positive and negative indicators that Farfetch saw (and disclosed) during the relevant period, and Defendants were "not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the[ir] business." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994); *Rombach*, 355 F.3d at 174 ("[C]ompanies must be permitted to operate with a hopeful outlook.").  Thus, "statements containing simple economic projections, expressions of optimism, and other puffery are insufficient" to state a claim. *In re Express Scripts*, 2017 WL 3278930, at *13.

### 3. Forward-Looking Statements Regarding Farfetch's Financial Outlook And Prospects Are Not False Or Misleading

Plaintiffs assert that Defendants' financial "guidance or expectations were materially overstated" because "internal forecasts already showed a material impact on future performance

---

[9] For a complete list of statements that constitute inactionable puffery, see Appendix A.  *See Fogel v. Wal-Mart de México SAB de CV*, 2017 WL 751155, at *18 (S.D.N.Y. Feb. 27, 2017) (accepting appendices that serve as "organizational tools").

[10] *See, e.g.*, *Schaffer*, 2018 WL 481883, at *9 ("on track" or "exceeding expectations" inactionable); *Kemp v. Universal Am. Fin. Corp.*, 2007 WL 86942, at *14 (S.D.N.Y. Jan. 10, 2007) ("well-positioned" non-actionable "optimism or puffery"); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (statements that company was "optimistic" and "expected [] to perform well" inactionable); *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 369-70, 398-99 (S.D.N.Y. 2006) ("expected increases" in sales not actionable despite company later reporting "fifteen percent decrease in sales").

and did not support the Company's outlook or projections." *E.g.*, ¶¶ 287-88, 319-20, 336-37. These are quintessential forward-looking statements.[11] *See In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *18-19 (S.D.N.Y. Apr. 2, 2020) (statements about a company's goal and how it "planned to achieve that goal are forward-looking," as are "statements about [the company] being 'on track' with respect to" that goal); *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *15 (S.D.N.Y. Sep. 21, 2021) (Ramos, J.) ("The PSLRA defines a forward-looking statement as one that contains, among other things, 'a projection of revenues, income, [or] earnings,' 'plans and objectives of management for future operations,' or 'a statement of future economic performance.'").

Pursuant to the PSLRA's "safe harbor," forward-looking statements like these are not actionable if: (i) they are identified as forward-looking and accompanied by meaningful cautionary language; (ii) they are immaterial; *or* (iii) the plaintiff fails to prove that the statement was made with actual knowledge that it was false or misleading. 15 U.S.C. § 78u-5(c). Here, the challenged statements were accompanied by meaningful cautionary language and Plaintiffs come nowhere close to showing that any Defendant made such a statement under the "stricter" standard of "knowing falsity." *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010).

*First*, Defendants' disclosures regarding Farfetch's financial outlook and prospects were accompanied by meaningful cautionary language. Each disclosure was accompanied by a warning that it "will include forward-looking statements," that "[a]ctual results could differ materially," and referred investors to "the important risk factors that could cause actual results to differ" in Farfetch's voluminous disclosures of risk factors in its annual reports filed with the SEC, and specifically pointed to the risks Plaintiffs allege were concealed, such as "the war in Ukraine," and

---

[11] *E.g.*, ¶¶ 291 ("forward-looking statements"), 298, 343 ("We expect this market to return to growth"), 351 ("set to deliver profitability and free cash flow"). For a complete list of forward-looking statements and the cautionary language that accompanied them, see Appendix A.

"the impact of regional COVID-19 restrictions." *E.g.*, Ex. 14, Q2 2022 Earnings Call, at 4; Ex. 15, Q2 2022 Earnings Release, at 13, 19; *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 84 (S.D.N.Y. 2017) (dismissing claims where "presentation was accompanied by a disclaimer identifying the type of statement [defendant] made as forward-looking and warning investors that actual results could differ"); *Abiomed*, 2021 WL 4311749, at *18 ("forward-looking" statements not actionable where "cautionary language warn[ed] of the very risks that [plaintiff] alleges that Defendants failed to disclose").

      ***Second***, Plaintiffs do not plead any facts showing any forward-looking statement was made with "knowing falsity." Instead, the AC offers allegations from six anonymous FEs, but their vaguely negative musings give no explanation how they are inconsistent with any statement and, indeed, the FEs are often just parroting the challenges the Company itself timely disclosed. Indeed, in many cases, Farfetch "expressly disclosed precisely what Plaintiffs[] claim it was trying to hide." *In re Farfetch Ltd. Sec. Litig.*, 2021 WL 4461264, at *9 (S.D.N.Y. Sep. 29, 2021), *aff'd sub nom. IAM Nat'l Pension Fund v. Farfetch Ltd.*, 2023 WL 2879304 (2d Cir. Apr. 11, 2023).

- <u>U.S. Market</u>: Plaintiffs allege that Farfetch's financial outlooks were false because the Company "was already experiencing a significant slowdown in growth in . . . the U.S. and China." ¶¶ 287-88. But the U.S. allegations rest entirely upon FE1, who worked at Stadium Goods (one of Farfetch's eight businesses) ¶ 54, left in September 2022 (more than one year before the end of the Class Period), and speaks only to "forecasts prepared by Stadium Goods," without any insight into how these were incorporated into the forecasts that Farfetch publicly issued for the Company as a whole, ¶¶ 129, 147.[12] *In re China Mobile Games & Ent. Grp., Ltd Sec. Litig.*, 2016 WL 922711, at *4 (S.D.N.Y. Mar. 7, 2016) (disregarding FE who worked at subsidiary remote from where relevant events occurred). Even if FE1 were in a position to speak about the

---

[12] Likewise, the AC's reliance on FE1 for its allegation that Farfetch's outlooks were false because its "large brand contracts had materially low take rates (between 8% and 10%)" is insufficient. ¶ 288. Even if FE1 had not left ***15 months*** before the end of the Class Period, the AC admits elsewhere that while "***the lowest*** commission rates that FE1 saw" were "8 to 10 percent," FE1 also saw higher rates ("20 percent"), and that "boutique luxury goods store[s]" had higher commission rates than those of "high-end luxury brands." ¶ 156. In any event, the AC does not explain how these rates relate to, much less contradict, the aggregate financial guidance issued by the Company.

Company across divisions, FE1's view that "sky-high" pandemic spending was a "thing of the past," ¶ 129, was the same thing the Company itself disclosed.[13]  *E.g.*, ¶¶ 358, 379, 413; Ex. 2, 2021 Form 20-F, at 13 ("revenue [for 2021] . . . is not indicative of our future performance, and our revenue growth rate may decline in the future.").

- China Market:  The AC relies entirely on allegations from FE3, who "worked in digital marketing" for Farfetch's China office and left in May 2022 (over 1.5 years before the end of the Class Period).[14]  According to FE3, Farfetch undertook "budget cuts to the marketing division" in China "before FE3 left in May 2022."  ¶ 130.  But unspecified budget cuts to a marketing division are not the same as a "slowdown" in customer demand.  And, again, Farfetch repeatedly disclosed both cost-cutting measures and sluggish demand in China during 2022.  *E.g.*, ¶¶ 313, 316, 327, 332, 343, 401.[15]  FE3 does not suggest that these statements failed to accurately or timely disclose the issues.

- Impact of Russia/Ukraine War:  Plaintiffs claim that Mr. Jordan's recitation of the Company's GMV expectation during a March 8, 2022, investor conference was false because "the halt of sales in Russia . . . had already negatively impacted Farfetch's GMV" as of that date.  ¶¶ 298-99.  But the war had only begun 12 days earlier.  And Mr. Jordan explained that the Company's most recent guidance was issued on February 23, 2023 (*i.e.*, the day before the war began) and that Farfetch was still evaluating the potential impact of the days' old war.  ¶¶ 300-01.  Just a few weeks *later*, after deciding to cease operations in Russia, Farfetch issued the first of many updates on how the war impacted its business.  *E.g.*, ¶¶ 313 ("Russia evaporated as a market . . . , and it was 6% of our GMV in 2021."), 327, 332.  And the AC does not explain how FE1—a U.S.-based employee of Stadium Goods, which sold sneakers—had any view into customer distribution on the Company's global marketplace or how FE1's opinion that Russia was "roughly 20% of Marketplace *sales*" (measured by number of sales or even number of customers at some unspecified point in time) contradicts the specific statement that Russia was 6 percent of GMV in 2021.  ¶¶ 142, 313-14.

- VAT Costs:  Next, the AC alleges that the outlooks were false because "direct brand contracts had . . . high VAT costs negatively impacting the Company's cash position, Adjusted EBITDA, and/or gross margins."  ¶ 292.  But aside from offering their personal view that the "direct brand e-concessions" were "not sustainable," ¶ 155, *see In re Weight Watchers Int'l, Inc. Sec. Litig.*, 2016 WL 2757760, at *6 (S.D.N.Y. May

---

[13] Nor does FE1 offer any allegations that contradict Farfetch's accurate and timely updates regarding its performance in the U.S. market.  *E.g.*, ¶¶ 343, 358, 379, 413-14, 420-24.

[14] According to the AC, FE3 also briefly worked at NGG in an unspecified country from February 2023 to July 2023, and left NGG around five months before the end of the Class Period.  ¶ 58.

[15] Acknowledging that Farfetch disclosed the exact issues the AC alleges were undisclosed, the AC pivots to claims that these disclosures were misleading because "Farfetch was already experiencing a significant slowdown in growth" and "downplayed the negative impact on growth thereafter."  *See, e.g.*, ¶¶ 328, 331, 340.  But the AC again alleges no facts showing that Farfetch was not accurately or timely describing the headwinds it disclosed.

11, 2016) (an FE's "personal view . . . simply is not enough to support a claim"), FE2 does not explain how VAT costs rendered any statement misleading given that the AC also admits that Farfetch recouped the VAT funds within six months to one year, ¶ 154, and disclosed the amount of VAT funds it was owed.[16] *Farfetch*, 2021 WL 4461264, at *9 (no falsity where company "expressly disclosed precisely what Plaintiffs[] claim it was trying to hide").

- Operating Costs and Inventory:  The AC also alleges that the outlooks were false because "Farfetch was already experiencing significant challenges managing its operating costs relating to supply chain and inventory." *E.g.*, ¶ 292.  But, again, Farfetch issued the outlooks along with detailed warnings about its ability to manage costs and inventory.  *E.g.*, Ex. 4, Q4 2021 Earnings Release, at 20-21; Ex. 2, 2021 Form 20-F, at 16-17, 22, 41-42.  The AC never explains what "costs" it is referencing, much less how they were allegedly already impacting the business (in a manner greater than disclosed) at the time of the challenged statements.  *MINISO*, 2024 WL 759246, at *13.

- Cash Projections:  The AC challenges various cash flow and liquidity projections for the simple reason that Farfetch ultimately ran out of cash.  *E.g.*, ¶¶ 345-46, 351-53.  This is textbook fraud-by-hindsight, where "[i]nstead of pleading facts to show that [the] disclosures were inaccurate at the time they were made, plaintiffs rely on subsequent [events] to argue that prior disclosures were misleading, . . . [c]ourts have routinely rejected such . . . pleadings."  *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 246 (S.D.N.Y 2010).  And, again, in the very same disclosures Plaintiffs challenge, Farfetch warned that "any projections of future cash needs and cash flows ***are subject to inherent uncertainty*.**"  *E.g.*, Ex. 11, Q2 2023 Earnings Release, at 10; *Shields*, 25 F.3d at 1129 ("[M]isguided optimism is not a cause of action, and does not support an inference of fraud.").[17]

### 4.    The Challenged Statements Are Inactionable Opinion Statements

In addition to being protected by the PSLRA safe harbor, many of the challenged statements contain "predictions of future performance," which are inherently "statements of goals or beliefs," and, therefore, opinions.  *Adient*, 2020 WL 1644018, at *17; *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 750-51, 758 (S.D.N.Y. 2018) (statements

---

[16] *See* Ex. 1, 2022 Form 20-F, at F-48 (disclosing "sales tax receivables," *i.e.*, receivables that "relate to recoverable [VAT]"); ¶ 418 (discussing "reversing the post-Brexit buildup of our VAT receivables, due in from European governments, which currently stands at over $200 million").

[17] The allegations that Farfetch knew its cost-saving initiatives were not effective, *e.g.*, ¶¶ 346, 353, 362, fail for the same reason.  The AC admits that Farfetch undertook serious efforts to reduce its expenditures in 2022, *e.g.*, ¶¶ 361, 370, 418, and the fact that ultimately these cuts were not enough says nothing about what Farfetch knew or believed about this effort at the outset.

marked by qualifiers like "I think," "we expect," or "I believe" often "reflect judgment as to values that [are] not objectively determinable" and so are inactionable opinions).  Indeed, many of the statements are expectations for market conditions, and statements regarding Reebok, Violet Grey, NGG, and YNAP were prefaced with qualifiers like "we expect," "we believe," "I've always felt," or "I think."  *E.g.*, ¶¶ 430 ("we believe that cash flow . . . will be sufficient"), 442 ("we expect a strong recovery"), 453 ("[w]e think [YNAP] is a great partnership").[18]

To establish liability for these opinions, Plaintiffs must show that: (i) "the speaker did not hold the belief she professed"; (ii) "the supporting fact she supplied were untrue"; or (iii) the opinion "omits material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion," and "those facts conflict with what a reasonable investor would take from the statement itself."  *Omnicare, Inc. v. Laborers Dist. Council*, 575 U.S. 175, 186, 189 (2015).  But the AC is devoid of any allegations showing that any Defendant "did not hold the belief" they professed, and the AC does not plead any information that contradicts these statements.  *See* Section I.A.3.  And even if the AC did identify specific facts that would potentially undermine Defendants' views, that would still be insufficient as a matter of law.  *See Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016); *In re Anheuser-Busch InBev SA/NV Sec. Litig.*, 2020 WL 5819558, at *6 (S.D.N.Y. Sept. 29, 2020) ("The existence of financial challenges, particularly where Defendants had acknowledged these challenges and outlined efforts to mitigate them, does not render Defendants' optimistic opinion statements actionable."); *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004) ("It is not sufficient . . . to allege that an opinion

---

[18] For a complete list of statements that are inactionable opinions, see Appendix A.  Mr. Neves and Mr. Jordan's SOX certifications, ¶¶ 294, 393, "do not constitute a standalone basis for liability" and "add nothing substantial to the scienter calculus."  *Adient*, 2020 WL 1644018, at *24; *In re Plug Power, Inc. Sec. Litig.*, 2022 WL 4631892, at *19 (S.D.N.Y. Sept. 9, 2022) (Ramos, J.).

was . . . excessively optimistic, [or] not borne out by subsequent events.").

### 5.    Farfetch's Quarterly Financial Results Are Not False Or Misleading

Next, Plaintiffs allege that Farfetch's historical financial results were "materially overstated," but—remarkably—never identify a specific number that was incorrect, let alone what the "correct" figure would have been.  This alone requires dismissal.  *Gavish v. Revlon, Inc.*, 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004) (dismissing challenges to financial statements, and noting that "defendants (and the court)" are "entitled to be appraised of the approximate amount of overstatement involved").  Instead, Plaintiffs argue that the historical results must have been inaccurate because Farfetch "failed to disclose that" it "lacked adequate controls over NGG's financial reporting" and "was improperly recognizing sales."  *E.g.*, ¶¶ 318, 320, 326.  Plaintiffs are simply wrong.  A weakness in internal controls does not enable the speculation that unspecified financials must have been wrong.  To the contrary, the identification and disclosure of those weaknesses indicates that the Company was aware of them and took them into account when preparing its financial statements.  *See In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 294-96 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) ("[D]isclosure of material weaknesses . . . do[es] not support an inference that . . . statements were materially false.").

Nor do FE5 and FE6, the source for the AC's allegations, plead any facts showing that ***Farfetch's*** reported financials were false due to material weaknesses in internal controls at ***NGG***.  FE5 merely opines that NGG's accounting software "***could*** have been altered"—not that it ***was***.  ¶¶ 212-13.  In particular, FE5 alleges that due to IT issues, NGG employees "correct[ed]" certain data after it had been extracted to Excel, but does not even allege that those "corrections" were improper or what effect, if any, such "corrections" had on Farfetch's reported financials.  *Id.*; *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 209 (S.D.N.Y. 2020) (Ramos, J.) (FE allegations insufficient where "[t]here is nothing to suggest that . . . the method for correcting any

22

discrepancies was inherently improper."); *In re Magnum*, 26 F. Supp. at 296.[19]  As for FE6, their "primary focus" was "remediat[ing] the material weaknesses within NGG," ***not*** Farfetch,[20] and FE6 fails to explain how the allegation that certain products were being sold below cost means that any particular figures were not accurately reported.  *See* ¶¶ 224-27, 229; *Abengoa*, 481 F. Supp. 3d at 208 (rejecting FE allegations based on "generalized instances and his or her similarly general beliefs").  Further, any allegation of impropriety is undermined by FE6's own allegations because, after FE6 purportedly voiced concerns to management, FE6 asserts that Farfetch's VP of Legal & Compliance and an independent forensic investigator met with FE6 to discuss any concerns. ¶¶ 231-33.  That FE6 "disagree[d] with management[]" is plainly insufficient to plead fraud. *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015).[21]

---

[19] *See also Francisco v. Abengoa, S.A.*, 624 F. Supp. 3d 365, 394 (S.D.N.Y. 2022) (Ramos, J.) (rejecting FEs whose "generalized allegations . . . cannot explain with specificity what effect the alleged conduct had on the company's statements"); *Weight Watchers*, 2016 WL 2757760, at *7 (rejecting "grandiose and hyperbolic assertion [because it was] a characterization or opinion of the witness, not an objectively testable statement of fact").

[20] *MINISO*, 2024 WL 759246, at *12 (rejecting FEs where plaintiff "has not alleged facts with sufficient particularity to support the probability that a North American [FE] would possess the information alleged about . . . operations outside of North America"); *Frankfurt-Trust Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 223 (S.D.N.Y. 2018) (rejecting FEs who worked within one unit and "had no insight" into other corporate units).

[21] Plaintiffs also claim that Farfetch's disclosure that its "intangible assets as of June 30, 2023 were worth approximately $1.5 billion" was false because Coupang, which bought the platform, valued "Farfetch's intangible assets [at] $325 million" nearly a year later.  ¶ 439.  However, valuations of "intangible assets" are quintessential opinion statements.  *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-11 (2d Cir. 2011) ("[M]anagement's determination of the 'fair value' of the assets acquired and liabilities assumed[ ] are not matters of objective fact.").  Plaintiffs come nowhere close to alleging why this opinion statement is actionable or even why a different organization arriving at a different subjective figure as of a different date (March 2024) would render Farfetch's June 2023 valuation false when made.  *Xerion Partners, I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 518 (S.D.N.Y. 2007), *aff'd sub nom. Bay Harbour Mgmt. LLC v. Carothers*, 282 F. App'x 71 (2d Cir. 2008) (dismissing claims where plaintiffs relied on write-downs that occurred months later to "conclude that [earlier] statements . . . must have been false when made").

### 6.    Statements Regarding Farfetch's Acquisitions And Strategic Partnerships Are Not False Or Misleading

The AC's allegations regarding Violet Grey, YNAP, and Reebok fail because they are either: (a) mere beliefs of FEs not involved in those businesses, *see Abengoa*, 481 F. Supp. 3d at 208 ("second-hand information, obtained only through intermediaries, undermines the likelihood that he had personal knowledge"); (b) impermissible fraud-by-hindsight allegations, *Xerion Partners*, 474 F. Supp. 2d at 518 (dismissing claims where plaintiffs relied on write-downs that occurred months later to "conclude that [earlier] statements . . . must have been false"); and/or (c) are internally inconsistent, *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 133 (2d Cir. 2011) ("The inconsistencies in the complaint as to this critical allegation undermine the force of [plaintiff]'s contention that the corresponding disclosures were misleading.").

- Violet Grey:  The AC alleges that general statements concerning Violet Grey were false because it was "struggling financially" and "experiencing a slowdown in sales, growth, and revenue." *E.g.*, ¶¶ 289-90, 298-99, 303-05, 310-11.  But none of the challenged statements even discuss Violet Grey's sales, growth, revenue, or financial condition, and again constitute inactionable puffery. *E.g.*, ¶¶ 289 ("Violet Grey is a cult favorite beauty destination" that "will bring industry authority"), 304, 310. Further, the AC's allegations regarding Violet Grey are supported by FE4, who left near the beginning of the Class Period, ¶ 60, did not work at Violet Grey, and bases their knowledge on "takeaway" interactions with others, ¶ 166.[22]

- YNAP:  The AC alleges that Mr. Neves's August 17, 2023, statement that "[w]e think th[e YNAP acquisition] is a great partnership" was false because YNAP's value "was significantly overstated" and "no longer reflected a fair value consideration." ¶¶ 453-54. But the sole support for this claim is that, roughly nine months after Mr. Neves's statement and after Farfetch/Richemont ended their partnership, Richemont wrote down "YNAP's asset valuation" due to "a challenging environment for luxury ecommerce." ¶¶ 279, 281. These fraud-by-hindsight allegations are insufficient as a matter of law.

- Reebok:  Plaintiffs challenge every statement on Farfetch's partnership with Reebok because, in sum, the partnership delivered some, but not all, of the expected benefits in Q2 2023. *E.g.*, ¶¶ 306-08, 323-24, 330-31.  But Farfetch disclosed that 2022 was a "transition

---

[22] Alleged misstatements regarding Violet Grey are also immaterial as a matter of law:  Violet Grey "represented less than 1% of [Farfetch's] total assets and . . . revenue," ¶ 394, and did "not have a material impact."  Ex. 1, 2022 Form 20-F, at F-85.

year" for the Reebok partnership, that NGG would not have "the operating license" until 2023, ¶ 307, and projected "trade from that relationship across Q2" 2023, ¶ 361. Plaintiffs then challenge certain other statements on grounds that Farfetch "failed to perform proper due diligence prior to the Reebok acquisition" and/or because "Reebok had been overvalued at the time of acquisition." *E.g.*, ¶ 308. These allegations fail for a simple reason: They rest entirely upon FE3, who did not start working at NGG until February 2023, worked in "marketing" (***not*** finance), and supposedly learned about valuation and diligence prior to the "acquisition" from others. ¶¶ 58, 173-75, 178-79. In any event, FE3 articulates the basis that Farfetch had for its statements about the Reebok partnership, including that it received data from Adidas and provided it to an "independent consulting firm" who "prepared a historical P&L analysis and forecasts" showing "significant growth and hundreds of millions in sales over the next few years." ¶¶ 173-74.

For all these reasons, statements regarding Violet Grey, YNAP, and Reebok are not actionable.

### 7.    Statements Regarding NGG Are Not False Or Misleading

The AC alleges that general statements about NGG and Mr. Neves's response to an analyst question concerning the performance of its brand Off-White "a couple of years" after the untimely death of Off-White's founder, Mr. Virgil Abloh, were false because—according to FE3—"the Off-White business was tanking in the six to 12 months after" Mr. Abloh's death in November 2021. *E.g.*, ¶¶ 323-24, 327-28. Even crediting FE3's musings about the business during 2022 before FE3 joined in February 2023,[23] Farfetch repeatedly disclosed the up-and-down performance in this business. *E.g.*, Ex. 2, 2021 Form 20-F, at 16-17, 50; Ex. 1, 2022 Form 20-F, at 17, 46. Plaintiffs allege no facts that would render any statements regarding NGG or Off-White false when made.[24]

---

[23] Although not necessary to resolve this motion, FE3's speculation is inconsistent with how the business was described in major fashion publications during 2022. *See, e.g.*, Ex. 28, Samuel Hine, *Virgil Abloh's Final Off-White Collection Is His Most Radical*, GQ (Mar. 1, 2022), https://www.gq.com/story/off-white-fw22-couture-show (noting that "LVMH has plans to turn Off-White into the next Dior"); Ex. 29, Matthew Schneier, *After Virgil*, THE CUT (Aug. 31, 2022), https://www.thecut.com/article/virgil-abloh-louis-vuitton-future-of-off-white.html ("But what is the legacy of Abloh, and who gets to decide? So far, Off-White's retailers say enthusiasm has not diminished. 'We're very bullish on both the present and the future,' says Lana Todorovich, the president and chief merchandising officer of Neiman Marcus. 'It was started by Virgil, but I think he made it such a strong expression of his values that people identify with those values and will continue to buy it. We have seen double-, triple-digit increases in the past 12 months.'").

[24] Although the AC challenges various statements as false because Farfetch purportedly "lacked proper oversight of its subsidiaries, including NGG," ¶ 451, the AC offers no facts supporting that

\* \* \*

The common theme in Plaintiffs' falsity allegations is that (i) FEs recite "trends" that the Company itself already disclosed, (ii) one or two FEs (often not even in the relevant business unit) opine—with the benefit of hindsight—that they would have made different decisions if they were running the Company, and (iii) because the business ultimately did not succeed, every statement must have been false when made.  But this "narrative requires the Court to stretch allegations of, at most, corporate mismanagement into actionable federal securities fraud.  This is not the law." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 562 (S.D.N.Y. 2014), *aff'd*, 604 Fed. Appx. 62 (2d Cir. 2015).  Plaintiffs' "fundamental disagreements with Defendants' business judgments . . . are not actionable under Section 10(b) and Rule 10b-5."  *In re Weight Watchers Int'l. Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 247 (S.D.N.Y. 2020).[25]

### B.    Plaintiffs Fail To Plead A Strong Inference Of Scienter

Plaintiffs' claims also fail because the AC does not come close to pleading the required "strong inference" of scienter—*i.e.*, an "intent to deceive, manipulate, or defraud."  15 U.S.C. § 78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  "[I]t is not

---

claim, and instead rehashes the same failed arguments regarding NGG's internal controls.  *See supra* Section I.A.5.

[25] *See also Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977) (allegations of mismanagement not "within the scope of [Section] 10(b)"); *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 n.1 (2d Cir. 1996) (affirming dismissal of securities fraud claim based on allegations of poor investment strategies); *Charas v. Sand Tech. Sys. Int'l, Inc.*, 1992 WL 296406, at *5 (S.D.N.Y. Oct. 7, 1992) ("[W]here the central thrust of a claim or series of claims arises from acts of corporate mismanagement, the claims are not cognizable under federal law."); *In re Allied Cap. Corp. Sec. Litig.*, 2003 WL 1964184, at *4 (S.D.N.Y. Apr. 25, 2003) ("[D]isagreement with some of [defendant's] valuations does not equate to alleging fraud."); *Magnum Hunter*, 26 F. Supp. 3d at 292 ("Mere allegations of corporate mismanagement are not actionable."); *Fadem v. Ford Motor Co.*, 2003 WL 22227961, at *4 (S.D.N.Y. Sept. 25, 2003) (courts will not "second guess the decisions made in the course of business operations, lest every strategy that goes awry becomes subject to a lawsuit, and corporations are inhibited from following all but the most conservative path").

sufficient to set out facts from which, if true, a reasonable person could infer that the defendant acted with the required intent." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110-11 (2d Cir. 2009). Rather, the requisite "strong" inference must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. The Second Circuit has long held that this requires Plaintiffs to allege particularized facts showing (i) that Defendants had the "motive and opportunity to commit fraud" or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. The AC does neither.

### 1. Plaintiffs Fail To Plead A Cognizable Motive

To adequately plead motive, Plaintiffs must allege facts "showing that the defendant benefited in some concrete and personal way from the purported fraud." *Plug Power*, 2022 WL 4631892, at *11. "[G]eneral motives common to most corporate officers do not constitute motive." *Id.*

Here, the AC alleges that the "Individual Defendants were incentivized to conceal material adverse non-public information" in order "to keep Farfetch's stock price artificially inflated in hopes of meeting the performance targets necessary to achieve lucrative bonuses" because their "compensation . . . was heavily dependent on the value of Farfetch securities." ¶¶ 469-71. Not so. As this Court has observed, "[t]he general rule in the Second Circuit is that receipt of incentive compensation, including performance-based bonuses, does not, by itself, establish motive." *Abengoa*, 624 F. Supp. 3d at 400. Nor does "the desire for the corporation to . . . keep stock prices high to increase officer compensation . . . suffice." *Plug Power*, 2022 WL 4631892, at *11; *MINISO*, 2024 WL 759246, at *18 (rejecting allegations based on "share-based compensation").

Although the AC dubiously alludes to alleged "suspicious trading activity," ¶ 464, it never says what this is. It is perhaps just an inadvertent cut-and-paste from other lawsuits, because the AC does not allege that the Defendants sold any Farfetch stock, much less show "that the sales

were unusual or suspicious" in timing or amount. *Plug Power*, 2022 WL 4631892, at *13; *Lipow*

*v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 161 (S.D.N.Y. 2015) (Ramos, J.) (that

"Defendants retained . . . shares" they received as part of their bonuses "counsels against finding

motive"). In fact, the AC could not possibly contain such an allegation, because each of the

Defendants ***increased*** their Farfetch stock during the Class Period, which is "wholly inconsistent

with fraudulent intent." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y.

2004). More specifically, Mr. Neves increased his Farfetch stock by over 2.3 million shares,

Mr. Jordan by over 674,000 shares, and Ms. Phair by almost 450,000 shares.[26] The Second Circuit

and a long line of decisions in this District have flatly held that an increase in net holdings "cannot

support a 'cogent and compelling' inference of fraudulent intent." *Avon Pension Fund v.

GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009).[27]

### 2. Plaintiffs Fail To Plead Conscious Misbehavior Or Recklessness

Where, as here, a plaintiff has pled no cognizable motive, it faces the even more difficult

task of establishing that a defendant without motive somehow engaged in conscious misbehavior

or recklessness so significant that the defendant can be held liable for fraud. *See ECA*, 553 F.3d

at 199 (absent motive, allegations of scienter must be "correspondingly greater"). In the Second

---

[26] *Compare* Ex. 2, 2021 Form 20-F, at 114 (showing Mr. Neves owns 47,496,937 shares; Mr. Jordan owns 930,183 shares; and Ms. Phair owns 767,301 shares as of March 4, 2022), with Ex. 1, 2022 Form 20-F, at 118 (showing increases in ownership of shares as of March 8, 2023), and Ex. 16, Form 13G (J. Neves) (reflecting holdings of 49,876,223 shares as of December 31, 2023); Ex. 17, Form 144 (E. Jordan) (reflecting holdings of 1,604,185 shares as of August 30, 2023); Ex. 18, Form 144 (S. Phair) (reflecting holdings of 1,217,283 shares as of August 4, 2023).

[27] *Bristol-Myers*, 312 F. Supp. 2d at 561 (increase in stock ownership "wholly inconsistent with fraudulent intent"); *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 516 (S.D.N.Y. 2011) ("The Individual Defendants' purchase and 'retention of the shares . . . [is] inconsistent with'" allegations of scienter); *Abely v. Aeterna Zentris Inc.*, 2013 WL 2399869, at *20 (S.D.N.Y. May 29, 2013) (same); *In re MELA Scis., Inc. Sec. Litig.*, 2012 WL 4466604, at *5 (S.D.N.Y. Sept. 19, 2012) (same); *In re Athenex, Inc. Sec. Litig.*, 2023 WL 7690175, at *14 (W.D.N.Y. Sept. 29, 2023), *report and recommendation adopted*, 2024 WL 2725609 (W.D.N.Y. May 28, 2024) (same).

Circuit, this requires particularized allegations showing "not merely a heightened form of negligence," but conscious recklessness; that is, "a state of mind approximating actual intent." *S. Cherry St.*, 573 F.3d at 109. Against this high bar, all Plaintiffs offer is a laundry list of legally inadequate allegations that do not give rise to *any* inference of scienter, much less the requisite strong inference. *See City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) (dismissing complaint for lack of scienter and rejecting plaintiffs' "faulty" arithmetic that "zero plus zero plus zero plus zero plus zero adds up to something").

### a.   The FE Allegations Are Insufficient To Establish Scienter

To begin, the FE allegations do not come even close to establishing scienter with respect to any statement. Five out of the six FEs do not even purport to have met any Defendant, let alone having discussed anything relevant with them. In fact, *none* of the FEs allege to have ever spoken with Mr. Neves or Ms. Phair. "In such a case, the law is abundantly clear that [their] allegations are insufficient to support scienter" because these individuals are simply without information about what any Defendant knew or believed. *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 497 (S.D.N.Y. 2017); *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 238 (S.D.N.Y. 2020) (no scienter where FEs had no "contact with the Individual Defendants").

Instead, the FEs "offer their thoughts and opinions as to various . . . issues experienced by" Farfetch, which do "not establish what specific contradictory information the makers of the statements had and the connection (temporal or otherwise) between that information and the statements at issue." *In re Canopy Growth Sec. Litig.*, 2024 WL 3445436, at *14 (S.D.N.Y. July 17, 2024). For example, FE2 alleges that Mr. Jordan "met regularly" with "treasury leadership" and "working capital group" where the "VAT situation" was discussed. ¶ 158. But FE2 does not

(and cannot)[28] allege that they attended these meetings, so they know absolutely nothing about the information Mr. Jordan received and how he assessed risks and developed his views. *Canopy Growth*, 2024 WL 3445436, at *13 (rejecting FE allegations where complaint "does not allege that CW5 . . . even attended the specific meetings at which inventory was discussed"). Nor does FE2 "identify the specific information" in the alleged "paper" that "outlined all the VAT risks" that was given to Mr. Jordan in 2022, much less allege that Mr. Jordan reviewed it or "how such information contradicted Defendants' public statements." *Woolgar*, 477 F. Supp. 3d at 220, 238 (rejecting FE "references" to "monthly reports" where "Complaint does not plausibly allege what information was actually included in those reports or discussed at [] meetings.").[29]

Next, FE5 alleges they prepared "slides" that their supervisor (**not** FE5) "provided to" Mr. Jordan, which discussed internal controls "of concern" and "changes" the team was "implementing to remediate" them.  ¶ 463.  As discussed above, *see supra* Sections F, I.A.5, Farfetch disclosed material weaknesses in internal controls and the steps it took to remediate them, so alleging that there were slides discussing these issues is entirely unremarkable.  But, more importantly, the allegations are meaningless, because there is no specific detail of "what information was conveyed in the[ slides], let alone how such information contradicted [the] challenged statements," and FE5 was not even present at the meetings where the slides were discussed.  *Canopy Growth*, 2024 WL 3445436, at *13.  Likewise, FE1's claim that vague "forecasts" for Stadium Goods (**not** Farfetch as a whole) were presented to Mr. Jordan on

---

[28] Plaintiffs state that "FE2 passed away" prior to their filing the AC, ¶ 56 n.1, and offer no support for the assertion that the Court may consider a witness whose purported statements can never be challenged.

[29] FE2's references to meetings with unnamed "executives," ¶ 462, fare no better. *Canopy Growth*, 2024 WL 3445436, at *13 (rejecting allegations that FE "told unspecified Canopy management about a[n] . . . issue at an unspecified time" because it was "devoid of any details about who was told what, and when").

unspecified dates, ¶ 147, are similarly deficient because they say nothing about what, if anything, in these forecasts contradicted any of Mr. Jordan's statements.  *Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) ("vague and general averments" that executives had access to "real-time customer and sales information" insufficient).

The sole FE alleged to have ever interacted with a Defendant—Mr. Jordan—is FE6.  FE6 alleges that within their "first few weeks of starting at Farfetch," they had one meeting with Mr. Jordan during which Mr. Jordan told FE6 that "shareholders were threatening to pull their money out of Farfetch because of the longstanding material weakness at NGG," and FE6 said that Farfetch should withhold financial benefits from NGG management to force them to remediate the weakness, which Mr. Jordan responded was not the "Farfetch way."  ¶¶ 219-20.  That sole interaction does nothing to support scienter (or contradict any statement made).  *Wyche v. Advanced Drainage Sys., Inc.*, 2017 WL 971805, at *15 (S.D.N.Y. Mar. 10, 2017) ("[D]ifferences of opinion, even stark differences . . . do not reveal scienter.").[30]  To the contrary, even crediting FE6's allegations—despite FE6's "fail[ure] to specify exactly what information was contained in the report or how said information contradicted [the challenged] statements," *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021)—FE6's allegations merely show that Farfetch devoted significant resources to remediate the material weakness it disclosed, including by hiring personnel and Deloitte "to provide more resources and financial expertise." ¶¶ 218, 223.  Such efforts were entirely consistent with Farfetch's robust disclosures

---

[30] Indeed, the alleged meeting occurred in April 2023, ¶ 219, **after** Farfetch's March 2023 (second) disclosure of the material weaknesses, ¶¶ 392-94.  *In re Plug Power Inc., Sec. Litig.*, 2023 WL 5577276, at *20 (S.D.N.Y. Aug. 29, 2023) ("timely disclosure" negates "inference of scienter."); *Holbrook v. Trivago N.V.*, 2019 WL 948809, at *21 (S.D.N.Y. Feb. 26, 2019) ("disclosures about [] risk" are "inconsistent with" scienter).

concerning NGG's material weakness, and the "message from senior management and legal" was that "resolv[ing] the material weakness" was a top priority.  ¶ 218.[31]

### b.  Plaintiffs' Other Scienter Allegations Are Insufficient

Left with nothing that even approaches the legal standard for scienter, Plaintiffs offer a series of familiar fallback arguments that have been repeatedly rejected as a matter of law.  For example, Plaintiffs allege that scienter can be inferred because Mr. Neves "maintained significant control over Farfetch," ¶¶ 459-60, and because Defendants "knew that the adverse facts specified [in the AC] had not been disclosed" by virtue "of their positions with Farfetch."  ¶¶ 52, 523.  As this Court held in *In re PetroChina*, however, "[i]t is well established that accusations founded on nothing more than a defendant's corporate position are entitled to no weight."  120 F. Supp. 3d at 366; *Woodley v. Wood*, 2022 WL 103563, at *7 (S.D.N.Y. Jan. 11, 2022) (Ramos, J.) ("[I]t is not enough that defendants held senior positions and had access to inside information").  For the same reason, Plaintiffs' conclusory assertion that the Defendants "held themselves out as knowledgeable," ¶ 458, is similarly deficient.  *See Hubiack v. Li-Cycle Holdings Corp.*, 2024 WL 2943959, at *10 (S.D.N.Y. June 10, 2024) (allegations that "Defendants held themselves out to investors and analysts as knowledgeable . . . is not enough"); *MINISO*, 2024 WL 759246, at *19.

---

[31] All of the FE allegations should be discounted because not a single one worked for Farfetch throughout the Class Period, and many worked for only a few months of the 22-month Class Period.  *See* ¶ 54 (FE1 – 7 months); ¶ 56 (FE2 – left 2 months prior to end of Class Period); ¶ 58 (FE3 – 12 months); ¶ 60 (FE4 – 4 months); ¶ 63 (FE5 – 5 months, and did not start working until 17 months into the Class Period); ¶ 65 (FE6 – 5 months, and did not start working until 14 months into the Class Period); *Schaffer*, 2018 WL 481883, at *8 (rejecting allegations from former employees "both of whom left [Defendant] early in the Class Period") (citing *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1115 (N.D. Cal. 2009) ("[B]ecause CW 3 and CW 5 were not Yahoo! Employees for most of the Class Period, the Court cannot rely on their statements . . . .")).  Further, the FE allegations in sum amount to nothing more than their personal views and/or disagreements with the decisions of Farfetch's management, which are insufficient to establish a strong inference of scienter.  *E.g.*, ¶ 155 (FE2 describing VAT process as "unsustainable), ¶ 165 (FE4 describing Violet Grey as "floundering"); *Wyche*, 2017 WL 971805, at *15.

Next, the AC claims that the alleged fraud "relates to the core business and operations of Farfetch," so "knowledge thereof may be imputed." ¶ 456. The core operations theory, however, "does not independently establish scienter." *Lipow*, 131 F. Supp. 3d at 163. Instead, it "at most constitutes supplemental support for alleging scienter," *id.*, and, for it to apply, the operation must "make up nearly all of a company's business or be essential to its survival." *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 320 (S.D.N.Y. 2021) (Ramos, J.). Even then, it still must be "coupled with evidence of corresponding fraudulent intent." *MINISO*, 2024 WL 759246, at *19. The AC's allegation that "NGG was a primary contributor to the Company's revenue and GMV," ¶ 456, does not even come close to satisfying these requirements. NGG was just one of Farfetch's eight businesses, *see* Ex. 1, 2022 Form 20-F, at 69, and the AC does not (because it cannot) allege that it made up most, much less nearly all of Farfetch's business. *Plug Power*, 2023 WL 5577276, at *21-22 ("the Warrant Waiver and the Revenue Charge are not 'core operations'" where "the Amazon Warrant Shares . . . represented 67% and 50% of the Company's revenue in 2018 and 2019" and "resulted in 332.4% of the Company's total consolidated revenue"). But, even if NGG were a so-called "core operation" (it is not), this still is not enough to plead scienter given the dearth of specific allegations in the AC supporting any Defendant's intent to defraud. *See Abengoa*, 559 F. Supp. 3d at 320-21 ("Even assuming, *arguendo*, that approximately 60% of Abengoa's consolidated sales constitutes enough to invoke the core operations doctrine, . . . the Court finds Plaintiffs' allegations insufficient, on the basis of the core operations doctrine alone, to establish scienter [because] they could not substitute specific factual allegations linking [defendant] to the alleged accounting fraud.").[32]

---

[32] For the same reason, Plaintiffs' claim that the "strategic cost-saving initiatives had a significant impact on Farfetch's core business operations," ¶ 457—impact the AC alleges was no "no match" for Farfetch's expenditures, ¶ 346—fails. Likewise, the AC's claim that knowledge may be imputed because "[c]ash management, inventory management, revenue reporting, and receivables were essential elements of each of the Company's business lines," ¶ 456, is not enough because,

Finally, the AC alleges that a handful of resignations at Farfetch or its subsidiaries over a 15-month period shows scienter.  ¶¶ 472-81.  However, a "resignation by itself is insufficient to support an allegation of scienter because there are any number of reasons that an executive might resign."  *Woodley*, 2022 WL 103563, at *9.  "For executive resignations to raise a strong inference of scienter, they must be highly unusual and suspicious."  *Wilbush*, 271 F. Supp. 3d at 499.  Put another way, Plaintiffs must allege "a factual basis to conclude that the resignation was tied to participation in or knowledge of the fraud."  *Abengoa*, 481 F. Supp. 3d at 214.  But Plaintiffs do not even try to allege anything "unusual" or "suspicious" about eight resignations over a 15-month period, particularly given that Farfetch had more than 6,700 employees.  Ex. 1, 2022 Form 20-F, at 116.  And the AC fails to articulate how any departures were tied to any fraud.  None of the departures had any temporal proximity to any alleged corrective disclosure.  *See Wilbush*, 271 F. Supp. 3d at 499 (rejecting inference of scienter from executive resignations when "none of them occurred at or about the time that Defendants' alleged fraud was disclosed").  Moreover, at least two of the executives who departed "remained on board to help with the[ir] transition" for months after they announced their resignations.  *See* ¶ 472 (Belloli – 4 months); ¶ 479 (Defendant Jordan – 10 months).  Because Plaintiffs do not allege the required "factual allegations linking [the executives'] resignation . . . to the alleged fraud," they cannot rely on those resignations to support scienter.  *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *18 (S.D.N.Y. Sept. 28, 2012).

### c.    The Non-Fraudulent Inference Is More Compelling

When "determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."  *Tellabs*, 551 U.S. at 323.  Here, Plaintiffs pursue a textbook fraud-by-hindsight scienter theory that goes as follows:  Defendants

---

under Plaintiffs' logic, "virtually every company in the United States . . . could be forced to defend securities fraud actions."  *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).

knew as early as February 2022 that Farfetch would run out of cash, so they orchestrated a nearly two-years-long fraud to hide this from investors, and, rather than sell the millions of Farfetch shares they held, they ***increased*** their Farfetch stock and retained it to the very end, suffering hundreds of millions of dollars in losses.  This theory defies logic.  *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) (rejecting "nonsensical" scienter allegations that "defie[d] economic reason").

The far more, and indeed only, plausible inference is that Defendants made good faith and accurate disclosures about the many risks Farfetch faced in the volatile industries in which it operated, invested heavily in Farfetch's growth following Farfetch's strong financial performance in 2021, successfully weathered a difficult (and timely disclosed) environment in 2022, but ultimately succumbed to a downturn in the luxury fashion and e-commerce industry in late 2023. This "obvious, non-culpable explanation" is far more cogent and compelling than fraud.  *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 531 (S.D.N.Y. Aug. 18, 2020) (non-culpable inference more compelling where defendant "invested heavily in a product that it believed could have been the next generation of TV but was ultimately unsuccessful").

## II.    PLAINTIFFS' SECTION 20(A) CLAIMS FAIL

Plaintiffs' Section 20(a) claim—which attempts to hold the Defendants liable for statements made by Farfetch as an organization—fails not only because the AC does not plausibly allege a primary violation of Section 10(b) but also because it fails to allege the requisite culpable participation by any Defendant in preparation of Farfetch's disclosures. *See ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the AC with prejudice.

Dated: September 11, 2024
        New York, New York

Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/ *Jeff G. Hammel*
    Jeff G. Hammel
    Jason C. Hegt
    Jooyoung Yeu
    Andrej Novakovski
    1271 Avenue of the Americas
    New York, New York 10020
    Telephone: (212) 906-1200
    Facsimile: (212) 751-4864
    jeff.hammel@lw.com
    jason.hegt@lw.com
    jooyoung.yeu@lw.com
    andrej.novakovski@lw.com

    *Attorneys for Individual Defendants*
    *José Neves, Elliot Jordan, and Stephanie*
    *Phair*