# EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| Farfetch Limited (in Official Liquidation), | Case No. 24-11519-CTG |
| Debtor in a Foreign Proceeding. | Hearing date: December 17, 2024 |
| | Objection Deadline: December 10, 2024 |

**MOTION OF THE FOREIGN REPRESENTATIVES FOR ENTRY OF AN ORDER TO CONDUCT DISCOVERY FROM SURPIQUE L.P. PURSUANT TO 11 U.S.C. 542(E), 1507(A), 1521(A)(4), 1521(A)(5), FED. R. BANKR. P. 2004, AND LOCAL RULE 2004-1**

Alexander Lawson and Christopher Kennedy of Alvarez & Marsal Cayman Islands Limited (the "**Foreign Representatives**" or "**JOLs**") in their capacities as Joint Official Liquidators of Farfetch Limited (in Official Liquidation) (the "**Company**") and as foreign representatives in a Cayman Islands foreign proceeding (the "**Cayman Proceeding**"), pending before the Grand Court of the Cayman Islands (the "**Cayman Court**"), hereby move, under sections 542(e), 1507(a), 1521(a)(4), and 1521(a)(5) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 2004-1 of the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") for entry of an order, substantially in the form attached as Exhibit A (the "**Proposed Order**"), authorizing issuance of, and directing compliance with, a subpoena containing discovery requests substantially in the form attached to the Proposed Order as Exhibit 1 (the "**Subpoena**"), for the production of documents by Surpique L.P. ("**Surpique**").

In support of this motion, the Foreign Representatives rely on the *Declaration of Christopher Kennedy in Support of the Foreign Representatives' Motion for Entry of an Order to*

1

*Conduct Discovery from Surpique L.P. Pursuant to 11 U.S.C. §§ 542(e), 1507(a), 1521(a)(4), 1521(a)(5), Fed. R. Bankr. P. 2004, and Local Rule 2004-1* (the "**Kennedy Declaration**"), the *Declaration of Ryan M. Goldstein in Support of the Foreign Representatives' Motion for Entry of an Order to Conduct Discovery from Surpique L.P. Pursuant to 11 U.S.C. §§ 542(e), 1507(a), 1521(a)(4), 1521(a)(5), Fed. R. Bankr. P. 2004, and Local Rule 2004-1* (the "**Goldstein Declaration**"), and the *Declaration of Mark Goodman in Support of the Foreign Representatives' Motion for Entry of an Order to Conduct Discovery from Surpique L.P. Pursuant to 11 U.S.C. §§ 542(e), 1507(a), 1521(a)(4), 1521(a)(5), Fed. R. Bankr. P. 2004, and Local Rule 2004-1* (the "**Goodman Declaration**"), filed contemporaneously.[1] In further support of the Motion, the Foreign Representatives respectfully state as follows:

## PRELIMINARY STATEMENT

1.      Despite having effectively purchased Farfetch's entire business following the Company's financial implosion in late 2023, Surpique has refused to produce any documents or communications to the Foreign Representatives. Instead, Surpique has at every turn attacked, blocked, and circumvented the JOLs' efforts to obtain core documents—including Farfetch books and records and communications that are maintained on a Farfetch server that Surpique possesses. Without access to these documents and communications, the JOLs cannot perform their most basic fiduciary duties, including investigating the circumstances of Farfetch's implosion.

2.      Surpique's conduct speaks for itself. Soon after the commencement of Farfetch's winding up and for several months thereafter, Surpique refused to produce Farfetch's books and records to the JOLs in the Cayman Islands, claiming that the Cayman Court had no jurisdiction over them. When the JOLs sought Chapter 15 recognition to, among other things, obtain the

---

[1] "Kennedy Ex. __" refers to exhibits to the Kennedy Declaration, while "Goldstein Ex. __" refers to exhibits to the Goldstein Declaration.

documents in a forum in which Surpique is indisputably subject to jurisdiction, Surpique objected on the basis that it alone (ironically, the party in possession of Farfetch's books and records) should not be subject to Rule 2004 discovery.

3. After the Court granted Recognition, the JOLs again sought to confer with Surpique on the production of documents. But despite multiple telephonic meet-and-confers and lengthy correspondence over a two-month period, and despite Surpique paying lip service to being willing to cooperate, Surpique has produced nothing. The most Surpique has done is offer a narrow, undefined set of Farfetch's historic books and records, which Surpique has failed on multiple occasions to actually describe. Moreover, Surpique has affirmatively reached out to *other* Rule 2004 discovery targets, including Farfetch's former legal counsel and financial advisor, and requested that they withhold productions from the Foreign Representatives on the basis that Surpique owns or controls responsive documents.

4. During the parties' efforts to confer, Surpique has categorically refused to agree to produce: (i) Farfetch's historic email communications with third parties, which are currently in the possession of Surpique and not the JOLs; (ii) Farfetch's historic internal email communications, which are again in the possession of Surpique and not the JOLs; (iii) Surpique's own communications in the lead-up to the transaction; and (iv) anything that Surpique unilaterally determines is not a narrowly defined "book and record" of Farfetch.

5. Without access to documents possessed by Surpique—including Farfetch's own historic books and records and communications—the Foreign Representatives cannot fulfill their duties to investigate the Company's affairs, its collapse, and the subsequent transfer of all its assets. Indeed, almost a year after their appointment, the Foreign Representatives, standing in the shoes of the Company, still lack access to Farfetch's *own* communications concerning its financial

3

implosion and the subsequent sale of assets. Surpique should no longer be permitted to continue this charade and should be ordered to simply produce the requested documents.

6. Accordingly, the Court should grant the Motion, permit the Foreign Representatives to take discovery from Surpique under Rule 2004, and order Surpique to promptly comply with the Subpoena.

## JURISDICTION AND VENUE

7. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and section 1501 of the Bankruptcy Code, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware. This is a core proceeding under 28 U.S.C. § 157(b)(2).

8. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1410.

9. Pursuant to Local Rule 9013-1(f), the Foreign Representatives confirm their consent to the entry of a final order or judgment by this Court with respect to this Motion if it is determined that the Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article II of the United States Constitution.

10. The statutory predicates for the relief requested herein are sections 542(e), 1507(a), and 1521(a)(4) and (a)(5) of the Bankruptcy Code, Bankruptcy Rules 2014 and 9016, and Local Rule 2004-1.

## BACKGROUND

### I. Events Leading to the Liquidation.[2]

11. The Company was incorporated as an exempt company limited by shares under the law of the Cayman Islands in 2018. It operated primarily as an offshore holding company and was

---

[2] This section contains a brief summary of these events, which are discussed in detail in the *Verified Petition of Foreign*

the sole parent of Farfetch Holdings plc ("**FF PLC**"), a public limited company organized under the laws of England and Wales which owned the FF Group, its direct and indirect operating subsidiaries. The FF Group operated a global retail platform for luxury fashion, e-commerce platforms, fashion and beauty product labels, and a London department store.

12. Farfetch's stock was publicly traded on the New York Stock Exchange. As a result, Farfetch was obligated to make various SEC filings (*e.g.*, Forms 20-F and 6-K). *See Declaration of Christopher Kennedy in Support of Chapter 15 Petition for Recognition as Foreign Main Proceeding* [D.I. 5] ¶ 14 ("**Kennedy Recognition Decl.**"); [D.I. 4-2, 4-8 (Forms 6-K)]. In these filings, the financial performance of Farfetch and its subsidiaries was reported on a consolidated basis. *See, e.g.,* [D.I. 4-7 at 2]. Farfetch also reported on many of the developments such as acquisitions (*e.g.*, FF PLC's proposed acquisition of 47.5% of Yoox-Net-A-Porter), made by its direct and indirect subsidiaries, which were Farfetch's only assets. *See* Kennedy Recognition Decl. ¶ 9; [D.I. 4-10].

13. In October 2023, the Company encountered an unexpected liquidity crisis. On November 28, 2023, the Company issued a press release informing the market that it would not announce its third-quarter results and that its earnings call scheduled for the next day would not be held. *See* [D.I. 4-9].

14. At the time, behind the scenes, Farfetch and its advisors were working to address its liquidity crisis and consider transactions available to Farfetch. Through a process that the Foreign Representatives are still trying to understand—a challenge without access to historic Farfetch documents and communications—in less than two months, Surpique became the bridge lender, stalking horse bidder, and ultimate buyer of Farfetch's assets.

---

*Representatives for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Certain Related Relief ("Verified Petition") [D.I. 4].*

15.     On December 18, 2023, the Company issued a press release stating that its direct, wholly owned subsidiary, FF PLC, had informed the Company's board of directors that it had entered into an agreement with Athena Topco LP, now known as Surpique. Surpique is a Delaware limited partnership jointly owned by Coupang, Inc. ("**Coupang**"), and funds managed and/or advised by Greenoaks Capital Partners ("**Greenoaks**"). [D.I. 4-10.] Pursuant to the agreement, FF PLC committed to sell substantially all its assets to Surpique, while the Company would provide FF PLC and other members of the FF Group a broad suite of releases for no consideration (the "**Coupang Sale**"). *See* Kennedy Recognition Decl. ¶ 18. The transaction included a multiple on invested capital fee and other fees that had to be paid by any alternative purchaser, making competing bids unlikely. *Id.* Ultimately, the Coupang Sale was consummated through an English law pre-pack administration process in January 2024. [D.I. 4-11].

16.     As part of the Coupang Sale, a server containing substantially all of the Company's books and records and email communications was transferred to Surpique. Kennedy Decl. ¶ 7; Kennedy Ex. 2, Mar. 21 JOLs Ltr. at 1. Access to these documents and communications is necessary for the Foreign Representatives to complete their statutory obligations as JOLs, including by assessing the Company's financial position leading up to the Coupang Sale and the fairness of the Coupang Sale itself. Kennedy Decl. ¶ 8.

## II.  The JOLs Are Appointed Under a Winding Up Order.

17.     Following the Coupang Sale, which left Farfetch essentially an empty shell, the indenture trustee for the Company's outstanding Convertible Senior Notes petitioned to wind up Farfetch in the Cayman Court, which subsequently entered a Winding Up Order and appointed the JOLs. *See* Kennedy Recognition Decl. ¶¶ 12, 21-23; *see also* [D.I. 1 at 4-6] (Winding Up Order).

18.     The JOLs were appointed by the Winding Up Order on February 9, 2024. Under Cayman law, the Foreign Representatives are fiduciaries and officers of the Cayman Court.

*Declaration of Mark Goodman in Support of Verified Petition Under Chapter 15 for Order and Final Decree Granting Recognition of Foreign Main Proceeding and Other Related Relief* [D.I. 6] ¶ 28. Their duties, under the Cayman Companies Act (the "**Companies Act**"), are to collect, realize, and distribute the Company's assets to its creditors and to report to the Company's creditors and other stakeholders on the affairs of the Company and the manner in which it is being wound up. *Id.*; *see also* Goodman Decl. ¶ 12. The JOLs are both empowered and required by the Companies Act to investigate the causes of the Company's failure and, generally, its promotion, business dealings, and affairs. Goodman Decl. ¶ 16 & n.3 (citing Companies Act § 102).

19. Under Cayman law, a first step in this process, and one that the JOLs are duty-bound to undertake and see through, is to obtain the FF Group's books and records. Goodman Decl. ¶¶ 17-20. The body of books and records that the JOLs are required to gather under Cayman law includes not just *all* the books and records of the Company itself, but also *all* of the books and records of the FF Group subsidiaries, since, as a holding company, the Company's affairs "include the affairs of its subsidiaries." *Id.* at ¶¶ 22-24 (quoting *In the Matter of Fortuna Development Corp.*, [2004–05 CILR 197], 25 Oct. 2004 ¶¶ 17-18, 21, 23). The JOLs are also required to "gather and review all readily available evidence" related to critical issues, like the Coupang Sale. *See id.* at ¶¶ 25-28 (quoting *Re Guardian Care Homes (West) Ltd. (In Liquidation)* [2018] EWHC 2664).

20. Upon their appointment, the Foreign Representatives promptly began their investigation into the Company's affairs and assets. Kennedy Recognition Decl. ¶¶ 21–23. Unfortunately, it soon became apparent that books and records and other information needed for the JOLs to investigate the affairs of Farfetch was in the hands of other parties. The JOLs thus immediately and diligently worked to obtain possession of and collect the property of the Company, including by filing a Chapter 15 petition. Kennedy Recognition Decl. ¶¶ 22-23.

### III. The JOLs Seek Recognition and Are Granted Broad Powers in the United States.

21. On July 10, 2024, to assist the JOLs in their work in the Cayman Proceeding, the JOLs filed the Verified Petition. [D.I. 4.] After a hearing held on August 5, 2024, the Court issued the Recognition Order, recognizing the Cayman Proceeding as foreign main proceedings and the JOLs as Foreign Representatives. *Order Granting (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Certain Related Relief* [D.I. 46] ¶¶ 1-3 (the "**Recognition Order**"). The Recognition Order entrusts the Foreign Representatives with "the administration or realization of all or part of the Company's assets within the territorial jurisdiction of the United States" under Section 1521(a)(5), including by granting the Foreign Representatives the ability to seek the turnover of the Company's property located in the United States under Bankruptcy Code section 542. *Id.* at ¶ 9.

22. The Recognition Order also grants the Foreign Representatives the power to conduct discovery under Section 1521(a)(4) and Rule 2004. With respect to Surpique, the order clarifies that a separate motion requesting Rule 2004 relief must be filed if no consensual production is agreed to. *Id.* at ¶ 8.

### IV. The JOLs' Lengthy Efforts to Seek Documents from Surpique.

23. Surpique has consistently refused to turn information over to the JOLs, despite the JOLs' many attempts to obtain such records in both the Cayman Islands and United States.

**A. Surpique obstructs the JOLs' actions in the Cayman Proceeding and refuses to submit to jurisdiction in the Cayman Islands.**

24. Soon after the Cayman Proceeding commenced, (and prior to any requests from the JOLs), on February 28, 2024, Surpique's counsel at Kirkland & Ellis LLP ("**Kirkland**") reached out to the JOLs, ostensibly on behalf of former FF Group members Farfetch.com Ltd. and Farfetch UK Ltd. Kennedy Ex. 1, Feb. 28 Surpique Ltr. The JOLs subsequently learned from Cayman

counsel for the Company's former CEO, Forsters LLP, that Kirkland was acting on behalf of Surpique. Kennedy Ex. 2, Mar. 21 JOLs Ltr. at 1. At that time, Surpique unjustifiably demanded that the JOLs not share any information it obtained with their UK counsel, Pallas Partners ("**Pallas**"). Kennedy Ex. 1, Feb. 28 Surpique Ltr. at 1-2. The JOLs believed the request was overreaching, but they nevertheless sought to work with Surpique to obtain needed information. Kennedy Ex. 2, Mar. 21 JOLs Ltr. at 1.

25.     The primary reason that the JOLs sought documents from Surpique was that they had learned that all of the Company's books and records and email communications were now in Surpique's possession. *Id.* The JOLs informed Surpique that, under Cayman law, the JOLs had a "duty to collect the assets, books and records of the Company." *Id.* The JOLs requested that Surpique "provide all documents and information [its] possession belonging to the Company. This includes, *without limitation*: (a) all board minutes and resolutions of the Company; (b) all financial information, statements and supporting information of the Company; (c) draft and executed versions of transaction documentation entered into by the Company (including the Transaction Support Agreement and any related documentation); (d) draft and final bids and term sheets relating to any marketing and sale of the business of the Farfetch group in H2 2023; and (e) copies of any insurance policies or indemnities provided to the directors (or former directors) to the Company." *Id.* (emphasis added). The JOLs requested production of these necessary documents by March 29, 2024. *Id.*

26.     Surpique responded on March 29. Far from complying with the JOLs' request as would be expected, Surpique's counsel stated: "As you know, *Surpique is not a Cayman entity* and neither your March 21 letter nor Forsters' March 12 email identifies legal grounds to 'require' our client to provide any documents to either Mr. Neves or the JOLs. To be clear, Surpique

certainly did not seek to acquire documents and information belonging *exclusively* to Farfetch Limited, and we are not presently aware of any material *exclusive* to Farfetch Limited in our client's possession." Kennedy Ex. 3, Mar. 29 Surpique Ltr. at 1-2 (emphasis added).

27.    While Surpique suggested that it would evaluate the JOLs' requests, it also stated: "Our client's willingness to assist the JOLs in this regard is subject to a full reservation of rights, *including with respect to any and all jurisdictional objections*. For the avoidance of doubt, *no action or inaction by Surpique or any of its affiliates in connection with your inquiry constitutes submission to the Farfetch Limited liquidation proceedings or to the jurisdiction of any administrative body or court of the Cayman Islands*." *Id.* at 2 (emphasis added). The letter also noted that Surpique and its owners had access to "a virtual data room containing detailed financial information for both the business as a whole and its components." *Id.*

28.    The JOLs responded on April 12, 2024. The JOLs attempted to strike a collaborative tone, writing that they "welcome Surpique's willingness to assist them in their obligations," and further requested that Surpique provide the contents of the "virtual data room" for the Coupang Sale. Kennedy Ex. 4, Apr. 12 JOLs Ltr. at 1. In an effort to reach a compromise with Surpique, and despite the fact that Surpique had no justification for seeking to dictate what advisors they could share information with, the JOLs stated that "documents and information provided by Surpique will not be provided to Pallas." *Id.* The JOLs' goal was to reduce conflict, regardless of how baseless the issues raised by Surpique were, in order to further the JOLs' investigation in a cost-effective manner.

29.    Despite these assurances, in its April 26 response, Surpique modified and increased its demand and now required that the JOLs terminate Pallas as UK counsel before it would provide any documents to the JOLs. Kennedy Ex 5, Apr. 26, 2024 Surpique Ltr. At this point, the JOLs

10

could no longer agree to Surpique's unwarranted demands. Surpique clearly lacked the right to dictate what qualified professionals the JOLs retained or to condition its compliance with the JOLs' document request on the JOLs fulfilling Surpique's demands. Notably, the April 26 response did not state that Surpique lacked access to the virtual data room (to which all potential buyers presumably have access).

30. For the next three months, Surpique refused to engage with the JOLs on discovery at all, and instead created delays by trying to steer the JOLs' conduct of the liquidation in Surpique's favor by withholding the indemnity that Surpique owed the Company under the terms of the Coupang Sale (in which Surpique reimbursed the JOLs for costs of the liquidation of Farfetch). Surpique even sought to use its power of the purse to force the JOLs to terminate Pallas and take other actions. *See* Kennedy Exs. 6-9. As a result of Surpique's actions, the JOLs sought and received a ruling from the Cayman Court that the JOLs were entitled to retain Pallas and that "no further sanction was necessary." Kennedy Ex. 10, Cayman Court Ruling. The Cayman Court further invited Surpique to apply to the Cayman Court "if they are unhappy with the JOLs' conduct." *Id.* Despite Surpique's supposedly critical concern regarding Pallas, it took no action in response to the Court's direction.

31. Given Surpique's intransigence, ever-increasing demands, and refusal to provide materials in the Cayman Proceeding, the JOLs sought Chapter 15 recognition.

**B. Surpique continues to stonewall after the filing of the Chapter 15 proceeding.**

32. About four weeks later (two weeks after the JOLs filed the Chapter 15 Petition) Surpique raised a new "concern" that the JOLs were seeking Chapter 15 recognition before the JOLs' "investigation in Cayman [was] complete." Goldstein Ex. 1, Jul. 23 Surpique Ltr. at 1. At this point, Surpique's clumsy strategy was fully transparent: deny the JOLs basic documents and information in the Cayman Proceeding, preventing them from doing their jobs, then claim that the

JOLs could not have a basis to take any action in the United States because they had not completed their investigation in Cayman. (Of course, Surpique had already stated that it was not subject to jurisdiction in the Cayman Islands.)

33. Surpique also alleged that the Chapter 15 filing "primarily" sought recognition "to try to contrive and assert claims against Surpique and its owners." *Id.* This is false—while the JOLs are duty-bound to investigate and, if proper, prosecute all causes of action that would benefit the Company and its creditors, the JOLs have made no decision on whether to pursue claims against Surpique, its owners (Coupang and Greenoaks), former officers or directors of the Company, or any other party. Kennedy Decl. ¶ 25. Nor could they, given that they have not received even the Company's most basic documents and communications from Surpique. *Id.* at ¶¶ 24-25.

34. The JOLs responded by letter on August 1, 2024, reiterating that they were duty-bound to investigate the Company's affairs and collapse, including by seeking Chapter 15 recognition, as sanctioned by the Winding Up Order, and noting that Surpique had no right to interpose itself to exercise economic control or influence over the course of the liquidation. Goldstein Ex. 2, Aug. 1 JOLs Ltr.

35. Surpique repeated its contrived concerns and false allegations in its objection to the Verified Petition. [D.I. 20]. After the recognition hearing, the Court issued the Recognition Order, which authorized the Foreign Representatives to make Bankruptcy Rule 2004 requests, "including against Surpique," but subject to a separate motion and order of the Court. In the courthouse hallway, Mr. Kennedy, one of the JOLs, spoke to Surpique's counsel at Kirkland briefly to try to prompt a more collaborative working relationship between the JOLs and Surpique, now that it was clear documents could be obtained through court order if necessary. Kennedy Decl. ¶¶ 21-22.

12

Surpique initially acted cooperative but has since tried to capitalize on an inaccurate account of that conversation to claim that the JOLs agreed in the conversation that Surpique could produce only an extremely narrow group of documents.[3]

### C. Post-Recognition, Surpique continues to impose delays and refuses to voluntarily produce highly relevant documents and communications.

36. Surpique's resistance has only intensified during the two-plus months that the parties have conferred in advance of this Motion. Surpique's resistance has a pattern: The JOLs make a reasonable request and Surpique responds in a way aimed at blocking any production.

37. On September 16, 2024, the JOLs requested to confer and served a draft Rule 2004 subpoena on Surpique's counsel, as required by Local Rule 2004-1 and the Recognition Order's directive to confer and try to reach agreement. Goldstein Ex. 3, Nov. 26 Email thread at 26. On September 23, and in response to the draft requests, Surpique openly accused the Foreign Representatives of pursuing a "Rule 2004 claims-mining exercise," and questioned whether the Foreign Representatives were seeking documents beyond only the narrow "books and records" to which Surpique contends the JOLs are entitled under Cayman law. *Id.* at 24-26.

38. The Foreign Representatives replied and reiterated on September 26 that they were prepared to confer on the draft requests and confirmed that they were seeking "documents to which they are entitled under U.S. law, including both books and records of Farfetch Limited and other relevant documents and communications in Surpique's possession." *Id.* at 23-24. Weeks passed, during which Surpique refused to even schedule a meet-and-confer. *See id.* at 18-23.

---

[3] In this conversation, Surpique claimed they did not understand what Mr. Kennedy meant when he said he was seeking "books and records" of Farfetch and its subsidiaries, Mr. Kennedy offered to provide examples of "books and records" under Cayman law. Surpique has since repeatedly claimed that Mr. Kennedy suggested that the JOLs sought only a "discrete list" of books and records, which would clearly be insufficient for the JOLs to investigate the pertinent issues. *Id.* at ¶¶ 21-22.

39.    The parties ultimately conferred on October 23, 2024. *Id.* at 18; Goldstein Ex. 4, Oct. 23 Surpique Ltr. During the call, the Foreign Representatives again explained that they lack access to Farfetch's historic documents and communications, and Surpique confirmed that it does maintain access to the Farfetch server as a result of the transfer of assets in the Coupang Sale.

40.    The parties agreed during the call that the Foreign Representatives would send a list of what constituted the Company's books and records under Cayman law, although the Foreign Representatives noted that their discovery rights in the Chapter 15 case were not limited by Cayman law. On October 25, 2024, the Foreign Representatives sent a description of the broad set of documents that comprise "books and records" under Cayman law, including documents related to governance, internal reporting, external reporting, and Project Athena and the Coupang Sale. The Foreign Representatives also made clear that "books and records" included "[a]ll communications and correspondence concerning the Company," including emails. Goldstein Ex. 3, Nov. 26 Email chain at 15-16; Goldstein Ex. 4, Oct. 23, 2024 Surpique Ltr.

41.    For its part, Surpique listed in a letter sent shortly after the meet-and-confer four limited categories of documents that it would be willing to produce voluntarily: "(i) director and officer insurance policies for Farfetch Limited; (ii) Farfetch Limited board minutes spanning multiple years; (iii) Farfetch Limited board materials; and (iv) Farfetch Limited financials included in the board materials." Goldstein Ex. 3 at 14. Surpique reiterated that it would also produce "additional documents" including "documents from the virtual data room used as part of the marketing of the Farfetch business or other financials." *Id.* (quoting Goldstein Ex. 4 at 3).

42.    But Surpique otherwise expressed that it was "disappointed" by the Foreign Representatives' list of books and records, which Surpique claimed was a "remarkable" "failure." Surpique added that in light of the "sweeping categories" of information sought by the Foreign

14

Representatives, it was "concerned that meeting and conferring [] again would be fruitless." *Id.* at 13-14. The parties had scheduled a second meet-and-confer for November 6, 2024. But the night before the meet-and-confer, Surpique suddenly accused the Foreign Representatives of "just playing games" and unilaterally postponed the call. Surpique continued to press by email for a "discrete list of books and records," even though the Foreign Representatives had made clear on multiple occasions that "books and records" were defined broadly under Cayman law, and that, in any event, they were not limited to "books and records" in Rule 2004 discovery. *See id.* at 8-13.

43. The parties conferred again on November 8. *Id.* at 7. Following the call, Surpique represented that it was "ready and willing to make a voluntary production of" some undefined set of "books and records." *Id.* at 6-8. But when pressed in multiple emails, Surpique refused to describe in writing what categories of information that production would include. *See id.* at 1-6. If anything, the scope of the documents that Surpique has said it will produce has only shrunk. For example, during the November 8 meet and confer, Surpique reversed the position that it had taken for months and said that it no longer had access to the virtual data room for the Coupang Sale and therefore would not produce documents from the data room. *Id.* at 2.

44. And, most importantly, Surpique's position on the scope of what it was *unwilling* to produce has never changed. Surpique remains unwilling to produce the vast set of materials necessary for the JOLs' investigation, including: (i) Farfetch's historic email communications with third parties; (ii) Farfetch's historic internal email communications; (iii) Surpique's own communications in the Project Athena transaction; and (iv) any document Surpique unilaterally determines is not a "book and record" of Farfetch under Cayman law. *See* Goldstein Decl. ¶ 8.

45. At bottom, since September (and putting aside all of the earlier efforts by the JOLs), the parties have spent two-plus months going around in circles. Surpique's position at every turn

has been long on accusations and finger-pointing but short on substance. And, without notice to the JOLs, Surpique has even gone out and inserted itself into the JOLs' efforts to reach agreement on the scope of productions by other recipients of draft Rule 2004 requests, including the Company's former counsel and financial advisors.

## RELIEF REQUESTED

46. By this Motion, and pursuant to sections 542(e), 1507(a), 1521(a)(4), and 1521(a)(5) of the Bankruptcy Code, and Rule 2004, the Foreign Representatives respectfully request entry of the Proposed Order:

      a. Authorizing the Foreign Representatives to take Rule 2004 discovery from and issue the Subpoena to Surpique; and

      b. Requiring Surpique to produce documents responsive to each Document Request contained in the Subpoena within 30 days after service of the Subpoena.

## BASIS FOR RELIEF

**I. Sections 542(e), 1507(a), 1521(a)(4) and (a)(5), and Rule 2004, Grant the Foreign Representatives Broad Power to Seek Discovery**

47. The requested relief—contrary to what Surpique suggests—is "necessary to effectuate the purpose of [Chapter 15] and to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a). The Foreign Representatives are charged with maximizing the recovery of the Company's creditors and simply uncovering for them what happened to Farfetch Limited. The documents held by Surpique are essential to both of the Foreign Representatives' functions. Therefore, the discovery that the Foreign Representatives seek under sections 542(e), 1507(a), 1521(a)(4), and 1521(a)(5) must be granted.

**A.      The Scope of Discovery Available Under Section 1521(a)(4) is vast, and not limited by, Cayman Law.**

48.      Surpique's contentions regarding the extremely narrow discovery powers of Chapter 15 foreign representatives have no basis in law. *First*, foreign representatives are permitted to use the full scope of Rule 2004, which is well accepted to be a fishing expedition and can even involve discovery into potential causes of action. *Second*, Cayman law does not limit what discovery is available to the Foreign Representatives in this Chapter 15 case. *Third*, the facts here make clear that the discovery sought is critical and "necessary" to the Cayman Proceeding. *See* 11 U.S.C. § 1521(a).

> 1. *Discovery available under section 1521(a)(4) is everything that is available to trustees under Rule 2004.*

49.      Section 1521(a)(4) of the Bankruptcy Code permits courts, upon "recognition of a foreign proceeding" to "provid[e] for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities." 11 U.S.C. § 1521(a)(4). *See also* 1 Collier on Bankruptcy 13.07 (16th ed. 2020) ("Section 1521(a)(4) authorizes the court to give the foreign representative the power to engage in discovery, without the necessity of opening formal litigation. This broad power of examination gives the foreign representative investigative powers similar to a trustee."). Section 1521(a)(4) "enables a Foreign Representative to take broad discovery concerning the property and affairs of a debtor." *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 471 B.R. 342, 346 (Bankr. S.D.N.Y. 2012). The statute permits discovery into potential causes of action held by the debtor, which are "contingent property interests." *Id.* (citing *In re Kane*, 628 F.3d 631, 641 n.7 (3d Cir. 2000) (noting that property of the estate "encompasses contingent property interests such as causes of action")). And requests for discovery under section 1521(a)(4) are permissible even if they pertain to assets

outside the U.S. *In re Markus*, 607 B.R. 379, 389 (Bankr. S.D.N.Y. 2019), *affirmed in part, vacated in part on other grounds*, *Markus v. Rozkhov*, 615 B.R. 679 (S.D.N.Y. 2020). Permitting broad discovery under section 1521(a)(4) promotes one of the "significant objectives of chapter 15" which is "***to provide judicial assistance to foreign representatives in gathering information which will enable them to comply with their duties***." *See In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. 803, 821 (Bankr. S.D.N.Y. 2018) (emphasis added); *In re Comair Ltd.*, 2021 WL 5312988, at \*10 (Bankr. S.D.N.Y. Nov. 14, 2021) (similar).

50.     In keeping with this objective, U.S. courts routinely grant foreign representatives the power to conduct Rule 2004 discovery, which is "one of the mechanisms by which bankruptcy courts provide such assistance." *Platinum Partners*, 583 B.R. at 810 (quoting *Krys v. Paul, Weiss, Rifkind, Wharton & Garrison, LLP (In re China Med. Techs., Inc.)*, 539 B.R. 643, 649 (S.D.N.Y. 2015)). Rule 2004 discovery is available to foreign representatives both under section 1521(a)(4) and under section 1507(a), which provides that U.S. courts may, after recognition, "provide additional assistance to a foreign representative under this tile *or under other laws of the United States*." 11 U.S.C. § 1507(a) (emphasis added); *In re Millennium Global*, 471 B.R. at 346-37 (noting that full Rule 2004 discovery is also available under this section).

51.     So, foreign representatives may use "the full scope of Rule 2004," without limitation. *Millennium Glob.*, 471 B.R. at 347; *see also In re Comair*, 2021 WL 5312988, at \*14 (granting motion of foreign representatives to take discovery under section 1521(a)(4) and under Rules 2004 and 9016); *In re Petroforte Brasileiro de Petroleo Ltda.*, 542 B.R. 899, 911 (Bankr. S.D. Fla. 2015) (finding that a foreign representative was entitled to discovery under section 1521(a)(4) of the Bankruptcy Code or Rule 2004); *In re AJW Offshore, Ltd.*, 488 B.R. 551, 561 (Bankr. E.D.N.Y. 2013) (granting foreign representative right to take Rule 2004 discovery); *In re*

18

*British Am. Ins.,* 488 B.R. 205, 225 n.16 (Bankr. S.D. Fla. 2013) ("After recognition, broad based inquiry into the debtor's assets and affairs is available under Fed. R. Bankr.P.2004") . This Court has granted such discovery many times. *See, e.g., In re Point Invs., Ltd. (in Liquidation)*, No. 22-10261 (TMH) Dkt. 96 (Bankr. D. Del. May. 31, 2023) (allowing foreign representatives to issue subpoenas under Rules 2004 and 9016); *In re Irish Bank Resolution Corp. Ltd. (in Special Liquidation)*, No. 13-12159 Dkt. 442 (Bankr. D. Del. Oct. 15, 2014) (order compelling production of documents requested by foreign representatives under Rule 2004).

52.     Rule 2004 requests may be used to "'discover the nature and extent of the bankruptcy estate' in order to distribute debtor's assets for the benefit of its creditors." *In re Millennium Lab Holdings II, LLC,* 562 B.R. 614, 626 (Bankr. D. Del. 2016) (quoting *In re Washington Mut., Inc.,* 408 B.R. 45, 50 (Bankr. D. Del. 2009)). "Legitimate goals of Rule 2004 examinations include 'discovering assets, examining transactions, and determining whether wrongdoing has occurred.'" *In re Washington Mut., Inc.,* 408 B.R. at 50 (quoting *In re Enron Corp.,* 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002)). "Potential examinees include 'third parties that possess knowledge of the debtor's acts, conduct, liabilities or financial condition which relate to the administration of the bankruptcy estate.'" *In re Millennium Lab Holdings II, LLC,* 562 B.R. at 626 (quoting *In re E.W. Resort Dev. V, L.P., L.L.L.P.*, 2014 WL 4537500, at \*7 (Bankr. D. Del. Sept. 12, 2014)).

53.     "A Rule 2004 examination 'is commonly recognized as more in the nature of a 'fishing expedition.'" *In re Washington Mut., Inc.*, 408 B.R. at 50 (quoting *In re Bennett Funding Grp., Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996)). Its scope is "'unfettered and broad.'" *Id* at 49 (quoting *In re Bennett Funding Grp., Inc.*, 203 B.R. at 28).

54. Surpique's main objection to the Foreign Representatives pursuing discovery appears to be that they may use it to later pursue lawsuits. [D.I. 20 (Surpique Objection) ¶¶ 3-4]. This is misguided. First, the JOLs may use the information for a wide range of reasons. Second, Surpique's objection is apparently to the scope of the Bankruptcy Code and Rules (in particular section 1521(a)(4) and Rule 2004), which it cannot change, not to the JOLs' requests. As noted above, courts recognize that causes of action are assets—"contingent property interests"—of the debtor. *In re Kane*, 628 F.3d at 641 n.7; *In re Millennium Global*, 471 B.R. at 346 (additionally finding that discovery into potential causes of action related to the foreign debtor's "affairs"). Allowing foreign representatives to investigate causes of action assists them in discharging their duties to investigate the company's affairs. *In re Comair Ltd.*, 2021 WL 5312988, at *10 (granting motion for discovery into potential causes of action); *see also In re Petroforte*, 542 B.R. at 902 (permitting discovery "for the purposes of investigating 'suspected misappropriated assets of [the debtor]'"). Other courts to consider the issue have held that information sought "for the purpose of investigating and assessing whether the estate or the Liquidator might have causes of action that would benefit the estate" undoubtedly related to the debtor's assets, affairs, or rights under section 1521(a)(4). *In re Historic & Trophy Buildings Fund FCP-SIF*, 2023 WL 5525044, at *3 (Bankr. S.D.N.Y. Aug. 25, 2023). The Foreign Representatives are bound to investigate the Company's affairs, report to its creditors, and seek to recover and monetize its assets on their behalf. To do so, they are duty-bound to discover and pursue any valuable causes of action held by the Company.

55. But even beyond assessing causes of action, discovery under both section 1521(a)(4) and Rule 2004 is needed for the JOLs to conduct their investigation, required by Cayman law, into the "promotion, business dealings and affairs" of the Company, as well as the causes of the Company's failure, its financial condition leading up to the Coupang Sale, and the

20

details of that transaction. *See* Goodman Decl. ¶ 16 (citing Companies Act § 102 ("[T]he liquidator shall be empowered to investigate . . . if the company has failed, the causes of the failure; and . . . generally, the promotion, business dealings and affairs of the company."). As noted above, the JOLs lack access to nearly all the Company's books and records, including basic financial information, which they need to fulfill their duties under Cayman law and to conduct basic financial analyses related to the Company's failure. Kennedy Decl. ¶¶ 7-8, 24. And other documents in Surpique's control, including Farfetch's historic communications and Surpique's own communications, are necessary for the JOLs to fully evaluate the Coupang Sale. For example, the JOLs want to uncover what occurred in the negotiations leading up to the final and rushed agreement. The JOLs also seek Surpique's own internal analyses of the worth of the assets it purchased. Only then can the fairness to the Company of the Coupang Sale be assessed.

    2.   *Cayman law does not limit the scope of discovery available to the Foreign Representatives, but Surpique is in flagrant violation of Cayman law, regardless.*

56.    Courts have consistently rejected efforts to block Rule 2004 discovery on the basis that the home country of a liquidator seeking Rule 2004 relief under chapter 15 permits narrower discovery than in U.S. Bankruptcy Court.

57.    For example, in *Platinum Partners*, the discovery target, the debtor's former auditor, argued that, under Cayman law, the foreign representatives could only seek information that had been the debtor's property. 583 B.R. at 812-14. While doubting that Cayman law was so restrictive, the Court held that even if that discovery were "clearly prohibited" under Cayman law, "the scope of discovery available in the foreign jurisdiction is not a valid basis upon which" to limit discovery under section 1521(a)(4) and Rule 2004. *Id.* at 815. The court explained that the law is different in different jurisdictions; unless the law of one jurisdiction is "repugnant" to the other, foreign nations grant each other's decisions comity. *Id.* Here, "far from being hostile to

Cayman litigants seeking evidence under U.S. law, Cayman courts are in fact receptive to evidence obtained through U.S. discovery procedures, even if such evidence may not be discoverable under Cayman law." *Id.* at 816. The *Platinum Partners* decision goes on to cite Cayman cases that "dismissed the notion" that Cayman law should limit discovery available under 28 U.S.C. § 1782. *Id.* (quoting *Lyxor Asset Mgmt. S.A. v. Phoenix Meridian Equity Ltd.*, 2009 CILR 553 ¶¶ 57-58). Thus, the *Platinum Partners* court declined to limit discovery under Chapter 15 based on Cayman law. *Id.*

58.     This is the only sensible result. Otherwise, U.S. courts would have to perform "full-blown analysis of foreign law each and every time a foreign representative seeks additional relief in the United States, which may result in differing interpretations of U.S. law depending on where the foreign main proceeding was pending." *Id.* at 817. Thus, this Court should reject any request by Surpique that it engage in such analysis, which would in any case show Cayman Island law provides for broad discovery. Goodman Decl. ¶¶ 17-28 (discussing Companies Act §§ 102 & 138 and other relevant law).[4]

59.     Surpique also cannot dictate to the Foreign Representatives what is "necessary" for them to do to fulfill their obligations in the Cayman Proceeding, as Surpique attempts to do. The JOLs have the right and obligation to manage the affairs of the Company as they see fit, and to

---

[4] Surpique claims that there is some undefined, "discrete list" of documents related exclusively to the Company and no other member of the FF Group to which the JOLs are entitled, and that's it. Not so. Under section 138 of the Companies Act and the Companies Winding Up Rules (2023 Revision) (the "**CWR**"), the JOLs are required to "get in" all of the Company's books and records. Goodman Decl. ¶¶ 17-21. And under section 102 of the Company's Act, the JOLs must undertake a full investigation into the Company's affairs and the causes of its failure. *Id.* at ¶¶ 25-28. Under all of these provisions of law, the JOLs *must* take possession of any document that could aid in their investigation. *Id.* at ¶¶ 22-28. Importantly, that includes all documents related to the affairs of the former FF Group subsidiaries. As noted above, the affairs of holding companies like the Company *are* their subsidiaries' affairs, as Cayman courts recognize. *Id.* at ¶¶ 22-24 (quoting *In the Matter of Fortuna Development Corp.*, [2004–05 CILR 197], 25 Oct. 2004 ¶¶ 17-18, 21, 23). Thus, the scope of discovery in Cayman would entitle the JOLs to everything they seek. Regardless, a debate over the scope of Cayman discovery is academic, given that the full scope of U.S. discovery is available to the JOLs in this Chapter 15 case.

22

decide what discovery is needed. Goodman Decl. ¶¶ 12-15. In *In re Comair Ltd.*, the court refused to limit discovery relating to Boeing's wrongdoing on the grounds that the foreign reorganization of the debtor was close to finalized. 2021 WL 5312988, at *11. The Court found the foreign representative was entitled to pursue claims against Boeing "in furtherance of his efforts" to reorganize the debtor under South African law. *Id.* at *12. The same is true here. The Foreign Representatives, not Surpique, must decide what is necessary for their investigation.

> **B.    The Foreign Representatives Are Additionally Entitled to Turnover of the Company's Property and Recorded Information that Relates to It.**

60.    The relief requested by the Foreign Representatives is also supported by the Recognition Order's grant of relief under section 1521(a)(5), requiring "any third-party holding assets of the Company, including books and records . . . to turn them over to Petitioners pursuant to Bankruptcy Code section 542." Recognition Order ¶ 9. The JOLs may use Section 542 of the Bankruptcy Code to obtain Company books and records and to seek any other "recorded information . . . relating to" the Company's assets under section 542(e). *See In re Platinum Partners*, 583 B.R. at 810 (noting that section 542(e) is "either directly applicable in chapter 15 cases or, in the alternative, delineate relief which can be granted by the court"); *see also In re Cryptopia Ltd.*, No.19-11688 (DSJ), Dkt. 37 (Bankr. S.D.N.Y. Nov. 10, 2021) (granting foreign representative relief under sections 542(e) and 1521(a)(4)).

61.    Section 542(e) provides that the Court may order any "person" that "holds recorded information, including *books*, documents, *records*, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee." 11 U.S.C. § 542(e) (emphasis added). The Court may order the disclosure of documents concerning a debtor's property or financial affairs, whether or not the documents themselves are property of the estate. *See In re Am. Metrocomm Corp.*, 274 B.R. 641, 652 (Bankr. D. Del. 2002); *In re McKenzie*,

716 F.3d 404, 419 (6th Cir. 2013). To be clear, although Section 542(e) mentions "attorneys" and "accountants" specifically, it applies to any "person," regardless of whether that "person" was a professional of the debtor. Thus, Section 542(e) applies equally to Surpique. 11 U.S.C. § 542(e); *In re Irish Bank Resolution Corp. Ltd. (in Special Liquidation)*, 559 B.R. 627, 646–47 (Bankr. D. Del. 2016); *see also In re The Terraces Subdivision, L.L.C.*, 2007 WL 4287742, at *1–2 (Bankr. D. Alaska Dec. 5, 2007) (electronic files held by surveying firm related to debtor's property and financial affairs subject to turnover under section 542(e)). Thus, Surpique must turn over documents responsive to the requests attached to the Proposed Order under section 542(e).

62.     This information is, as noted in greater detail above, essential for the Foreign Representatives to fulfill their duties, as established by the Cayman Court, and to serve the interests of the Company's creditors. *See, e.g.,* Goodman Decl. ¶¶ 12, 16. The information sought relates to the Company's property or financial affairs, both of which would cover not just the Company's affairs, but those of the former FF Group subsidiaries, as well. The Foreign Representatives must be permitted to continue to investigate the Company's assets, affairs, rights, obligations, and liabilities and any causes of action that may be available to the Company in the United States.

### CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 2004-1

63.     In accordance with Local Rule 2004-1, before filing this Motion, counsel to the Foreign Representatives conferred with counsel to Surpique to arrange cooperative productions under Rule 2004, including telephonic meet and confers held on October 23, 2024 and November 8, 2024, and many email exchanges before and after those telephonic meet and confers. Although Surpique agreed to produce a narrow, undefined set of Farfetch "books and records," it (i) placed untenable limitations on the scope of documents it would produce voluntarily, and (ii) refused to agree to produce (a) Farfetch's historic email communications with third-parties; (b) Farfetch's historic internal email communications; (c) Surpique's own communications in the lead-up to the

24

transaction; and (d) anything that Surpique unilaterally determines is not a "book and record" of Farfetch.

## RESERVATION OF RIGHTS

64.     The Foreign Representatives reserve all rights to request, under Rule 2004, sections 542(e), 1507(a), 1521(a)(4), (a)(5), and (b) of the Bankruptcy Code, or otherwise, additional documents or examination of any party.

## NO PRIOR REQUEST

65.     No previous motion or application for the relief sought herein has been made to this or any other court.

## NOTICE

66.     Notice of this Motion will be provided to the following parties, through their counsel, if represented: (a) counsel to Surpique; (b) the Office of the United States Trustee for the District of Delaware; and (c) all parties requesting notice under Rule 2002 of which the Foreign Representatives are aware. In light of the relief requested, the Foreign Representatives submit that no further notice is necessary.

## CONCLUSION

For the reasons stated above, the Foreign Representatives request that the Court grant this Motion in its entirety and grant such other and further relief as is just and proper.

Dated: December 3, 2024
Wilmington, Delaware

REID COLLINS & TSAI LLP

*/s/ Jessica Zeldin*
Jonathan M. Kass (Del. Bar No. 6003)
Jessica Zeldin (Del. Bar. No. 3558)
300 Delaware Avenue, Suite 770
Wilmington, Delaware 19801
Tel.: (302) 467-1766
Email: jkass@reidcollins.com
        jzeldin@reidcollins.com

William T. Reid, IV (*Pro hac vice*)
Angela J. Somers (*Pro hac vice*)
420 Lexington Avenue, Suite 2731
New York, New York 10170
Tel.: (212) 344-5200
Email:  wreid@reidcollins.com
        asomers@reidcollins.com

Craig A. Boneau (*Pro hac vice*)
Ryan M. Goldstein (*Pro hac vice*)
Robert J. LaCroix (*Pro hac vice* forthcoming)
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, Texas 78746
Tel: (512) 647-6100
Email: cboneau@reidcollins.com
        rgoldstein@reidcollins.com
        rlacroix@reidcollins.com

*Counsel to the Foreign Representatives*

26

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| Farfetch Limited (in Official Liquidation), | Case No. 24-11519-CTG |
| Debtor in a Foreign Proceeding. | **Objection Deadline: December 10, 2024** |
| | **Hearing Date: December 17, 2024** |

**NOTICE OF MOTION OF THE FOREIGN REPRESENTATIVES FOR ENTRY OF AN ORDER TO CONDUCT DISCOVERY FROM SURPIQUE L.P. PURSUANT TO 11 U.S.C. 542(E), 1507(A), 1521(A)(4), 1521(A)(5), FED. R. BANKR. P. 2004, AND LOCAL RULE 2004-1**

**PLEASE TAKE NOTICE** that on December 3, 2024, Alexander Lawson and Christopher Kennedy of Alvarez & Marsal Cayman Islands Limited (the "**Foreign Representatives**" or "**JOLs**") in their capacities as Joint Official Liquidators of Farfetch Limited (in Official Liquidation) (the "**Company**") and as foreign representatives in a Cayman Islands foreign proceeding (the "**Cayman Proceeding**"), pending before the Grand Court of the Cayman Islands (the "**Cayman Court**"), filed the *Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery from Surpique L.P. Pursuant to 11 U.S.C. 542(e), 1507(a), 1521(a)(4), 1521(a)(5), Fed. R. Bankr. P. 2004, and Local Rule 2004-1* (the "**Motion**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

**PLEASE TAKE FURTHER NOTICE** that a hearing with respect to the relief requested in the Motion will be held on **December 17, 2024 at 11:30 a.m. (ET)** (the "**Hearing**") before the Honorable Craig T. Goldblatt, United States Bankruptcy Judge, at the Bankruptcy Court, via Zoom.

**PLEASE TAKE FURTHER NOTICE** that any objections or responses to the Motion must be (i) made in writing, (ii) filed with the Clerk of the Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801, and served so as to be **received** **on or before 4:00 p.m. (ET) on December 10, 2024**; and (iii) served upon the undersigned counsel.

**PLEASE TAKE FURTHER NOTICE** that if you timely file and serve an objection or response, you or your attorney must attend the Hearing.

**PLEASE TAKE FURTHER NOTICE** THAT IF NO RESPONSES OR OBJECTIONS ARE RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED BY THE FOREIGN REPRESENTATIVES WITHOUT FURTHER NOTICE OR HEARING.

Dated: December 3, 2024
Wilmington, Delaware

REID COLLINS & TSAI LLP

*/s/ Jessica Zeldin*
Jonathan M. Kass (Del. Bar No. 6003)
Jessica Zeldin (Del. Bar. No. 3558)
300 Delaware Avenue, Suite 770
Wilmington, Delaware 19801
Tel.: (302) 467-1766
Email: jkass@reidcollins.com
       jzeldin@reidcollins.com

William T. Reid, IV (*Pro hac vice*)
Angela J. Somers (*Pro hac vice*)
420 Lexington Avenue, Suite 2731
New York, New York 10170
Tel.: (212) 344-5200
Email:  wreid@reidcollins.com
        asomers@reidcollins.com

Craig A. Boneau (*Pro hac vice*)
Ryan M. Goldstein (*Pro hac vice*)
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, Texas 78746
Tel: (512) 647-6100
Email: cboneau@reidcollins.com
       rgoldstein@reidcollins.com

*Counsel to the Foreign Representatives*

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| Farfetch Limited (in Official Liquidation), | Case No. 24-11519-CTG |
| Debtor in a Foreign Proceeding. | Re: D.I. 66 |

**[PROPOSED] ORDER GRANTING FOREIGN REPRESENTATIVES' MOTION FOR
ENTRY OF AN ORDER TO CONDUCT DISCOVERY FROM SURPIQUE L.P.
PURSUANT TO 11 U.S.C. 542(E), 1507(A), 1521(A)(4), 1521(A)(5), FED. R. BANKR. P.
2004, AND LOCAL RULE 2004-1**

Upon consideration of the *Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery from Surpique L.P. Pursuant to 11 U.S.C. 542(e), 1507(a), 1521(a)(4), 1521(a)(5), Fed. R. Bankr. P. 2004, and Local Rule 2004-1* (the **Motion**)[1] and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012; and upon consideration of the Motion; and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant to 28 U.S.C. § 1410; and finding adequate notice of the Motion having been given; and that no other or further notice need be given; and upon the record of any hearing held to consider the relief requested in the Motion; and this Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and any objections to the requested relief having been withdrawn, resolved or overruled on the merits; and after due deliberation and sufficient cause appearing therefore:

---

[1] Capitalized terms not defined here in shall have the meanings ascribed in the Motion.

1

**IT IS HEREBY ORDERED THAT**

1.      The Motion is GRANTED.

2.      The Foreign Representatives and their agents are authorized to serve subpoenas, attaching discovery requests in the form attached hereto as **<u>Exhibit 1</u>**, for the production of documents upon Surpique L.P. ("**Surpique**").

3.      The service of the subpoena pursuant to this Order shall be without prejudice to Surpique's right to object in accordance with applicable law and procedural rules. Notwithstanding the foregoing, Surpique (a) shall not object or withhold production of documents on the basis that the discovery requests call for documents to which the Foreign Representatives are not entitled under Cayman law; (b) shall collect and produce documents stored on the Farfetch server it acquired through the Coupang Sale, including internal Farfetch communications and Farfetch communications with third parties; and (c) shall collect and produce Surpique's own pre-transaction documents and communications.

4.      Unless otherwise agreed among the parties in writing, Surpique shall comply with the subpoena and shall produce all documents and information responsive to the document requests contained in the subpoena not later than 30 days after the service of the subpoena and a copy of this Order.

5.      Any disputes concerning the subpoenas that are not resolved by agreement of the parties may be raised only by letter brief to the Court not exceeding five (5) pages, single-spaced. Parties in interest may file a responsive brief within three (3) business days, which shall not exceed five (5) pages, single-spaced. Copies of such letter briefs shall also be emailed to the Court's chambers.

6. Nothing in this Order shall be deemed to limit or restrict the Foreign Representatives' right to seek further discovery, including, but not limited to, in other or additional examinations under the Recognition Order, section 1521 of the Bankruptcy Code, and Rule 2004.

7. Notwithstanding any provision of the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon entry; (b) the Foreign Representatives are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Foreign Representatives and their agents are authorized and empowered and may, in their discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

8. This Court shall retain jurisdiction over: (a) any and all matters arising from the interpretation, implementation, amendment, modification, or enforcement of this Order; (b) any requests for additional relief or any adversary proceeding brought in or through this Chapter 15 case; and (c) any request by Surpique for relief from the provisions of this Order, for cause shown, as to any of the foregoing, and provided the same is properly commenced and within the jurisdiction of this Court.

Dated: Wilmington, Delaware
      December \_\_\_, 2024

_____
Craig T. Goldblatt
United States Bankruptcy Judge

# EXHIBIT 1

B2540 (Form 2540 – Subpoena for Rule 2004 Examination) (12/15)

# UNITED STATES BANKRUPTCY COURT

For the District of Delaware

In re:

Farfetch Limited (in Official Liquidation),

     Debtor in a Foreign Proceeding.

Case No. 24-11519-CTG

Chapter 15

## SUBPOENA FOR RULE 2004 EXAMINATION

To:        Surpique L.P. c/o
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022

☐ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at an examination under Rule 2004, Federal Rules of Bankruptcy Procedure. A copy of the court order authorizing the examination is attached.

| PLACE | DATE AND TIME |
|---|---|
| | |

The examination will be recorded by this method: _____

**X**    *Production:* You, or your representatives, must also bring with you to the examination the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: SEE ATTACHED EXHIBIT 1 HERETO

REID COLLINS & TSAI LLP
420 Lexington Avenue Suite 2731
New York, New York 10170
Main 212.344.5200

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

        CLERK OF COURT

                              OR

_____    */s/ DRAFT* _____
*Signature of Clerk or Deputy Clerk*        *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *Alexander Lawson and Christopher Kennedy of Alvarez & Marsal Cayman Islands Limited (the "Foreign Representatives")*, who issues or requests this subpoena, are: Reid Collins & Tsai, LLP, 300 Delaware Avenue, Suite 770, Wilmington, DE 19803; jzeldin@reidcollins.com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

B2540 (Form 2540 – Subpoena for Rule 2004 Examination) (Page 2)

## PROOF OF SERVICE
**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*: _____
on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
      (i) is a party or a party's officer; or
      (ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
   (A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   (B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
   (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
   (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      (i) fails to allow a reasonable time to comply;
      (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
      (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      (iv) subjects a person to undue burden.
   (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      (i) disclosing a trade secret or other confidential research, development, or commercial information; or

      (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
   (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      (i) expressly make the claim; and
      (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…
**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

**EXHIBIT 1 – DOCUMENTS TO BE PRODUCED**

**<u>DEFINITIONS</u>**

For purposes of the below document requests (the "**Requests**"), the following terms apply:

1.  "**AlixPartners**" means AlixPartners UK LLP or any affiliate or subsidiary or any affiliate or subsidiary.

2.  "**Athena Topco**" means Athena Topco LP, a Delaware limited partnership or any affiliate or subsidiary or any affiliate or subsidiary.

3.  **"Audit"** means a financial audit providing an opinion by the auditor on whether the financial statements are prepared in accordance with the applicable financial reporting framework) (e.g., Generally Accepted Accounting Principles (GAAP) and International Financial Reporting Standards (IFRS)) and whether they present a true and fair view of the company's financial position, performance and cashflows.

4.  "**Audit Committee**" means the audit committee of Farfetch's board of directors.

5.  **"Board"** means Farfetch's board of directors.

6.  "**Bridge Loan**" means the committed first lien delayed draw term loan facility in an aggregate principal amount of $500 million entered into between FF PLC and/or certain direct and/or indirect subsidiaries of FF PLC, as borrowers and/or guarantors, and Athena Topco, as lender.

7.  "**CEO**" means a Chief Executive Officer of any entity.

8.  "**CFO**" means Chief Financial Officer of any entity.

9.  "**Communication**" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

10. "**Concerning**" (whether or not capitalized) means relating to, referring to, describing, evidencing, or constituting.

11. "**Coupang**" means Coupang, Inc. or any affiliate or subsidiary

12. "**Coupang Sale**" means the process leading up to and the execution and closing of the sale of businesses and assets of FF PLC and/or any of its affiliates or subsidiaries, involving FF PLC and Athena Topco, Coupang and/or Greenoaks Capital Partners in the period of November 1, 2023 through April 30, 2024.

13. "**Director or Officer**" means any member of the Board of Directors of Farfetch, including any advisory or ex officio members or any member of Management.

14. "**Document**" means the full and broadest scope of documents and things discoverable under the Federal Rules of Bankruptcy Procedure and includes, without limitation, (a) written material of whatever kind or nature, whether typed, printed, handwritten, or otherwise produced, including, without limitation, correspondence letters, text messages, memoranda, notes, contracts, bills, invoices, calendars, photostats, or photocopies; (b) electronic data compilations, including, without limitation, computerized files, computer discs, hard drives, servers, or database records; (c) voicemail recordings; (d) electronic mail messages; or (e) other electronic messages, however stored, as well as all drafts and non-identical copies of each of the foregoing categories of documents and things.

15. "**EBITDA**" means earnings before interest, taxes, depreciation, and amortization.

16. "**Evercore**" means Evercore Group LLC.

17. "**Farfetch**" means Farfetch Limited.

18.     **"Farfetch Group"** means Farfetch, FF PLC, and all direct and indirect subsidiary companies owned by FF PLC or affiliates collectively.

19.     **"FF PLC"** means Farfetch Holdings PLC, a public limited company organized under the laws of England and Wales and a wholly owned direct subsidiary of Farfetch Limited.

20.     **"Greenoaks"** means funds managed or advised by Greenoaks Capital Partners LLC, Greenoaks Capital Partners LLC or any of its affiliates or subsidiaries.

21.     **"Including"** (whether or not capitalized) means including, but not limited to.

22.     **"Intercompany Claims"** means amounts owed to Farfetch concerning money loaned or advanced, credit extended, or goods or services provided from Farfetch to any entity in the Farfetch Group.

23.     **"Intercompany Subordination Agreement"** means the any subordination agreement between or among any of the lenders to any company in the Farfetch Group and/or any company in the Farfetch Group.

24.     **"JP Morgan"** means J.P. Morgan Securities LLC, or any of its affiliates or subsidiaries.

25.     **"Latham"** means Latham & Watkins LLP and all affiliated partnerships, limited liability companies, and Foreign Legal Consultant Offices, including but not limited to Latham & Watkins (London) LLP.

26.     **"Management"** means any executive in charge of the operations of Farfetch, including the CEO, CFO, Chief Operations Officer, Chief Strategy Officer, Chief Legal Officer, Chief Customer Officer, Chief Marketplace Officer, Chief Marketing Officer, and Chief Product Officer.

3

27. "**Person**" means any natural person or any legal entity, including, without limitation, any trust, estate, or governmental or business unit or association.

28. "**Project Athena**" means the marketing process undertaken by JP Morgan, AlixPartners, Evercore and any other advisors to Farfetch or its subsidiaries on behalf of FF PLC to sell the assets of FF PLC in or around December 2023.

29. "**PwC**" means PricewaterhouseCoopers.

30. "**SEC**" means the Securities and Exchange Commission.

31. "**Special Committee**" means a special committee of the Board, including a committee comprised of Victor Luís, Dana Evan, David Rosenblatt, and Diane Irvine.

32. "**Surpique**" means Surpique LP, formerly known as Athena Topco LP.

33. "**Term Lenders**" means the lenders under the Term Loan.

34. "**Term Loans**" means the loans and advances extended by the Term Lenders to any company in the Farfetch Group through February 9, 2024, including loans and advances under the Credit Agreement dated October 20, 2022, between and among FF PLC, Farfetch U.S. Holdings, Inc. and/or certain of its direct and/or indirect subsidiaries, as amended, and loan referred to as the Term Loan B.

35. "**Treasury Committee**" means the treasury committee of Farfetch's board of directors.

36. "**TSA**" means the Transaction Support Agreement entered into by FF PLC, Farfetch Limited, Athena Topco, and an ad hoc group of lenders, among others, dated December 18, 2023, and all Transaction Documents or supplemental documents concerning the TSA or the Coupang Sale.

37.     "**You**" or "**Your**" means both Surpique LP and Athena Topco LP.

38.     "**YNAP Acquisition**" means the proposed acquisition by FF PLC of 47.5% of Yoox-Net-A-Porter (YNAP) that was terminated effective December 18, 2023.

[*This space intentionally left blank.*]

## **INSTRUCTIONS**

The preceding Definitions apply to each of these Instructions, and for purposes of the Requests, the following Instructions shall be followed:

1.　　Words and phrases not defined shall have their ordinary and plain meaning within the context of the Federal Rules of Civil Procedure and in accordance with the generally accepted meaning accorded such words and phrases in everyday use in the English language.

2.　　The plural includes the singular, and the singular includes the plural.

3.　　The use of the present tense includes the past tense, the use of the past tense shall include the present tense, and the use of any verb in any tense shall be construed as including the use of that verb in all other tenses.

4.　　All responses shall comply with the requirements of the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, and the Local Rules for the United States Bankruptcy Court for the District of Delaware.

5.　　<u>Time Period</u>. Unless otherwise specified, each Request herein seeks all documents generated, maintained, or received by You during the period January 1, 2019 through the present.

6.　　The following Requests shall be deemed continuing in nature. In the event You become aware of or acquire additional information concerning any of the following Requests, such additional information is to be promptly produced.

7.　　You are to produce all responsive Documents in Your possession, custody or control, wherever located, including, without limitation, those in the custody of Your representatives and affiliates. A Document is deemed to be in Your possession, custody, or control if it is in Your physical custody, or if it is in the physical custody of any other person or entity and You: (i) own such Document in whole or in part; (ii) have a right, by contract, statute, or otherwise, to use, inspect, examine, or copy such Document on any terms; (iii) have an understanding, express or implied, that You may use, inspect, examine, or copy such Document on any terms; or (iv) as a practical matter, You have been able to use, inspect, examine, or copy such Document when You sought to do so.

8.　　If any Document requested herein was formerly in Your possession, custody or control and has been lost or destroyed or otherwise disposed of, You are requested to submit in lieu of any such Document a written statement (a) describing in detail the nature of the Document and its contents, (b) identifying the person(s) who prepared or authored the Document and, if applicable, the person(s) to whom the Document was sent, (c) specifying the date on which the Document was prepared or transmitted, and (d) specifying the date on which the Document was lost or destroyed and, if destroyed, the conditions of and reasons for such destruction and the person(s) requesting and performing the destruction.

9.      If any part of the following Requests cannot be responded to in full, please respond to the extent possible, specifying the reason(s) for Your inability to respond to the remainder and stating whatever information or knowledge You have concerning the portion to which You do not respond.

10.     If You object to any of these Requests, state in writing with specificity the grounds of Your objections. Any ground not stated shall be waived. If You object to a particular portion of any Request, You shall respond to any other portions of such Request as to which there is no objection and state with specificity the grounds of the objection.

11.     Where any copy of any Document whose production is sought herein, whether a draft or final version, is not identical to any copy thereof, by reason of alterations, notes, comments, initials, underscoring, indication of routing, or other material contained thereon or attached thereto, all such non-identical copies are to be produced separately.

12.     The words "and" and "or" are to be construed both conjunctively and disjunctively. The singular form of a noun or pronoun includes the plural form and vice versa. The word "all" shall also include "each of," and vice versa. The word "any" shall be construed to mean "any and all" where the effect of such construction is to broaden the scope of the Request.

13.     The Documents must be produced in accordance with the specifications in Appendix A attached hereto.

14.     Electronic records and computerized information should be produced in an intelligible format or together with a sufficient description of the system or program from which each was derived to permit rendering the material legible.

15.     Documents attached to each other should not be separated.

16.     Documents not otherwise responsive to a Request shall be produced if such documents mention, discuss, refer to, or explain a document that is called for by this discovery request.

17.     If the identity of Documents responding to a Request is not known, then that lack of knowledge must be specifically indicated in the response. If any information requested is not in Your possession but is known or believed to be in the possession of another person or entity, then identify that person or entity and state the basis of Your belief or knowledge that the requested information is in such person's or entity's possession.

18.     To the extent you refuse to respond to any Request, in whole or in part, on grounds of privilege, identify the withheld Document or Communication on a privilege log stating: (i) the identity of the person(s) who prepared or authored the Document or took part in the Communication; (ii) the person(s) to whom the Document was shown or otherwise disclosed; (iii) the date(s) on which the Document was prepared and disseminated, or on which the Communication transpired or was disclosed; (iv) the general subject matter of the Document or Communication; (v) the nature of the Document or Communication (e.g., telephone conference,

7

office conference); and (v) the basis for the claim of privilege or withholding. Any redactions to Documents shall be prominently identified with a mark indicating the location and size of the redacted area.

*[This space intentionally left blank.]*

# DOCUMENT REQUESTS

**REQUEST NO. 1:**

A copy of the complete server on which all Documents and Communications constituting Farfetch's books and records were maintained, which was turned over to Surpique as part of the closing of the Coupang Sale.

**REQUEST NO. 2:**

Documents and Communications concerning or utilized by Farfetch in connection with its public filings with the SEC for the years 2019 through 2023.

**REQUEST NO. 3:**

Documents and Communications concerning or utilized by Farfetch in connection with the creation and issuance of its consolidated financial statements or any financial projections from January 1, 2019 through February 9, 2024.

**REQUEST NO. 4:**

Documents and Communications concerning all contents in the virtual data room established by Farfetch in connection with the sale of substantially all the assets of Farfetch and the Coupang Sale.

**REQUEST NO. 5:**

Documents and Communications concerning the answers and responses to all inquiries made by You in connection with Project Athena and the Coupang Sale.

**REQUEST NO. 6:**

Documents and Communications concerning all financial information and results of the financial reporting of Farfetch and the Farfetch Group for the third and fourth quarters of 2023.

**REQUEST NO. 7:**

Documents and Communications concerning the Board or any activity or decision of the Board, or any special committee or subcommittee of the Board, including minutes of meetings, notes, internal memoranda, presentations, financial analyses, briefing materials and resolutions from January 1, 2019 to February 9, 2024.

**REQUEST NO. 8:**

Documents and Communications concerning the Audit Committee from January 1, 2019 to February 9, 2024, including private sessions held between the Audit Committee, and (i) Farfetch's Officers, (ii) PwC, (iii) the internal audit department of any company in the Farfetch Group, and/or (iv) any other Director, including any minutes or resolutions, schedules, annexures, appendices, briefing materials, presentations, or any other documents relating to those minutes or resolutions.

9

**REQUEST NO. 9:**

Documents and Communications concerning any analysis done by any Deloitte entity for the Board, any subcommittee of the Board of for Farfetch concerning Intercompany Claims.

**REQUEST NO. 10:**

Documents and Communications concerning the Treasury Committee from January 1, 2019 through February 9, 2024, including any minutes or resolutions schedules, annexures, appendices, briefing materials, presentations, or any other Documents relating to those minutes or resolutions.

**REQUEST NO. 11:**

Documents and Communications from Farfetch's CEO, Farfetch's CFO, or a representative of the finance department of any company in the Farfetch Group to the Board or Management from January 1, 2019 through February 9, 2024.

**REQUEST NO. 12:**

Documents and Communications concerning Farfetch's cashflow, cash position and liquidity of Farfetch, including Documents that detail cash expenditures from January 1, 2019 through February 9, 2024.

**REQUEST NO. 13:**

Documents and Communications concerning and Farfetch's and the Farfetch Group's use of EBITDA or a similar financial metric to determine discretionary cash available or as a substitute for other IFRS measures of financial performance from January 1, 2019 through February 9, 2024.

**REQUEST NO. 14:**

Documents and Communications concerning Farfetch's and the Farfetch Group's revenues, gross profits, operating losses and any impairment to intangibles from January 1, 2019 through February 9, 2024.

10

**REQUEST NO. 15:**

Documents and Communications regarding all of Farfetch's and the Farfetch Group's operating costs and expenses, including fixed costs (including rent or lease payments, salaries insurance, depreciation, amortization), variable or semi-variable costs (including labor, utilities, shipping and freight, commissions), operating expenses (including marketing and advertising, administrative costs software licenses, equipment real estate), all direct, indirect and sunk or other costs from January 1, 2019 through February 9, 2024.

**REQUEST NO. 16:**

Documents and Communications concerning the Farfetch CFO's May 18, 2023 announcement in its Form 6-K that it had "successfully navigated through unprecedented macrochallenges, and through continued focused execution [to] remain on track to deliver a year of luxury market-beating growth, a return to profitability and positive free cash flow."

**REQUEST NO. 17:**

Documents and Communications that are the basis for the statement made by Farfetch in the draft results for the third quarter of 2023: "As a result of the Company's history of losses and anticipated operating cash needs, combined with current liquidity levels, the Company's management has concluded that a material uncertainty exists that may cast significant doubt on the Company's ability to continue as a going concern, such that it may be unable to realize its assets and discharge its liabilities in the normal course of business" and that "all previously provided guidance for all future periods is withdrawn."

**REQUEST NO. 18:**

Documents and Communications concerning funds raised and liquidity made available to Farfetch from any source, including secured or unsecured financing, the issuance of debt or equity, trade credit, contractual arrangements, strategic partnerships, and/or royalties; and all non-operating interest and other costs associated with any source of funding for the years 2019 through 2023.

**REQUEST NO. 19:**

Documents and Communications from PwC concerning any Audit of Farfetch from January 1, 2019 through February 9, 2024, including (a) Farfetch's 2022 Audit and Farfetch's 2023 interim reporting; and (b) Communications between PwC and the Audit Committee, Farfetch's CEO or Farfetch's CFO concerning (a).

**REQUEST NO. 20:**

Documents and Communications from January 1, 2019 through February 9, 2024, concerning PwC's involvement in the quarterly reporting of the Farfetch Group, safeguards performed by PwC concerning the independence of information provided for Audits, material weaknesses of the Farfetch Group that were identified and the impact the refusal to sign off on Farfetch Italia S.r.l companies' financial information would have on the 2022 Audit.

11

**REQUEST NO. 21:**

Documents and Communications concerning Farfetch's assessment of its ability to continue as a going concern from January 1, 2019 through February 9, 2024, and any Documents or Communications relied upon in forming any opinion or analysis relating to the assessment.

**REQUEST NO. 22:**

Documents and Communications concerning PwC's assessment of Farfetch's ability to continue as a going concern at any time from January 1, 2019 through February 9, 2024, including any other Documents relied upon in forming any opinion, analysis, or assessment, regardless of time frame, of Farfetch's ability to continue as a going concern.

**REQUEST NO. 23:**

Documents and Communications concerning Farfetch's and the Farfetch Group's need for liquidity and the amount needed in November of 2023 through March 31, 2024.

**REQUEST NO. 24:**

Documents and Communications concerning the negative financial repercussions of the November 2023 announcement that the Farfetch Group would not disclose its results for the third quarter of 2023, including increased credit and payments terms, processing of orders, and costs.

**REQUEST NO. 25:**

Documents and Communications concerning all of Farfetch's and the Farfetch Group's internal and management accounts from January 1, 2019 through February 9, 2024 and financial performance and metrics for each business unit.

**REQUEST NO. 26:**

Documents and Communications concerning financial projections and cashflow forecasts of Farfetch that the Farfetch Group prepared from January 1, 2019 through February 9, 2024, including correspondence relating to the review and approval of these projections and forecasts and the review and approval of the headroom model.

**REQUEST NO. 27:**

Documents and Communications concerning the review by the Board and Management of Farfetch's quarterly earnings reports, including any statements within those earnings reports made by Farfetch's CEO or Farfetch's CFO.

**REQUEST NO. 28:**

Documents and Communications concerning the Board's decision to create a Special Committee.

**REQUEST NO. 29:**

Documents concerning Project Athena presented to the Special Committee and Communications with the Special Committee concerning Project Athena.

**REQUEST NO. 30:**

Documents and Communications concerning options considered to address Farfetch's liquidity position, including monetization of non-core assets, secured and unsecured financing, issuance of debt or equity, partnerships or contractual arrangements and any other funding or financing from third parties such as Alibaba and Richemont.

**REQUEST NO. 31:**

Documents and Communications concerning a potential take-private process for Farfetch.

**REQUEST NO. 32:**

Documents and Communications concerning the Term Loans, including Farfetch's decision to enter into (i) any amendment of the "Term Loans" as defined in the Farfetch's Form 6-K for the month of December 2023, (ii) Bridge Loan Facility; and (iii) the Term Loan B extension in August 2023 and the consideration of other available options.

**REQUEST NO. 33:**

Documents and Communications concerning the Intercompany Subordination Agreement.

**REQUEST NO. 34:**

Documents and Communications concerning Farfetch's decision not to announce its third quarter results in 2023.

**REQUEST NO. 35:**

Documents constituting corporate records, meeting minutes, notes, internal memoranda, analyses, factual research, due diligence, and presentations of the Farfetch Group concerning Farfetch.

**REQUEST NO. 36:**

Documents concerning corporate records, meeting minutes, notes, internal memoranda, analyses, factual research, due diligence, and presentations, of Farfetch and the Farfetch Group concerning Project Athena.

**REQUEST NO. 37:**

Documents and Communications concerning subordination agreements and Project Athena and/or the Coupang Sale.

**REQUEST NO. 38:**

Documents and Communications concerning the Intercompany Claims.

**REQUEST NO. 39:**

Documents and Communications concerning the Intercompany Claims owing from Farfetch Japan Co., Ltd to Farfetch.

**REQUEST NO. 40:**

Documents and Communications concerning the Intercompany Claims owing from Farfetch Italia S.r.l. Limited to Farfetch.

**REQUEST NO. 41:**

Documents and Communications concerning the Intercompany Claims owing from New Guards Group Holding S.p.A. to Farfetch.

**REQUEST NO. 42:**

Documents and Communications concerning the Intercompany Claims owing from Farfetch Middle East FZE to Farfetch.

**REQUEST NO. 43:**

Documents and Communications concerning the Intercompany Claims owing from Farfetch China Holdings Ltd to Farfetch.

**REQUEST NO. 44:**

Documents and Communications concerning the Intercompany Claims owing from Farfetch.com US LLC to Farfetch.

**REQUEST NO. 45:**

Documents and Communications concerning the Intercompany Claims owing from Farfetch UK Limited to Farfetch.

**REQUEST NO. 46:**

Documents and Communications concerning the Intercompany Claims owing from Farfetch Holdings plc to Farfetch.

**REQUEST NO. 47:**

Documents and Communications concerning any assets, interest or rights jointly owned or shared with Farfetch and any company in the Farfetch Group

**REQUEST NO. 48:**

Documents and Communications concerning the decision to enter into transactions regarding Violet Grey and Reebok and to terminate the YNAP Acquisition.

**REQUEST NO. 49:**

All Documents and Communications concerning Farfetch's Value-Added Tax, or the recovery or factoring in of such Value-Added Tax receivables from January 1, 2019 through February 9, 2024.

**REQUEST NO. 50:**

Documents and Communications concerning material weaknesses and lack of internal and operational controls for Farfetch or any company in the Farfetch Group from January 1, 2019 through February 9, 2024.

**REQUEST NO. 51:**

Documents and Communications relating to any possible or identified material misstatement of the financial position of Farfetch or any other related negative repercussions based on lack of internal and operational controls from January 1, 2019 through February 9, 2024.

**REQUEST NO. 52:**

Documents and Communication concerning the financial impact on the Farfetch Group, including the steps taken by Management to mitigate the financial impact of (a) the Ukraine war (b) China zero tolerance and other extended COVID lockdown policies and (c) strengthening of the US dollar from January 1, 2020 through February 9, 2024.

**REQUEST NO. 53:**

Documents and Communications concerning all efforts of Farfetch Group's partners to de-risk their relationship with the Farfetch Group, including changes to supplier and service provider terms, partner credit limit terms, or lender financing terms and those raised in the Board presentation of December 7, 2023.

**REQUEST NO. 54:**

Copies of all insurance policies concerning acts of Directors or Management and insuring liability of Directors, Management and/or Farfetch.

**REQUEST NO. 55:**

Copies of all Directors and Management liability insurance policies concerning excess insurance to the insurance provided in policy number FSGDO2201097 for the October 21, 2022 to October 21, 2023 policy period (or for any equivalent policy).

**REQUEST NO. 56:**

Copies of any indemnities relating to acts of Directors or Management.

**REQUEST NO. 57:**

Documents and Communications concerning rights, releases, approvals, or agreements to which Farfetch was required to be a party to close the Coupang Transaction.

**REQUEST NO. 58:**

Documents and Communications concerning the purchase of a tail on any Directors and Officer liability insurance and negotiations with any party to the Coupang Sale concerning the same.

**REQUEST NO. 59:**

Documents and Communications concerning any indemnification for winding up costs of Farfetch as consideration for, or as part of the negotiations of the Coupang Sale.

**REQUEST NO. 60:**

Documents and Communications concerning the resignation of directors of Farfetch from October of 2023 to the present date.

**REQUEST NO. 61:**

Communications concerning the circumstances surrounding the termination, resignation and/or departure of Elliot Jordan as CFO of Farfetch.

**REQUEST NO. 62:**

Communications concerning the selection and hiring of Tim Stone as CFO of Farfetch.

**REQUEST NO. 63:**

Documents and Communications concerning the TSA, including all drafts of the TSA.

**REQUEST NO. 64:**

All requests for information made by You to the Farfetch Group before Surpique's acquisition of substantially all of the assets of FF PLC through the Coupang Sale.

**REQUEST NO. 65:**

Documents and Communications concerning Project Athena, not otherwise incorporated in the requests herein, including Documents and Communications concerning all actions taken by Farfetch to enter into and close the Coupang Sale.

16

**REQUEST NO. 66:**

Documents and Communications concerning the Coupang Sale, not otherwise incorporated in the requests herein, including Documents and Communications concerning all actions taken by Farfetch to enter into and close the Coupang Sale.

**REQUEST NO. 67:**

Communications concerning Project Athena and/or the Coupang Sale between or among You and any legal advisor to Farfetch and/or its Directors or Officers, including Communications with Latham, Mourant Ozannes (Cayman) LLP, and/or Forsters LLP.

**REQUEST NO. 68:**

Documents and Communications concerning any legal advice or analysis provided to Farfetch concerning Project Athena, the Coupang Sale, and/or the Board's fiduciary duties by (i) You; (ii) Latham, (iii) Mourant Ozannes (Cayman) LLP; (iv) Forsters LLP; or (v) any other firm or company.

**REQUEST NO. 69:**

Communications concerning Project Athena and/or the Coupang Sale with any advisor to Farfetch or the Farfetch Group.

**REQUEST NO. 70:**

Communications concerning Project Athena and/or the Coupang Sale and Brunswick Group LLC.

**REQUEST NO. 71:**

Documents and Communications concerning the Board's decision, or the decision of the FF PLC Board, to hire JP Morgan as FF PLC's (or any other company's in the Farfetch Group) financial advisor or investment banker for Project Athena, any retention agreement, JP Morgan's role in Project Athena and its assessment of the Coupang Sale, and issues JP Morgan identified with the Farfetch business or finances.

**REQUEST NO. 72:**

Communications between You and JP Morgan concerning Project Athena and the Coupang Sale.

**REQUEST NO. 73:**

Documents and Communications concerning the Board's decision, or the decision of the FF PLC Board, to hire AlixPartners as FF PLC's (or any other company's in the Farfetch Group) advisor for Project Athena, any retention agreement, AlixPartners' role in Project Athena, its assessment of the Coupang Sale, and issues AlixPartners identified with the Farfetch business or finances, including the experience and skills of the Farfetch finance department, and the oversight of the Farfetch's CEO of the finance department.

17

**REQUEST NO. 74:**

Communications between You and AlixPartners concerning Project Athena and the Coupang Sale.

**REQUEST NO. 75:**

Documents and Communications concerning the Board's decision, or the decision of the FF PLC Board, to hire Evercore as FF PLC's (or any other company's in the Farfetch Group) financial advisor for Project Athena, any retention agreement, Evercore's role in Project Athena, its assessment of the Coupang Sale, and issues Evercore identified with the Farfetch business or finances.

**REQUEST NO. 76:**

Communications between You and Evercore concerning Project Athena and the Coupang Sale.

**REQUEST NO. 77:**

Documents and Communications between You and the Term Lenders.

**REQUEST NO. 78:**

Documents concerning financial analyses, including cash projections and reports on profitability, for Project Athena authored by any third party.

**REQUEST NO. 79:**

Documents and Communications provided to You concerning Farfetch's cash flows and liquidity position from January 1, 2019 through February 9, 2024.

**REQUEST NO. 80:**

Documents and Communications provided to You concerning Farfetch's decision to terminate the YNAP Acquisition.

**REQUEST NO. 81:**

Documents concerning valuations provided to You by any third-party concerning Project Athena and the Coupang Sale.

# APPENDIX A

## Technical Specifications for Production

I.  <u>PRODUCTION OF DOCUMENTS ORIGINATING AS PAPER</u>

For documents that have originated in paper format, the following specifications should be used for their production.

- Images should be produced as follows:
    - o B&W: single page TIFF group IV format imaged at 300dpi
    - o Color: JPEG files
- Each filename must be unique and match the Bates number of the page. The filename should not contain any blank spaces and should be zero padded (for example ABC00000001).
- Media may be delivered on external flash drives, other USB hard drives, or via link to an FTP download. Each media volume should have its own unique name and a consistent naming convention (for example ZZZ001 or SMITH001).
- Each delivery should be accompanied by an image cross reference or load file that contains a link for every image file in the production.
- A delimited text file that contains available fielded date should also be included and at a minimum include Beginning Bates Number, Ending Bates Number, Custodian, and Number of Pages. The delimiters for that file should be

    Field Separator, ASCII character 20: "^"

    Quote Character, ASCII character 254: "þ"

    Multi-Entry Delimiter, ASCII character 059: ";"
- To the extent that documents have been run through an Optical Character Recognition (OCR) Software in the course of reviewing the documents for production, full text should also be delivered for each document. Text should be delivered on a document level in an appropriately formatted text file (.txt) that is named to match the first Bates number of the document and should be organized into a folder separate from images.

- A text cross reference load file should also be included with the production delivery that lists the Beginning Bates Number of the document and the relative path to the text file for that document on the production media.

II.     <u>PRODUCTION OF EMAIL, DIGITAL COMMUNICATIONS, AND OTHER ELECTRONIC DOCUMENTS</u>

Digital communications and electronic documents should be produced in such fashion as to identify the location (i.e., the cloud-based service, network file folder, hard drive, back-up tape or other location) where the documents or communications are stored and, where applicable, the natural person in whose possession they were found (or on whose hardware device they reside or are stored). If the storage location was a file share or work group folder, that should be specified as well.

For email and other digital communications, attachments, enclosures, and/or exhibits to any parent record should also be produced and proximately linked to the respective parent record containing the attachments, enclosures, and/or exhibits. Preserve the parent/child relationship in email by including a reference to all attachments in the "BEGATT" and "ENDATT" fields. Produce attachments as separate documents and number them consecutively to the parent email/document.

For standard documents, emails, and presentations originating in electronic form, documents should be produced as TIFF/JPG images using the same specifications above with the following exceptions:

- Provide a delimited text file (using the delimiters detailed above) containing the following extracted metadata fields where they exist (as well as any other metadata fields that may exist) in the file being produced:

  > BEGDOC,
  >
  > ENDDOC BEGATT ENDATT
  >
  > Page Count Custodian Author From
  >
  > To CC BCC
  >
  > Document Date Subject

Title Date Sent

Time Sent

Date Received

Time Received

Date Created

Date Created

Date Last Modified

Time Last Modified

File Type

File Extension

File Size

File Name

Source Path

MD5 Hast

Native Link

- Extracted full text (not OCR text) should also be delivered for each electronic document. The extracted full text should be delivered on a document level according to the specifications above similar to paper documents.

- Foreign language text files and metadata should be delivered with the correct encoding to enable the preservation of the documents' original language.

- All spreadsheets and multimedia files should be produced in their native format and in the order that they were stored in the ordinary course of business, *i.e.* emails that attach spreadsheets or multimedia file should not be separated from each other and should be linked using the Attachment Range fields above (BEGATT, ENDATT). The file name should match the bates number assigned to the file. Microsoft Excel files should be produced with a placeholder image and metadata. Multimedia files should be produced with a placeholder image, placeholder text file, and metadata. The extractable metadata and text should be produced in the same manner as other documents that originated in

electronic form. The parties agree to work out a future protocol governing the use and format of documents produced pursuant to this paragraph at trial, depositions or hearings (such as converting to TIFF images in accordance with the above protocol).

- To the extent that they exist, corrupt or password protected files should be repaired and/or decrypted prior to production. If it is necessary to include in the production as-is, they should be submitted in native format with placeholder image, placeholder text file and metadata, and a separate .CSV should be provided indicating beginning Bates number and error code for each record.

- Notwithstanding the language of Federal Rule of Civil Procedure 34, upon review the requesting party may ask for certain other documents and\or databases that were initially produced in their petrified (TIFF, JPG or PDF) format to be produced in their native format in the event that the petrified version is not reasonably usable. If this is the case, the requesting party will submit a list of bates numbers identifying the documents. The documents should be produced in their unaltered native format with an accompanying text delimited text file (using the delimiters above) that contains the following fields:

> Beginning Production Number
>
> Ending Production Number
>
> Beginning Attachment Range
>
> Ending Attachment Range
>
> Path to Native File
>
> MD5 Hash Value

III.    <u>PRODUCTION OF DATABASES AND OTHER STRUCTURED DATA</u>

Generally, databases should be produced in a mutually agreeable data exchange format. To determine the data that is relevant to the document requests, a list of databases and systems used to manage relevant data should be provided with the following information:

> <u>Database Name</u>
>
> <u>Type of Database</u>

<u>Software Platform</u>

<u>Software Version</u>

<u>Business Purpose</u>

<u>Users</u>

<u>Size in Records</u>

<u>Size in Gigabytes</u>

<u>A List of Standard Reports</u>

<u>Database Owner or Administrator's Name</u>

<u>Field List</u>

<u>Field Definitions (including field type, size and use)</u>

<u>Upon review of the list, the parties agree to meet and confer regarding the data to be produced from each source, if any, and the form(s) of the production thereof.</u>

IV.     <u>PRODUCTION TRANSMITTAL INFORMATION</u>

When making a production, accompany the submission with a letter or email that includes all of the following:

- Volume name,

- Bates range and custodians,

- Total number of records

- Total number of images or files

- List of fields in the order in which they are listed in the data files,

- Date and time format, and

- Confirmation that the number of files on the volume match the load files.