# EXHIBIT 4

REID COLLINS & TSAI LLP
300 Delaware Avenue, Suite 770
Wilmington, Delaware 19801
Main: 302.467.1765
Fax: 302.467.1772
www.reidcollins.com

Jessica Zeldin | Partner
Direct: 302.467.1912
jzeldin@reidcollins.com

# reid | collins

February 24, 2025

**VIA ECF AND ELECTRONIC MAIL**

Hon. Craig T. Goldblatt
United States Bankruptcy Court for the District of Delaware
824 North Market Street
3rd Floor, Courtroom 7
Wilmington, DE 19801

Re: *In re Farfetch Ltd. (in Official Liquidation)*, Case No. 24-11519-CTG (Bankr. D. Del.)

Dear Judge Goldblatt:

Pursuant to Local Rule 7026-1, Part F of the Chambers Procedures, and paragraph 5 of the Court's February 4, 2025 Order (D.I. 119), the Foreign Representatives seek an order (1) overruling Surpique L.P.'s ("**Surpique**") overarching "books and records" objection; and (2) compelling Surpique to produce all historic Farfetch email communications that are responsive to the subpoena. The Foreign Representatives' subpoena and discovery requests (the "**Requests**") are attached to this letter as **Exhibit A**. Surpique's responses and objections (the "**R&Os**") are attached as **Exhibit B**.

## I. Introduction

This discovery motion is just the latest chapter in Surpique's steadfast refusal to produce historic Farfetch documents and communications. After the Court rejected Surpique's prior argument about the narrow scope of "books and records" under Cayman law and authorized the service of a subpoena, Surpique simply repackaged its argument into a new boilerplate objection that the Foreign Representatives are only entitled to a narrow scope of formal books and records under U.S. law. Surpique's position contravenes black-letter Delaware and U.S. law, which define "books and records" broadly and comprehensively to include written communications, including emails. Surpique still has not produced a single document to the Foreign Representatives. Absent intervention from the Court, Surpique will continue to use vague assertions of the meaning of

Hon. Craig T. Goldblatt
February 24, 2025
Page 2

---

"books and records" to continue the wild goose chase over Farfetch's historic documents and communications.

## II.      Relevant Background and Procedural History

As the Court is aware, during the Chapter 15 recognition hearing, Surpique objected to the issuance of a subpoena under Rule 2004. When the Foreign Representatives subsequently sought an order from the Court authorizing the issuance of a subpoena (*see* D.I. 66-69 and 96-97), Surpique again objected, arguing that Rule 2004 discovery was barred as a matter of Cayman law or otherwise limited to an extremely narrow set of documents available under Cayman law (*see* D.I. 82-83).

The Court held a hearing on January 15, 2025. *See* D.I. 106. During the hearing, the Court largely rejected Surpique's Cayman law objections, observing that Surpique would need to produce pre-transaction books and records in its possession that were the Debtor's, including books and records related to Farfetch Limited's subsidiaries. Hearing Tr. (**Exhibit C**) at 81:11-82:15. The Court further noted during the hearing that the scope of books and records is "not going to be limited to what Cayman law defines as a book and record," and instead would include "books and records as we would commonly understand them in the United States." *Id.* at 81:18-82:2. Finally, although the Court granted broad relief to the Foreign Representatives as to historic Farfetch documents, the Court observed that absent further sanction from the Cayman Court, it would not order the production of "genuine third party documents," like internal Surpique emails post-dating the transaction.  *Id.* at 82:16-83:13.

At the Court's direction, the parties conferred following the hearing on a form of order. During the parties' meet-and-confer sessions, it became clear that they had divergent views of the scope of "books and records as we would commonly understand them in the United States." Whereas the Foreign Representatives took the position that historic Farfetch email communications are clearly company books and records as commonly understood under U.S. principles, Surpique took the position that the Foreign Representatives are only entitled to formal books and records, such as board materials, and generally are not entitled to email communications, absent special circumstances. Unable to reach an agreement, the parties submitted a joint proposed order that quoted the Court's observations during the hearing and required Surpique to produce "the books and records, as understood 'under U.S. principles,' of Farfetch Limited or any of its subsidiaries prior to or at the time of closing of the January 30, 2024 transaction." They also included a footnote in the order reserving the right to present the dispute to the Court at a later date, on a written record. On February 4, 2025, the Court entered the proposed order (the "**Rule 2004 Order**"). D.I. 119 (**Exhibit D**).

Following entry of the Rule 2004 Order, the Foreign Representatives served the Rule 2004 subpoena and Requests that the Court had authorized. *See* Ex. A. As noted in detail during the prior briefing on the motion for the issuance of a subpoena, the Foreign Representatives lack access to historic Farfetch documents and communications, which are uniquely in Surpique's control, and therefore seek, among other things, internal Farfetch email communications and external Farfetch

Hon. Craig T. Goldblatt
February 24, 2025
Page 3

email communications with advisors and third parties that are responsive to the subpoena's Requests. Without access to these communications, the Foreign Representatives are unable to conduct their investigation, to determine whether any causes of action exist, and to report to creditors.

On February 18, 2025, Surpique served its R&Os. *See* Ex B. Consistent with the position Surpique took following the January 15 hearing, the R&Os include a threshold, general objection stating that the Requests are "impermissible, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent that the Requests seek documents beyond the 'books and records,' as understood under U.S. principles, of Farfetch and its subsidiaries prior to or at the time of closing of the January 30, 2024 transaction." Ex B. at 2. Then, in its specific response to every single Request, Surpique again objected on the basis that each request seeks information that is "beyond the 'books and records' of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing." *Id.* at 12-94.

Subject to its blanket "books and records" objection, for certain requests, Surpique expressed a willingness to produce "Farfetch books and records, as understood under U.S. principles," following a reasonable search of documents—but without any resolution of ***what*** that term actually means. Based on the parties' meet-and-confer sessions, the Foreign Representatives understand that Surpique's definition would generally exclude email communications, absent special circumstances. Specifically, Surpique would first conduct an analysis as to whether formal board minutes exist relating to the requested subject matter and would only be willing to produce emails if the Foreign Representatives can prove a specific need for electronic communications. This time-consuming process will significantly delay the production. Moreover, whether a Farfetch document rises to the level of a "book and record" and is therefore responsive to the subpoena would be subject to Surpique's unilateral need-based analysis. For other requests— including core requests seeking Farfetch's communications with its attorneys and financial advisors in the lead-up to Project Athena—Surpique refused to produce ***any*** documents, based on the mistaken position that Farfetch emails with third parties cannot ever qualify as "books and records" (as Surpique incorrectly understands the term).

The parties conferred on this issue again on February 21, 2025, for close to 45 minutes. The Foreign Representatives explained that Surpique's narrow view of "books and records" is a threshold issue that will impact its entire collection and production. Surpique stood by its objection, reiterating that the Foreign Representatives are only entitled to an undefined set of Farfetch materials that rise to the level of "books and records," and that notwithstanding the service of the subpoena authorized by the Court, the burden is on the Foreign Representatives to justify why they should receive particular sets of materials. Accordingly, pursuant to Local Rule 7026-1(d), counsel avers that a reasonable effort has been made to reach agreement, but the parties have been unable to resolve this dispute. Absent Court intervention, the Foreign Representatives' investigation into Farfetch's financial collapse will continue to be materially impeded by Surpique's refusal to produce historic documents and communications that are plainly responsive to the subpoena and highly relevant to the Foreign Representatives' mandate.

Hon. Craig T. Goldblatt
February 24, 2025
Page 4

---

### III.    Argument

Surpique's narrow interpretation of what constitutes "books and records" of Farfetch or its subsidiaries is designed to hide information from the Foreign Representatives and frustrate the Rule 2004 Order. Indeed, Surpique has essentially repackaged its prior Cayman law argument about the narrow scope of books and records—which the Court *rejected*—into the same argument, but this time under vague notions of U.S. law.

During the parties' meet-and-confer sessions, both sides used as an analogy the treatment of books and records under Section 220 of the Delaware General Corporations Law. That statute, like the Rule 2004 Order, does not define "books and records." But cases describing the scope of books and records under Section 220 make absolutely clear that electronic communications *are* books and records, just like any other corporate record. Indeed, in *KT4 Partners LLC v. Palantir Technologies Inc.*, 203 A.3d 738, 750 (Del. 2019), the Delaware Supreme Court confirmed that "the general category of 'books and records' [] has long been understood to cover both official corporate records and less formal written communications," including "emails." In other words, "the general understanding [of] the term 'books and records' is *comprehensive*." *Id.* at 751 (emphasis added); *see also, e.g.*, *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 792 (Del. Ch. 2016) (holding that "email and other electronic documents [] count as corporate books and records"). Courts regularly order the production of emails in response to a request for a company's books and records. *See Palantir*, 203 A.3d at 752 & n.71 (surveying cases that ordered the production of emails as corporate books and records). Dictionary definitions are in accord and also confirm the broad scope of books and records. *See, e.g.*, *Record*, *Black's Law Dictionary* (12th Ed. 2024) ("1. A documentary account of past events, usu. designed to memorialize those events. 2. Information that is inscribed on a tangible medium or that, having been stored in an electronic or other medium, is retrievable in perceivable form.").[1]

---

[1] While Delaware's broad construction of "books and records" is indicative of what the term means under U.S. principles, federal law also defines "books and records" broadly. "Issuers" like Farfetch who registered securities with the SEC are required to retain accurate "books, records, and accounts." 15 U.S.C. § 78m(b)(2)(A). Courts interpreting this requirement have found that it applies to "virtually any tangible embodiment of information made or kept by an issuer . . . such as tape recordings, computer print-outs, and similar representations." *S.E.C. v. World-Wide Coin Invs., Ltd.*, 567 F. Supp. 724, 748-49 (N.D. Ga. 1983). Bankruptcy courts use a similarly broad understanding when considering transfers of venue under 11 U.S.C. § 1412 and turnover requests under 11 U.S.C. § 542. *See, e.g.*, *RCS Capital Corp. v. Schulte Roth & Zabel LLP (In re RCS Capital Corp.)*, 2018 WL 2410178, at *3 (Bankr. D. Del. May 17, 2018) (considering all documents to be produced in "discovery in an avoidance action" when weighing "location of books and records" factor of venue transfer test); *In re Tri-O-Clean, Inc.*, 230 B.R. 192, 200 (Bankr. S.D. Fla. 1998) (requiring third party and entities under their control to turn over to trustee "all of the Debtor's books and records including, but not limited to . . . documentation related to the Debtor's business affairs"). And various SEC regulations requiring the retention of "records" require the

Hon. Craig T. Goldblatt
February 24, 2025
Page 5

This should be the beginning and the end of the analysis. A company's email communications are part of that company's "books and records, as understood under U.S. principles." *See* Rule 2004 Order. Accordingly, the Court should overrule Surpique's objection—which relies on a nebulous but narrow construction of "books and records" and would result in the large-scale withholding of responsive email communications—and should order Surpique to produce all Farfetch email communications that are otherwise responsive to the subpoena's Requests.

During the parties' efforts to confer, Surpique argued that stockholders making inspection demands under Section 220 first receive documents like formal board materials, and only gain access to emails where they can show a sufficient need. This argument misses the mark. As an initial matter, even Surpique apparently concedes that email communications are, like formal board materials, books and records. But more importantly, the reason stockholders might first receive discrete, formal materials is not because of the meaning of "books and records," but because Section 220 only permits inspection of books and records that are "***necessary and essential*** to accomplish the stated, proper purpose" of the stockholder. *Saito v. McKeson HBOC, Inc.*, 806 A.2d 113, 116 (Del. 2002) (emphasis added). In other words, putting aside the broad scope of "books and records," a stockholder seeking inspection under Section 220 may only receive documents related to a proper purpose, and even then, only documents that are "necessary and essential" to that proper purpose.

These limitations on the process through which a stockholder can inspect books and records make perfect sense in the context of Section 220, where any stockholder, no matter the size of his holdings, can attempt to inspect the company's books and records.  But the limitations unique to Section 220 practice—such as having a proper purpose and only allowing inspection of documents "necessary and essential" to that purpose—have no bearing whatsoever on what is and what is not a "book and record" in the first instance. And the limitations have no application here, where the Foreign Representatives, ***standing in the shoes of the company itself***, are seeking the company's ***own*** historic documents through a lawful Rule 2004 subpoena, which requires far broader disclosure than a Section 220 demand.

Absent threshold relief from the Court, Surpique will be able to wield its vague "books and records" objection to severely limit the email communications that it collects and produces in response to the Requests. In other words, as things stand, even where Surpique represents in the R&Os that it is willing to produce documents identified during a reasonable search, that search and production will be limited to whatever Surpique unilaterally determines rises to its own narrow definition of "books and records." Moreover, in addition to incorporating the objection into every single response in the R&Os, Surpique is refusing to produce ***any*** documents based on that objection for certain requests, including:

---

retention of "all communications sent . . . relating to [the regulated entity's] business," among numerous other broad categories of documents. 17 C.F.R. § 240.17a-4(b)(4) (record-keeping by exchange members, brokers and dealers).

Hon. Craig T. Goldblatt
February 24, 2025
Page 6

- Communications between Farfetch and Latham or Cayman counsel about Project Athena or the Coupang Sale (Request No. 58 at 80-81)[2];

- Communications between Farfetch and AlixPartners (Farfetch's U.K. restructuring advisor) concerning Project Athena or the Coupang Sale (Request No. 62 at 87-88);

- Communications between Farfetch and Evercore (one of Farfetch's U.S. financial advisors) concerning Project Athena or the Coupang Sale (Request No. 64 at 89-90);

- Communications between Farfetch and the Term Lenders (Request No. 65 at 90-91);

- Documents and Communications provided to Farfetch concerning its cash flows and liquidity position (Request No. 67 at 92); and

- Documents concerning valuations provided to Farfetch by any third-party concerning Project Athena or the Coupang Sale (Request No. 69 at 93-94); and

- Communications between Farfetch and JP Morgan (Farfetch's other U.S. financial advisor) concerning Project Athena or the Coupang Sale (Request No. 72 at 85-86)

Thus, notwithstanding the entry of the Rule 2004 Order, Surpique is *still* refusing to provide core, pre-transaction documents and communications concerning the Coupang Sale—precisely the type of historic Farfetch information that the Court ordered Surpique to turnover and that the Foreign Representatives need to conduct their investigation.

## IV. Conclusion

Surpique's overarching objection to producing any Farfetch documents beyond a narrow set of what it unilaterally deems to be "books and records" is both contrary to the Rule 2004 Order and black-letter U.S. law. Accordingly, the Court should overrule Surpique's objection and compel the production of all historic Farfetch email communications that are responsive to the subpoena's Requests. Absent relief from the Court, the parties cannot meaningfully confer on standard items like custodians, date range, and search terms since Surpique can wield its over-arching and narrow books and records objection to avoid a broad collection and production of responsive documents.

Respectfully submitted,

*/s/ Jessica Zeldin*

Jessica Zeldin
(Del. Bar No. 3558)

cc:     All counsel of record (via ECF)

Enclosures

---

[2] Surpique's numbering in the R&Os is out of order, so the Foreign Representatives refer to both Request Number and page number.

# EXHIBIT A

Case 24-10952-CTG Doc 124-1 Filed 02/25/25 Page 1 of 27

B2540 (Form 2540 – Subpoena for Rule 2004 Examination) (12/15)

# UNITED STATES BANKRUPTCY COURT

For the District of Delaware

In re:

Farfetch Limited (in Official Liquidation),

Debtor in a Foreign Proceeding.

Case No. 24-11519-CTG

Chapter 15

## SUBPOENA FOR RULE 2004 EXAMINATION

To:    Surpique L.P. c/o
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022

☐ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at an examination under Rule 2004, Federal Rules of Bankruptcy Procedure.  A copy of the court order authorizing the examination is attached.

| PLACE | DATE AND TIME |
|---|---|
|  |  |

The examination will be recorded by this method: _____

**X**    *Production:* You, or your representatives, must also bring with you to the examination the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: SEE ATTACHED EXHIBIT 1 HERETO, with production made as ordered by the Court (D.I. 119) to the following address or to rgoldstein@reidcollins.com:

REID COLLINS & TSAI LLP
420 Lexington Avenue Suite 2731
New York, New York 10170
Main 212.344.5200

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    02/04/2025

CLERK OF COURT

OR

_____
*Signature of Clerk or Deputy Clerk*

*/s/ Jessica Zeldin*
_____
*Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *Alexander Lawson and Christopher Kennedy of Alvarez & Marsal Cayman Islands Limited (the "Foreign Representatives")*,  who issues or requests this subpoena, are: Reid Collins & Tsai, LLP, 300 Delaware Avenue, Suite 770, Wilmington, DE 19803; jzeldin@reidcollins.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

B2540 (Form 2540 – Subpoena for Rule 2004 Examination) (Page 2)

# PROOF OF SERVICE
## (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

      I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

B2540 (Form 2540 – Subpoena for Rule 2004 Examination) (Page 3)

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
(A)*Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections*. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
(A)*When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A)*Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
(A)*Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…
**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

## EXHIBIT 1 – DOCUMENTS TO BE PRODUCED

### DEFINITIONS

For purposes of the below document requests (the "**Requests**"), the following terms apply:

1.      "**AlixPartners**" means AlixPartners UK LLP or any affiliate or subsidiary or any affiliate or subsidiary.

2.      "**Athena Topco**" means Athena Topco LP, a Delaware limited partnership or any affiliate or subsidiary or any affiliate or subsidiary.

3.      "**Audit**" means a financial audit providing an opinion by the auditor on whether the financial statements are prepared in accordance with the applicable financial reporting framework) (e.g., Generally Accepted Accounting Principles (GAAP) and International Financial Reporting Standards (IFRS)) and whether they present a true and fair view of the company's financial position, performance and cashflows.

4.      "**Audit Committee**" means the audit committee of Farfetch's board of directors.

5.      "**Board**" means Farfetch's board of directors.

6.      "**Bridge Loan**" means the committed first lien delayed draw term loan facility in an aggregate principal amount of $500 million entered into between FF PLC and/or certain direct and/or indirect subsidiaries of FF PLC, as borrowers and/or guarantors, and Athena Topco, as lender.

7.      "**CEO**" means a Chief Executive Officer of any entity.

8.      "**CFO**" means Chief Financial Officer of any entity.

9.      "**Communication**" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

1

10. "**Concerning**" (whether or not capitalized) means relating to, referring to, describing, evidencing, or constituting.

11. "**Coupang**" means Coupang, Inc. or any affiliate or subsidiary

12. "**Coupang Sale**" means the process leading up to and the execution and closing of the sale of businesses and assets of FF PLC and/or any of its affiliates or subsidiaries, involving FF PLC and Athena Topco, Coupang and/or Greenoaks Capital Partners in the period of November 1, 2023 through April 30, 2024.

13. "**Director or Officer**" means any member of the Board of Directors of Farfetch, including any advisory or ex officio members or any member of Management.

14. "**Document**" means the full and broadest scope of documents and things discoverable under the Federal Rules of Bankruptcy Procedure and includes, without limitation, (a) written material of whatever kind or nature, whether typed, printed, handwritten, or otherwise produced, including, without limitation, correspondence letters, text messages, memoranda, notes, contracts, bills, invoices, calendars, photostats, or photocopies; (b) electronic data compilations, including, without limitation, computerized files, computer discs, hard drives, servers, or database records; (c) voicemail recordings; (d) electronic mail messages; or (e) other electronic messages, however stored, as well as all drafts and non-identical copies of each of the foregoing categories of documents and things.

15. "**EBITDA**" means earnings before interest, taxes, depreciation, and amortization.

16. "**Evercore**" means Evercore Group LLC.

17. "**Farfetch**" means Farfetch Limited.

18. **"Farfetch Group"** means Farfetch, FF PLC, and all direct and indirect subsidiary companies owned by FF PLC or affiliates collectively.

19. **"FF PLC"** means Farfetch Holdings PLC, a public limited company organized under the laws of England and Wales and a wholly owned direct subsidiary of Farfetch Limited.

20. **"Greenoaks"** means funds managed or advised by Greenoaks Capital Partners LLC, Greenoaks Capital Partners LLC or any of its affiliates or subsidiaries.

21. **"Including"** (whether or not capitalized) means including, but not limited to.

22. **"Intercompany Claims"** means amounts owed to Farfetch concerning money loaned or advanced, credit extended, or goods or services provided from Farfetch to any entity in the Farfetch Group.

23. **"Intercompany Subordination Agreement"** means the any subordination agreement between or among any of the lenders to any company in the Farfetch Group and/or any company in the Farfetch Group.

24. **"JP Morgan"** means J.P. Morgan Securities LLC, or any of its affiliates or subsidiaries.

25. **"Latham"** means Latham & Watkins LLP and all affiliated partnerships, limited liability companies, and Foreign Legal Consultant Offices, including but not limited to Latham & Watkins (London) LLP.

26. **"Management"** means any executive in charge of the operations of Farfetch, including the CEO, CFO, Chief Operations Officer, Chief Strategy Officer, Chief Legal Officer, Chief Customer Officer, Chief Marketplace Officer, Chief Marketing Officer, and Chief Product Officer.

3

27. "**Person**" means any natural person or any legal entity, including, without limitation, any trust, estate, or governmental or business unit or association.

28. "**Project Athena**" means the marketing process undertaken by JP Morgan, AlixPartners, Evercore and any other advisors to Farfetch or its subsidiaries on behalf of FF PLC to sell the assets of FF PLC in or around December 2023.

29. "**PwC**" means PricewaterhouseCoopers.

30. "**SEC**" means the Securities and Exchange Commission.

31. "**Special Committee**" means a special committee of the Board, including a committee comprised of Victor Luís, Dana Evan, David Rosenblatt, and Diane Irvine.

32. "**Surpique**" means Surpique LP, formerly known as Athena Topco LP.

33. "**Term Lenders**" means the lenders under the Term Loan.

34. "**Term Loans**" means the loans and advances extended by the Term Lenders to any company in the Farfetch Group through February 9, 2024, including loans and advances under the Credit Agreement dated October 20, 2022, between and among FF PLC, Farfetch U.S. Holdings, Inc. and/or certain of its direct and/or indirect subsidiaries, as amended, and loan referred to as the Term Loan B.

35. "**Treasury Committee**" means the treasury committee of Farfetch's board of directors.

36. "**TSA**" means the Transaction Support Agreement entered into by FF PLC, Farfetch Limited, Athena Topco, and an ad hoc group of lenders, among others, dated December 18, 2023, and all Transaction Documents or supplemental documents concerning the TSA or the Coupang Sale.

37. "**You**" or "**Your**" means both Surpique LP and Athena Topco LP.

38. "**YNAP Acquisition**" means the proposed acquisition by FF PLC of 47.5% of Yoox-Net-A-Porter (YNAP) that was terminated effective December 18, 2023.

[*This space intentionally left blank.*]

# INSTRUCTIONS

The preceding Definitions apply to each of these Instructions, and for purposes of the Requests, the following Instructions shall be followed:

1. Words and phrases not defined shall have their ordinary and plain meaning within the context of the Federal Rules of Civil Procedure and in accordance with the generally accepted meaning accorded such words and phrases in everyday use in the English language.

2. The plural includes the singular, and the singular includes the plural.

3. The use of the present tense includes the past tense, the use of the past tense shall include the present tense, and the use of any verb in any tense shall be construed as including the use of that verb in all other tenses.

4. All responses shall comply with the requirements of the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, and the Local Rules for the United States Bankruptcy Court for the District of Delaware.

5. <u>Time Period</u>. Unless otherwise specified, each Request herein seeks all documents generated, maintained, or received by You during the period January 1, 2019 through the present.

6. The following Requests shall be deemed continuing in nature. In the event You become aware of or acquire additional information concerning any of the following Requests, such additional information is to be promptly produced.

7. You are to produce all responsive Documents in Your possession, custody or control, wherever located, including, without limitation, those in the custody of Your representatives and affiliates. A Document is deemed to be in Your possession, custody, or control if it is in Your physical custody, or if it is in the physical custody of any other person or entity and You: (i) own such Document in whole or in part; (ii) have a right, by contract, statute, or otherwise, to use, inspect, examine, or copy such Document on any terms; (iii) have an understanding, express or implied, that You may use, inspect, examine, or copy such Document on any terms; or (iv) as a practical matter, You have been able to use, inspect, examine, or copy such Document when You sought to do so.

8. If any Document requested herein was formerly in Your possession, custody or control and has been lost or destroyed or otherwise disposed of, You are requested to submit in lieu of any such Document a written statement (a) describing in detail the nature of the Document and its contents, (b) identifying the person(s) who prepared or authored the Document and, if applicable, the person(s) to whom the Document was sent, (c) specifying the date on which the Document was prepared or transmitted, and (d) specifying the date on which the Document was lost or destroyed and, if destroyed, the conditions of and reasons for such destruction and the person(s) requesting and performing the destruction.

6

9.      If any part of the following Requests cannot be responded to in full, please respond to the extent possible, specifying the reason(s) for Your inability to respond to the remainder and stating whatever information or knowledge You have concerning the portion to which You do not respond.

10.      If You object to any of these Requests, state in writing with specificity the grounds of Your objections. Any ground not stated shall be waived. If You object to a particular portion of any Request, You shall respond to any other portions of such Request as to which there is no objection and state with specificity the grounds of the objection.

11.      Where any copy of any Document whose production is sought herein, whether a draft or final version, is not identical to any copy thereof, by reason of alterations, notes, comments, initials, underscoring, indication of routing, or other material contained thereon or attached thereto, all such non-identical copies are to be produced separately.

12.      The words "and" and "or" are to be construed both conjunctively and disjunctively. The singular form of a noun or pronoun includes the plural form and vice versa. The word "all" shall also include "each of," and vice versa. The word "any" shall be construed to mean "any and all" where the effect of such construction is to broaden the scope of the Request.

13.      The Documents must be produced in accordance with the specifications in Appendix A attached hereto.

14.      Electronic records and computerized information should be produced in an intelligible format or together with a sufficient description of the system or program from which each was derived to permit rendering the material legible.

15.      Documents attached to each other should not be separated.

16.      Documents not otherwise responsive to a Request shall be produced if such documents mention, discuss, refer to, or explain a document that is called for by this discovery request.

17.      If the identity of Documents responding to a Request is not known, then that lack of knowledge must be specifically indicated in the response. If any information requested is not in Your possession but is known or believed to be in the possession of another person or entity, then identify that person or entity and state the basis of Your belief or knowledge that the requested information is in such person's or entity's possession.

18.      To the extent you refuse to respond to any Request, in whole or in part, on grounds of privilege, identify the withheld Document or Communication on a privilege log stating: (i) the identity of the person(s) who prepared or authored the Document or took part in the Communication; (ii) the person(s) to whom the Document was shown or otherwise disclosed; (iii) the date(s) on which the Document was prepared and disseminated, or on which the Communication transpired or was disclosed; (iv) the general subject matter of the Document or Communication; (v) the nature of the Document or Communication (e.g., telephone conference,

7

office conference); and (v) the basis for the claim of privilege or withholding. Any redactions to Documents shall be prominently identified with a mark indicating the location and size of the redacted area.

*[This space intentionally left blank.]*

# DOCUMENT REQUESTS

**REQUEST NO. 1:**

A copy of the complete server on which all Documents and Communications constituting Farfetch's books and records were maintained, which was turned over to Surpique as part of the closing of the Coupang Sale.

**REQUEST NO. 2:**

Documents and Communications concerning or utilized by Farfetch in connection with its public filings with the SEC for the years 2019 through 2023.

**REQUEST NO. 3:**

Documents and Communications concerning or utilized by Farfetch in connection with the creation and issuance of its consolidated financial statements or any financial projections from January 1, 2019 through February 9, 2024.

**REQUEST NO. 4:**

Documents and Communications concerning all contents in the virtual data room established by Farfetch in connection with the sale of substantially all the assets of Farfetch and the Coupang Sale.

**REQUEST NO. 5:**

Documents and Communications concerning the answers and responses to all inquiries made by You in connection with Project Athena and the Coupang Sale.

**REQUEST NO. 6:**

Documents and Communications concerning all financial information and results of the financial reporting of Farfetch and the Farfetch Group for the third and fourth quarters of 2023.

**REQUEST NO. 7:**

Documents and Communications concerning the Board or any activity or decision of the Board, or any special committee or subcommittee of the Board, including minutes of meetings, notes, internal memoranda, presentations, financial analyses, briefing materials and resolutions from January 1, 2019 to February 9, 2024.

**REQUEST NO. 8:**

Documents and Communications concerning the Audit Committee from January 1, 2019 to February 9, 2024, including private sessions held between the Audit Committee, and (i) Farfetch's Officers, (ii) PwC, (iii) the internal audit department of any company in the Farfetch Group, and/or (iv) any other Director, including any minutes or resolutions, schedules, annexures, appendices, briefing materials, presentations, or any other documents relating to those minutes or resolutions.

**REQUEST NO. 9:**

Documents and Communications concerning any analysis done by any Deloitte entity for the Board, any subcommittee of the Board of for Farfetch concerning Intercompany Claims.

**REQUEST NO. 10:**

Documents and Communications concerning the Treasury Committee from January 1, 2019 through February 9, 2024, including any minutes or resolutions schedules, annexures, appendices, briefing materials, presentations, or any other Documents relating to those minutes or resolutions.

**REQUEST NO. 11:**

Documents and Communications from Farfetch's CEO, Farfetch's CFO, or a representative of the finance department of any company in the Farfetch Group to the Board or Management from January 1, 2019 through February 9, 2024.

**REQUEST NO. 12:**

Documents and Communications concerning Farfetch's cashflow, cash position and liquidity of Farfetch, including Documents that detail cash expenditures from January 1, 2019 through February 9, 2024.

**REQUEST NO. 13:**

Documents and Communications concerning and Farfetch's and the Farfetch Group's use of EBITDA or a similar financial metric to determine discretionary cash available or as a substitute for other IFRS measures of financial performance from January 1, 2019 through February 9, 2024.

**REQUEST NO. 14:**

Documents and Communications concerning Farfetch's and the Farfetch Group's revenues, gross profits, operating losses and any impairment to intangibles from January 1, 2019 through February 9, 2024.

10

**REQUEST NO. 15:**

Documents and Communications regarding all of Farfetch's and the Farfetch Group's operating costs and expenses, including fixed costs (including rent or lease payments, salaries insurance, depreciation, amortization), variable or semi-variable costs (including labor, utilities, shipping and freight, commissions), operating expenses (including marketing and advertising, administrative costs software licenses, equipment real estate), all direct, indirect and sunk or other costs from January 1, 2019 through February 9, 2024.

**REQUEST NO. 16:**

Documents and Communications concerning the Farfetch CFO's May 18, 2023 announcement in its Form 6-K that it had "successfully navigated through unprecedented macrochallenges, and through continued focused execution [to] remain on track to deliver a year of luxury market-beating growth, a return to profitability and positive free cash flow."

**REQUEST NO. 17:**

Documents and Communications that are the basis for the statement made by Farfetch in the draft results for the third quarter of 2023: "As a result of the Company's history of losses and anticipated operating cash needs, combined with current liquidity levels, the Company's management has concluded that a material uncertainty exists that may cast significant doubt on the Company's ability to continue as a going concern, such that it may be unable to realize its assets and discharge its liabilities in the normal course of business" and that "all previously provided guidance for all future periods is withdrawn."

**REQUEST NO. 18:**

Documents and Communications concerning funds raised and liquidity made available to Farfetch from any source, including secured or unsecured financing, the issuance of debt or equity, trade credit, contractual arrangements, strategic partnerships, and/or royalties; and all non-operating interest and other costs associated with any source of funding for the years 2019 through 2023.

**REQUEST NO. 19:**

Documents and Communications from PwC concerning any Audit of Farfetch from January 1, 2019 through February 9, 2024, including (a) Farfetch's 2022 Audit and Farfetch's 2023 interim reporting; and (b) Communications between PwC and the Audit Committee, Farfetch's CEO or Farfetch's CFO concerning (a).

**REQUEST NO. 20:**

Documents and Communications from January 1, 2019 through February 9, 2024, concerning PwC's involvement in the quarterly reporting of the Farfetch Group, safeguards performed by PwC concerning the independence of information provided for Audits, material weaknesses of the Farfetch Group that were identified and the impact the refusal to sign off on Farfetch Italia S.r.l companies' financial information would have on the 2022 Audit.

**REQUEST NO. 21:**

Documents and Communications concerning Farfetch's assessment of its ability to continue as a going concern from January 1, 2019 through February 9, 2024, and any Documents or Communications relied upon in forming any opinion or analysis relating to the assessment.

**REQUEST NO. 22:**

Documents and Communications concerning PwC's assessment of Farfetch's ability to continue as a going concern at any time from January 1, 2019 through February 9, 2024, including any other Documents relied upon in forming any opinion, analysis, or assessment, regardless of time frame, of Farfetch's ability to continue as a going concern.

**REQUEST NO. 23:**

Documents and Communications concerning Farfetch's and the Farfetch Group's need for liquidity and the amount needed in November of 2023 through March 31, 2024.

**REQUEST NO. 24:**

Documents and Communications concerning the negative financial repercussions of the November 2023 announcement that the Farfetch Group would not disclose its results for the third quarter of 2023, including increased credit and payments terms, processing of orders, and costs.

**REQUEST NO. 25:**

Documents and Communications concerning all of Farfetch's and the Farfetch Group's internal and management accounts from January 1, 2019 through February 9, 2024 and financial performance and metrics for each business unit.

**REQUEST NO. 26:**

Documents and Communications concerning financial projections and cashflow forecasts of Farfetch that the Farfetch Group prepared from January 1, 2019 through February 9, 2024, including correspondence relating to the review and approval of these projections and forecasts and the review and approval of the headroom model.

**REQUEST NO. 27:**

Documents and Communications concerning the review by the Board and Management of Farfetch's quarterly earnings reports, including any statements within those earnings reports made by Farfetch's CEO or Farfetch's CFO.

**REQUEST NO. 28:**

Documents and Communications concerning the Board's decision to create a Special Committee.

**REQUEST NO. 29:**

Documents concerning Project Athena presented to the Special Committee and Communications with the Special Committee concerning Project Athena.

**REQUEST NO. 30:**

Documents and Communications concerning options considered to address Farfetch's liquidity position, including monetization of non-core assets, secured and unsecured financing, issuance of debt or equity, partnerships or contractual arrangements and any other funding or financing from third parties such as Alibaba and Richemont.

**REQUEST NO. 31:**

Documents and Communications concerning a potential take-private process for Farfetch.

**REQUEST NO. 32:**

Documents and Communications concerning the Term Loans, including Farfetch's decision to enter into (i) any amendment of the "Term Loans" as defined in the Farfetch's Form 6-K for the month of December 2023, (ii) Bridge Loan Facility; and (iii) the Term Loan B extension in August 2023 and the consideration of other available options.

**REQUEST NO. 33:**

Documents and Communications concerning the Intercompany Subordination Agreement.

**REQUEST NO. 34:**

Documents and Communications concerning Farfetch's decision not to announce its third quarter results in 2023.

**REQUEST NO. 35:**

Documents constituting corporate records, meeting minutes, notes, internal memoranda, analyses, factual research, due diligence, and presentations of the Farfetch Group concerning Farfetch.

**REQUEST NO. 36:**

Documents concerning corporate records, meeting minutes, notes, internal memoranda, analyses, factual research, due diligence, and presentations, of Farfetch and the Farfetch Group concerning Project Athena.

**REQUEST NO. 37:**

Documents and Communications concerning subordination agreements and Project Athena and/or the Coupang Sale.

13

**REQUEST NO. 38:**

Documents and Communications concerning the Intercompany Claims.

**REQUEST NO. 39:**

Documents and Communications concerning the Intercompany Claims owing from Farfetch Japan Co., Ltd to Farfetch.

**REQUEST NO. 40:**

Documents and Communications concerning the Intercompany Claims owing from Farfetch Italia S.r.l. Limited to Farfetch.

**REQUEST NO. 41:**

Documents and Communications concerning the Intercompany Claims owing from New Guards Group Holding S.p.A. to Farfetch.

**REQUEST NO. 42:**

Documents and Communications concerning the Intercompany Claims owing from Farfetch Middle East FZE to Farfetch.

**REQUEST NO. 43:**

Documents and Communications concerning the Intercompany Claims owing from Farfetch China Holdings Ltd to Farfetch.

**REQUEST NO. 44:**

Documents and Communications concerning the Intercompany Claims owing from Farfetch.com US LLC to Farfetch.

**REQUEST NO. 45:**

Documents and Communications concerning the Intercompany Claims owing from Farfetch UK Limited to Farfetch.

**REQUEST NO. 46:**

Documents and Communications concerning the Intercompany Claims owing from Farfetch Holdings plc to Farfetch.

**REQUEST NO. 47:**

Documents and Communications concerning any assets, interest or rights jointly owned or shared with Farfetch and any company in the Farfetch Group

14

**REQUEST NO. 48:**

Documents and Communications concerning the decision to enter into transactions regarding Violet Grey and Reebok and to terminate the YNAP Acquisition.

**REQUEST NO. 49:**

All Documents and Communications concerning Farfetch's Value-Added Tax, or the recovery or factoring in of such Value-Added Tax receivables from January 1, 2019 through February 9, 2024.

**REQUEST NO. 50:**

Documents and Communications concerning material weaknesses and lack of internal and operational controls for Farfetch or any company in the Farfetch Group from January 1, 2019 through February 9, 2024.

**REQUEST NO. 51:**

Documents and Communications relating to any possible or identified material misstatement of the financial position of Farfetch or any other related negative repercussions based on lack of internal and operational controls from January 1, 2019 through February 9, 2024.

**REQUEST NO. 52:**

Documents and Communication concerning the financial impact on the Farfetch Group, including the steps taken by Management to mitigate the financial impact of (a) the Ukraine war (b) China zero tolerance and other extended COVID lockdown policies and (c) strengthening of the US dollar from January 1, 2020 through February 9, 2024.

**REQUEST NO. 53:**

Documents and Communications concerning all efforts of Farfetch Group's partners to de-risk their relationship with the Farfetch Group, including changes to supplier and service provider terms, partner credit limit terms, or lender financing terms and those raised in the Board presentation of December 7, 2023.

**REQUEST NO. 54:**

Copies of all insurance policies concerning acts of Directors or Management and insuring liability of Directors, Management and/or Farfetch.

**REQUEST NO. 55:**

Copies of all Directors and Management liability insurance policies concerning excess insurance to the insurance provided in policy number FSGDO2201097 for the October 21, 2022 to October 21, 2023 policy period (or for any equivalent policy).

**REQUEST NO. 56:**

Copies of any indemnities relating to acts of Directors or Management.

**REQUEST NO. 57:**

Documents and Communications concerning rights, releases, approvals, or agreements to which Farfetch was required to be a party to close the Coupang Transaction.

**REQUEST NO. 58:**

Documents and Communications concerning the purchase of a tail on any Directors and Officer liability insurance and negotiations with any party to the Coupang Sale concerning the same.

**REQUEST NO. 59:**

Documents and Communications concerning any indemnification for winding up costs of Farfetch as consideration for, or as part of the negotiations of the Coupang Sale.

**REQUEST NO. 60:**

Documents and Communications concerning the resignation of directors of Farfetch from October of 2023 to the present date.

**REQUEST NO. 61:**

Communications concerning the circumstances surrounding the termination, resignation and/or departure of Elliot Jordan as CFO of Farfetch.

**REQUEST NO. 62:**

Communications concerning the selection and hiring of Tim Stone as CFO of Farfetch.

**REQUEST NO. 63:**

Documents and Communications concerning the TSA, including all drafts of the TSA.

**REQUEST NO. 64:**

All requests for information made by You to the Farfetch Group before Surpique's acquisition of substantially all of the assets of FF PLC through the Coupang Sale.

**REQUEST NO. 65:**

Documents and Communications concerning Project Athena, not otherwise incorporated in the requests herein, including Documents and Communications concerning all actions taken by Farfetch to enter into and close the Coupang Sale.

**REQUEST NO. 66:**

Documents and Communications concerning the Coupang Sale, not otherwise incorporated in the requests herein, including Documents and Communications concerning all actions taken by Farfetch to enter into and close the Coupang Sale.

**REQUEST NO. 67:**

Communications concerning Project Athena and/or the Coupang Sale between or among You and any legal advisor to Farfetch and/or its Directors or Officers, including Communications with Latham, Mourant Ozannes (Cayman) LLP, and/or Forsters LLP.

**REQUEST NO. 68:**

Documents and Communications concerning any legal advice or analysis provided to Farfetch concerning Project Athena, the Coupang Sale, and/or the Board's fiduciary duties by (i) You; (ii) Latham, (iii) Mourant Ozannes (Cayman) LLP; (iv) Forsters LLP; or (v) any other firm or company.

**REQUEST NO. 69:**

Communications concerning Project Athena and/or the Coupang Sale with any advisor to Farfetch or the Farfetch Group.

**REQUEST NO. 70:**

Communications concerning Project Athena and/or the Coupang Sale and Brunswick Group LLC.

**REQUEST NO. 71:**

Documents and Communications concerning the Board's decision, or the decision of the FF PLC Board, to hire JP Morgan as FF PLC's (or any other company's in the Farfetch Group) financial advisor or investment banker for Project Athena, any retention agreement, JP Morgan's role in Project Athena and its assessment of the Coupang Sale, and issues JP Morgan identified with the Farfetch business or finances.

**REQUEST NO. 72:**

Communications between You and JP Morgan concerning Project Athena and the Coupang Sale.

**REQUEST NO. 73:**

Documents and Communications concerning the Board's decision, or the decision of the FF PLC Board, to hire AlixPartners as FF PLC's (or any other company's in the Farfetch Group) advisor for Project Athena, any retention agreement, AlixPartners' role in Project Athena, its assessment of the Coupang Sale, and issues AlixPartners identified with the Farfetch business or finances, including the experience and skills of the Farfetch finance department, and the oversight of the Farfetch's CEO of the finance department.

17

**REQUEST NO. 74:**

Communications between You and AlixPartners concerning Project Athena and the Coupang Sale.

**REQUEST NO. 75:**

Documents and Communications concerning the Board's decision, or the decision of the FF PLC Board, to hire Evercore as FF PLC's (or any other company's in the Farfetch Group) financial advisor for Project Athena, any retention agreement, Evercore's role in Project Athena, its assessment of the Coupang Sale, and issues Evercore identified with the Farfetch business or finances.

**REQUEST NO. 76:**

Communications between You and Evercore concerning Project Athena and the Coupang Sale.

**REQUEST NO. 77:**

Documents and Communications between You and the Term Lenders.

**REQUEST NO. 78:**

Documents concerning financial analyses, including cash projections and reports on profitability, for Project Athena authored by any third party.

**REQUEST NO. 79:**

Documents and Communications provided to You concerning Farfetch's cash flows and liquidity position from January 1, 2019 through February 9, 2024.

**REQUEST NO. 80:**

Documents and Communications provided to You concerning Farfetch's decision to terminate the YNAP Acquisition.

**REQUEST NO. 81:**

Documents concerning valuations provided to You by any third-party concerning Project Athena and the Coupang Sale.

## APPENDIX A

## Technical Specifications for Production

I.   PRODUCTION OF DOCUMENTS ORIGINATING AS PAPER

For documents that have originated in paper format, the following specifications should be used for their production.

- Images should be produced as follows:
  - o  B&W: single page TIFF group IV format imaged at 300dpi
  - o  Color: JPEG files
- Each filename must be unique and match the Bates number of the page. The filename should not contain any blank spaces and should be zero padded (for example ABC00000001).
- Media may be delivered on external flash drives, other USB hard drives, or via link to an FTP download. Each media volume should have its own unique name and a consistent naming convention (for example ZZZ001 or SMITH001).
- Each delivery should be accompanied by an image cross reference or load file that contains a link for every image file in the production.
- A delimited text file that contains available fielded date should also be included and at a minimum include Beginning Bates Number, Ending Bates Number, Custodian, and Number of Pages. The delimiters for that file should be

  Field Separator, ASCII character 20: "^"

  Quote Character, ASCII character 254: "þ"

  Multi-Entry Delimiter, ASCII character 059: ";"

- To the extent that documents have been run through an Optical Character Recognition (OCR) Software in the course of reviewing the documents for production, full text should also be delivered for each document. Text should be delivered on a document level in an appropriately formatted text file (.txt) that is named to match the first Bates number of the document and should be organized into a folder separate from images.

- A text cross reference load file should also be included with the production delivery that lists the Beginning Bates Number of the document and the relative path to the text file for that document on the production media.

II.    PRODUCTION OF EMAIL, DIGITAL COMMUNICATIONS, AND OTHER ELECTRONIC DOCUMENTS

Digital communications and electronic documents should be produced in such fashion as to identify the location (i.e., the cloud-based service, network file folder, hard drive, back-up tape or other location) where the documents or communications are stored and, where applicable, the natural person in whose possession they were found (or on whose hardware device they reside or are stored). If the storage location was a file share or work group folder, that should be specified as well.

For email and other digital communications, attachments, enclosures, and/or exhibits to any parent record should also be produced and proximately linked to the respective parent record containing the attachments, enclosures, and/or exhibits. Preserve the parent/child relationship in email by including a reference to all attachments in the "BEGATT" and "ENDATT" fields. Produce attachments as separate documents and number them consecutively to the parent email/document.

For standard documents, emails, and presentations originating in electronic form, documents should be produced as TIFF/JPG images using the same specifications above with the following exceptions:

- Provide a delimited text file (using the delimiters detailed above) containing the following extracted metadata fields where they exist (as well as any other metadata fields that may exist) in the file being produced:

    BEGDOC,

    ENDDOC BEGATT ENDATT

    Page Count Custodian Author From

    To CC BCC

    Document Date Subject

Title Date Sent

Time Sent

Date Received

Time Received

Date Created

Date Created

Date Last Modified

Time Last Modified

File Type

File Extension

File Size

File Name

Source Path

MD5 Hast

Native Link

- Extracted full text (not OCR text) should also be delivered for each electronic document. The extracted full text should be delivered on a document level according to the specifications above similar to paper documents.

- Foreign language text files and metadata should be delivered with the correct encoding to enable the preservation of the documents' original language.

- All spreadsheets and multimedia files should be produced in their native format and in the order that they were stored in the ordinary course of business, *i.e.* emails that attach spreadsheets or multimedia file should not be separated from each other and should be linked using the Attachment Range fields above (BEGATT, ENDATT). The file name should match the bates number assigned to the file. Microsoft Excel files should be produced with a placeholder image and metadata. Multimedia files should be produced with a placeholder image, placeholder text file, and metadata. The extractable metadata and text should be produced in the same manner as other documents that originated in

electronic form. The parties agree to work out a future protocol governing the use and format of documents produced pursuant to this paragraph at trial, depositions or hearings (such as converting to TIFF images in accordance with the above protocol).

- To the extent that they exist, corrupt or password protected files should be repaired and/or decrypted prior to production. If it is necessary to include in the production as-is, they should be submitted in native format with placeholder image, placeholder text file and metadata, and a separate .CSV should be provided indicating beginning Bates number and error code for each record.

- Notwithstanding the language of Federal Rule of Civil Procedure 34, upon review the requesting party may ask for certain other documents and\or databases that were initially produced in their petrified (TIFF, JPG or PDF) format to be produced in their native format in the event that the petrified version is not reasonably usable. If this is the case, the requesting party will submit a list of bates numbers identifying the documents. The documents should be produced in their unaltered native format with an accompanying text delimited text file (using the delimiters above) that contains the following fields:

> Beginning Production Number
> Ending Production Number
> Beginning Attachment Range
> Ending Attachment Range
> Path to Native File
> MD5 Hash Value

III.    <u>PRODUCTION OF DATABASES AND OTHER STRUCTURED DATA</u>

Generally, databases should be produced in a mutually agreeable data exchange format. To determine the data that is relevant to the document requests, a list of databases and systems used to manage relevant data should be provided with the following information:

> <u>Database Name</u>
> <u>Type of Database</u>

Software Platform

Software Version

Business Purpose

Users

Size in Records

Size in Gigabytes

A List of Standard Reports

Database Owner or Administrator's Name

Field List

Field Definitions (including field type, size and use)

Upon review of the list, the parties agree to meet and confer regarding the data to be produced from each source, if any, and the form(s) of the production thereof.

IV.     PRODUCTION TRANSMITTAL INFORMATION

When making a production, accompany the submission with a letter or email that includes all of the following:

- Volume name,

- Bates range and custodians,

- Total number of records

- Total number of images or files

- List of fields in the order in which they are listed in the data files,

- Date and time format, and

- Confirmation that the number of files on the volume match the load files.

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 15 |
| | ) | |
| Farfetch Limited (in Official Liquidation), | ) | Case No. 24-11519-CTG |
| | ) | |
| Debtor in a Foreign Proceeding | ) | |
| | ) | |

**SURPIQUE'S RESPONSES AND OBJECTIONS TO THE JOLS' RULE 2004**
**REQUESTS FOR THE PRODUCTION OF DOCUMENTS**

Pursuant to Federal Rule of Civil Procedure 45, as incorporated in this proceeding through

Federal Rules of Bankruptcy Procedure 2004, 7026, and 9016 and Rules 2004-1 and 7026-1 of the

Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the

District of Delaware ("Local Rules"), Surpique LP ("Surpique"), by and through its undersigned

counsel, hereby objects and responds to the Rule 2004 Requests for the Production of Documents,

dated January 9, 2025 (the "Requests," and each a "Request"), issued by Christopher Kennedy and

Alexander Lawson (the "JOLs" or the "Foreign Representatives"), in their capacities as foreign

representatives of Farfetch Limited ("Farfetch") (in Official Liquidation), to Surpique.

Surpique's Responses and Objections (the "Responses," and each a "Response") to the

Requests are made without prejudice to Surpique's right to amend or supplement the Responses at

a later date. By providing the Responses, Surpique does not waive (and expressly reserves) its

right to make additional objections at a later date.

**GENERAL OBJECTIONS**

1. Surpique objects to the Requests to the extent that they impose burdens or

obligations upon Surpique that are inconsistent with the Federal Rules of Civil Procedure, the

United States Bankruptcy Code, the Local Rules, the law of the Cayman Islands (to the extent

relevant), or any other applicable rules (collectively, the "Applicable Rules"). Surpique will respond to the Requests consistent with the aforementioned rules.

2. Surpique objects to the Requests as contrary to law and premature to the extent that the Requests seek documents belonging to Surpique or other third parties prior to the JOLs seeking and receiving an order from the Grand Court of the Cayman Island directing such discovery and ruling that it is consistent with Cayman law, as required by the Court at the January 15, 2025 hearing in this chapter 15 proceeding.

3. Surpique objects to the Requests as impermissible, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent that the Requests seek documents beyond the "books and records," as understood under U.S. principles, of Farfetch and its subsidiaries prior to or at the time of closing of the January 30, 2024 transaction (the "Transaction") or documents that remain the legal property of Farfetch following the closing of the Transaction, as discussed by the Court at the January 15, 2025 hearing and the Court's February 4, 2025 order in this chapter 15 proceeding.

4. Surpique objects to the Requests to the extent that they seek discovery beyond the permissible scope of discovery under Cayman Islands law, the governing law of the foreign main proceeding before the Grand Court of the Cayman Islands. Surpique further objects to the Requests to the extent that they seek discovery that is not necessary to advance the purposes of chapter 15 or the interests of the United States. Surpique further objects to the Requests to the extent that the Foreign Representatives have not articulated any potentially viable causes of action or tied the Requests to any such causes of action.

5. Surpique objects to the Requests as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent that the Requests seek documents related to, or

books and records belonging to, the "Farfetch Group," which incorporates over 80 entities located across the globe—which are either not affiliated with Surpique or are several corporate layers removed from Surpique.

6. Surpique objects to the Requests as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent that the Requests are duplicative of discovery requests issued to other parties in this chapter 15 proceeding, the foreign main proceeding, or other related proceedings.

7. Surpique objects to the Requests to the extent that the Requests call for information that is not within Surpique's possession, custody, or control. Surpique further objects to the Requests to the extent that the Requests call for information that is already in the JOLs' possession, is publicly available, or is otherwise available from a source that is more convenient, less burdensome, or less expensive.

8. Surpique objects to the Requests to the extent that the Foreign Representatives have not taken reasonable steps to avoid imposing any undue burden or expense on Surpique. Surpique further objects to the Requests to the extent that compliance with the Requests would require Surpique to incur significant expenses without reimbursement for such expenses.

9. Surpique objects to the Requests to the extent that the Requests: (a) seek information that is not relevant to this proceeding or the foreign main proceeding; (b) are not proportional to the needs of this proceeding or the foreign main proceeding; (c) are vague or ambiguous; (d) are overbroad; (e) are unduly burdensome; (f) are harassing; (g) are duplicative; or (h) will cause unnecessary expense.

10. Surpique objects to the Requests to the extent that they call for the disclosure of information immune from or otherwise exempt from discovery due to protection by the attorney

3

work product doctrine, attorney-client privilege, or any other applicable privilege, immunity, or protection provided by any applicable laws. Surpique will not produce any documents subject to such privileges, doctrines, or immunities. To the extent any such documents are produced inadvertently, such production is not intended to waive any applicable privilege or protection. Surpique reserves the right to seek the return or destruction of any such documents.

11. Surpique objects to the Requests to the extent that they call for the production of documents that contain or otherwise reveal any trade secrets, proprietary business information, competitively sensitive business or commercial information, strategic planning information, or other private, confidential information. To the extent that Surpique has responsive documents containing sensitive information, it will produce such documents pursuant to an agreed-upon protective order that limits the dissemination to third parties and appropriately governs the production and exchange of confidential, potentially privileged, and other sensitive material, or in some other manner agreed by the parties that would ensure the confidentiality and protected nature of documents until such time as an appropriate order can be entered.

12. Surpique objects to the Requests to the extent that they purport to impose an obligation to conduct anything beyond a reasonable and diligent search of reasonably accessible files (including electronic files) where responsive documents reasonably would be expected to be found.

13. Surpique objects to the Requests to the extent that they purport to require production of electronically stored information ("ESI") that is not stored on active systems, but is stored on systems, backup tapes, and other media that are no longer part of normal business operations. Such ESI is not reasonably accessible and likely is duplicative of ESI available from other more readily accessible sources. Given the lack of relevance of such ESI and the cost

4

associated with searching, preserving, and accessing these data sources, Surpique will not search the ESI sources described above.

14.     Surpique's assertion of an objection to a Request, or any statement that it will produce documents in response to a particular Request, is not and should not be construed as an admission that any responsive documents now exist or previously existed or are within Surpique's possession, custody, or control.

15.     Surpique objects to the Requests to the extent that they purport to require Surpique to draw legal conclusions or are predicated on legal conclusions and arguments.  Subject to and without waiving any of the objections, Surpique states that any response, or provision of documents or information in response, to any of the Requests is not intended to provide, and shall not constitute, a legal conclusion or admission concerning any of the terms used in the Requests.

16.     Surpique provides these Responses without in any way waiving or intending to waive: (a) any objections as to the competency, relevance, materiality, privileged status, or admissibility as evidence, for any purpose, of any information provided in response to the Requests; (b) the right to object on any ground to the documents produced in response to the Requests at any hearing or trial; or (c) the right to object on any ground at any time to a demand for further responses to the Requests.

17.     The Responses reflect only the current state of Surpique's knowledge and information on the Requests.  Further investigation may identify additional facts or information that also could lead to additions to, changes in, or variations from the Responses herein. Consequently, Surpique reserves the right to: (a) revise, correct, supplement, amend, modify, or clarify its Responses as additional information is discovered in accordance with the Applicable Rules; (b) provide additional responsive information; (c) modify its objections on grounds

including, but not limited to, relevance, undue burden, and/or proportionality; (d) object to further discovery in this chapter 15 proceeding; (e) rely upon any information provided in this chapter 15 proceeding or the foreign main proceeding, including, without limitation, in any hearing, proceeding, or trial; and (f) challenge the authenticity or admissibility of any information in any hearing, proceeding, or trial.

18.     Surpique objects to the Requests to the extent that they seek information concerning events outside of the relevant time period and/or purport to require Surpique to answer as to all times. To the extent Surpique agrees to produce documents responsive to the Requests, Surpique will produce documents subject to an agreed-upon time period.

19.     These General Objections apply to and are incorporated in full into each Response to the Requests below, regardless of whether referenced or restated in the Response.

### OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.     Surpique objects to the definition of the term "AlixPartners" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it includes "any affiliate or subsidiary." Surpique will interpret this term to mean AlixPartners UK LLP.

2.     Surpique objects to the definition of the term "Athena Topco" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it includes "any affiliate or subsidiary." Surpique will interpret this term to mean Athena Topco LP.

3.     Surpique objects to the definitions of the terms "Communication" and "Document" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent the definitions purport to impose requirements or obligations on Surpique beyond the scope of, or different from, those imposed by the Applicable Rules and to the extent the

6

definitions purport to include oral communications that are not recorded or memorialized in any other reasonably accessible form. Surpique further objects to the definitions of these terms to the extent that they seek information that is not within Surpique's actual possession, custody, or control. Surpique will interpret these terms consistent with the Applicable Rules.

4. Surpique objects to the definitions of the terms "Concerning" and "Including" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent that they purport to impose requirements or obligations on Surpique beyond the scope of, or different from, those imposed by the Applicable Rules. In responding to the Requests, Surpique will apply the ordinary meanings of "concerning" and "including."

5. Surpique objects to the definition of the term "Coupang" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it includes "any affiliate or subsidiary." Surpique will interpret this term to mean Coupang, Inc.

6. Surpique objects to the definition of the term "Coupang Sale" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it includes the "process leading up to and the execution and closing of the sale of businesses and assets of FF PLC and/or any of its affiliates or subsidiaries, involving FF PLC and Athena Topco, Coupang and/or Greenoaks Capital Partners in the period of November 1, 2023 through April 30, 2024." Surpique will interpret this term to mean the sale of FF PLC's business and assets to Surpique Acquisition Limited pursuant to the Sale and Purchase Agreement, dated January 30, 2024.

7. Surpique objects to the definition of the term "Director or Officer" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case to the

7

extent it includes "any advisory or ex officio members." Surpique will interpret this term to mean any member of Farfetch's Board of Directors or Management.

8. Surpique objects to the definition of the term "Farfetch Group" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it includes "all direct and indirect subsidiary companies owned by FF PLC or affiliates." Surpique will interpret this term to mean, collectively, Farfetch, FF PLC, and any direct and indirect subsidiaries of FF PLC prior to the Coupang Sale.

9. Surpique objects to the definition of the term "Greenoaks" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it includes "any of its affiliates or subsidiaries." Surpique will interpret this term to mean Greenoaks Capital Partners LLC.

10. Surpique objects to the definition of the term "Intercompany Claims" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it includes "amounts owed to Farfetch concerning money loaned or advanced, credit extended, or goods or services provided from Farfetch to any entity in the Farfetch Group" without reference to any time period. Surpique will interpret this term to mean amounts owed to Farfetch, as recorded in Farfetch's books as of December 31, 2023, concerning money loaned or advanced, credit extended, or goods or services provided from Farfetch to any entity in the Farfetch Group.

11. Surpique objects to the definition of the term "Intercompany Subordination Agreement" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it includes "any subordination agreement between or among any of the lenders to any company in the Farfetch Group and/or any company in the Farfetch Group." Surpique will interpret this term to mean the Intercompany Subordination Agreement, dated

8

October 20, 2022 (as amended from time to time), between, among others, Farfetch, FF PLC, JP Morgan/Chase, and Wilmington Trust, National Association.

12. Surpique objects to the definition of the term "JP Morgan" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it includes "any of its affiliates or subsidiaries." Surpique will interpret this term to mean J.P. Morgan Securities LLC.

13. Surpique objects to the definition of the term "Latham" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it includes "all affiliated partnerships, limited liability companies, and Foreign Legal Consultant Offices." Surpique will interpret this term to mean Latham & Watkins LLP and Latham & Watkins (London) LLP.

14. Surpique objects to the definition of the term "Management" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it includes "any executive in charge of the operations of Farfetch." Surpique will interpret this term to include Farfetch's CEO, CFO, Chief Operations Officer, Chief Strategy Officer, Chief Legal Officer, Chief Customer Officer, Chief Marketplace Officer, Chief Marketing Officer, and Chief Product Officer as applicable.

15. Surpique objects to the definition of the term "Person" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it includes "any natural person or any legal entity, including, without limitation, any trust, estate, or governmental or business unit or association." Surpique further objects to this definition to the extent it exceeds the definition adopted in the Applicable Rules. Surpique will interpret this term to mean any natural person or legal entity.

16.     Surpique objects to the definition of the term "Term Loans" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it includes "loans and advances extended by the Term Lenders to any company in the Farfetch Group through February 9, 2024." Surpique will interpret this term to mean the loans and advances under the Credit Agreement dated October 20, 2022, between and among FF PLC, Farfetch U.S. Holdings, Inc. and/or certain of its direct and/or indirect subsidiaries, as amended, and the loan referred to as the Term Loan B. Surpique will further interpret the term "Term Lenders" to mean companies and or individuals that provided the loans and advances under the Credit Agreement dated October 20, 2022, between and among FF PLC, Farfetch U.S. Holdings, Inc. and/or certain of its direct and/or indirect subsidiaries, as amended, and the loan referred to as the Term Loan B.

17.     Surpique objects to the definition of the term "TSA" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it includes "all Transaction Documents or supplemental documents concerning the TSA or the Coupang Sale." Surpique will interpret this term to mean the Transaction Support Agreement entered into by FF PLC, Farfetch, Athena Topco, and an ad hoc group of lenders, among others, on December 18, 2023.

18.     Surpique objects to Instruction No. 5 and the "Time Period" as overbroad, unduly burdensome, and not proportional to the needs of this case. To the extent Surpique agrees to produce documents responsive to the Requests, Surpique will produce documents subject to an agreed-upon time period.

10

19.     Surpique objects to Instruction No. 6 as overbroad, unduly burdensome, and not proportional to the needs of this case to the extent it purports to require Surpique to search for or produce documents on an ongoing basis.

20.     Surpique objects to Instruction No. 7 as overbroad, unduly burdensome, and not proportional to the needs of this case to the extent it seeks to impose obligations greater than those imposed by the Applicable Rules.  Surpique will produce any documents in accordance with an appropriate and reasonable search protocol and consistent with the Applicable Rules.

21.     Surpique objects to Instruction Nos. 8 and 17 as overbroad, unduly burdensome, and not proportional to the needs of this case to the extent that they seek to impose obligations greater than those imposed by the Applicable Rules.  Surpique will not search for or provide information regarding documents that are not within its possession, custody, or control.

22.     Surpique objects to Instruction Nos. 9 and 10 as overbroad, unduly burdensome, and not proportional to the needs of this case to the extent that they seek to impose obligations greater than those imposed by the Applicable Rules.  Surpique will respond to the Requests consistent with the Applicable Rules.

23.     Surpique objects to Instruction Nos. 11, 13, 14, and 15 as overbroad, unduly burdensome, and not proportional to the needs of this case to the extent that they seek to impose obligations greater than those imposed by the Applicable Rules.  Surpique will produce documents in accordance with an appropriate and reasonable search protocol and ESI protocol and consistent with the Applicable Rules.

24.     Surpique objects to Instruction No. 16 as overbroad, unduly burdensome, and not proportional to the needs of this case to the extent it seeks to impose obligations greater than those imposed by the Applicable Rules and to the extent it purports to require Surpique to search for or

11

produce documents that are not responsive to a Request or that Surpique does not agree to search for in response to a Request. Surpique will only produce documents that are called for by a Request and that it agrees to produce in response to that Request.

26. Surpique objects to Instruction No. 18 as overbroad, unduly burdensome, and not proportional to the needs of this case to the extent it seeks to exceed the requirements under the Applicable Law. Surpique will produce a privilege log consistent with the Applicable Law, customary practice, and any other agreement that may be reached by the parties regarding the scope, timing, and/or format of privilege logs.

26. These Objections to Definitions and Instructions apply to and are incorporated in full into each Response to the Requests below, regardless of whether referenced or restated in the Response.

## DOCUMENT REQUESTS

**REQUEST NO. 1:**

A copy of the complete server on which all Documents and Communications constituting Farfetch's books and records were maintained, which was turned over to Surpique as part of the closing of the Coupang sale.

**RESPONSE TO REQUEST NO. 1:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects on the grounds that it is vague, ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent that it seeks a copy of the "complete server" without any subject matter limitation and without limitation to any specific

12

documents allegedly maintained on that server.  Surpique further objects to this Request to the extent that it seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding and to the extent that it seeks documents not in Surpique's possession, custody, or control.  Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity.  Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to meet and confer regarding the scope of this Request.

**REQUEST NO. 2:**

Documents and Communications concerning or utilized by Farfetch in connection with its public filings with the SEC for the years 2019 through 2023.

**RESPONSE TO REQUEST NO. 2:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing.  Surpique further objects on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent that it seeks all documents "concerning" Farfetch's public filings with the SEC or "utilized by Farfetch" in connection with those filings.  Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more

13

convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect Farfetch's SEC filings for the years 2019 through 2023, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 3:**

Documents and Communications concerning or utilized by Farfetch in connection with the creation and issuance of its consolidated financial statements, or any financial projections from January 1, 2019 through February 9, 2024.

**RESPONSE TO REQUEST NO. 3:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent that it seeks all documents "concerning" Farfetch's consolidated financial statements or any financial projections or documents "utilized by Farfetch" in connection with those matters. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks

14

documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect Farfetch's consolidated financial statements or financial projections from January 1, 2019 to January 30, 2024, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 4:**

Documents and Communications concerning all contents in the virtual data room established by Farfetch in connection with the sale of substantially all the assets of Farfetch and the Coupang Sale.

**RESPONSE TO REQUEST NO. 4:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents "all contents in the virtual data room" without any subject matter limitation. Surpique further objects to this

Request to the extent that it seeks documents already in the JOLs' possession. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to meet and confer regarding the scope of this Request if the Foreign Representatives confirm that they do not already have documents from the virtual data room.

**REQUEST NO. 5:**

Documents and Communications concerning the answers and responses to all inquiries made by You in connection with Project Athena and the Coupang Sale.

**RESPONSE TO REQUEST NO. 5:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents "concerning" answers and responses to "inquiries" made by Surpique. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

16

Subject to and without waiving the foregoing objections, Surpique is willing to meet and confer regarding the scope of this Request.

**REQUEST NO. 6:**

Documents and Communications concerning all financial information and results of the financial reporting of Farfetch and the Farfetch Group for the third and fourth quarters of 2023.

**RESPONSE TO REQUEST NO. 6:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing.  Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents concerning "all financial information" and documents concerning the Farfetch Group, which incorporates over 80 entities located across the globe.  Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding.  Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

17

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the Farfetch Group's financial reporting from third and fourth quarters of 2023, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 5:**

Documents and Communications concerning the Board or any activity or decision of the Board, or any special committee or subcommittee of the Board, including minutes of meetings, notes, internal memoranda, presentations, financial analyses, briefing materials and resolutions from January 1, 2019 to February 9, 2024.

**RESPONSE TO REQUEST NO. 5:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents "concerning the Board" or "any special committee or subcommittee of the Board" without any subject matter limitation. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product

18

doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that reflect Board (including any special committee or subcommittee thereof) materials, minutes, and agendas from January 1, 2019 to January 30, 2024, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 6:**

Documents and Communications concerning the Audit Committee from January 1, 2019 to February 9, 2024, including private sessions held between the Audit Committee, and (i) Farfetch's Officers, (ii) PwC, (iii) the internal audit department of any company in the Farfetch Group, and/or (iv) any other Director, including any minutes or resolutions, schedules, annexures, appendices, briefing materials, presentations, or any other documents relating to those minutes or resolutions.

**RESPONSE TO REQUEST NO. 6:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents concerning the Audit Committee without any subject matter limitation, seeks documents concerning undefined "private sessions" between the Audit Committee and a large number of individuals, and seeks documents concerning the Farfetch Group, which incorporates

19

over 80 entities located across the globe.  Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding.  Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity.  Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.  Surpique further objects to this Request to the extent it is duplicative of Request No. 7.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that reflect Audit Committee materials, minutes, and agendas from January 1, 2019 to January 30, 2024, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 7:**

Documents and Communications concerning any analysis done by any Deloitte entity for the Board, any subcommittee of the Board of for [sic] Farfetch concerning Intercompany Claims.

**RESPONSE TO REQUEST NO. 7:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing.  Surpique

20

further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents concerning "any analysis done" by "any Deloitte entity" for the Board (or any subcommittee thereof) concerning the Intercompany Claims.  Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding.  Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect any formal analysis performed by Deloitte on the Intercompany Claims, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 8:**

Documents and Communications concerning the Treasury Committee from January 1, 2019 through February 9, 2024, including any minutes or resolutions schedules, annexures, appendices, briefing materials, presentations, or any other Documents relating to those minutes or resolutions.

**RESPONSE TO REQUEST NO. 8:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and

records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents concerning the Treasury Committee without any subject matter limitation. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law. Surpique further objects to this Request to the extent it is duplicative of Request No. 7.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records that reflect Treasury Committee materials, minutes, and agendas from January 1, 2019 to January 30, 2024, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 9:**

Documents and Communications from Farfetch's CEO, Farfetch's CFO, or a representative of the finance department of any company in the Farfetch Group to the Board or Management from January 1, 2019 through February 9, 2024.

**RESPONSE TO REQUEST NO. 9:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025

22

order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents "from Farfetch's CEO, Farfetch's CFO, or a representative of the finance department of any company in the Farfetch Group," which incorporates a group of more than 300 individuals, "to the Board or Management" without any subject matter limitation. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to meet and confer regarding the scope of this Request.

**REQUEST NO. 10:**

Documents and Communications concerning Farfetch's cashflow, cash position and liquidity of Farfetch, including Documents that detail cash expenditures from January 1, 2019 through February 9, 2024.

**RESPONSE TO REQUEST NO. 10:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025

23

order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents concerning "Farfetch's cashflow, cash position and liquidity." Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect Farfetch's cashflow, cash position, and liquidity from January 1, 2019 to January 30, 2024, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 11:**

Documents and Communications concerning and Farfetch's and the Farfetch Group's use of EBITDA or a similar financial metric to determine discretionary cash available or as a substitute for other IFRS measures of financial performance from January 1, 2019 through February 9, 2024.

24

**RESPONSE TO REQUEST NO. 11:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents concerning the "use of EBITDA" or a "similar financial metric" by Farfetch and the Farfetch Group, which incorporates over 80 entities located across the globe, to determine "discretionary cash available" or as a "substitute" for "other IFRS measures of financial performance." Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the Farfetch Group's financial reporting from January 1, 2019 to January 30, 2024.

25

**REQUEST NO. 12:**

Documents and Communications concerning Farfetch's and the Farfetch Group's revenues, gross profits, operating losses and any impairment to intangibles from January 1, 2019 through February 9, 2024.

**RESPONSE TO REQUEST NO. 12:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents concerning "revenues, gross profits, operating losses and any impairment to intangibles" of Farfetch and the Farfetch Group, which incorporates over 80 entities located across the globe. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the Farfetch Group's revenues, gross profits, operating losses, and any impairment to intangibles from

26

January 1, 2019 to January 30, 2024, if any such documents exist and are identified during a

reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 13:**

Documents and Communications regarding all of Farfetch's and the Farfetch Group's operating costs and expenses, including fixed costs (including rent or lease payments, salaries insurance, depreciation, amortization), variable or semi-variable costs (including labor, utilities, shipping and freight, commissions), operating expenses (including marketing and advertising, administrative costs software licenses, equipment real estate), all direct, indirect and sunk or other costs from January 1, 2019 through February 9, 2024.

**RESPONSE TO REQUEST NO. 13:**

In addition to its General Objections and Objections to Definitions and Instructions, and

consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025

order, Surpique objects to this Request to the extent it seeks documents beyond the "books and

records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or

documents that remain the property of Farfetch following the Transaction's closing. Surpique

further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly

burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all

documents regarding all "operating costs and expenses" of Farfetch and the Farfetch Group, which

incorporates over 80 entities located across the globe. Surpique further objects to this Request to

the extent that it seeks documents already in the JOLs' possession, seeks documents available

through less burdensome means or more convenient or appropriate parties, or seeks documents

duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main

proceeding, or any related proceeding. Surpique further objects to this Request to the extent that

it seeks the discovery of information that is protected from disclosure by the attorney-client

privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity.

Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the Farfetch Group's operating costs and expenses from January 1, 2019 to January 30, 2024, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 14:**

Documents and Communications concerning the Farfetch CFO's May 18, 2023 announcement in its Form 6-K that it had "successfully navigated through unprecedented macrochallenges, and through continued focused execution [to] remain on track to deliver a year of luxury market-beating growth, a return to profitability and positive free cash flow."

**RESPONSE TO REQUEST NO. 14:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client

28

privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the Farfetch CFO's May 18, 2023 announcement referenced in the Request, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 15:**

Documents and Communications that are the basis for the statement made by Farfetch in the draft results for the third quarter of 2023: "As a result of the Company's history of losses and anticipated operating cash needs, combined with current liquidity levels, the Company's management has concluded that a material uncertainty exists that may cast significant doubt on the Company's ability to continue as a going concern, such that it may be unable to realize its assets and discharge its liabilities in the normal course of business" and that "all previously provided guidance for all future periods is withdrawn."

**RESPONSE TO REQUEST NO. 15:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing.  Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case.  Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main

29

proceeding, or any related proceeding.  Surpique further objects to this Request to the extent that

it seeks the discovery of information that is protected from disclosure by the attorney-client

privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity.

Surpique further objects to this Request to the extent it seeks discovery beyond the permissible

scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce

Farfetch books and records, as understood under U.S. principles, that discuss or reflect Farfetch's

statement referenced in the Request, if any such documents exist and are identified during a

reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 16:**

Documents and Communications concerning funds raised and liquidity made available to
Farfetch from any source, including secured or unsecured financing, the issuance of debt or equity,
trade credit, contractual arrangements, strategic partnerships, and/or royalties; and all non-
operating interest and other costs associated with any source of funding for the years 2019 through
2023.

**RESPONSE TO REQUEST NO. 16:**

In addition to its General Objections and Objections to Definitions and Instructions, and

consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025

order, Surpique objects to this Request to the extent it seeks documents beyond the "books and

records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or

documents that remain the property of Farfetch following the Transaction's closing.  Surpique

further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly

burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all

documents "concerning funds raised and liquidity made available to Farfetch from any source."

Surpique further objects to this Request to the extent that it seeks documents already in the JOLs'

possession, seeks documents available through less burdensome means or more convenient or

30

appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that reflect Farfetch's financial statements for the years 2019 through 2023, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 17:**

Documents and Communications from PwC concerning any Audit of Farfetch from January 1, 2019 through February 9, 2024, including (a) Farfetch's 2022 Audit and Farfetch's 2023 interim reporting; and (b) Communications between PwC and the Audit Committee, Farfetch's CEO or Farfetch's CFO concerning (a).

**RESPONSE TO REQUEST NO. 17:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents "from PwC concerning any Audit of Farfetch." Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available

31

through less burdensome means or more convenient or appropriate parties, or seeks documents

duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main

proceeding, or any related proceeding. Surpique further objects to this Request to the extent that

it seeks the discovery of information that is protected from disclosure by the attorney-client

privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity.

Surpique further objects to this Request to the extent it seeks discovery beyond the permissible

scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce

Farfetch books and records, as understood under U.S. principles, that discuss or reflect any Audit

by PwC of Farfetch from January 1, 2019 to January 30, 2024, if any such documents exist and

are identified during a reasonable search of documents in Surpique's possession, custody,

or control.

**REQUEST NO. 18:**

Documents and Communications from January 1, 2019 through February 9, 2024, concerning PwC's involvement in the quarterly reporting of the Farfetch Group, safeguards performed by PwC concerning the independence of information provided for Audits, material weaknesses of the Farfetch Group that were identified and the impact the refusal to sign off on Farfetch Italia S.r.l companies' financial information would have on the 2022 Audit.

**RESPONSE TO REQUEST NO. 18:**

In addition to its General Objections and Objections to Definitions and Instructions, and

consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025

order, Surpique objects to this Request to the extent it seeks documents beyond the "books and

records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or

documents that remain the property of Farfetch following the Transaction's closing. Surpique

further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly

burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all

documents concerning PwC's "involvement" in the quarterly reporting of the Farfetch Group, which incorporates over 80 entities located across the globe; "safeguards" performed by PwC; "material weaknesses" of the Farfetch Group; and the "impact the refusal to sign off on Farfetch Italia S.r.l companies' financial information would have on the 2022 Audit." Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect PwC's involvement in the quarterly reporting of the Farfetch Group from January 1, 2019 to January 30, 2024, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 19:**

Documents and Communications concerning Farfetch's assessment of its ability to continue as a going concern from January 1, 2019 through February 9, 2024, and any Documents or Communications relied upon in forming any opinion or analysis relating to the assessment.

**RESPONSE TO REQUEST NO. 19:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and

records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents concerning Farfetch's assessment of its ability to "continue as a going concern" and documents relied upon "in forming any opinion or analysis relating to the assessment." Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to meet and confer regarding the scope of this Request.

**REQUEST NO. 20:**

Documents and Communications concerning PwC's assessment of Farfetch's ability to continue as a going concern at any time from January 1, 2019 through February 9, 2024, including any other Documents relied upon in forming any opinion, analysis, or assessment, regardless of time frame, of Farfetch's ability to continue as a going concern.

**RESPONSE TO REQUEST NO. 20:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and

34

records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing.  Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents concerning PwC's assessment of Farfetch's ability to "continue as a going concern" and documents relied upon "in forming any opinion, analysis, or assessment, regardless of time frame, of Farfetch's ability to continue as a going concern."  Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding.  Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to meet and confer regarding the scope of this Request.

**REQUEST NO. 21:**

Documents and Communications concerning Farfetch's and the Farfetch Group's need for liquidity and the amount needed in November of 2023 through March 31, 2024.

**RESPONSE TO REQUEST NO. 21:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and

records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents concerning the "need for liquidity" of Farfetch and the Farfetch Group, which incorporates over 80 entities across the globe, and "the amount needed." Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the Farfetch Group's need for liquidity from November 1, 2023 through January 30, 2024, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 22:**

Documents and Communications concerning the negative financial repercussions of the November 2023 announcement that the Farfetch Group would not disclose its results for the third quarter of 2023, including increased credit and payments terms, processing of orders, and costs.

**RESPONSE TO REQUEST NO. 22:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect any negative financial repercussions of the November 2023 announcement that the Farfetch Group would not disclose its results for the third quarter of 2023, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 23:**

Documents and Communications concerning all of Farfetch's and the Farfetch Group's internal and management accounts from January 1, 2019 through February 9, 2024 and financial performance and metrics for each business unit.

**RESPONSE TO REQUEST NO. 23:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents concerning "internal and management accounts" of Farfetch and the Farfetch Group, which incorporates over 80 entities across the globe, and the "financial performance and metrics for each business unit." Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to meet and confer regarding the scope of this Request.

**REQUEST NO. 24:**

Documents and Communications concerning financial projections and cashflow forecasts of Farfetch that the Farfetch Group prepared from January 1, 2019 through February 9, 2024,

38

including correspondence relating to the review and approval of these projections and forecasts and the review and approval of the headroom model.

**RESPONSE TO REQUEST NO. 24:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents concerning "financial projections and cashflow forecasts" of Farfetch prepared by the Farfetch Group, which incorporates over 80 entities across the globe, and all "correspondence relating to the review and approval of these projections and forecasts" and the "headroom model." Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that reflect financial projections and cashflow forecasts of Farfetch prepared by entities in the Farfetch Group from January 1, 2019

39

to January 30, 2024, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 25:**

Documents and Communications concerning the review by the Board and Management of Farfetch's quarterly earnings reports, including any statements within those earnings reports made by Farfetch's CEO or Farfetch's CFO.

**RESPONSE TO REQUEST NO. 25:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents concerning "the review" by the Board and Management of Farfetch's quarterly earnings reports and "any statements" within those reports made by Farfetch's CEO or Farfetch's CFO. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

40

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect review by the Board or Management of Farfetch's quarterly earnings reports, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 26:**

Documents and Communications concerning the Board's decision to create a Special Committee.

**RESPONSE TO REQUEST NO. 26:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

41

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the Board's decision to form the Special Committee, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 27:**

Documents concerning Project Athena presented to the Special Committee and Communications with the Special Committee concerning Project Athena.

**RESPONSE TO REQUEST NO. 27:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that reflect documents presented to the Special Committee regarding Project Athena, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 28:**

Documents and Communications concerning options considered to address Farfetch's liquidity position, including monetization of non-core assets, secured and unsecured financing, issuance of debt or equity, partnerships or contractual arrangements and any other funding or financing from third parties such as Alibaba and Richemont.

**RESPONSE TO REQUEST NO. 28:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect options considered to address Farfetch's liquidity position, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 29:**

Documents and Communications concerning a potential take-private process for Farfetch.

**RESPONSE TO REQUEST NO. 29:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect a potential

44

take-private process for Farfetch, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 30:**

Documents and Communications concerning the Term Loans, including Farfetch's decision to enter into (i) any amendment of the "Term Loans" as defined in the Farfetch's Form 6-K for the month of December 2023, (ii) Bridge Loan Facility; and (iii) the Term Loan B extension in August 2023 and the consideration of other available options.

**RESPONSE TO REQUEST NO. 30:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents "concerning the Term Loans" and the "consideration of other available options." Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

45

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the Term Loans, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 31:**

Documents and Communications concerning the Intercompany Subordination Agreements.

**RESPONSE TO REQUEST NO. 31:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the Intercompany Subordination Agreements, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 34:**

Documents and Communications concerning Farfetch's decision not to announce its third quarter results in 2023.

**RESPONSE TO REQUEST NO. 34:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

47

Subject to and without waiving the foregoing objections, Surpique is willing to produce

Farfetch books and records, as understood under U.S. principles, that discuss or reflect Farfetch's

decision not to announce its third quarter results in 2023, if any such documents exist and are

identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 32:**

Documents constituting corporate records, meeting minutes, notes, internal memoranda, analyses, factual research, due diligence, and presentations of the Farfetch Group concerning Farfetch.

**RESPONSE TO REQUEST NO. 32:**

In addition to its General Objections and Objections to Definitions and Instructions, and

consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025

order, Surpique objects to this Request to the extent it seeks documents beyond the "books and

records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or

documents that remain the property of Farfetch following the Transaction's closing. Surpique

further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly

burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all

"corporate records, meeting minutes, notes, internal memoranda, analyses, factual research, due

diligence, and presentations" of the Farfetch Group, which incorporates over 80 entities located

across the globe, "concerning Farfetch" without any subject matter limitation. Surpique further

objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks

documents available through less burdensome means or more convenient or appropriate parties,

or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding,

the foreign main proceeding, or any related proceeding. Surpique further objects to this Request

to the extent that it seeks the discovery of information that is protected from disclosure by the

attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection,

48

or immunity.  Surpique further objects to this Request to the extent it seeks discovery beyond the

permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to meet and

confer regarding the scope of this Request.

**REQUEST NO. 33:**

Documents concerning corporate records, meeting minutes, notes, internal memoranda, analyses, factual research, due diligence, and presentations, of Farfetch and the Farfetch Group concerning Project Athena.

**RESPONSE TO REQUEST NO. 33:**

In addition to its General Objections and Objections to Definitions and Instructions, and

consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025

order, Surpique objects to this Request to the extent it seeks documents beyond the "books and

records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or

documents that remain the property of Farfetch following the Transaction's closing.  Surpique

further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly

burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all

documents "concerning corporate records, meeting minutes, notes, internal memoranda, analyses,

factual research, due diligence, and presentations" of Farfetch and the Farfetch Group, which

incorporates over 80 entities located across the globe, "concerning Project Athena."  Surpique

further objects to this Request to the extent that it seeks documents already in the JOLs' possession,

seeks documents available through less burdensome means or more convenient or appropriate

parties, or seeks documents duplicative of those sought from other parties in this chapter 15

proceeding, the foreign main proceeding, or any related proceeding.  Surpique further objects to

this Request to the extent that it seeks the discovery of information that is protected from disclosure

by the attorney-client privilege, the work-product doctrine, or any other applicable privilege,

49

protection, or immunity.  Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce books and records, as understood under U.S. principles, of Farfetch, FF PLC, and FF UK Limited that discuss or reflect the above categories of documents in the Request concerning Project Athena, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 34:**

Documents and Communications concerning subordination agreements and Project Athena and/or the Coupang Sale.

**RESPONSE TO REQUEST NO. 34:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing.  Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case.  Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding.  Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity.

50

Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce books and records, as understood under U.S. principles, of Farfetch, FF PLC, and FF UK Limited that discuss or concern Project Athena or the Coupang Sale, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 35:**

Documents and Communications concerning the Intercompany Claims.

**RESPONSE TO REQUEST NO. 35:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the Intercompany Claims, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

## REQUEST NO. 36:

Documents and Communications concerning the Intercompany Claims owing from Farfetch Japan Co., Ltd to Farfetch.

## RESPONSE TO REQUEST NO. 36:

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law. Surpique further objects to this Request to the extent it is duplicative of Request No. 38.

52

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the Intercompany Claims owing from Farfetch Japan Co., Ltd to Farfetch, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 37:**

Documents and Communications concerning the Intercompany Claims owing from Farfetch Italia S.r.l. Limited to Farfetch.

**RESPONSE TO REQUEST NO. 37:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible

53

scope of discovery under Cayman Islands law. Surpique further objects to this Request to the extent it is duplicative of Request No. 38.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the Intercompany Claims owing from Farfetch Italia S.r.l. Limited to Farfetch, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 38:**

Documents and Communications concerning the Intercompany Claims owing from New Guards Group Holding S.p.A. to Farfetch.

**RESPONSE TO REQUEST NO. 38:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity.

Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law. Surpique further objects to this Request to the extent it is duplicative of Request No. 38.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the Intercompany Claims owing from New Guards Group Holding S.p.A. to Farfetch, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 39:**

Documents and Communications concerning the Intercompany Claims owing from Farfetch Middle East FZE to Farfetch.

**RESPONSE TO REQUEST NO. 39:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client

55

privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.  Surpique further objects to this Request to the extent it is duplicative of Request No. 38.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the Intercompany Claims owing from Farfetch Middle East FZE to Farfetch, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

## REQUEST NO. 40:

Documents and Communications concerning the Intercompany Claims owing from Farfetch China Holdings Ltd to Farfetch.

## RESPONSE TO REQUEST NO. 40:

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing.  Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case.  Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding.  Surpique further objects to this Request to the extent that

56

it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law. Surpique further objects to this Request to the extent it is duplicative of Request No. 38.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the Intercompany Claims owing from Farfetch China Holdings Ltd to Farfetch, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 41:**

Documents and Communications concerning the Intercompany Claims owing from Farfetch.com US LLC to Farfetch.

**RESPONSE TO REQUEST NO. 41:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main

proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law. Surpique further objects to this Request to the extent it is duplicative of Request No. 38.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the Intercompany Claims owing from Farfetch.com US LLC to Farfetch, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 42:**

Documents and Communications concerning the Intercompany Claims owing from Farfetch UK Limited to Farfetch.

**RESPONSE TO REQUEST NO. 42:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents

58

duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding.  Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.  Surpique further objects to this Request to the extent it is duplicative of Request No. 38.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the Intercompany Claims owing from Farfetch UK Limited to Farfetch, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 46:**

Documents and Communications concerning the Intercompany Claims owing from Farfetch Holdings plc to Farfetch.

**RESPONSE TO REQUEST NO. 46:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing.  Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case.  Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available

59

through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law. Surpique further objects to this Request to the extent it is duplicative of Request No. 38.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the Intercompany Claims owing from Farfetch Holdings plc to Farfetch, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 43:**

Documents and Communications concerning any assets, interest or rights jointly owned or shared with Farfetch and any company in the Farfetch Group.

**RESPONSE TO REQUEST NO. 43:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all

documents "concerning any assets, interest or rights jointly owned or shared with Farfetch and any company in the Farfetch Group," which incorporates over 80 entities located across the globe. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to meet and confer regarding the scope of this Request.

**REQUEST NO. 44:**

Documents and Communications concerning the decision to enter into transactions regarding Violet Grey and Reebok and to terminate the YNAP Acquisition.

**RESPONSE TO REQUEST NO. 44:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available

through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding.  Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the decision to enter into transactions regarding Violet Grey and Reebok and to terminate the YNAP Acquisition, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 45:**

All Documents and Communications concerning Farfetch's Value-Added Tax, or the recovery or factoring in of such Value-Added Tax receivables from January 1, 2019 through February 9, 2024.

**RESPONSE TO REQUEST NO. 45:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing.  Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case.  Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available

through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect Farfetch's Value-Added Tax from January 1, 2019 to January 30, 2024, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 46:**

Documents and Communications concerning material weaknesses and lack of internal and operational controls for Farfetch or any company in the Farfetch Group from January 1, 2019 through February 9, 2024.

**RESPONSE TO REQUEST NO. 46:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents concerning "material weaknesses" and "lack of internal and operational controls" for Farfetch or any company in the Farfetch Group, which incorporates 80 entities located across the

63

globe.  Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding.  Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity.  Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect any material weaknesses or lack of internal and operational controls for the Farfetch Group from January 1, 2019 to January 30, 2024, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 47:**

Documents and Communications relating to any possible or identified material misstatement of the financial position of Farfetch or any other related negative repercussions based on lack of internal and operational controls from January 1, 2019 through February 9, 2024.

**RESPONSE TO REQUEST NO. 47:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing.  Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all

64

documents relating to "any possible or identified material misstatement" of the financial position of Farfetch or any other "related negative repercussions based on lack of internal and operational controls." Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it calls for a legal conclusion, specifically with respect to what constitutes a "material misstatement." Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or concern any identified material misstatement of the financial position of Farfetch from January 1, 2019 to January 30, 2024, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 48:**

Documents and Communication concerning the financial impact on the Farfetch Group, including the steps taken by Management to mitigate the financial impact of (a) the Ukraine war (b) China zero tolerance and other extended COVID lockdown policies and (c) strengthening of the US dollar from January 1, 2020 through February 9, 2024.

**RESPONSE TO REQUEST NO. 48:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025

65

order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents "concerning the financial impact on the Farfetch Group," which incorporates over 80 entities located across the globe, of "the Ukraine war," "China zero tolerance and other extended COVID lockdown policies," and the "strengthening of the US dollar." Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the financial impact on the Farfetch Group of the Ukraine war, China zero tolerance and other extended COVID lockdown policies, and the strengthening of the US dollar from January 1, 2020 to January 30, 2024, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

66

**REQUEST NO. 49:**

Documents and Communications concerning all efforts of Farfetch Group's partners to de-risk their relationship with the Farfetch Group, including changes to supplier and service provider terms, partner credit limit terms, or lender financing terms and those raised in the Board presentation of December 7, 2023.

**RESPONSE TO REQUEST NO. 49:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents concerning all efforts of partners of the Farfetch Group, which incorporates over 80 entities across the globe, to "de-risk" their relationship with the Farfetch Group. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss the efforts, as raised

in the December 7, 2023 Board presentation, of Farfetch Group's partners to de-risk their relationship with the Farfetch Group, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 54:**

Copies of all insurance policies concerning acts of Directors or Management and insuring liability of Directors, Management and/or Farfetch.

**RESPONSE TO REQUEST NO. 54:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that reflect insurance policies responsive to this Request, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 55:**

Copies of all Directors and Management liability insurance policies concerning excess insurance provided in policy number FSGDO2201097 for October 21, 2022 to October 21, 2023 policy period (or for any equivalent policy).

**RESPONSE TO REQUEST NO. 55:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that reflect insurance policies responsive to this Request, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 50:**

Copies of any indemnities relating to acts of Directors or Management.

69

**RESPONSE TO REQUEST NO. 50:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that reflect indemnities relating to acts of Directors or Management, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 51:**

Documents and Communications concerning rights, releases, approvals, or agreements to which Farfetch was required to be a party to close the Coupang Transaction.

**RESPONSE TO REQUEST NO. 51:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and

70

records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect rights, releases, approvals, or agreements to which Farfetch was required to be a party to close the Coupang Transaction, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 58:**

Documents and Communications concerning the purchase of a tail on any Directors and Officer liability insurance and negotiations with any party to the Coupang Sale concerning the same.

**RESPONSE TO REQUEST NO. 58:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and

71

records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the purchase of a tail on any Directors and Officer liability insurance in connection with the Coupang Sale, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 52:**

Documents and Communications concerning any indemnification for winding up costs of Farfetch as consideration for, or as part of the negotiations of the Coupang Sale.

**RESPONSE TO REQUEST NO. 52:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and

records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, responsive to this Request, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 53:**

Documents and Communications concerning the resignation of directors of Farfetch from October of 2023 to the present date.

**RESPONSE TO REQUEST NO. 53:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or

73

documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the resignation of directors of Farfetch from October 1, 2023 to January 30, 2024, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**<u>REQUEST NO. 61</u>:**

Communications concerning the circumstances surrounding the termination, resignation and/or departure of Elliot Jordan as CFO of Farfetch.

**<u>RESPONSE TO REQUEST NO. 61</u>:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or

documents that remain the property of Farfetch following the Transaction's closing. Surpique

further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not

proportional to the needs of the case. Surpique further objects to this Request to the extent that it

seeks documents already in the JOLs' possession, seeks documents available through less

burdensome means or more convenient or appropriate parties, or seeks documents duplicative of

those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any

related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery

of information that is protected from disclosure by the attorney-client privilege, the work-product

doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to

this Request to the extent it seeks discovery beyond the permissible scope of discovery under

Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce

Farfetch books and records, as understood under U.S. principles, that discuss or reflect the

termination, resignation and/or departure of Elliot Jordan as CFO of Farfetch, if any such

documents exist and are identified during a reasonable search of documents in Surpique's

possession, custody, or control.

**REQUEST NO. 62:**

Communications concerning the selection and hiring of Tim Stone as CFO of Farfetch.

**RESPONSE TO REQUEST NO. 62:**

In addition to its General Objections and Objections to Definitions and Instructions, and

consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025

order, Surpique objects to this Request to the extent it seeks documents beyond the "books and

records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or

documents that remain the property of Farfetch following the Transaction's closing. Surpique

further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the selection and hiring of Tim Stone as CFO of Farfetch, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 54:**

Documents and Communications concerning the TSA, including all drafts of the TSA.

**RESPONSE TO REQUEST NO. 54:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it

76

seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or reflect the TSA, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 55:**

All requests for information made by You to the Farfetch Group before Surpique's acquisition of substantially all of the assets of FF PLC through the Coupang Sale.

**RESPONSE TO REQUEST NO. 55:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents "requests for information made by You to Farfetch or any company in the Farfetch

77

Group," which incorporates over 80 entities located across the globe, without any subject matter limitation. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to meet and confer regarding the scope of this Request.

**REQUEST NO. 56:**

Documents and Communications concerning Project Athena, not otherwise incorporated in the requests herein, including Documents and Communications concerning all actions taken by Farfetch to enter into and close the Coupang Sale.

**RESPONSE TO REQUEST NO. 56:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents

78

duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to meet and confer regarding the scope of this Request.

**REQUEST NO. 57:**

Documents and Communications concerning the Coupang Sale, not otherwise incorporated in the requests herein, including Documents and Communications concerning all actions taken by Farfetch to enter into and close the Coupang Sale.

**RESPONSE TO REQUEST NO. 57:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client

privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to meet and confer regarding the scope of this Request.

**REQUEST NO. 58:**

Communications concerning Project Athena and/or the Coupang Sale between or among You and any legal advisor to Farfetch and/or its Directors or Officers, including Communications with Latham, Mourant Ozannes (Cayman) LLP, and/or Forsters LLP.

**RESPONSE TO REQUEST NO. 58:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Based on the foregoing objections, Surpique will not produce documents responsive to this Request.

**REQUEST NO. 59:**

Documents and Communications concerning any legal advice or analysis provided to Farfetch concerning Project Athena, the Coupang Sale, and/or the Board's fiduciary duties by (i) You; (ii) Latham, (iii) Mourant Ozannes (Cayman) LLP; (iv) Forsters LLP; or (v) any other firm or company.

**RESPONSE TO REQUEST NO. 59:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks all documents concerning any "analysis" provided to Farfetch concerning Project Athena, the Coupang Sale, and/or the Board's fiduciary duties. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

81

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss Project Athena, the Coupang Sale, or the Board's fiduciary duties, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 60:**

Communications concerning Project Athena and/or the Coupang Sale with any advisor to Farfetch of the Farfetch Group.

**RESPONSE TO REQUEST NO. 60:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks documents concerning communications with any advisor to the Farfetch Group, which incorporates over 80 entities located across the globe. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to

82

this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or concern Project Athena or the Coupang Sale, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 61:**

Communications concerning Project Athena and/or the Coupang Sale and Brunswick Group LLC.

**RESPONSE TO REQUEST NO. 61:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to

this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch books and records, as understood under U.S. principles, that discuss or concern Brunswick Group LLC in connection with Project Athena or the Coupang Sale, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 71:**

Documents and Communications concerning the Boards decision, or the decision of the FF PLC Board, to hire JP Morgan as FF PLC's (or any other company's in the Farfetch Group) financial advisor or investment banker for Project Athena, any retention agreement, JP Morgan's role in Project Athena and its assessment of the Coupang Sale, and issues JP Morgan identified with the Farfetch business or finances.

**RESPONSE TO REQUEST NO. 71:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks documents concerning the Farfetch Group, which incorporates over 80 entities located across the globe. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further

84

objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch and FF PLC books and records, as understood under U.S. principles, that discuss or concern JP Morgan's involvement in Project Athena or the Coupang Sale, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 72:**

Communications between You and JP Morgan concerning Project Athena and the Coupang Sale.

**RESPONSE TO REQUEST NO. 72:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery

85

of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Based on the foregoing objections, Surpique will not produce documents responsive to this Request.

**REQUEST NO. 73:**

Documents and Communications concerning the Board's decision, or the decision of the FF PLC Board, to hire AlixPartners as FF PLC's (or any other company's in the Farfetch Group) advisor for Project Athena, any retention agreement, AlixPartners' role in Project Athena, its assessment of the Coupang Sale, and issues AlixPartners identified with the Farfetch business of finances, including the experience and skills of the Farfetch finance department, and the oversight of the Farfetch's CEO of the finance department.

**RESPONSE TO REQUEST NO. 73:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks documents concerning the Farfetch Group, which incorporates over 80 entities located across the globe. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request

86

to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch and FF PLC books and records, as understood under U.S. principles, that discuss or reflect AlixPartners's involvement in Project Athena or the Coupang Sale, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 62:**

Communications between You and AlixPartners concerning Project Athena and the Coupang Sale.

**RESPONSE TO REQUEST NO. 62:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery

87

of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Based on the foregoing objections, Surpique will not produce documents responsive to this Request.

**REQUEST NO. 63:**

Documents and Communications concerning the Board's decision, or the decision of the FF PLC Board, to hire Evercore as FF PLC's (or any other company's in the Farfetch Group) financial advisor for Project Athena, any retention agreement, Evercore's role in Project Athena, its assessment of the Coupang Sale, and issues Evercore identified with the Farfetch business or finances.

**RESPONSE TO REQUEST NO. 63:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case, particularly to the extent it seeks documents concerning the Farfetch Group, which incorporates over 80 entities located across the globe. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the

88

attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity.  Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce Farfetch and FF PLC books and records, as understood under U.S. principles, that discuss or reflect Evercore's involvement in Project Athena or the Coupang Sale, if any such documents exist and are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 64:**

Communications between You and Evercore concerning Project Athena and the Coupang Sale.

**RESPONSE TO REQUEST NO. 64:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing.  Surpique further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case.  Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding.  Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product

89

doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Based on the foregoing objections, Surpique will not produce documents responsive to this Request.

**REQUEST NO. 65:**

Documents and Communications between You and the Term Lenders.

**RESPONSE TO REQUEST NO. 65:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

90

Based on the foregoing objections, Surpique will not produce documents responsive to this Request.

**REQUEST NO. 66:**

Documents concerning financial analyses, including cash projections and reports on profitability, for Project Athena authored by any third party.

**RESPONSE TO REQUEST NO. 66:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Subject to and without waiving the foregoing objections, Surpique is willing to produce books and records, as understood under U.S. principles, of Farfetch, FF PLC, and FF UK Limited reflecting any third-party financial analyses for Project Athena, if any such documents exist and

91

are identified during a reasonable search of documents in Surpique's possession, custody, or control.

**REQUEST NO. 67:**

Documents and Communications provided to You concerning Farfetch's cash flows and liquidity position from January 1, 2019 through February 9, 2024.

**RESPONSE TO REQUEST NO. 67:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Based on the foregoing objections, Surpique will not produce documents responsive to this Request.

92

**REQUEST NO. 68:**

Documents and Communications provided to You concerning Farfetch's decision to terminate the YNAP Acquisition.

**RESPONSE TO REQUEST NO. 68:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Based on the foregoing objections, Surpique will not produce documents responsive to this Request.

**REQUEST NO. 69:**

Documents concerning valuations provided to You by any third-party concerning Project Athena and the Coupang Sale.

93

**RESPONSE TO REQUEST NO. 69:**

In addition to its General Objections and Objections to Definitions and Instructions, and consistent with the Court's decision at the January 15, 2025 hearing and in the February 4, 2025 order, Surpique objects to this Request to the extent it seeks documents beyond the "books and records" of Farfetch and its subsidiaries prior to or at the time of the Transaction's closing or documents that remain the property of Farfetch following the Transaction's closing. Surpique further objects to this Request on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. Surpique further objects to this Request to the extent that it seeks documents already in the JOLs' possession, seeks documents available through less burdensome means or more convenient or appropriate parties, or seeks documents duplicative of those sought from other parties in this chapter 15 proceeding, the foreign main proceeding, or any related proceeding. Surpique further objects to this Request to the extent that it seeks the discovery of information that is protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, protection, or immunity. Surpique further objects to this Request to the extent it seeks discovery beyond the permissible scope of discovery under Cayman Islands law.

Based on the foregoing objections, Surpique will not produce documents responsive to this Request.

94

Dated: February 18, 2025
Wilmington, Delaware

**KLEHR HARRISON HARVEY**
**BRANZBURG LLP**

*/s/ Domenic E. Pacitti*

Domenic Pacitti (DE Bar No. 3989)
919 North Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone: (302) 552-5511
Facsimile: (302) 426-1189
Email: dpacitti@klehr.com

-and-

**KIRKLAND & ELLIS LLP**

Joshua Greenblatt, P.C. (admitted *pro hac vice*)
Amanda Lamothe-Cadet (admitted *pro hac vice*)
601 Lexington Ave
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: josh.greenblatt@kirkland.com
        amanda.lamothecadet@kirkland.com

John R. Luze (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: john.luze@kirkland.com

Kenneth P. Monroe (admitted *pro hac vice*)
200 Clarendon St.
Boston, MA 02116
Telephone: (617) 385-7571
Facsimile: (617) 385-7501
Email: kenneth.monroe@kirkland.com

*Counsel to Surpique LP*

# EXHIBIT C

<pre>
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE


IN RE:                            .   Chapter 15
                                  .   Case No. 24-11519 (CTG)
FARFETCH LTD., (in Official       .
Liquidation),                     .   Courtroom No. 7
                                  .   824 Market Street
                                  .   Wilmington, Delaware 19801
    Debtor in a Foreign           .
      Proceeding.                 .   Wednesday, January 15, 2025
. . . . . . . . . . . . . . . .       1:00 p.m.

                       TRANSCRIPT OF ZOOM HEARING
              BEFORE THE HONORABLE CRAIG T. GOLDBLATT
                   UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Foreign
Representative:                   Jessica Zeldin, Esquire
                                  REID COLLINS & TSAI, LLP
                                  300 Delaware Avenue
                                  Suite 770
                                  Wilmington, Delaware 19801

For Petitioners
Alexander Lawson and
Christopher Kennedy:              Ryan M. Goldstein, Esquire
                                  REID COLLINS & TSAI, LLP
                                  300 Delaware Avenue
                                  Suite 770
                                  Wilmington, Delaware 19801


(APPEARANCES CONTINUED)

Audio Operator:                   Teasha Marsh, ECRO

Transcription Company:           Reliable
                                  The Nemours Building
                                  1007 N. Orange Street, Suite 110
                                  Wilmington, Delaware 19801
                                  Telephone: (302)654-8080
                                  Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
</pre>

2

APPEARANCES (CONTINUED):

For Surpique, LP:          John R. Luze, Esquire
                          KIRKLAND & ELLIS, LLP
                          333 West Wolf Point Plaza
                          Chicago, Illinois 60654

For Interested Party,
Latham & Watkins:          Marcos A. Ramos, Esquire
                          RICHARDS, LAYTON & FINGER, P.A.
                          One Rodney Square
                          920 North King Street
                          Wilmington, Delaware 19801

INDEX

MOTIONS:                                                          PAGE

Agenda
Item 1:    Motion of the Foreign Representatives for        48
           Entry of an Order to Conduct Discovery from
           Latham & Watkins LLP Pursuant to 11 U.S.C.
           542(e), 1521(a)(4), 1521(a)(5), Fed. R. Bankr.
           P. 2004, and Local Rule 2004-1
           (D.I. 58, filed 11/19/24).

           Court's Ruling:                                  83

Agenda
Item 2:    Motion of the Foreign Representatives for         5
           Entry of an Order to Conduct Discovery from
           Surpique L.P. Pursuant to 11 U.S.C. 542(e),
           1507(a), 1521(a)(4), 1521(a)(5), Fed. R.
           Bankr. P. 2004, and Local Rule 2004-1.
           (D.I. 66, filed 12/3/24)

           Court's Ruling:                                  79

Transcriptionists' Certificate                              89

(Proceedings commence at 1:00 p.m.)

THE COURT: Good afternoon. This is Judge Goldblatt. We are on the record in In Re Farfetch Limited, Case Number 24-11519. We are proceeding this afternoon by way of Zoom, so usual Zoom rules are in effect. And I am happy to pass the virtual podium, I guess to start with counsel for the foreign representative to walk us through our agenda.

MS. ZELDIN: Thank you, Your Honor. This is Jessica Zeldin on behalf of the foreign representative. With me on the line or on the Zoom are my colleagues Ryan Goldstein, Julia Di Fiore, and Robert LaCroix.

Mr. Goldstein is going to make today's arguments and will walk you through the agenda on behalf of the foreign representative.

THE COURT: Okay. Very well.

MR. ZELDIN: Thank you.

THE COURT: Thank you. Thank you, Ms. Zeldin.

Mr. Goldstein.

MR. GOLDSTEIN: Thank you, Your Honor. The parties conferred in advance of today's hearing and agreed on an order of argument, subject to, of course, Your Honor's preferences, to start by arguing the motion seeking documents and the issuance of a subpoena to Surpique, counsel is on the line from Surpique; and then to follow separately with

argument on the motion seeking the issuance of a subpoena to Latham & Watkins.

THE COURT: Okay. Very well.

I'm sorry. Can you hear me?

MR. GOLDSTEIN: Yes, Your Honor.

THE COURT: Okay. Yeah, so proceeding in that order is fine, I'm happy to have you proceed then, I guess, with the motion with respect to Surpique.

MR. GOLDSTEIN: Okay. Would you like to take appearances from Surpique's counsel first or shall I commence?

THE COURT: I'm happy for folks to appear when they chime in, so I'm -- unless someone asks otherwise, I'm happy to allow you to proceed.

MR. GOLDSTEIN: Thank you, Your Honor.

I think there's a lot of paper here, there's a lot of issues. But what I'd like to do is reorient the Court on the Surpique motion to sort of three issues, briefly:

One, how did we get here?

Two, what does the Court need to resolve on the motion and what does the Court not need to resolve, in order to break the log jam?

And three, what's next? Where do we go from here?

So there's a lengthy procedural history to this Cayman liquidation and efforts to seek documents from

Surpique.

Briefly, Farfetch Limited was a Cayman Islands holding company, publicly traded in the United States. And its assets as a holding company were subsidiaries that were all in the fashion industry, the fashion space.

In the transaction referred to as "Project Athena," Surpique, LP, which is the discovery target here and which is a Delaware entity, acquired from a subsidiary of Farfetch Limited all of those subsidiaries. It was an asset transaction in which far -- Surpique acquired the subsidiaries.

THE COURT: All right. So slow down.

MR. GOLDSTEIN: As part of that --

THE COURT: Slow down. I'm sorry.

MR. GOLDSTEIN: Yep.

THE COURT: Mr. Goldstein, slow down a second.

So, analytically, what you said doesn't totally hold together because a subsidiary can't sell itself. So walk me through more precisely the sale. Who was the sell -- was the seller the debtor or was the seller a subsidiary of the debtor?

MR. GOLDSTEIN: The seller was a subsidiary of the debtor in the U.K., a different Farfetch entity, that then sold further subsidiaries down --

THE COURT: Got it.

MR. GOLDSTEIN: -- the corporate chain --

THE COURT: So the first --

MR. GOLDSTEIN: -- to Surpique.

THE COURT: The first level subsidiary that was the seller in the transaction, what's the name of that entity?

MR. GOLDSTEIN: That's Surpique, it's a PLC in in the United -- excuse me -- Farfetch, PLC, in the United Kingdom.

THE COURT: Got it. Okay. And so -- okay. I'm with you so far. All right. You can --

MR. GOLDSTEIN: Okay.

THE COURT: You can pick up --

MR. GOLDSTEIN: So as part --

THE COURT: -- from there.

MR. GOLDSTEIN: As part of that transaction, Surpique acquires, among other things, a server that hosts all of the Farfetch Limited Group's documents, communications, and information; those pass to Surpique as part of the transaction. And the creditors of Farfetch Limited, the Cayman Islands holding company that's traded in the United States, essentially are left unpaid, and a liquidation ensues in the Cayman Islands.

And just to orient the Court, this is a situation where the liquidators, now standing in the shoes of Farfetch

Limited, do not have access to Farfetch Limited's historical documents. Those went to Surpique as part of the transaction. So the liquidators really are starting at square one, in terms of piecing together the company's financials, how it arrived at the transaction with Surpique, and what to report to creditors.

THE COURT: Okay.

MR. GOLDSTEIN: In that Cayman Islands liquidation, Surpique has not appeared. Surpique has objected to jurisdiction in the Cayman Islands, which, in part, necessitated the filing of this Chapter 15 proceeding in Delaware, Surpique's home forum. I know Your Honor is familiar with that from the recognition hearing. Surpique appeared at the recognition hearing and had a limited objection to what we're here today on, the discovery.

The Court, following the hearing, issued a recognition order. That recognition order authorizes the liquidators to take actions under Section 1521, in the United States, including the issuance of subpoenas under Rule 2004; except, with respect to Surpique, the recognition order required this separate motion.

That takes us to: What does the Court need to resolve today? And in the ten months that the liquidators have been seeking documents from Surpique, first in the Cayman Islands, and later during a lengthy meet-and-confer

process under the Local Rule 2004, Surpique has not produced a single document. It has not produced a "book and record," as defined under Cayman law, it has not produced email correspondence, it has not produced anything.

And that is because Surpique is raising a threshold legal argument. And without the resolution of these threshold legal arguments, it's really impossible to confer on the scope of the requests and how Surpique is going to go about collecting and producing documents because we're just of in different universes, and we need the Court's resolution to sort of unclog what is, effectively, a logjam.

Section 1521(a)(4) of the Code authorizes the issuance of a subpoena where it is necessary to effectuate the purposes of the Chapter 15 proceeding or to protect the interests of Farfetch Limited, the debtor, or its creditors.

Here, the issuance of a subpoena is absolutely necessary. The liquidators are tasked with investigating the causes of the company's financial implosion, investigating potential assets and causes of action in the United States, reporting on the affairs of the company to the creditors. The liquidators cannot take any of those steps without access to, among other things, the company's historic documents. How did it put together its financials? Who was it communicating with? Currently, as we sit here today at the outset of this investigation, the joint liquidators do not

have access to those materials.

U.S. decisions are clear that Rule 2004 can be used as a tool in a Chapter 15 proceeding to investigate a company's affairs, to investigate U.S. assets like causes of action. This even applies where the foreign main proceeding is a Cayman Islands liquidation. Platinum Partners, which is a 2018 Southern District Bankruptcy Court decision, walks through the statutory scheme in detail.

And so, here, the discovery is absolutely necessary. Surpique's argument has been rejected by a number of courts, Platinum Partners included. These decisions hold that it's not really about the nooks and crannies and the nuances of foreign law and what is or is not customary or usual in a foreign jurisdiction. The question really is whether any of the activities under Rule 2004 are hostile to some foreign regime or are oppressive.

And here, that's simply not the case, given that Surpique is currently in possession of the server -- it doesn't dispute that it has possession, custody, and control of the server -- and where Surpique is a Delaware entity.

Surpique has effectively sent the liquidators on a bit of a wild goose chase. We went to the Cayman Islands, Surpique didn't appear, and now necessitating this Chapter 15 proceeding, where I think there's a bit of buyer's remorse. The question here is a U.S. law question. And Platinum

Partners lays out in detail how discovery is available to a liquidator unless the discovery that the liquidator seeks to take is somehow hostile or oppressive.

THE COURT:  All right.  So, Mr. Goldstein, can I slow you down --

MR. GOLDSTEIN:  Yep.

THE COURT:  -- and just so that I can isolate some of the moving parts.

So I read Platinum Partners and I understand what Judge Chapman said, and I understand that Rule 2004 is applicable in a Chapter 15.

Can you, just by your lights -- right.  1521(a)(4) is a statutory grant of authority that isn't exactly the same as Rule 2004, but is sort of similar, and my recognition order renders it applicable.  Does that matter?  Does it -- should I think of this like I would think of a Rule 2004 exam in a reg -- in an ordinary -- in a case that was, you know, not a Chapter 15, or does the inclusion of 1521(a)(4) sort of move the needle on how I think about the problem?

MR. GOLDSTEIN:  I don't think it moves the needle at all.  I think Your Honor should think of this as a traditional Rule 2004 analysis.  Courts have held that Rule 2004 is sort of the vehicle to take discovery under Section 1521(a)(4), including with respect to information that may be abroad, so long as the person who possesses or

Case 24-1951, Document 61-4, Filed 02/25/25, Page 18 of 49

12

controls those documents is in the United States.

THE COURT:  Okay.

MR. GOLDSTEIN:  There's a separate section, which Surpique cites, 1522, that does, I think, come into play in thinking through how to tailor the relief and how to protect the person from whom you're seeking the information.

THE COURT:  Okay.  I'm with you that far.

In addition, your motion cites 542, the turnover power.  And I guess I'm -- am I right?  Am I remembering that correctly, that you cite the turnover authority as part of the basis?

MR. GOLDSTEIN:  As a -- yes, as a separate basis entitling the liquidators to relief.

THE COURT:  But here's my question.  Didn't the sale to Surpique close in advance of the petition date?

MR. GOLDSTEIN:  Yes, it did.

THE COURT:  So, on the petition date, this server wasn't your property, was it?

MR. GOLDSTEIN:  The server was no longer Farfetch Limited's property as of the petition date --

THE COURT:  All right.  So how --

MR. GOLDSTEIN:  -- that's right.

THE COURT:  So how does 542 help you then?

MR. GOLDSTEIN:  Well, I -- the case law has held that the information contained on the server can still be

Case 24-01819-ER TG Document 61-4 Filed 02/25/25 Page 14 of 90

13

turned over by either Surpique, who controls the server; or, with respect to the separate motion that we'll argue separately, information that Latham has remains subject to turnover.

THE COURT:  I understand.  Hold aside Latham for a second.  I'm thinking --

MR. GOLDSTEIN:  Yeah.

THE COURT:  -- vis-a-vis Surpique.  And I guess I have a hard time under -- after the transaction closed, Surpique owned the server.  Again, this may not matter because we've got a 2004 motion.  I'm just trying to make sure that I'm thinking about the issue, analytically, correctly.

MR. GOLDSTEIN:  That -- you're -- I think you have the facts correct.

THE COURT:  Okay.

MR. GOLDSTEIN:  That's right.

THE COURT:  And so why was the -- why was the information property of the estate?  What's the -- I understand that it was information that related to the debtor's and the debtor's other subsidiaries' business operations.  But we typically think of what's property of the estate -- and I confess I don't purport to be an expert under Cayman law.  But at least with respect to a U.S. Debtor, what would be property -- if the debtor sold something the day

before the bankruptcy and that sale closed before the bankruptcy filed, you don't get to get that back in a turnover action, right?

MR. GOLDSTEIN: I think that's right, but it -- and 542(e) doesn't necessarily pertain --

THE COURT: Oh --

MR. GOLDSTEIN: -- only to property.

THE COURT: -- I see. 542(e) is broader than 542(a).

MR. GOLDSTEIN: Right. It includes reported information, including books, documents, records, and papers relating to the debtor's property or financial affairs.

THE COURT: Right. But that applies only to -- oh, I see, a person who holds recording information -- I see. Got it. Thank you. That's helpful, I appreciate it.

Okay. Let me let you proceed.

MR. GOLDSTEIN: So, under Rule 2004 and the Chapter 15 cases dealing with foreign liquidations, the case law and the most recent case law is clear -- Platinum Partners; Hughes, which is a Southern District of New York bankruptcy case; and Gross -- that this analysis, this nuanced analysis for foreign law is not something the Court needs to sort of go into the weeds on to describe -- to decide the motion.

Surpique cites some cases for the proposition that

Rule 2004 in a Chapter 15 is narrowed by foreign law.  Those are all outdated cases.  Hopewell predates Chapter 15, Sphinx predates Chapter 15 case law from 2007.  But generally, the cases they cite -- and we walked through them in the reply -- they all deal with the late stages of a foreign liquidation and attempts by a liquidator to come to a U.S. Court and essentially seek discovery in aid of a pending claim, a liquidator who has decided yes, I have a cause of action against target X, I'm going to pursue it, and then can't get the discovery in the foreign forum, and so they come to the U.S.

Here, the joint liquidators are on the front end of the investigation.  We are lacking access to basic documents to help us understand what went into this transaction, where it came from, what the board was thinking, how the financials came to be misstated or not stated in the Fall of 2023.  And so I think all of those cases are distinguishable for that core fact alone, but none of them apply in the circumstances like this one, where a liquidator in a foreign proceeding is seeking information on the front end.

In addition, Platinum Partners cites a Cayman case, Lyxor, which is described in the papers.  And in that case, the Cayman Courts have said, as the foreign forum, evidence obtained in the U.S. pursuant to U.S. discovery

mechanisms that might not be available in the Cayman Islands, we accept that evidence, we have no problem with that evidence, that evidence is not hostile to our regime or contrary to our public policy.

So, again here, the question is: How can this Court provide assistance to a foreign main proceeding through this Chapter 15? And a way to provide assistance is to enable the joint liquidators to investigate the causes of the financials -- of the company's financial collapse, which is their mandate under Cayman law.

I think, again, Lyxor answers the question. Surpique does not actually argue that this subpoena, in any way, is hostile to Cayman law, or that it would be unable to simultaneously respond to the subpoena and also comply with Cayman law, which is what you typically see in these foreign discovery, comity analyses. And again, Surpique objected to providing these materials in the Cayman Islands. It says it's willing to voluntarily provide books and records, some undefined set. It hasn't done that.

And so the Court, at this point, I think, can un-jam this -- we're stuck in the mud -- and at least allow the parties to meaningfully confer by issuing an order authorizing the subpoena and allowing Surpique to respond and object and allowing the joint liquidators to finally go out and get from Surpique the books and records and email

communications that will enable them to perform their investigation and their mandate.

THE COURT: Okay.

MR. GOLDSTEIN: Unless Your Honor has any questions --

THE COURT: So --

MR. GOLDSTEIN: -- we'd ask that you --

THE COURT: Okay. So I understand where you are.

MR. GOLDSTEIN: Go ahead.

THE COURT: So can you -- so let me -- the way I understand Rule 2004 typically works -- and I think this is totally consistent with what you just said -- is, you know, normally a party comes and asks for authority to take 2004 discovery, the Court says yes or no. If the Court says yes, you serve subpoenas; and, if there's a dispute over compliance with a subpoena, you can move to compel production or someone can seek a protective order. And that happens after the dispute has ripened, the parties have met and conferred and we have a ripe dispute about particular documents.

Now, here, what the recognition order did, as I think you've described correctly, is it granted that authority in general, except for with respect to Surpique because, at the recognition hearing, that was sort of the way to get through our day. It's sort of a compromised

resolution. It said look, you can take 2004 in general, except with respect to Surpique, where you can still file such a motion and they can come in and object. And so I understand that your motion seeks the authority that wasn't granted in the recognition order, where we reserved the question for today.

So what I really have in front of me is you can take 2004 discovery or not, not really disputes about the meets and bounds of what must be done in response to a subpoena. So I understand the ask, as it relates, you know, in broad strokes, to categories of documents. I'm happy to try to be helpful and not stand on ceremony about procedure. But as I understand it, you're not asking me I get this document and not that document. You want the right to serve a subpoena, and then we'll deal with specific documents as they arise.

So am I in the ballpark of understanding your position correctly, so far?

MR. GOLDSTEIN: Your Honor, I think you are in the ballpark. And certainly, we seek the authority to issue the subpoena that we attached to the motion, and which incorporates document requests. We did engage in a lengthy meet-and-confer process post-recognition.

And what I will say is a decision that only allows the issuance of a subpoena without any other --

Case 1:23-cv-09518-ER Document 124-4 Filed 02/25/25 Page 20 of 90
Case 24-01519-ERTG Doc 124-4 Filed 02/25/25 Page 20 of 226

19

THE COURT: I --

MR. GOLDSTEIN: -- analysis --

THE COURT: I hear you.

MR. GOLDSTEIN: -- might lead us back here in two months.

THE COURT: I understand.

MR. GOLDSTEIN: And so --

THE COURT: I hear you and I'm willing to be pragmatic and try to be helpful. But that's exactly where -- what my question was setting up.

So what you seek -- to me, there is an analytic distinction between the things that are the debtor -- right? I'm -- because I sit in Delaware and old fashioned, I believe in the corporate form. And there's a difference between what were the debtor's books and records that may be held by Surpique and the books and records of the debtor's subsidiaries that may be held by Surpique.

That's -- and I guess the question is -- as to the debtor's books and records, I'm going to hear them out, but I'm inclined to think you're likely right, subject to hearing the rest of them. As to things beyond your own books and records, it seems -- my instinct is to let the normal process play itself out. You can serve a subpoena, the -- Rule 2004 permits you to get things that are other than things you owned. And if someone else's books and records are within

the scope of a valid 2004 subpoena, the fact that that isn't yours, but is somebody else's, isn't, you know, a complete, you know, defense to the subpoena. You still have the usual relevance and burden analysis.

But I guess the quest -- I guess my question for you is -- if I grant your motion, I don't think I'm saying you get everything and anything, and that all arguments about burden and relevance are gone. And so I guess what -- it seems to me where -- look, I'll just -- just to give away the punchline, where my head is getting on the bench is to say, as to the stuff that are actually the debtor's books and records, you should just get that and we can cut through it. And as to the rest, you should serve your subpoena and we should let the process play itself out.

Tell me if I -- well, and I guess my question for you is: Am I thinking about that the wrong way?

MR. GOLDSTEIN: Well, I think perhaps, for two reasons:

One, this was a holding company in the Cayman Islands, whose business was to operate the subsidiaries and to report on consolidated matters. They all used a single server. They used the same email accounts. They had consolidated financials. So to ask Surpique now, standing in the shoes of the subsidiaries, as owner of those subsidiaries, to ferret out okay, this was a Farfetch Limited

book and record only and this has nothing to do with the subsidiaries, I think is going to be perhaps a challenging process.

The other point I would make, when you use the words "books and records," is that Surpique has made an argument that, under Cayman law -- which, again, we don't think applies -- "books and records" is exceedingly narrow, and for a holding company, in particular. And so I wouldn't want Your Honor's order --

THE COURT: No --

MR. GOLDSTEIN: -- to invite that issue --

THE COURT: I hear you.

MR. GOLDSTEIN: -- back into --

THE COURT: Look, I -- again, I'll hear them. But it seems to me that we're here on what is a 2004 motion. And I can order the discovery of what is appropriate in light of the purposes of Chapter 15. And so I don't think the Cayman law definition -- again, I'll hear the other side, but I don't think the Cayman law definitions of "books and records" control what is appropriate discovery in the Chapter 15 case, so it's largely for the reasons that Judge Chapman set forth in Platinum Partners. But again, I'll hear them out.

Okay. So I understand what you're saying. And let me -- I guess, unless you have anything further, why don't I hear from Surpique and we can sort out where we are?

MR. GOLDSTEIN: No, nothing further from me. Thank you, Your Honor.

THE COURT: Okay. Very well. Thank you, Mr. Goldstein,

MR. LUZE: Your Honor, Jack Luze from Kirkland & Ellis on behalf of Surpique. Can you hear me okay?

THE COURT: I can, Mr. Luze. You can proceed.

MR. LUZE: All right. Thank you, Your Honor.

So, certainly taking on board the discussion that Your Honor just had with Mr. Goldstein --

THE COURT: Yep.

MR. LUZE: -- a few points to make.

THE COURT: Yeah. And again, I should say the following: What I said where I am preliminarily is preliminary. And you know, you're -- to the extent you disagree with any of what I just said, don't let me bully you, you should tell me you think I'm wrong.

MR. LUZE: Certainly, Your Honor.

So a few points, Your Honor. I think it's important to clarify sort of what we are and are not saying, at least what Surpique is and is not saying. We aren't saying and we have not taken the position that there's a categorical bar on 2004 discovery for a foreign representative. What we are saying is Rule 2004 may provide a procedural mechanism by which a U.S. Court sitting in a

Chapter 15 could order production of certain documents.

And I don't know that we even have that much of a disagreement on the type of analysis that Your Honor should engage in. We each cite a few cases, you know, Glitnir and Sphinx feature prominently in our papers. Platinum Partners was discussed at length in the liquidators' papers.

The analysis that Judge Chapman engaged in Platinum Partners is a similar analysis to what we're asking Your Honor to engage in, and it's not dissimilar from the analysis that Judge Bernstein engaged in Glitnir or Judge Drain engaged in, in Sphinx. Its application of Rule 2004 in light of 1521(a)(4), which says, where discovery is necessary to effectuate the purpose of this chapter, Chapter 15, and application of Rule 2004, in light of what's being requested and who's requesting it.

Here, we have joint liquidators that are a creature of statute in the Cayman Islands and that have certain authorities conferred on them by that statute, and there are certain limits to their authority. We don't disagree that there's a baseline of documents that they're entitled to. There are documents that we've offered to produce that we believe constitute books and records in accordance with Cayman law.

There is a whole lot -- there's a whole lot of additional documentation that's been requested by the

liquidators that goes well beyond that sort of request and into what is a more typical Rule 2004 fishing expedition. This is the type of thing that Judge Drain addressed in Sphinx, where he considered the request and said that I'm not sure that a fishing expedition is consistent with the policies of this chapter, where it might be appropriate for a creditors' committee or a Chapter 11 debtor to avail themselves of that sort of broad procedural mechanism.

It's not just books and records. The 81 requests that are attached to the subpoena go well beyond that, communications and documents related to a whole range of subjects going back five years. And I take Your Honor's point that well, maybe they should serve the subpoena and then we can be back here on objections, motion to compel, motion to quash, et cetera; that's the normal way this plays out.

But we feel it's important to note that there's a baseline -- and Cayman law is applicable in this regard -- of legal entitlement on the part of the provisional liquidators -- or the joint liquidators, and we think that should guide Your Honor's decision in guidance at the outset of this, so that we can get more directly to the point of what we should --

THE COURT: So --

MR. LUZE: -- or should not --

THE COURT: So, Mr. Luze --

MR. LUZE: -- produce here.

THE COURT: -- look, I do want to be practical here and, again, not stand on procedural ceremony; if I can help solve a problem, I'm going to do my best to help solve a problem. But I want to make sure I'm -- I understand sort of your...

So there are some things that you think that they are entitled to that -- things that are, quote, "books and records" under Cayman law, you haven't yet produced, but you're not really fighting that, whatever that universe is, that they get. Do I understand that correctly?

MR. LUZE: That's correct, Your Honor.

THE COURT: Okay. Why are we -- why is that still in front of me and not -- if you don't actually take issue with it, why don't they have them today.

MR. LUZE: It -- so, Your Honor, the books and records. So we have a narrower conception of books and records --

THE COURT: I understand.

MR. LUZE: -- (indiscernible)

THE COURT: But as to the stuff you're not fighting -- forget about what exactly the bounds are. As to the stuff where you don't claim any right to withhold it, why have you been withholding it?

26

MR. LUZE:  So we've offered to turn it over. We've requested that the joint liquidators agree to confidentiality --

THE COURT:  I see.

MR. LUZE:  -- over those documents, would not turn it over to third papers, and we've been unable to reach an agreement --

THE COURT:  I see.

MR. LUZE:  -- on that.

THE COURT:  So we have an issue about a protective order.  I understand that.  Okay.  Well, we can get --

MR. LUZE:  Correct --

THE COURT:  -- to that.

MR. LUZE:  -- Your Honor.

THE COURT:  We can get to that when we get there. Okay.

MR. LUZE:  So, Your Honor -- oh, sorry, Your Honor.

THE COURT:  No, go -- so, actually, if I can just ask the next question which is -- okay.  So that stuff, we can have a conversation about the protective order if you can't work that out, but that stuff you're going to turn over.

Explain to me what, in your view, is the charge of the joint liquidators under Cayman law because it seems to me

what they want to do is something that seems, from the American bankruptcy perspective, sort of customary and familiar, which is look, I want to understand the financial condition of the debtor or I want to understand are there claims and causes of action and, to the extent that there's information that you have that might tell me something in beyond a purely speculative way about what those claims look like, that's what 2004 is for.

And I've got to say my initial instinct is that that's right. You're telling me that's way beyond what Cayman law authorizes. And I guess I'd like to hear more from you. Again, I don't think -- I'm not sure Cayman law is directly relevant. But if there's a dispute about what the charge -- right? My job is to be in aid of the foreign proceeding. So it might be that some understanding of what the foreign proceeding is about does bear on what I think is in aid of that proceeding. So help me with where the disagreement is about what's supposed to be happening in the foreign proceeding.

MR. LUZE: So, Your Honor, at least as it relates to their initial charge, which I think, initially, the liquidators are trying to educate themselves about Farfetch, educate themselves about the transaction that occurred, and understand where they go from there. Are there claims and causes of action they pursue, that they would have to seek

separate sanction from the Cayman Court to pursue?

But in terms of what their like immediate charge is -- and we go into this in Moran's declaration that we submitted on her behalf -- it's -- the formulation under Cayman law is to gather documents, to reconstitute the knowledge of the company.

So the liquidators, effectively, inherited a shell. There's nothing there. Everything was acquired through that transaction. So they, understandably, want to understand the baseline information about this company, reconstitute the knowledge of the company. And Cayman law provides that what they're entitled to -- it's like a baseline entitlement -- is books and records, things that they have a proprietary interest in, a contractual right to, things that they own, but is in someone else's possession, and things that are required for the JOLs to reconstitute their knowledge of the company.

THE COURT: So --

MR. LUZE: That's what --

THE COURT: -- let me --

MR. LUZE: -- we view --

THE COURT: Can I stop --

MR. LUZE: -- as the --

THE COURT: Can I stop you there? So, if there was information that, before the transaction closed, was

accessible by the company, the debtor, why isn't that information, information that you would look at in order to reconstitute the knowledge of the company?

MR. LUZE:  It may very well be, Your Honor.  But there's a whole server of information and communications, et cetera, that are not their documents, not Farfetch Limited's documents; that much of that is documents owned by the subsidiaries, for example.

THE COURT:  All right.  But --

MR. LUZE:  And there is not an automatic --

THE COURT:  Before the sale, that's information that would have -- right?  I mean, we understand the basics of corporate law, right?  Before the sale, the parent would have had access, as a practical matter, to information in the hands of its subsidiaries whose boards it appoints, right?

MR. LUZE:  Potentially, Your Honor.  I mean, the Cayman standard -- the Cayman standard on this, it's dependent on -- whether those subsidiary books and records is basically dependent on the level of access and control -- this is in Ms. Moran's declaration -- the level of access and control that the parent company has over those subsidiary's books and records.

It's not -- under Cayman law, if this was in front of the Cayman Court, it's not on the -- it's not the burden of the entity that's in Surpique's position to disprove that

Case 24-01519, Document 46-1, Filed 02/25/25, Page 161 of 226

30

access; it's the burden of the liquidators to prove that level of access and prove their entitlement to those documents.

THE COURT:  Okay.  Can I ask this -- this is maybe an unfair question, but it's what pops into my head, and that's -- we all just have to roll with that.  But in a world in which -- look, you're allowed, if there's not personal jurisdiction over your client in the Grand Cayman -- in the Cayman Islands to resist appearing there and not submit to the jurisdiction of that Court.  That's totally your right.  But do you get both do that and come to me and start telling me about Cayman law, the kind -- and have me resolve a question of Cayman law that would probably more sensibly be resolved by a court there?

MR. LUZE:  Yeah, what I would say in response to that is it was sort of characterized as us affirmatively -- or I should say our client affirmatively objecting to jurisdiction.  We haven't taken an affirmative stance, *vis-a-vis* the Cayman Court.  We have not appeared, we have not affirmatively submitted -- they have not taken the question even to the Cayman Court.  We would potentially appear and contest it.  They have elected, purposely, not to put this question in front of the Cayman Court and, instead, have the dispute here, and so that's why we're left in this position, Your Honor.

Case 1:23-cv-09518-ER  Document 461-4  Filed 02/25/25  Page 32 of 192
Case 24-09519-ERTG  Document 1-61  Filed 02/05/25  Page 162 of 226

31

And one point on Cayman law, which is clear in Ms. Moran's declaration and was not really addressed in the liquidators' declaration that they submitted in connection with their opening motion, is the idea of pre-litigation discovery, while it's commonplace in a Chapter 11 pursuant to Rule 2004 to get pre-litigation discovery, that is antithetical to the policy of -- in the Caymans that applies to the joint provisional -- or that applies to the joint liquidators. It is expressly prohibited, pre-litigation discovery.

And there's a couple of cases cited in Ms. Moran's declaration. I think the one that's most helpful is in Paragraph 67, it is the Basis Yield decision, where the Court talks about the lack of an ability of the liquidator to get pre-litigation discovery and says -- and in that case, it was the liquidators went to the Cayman Court, which is all we're saying they should do here, go to the Cayman Court and get sanctioned to do this, which they have not.

They went to the Cayman Court and said we want to issue these subpoenas in Australia and this type of pre-litigation discovery is allowed there, and the Court said well, it's not allowed here, it's outside of your statutory mandate and it would be -- and the Court uses the words "oppressive and unfair" to allow that sort of discovery to be conducted by a joint liquidator in the Cayman Islands because

it's against their policy.

And this gets to the point that Judge Chapman was making in Platinum Partners. Judge Chapman said that it's -- I'm -- she said I'm not bound by foreign law, 2004 may very well allow you to get something in excess of foreign law, and I may very well -- I may very well give you that, I'm going to allow 2004 as I see fit, based on the purpose of Chapter 15 as I interpret it. But she did say so long as it's not contrary to the policy, repugnant to the policy of the main proceeding, and that's exactly what we have here. Judge Chapman commented that she basically didn't have a record on that topic, she didn't have a developed record on whether it was or was not. And in the absence of that record, Judge Chapman determined that I'm going to order these documents.

I think it's also relevant to note what the documents were at issue there. Like the only case that's cited by either party that deals with a true fishing expedition type of subpoena request is Judge Drain's ruling in Sphinx, where he didn't allow it. In the Platinum Partners case, Judge Chapman was analyzing a situation where the liquidators had asked the auditors for their working papers. I think Judge Chapman, rightfully so, you know, determined that those working papers would be very helpful to the liquidators in, you know, learning about the company.

The phraseology we use is "reconstituting the knowledge of the company."  And she ordered their turnover.  She didn't see anything, there was nothing in front of Her Honor that said that that was contrary to the public policy of the Cayman Islands.

It's also worth noting that that was not -- like that turnover was -- I think that they were genuinely trying to understand about the company that they were administering in that instance.  It was not gain a litigation advantage over those parties, which is where you trip up Cayman law.

If Your Honor reads the 81 requests here, there's a subset of these that are true books and records type of things.  There's probably a subset of this that are their documents, that maybe they have some legal entitlement to that we could work out turning over.  A significant majority of this, this is documents and communications going back five years on a whole range of topics, is to figure out if there's litigation claims.  Like it could be no other purpose, other than to develop a -- potentially, depending on what the documents say, develop a litigation strategy against the targets of those discovery requests.

Like there, could be no other purpose, other than to develop, potentially, depending on what the documents say, develop a litigation strategy against the targets of those discovery requests.  It's not just us.  I mean, there's been

almost a thousand discovery requests across multiple parties and that is what, that specific thing is what's repugnant to Cayman law, based on Ms. Moran's declaration.

There's nothing in the Campbell's declaration that said anything to the contrary. I don't think it's genuinely in dispute. The pre-litigation discovery is not allowed in the Cayman Islands where the purpose is to discover if you have a litigation claim, you know, exert influence and pressure on a party to maybe get some sort of settlement. These types of things happen all the time in Chapter 11; that's the statutory framework we're left with there.

We have a different statutory framework here, where Your Honor is charged with analyzing whether the request is necessary to further the policies of this Chapter. This Chapter is meant to foster, comity, cooperation, avoid multiplicity of proceedings. It's meant to assist the liquidator in pursuing a party who may just have jurisdiction in the United States.

THE COURT: But, Mr. Luze, help me with this, right. So we're now at the stage of whether I authorize the issuance of a subpoena. And the kinds of questions that you're getting at about, you know, these ones they can have. These others, well, some of these we think are too broad and some are too narrow -- I mean, some of them are too burdensome, some -- et cetera, et cetera.

We normally consider that kind of question after a subpoena has been issued and I get either, a motion to compel or a motion for a protective order and the parties have a meet-and-confer, and I've got something in front of me that reflects some effort to give me a concrete and ripe dispute about what discovery is or isn't appropriate.

And, again, look, I want to be pragmatic and not be a pin head in a way that interferes with, you know, that contributes to delay and expense and what have you. But how do I make the decision that you're asking me to make on the record that's now in front of me?

MR. LUZE: What I would say, Your Honor, the reason that we're having this dispute today and the reason that we negotiated to the language that's in the recognition order is we viewed there to be restrictions. And going through the process, and we've been to -- we've had meet-and-confers; we've talked about the requests. There's been no desire to narrow the requests on the part of the joint liquidators.

We also think that these are issues in some certain circumstances that are more properly heard by the Cayman Court in the first instance. We're going to be here. We've got categorical objections to, for example, third-party documents, communications between Surpique and its own advisors leading up to the transaction; communications

between Surpique and other third parties in the time leading up to the transaction; documents that were never owned by Farfetch; documents that don't constitute the knowledge of Farfetch or any of the people that comprise that entity prior to the transaction.

So we will be -- unless there's a direction from the Court, we'll be here on the same dispute.

THE COURT:  Okay.  I understand where you are. Let me let you continue.

MR. LUZE:  And I think what's -- just to sort of sum it up, Your Honor, because I think what's important -- the points that we've made so far, you know, what's the appropriate analysis under U.S. law.  And I don't know that we really disagree that Judge Chapman engaged in an analysis that we would say is the right analysis.  You know, that case kind of goes against our position because she ordered -- Your Honor ordered the production.

But that's the type of analysis we're asking this Court to engage in, at least, well-reasoned decision.  And there are courts that have engaged in this similar analysis and came to another conclusion.

We talked about what we view as the Cayman law restrictions on what the joint liquidators are entitled to. There's also a point in Ms. Moran's declaration, which I think is important, that talks about under that statutory

framework, the Cayman statutory framework, the liquidators are required to get sanctioned from the Court before they pursue claims and causes of action; this is the section at the end of Ms. Moran's declaration.

Our position is that what is being done here, issuing a subpoena would fall within pursuing a claim or cause of action the way the Cayman courts view it, as broadly. And, essentially, this Court would be authorizing the liquidators to act outside of their statutory mandate, their court mandate from the Cayman Islands.

And we think that's a somewhat dangerous precedent in as much as what this Court does should flow from the statutory mandate or what's been authorized by the Court in the Cayman Islands and there's been no attempt by the liquidators to get that baseline authorization before coming here and seeking these discovery requests.

And I think just to wrap up, Your Honor, because we do have a suggestion about, potentially, how to proceed here. The 81 requests that we received, they broadly fall into four categories in our view: there's the books and records, which we've discussed already; there's potentially some subset of documents that Farfetch Ltd. actually owns that are in our possession now. The Cayman law -- whether it's a term note, whether it's a 2004, whatever it is, those documents could be given back and certainly by debt --

THE COURT: I'm sorry, just so that I understand, do you say that they currently own or once owned?

MR. LUZE: Yeah, have a proprietary interest in. We're on their server, but it's still their documents, we're just in possession of them.

THE COURT: Got it.

MR. LUZE: We've not identified any documents in that category --

THE COURT: Okay.

MR. LUZE: -- but, potentially, that exists.

THE COURT: No, I understand what you're saying.

Go ahead.

MR. LUZE: But the distinction between that and the books and records is even if we bought the books and records and the transaction, we're not arguing that we shouldn't give them access to the books and records.

THE COURT: I understand.

MR. LUZE: The third category is subsidiary documents; subsidiary documents, never owned by Farfetch, now owned by -- still owned by those subsidiaries. Those subsidiaries now owned by Surpique.

The third category of documents is what we find most contrary to Cayman policy, and by extension, policy of Chapter 15, is third-party documents, so Surpique and its advisors, Surpique and other third parties; documents that

were never Farfetch's documents.

And just ticking through those quickly, what we think that the law or what the outcome should be under the analysis and Platinum Partners taking into consideration what we think is a well-developed record on Cayman law, is Category 1, they're entitled to their books and records. Category 2, if we identify any documents that they have a, you know, proprietary interest in, we should turn them over; they're their documents. Subsidiary documents, this is in Ms. Moran's declaration, they have to demonstrate that there was a level of control or access to those documents, such that they should be entitled to them or that they are necessary documents to reconstitute the knowledge.

There's -- and that that dispute is more properly heard by the Cayman Court Category 4 related to third-party communications. We view there as simply being no entitlement on the part of the liquidator to these documents in the absence of an affirmative grant of authority to conduct true Rule 2004 fishing expedition-style discovery, which we view as being plainly contrary to Cayman law and it would be inappropriate for this Court to approve in light of that, especially when they have not even sought that authority from the Cayman Court.

But at the very least, maybe the Cayman Court comes out the other side of this, but they should, at the

very least, seek sanctions from the Cayman Court to be doing that sort of discovery. It's plainly outside of their statutory mandate right now.

And so what we think might be helpful, if Your Honor is to inclined, is, in approving the service of some type of subpoena is to reflect that group. If there are books and records or documents in our possession that they own, we have to turn them over. There may very well be a dispute about the metes and bounds of books and records.

And I'm not even sure we need a discovery order for that, but it's what they're asking for.

And with respect to third-party documents, saying that in the absence, and subsidiary documents, in the absence of a further order of the Cayman Court, that at this time, they're not entitled to assert discovery for those.

THE COURT: All right. So, Mr. Luze, I'm sorry to be so annoying, but your description reminded me of an earlier question and now I'm stuck. I was unstuck, but now I'm stuck again.

To the extent that there are things in your possession that they own, meaning they have a legal right to it -- you're just the physical custodian of it, but they're the owner of it; they're entitled to it -- and, you know, outside of bankruptcy they have a legal right if they call you up and ask you for it, you're obligated to give it to

them.

MR. LUZE:  Yes.

THE COURT:  As to that document, what's you're basis for being entitled to a protective order?

MR. LUZE:  We don't think we -- I mean, we don't think -- we think that that's probably a null set.  But to the extent that that does exist, they should have it; it's theirs.

THE COURT:  All right.

MR. LUZE:  I think the real dispute is over what constitutes books and records and a protective order for that.  And then we have a foundational dispute on subsidiary documents and third-party documents.

THE COURT:  All right. Okay.

I think I -- let me ask this question:  If I were to rule as you suggest, would I expect that, then, to the extent an issue would arise in the Cayman Islands, you would either appear or not appear, but whatever the Cayman Court ruled, I would enforce?

MR. LUZE:  That's right.

I think it's -- there's nothing stopping them from going to the Cayman Court and getting that direction.  So people have to make their own decision whether to appear or not and live with the consequences of that ruling because the liquidators have access to this forum to enforce that order,

Case 1:23-cv-11195-ER Document 141-4 Filed 02/25/25 Page 43 of 79
Case 24-09519 Document 41 Filed 02/25/25 Page 173 of 226

42

whatever it says.

THE COURT: Okay. I understand your position.

Okay.

MR. LUZE: Any other questions for me, Your Honor?

THE COURT: No, I think I understand where we are.

Let me, I guess I want to go back to Mr. Goldstein if that -- unless you have anything else that you'd like to add?

MR. LUZE: That was my presentation, Your Honor.

THE COURT: Okay. That's very helpful.

Thank you, Mr. Luze.

So, Mr. Goldstein, help me with this. Look, I understand what Platinum Partners says and I, in broad strokes, agree with Judge Chapman's analysis, but there is another way to skin the cat, which is, strikes me as by no means, crazy, which is to say, look, this is a Chapter 15. I'm not the main action. I'm here to enforce, to assist the foreign Court in connection with the main case.

And so what if I were to say, Look, whatever order is issued by the Cayman Court, whatever they say they're entitled to, I'm going to enforce. Why isn't that a sensible way -- and then, you know, look, as to things that no one disputes you're entitled to, sure, you can have those. But as to where there's a dispute about whether this would or wouldn't be helpful to fulfilling the joint liquidators

statutory obligations under Cayman law, why isn't it appropriate for me to say, Yeah, I want to help, but I'm not the main action. The main action is in this the Caymans, and that Court should decide what's helpful.

What's wrong with thinking about the problem that way?

MR. GOLDSTEIN: Well, I think, first of all, the liquidators have already been empowered under Cayman law to collect and realize assets, to report to the company's creditors upon the affairs of the company and the manner in which it has been wound up to investigate the causes of failure of Farfetch Ltd. and the promotion, business dealings, and affairs of Farfetch Ltd. Those are all from the Company Act. That is implicit in there in their mandate.

THE COURT: All right. Well --

MR. GOLDSTEIN: And separately --

THE COURT: And so, this should be easy, right?

MR. GOLDSTEIN: Well, and so, I think at the margins, Your Honor, that might make sense. Let the foreign Court enter an order in the first instance on some of these, I guess, bespoke issues of Cayman law.

But the meat of what we're talking about here is obtaining from Surpique, the company's own documents and communications to help achieve the mission that the joint liquidators have already been appointed to achieve and that

the winding-up order already authorizes them to seek relief through the Chapter 15 proceeding.

And so, if some ways, we'd be 10 months into this liquidation and going back to the Cayman Court. My understanding is there's a different in practice between Cayman practitioners. Some seek sanction for every little thing that the liquidators do, some don't.

Here, I think it's clear that the liquidators have a mandate to undertake an investigation, understand the company's financial implosion, and we're sort of getting the runaround. I mean, now we're in Delaware in the Chapter 15 proceeding where comity favors assistance.

THE COURT: Yeah.

MR. GOLDSTEIN: Comity favors --

THE COURT: Yeah, exactly.

But the argument that's being made to me is what you're doing far exceeds what is authorized or would be authorized under Cayman law.

I understand you disagree with that, but we're -- but my question to you is to the extent that's the dispute, why does it make sense for me to resolve it in the first instance, as opposed to, as to things that, you know, look, it sounds like there's a category of things to which you're entitled and no one is disputing and I've got no problem issuing an order giving those to you.

45

Where the question is, where the reason things are being withheld is, the basis for withholding them is, we think it's inappropriate under Cayman law to require us to produce these, isn't it a little bit weird for that question to be decided by me in the capacity as the ancillary judge trying to help the Court in the Cayman Islands?

MR. GOLDSTEIN: So, two responses.

One, I don't think it would be because the analysis is, is it hostile or oppressive and -- and Lyxor, which Platinum Partners cites. Says Cayman courts accept discovery that is uncovered in the United States through mechanisms that are not available in Cayman law. So that's step one.

But at step two, Your Honor --

THE COURT: Yeah, but that's sort of circular, isn't it? I mean --

MR. GOLDSTEIN: Well --

THE COURT: -- because, sure, if you get it by some other means in the United States, you can still use it there, but that doesn't answer the question, is that a basis to permit you to get it?

MR. GOLDSTEIN: Right. The question is, do we have a basis to get it is, what does 2004 and Section 1521(a)(4) allow?

THE COURT: Right.

MR. GOLDSTEIN: And that's --

THE COURT: And what 1521 talks about is in aid of the foreign case.

MR. GOLDSTEIN: Right.

So, to Your Honor's point, I think what might make sense, given some of the different sort of vehicles that have been discussed today, is to enter an order that authorizes the issuance of a subpoena that requires Surpique to provide these materials that, as I understand Mr. Luze today, they have access to and they agree are responsive and should be produced. There may be a debate at the margins, but there's at least some universe of documents.

As to the marginal documents and the example was Surpique's own communications in the lead-up to the transaction. Surpique's communications with outside advisors about why it should buy this company and at what price.

Perhaps this order doesn't need to resolve that question. We could meet and confer on the responsive objections and at the time someone files, either a motion to compel or a motion to quash, that may be the time for Your Honor to say, Well, let me defer to the Cayman Court on that.

THE COURT: Okay. I understand your -- that's a fair response, okay.

Anything further on your end?

MR. GOLDSTEIN: Nothing further.

Case 1:23-cv-11195-ER Document 244-4 Filed 02/25/25 Page 48 of 226
Case 1:24-09519-ER-TG Document 61-4 Filed 02/25/25 Page 178 of 226

47

Your Honor raised the protective order. There's one in place; it's Docket Entry 57, that we reached with the former directors and officers. It allows other parties to join. It limits the use of the documents to these proceedings and the Cayman proceedings.

Surpique never proposed any changes. What they did propose was sort of an interim step that we didn't think made very much sense, and so the joint liquidators agree that there should be a protective order over the documents. There's one in place and unless we hear some objection to it, I think it should govern the Surpique production.

THE COURT: Well, if there's a dispute about the form of protective order, the parties' rights are preserved. I don't think that's a ripe dispute in front of me, but I think that's helpful, I appreciate to understand.

MR. GOLDSTEIN: And that's all, Your Honor. Thank you.

THE COURT: All right. Thank you, Mr. Goldstein.

Mr. Luze, anything further from Surpique?

MR. LUZE: Just to clear up a (indiscernible) point, Your Honor, and, perhaps, Your Honor is not issuing a ruling right at this moment, but I couldn't tell if where Mr. Goldstein was landing was that the subpoena would cover just those (indiscernible). Setting aside that we may disagree on what the phrase "books and records" means, would

48

just authorize service of a subpoena on those documents and then whatever happens on the rest, whether they go to the Cayman Islands or not, will be dealt with at a future date.

THE COURT:  So, Mr. Luze, so I haven't issued a decision on this.

MR. LUZE:  Yeah.

THE COURT:  And part of me thinks there may be some relationship between how this comes out and the other motion.  So in terms of, you know, fine-tuning the details of the form of order, I think everyone's rights are preserved. I haven't made a decision.

I want to hear the next one and then I'll let you know where I am and we can talk about what the right way to proceed in light of that is, if that works for you?

MR. LUZE:  Certainly, Your Honor.  Thank you.

THE COURT:  Okay.  All right.

So that's that, which, I guess, brings us to the Latham motion.  And, Mr. Goldstein, is that you again or...

MR. GOLDSTEIN:  It is, Your Honor; a double header for me.

THE COURT:  Okay.  Me, too.

(Laughter)

MR. GOLDSTEIN:  Yeah, a full day, I'm sure.

This one, I think, comes down to a simpler issue of U.S. law, a dispositive legal issue for which there is no

factual dispute.

Latham & Watkins jointly represented Farfetch Ltd. and its subsidiaries on a number of matters for a number of years, including, most importantly, the Project Athena transaction, through this Surpique acquired the Farfetch subsidiaries.

The Latham engagement letters make this clear, for each engagement letter, Farfetch Ltd. is one of the clients. This makes sense. Farfetch Ltd. was the Cayman holding company at the top of the corporate hierarchy. And Farfetch Ltd., with its subsidiaries, engaged Latham on a number of matters; in fact, there was a single matter client number that Latham used for all Farfetch representations.

During the process of meeting and conferring on this request, Latham conceded that there's a core set of matters for which Farfetch Ltd. was, in fact, one or more of the clients. That's in Exhibit 1 to our reply. It's a list from Latham & Watkins of matters, including Project Athena, for which Farfetch Ltd. was a client, perhaps, alongside subsidiaries.

THE COURT: All right. So, Mr. Goldstein, can I stop you for a second?

So let's start with the presumption that, like, the principles of Teleglobe are going to be broadly applicable here.

Case 24-19519, Document 44-3, Filed 06/25/25, Page 181 of 226

50

Are you asking for anything other than documents that relate to the joint representation? Is it limited to things that, basically, Teleglobe says you have? To the extent there are matters, to the extent Latham did work -- I have no idea if this is true or false -- to the extent Latham did work post-closing and gave advice to its client after your sale closed, do you contend that you have a right to those matters, to those documents?

MR. GOLDSTEIN: We are not seeking documents that are from post-closing. Latham represents the former directors. Currently, we're not seeking documents related to that ongoing representation of the former directors.

We are seeking documents related to representations where Farfetch Ltd. was the only client or more -- I think there's a broader array of matters where Farfetch Ltd. and its subsidiaries were joint clients. And, yes, under Teleglobe, each joint client would be entitled to those documents. It's not a waiver of privilege; it's just a matter of gaining access to privileged communications that sitting here today, Surpique is in possession of, presumably, on that server we just discussed, and Latham is in possession of, at least with respect to communications between Latham and Farfetch.

Teleglobe makes clear that this applies even during a divorce or a merger, right, and the fact that the

subsidiaries are now in the Surpique camp and Farfetch Ltd. is now represented by the joint liquidators, that doesn't change anything. Everyone should have access to the jointly privileged communications.

I don't think Latham disputes that point in its brief; I think Latham has been forced by Surpique's position to essentially say, our hands are tied.

We're not trying to duplicate efforts here, right. There's some universe of documents that both factually and -- excuse me -- that both Surpique and Latham are in possession of. But it can't be the case that they can both point to each other and say, Well, you don't get it from either of us.

THE COURT: I understand.

MR. GOLDSTEIN: And Latham --

THE COURT: That's sort of my question, which is what the relationship between the two motions, what subset, what fraction of the information you're seeking from Surpique do you think you're entitled to get from Latham?

I understand that's asking you, you know, to tell me how many documents are there that you've never seen, so it may not be a fair question. But, do you have a sense of, like, what fraction of the relief that you're asking for do you get if I just say, Latham has got to give you the stuff that Teleglobe says it needs to give you.

MR. GOLDSTEIN: That would be just a small subset

of what we're seeking from Surpique.

THE COURT: Got it.

Go ahead.

MR. GOLDSTEIN: I think that maybe another way to think about it is, what can we sort of chisel away from what Latham is required to provide if Surpique is providing some of those same materials?

But I think Latham, as a fiduciary, as a former law firm for the joint clients, has an obligation to provide everything.

THE COURT: Okay.

MR. GOLDSTEIN: Communications with Farfetch, communications with counterparties, communications with advisors, and internal communications about the representation, most notably, the Project Athena matter, that gave rise to the liquidation and the proceedings here.

I think Teleglobe governs, the simpler fact pattern under Teleglobe. It sounds like Your Honor has read it and, you know, there's an array of fact patterns there, but it governance. It's binding. I think in this court, everyone's been son notice of what we're trying to achieve here and so I think an order categorically ruling that Latham should produce those materials is both allowed by the law and that Your Honor should enter it.

So, unless Your Honor has any other questions,

nothing further from me.

THE COURT: Okay. Thank you, Mr. Goldstein.

Let me hear from counsel for Latham, Mr. Ramos.

MR. RAMOS: Good afternoon, Your Honor.

Marcos Ramos, Richards Layton, on behalf of Latham.

Your Honor, like you, I like to be practical in relation to what questions you might have. And so if it's okay, I will plan to simply start with some of the points that were just made by counsel for the foreign representatives and then go through some additional material. But I want to be responsive to what you have in mind, so please feel free.

THE COURT: So let's back up a second.

And I -- I probably should have asked this question to Mr. Goldstein, too. Actually, can I -- Mr. Ramos, can I just go back to Mr. Ramos for a second?

MR. RAMOS: Of course.

THE COURT: I will -- I do want to hear what you have to say.

Mr. Goldstein, procedurally, I want to understand where we are with respect to -- so the Rule 2000 -- the recognition order authorized you to serve subpoenas, basically, to take 2004 discovery of everyone, other than Surpique, right?

54

MR. GOLDSTEIN:  That's right, Your Honor.

And then read in tandem with the Local Rule, which requires so forth pre-notice to a discovery target of requests, we provided a number of draft requests to Latham, to Surpique, to other discovery targets.

Most of those discovery targets, the investment advisors, for example, Evercore and JPMorgan, agreed to accept service of a subpoena.  And so we're off doing the meet-and-confers and doing the responses and objections.

Latham was unable to really accept service of the subpoena or commit to providing materials in response to the subpoena because of this threshold issue related to privilege.

THE COURT:  Okay.  I understand that.

Let me hear from Mr. Ramos.

Look, as a technical matter, I think what one could say is, look, you've got the authority to serve a subpoena.  Serve a subpoena.  If you don't get the documents you want, file a motion to compel.  I'm inclined to be more pragmatic than that and try to help the parties move this along.  But I just want to get my head wrapped around where we were procedurally.

Mr. Ramos, do you disagree with anything with that as a procedural matter?

MR. RAMOS:  Your order says what it says, Your

55

Honor. It clearly addresses the issue of discovery.

Obviously, Latham didn't appear at the recognition hearing or consider, at that point, the issue of a subpoena being issued to it.

But it is the case, as Counsel indicated, he went through a process under our Local Rules in terms of providing notice and then filed the motion on behalf of his firm.

THE COURT: Okay. Very well.

And, look, to the extent you want to say that my original recognition order wasn't on notice to you and, therefore, you're not bound by it, I'd give you the chance to make that argument, but in any case, I don't think it makes any difference because I think we all want to figure out what it is you ought to be required to do and let's turn to that.

MR. RAMOS: Yes, sure.

And so, Your Honor, again, I'll start with some of the last points that were addressed by Counsel. One of the issues that you finished with, with Surpique was the seeming proposal, as to how they might move forward in connection with the request to Surpique. And the two issues that I heard that would be reserved for either additional meet-and-confer or potential resolution, included an issue of third-party communications, but also subsidiary documents.

So that really backs into one of the key issues that is at play under the motion that's filed by the foreign

representatives here, which is the privilege issue.

THE COURT:  But, Mr. Ramos --

MR. RAMOS:  And your order --

THE COURT:  So, look, in fairness, I understand the issue about subsidiary documents where we're talking about outside the context of a joint representation.

MR. RAMOS:  Yes.

THE COURT:  But in the context of a joint representation, Teleglobe answers that question.  There's no need to reserve it.  It says both parties are entitled to have access to materials created in connection with a joint representation, period.

And the fact that one of the parties doesn't want the other to get it doesn't matter.  If it's created in a joint representation, that's the risk you run when you do a joint representation.  It means that the party with whom you're in a joint representation gets all of the materials that are in the hands of the lawyer that repeat to the joint representation.  And if you don't -- if you're not happy with that, don't do a joint representation.

Do you read Teleglobe differently?

MR. RAMOS:  No, we don't, and I don't think we've argued it differently either, Your Honor, in the objection.

The issue here is which matters were for Limited only.  Which matters were actually joint matters.  And which

matters were for the subsidiaries, as opposed to joint matters were for Limited.

And this is the real theme of the exchanges between Latham over the course of time with the foreign representatives from the very beginning. Your Honor attached to the declaration, Mr. Goldstein's declaration submitted with the motion, along with the declaration that was submitted under the objection, are various back-and-forth communications between the parties starting in February, going through March into April. All communications under which requests were made to Latham in order to provide directed, targeted information and Latham did so.

One of the issues that was fronted up under the initial communications from Latham to the joint liquidators, this is the March 4th email, Your Honor, that's attached to Mr. Goldstein's declaration as -- his declaration submitted in the objection, and that's Exhibit 2, to that declaration. Latham confirmed under that communication that it was not currently representing the company, but it also confirmed to the joint liquidators that Latham had matters for the subsidiary, not joint client matters.

And so there's continued back-and-forth where Latham was participating in discussions with the joint liquidators and trying to get them information that they said they needed and Latham did produce documents and cooperated

in that process.  But Latham fronted up this issue that it's mirrored in the communications which Surpique delivered to Latham and which the foreign representatives had, which that there are matters which the joint-client status may be disputed.

THE COURT:  So, Mr. Ramos --

MR. RAMOS:  And so as part of the --

THE COURT:  -- to the extent is this question answered by the engagement letters?

MR. RAMOS:  It's not, Your Honor.

So, the engagement letters were attached, again, to Mr. Goldstein's declarations and they're attached as, I believe, Exhibit 5, Exhibit 6, and Exhibit 7.  And the foreign representatives relied principally on the January 2018 engagement letter -- excuse me, Your Honor -- which was attached as Exhibit 5.

The particular language that they relied on is found on page 1.  It deals -- they cite to the phrase in the second-to-the-last line, "the terms in this engagement letter."  You know, that sentence goes on and includes specifications, such as governing conflicts of interest and arbitrations of disputes.

It does not state in that engagement letter that each and every matter that we have is as a joint-client circumstance with Farfetch Ltd. and each of its subsidiaries.

THE COURT:  So, Mr. Ramos, are there --

MR. RAMOS:  Indeed, even out of the --

THE COURT:  -- are there any engagement letters that -- with individual subsidiaries?

MR. RAMOS:  Your Honor, we're still in the process of assessing information.  These are the three that we produced to and given to the foreign representatives.  This engagement letter, itself, does not require that there be a quote, unquote, engagement letter separate from this; it requires that there be an understanding amongst and consistent with the restatement and understanding amongst the parties.  And this letter, at the most, speaks to confirmed in writing.

But on its face, this letter does not support the conclusion which the foreign representatives reached; indeed, even under this 2018 engagement letter, in the section that deals with the client file, it notes that any separate engagement which occurs, would have its own file.

And so there's no implication under this engagement that any and all matters and activities are for each of one of these entities.  Of course, this engagement letter covered a specific project.  It was, you know, delineated in paragraph 1 on page 1 and there are other terms in the engagement letter itself that recognize that any later project, including projects for affiliates and subsidiaries,

that would be dealt with at the time --

THE COURT:  All right.

MR. RAMOS:  -- pursuant to their discussions.

THE COURT:  All right.  Can we -- can I back you up a second?

MR. RAMOS:  Yes.

THE COURT:  So, the principal issue is, you know, what's described as "Project Athena," which is the sale, right?

MR. RAMOS:  Yes.

THE COURT:  And do you disagree that that was a matter that was a joint representation?

MR. RAMOS:  Your Honor, we had -- there are a number of matters that we have identified to the foreign representatives which we identified as potentially being joint representation matters.  And so, with regard to those, we had been proposing to the foreign representative that that information be shared with Surpique, that the parties get together and determine whether there is a dispute about that, because Surpique's communications to Latham, which also, of course, were attached to the declarations, Your Honor, identified its view that subsidiary -- that the transaction itself could affect the privilege in connection with the subsidiaries, but that the matters that were pertaining to the subsidiaries were not matters for which Limited had

Case 1:23-cv-04182-ER Document 123-4 Filed 02/25/25 Page 62 of 192
Case 1:24-cv-09519-ER-TG Document 461-4 Filed 02/25/25 Page 192 of 226

61

rights of access to.

And so --

THE COURT:  So that --

MR. RAMOS:  -- if there's a dispute --

THE COURT:  I'm sorry, Mr. Ramos.  I'm sorry.

MR. RAMOS:  That's okay.

THE COURT:  So, let's slow down a second, because --

MR. RAMOS:  Yes.

THE COURT:  -- look, for communications that took place before the closing of the transaction and that were done pursuant to joint engagement, I understand that the subsidiaries might not want that turned over and that, look, you've got a client and, you know, it's -- or Latham has a client and its job is to do the best it can for its clients, so I'm not faulting anyone.

But I don't see a legal basis.  I understand that Surpique would like to look at it first, but explain to me what in Teleglobe entitles them to look at it first.  If the document created, pursuant to a joint communication, Surpique is also entitled to it because it was also a party.  It's the entities that Surpique now owns were also parties to the joint representation, so they get it, too.

MR. RAMOS:  Yes.

THE COURT:  But why do they get the ability to

come in and say, This document that we agree was created under a joint representation between us and Limited, we get to be heard as to Limited's rights to get it. That's just a way of saying, We disagree with Teleglobe, no?

MR. RAMOS: No.

But, Your Honor, here's my understanding, if I'm not articulating it well, I apologize. We understand Surpique may contest whether they actually -- whether the matters that we preliminarily identified actually were joint or only involved their subsidiary.

THE COURT: Okay.

MR. RAMOS: And so the question on joint, we think that that's a separate issue. We're not disagreeing with Teleglobe --

THE COURT: I see.

MR. RAMOS: -- but we wanted the parties with the real interest to confer about that so that we weren't in the position of having to make a different decision than one of the clients would, itself, make. And we thought that the process should follow in that direction first.

THE COURT: All right.

MR. RAMOS: And Your Honor raised a question -- Your Honor raised a question to Mr. Goldstein with regards to the crossover between the requests to Surpique and to Latham. To that end, Your Honor, I could just refer to you, we

attached a few documents to the declaration in support of the objection at Exhibit 8 and Exhibit 9. And it's a comparison of the requests that are proposed for Surpique and then the requests to Latham.

And Exhibit 9 is a chart that maps out those requests and shows that, except for one request, everything that they're proposing under the draft requests to Latham are proposed to Surpique. And in light of Surpique's possession of relevant server and understand the burden and related analyses, we felt that proceeding *vis-a-vis*, Surpique first, would provide very helpful guidance --

THE COURT: Yeah.

MR. RAMOS: -- because at least it crystallized whether Surpique actually had a dispute with regards to particular matters.

THE COURT: So, I view this sort of the opposite, with all respect and apologies.

But, to me, the right of the client to get its hands on its files from its lawyer is easier than the question of dealing with a Rule 2004 request of the buyer with respect to things that were sold.

MR. RAMOS: And it's quite possible, Your Honor, in the meet-and-confer process, much of the type that was discussed under Surpique, that could be the resolution, right, the crystallization of the discussions so that there is no

dispute.

THE COURT: So let me be -- give you a target to shoot at.

MR. RAMOS: Okay.

THE COURT: Tell me what's wrong with the following. What if I were to say Teleglobe controls. Any piece of paper that was created pursuant to a joint representation that's in Latham's possession Latham is required to turn over to its previous client, here the joint liquidators. If it's got a piece of paper that was created in connection with what was a representation of only the subsidiary and not a joint representation, well, that's another story and the joint liquidators aren't entitled to that.

That said, I'm going to proceed on the assumption that what the engagement letters say controls and that, if you want to come in and rebut that presumption with respect to any particular file, we'll have an evidentiary hearing and we'll give you a chance to rebut that presumption, but that that's going to be -- let me ask this about the organization of the files, right?

I take it -- is every document linked in some form or fashion to some client matter number?

MR. RAMOS: Your Honor, I don't have perfect information across those areas, but I will tell you that I

believe the answer to that is no. I believe that that was not necessarily at all required under the forms of engagement letter that had been identified. And so that burden -- so, yes, it creates a significant issue under these requests, Your Honor, in the sense that the requests themselves are not limited to the liquidity and sale transaction time period that Counsel focused on in his presentation, but do I ask us to go back five-plus years in connection with the subject matter --

THE COURT: And, Mr. Ramos, do you have any engagement letter prior to the closing of the sale in which Latham's client is a subsidiary and not also the parent?

MR. RAMOS: We didn't present it, Your Honor, we didn't believe it necessary. I can't answer that we don't. We're -- you know, we are happy to understand that that is an issue of concern for you and would come up in connection, as you indicated, with regards to the meet-and-confer or in a motion.

THE COURT: All right. So --

MR. RAMOS: But what I can tell you is we have a 2018 letter, it is plainly our position the 2018 letter does not support the conclusion that Farfetch Ltd. was a joint client in connection with any matter that we might have had for subsidiaries.

THE COURT: All right. So, look, tell me what's

wrong -- what would be wrong with my saying to you I'm going to presume that, in the absence of an engagement letter that is just with -- that, basically, I know there's a joint engagement, I'm not aware of -- there's no evidence before me of any individual engagement -- that to the extent Latham takes the position that a piece of paper in its possession was created pursuant to an individual engagement of a subsidiary it should be entitled to come in and make that argument and, therefore, say the documents shouldn't be turned over for that reason, but it's going to have to come forward with -- then we're going to have an evidentiary hearing and we're going to have witnesses, and you're going to have to show me that the best way to understand what happened here is that this was not created under a joint representation and all of the engagement letters we have are joint representations. So it's not going to be an easy case for you, but I'm not going to preclude you from trying to make that case as to any particular document.

Would ruling to that effect -- do you have any issue with a ruling to that effect?

MR. RAMOS: Well, Your Honor, substantively, the issue of the client relationship may not necessarily depend on whether there's a written engagement letter.

THE COURT: I understand that.

MR. RAMOS: And so I want to make a caveat to the

hypothetical, Your Honor --

THE COURT:  No, but --

MR. RAMOS:  -- but --

THE COURT:  -- I agree with you as a general proposition that an engagement letter isn't a, you know, *sine qua non* of an attorney-client relationship, but, you know, it's also pretty standard practice when you have an attorney-client relationship to document it with an engagement letter and, in a world in which we have engagement letters that are joint representations, to me, I'm not barring it, but what I'm saying is the likelihood that I'm going to find without a piece of paper that, notwithstanding these pieces of paper, these other things were under some other non-documented attorney-client relationship, I'll hear you, but good luck.

MR. RAMOS:  I understand, Your Honor.  And there I would -- concept-wise, Your Honor, I understand what you're saying.  I would -- aside from the issue of the ability to have a client relationship other than under the engagement letter and what I've said on the form of engagement letter, what I would say to you is that, if that's your inclination, we can certainly take that guidance without providing a specific time frame for the party -- for that to be resolved because there will be evidentiary issues, and the guidance itself may help to clear, as has been discussed, any logjams that are there in connection with this issue.

The other thing that I would say, Your Honor, in general is that we, I think as Surpique argued, do and have contested the scope, right? The time period, the subject matters. The requests themselves are not focused on particular matters that relate to only matters that were for Farfetch Ltd. or for joint matters. And so that backed us in, Your Honor, to some of the relief that was sought under the proposed order because the relief sought under the proposed order was seeking to in advance, before any production objection or consideration and meet-and-confer under the request, a waiver of parties' privilege rights, a waiver of other rights in connection with any potential production. And we addressed that in the objection, Your Honor, in connection with the form of the proposed order, and it's seeking in advance -- for example, Surpique's privilege rights that would pertain to the subsidiaries which it purchased being waived. That would be one way to read the proposed order that they were submitting.

So we didn't feel that in advance it was appropriate to ask the Court to address and deal with what might be asserted as privilege or other legitimate bases for -- for -- under an objection to the form of request as proposed, that goes to client (indiscernible) and otherwise.

And in terms related to that issue, Your Honor, there was some discussion of turnover earlier -- and this

actually may have been in the Surpique motion, but the only relief that they're seeking is under Rule 2004. And so, you know, for us looking at that, it really did back into whose documents they are and wanting to be clear, and trying to get the relevant parties to a point where they were, about whose documents they are. But certainly the guidance that you're giving in terms of Teleglobe, obviously, parties are hearing that as well, and we're happy to take that guidance and go forward.

And in connection with any resolution that happens with regards to the Surpique side, the only thing I'll add, Your Honor, is, again, the requests to Surpique are coextensive but for one or two requests, and they have all this material. And so that was a big part of our burden issue, we understand Your Honor's comments on that previously, but it is the case that they would be able to -- whatever they obtained from Surpique in resolution of that matter --

THE COURT: Yeah, but Mr. Ramos --

MR. RAMOS: -- certainly will inform whether there's a dispute about whose materials it is.

THE COURT: Look, maybe this reaction stems from spending a lot of years at a big law firm, but when you get a call from a former client and they say I want all of my files, I don't get to say that's burdensome, like that's just

not a thing I'm allowed to say. So I don't understand -- so it seems to me Surpique gets to say it's burdensome, but I don't understand what business Latham has talking about the burden it has in turning over to its former client things that are owned by its former client.

MR. RAMOS: And, Your Honor, just to be clear, I apologize, you know, to the extent that they were interested in their client file, we were prepared to give it to them, and we've already given them substantial documents --

THE COURT: But I mean by their file --

MR. RAMOS: -- and made ourselves available --

THE COURT: -- I think their file includes things under a joint representation.

MR. RAMOS: And that may be, we're not arguing differently, but here we argued that there's a dispute between parties as to whether the joint representation exists and we didn't --

THE COURT: I understand.

MR. RAMOS: -- want to be between the rock and the hard place --

THE COURT: I get it.

MR. RAMOS: -- of that determination.

THE COURT: I get it. But, look, let me say I'm unsympathetic to the burden argument. I think a law firm has a choice, it can either dot its I's and cross its T's and

make clear what documents are the property of which clients, or it can choose not to, in which case, when the client calls and asks for its files, it's got a problem. That problem, if it has, is one of its own making and it's not going to be the basis for relief here.

MR. RAMOS: Thank you, Your Honor.

THE COURT: Okay.

MR. RAMOS: In terms -- I guess, Your Honor, unless you have different or other questions, we certain understand the proposed resolution. We would note that the proposed order, again, has several provisions which we think are objectionable, we've set that forth in the reply, and in terms of whatever time frame to get to the point that Your Honor is advising, that will take some time certainly --

THE COURT: No, I understand that.

MR. RAMOS: -- moving things forward.

THE COURT: Let me --

MR. RAMOS: So we just want to be clear --

THE COURT: I get that. That's a fair point, Mr. Ramos. Let me go back to Mr. Goldstein on some of those points. So I understand your position there.

So, Mr. Goldstein, look, your letter -- your proposed order does have these bells and whistles that I think come without any particular -- like you say, produce it within 30 days, that sort of -- that -- frankly, it was

reading that that gave rise to my mind to this question of where are we procedurally, right? Because normally you get an order that says take discovery, serve a subpoena, you serve a subpoena, the parties either work out a discovery schedule or they don't; if they don't, someone can come in and say, no, I want it ordered produced now, but you make that decision against the backdrop of what has happened here. You don't see that in advance -- look, Rule 45 says 14 days, okay. You want to, you know, seek contempt because they don't produce things in 14 days, you can file that motion. That's not going to go that well.

Normally, we expect there to be a meaningful meet-and-confer not just on the scope, but also on the timing, and parties not lightly to say you're in contempt because you should have produced it yesterday.

So my instinct is this should go the normal way. We should say what they're required to do and then you should have a conversation about when it can reasonably be done. And if there's a dispute that ripens in that conversation that you need me to resolve, I'm here, I'm not hard to reach, but I don't think I ought to be pre-adjudicating that.

So tell me why that's wrong.

MR. GOLDSTEIN: No, Your Honor, I think that's fair. We included it in the proposed order, but we are certainly not wedded to a deadline for Latham to produce

73

documents after Your Honor issues an order describing what this process looks like and I think the Teleglobe-style order makes sense.  We've certainly had conversations with -- Mr. Ramos and I about prioritizing certain matters from that list that Latham sent us, including Project Athena.  And so I do think the parties following the order can and should confer on the scope of the subpoena and the ways in which Latham, as former counsel to Farfetch Ltd., can prioritize certain productions.  And so, no, Your Honor, I don't think the proposed order needs to include that particular provision.

THE COURT:  All right.  So, Mr. Ramos, going back to you, looking at the proposed form of order -- okay, so you've got an issue with his thing saying the disputes are limited to five pages, we're just going to follow my -- if there's a dispute that arises, we're just going to follow my chambers' procedures.  I don't believe in page limits.  My view of briefing is you can write as many pages as you want and I'll read until I get bored.  So you make your own judgment about how long you want to write.  That's -- I'm joking.  The chambers procedures actually have rules, they'll apply.

Mr. Ramos, so other -- anything else in --

MR. RAMOS:  In the form of order, Your Honor, yes. In paragraph 3, we objected to the -- from the "Notwithstanding" in the second line forward.  And those were

Case 1:23-cv-11195-SHS Document 214-4 Filed 02/25/25 Page 75 of 95
Case 1:24-cv-09319-ER-TG Document 61-4 Filed 02/25/25 Page 105 of 226

the in-advance requests for the waiver of privilege, whoever's privilege it might be, and/or objections to production --

THE COURT: All right, I hear you.

MR. RAMOS: -- that was not limited --

THE COURT: I hear you, that's fair.

So, look, Mr. Goldstein, what I'm inclined to say is that Teleglobe controls, which is, if it's joint representation, you get it even if it's somebody else's privilege also, but otherwise other parties all have their privileges. Why do I need to say more than that?

MR. GOLDSTEIN: I think Your Honor saying Teleglobe controls and that former joint clients are equally entitled to the privileged materials would be sufficient.

THE COURT: Okay.

MR. GOLDSTEIN: It's not a waiver, it's never been our position that it's a waiver.

THE COURT: All right. Mr. Ramos, is that good enough?

MR. RAMOS: Your Honor, look, your indication to us is good enough, I'm not sure we even need that in the order --

THE COURT: I don't think you do either.

MR. RAMOS: -- but just to be clear -- yes.

THE COURT: So, look --

MR. RAMOS:  And just to be --

THE COURT:  Go ahead.  I'm sorry, I --

MR. RAMOS:  I'm sorry.

THE COURT:  -- I apologize.  Part of my job is to listen to the lawyers, so you can tell me I need to do that part of my job too.  So --

MR. RAMOS:  I'm sorry, Your Honor.  Yes --

THE COURT:  -- no, my fault.

MR. RAMOS:  -- we do object to -- we certainly could confer with and we would of course with the foreign representative, but we object to the balance of paragraph 3.  We object under paragraph 4 in terms of requiring production within a particular time frame.  Obviously, if it's a subpoena and we have to issue a written objection, and then confer and, you know, timing issues can be dealt with in discussion, but we don't think it would be appropriate to put that in this order.

The only other -- you addressed the last paragraph, paragraph 5 -- and I believe under paragraph 8 we objected as well, Your Honor, and that is in connection with subparts (b) and (c).  And those were provisions under which the Court was being asked to retain jurisdictions over adversary proceedings brought in or through this Chapter 15 case.  We didn't understand why that was in this particular order, which was not adversary proceeding-related, and then

paragraph (c), Your Honor, I'm sure we could figure out language, but we didn't necessarily want to in advance determine exactly where the jurisdiction is for certain things. And, Your Honor, that issue came up in connection with the Surpique and the possibility of going back to the Cayman court as well.

And so those were things that we objected to under the form of order.

THE COURT: Okay, all right. So, look, my instinct is to prejudge as little as necessary and not to be territorial and, you know, assert -- I mean, the paragraph doesn't say exclusive jurisdiction.

Look, why don't I -- I'm inclined to take a few minutes and gather my thoughts and then come back. What I'm going to do is to give you the outlines of a ruling and then it's going to require the parties to meet and confer about a form of order reflecting it, and so you should do that. And obviously, you know, in that process, if you can't reach agreement about a form, you know, I'm always happy to get -- happy is the wrong word -- part of my job includes sometimes getting dueling forms of order and deciding as between them. And you're right, I can't make you agree, all I can make you do is try. And if there's disagreement, I am happy to do my job, which is resolve disputes about the form of order.

So, unless there's anyone else who wants to be

heard further, what I propose to do is to take 15 minutes and gather my thoughts, and then come back and give you something of an outline of a ruling that I would then ask the parties to try to see if they can document. Before we do that, is there anyone who wants to be heard further at this point?

(No verbal response)

THE COURT: Okay, seeing none, let me recess. It's now 2:30, give me 15 minutes and I'll come back on at 2:45.

COUNSEL: Thank you, Your Honor.

THE COURT: Until then, we're in recess. Thank you.

(Recess taken at 2:31 p.m.)

(Proceedings resumed at 2:45 p.m.)

THE COURT: Hi, all. This is Judge Goldblatt.

We're back on the record. You can all hear me?

MR. RAMOS: Yes, Your Honor.

MR. GOLDSTEIN: Yes.

MR. RAMOS: This is Marcos Ramos. Your Honor, I don't know if it's possible, but if possible I wanted to make just one last point before you proceeded to provide us with your direction.

THE COURT: It appears to be possible. You can --

(Laughter)

MR. RAMOS: Thank you, Your Honor.

THE COURT: -- you can proceed.

MR. RAMOS: You know, in the back and forth that we were having during the course of argument, one thing I had intended to do was to walk through the 2018 engagement letter more particularly, and I neglected to do that, trying to --

THE COURT: Probably because I cut you off.

MR. RAMOS: But, Your Honor, I was remiss not to note to Your Honor that, to the extent the 2018 engagement letter is what is relied on in terms of whatever the client relationship is, there is a provision in it which addresses governing law in connection with the engagement and provides that it will be determined by where the individuals providing the services are located.

And so we were discussing Teleglobe and we're happy to take Your Honor's direction on that point. I don't believe it's an issue that needs determination today. We'll obviously proceed forward with whatever direction Your Honor gives and, if it needs to be addressed down the line that can be addressed down the line, but I was remiss in not bringing it to your attention and so I just wanted to mention that at the outset.

THE COURT: Okay, that's helpful. I appreciate that. Let me just make a note.

(Pause)

THE COURT: Okay. Anything further?

(No verbal response)

THE COURT:  All right.

MR. RAMOS:  Not from me, Your Honor.

THE COURT:  So, look, let me tell you where I am. I hope that what I'm going to say provides enough guidance to move this matter forward, but here's where I am.

So let me say, so I have this like elaborate bench ruling that my terrific law clerk did a great job on that walks through the procedural history of the case and cites to all the relevant case law, and she really did a fabulous job, but I'm going to save all of you from my reading all of that because I think we can sort of cut -- under the circumstances here, I think we can cut to the chase and just get to the bottom of, you know, what are the basic principles, which I think are actually reasonably straightforward, and how do they apply here.

So the basic -- let's start with the Surpique request.  There, I think everyone agrees that the basic principles are essentially -- you know, you could argue about where -- on which syllables to put emphasis, but basically no one really takes issue with the framework that Judge Chapman set out in her very thoughtful opinion in Platinum Partners. And the gist of that analysis is, when you have a case that is a valid Chapter 15 that has been recognized, there is authority of the foreign representative to get a hold of

relevant documents and materials, and that that's reflected both in 1521(a)(4) that expressly says that part of the relief a court can grant upon recognition is provide for the examination of witnesses, taking of evidence, or delivery of information, as well as Rule 2004, which is applicable on Chapter 15 cases.

So principle one is, as a matter of U.S. law, the Court may decide that certain information is just going to go to the foreign representative because Chapter 15 authorizes it.

You know, another relevant consideration is, well, what is the purpose of Chapter 15? And Chapter 15 is, after all, intended to be -- if you look at 1501, it talks about the role of the Court, you know, in assisting a foreign court, that it is an ancillary case that is in the service of the principles of comity and giving effect to -- you know, to assist the work done by the foreign court which has the main case. And so what you've got to do is sort of balance -- it seems to me is to balance those concerns here.

And so what I'm going to do is address -- I don't -- address the four categories of documents that Mr. Luze set forth and give you sort of rulings on where I am on each of those four categories. So the four categories -- and say a few words about the metes and bounds of each of those categories.

So category one are what are, essentially, the debtor's books and records, category two are any other documents that are in Surpique's possession that are -- that is essentially the property of the debtor, the third are documents that are essentially the books and records of the subsidiaries, and the fourth is sort of third party documents, sort of information that Surpique has that doesn't fit into any of the prior three categories, essentially. And this isn't exactly what Mr. Luze was asking for, but is in -- well, but takes account of his suggestion.

So, here's my ruling. With respect to books and records or other documents in Surpique's possession that, you know, are the debtor's, those need to be turned over. I don't think those are disputed, everyone agrees with that. The one area where there may be some disagreement are what counts as books and records, and my view, sort of relying on the Platinum Partners principle and the language of 1521 that authorizes this Court to grant discovery, I'm not going -- in ordering the production of books and records, that's not going to be limited to what Cayman law defines as a book and record. That's a term -- I don't have the ability here to say exactly what is and is not a book and record, but I think that's a term that has sufficient meaning in English under U.S. principles that, if there's a dispute about it, I would resolve it under those principles. So, basically, what I'm

saying is books and records as we would commonly understand them in the United States need to be turned over.

In addition, I'm going to do the same with respect to the books and records of the subsidiaries. I think there to, under the rationale of Platinum Partners and the authority under 1521(a)(4), it's appropriate for the foreign liquidators to get that material in the context of this case in which what we have is the bankruptcy of a holding company, in a world in which no one contests that its financials were on a consolidating basis that I think that the books and records of the subsidiaries, at least those subsidiaries as of the time of the closing or prior, that those are -- I'm going to -- this is a matter of judgment, this doesn't come from, you know, geometry, but it's my judgment that it's appropriate for the joint liquidators to get those.

The category where I'm not there are the genuine third party documents, those things that really are the kinds of things that, frankly, in a U.S. case in a 2004 examination, I would without much hesitation grant to allow the debtor to explore causes of action against third parties and the like. There, what I will say is that I'm more than happy to enforce any order of the Cayman court that directs their production, but it seems to me there there's enough of a dispute in front of me about whether ordering that would on the one hand be helpful to the Cayman proceedings or on the

other, you know, be inconsistent with Cayman law, and I'm not going to purport to resolve that question myself. I think that there I'm happy to be helpful to the court in the Cayman Islands in whatever that court's judgment is. If it's not self-executing and an order of this Court enforcing it is necessary and helpful as to an entity that's the U.S. party that holds the documents, Surpique, I'm more than happy to enforce it, but I'm going to provide that I'm not going to order it myself, I'll simply enforce an order that may be entered by the court in the Cayman Islands. And Surpique can either appear in the Cayman Islands or default and, you know, an order entered on default I'll enforce with the same vigor I would an order entered if they do appear and oppose it.

So that's where I am with respect to Surpique. With respect to the request as to Latham & Watkins -- and so, I guess, just to dot the I, as to Surpique, I had reserved in the recognition order the question whether the service of a subpoena is appropriate, I will authorize the service of a subpoena and would enforce such subpoena to the extent described above.

With respect to Latham & Watkins, look, I don't think I have a sufficient factual -- the principles are the principles that generally, I think, unless persuaded otherwise I'm starting from the proposition that Teleglobe applies. And so documents that are the -- that are created

under -- and, to me, it sounds to me Mr. Ramos isn't fighting this point -- documents that are created under a joint representation need to be turned over, period, and I'm going to so order.

To the extent there's a dispute about whether any particular document in Latham's possession was or was not produced under a joint representation, we're going to set up a mechanism for me to adjudicate that. That's going to be fact-intensive and all parties' rights on that question are reserved, and we'll resolve such a dispute if and when it ripens. And you heard what I had to say about my instinct in thinking about that, but I'm not -- you know, I'll decide that on the actual facts. And so what I'd like the order to do is to set up a mechanism in which, if the parties meet and confer and there's a disagreement about whether a document has or hasn't been submitted under -- you know, was or wasn't created in connection with or pursuant to a joint representation, we'll then have a hearing, an evidentiary hearing, because I think this would be a question -- if we have this problem, it's essentially a question of fact and we should just set up a mechanism, and the parties should meet and confer about what such an appropriate mechanism would look like, to bring that to me for me to decide on an actual factual record.

Let me just say the following in terms of process

and the like. I want to be respectful of parties' procedural rights and not jam people unnecessarily, so not create hair trigger deadlines that create, you know, needless risk of default, but I also want to be pragmatic that what we're talking here is sort of, you know, fundamentally a discovery issue and I do, you know, want to move as expeditiously as reasonable. I don't want to create months and months and months of delay in getting to the bottom of these issues. We are where we are. The case, you know, is ten months old already, what have you, but to the extent an issue arises, the procedures that you set out should provide a mechanism for the thing to come to me, you know, as quickly as I reasonably can, consistent with fair process to the parties.

So let me pause there and ask, first, if that gives the parties sufficient guidance to go talk about an order, and, second, if anyone thinks that what I've said is so insane that you want a chance to talk me out of it.

MR. GOLDSTEIN: Your Honor, for the foreign representatives, I think that does give us guidance, and we hear you loud and clear on the tension between moving quickly and not letting delay get in the way. Did you have a time frame in mind for submitting the joint proposed order or the competing orders?

THE COURT: No, I'd like you to meet and confer. And that -- look, again, the same principle, you should move

as quickly as you reasonably can. You know, no one should stay up all night over this, but this also shouldn't take weeks. So, you should meet and confer, if you can reach an agreement -- subject to whatever further discussion we have now, if you reach an agreement and can submit an order under certification, that would be delightful, and if you can't, if you submit me a certification with competing forms of order and if you want to have brief letters as to why your form is better than their form, you know, I'll do my job and resolve the dispute.

MR. GOLDSTEIN: Thank you, Your Honor.

MR. LUZE: Your Honor, very briefly, Jack Luze from Kirkland & Ellis. So, if I understand correctly, Your Honor would want proposed forms of order for both, correct, for the --

THE COURT: Correct, correct.

MR. LUZE: And then separately on the documents that we've been ordered to turn over, basically, the first three categories, I assume, Your Honor, we would do the same *vis-a-vis* a protective order. We'll try to agree; if we can't, Your Honor will resolve it.

THE COURT: Exactly, exactly. You should meet and confer. If you can work that out, terrific; if there's an issue and the parties can't agree, I'm happy to -- you know, to look at forms of order. If you want to make arguments,

you know, you're welcome to, and if there's a dispute I need to resolve, I'm happy to do it.

MR. LUZE: All right. Thank you, Your Honor.

THE COURT: Okay.

MR. RAMOS: Thank you, Your Honor --

THE COURT: Mr. Ramos?

MR. RAMOS: -- we appreciate -- no, thank you, Your Honor. We will meet and confer with the other side on the form of order. We hear your comments in terms of the time frame to get it to the Court, thinking about the mechanism might take some time, but of course I hear Your Honor's comments and I'm not disagreeing with them at all.

THE COURT: Okay.

MR. RAMOS: So we will meet and confer with them on that form of order.

THE COURT: Okay, terrific.

So, look, let me say, this issue was presented in a way that was helpful and clear. I understand that you all have work to do. I do appreciate that, you know, the parties here have all conducted themselves with the utmost professionalism, have, you know, endeavored to work out what they could, have brought this to me only after good faith efforts were unsuccessful. So I have no concerns at all about, you know, what brought us here. I'm hopeful that that same level of professionalism will allow you to work out the

remaining issues, but, you know, sometimes there are just disagreements and courts have to resolve disputes, and if I didn't want to do that, I didn't have to apply for this job.

So let me thank all of you for your efforts.  I look forward to seeing, you know, either a single or competing forms of order.  And if there's any issue that arises that requires my attention, please don't hesitate to reach out to chambers and I'm happy to do what I can to be helpful.

So anything further from the parties while we're here?

MR. GOLDSTEIN:  Nothing from the foreign representatives.  Thank you, Your Honor.

THE COURT:  Okay.

MR. RAMOS:  No, Your Honor.

THE COURT:  All right, great.

MR. RAMOS:  Thank you, Your Honor.

THE COURT:  Great.  Well, thanks to all the parties.  We'll sit tight and look for whatever comes next.

And, with that, we're adjourned.  Thank you.

COUNSEL:  Thank you, Your Honor.

(Proceedings concluded at 3:02 p.m.)

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.


/s/ William J. Garling                    January 16, 2025

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable


/s/ Tracey J. Williams                    January 16, 2025

Tracey J. Williams, CET-914

Certified Court Transcriptionist

For Reliable


/s/ Coleen Rand                           January 16, 2025

Coleen Rand, CET-341

Certified Court Transcriptionist

For Reliable

# EXHIBIT D

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 15 |
| Farfetch Limited (in Official Liquidation), | Case No. 24-11519-CTG |
| Debtor in a Foreign Proceeding. | **Re: D.I. 66** |

**ORDER GRANTING IN PART FOREIGN REPRESENTATIVES' MOTION FOR ENTRY OF AN ORDER TO CONDUCT DISCOVERY FROM SURPIQUE L.P. PURSUANT TO 11 U.S.C. 542(E), 1507(A), 1521(A)(4), 1521(A)(5), <u>FED. R. BANKR. P. 2004, AND LOCAL RULE 2004-1</u>**

Upon consideration of the *Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery from Surpique L.P. Pursuant to 11 U.S.C. 542(e), 1507(a), 1521(a)(4), 1521(a)(5), Fed. R. Bankr. P. 2004, and Local Rule 2004-1* (the **Motion**) [Docket No. 66];[1] and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012; and upon consideration of the Motion; and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant to 28 U.S.C. § 1410; and finding adequate notice of the Motion having been given; and that no other or further notice need be given; and after consideration of the Objection to the Motion filed by Surpique L.P. (**Surpique**) [Docket No. 82] and the Reply in Further Support of the Motion filed by the Foreign Representatives [Docket No. 96]; and upon the record of the hearing held January 15, 2025 (the **Hearing**), to consider the relief requested in the Motion:

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

**IT IS HEREBY ORDERED THAT**

1. The Motion is GRANTED to the extent set forth herein.

2. The Foreign Representatives and their agents are authorized to serve a subpoena, attaching discovery requests in the form attached hereto as **Exhibit 1**, for the production of documents upon **Surpique**.

3. The service of the subpoena pursuant to this Order shall be without prejudice to Surpique's right to serve responses and objections in accordance with applicable law and procedural rules. Notwithstanding the foregoing, and consistent with the Court's ruling, the Foreign Representatives shall not receive pursuant to the subpoena any documents except those that would be considered (a) the books and records, as understood "under U.S. principles,"[2] of Farfetch Limited or any of its subsidiaries prior to or at the time of closing of the January 30, 2024 transaction (**Transaction**), or (b) documents that remain the legal property of Farfetch Limited following the closing of the Transaction.

4. Unless otherwise agreed among the parties in writing, following entry of a suitable protective order and subject to any objections—except any objection that the Foreign Representatives are not permitted to receive the documents described in categories (a) and (b) in paragraph 3 above—Surpique shall produce documents and information responsive to the document requests contained in the subpoena as contemplated by Federal Rule of Civil Procedure 45 and Federal Rule of Bankruptcy Procedure 9016.

---

[2]    Jan. 15, 2025 Hearing, Tr. 81:23–24.  The parties disagree as to the scope of "books and records" as understood under U.S. legal principles and to what extent books and records include emails and other communications, and reserve the right to present the dispute to the Court at a later date.

5.      Any disputes that are not resolved by agreement of the parties may be raised pursuant to Section F (Discovery Disputes and Case Administration Matters) of the Chambers Procedures for Judge Craig T. Goldblatt.

6.      Notwithstanding any provision of the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon entry; (b) the Foreign Representatives are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Foreign Representatives and their agents are authorized and empowered and may, in their discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

7.      This Court shall retain jurisdiction over any and all matters arising from the interpretation, implementation, amendment, modification, or enforcement of this Order.

**Dated: February 4th, 2025**
**Wilmington, Delaware**

**CRAIG T. GOLDBLATT**
**UNITED STATES BANKRUPTCY JUDGE**

3

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

In re:

Farfetch Limited (in Official Liquidation),

Debtor in a Foreign Proceeding.

Chapter 15

Case No. 24-11519-CTG

**Re: D.I. 119**

[PROPOSED] ORDER GRANTING THE FOREIGN REPRESENTATIVES' LETTER MOTION FOR ENTRY OF AN ORDER (1) OVERRULING SURPIQUE L.P.'S OVERARCHING "BOOKS AND RECORDS" OBJECTION; AND (2) COMPELLING SURPIQUE TO PRODUCE ALL HISTORIC FARFETCH EMAIL COMMUNICATIONS THAT ARE RESPONSIVE TO THE SUBPOENA

Upon consideration of the *Letter Motion of the Foreign Representatives for Entry of an Order (1) Overruling Surpique L.P.'s ("**Surpique**") Overarching "Books and Records" Objection; and (2) Compelling Surpique to Produce All Historic Farfetch Email Communications that are Responsive to the Subpoena* (the "**Letter Motion**"); and the Court having jurisdiction to consider the Letter Motion and the relief requested therein pursuant to Local Rule 7026-1, Part F of the Chambers Procedures and paragraph 5 of the Court's February 4, 2025 Order (D.I. 119):

**IT IS HEREBY ORDERED THAT**

1.      The Letter Motion is GRANTED.

2.      Surpique's "books and records" objection is overruled.  The Court will construe the term "books and records" to include historic Farfetch email communications.

3.      Surpique is ordered to produce all historic Farfetch email communications that are otherwise responsive to the Foreign Representatives' subpoena and discovery requests that Surpique is withholding based on its books and records objection.

4.      Notwithstanding any provision of the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon entry; (b) the Foreign Representatives

are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Foreign Representatives and their agents are authorized and empowered and may, in their discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

5. This Court shall retain jurisdiction over any and all matters arising from the interpretation, implementation, amendment, modification, or enforcement of this Order.