UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE FARFETCH LIMITED SECURITIES LITIGATION | **OPINION & ORDER**<br><br>23-cv-10982 (ER) |

R<small>AMOS</small>, D.J.:

Co-Lead Plaintiffs Fernando Sulichin and Yuanzhe Fu (collectively, "Plaintiffs") bring this putative class action against Farfetch Limited ("Farfetch" or the "Company") and its direct subsidiary FF Realisations plc (f/k/a Farfetch Holdings plc) ("FF Holdings"), and individuals José Manuel Ferreira Neves ("Neves"), Elliot Gilbert Jordan ("Jordan"), and Stephanie Nadine Phair Kooij ("Phair") (collectively, "Defendants"), alleging violations of Section 10(b) and 20(a) of the Securities Exchange Act, and Securities and Exchange Commission ("SEC") Rule 10b-5. Specifically, the Consolidated Amended Class Action Complaint ("CAC")[1] alleges that Defendants made materially false or misleading statements, omitted material historical or present facts, and deceived investors in order to artificially inflate Farfetch stock prices in violation of Section 10(b) and 10b-5, and that Neves, Jordan, and Phair (collectively, "Individual Defendants") were controlling persons of Farfetch[2] and FF Holdings and violated Section 20(a) and are culpable participants in the alleged fraud. Before the court are the Individual Defendants' motion to dismiss the CAC, Docs. 43 and 47. For the reasons set forth below, the motion is GRANTED.

---

[1] Unless otherwise noted, citations to "¶ _" refer to the Consolidated Amended Class Action Complaint, Doc. 34.

[2] By an Order of the United States Bankruptcy Court for the District of Delaware dated August 5, 2024, all pending actions against Farfetch are stayed.

I.    BACKGROUND

A.  Factual Background

The following facts are based on the allegations in the CAC, which the Court accepts as true for purposes of the instant motions.  *See*, *e.g.*, *Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

Farfetch is a publicly traded technology company founded in 2007 that supported third-party sales of luxury goods to consumers worldwide via its digital marketplace platform.[3]  ¶¶ 2, 8, 66.  At its inception, Farfetch did not store any inventory and instead allowed brands to use its platform as a marketplace, facilitating sales between luxury boutiques and customers these brands may not have reached otherwise.[4]  ¶ 66.  Farfetch conducted its business and operations through various subsidiaries, including FF Holdings.  ¶ 3.

Farfetch operated as a private company for over 10 years before launching its initial public offering ("IPO") in September 2018, with shares listed on the New York Stock Exchange ("NYSE").  ¶¶ 8, 70.  Plaintiffs allege that Farfetch was sold to investors as a "low-risk, third-party e-commerce fashion platform capitalizing on organic growth and extremely high take rates."  ¶ 8.  As a result, Plaintiffs assert that Farfetch achieved a "wildly successful IPO that raised over $1 billion and led to an $8 billion valuation" even though the Company had never made a profit and had less than $400 million in revenue in 2017.  ¶ 72.  Defendant Neves founded Farfetch, and, at all relevant times, served as chief executive officer ("CEO") and chairman of the board.  ¶ 5.  Neves also served as a director of FF Holdings starting in November 2023.  *Id.*  Neves, by virtue of holding the

---

[3] The CAC notes that the luxury clothing industry was slow to take advantage of the option to sell clothes online and that some luxury brands were reluctant to sell their products through third-party websites, fearing that their image would be damaged or that the third-party websites would discount prices.  ¶ 76.

[4] Farfetch made money by taking between 30% and 32% in commissions from each sale made through its website.  ¶ 68.  This percentage from each sale is known as a "take rate".  *Id.*

majority of voting rights in Farfetch, maintained ultimate controlling authority over the Company.  *Id.*

Defendant Jordan joined the Farfetch team in 2015 as chief financial officer ("CFO") and served in this position until his departure from the Company in 2023.[5]  ¶ 6. Jordan also served as one of the two directors and CFO of FF Holdings from October 2019 until his departure in August 2023.  *Id.*

Defendant Phair joined Farfetch in 2016 as chief strategy officer ("CSO"), was promoted to chief customer officer ("CCO") in 2019, and later assumed the role of group president in 2022, and chair of New Guards Group ("NGG") in June 2023.  ¶ 7.  Phair also served as one of the two directors and CCO of FF Holdings beginning in October 2019.  *Id.*

Plaintiffs are shareholders that purchased Farfetch securities between February 24, 2022 and December 17, 2023 (the "Class Period").  ¶¶ 42–43.

Plaintiffs allege that during the Class Period, the Defendants "issued a series of pervasive and material misstatements and/or omitted material facts necessary to make statements issued not misleading in light of the circumstances in which they were made." ¶ 284.  Plaintiffs allege that the Defendants ignored internal guidance regarding its acquisitions, business model, and internal controls over financial reporting to set unrealistic expectations about Farfetch's financial growth.  ¶¶ 137, 284.  Specifically, Plaintiffs allege that Defendants "recklessly disregarded contrary internal guidance and forecasts to set unrealistic public expectations of continued growth, reassured investors of the Company's liquidity strength, operating leverage, and maintained near-term fiscal targets of profitability," meaning that they did not adjust their short-term financial targets to reflect possible negative consequences.  ¶ 159.  Plaintiffs also allege that Defendants failed to remediate known material weaknesses in Farfetch's internal controls over

---

[5] Jordan's departure was announced on February 23, 2023 and became effective on August 31, 2023.

financial reporting, leading to an artificial spike in Farfetch's stock price.  ¶¶ 198, 284. The CAC alleges that when the truth emerged via corrective disclosures that dissipated the artificial inflation, the stock price dopped, causing significant damages to Plaintiffs and the Class.  ¶ 284.

The CAC alleges that, in 2018, Farfetch was struggling to generate revenue through third-party sales and user engagement due to the refusal of luxury brands to expand into e-commerce.  ¶ 10.  To curb the effects of this problem, Farfetch executed a series of costly acquisitions of first-party retailers, operating independent e-commerce websites, and brick-and-mortar storefronts.  ¶¶ 11, 77.  In a span of less than one year, Farfetch allegedly spent hundreds of millions of dollars acquiring three companies: Stadium Goods[6] on December 12, 2018 for $250 million; Toplife[7] on February 28, 2019 for $50 million; and the NGG on August 8, 2019 for $675 million.[8]  ¶¶ 11, 78–81. Plaintiffs assert that Defendants justified these acquisitions as an expansion of its capabilities to include design, production, and brand development.  ¶ 15.

Plaintiffs allege that despite the Defendants' justifications, industry experts were skeptical of the NGG acquisition, which resulted in Farfetch stock price dropping over 45% in a single trading day.  ¶ 13.  Plaintiffs also allege that, according to Former Employee #3 ("FE3"),[9] Farfetch made only approximately $1 million in sales one year after acquiring Toplife, leading to the termination of an agreement that Farfetch would

---

[6] Stadium Goods is a sneaker and streetwear marketplace specializing in new and deadstock (brand new, never been worn, second-hand) products.  ¶ 78.  According to Former Employee #1 ("FE1"), Stadium Goods maintained its own separate platform for consigners and brands to list their goods for sale after Farfetch acquired it.  ¶ 55.  FE1 worked at Farfetch from May 2021 to September 2022 as director of eCommerce and site merchandising for Stadium Goods.  ¶ 54.

[7] Toplife is a luxury e-commerce platform operating in the Chinese market and owned by a then-existing partner JD.com.  ¶ 79.

[8] NGG is a luxury fashion house encompassing several brands' design, production, first-party sales, and distribution.  ¶ 81.

[9] FE3 worked in digital marketing at Farfetch from March 2018 to August 2022, and Farfetch's subsidiary, NGG, from February 2023 to July 2023.  ¶ 58.

give JD.com a 30% commission on every sale made by redirecting customers from JD.com to Farfetch.  ¶¶ 79–80.

Following these acquisitions Farfetch reorganized into three separate segments: (1) Digital Platform—mostly comprised of first-party and third-party transactions between sellers, including Farfetch subsidiaries, and consumers conducted on the Farfetch's technology platforms; (2) Brand Platform—comprised of production and wholesale distribution of brands owned and licensed by NGG, and includes franchised store operations; and (3) In-Store—comprised of the transactions conducted in the physical stores operated by the Company's various subsidiaries and certain brands in the NGG portfolio.  ¶¶ 12, 82–83.

Plaintiffs allege that Farfetch failed to successfully integrate these new businesses into the Company's existing platform and to ensure that the future cash needs of these acquisitions would not have a negative impact on the Company's overall financial health. ¶¶ 15, 89.  Stadium Goods and NGG continued to operate as standalone brands on the Farfetch platform while also maintaining their own e-commerce websites, platforms, and brick-and-mortar storefronts led by their respective management teams who had access to Farfetch's cash.  ¶¶ 16, 90.  Plaintiffs allege that Farfetch's failure to integrate these acquisitions created an "unworkable corporate environment," as well as "company-wide inefficiencies, unprecedented operating costs, and significant pressures on cash flow."  ¶ 17.  Additionally, Plaintiffs assert that Farfetch suffered from weaknesses in its internal controls over financial reporting, particularly with NGG, which led to inaccurate and/or overstated revenue, gross merchandise value ("GMV"), receivables, costly inventory stockpiles, and duplicative operating expenses.  ¶¶ 18, 88.

Plaintiffs allege that this mismanagement resulted in heavy monetary losses. When Farfetch completed its IPO, its cash and cash equivalents balance amounted to approximately $1,043,500,000 as of September 30, 2018.  ¶ 94.  After the Toplife and

NGG acquisitions, Farfetch's cash and cash equivalents balance dropped to approximately $322,400,000 as of December 31, 2019.  ¶ 95.

Plaintiffs allege that "to ensure adequate financial flexibility and liquidity going forward," Farfetch signed a commitment letter with J.P. Morgan Securities plc for a €300 million senior secured loan facility in connection with the NGG acquisition in August 2019.  ¶ 96.  On January 30, 2020, Farfetch announced that it had agreed to issue, via a private placement, $250 million convertible senior notes ("February 2020 Notes") to "supplement Farfetch's current liquidity position."  ¶ 97.  Once the private placement was completed, Farfetch canceled the secured loan facility with J.P. Morgan.  ¶ 97.

The CAC alleges that, beginning in 2020, the COVID-19 pandemic and the spike in online shopping "conveniently" masked the extent of the negative impact of these acquisitions.  ¶ 19.  During the second quarter of 2020, Farfetch processed a record-breaking number of online orders and attracted over 500,000 new customers.  ¶ 20.

In the midst of the online sale boom, Farfetch closed several private offerings.  On April 20, 2020, Farfetch closed a private offering of $400 million in convertible senior notes ("April 2020 Notes").  ¶ 98.  The Indenture between the Company and Wilmington Trust, National Association as the trustee, set forth certain types of bankruptcy or insolvency events of default after which the April 2020 Notes would automatically become due and payable.  *Id.*

On November 17, 2020, Farfetch completed the placement of convertible senior notes to Alibaba Group Holding Limited ("Alibaba") and Richemont for total gross proceeds of $600 million ($300 million each) ("November 2020 Notes").  ¶ 99.

During the first half of 2021, Farfetch achieved record sales.  ¶ 21.  In fact, Farfetch, in its Q4 2021 Earnings Call, reported it achieved a "strong growth" for that year, while also "stay[ing] disciplined as [it] navigated many external headwinds, including digital services taxes, and the greater-than-expected impact of Brexit, [and] inflationary pressures."  Doc. 45-3 at 5.

According to Plaintiffs, there were several notable investments in Farfetch during this time, so that Farfetch's cash and cash equivalents balance amounted to approximately $ 1,573,400,000 as of December 31, 2020.  ¶¶ 101–02.

In the second half of 2021, Farfetch struggled to maintain its COVID-19-level online shopping rates as shutdowns lifted in the U.S. and China, its two largest markets. ¶¶ 21, 127.  Plaintiffs allege that Farfetch's growth in the China market also slowed down because of competition from Chinese-owned companies and strict government regulations in the region.[10]  ¶ 128.

In November 2021, Off-White's[11] creative director Virgil Abloh unexpectedly passed away, causing a major blow to the brand and resulting in a loss of sales for NGG. ¶¶ 21, 144.  Plaintiffs allege that since buyers associated Off-White designs and Abloh, the Off-White brand experienced a decrease in sales in the six to 12 months after his death, and Farfetch had to act quickly to mitigate the loss of sales from the Off-White brand.  ¶¶ 144–45.

Plaintiffs also allege that pandemic shutdowns increased direct-to-consumer e-commerce competition from the luxury brands themselves, reducing Farfetch's e-commerce market share.  ¶ 23.  According to Plaintiffs, Farfetch refused to re-negotiate unfavorable contract terms with these luxury brands, resulting in lower profit margins. *Id.*

In January 2022, Farfetch announced that it was acquiring Violet Grey, a luxury beauty retailer, ahead of the launch of NGG Beauty, Farfetch's venture into the beauty sector.  ¶¶ 27–28.  According to Plaintiffs, Violet Grey was already experiencing "significant financial hardships and declining growth" when Farfetch made the decision

---

[10] According to FE3, Farfetch was unable to compete against established Chinese companies that benefited from protectionist laws instituted by the Chinese government to restrict or limit international trade.  ¶ 128. Plaintiffs allege that FE1 said that the forecasts for 2022 prepared by Stadium Goods showed the platform would not see the success it had in the previous year.  ¶ 129.

[11] Off-White was NGG's top luxury brand.  ¶ 21.

to acquire it, so the acquisition could not propel Farfetch's growth goals in the beauty sector.[12] ¶ 32.

Then, in February 2022, Farfetch stopped all sales to its third largest market—Russia—as a result of the war in Ukraine.[13] ¶¶ 22, 141. At the same time, Farfetch disclosed a "forward-looking" outlook projecting year-over-year growth of roughly 20 to 30 percent in GMV, but also warned investors that it operated "in a very competitive and rapidly changing environment," and that "[u]ncertainties resulting from the COVID-19 pandemic . . . could have material impacts on [its] future performance." Doc. 45-4 at 10, 23. Farfetch explained that its business could be affected by "weakened consumer sentiment and discretionary income [] from various macro-economic conditions" and "slowing e-commerce consumer activity as . . . populations resume to pre-pandemic activities and lifestyles." *Id.* at 10.

Two days before the start of the Class Period, on February 22, 2022, Farfetch announced NGG's commercial agreement with Authentic Brands Group LLC (otherwise known as Adidas) to become the exclusive partner to curate, create and bring to market Reebok's luxury collaborations. ¶ 29. NGG also became a core operating partner for Adidas across Europe, and distributor of premium Reebok products in the U.S., Canada, Europe and other key markets. *Id.* According to Plaintiffs, Farfetch neglected to conduct proper due diligence on the Reebok deal, resulting in higher-than-expected costs, low to negative profit margins, and unsellable inventory.[14] ¶ 32.

---

[12] According to the CAC, in August 2023, Farfetch announced its decision to discontinue NGG Beauty and said it was "exploring strategic options for Violet Grey." ¶ 169. Plaintiffs allege that reports in October 2023 confirmed that Farfetch had placed the beauty brand up for sale. *Id.*

[13] Farfetch did not disclose how the war in Ukraine impacted their sales until March 8, 2022 when Jordan reported that Farfetch "ceased operations" in Russia and that its guidance for 2022 had been issued "before we saw impact in that region." ¶ 301.

[14] According to FE3, Farfetch failed to obtain relevant financial data from Adidas. ¶ 173. FE3 stated that Adidas only provided topline sales data to Farfetch, and failed to provide details on key metrics such as discounts and logistics costs. *Id.*

During the March 25, 2022 Goldman Sachs European Digital Economy Conference: Consumer Internet Conference, Neves explained that "we don't know" if "[t]he situation in China with lockdowns" is "a headwind or a tailwind," because it is an "entire[ly] speculative exercise" to "try to look into the future." ¶ 313

During the May 8, 2022 Morgan Stanley Technology, Media and Telecom Conference Jordan shared the following outlook:

> So I've always felt that the marketplace from the current distance that we have would grow at least as fast as the online market, if not more. **And then as you said, you add in Beauty, which is a new category for us, it's $75 billion of the $300 billion market.** It's a category we've not played in until we launch this Q2 coming, so that will add incremental GMV. I think it's also got an amazing halo effect on the fashion and the accessories business as well because customers buy beauty more frequently and therefore Farfetch will be more front of mind to be able to buy clothing as well.
>
> **And we expect that to drive a good level of customer retention and customer acquisition as we move forward for the year ahead.** Plus on top of that, as you say, we have a pipeline of [Farfetch Platform Solutions ("FPS")][15] clients that we're very confident we will see come to market later this year to help continue to drive growth. **And on top of all that, we've been able to see that the China market take some really good learnings** from the work we've done with [a Chinese e-commerce platform] over the last 12 months since we've been live **and apply those learnings to see an acceleration of growth from that channel within a very important market over the next 12 months as well.**
>
> **So overall, we're very confident that 28% to 32% is the right number.** We've also sort of looked at it by customer cohort, by our retention levels, our expected AOV, our frequency of shop, the new customers that we're adding per quarter. We've been recently adding 500,000, 600,000 new customers per quarter. **And when you add all that together plus what we see from FPS, 28% to 32% is absolutely the right number to go for.**

¶ 298 (emphasis in original).

---

[15] FPS is Farfetch's e-commerce technology.

Farfetch announced it was partnering with Neiman Marcus Group ("NMG") in May 2022 to integrate FPS into the online experience of Bergdorf Goodman, NMG's department store. ¶ 30. Farfetch intended to finish integrating the NMG partnership in 2023. *Id.*

Farfetch hosted a conference call with investors and analysis to discuss its Q1 2022 results on May 26, 2022 (the "Q1 2022 Earnings Call"). During the Q&A, Jordan was asked about Farfetch's underperformance for Q1, to which Jordan responded:

> I mean, broadly, ***first quarter was entirely down to the 3 factors that we've outlined earlier.*** Russia and sort of adjacent countries, I guess, that have been impacted by what's going on there in Eastern Europe, the China lockdown and then there's quite a sudden acceleration on full price from our e-concession partners, which obviously we celebrate.
>
> […]
>
> ***Obviously, with the Reebok deal and then Neiman Marcus live next year as well, we're going to see much stronger growth in 2023***, and that's the time to invest in some of these longer-term initiatives that we definitely want to do.

¶ 330 (emphasis in original).

In August 2022, Farfetch announced its plan to acquire a 47.5% stake in Yoonx Net-a-Porter ("Net-a-Porter"), an online luxury and fashion retailer. ¶ 31. Neves stated that "[t]his significant partnership unequivocally establishes FARFETCH as a pre-eminent global platform for luxury." *Id.*

Farfetch issued a press release announcing its Q2 2022 financial results on August 25, 2022 (the "Q2 2022 Earnings Release"), wherein the Company disclosed both positive and negative financial results. ¶ 332. Specifically, the earnings release provided that the GMV increased by $12.6 million and that revenue increased by $56.0 million year-over-year. ¶¶ 333–34. The Q2 2022 Earnings Release also provided Farfetch's then-current outlook, which covered uncertainties from the impact of COVID-19, macroeconomic factors, and geopolitical turmoil. ¶ 336.

During the call, Neves stated the following:

> We are navigating a volatile macro environment adeptly, continuing to post growth compounding on what has been a tremendous 3-year run for Farfetch, a period that saw our business double as measured by our GMV. This makes me extremely bullish for 2023, a year when we will lap our closure of our Russia operations, expect China to turn into a tailwind, and will start to see the fruits of large deals signed this year with Reebok, Neiman Marcus Group and Salvatore Ferragamo. These 2023 vectors of growth, combined with the rationalisation of costs we are implementing this year, make me very confident about our 2023 top line, profitability and cash generation.

¶ 338. Jordan added that, during the second quarter, Farfetch navigated macro challenges while "delivering robust underlying growth," which resulted in revenue growth of 21% year-over-year. ¶ 339.

Also on August 25, 2022, Farfetch hosted a conference call with investors and analysts to discuss its Q2 2022 results (the "Q2 2022 Earnings Call"), during which Jordan stated that Farfetch has "seen strong engagement from customers including during our 6.18 event in the China market and year-on-year growth on Tmall, which means [they] remain[ed] optimistic about the China market and our overall proposition moving forward." ¶ 343. Jordan said Farfetch expected the China market to return to growth over the following 12 months. *Id.* Jordan also discussed the outlook for the full 2022 calendar year, stating in relevant part:

> I'd now like to cover our outlook for the rest of the year. As the Q2 results highlight, *we are successfully managing many factors across the business and achieving strong underlying revenue growth and improved gross margins.*
>
> […]
>
> In addition, *our cost-saving initiatives allow us to target breakeven adjusted EBITDA for the second consecutive year.* I will reiterate that ongoing currency movements may adversely impact our reported figures. In terms of reserves, which are largely held in U.S. dollars, we continue to closely manage our liquidity position. *H2 [second half of the year] profitability and improving working capital position as we exit the year means that cash and cash equivalents is expected to close above $650 million at year-end.*

11

¶ 345 (emphasis in original).

At least eight senior executives resigned from August 2022 to November 2022. Plaintiffs assert that the timing of these resignations "suggests that Company executives were aware of Farfetch's true financial condition and some left to avoid liability."  Doc. 48 at 39.

During a November 17, 2022 earnings call, Neves explained, "we're seeing continued digital media cost inflation for luxury, especially in the U.S. as well as reports of higher inventories indicating we're going to be heading to a very promotional environment."  Doc. 45-6 at 6.  Jordan added that sales in the U.S. "were down" due to the "deliberate decision to reduce demand generation spend . . . to focus on higher-margin profitability."  *Id.* at 8.  Neves is quoted as follows in the Q3 2022 Earnings Release, published on November 17, 2022:

> Through it all, our focus has remained on our mission to be the global platform for luxury while also taking the opportunity to fundamentally re-structure our organization and streamline our cost base.  ***As a result, Farfetch is further positioned to seize the significant announced milestones and future opportunities ahead, and emerge from this period as an even stronger business set to deliver profitability and free cash flow.***

¶ 351 (emphasis in original).  Similarly, Jordan is quoted saying, "we remain well capitalized to execute on our long-term vision, and I am confident we will return to profitable growth in 2023."  ¶¶ 238, 352.

On December 1, 2022, Farfetch hosted an analyst and investor day to discuss its operations since its IPO in 2018.  ¶ 363.  During the call, Jordan discussed Farfetch's future, which included the expectation that business would start to accelerate its growth and deliver a second phase of growth.  ¶ 364.  According to Jordan, this growth came with profitability and free cash flow, both of which were payoffs from Farfetch's business investments.  *Id.*

In early 2023, Farfetch started seeing improvement in its finances.  Farfetch officially launched the Reebok partnership in May 2023, ¶ 409, and it started seeing "sequential improvement in GMV growth in the US and China," ¶¶ 404.  Farfetch issued a press release on May 3, 2023, in which Neves is quoted saying:

> Launching the partnership with Reebok is an important execution milestone in FARFETCH's plans for 2023.  ***We are delighted that the NGG++ and FARFETCH Platform Solutions teams have ensured Reebok's wholesale and ecommerce operations are up and running on time and on budget.***  We look forward to delivering on further milestones for Reebok throughout our partnership.

¶ 396 (emphasis in original).

According to FE3, Adidas had been heavily discounting its Reebok products in 2022, which in turn, had boosted Farfetch's sales, sales growth, and revenue throughout the greater part of that year based on its partnership with Adidas.  ¶ 176.  This, however, meant that Farfetch did not have room for profit margins at the discounted price.  *Id.* Plaintiffs also allege that FE3 informed them that Farfetch had to take a much larger inventory than they expected, which Farfetch had trouble selling because it was from the previous season.  ¶¶ 179–81.  The CAC alleges that, by the end of the second quarter of 2023, it was obvious to FE3 that the Reebok brand was not going to reach the sales, growth, and revenue it was expected to achieve when it was acquired.  ¶ 184.

During the second quarter of 2023, Farfetch reported that business growth was "sequentially better" as compared to the first quarter, but "the recovery [was] not [] as robust as [] expected" at the start of the year.  Doc. 45-10 at 7.  At the same time, the Company "expect[ed] . . . recovery of these deliveries to result in Q3" sales being double that of Q2.  *Id.* at 8.

Farfetch issued a press release announcing its financial results for the three-month period ended June 30, 2023 on August 17, 2023 (the "Q2 2023 Earnings Release").  The Q2 2023 Earnings Release provided, in relevant part:

- ***Digital Platform GMV and Digital Platform Services Revenue growth accelerate to 7% and 10% year-over-year***
- Strong supply growth of over 40% year-over-year on the Farfetch Marketplace •Record Active Consumers of 4.1 million, up 7% year-over-year
- ***Operating cost base reduced year-over-year, delivering operating cost leverage***
- ***Progress on strategic initiatives underpins 2023 expectations for strong growth, Adjusted EBITDA profitability and positive Free Cash Flow***

¶ 426 (emphasis in original).  The Q2 2023 Earnings Release stated, in relevant part, that: "We believe that cash flow generated from operations and our cash, cash equivalents and marketable securities balances, as well as borrowing arrangements, ***will be sufficient to meet our anticipated operating cash needs for at least the next twelve months***."  ¶ 430 (emphasis in original).

Jordan is also quoted saying that Farfetch's second quarter performance "***demonstrates our progress towards delivering profitable growth and positive free cash flow in 2023***," adding, in relevant part:

> Our Digital Platform has performed particularly well, returning to growth while maintaining a stable order contribution margin.  This, coupled with significant savings in the cost base across all areas of the business, means our digital platform is more profitable than last year.  ***We enter the second half well positioned to achieve faster levels of growth, with a lower cost base and strong liquidity***

¶ 433 (emphasis in original).

During the question-and-answer portion of the Q2 2023 earnings call, an analyst inquired about the performance and health of the Off-White brand, to which Neves responded:

> We don't break out performance on the brand by brand, but the consumer demand around Off-white and Palm Angels remains very strong.  What we see is 2 different pictures in terms of wholesale versus direct-to-consumer, so wholesale always overshoot in both directions.  ***So we saw a very fast expansion of our wholesale business, as we said, 20% CAGR from '18 to '22.***
>
> […]

> *So if you look at direct to consumer, the [sic] in aggregate, the*
> *NGG direct-to-consumer digital sales are up double digits.*

¶ 450 (emphasis in original).

According to Plaintiffs, all the foregoing statements differed from the reality. Plaintiffs alleged that Farfetch's cash and cash equivalents balance amounted to approximately $734,200,000 as of December 31, 2022, but by June 30, 2023, the balance had dropped to approximately $453,800,000. ¶ 106. As a result of the foregoing, Plaintiffs assert that "between February 2020 and September 2023, the Company, and its subsidiaries, received roughly $2.4 billion through various convertible notes, investments, and term loans, on top of the more than $1 billion raised in the Company's September 2018 IPO, and by December 2023, it was all gone." ¶ 109.

Plaintiffs also allege that Farfetch refused to address the high costs associated with direct brand partnerships. For example, Plaintiffs explained that the increase in stock from direct brand e-concessions versus multi-brand boutique sales had different implications for the Company's value added taxes ("VAT") payments and credits. ¶ 153. According to Plaintiffs, regardless of where the final buyer was located, Farfetch would buy the product from the luxury brand so that it, as the initial buyer located in Europe, had to pay VAT on the products it sold. ¶ 154. If the final buyer lived outside of Europe, the VAT paid by Farfetch would ultimately become refundable once Farfetch requested the VAT refund. [16] *Id.*

Importantly, each of the Individual Defendants increased their Farfetch stock during the Class Period. Doc. 44 at 37.

---

[16] According to Former Employee #2 ("FE2"), it could take anywhere from 6 months to a year to receive the VAT refund. ¶ 154. FE2 believed this model was financially unsustainable for Farfetch, especially in cases where the final buyer was in Europe and Farfetch was not eligible for the VAT refund. ¶ 155. FE2 was director of global indirect tax at Farfetch from May 2021 to October 2023.

a.  *Truth Emerges*

On August 17, 2023, Farfetch issued a press release announcing its financial results for the second quarter of 2023, reporting predominantly negative results.  ¶ 242.  It reported revenue of approximately $572 million, which was less than the market consensus of $650,710,000, stating in relevant part:

> Revenue decreased $7.3 million year-over-year from $579.3 million in second quarter 2022 to $572.1 million in second quarter 2023, representing a year-over year decrease of 1.3%.  This decrease was primarily driven by a 42.2% decrease in Brand Platform Revenue to $67.4 million, as well as a 15.1% decrease in In-Store Revenue to $22.7 million.

*Id.*  Farfetch also announced its decision to discontinue NGG Beauty as a category on the Group's marketplace and disclosed that it was "exploring strategic options for Violet Grey."[17]  ¶ 243.

That same day, during after-market hours, Farfetch held a conference call with investors and analysts to discuss the Company's quarterly financial results.  During the call, Defendants discussed slowdowns in growth in the U.S. and China, onboarding challenges affecting the launch of the Reebok partnership, and issues with inventory and shipping, and the negative impact these had had on Farfetch's revenue.  ¶ 244.  During the call, Phair disclosed that because of "the initial transitional challenges" impacting the Reebok launch, the Company had revised its expected 2023 revenue from Reebok to approximately $200 million across both the brand and digital platforms.  ¶ 245.  As a result of this announcement and the disclosures at the conference call, Farfetch's stock price fell $2.15 per share, or 45.17%, to close at $2.61 per share on August 18, 2023.  ¶ 247.

---

[17] According to Former Employee #6 ("FE6"), who worked at Farfetch as a senior member of the internal controls team from April 2023 to September 2023, and attended meetings with senior management and Farfetch's legal team, the internal controls team came under intense pressure to fix the long-standing material weakness at NGG.  ¶¶ 65, 218.  Specifically, FE6 said that, at these meetings, the takeaway was that Farfetch could be forced to delist from the NYSE and might cease to exist if they did not fix the material weakness at NGG by the end of 2023.  ¶ 218.

Then, on November 28, 2023, after market hours, Farfetch announced that it would not be disclosing its financial results for the quarter ended September 30, 2023.  ¶ 249.  Farfetch added that they would not be providing any guidance or forecast going forward, and that "prior forecasts or guidance should no longer be relied upon."  ¶ 250. Farfetch's stock price fell $1.13 per share, or 53.8%, to close at $0.97 per share on November 29, 2023.  ¶ 251.

On November 30, 2023, Farfetch announced that J. Michael Evans, the President of Alibaba, had resigned as a board member, effective immediately, purportedly "in furtherance of the arm's length commercial relationship between Alibaba [] and [Farfetch]."  ¶ 254.  According to the CAC, Evan's resignation from the board signaled to investors, analysts, and market experts that Farfetch was losing support.  ¶ 255.

On December 18, 2023, Farfetch announced the agreement to transfer FF Holdings' business and assets, to Coupang, Inc. ("Coupang"), in exchange for a $500 million bridge loan to continue operating until the consummation of the transfer.  ¶ 256. Farfetch explained that holders of Class A and B ordinary shares and its convertible notes "will not recover any of their outstanding investments in Farfetch," that Farfetch would be "delisted from the NYSE" and "liquidated."  ¶ 257.  During that call, Farfetch also announced that several independent members of the Board of Directors resigned, leaving Neves as the only Board member overseeing the transfer of Farfetch's business and assets to Coupang.  ¶ 258.  Lastly, Farfetch announced that FF Holdings' proposed acquisition of 47.5% of Net-a-Porter, the adoption of FPS by Net-a-Porter and Richemont and the launch of Richemont Maisons e-concessions on the Farfetch Marketplace would be immediately terminated.  ¶ 259.

Following the announcement of the transfer, Farfetch's share price fell $0.60 per share, or 93.75%, to close at $0.04 per share on December 20, 2023, the NYSE started delisting proceeds from Farfetch's Class A ordinary shares, and trading was immediately suspended.  ¶ 263.  The transfer was completed in January 2024, and Farfetch continued

operations as usual under the same name and substantially the same leadership, including Neves.[18]  ¶¶ 265–68.

Coupang's 10-Q for the quarter ended March 31, 2024 ("Q1 2024 10-Q"), filed on May 8, 2024, revealed the material weaknesses in Farfetch's internal controls over its financial reporting in Item 15 of its Annual Report on Form 20-F for the year ended December 31, 2022.  ¶ 271.  In relevant part, the 10-Q stated:

> **The unremediated material weakness identified and disclosed by Farfetch related to the operating effectiveness of certain business process and information technology controls in the New Guards business.**  We are in the process of reviewing the operations of Farfetch and implementing Coupang's internal control structure over the acquired operations.  While we did not include Farfetch in our assessment of internal control over financial reporting as of March 31, 2024, **we determined the material weakness previously disclosed by Farfetch was not fully remediated as of March 31, 2024** and could result in a material misstatement of our annual or interim consolidated financial statements that will not be prevented or detected on a timely basis. We are actively engaged in the remediation efforts.

*Id.*  The CAC further alleges that the fair value of Farfetch as of Coupang's acquisition date (January 29, 2024) drastically differed from the financial position provided by the Company in its last publicly issued financial results for the quarter ended June 30, 2023. ¶ 272.

### B.  Procedural Background

Jasmine Wu, individually and on behalf of all others similarly situated, filed the first complaint in this consolidated class action on December 19, 2023.  Doc 1.  Three alleged members of the putative class filed motions seeking appointment as lead

---

[18] Neves stepped down as CEO on February 15, 2024.  ¶ 269.  His departure was part of a string of layoffs. *Id.*

plaintiff.[19]  On October 20, 2023, two months prior to the filing of the above-captioned action, a related securities class action asserting substantially the same claims was filed in the United States District Court for the District of Maryland, *Ragan v. Farfetch Limited et al.*, No. 8:23-cv-02857 (D. Md.).  Doc 14 at 2.  On February 6, 2024, the Court consolidated the cases, and Fernando Sulichin and Yuanzhe Fu were appointed lead plaintiffs, and Levi & Korsinsky, LLP and Hagens Berman Sobol Shapiro LLP were appointed co-lead counsel.  Doc. 23.  In that Order, the Court directed Plaintiffs to file an amended complaint in the consolidated case or designate the existing complaint as the operative complaint.  *Id.*  The Court also directed Defendants and co-lead plaintiffs to meet and confer regarding scheduling.  *Id.*

On June 21, 2024, lead plaintiffs filed the CAC, alleging two counts:  (1) violation of Section 10(b) of the Exchange Act (15 U.S.C. §78j(b)) and Rule 10b-5 (17 C.F.R. §240.10b-5), and (2) a violation of Section 20(a) of the Exchange Act by the Individual Defendants.  Doc. 34.  The 186-page CAC contains 525 paragraphs, 171 of which include block quotations copied and pasted directly from over 80 different disclosures from February 24, 2022 through December 17, 2023, inclusive.

On September 11, 2024, the Individual Defendants filed a motion to dismiss the CAC in its entirety, with prejudice, and a request for judicial notice in support of their motion to dismiss.  Docs. 43, 46.  The Individual Defendants argue that the CAC pleads no viable theory of securities fraud and should therefore be dismissed.  Doc. 44 at 10.

---

[19] The following individuals moved to appoint Lead Plaintiff in the SDNY action:  On December 19, 2023, movant Michael Bievetski moved the Court to appoint Bievetski as lead plaintiff and The Rosen Law Firm, P.A. as lead counsel.  Doc. 5.  Also on December 19, 2023, movant Eduardo Archer Veloso Martins and RenoportoInvestimentos Imobiliários, LDA ("Martins") moved the Court to appoint Martins as Lead Plaintiff and to approve the proposed selection of Pomerantz LLP as lead counsel for the Class.  Doc. 8.  Lastly, on January 2, 2024, Fernando Sulichin, individually and on behalf of Lyxor Overseas Holdings Ltd. and Cinergy Advisors Ltd. ("Sulichin"), moved the Court to appoint Sulichin as Lead Plaintiff and Levi & Korsinsky, LLP as Lead Counsel.  Doc. 17.  Martins, Altamimi,and Sulichin, along with two other individuals—Fernando Sulichin and Yuanzhe Fu—moved separately to seek appoint as Lead Plaintiff in the Ragan Maryland Action.  Doc. 23 at 2.

Specifically, the Individual Defendants argue that Plaintiffs did not plead any actionable misstatement or omission and, instead, the CAC "sends readers on a scavenger hunt through large block quotations excerpted from more than 80 different disclosures over a nearly two-year period," in what constitutes puzzle-pleading.  Doc. 44 at 11.  The Individual Defendants add that nearly all of the challenged statements are (i) inactionable expressions of corporate optimism, (ii) forward-looking statements protected by the PSLRA safe harbor, and/or (iii) opinion statements.  Doc. 44 at 11.  Lastly, the Individual Defendants argue that the Plaintiffs do not—and cannot—plead facts to meet the requisite "strong" inference that the Defendants acter with scienter.  Doc. 44 at 12.

## II.    LEGAL STANDARDS

### A.  Rule 12(b)6

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See Koch*, 699 F.3d at 145.  However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'"  *Id*. at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

The question in a Rule 12(b)(6) motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the

claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting

*Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 278 (2d Cir. 1995)).  "[T]he purpose

of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the

formal sufficiency of the plaintiff's statement of a claim for relief without resolving a

contest regarding its substantive merits,'" and without regard for the weight of the

evidence that might be offered in support of the plaintiff's claims.  *Halebian v. Berv*, 644

F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Communications, Inc. v. City of

New York*, 458 F.3d 150, 155 (2d Cir. 2006)).  Furthermore, "only a complaint that states

a plausible claim for relief survives a motion to dismiss" and "[d]etermining whether a

complaint states a plausible claim for relief will ... be a context-specific task that requires

the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556

U.S. at 679.

### B.  Rule 9(b)

Because claims under Section 10(b) of the Exchange Act and Rule 10b-5

thereunder sound in fraud, they are subject to the heightened pleading requirements of

Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act (the "PSLRA").

*Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir. 2000).  Rule 9(b) requires that the

complaint "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P.

9(b).  To satisfy that requirement, the complaint must:  "(1) specify the statements that the

plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the

statements were made, and (4) explain why the statements were fraudulent."  *ATSI

Communications, Inc. v. Shaar Fund, Limited*, 493 F.3d 87, 99 (2d Cir. 2007) (citing

*Novak*, 216 F.3d at 306).  The PSLRA imposes similar requirements on claims brought

under the Exchange Act:  "the complaint shall specify each statement alleged to have

been misleading, the reason or reasons why the statement is misleading, and, if an

allegation regarding the statement or omission is made on information and belief, the

complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged misstatement or omission. 15 U.S.C. § 78u-4(b)(2)(A). A complaint will survive under that heightened standard "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

### C. External Documents

In resolving a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials extrinsic to the complaint. Fed. R. Civ. P. 12(d). However, that rule is not absolute. In addition to the facts alleged in the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Communications*, 493 F.3d at 98. Courts may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted). The Court may also "take judicial notice of public disclosure documents that must be filed with the [SEC] and documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law.'" *Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014), *aff'd sub nom. Lucas v. Icahn*, 616 Fed. App'x. 448 (2d Cir. 2015) (summary order) (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991)); *see also In re Bank of America AIG Disclosure Securities Litigation*, 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013), *aff'd*, 566 Fed. App'x. 93 (2d Cir. 2014) (summary order). However, the Court can consider a company's public filings with the SEC "'only to determine what the documents stated,' and 'not to prove

the truth of their contents.'"  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Kramer*, 937 F.2d at 774).

## III.  DISCUSSION

### A.  Judicial Notice of External Documents

The Individual Defendants attach 29 documents to the Declaration of Jason C. Hegt in support of their motion to dismiss.  *See* Doc. 45.

The CAC cites all but six of the attached documents:

- Exhibit 16:  Form 13G (J. Neves)[20];

- Exhibit 17:  Form 144 (Notice of Proposed Sale of Securities, E. Jordan)[21];

- Exhibit 18:  Form 144 (Notice of Proposed Sale of Securities, S. Phair)[22];

- Exhibit 27:  "The Luxury Slump:  What's happening with the world's largest fashion houses" published in the Vanguard Think Thank, dated November 2022;

- Exhibit 28:  "Virgil Abloh's Final Off-White Collection Is His Most Radical" published in GQ, dated March 1, 2022; and

- Exhibit 29:  "After Virgil The billion-dollar uncertainty in the wake of designer Virgil Abloh's sudden death last fall" published in The Cut, dated August 31, 2022.

A district court is entitled to consider "the full text of those documents" partially quoted in a complaint but considered integral to ruling on a motion to dismiss.  *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 809 (2d Cir. 1996).  Here, securities filings partially quoted in the CAC are integral to the allegations based on securities fraud.  Accordingly, the CAC

---

[20] The form reflects Neves's holdings of 49,876,223 shares as of December 31, 2023.

[21] The form reflects Jordan's holdings of 1,604,185 shares as of August 30, 2023.

[22] The form reflects Phair's holdings of 1,217,283 shares as of August 2, 2023.

incorporates these documents by reference and the Court will consider them in deciding the present motions.

Regarding the documents not cited in the CAC—Form 13G (J. Neves), Forms 144 (E. Jordan and S. Phair), the Vanguard article, the GQ article, and the The Cut article— the Court may "take judicial notice of public disclosure documents that must be filed with the SEC" as well as documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law,'" *Silsby*, 17 F. Supp. 3d at 354, and of "press coverage establishing what information existed in the public domain during periods relevant to the plaintiffs' claims." *In re Bank of America AIG Disclosure Securities Litigation*, 980 F. Supp. 2d at 570 (citing *Staehr v. Hartford Financial Services Group Inc.*, 547 F.3d 406, 425–26 (2d Cir. 2008)). Although Plaintiffs raise objections to the Court's consideration of the majority of the attached documents, this Court may take judicial notice of all of the documents attached to the Defendants' motion to dismiss.

### B. Section 10(b) and Rule 10(b)-5 Liability

Section 10(b) of the Exchange Act prohibits using or employing, "in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance," 15 U.S.C. § 78j(b) (1934), while Rule 10(b)-5 creates liability for a person who makes "any untrue statement of a material fact or ... omit[s] to state a material fact ... in connection with the purchase or sale of any security." *In re OSG Securities Litigation*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.10b-5 (1951)). Rule 10(b)-5, promulgated by the SEC to implement section 10(b), "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." *Press v. Chemical Investment Services Corporation,* 166 F.3d 529, 534 (2d Cir. 1999). Under Rule 10(b)-5, it is unlawful for any person, directly or indirectly, by use of any means specified in section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material

> fact necessary in order to make the statements made, in the light of
> the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which
> operates or would operate as a fraud or deceit upon any person, in
> connection with the purchase or sale of any security.

17 C.F.R. § 240.10(b)-5.

To state a private civil claim under section 10(b) and Rule 10(b)-5, a plaintiff must plead that: (1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.*, a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005); *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007). Defendants contest only the first two elements.

    *1.  Material Misrepresentations or Omissions*

    *a.  Particularity and Puzzle Pleading*

Defendants first argue that the CAC should be dismissed due to impermissible "puzzle pleading." Doc. 44 at 23–24. Puzzle pleading, or allegations without any effort to "demonstrate with specificity why and how each statement is materially false or misleading," is improper and alone warrants dismissal, as it constitutes a failure to meet Rule 9(b) and the PSLRA's pleading requirements. *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37–38 (2d Cir. 2012) (internal quotations omitted).

Here, the CAC includes impermissible puzzle pleading warranting dismissal. Plaintiffs employ a 186-page, 525-paragraph Complaint, of which 171 paragraphs spanning 80 pages are dedicated to reciting Defendants' statements during the Class Period. ¶¶ 284–454. *See In re PetroChina Co. Ltd., Securities Litig.*, 120 F. Supp. 3d 340, 356 (S.D.N.Y. 2015) ("district courts should not have to search the long quotations in the complaint for particular false statements, and then determine on its own initiative

how and why the statements were false and how other facts might show a strong

inference of scienter.") (internal quotations omitted).

The section titled "False and Misleading Statements" contains lengthy block

quotations taken from over 80 disclosures over a nearly two-year period, followed by a

"'conclusory assertion that they were falsely made' due to a laundry list of generalized

reasons." Doc. 44 at 24. Plaintiff uses some variation of the same nine or so generalized

reasons to allege why 81 pages of quotations taken from a myriad of financial reports and

investor calls spanning almost two years were false or misleading when made. *Plumbers

& Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, No. 19-cv-00235 (VEC),

2020 WL 4937461, at *3 (S.D.N.Y. Aug. 24, 2020) (complaint which "use[d] two terse

paragraphs generically to allege why 36 pages of quotations spanning 83 paragraphs

contain[ed] false or misleading statements" failed to plead with requisite particularity),

*aff'd*, 11 F.4th 90 (2d Cir. 2021) ("Plumbers II"). "That is far too great a weight for

sweeping explanations of fraud to bear." *Id.*

Plaintiffs purport to assist the reader in identifying the false or misleading

statements by bolding and italicizing several quotes throughout the 81 pages of

statements where they deem it necessary, Doc. 48 at 26, but that does suffice to cure the

CAC of its deficiencies. To start, the majority of the block quotes do not contain boldface

or italics, leaving the reader to guess which phrases in the block quotes, which are often

several paragraphs long, are the misstatements that form the basis of Plaintiffs causes of

action. In the instances where there are bolded and italicized statements, the reader is

still left to guess what in the bolded and italicized statements are false or misleading and

why.

Plaintiffs assert that "Defendants' misstatements were often false or misleading by

omission, which require longer quotations to illustrate an absence and rebut accusations

of cherry-picked quotes." Doc. 48 at 26. This, however, does not rectify Plaintiff's

failure to meet the particularity requirement. Defendants argue that, in failing to specify

which part of the statements are misleading or false, Plaintiffs concede that the CAC failed to specify which parts of the 80+ disclosures they challenge.  Doc. 50 at 7.  The Court agrees.  Plaintiffs further attempt to justify their use of generalized reasons by alleging that many of the Defendants' statements were false or misleading for "common, overlapping reasons" and therefore "the same evidence was probative of falsity for many misstatements."  Doc. 48 at 26.  Even assuming this is true, Plaintiff's ten or so generalized reasons explaining why the alleges statements are false or misleading are conclusory.[23]

The Court is unable to meaningfully distinguish the CAC from others in this Circuit that have been dismissed for failure to plead fraud with the requisite particularity. The CAC fails to "describe[] what portion of each quotation constitutes a false representation," instead "placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts." *Construction Laborers Pension Trust for Southern California v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020) (internal quotations omitted).  The CAC is consequently dismissed for failing to meet the pleading standards of Rule 9(b) and the PSLRA.

   b.  *Plaintiffs Fail to Plead Material Misrepresentations or Omissions.*

Even if the CAC had met the pleading standards of Rule 9(b) and the PSLRA, Plaintiffs have not alleged a materially false or misleading statement that could sustain a

---

[23] The ten reasons Plaintiffs allege are:  (1) Farfetch lacked proper oversight concerning the cash needs of different divisions of the Farfetch Group, including *inter alia*, NGG; (2) Farfetch was experiencing significant challenges managing its operating costs relating to supply chain and inventory when it made the allegedly false or misleading statements; (3) high VAT costs and low take rates negatively impacted Farfetch's cash position, EBITDA, and gross margins; (4) Violet Grey was already struggling financially when Farfetch acquired it; (5) Farfetch was experiencing a slowdown in China and the U.S.—its two largest markets—when the allegedly false or misleading statements were made; (6) the halt of sales in Russia—Farfetch's third largest market—had already negatively impacted Farfetch when the allegedly false or misleading statements were made; (7) Farfetch's operational and informational technology controls for NGG were inappropriately designed and therefore Farfetch y lacked adequate internal controls over NGG's financial reporting of revenue and GMV; (8) Farfetch improperly recognized sales; (9) Reebok had been overvalued at the time of acquisition; and (10) Farfetch's guidance or expectations were materially overstated.

securities fraud claim. *See Construction Laborers Pension Trust*, 433 F. Supp. 3d at 532

(describing standards for materiality and falsity).[24]

    *i.   Non-Actionable Corporate Optimism or Puffery*

Many of the challenged statements constitute non-actionable corporate optimism

or puffery.  For a statement to be actionable, "the representation must be one of existing

fact, and not merely an expression of opinion, expectation or declaration of intention."  *In

re Duane Reade Inc. Securities Litigation*, No. 02-cv-6478 (NRB), 2003 WL 22801416,

at *4 (S.D.N.Y. Nov. 25, 2003) (quoting *Greenberg v. Chrust*, 282 F. Supp. 2d 112, 121

(S.D.N.Y. 2003)), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 Fed. Appx. 250 (2d

Cir. 2004) (summary order).  "[G]eneralizations regarding integrity, fiscal discipline and

risk management constitute precisely the type of 'puffery' that this and other circuits have

consistently held to be inactionable."  *In re JP Morgan Chase Securities Litigation*, No.

02-cv-1282 (SHS), 2007 WL 950132, at *12 (S.D.N.Y. Mar. 29, 2007) (internal

quotations and citations omitted), *aff'd sub nom. ECA*, 553 F.3d at 206; *In re New York

Community Bancorp, Inc., Securities Litigation*, 448 F. Supp. 2d 466, 478–79 (E.D.N.Y.

---

[24] While the Court does not find it necessary to offer a detailed explanation of every potentially forward-looking statement given that the complaint includes puzzle pleading, it is important to note that Defendants did provide meaningful cautionary language along with their disclosures.  Defendants contend that many of these statements are protected by the PSLRA's safe harbor provision,  Doc. 44 at 25–29,  which provides that no liability attaches to certain forward-looking statements that are identified as such and "accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the forward looking statements."  *In re Nokia Oyj (Nokia Corporation) Securities Litigation*, 423 F. Supp. 2d 364, 400 (S.D.N.Y. 2006) (citing 15 U.S.C. § 78u–5(c)).  "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information."  *Slayton v. American Express Co.*, 604 F.3d 758, 772 (2d Cir. 2010); *Villare v. Abiomed, Inc.*, No. 19-cv-7319 (ER), 2021 WL 4311749, at *18 (S.D.N.Y. Sep. 21, 2021) ("forward-looking" statements not actionable where "cautionary language warn[ed] of the very risks that [plaintiff] alleges that Defendants failed to disclose."). Here, for example, Defendants properly warned investors of risks concerning Virgil Abloh's death and Violet Grey.  Doc. 44 at 33–34; Doc. 45-25 at 36 ("Certain designers and creators, including Virgil Abloh, the founder and Creative Director of Off-White, are critical to the success of the brands within the New Guards portfolio, and their departure could have a significant impact on . . . New Guards' business."); *see also* Doc. 45-2 at 37 (Farfetch "may be unsuccessful in integrating" its "acquisitions" like "Violet Grey" and "may not achieve the anticipated benefits" due to possible "unanticipated and substantial costs or liabilities").  Therefore, Defendants' risk disclosures timely "warn[ed] of the precise risks [Plaintiffs] claim[] were omitted."  *In re MINISO Group Holding Ltd. Securities Litigation.*, 2024 WL 759246, at *14 (S.D.N.Y. Feb. 23, 2024).

2006) ("Generalized statements regarding a company's fiscal discipline and risk management amount to no more than inactionable puffery.").

However, "[s]tatements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *In re International Business Machines Corporate Securities Litigation*, 163 F. 3d 102, 107 (2d Cir. 1998) (internal citations omitted); *see also Gissin v. Endres*, 739 F. Supp. 2d 488, 502 (S.D.N.Y. 2010) ("statements are not protected where defendants had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality") (internal quotation marks omitted).

Here, Farfetch's statements that the Company was "on track to deliver on our plan for 2023," that Reebok was "on budget and on schedule," China was "back to growth," and that the U.S. had "continued softness," but "gives us confidence that we're going to go back to growth," are all non-actionable puffery.  ¶¶ 404, 411, 414, 416, 421, 423; *see Gissin*, 739 F. Supp. 2d at 511–12 (finding the defendant's statement that the company "continues to maintain a strong balance sheet" was mere puffery because it did not "offer any of the 'long-term guarantees' or specifics which would convert an opinion or projection into a factual misrepresentation."); *see also Livingston v. Cablevision Systems Corp.*, 966 F. Supp. 2d 208, 220 (E.D.N.Y. 2013) (finding statements that a company "'can continue to provide superior products, superior customer service, and compete aggressively, and continue to grow' is quintessential inactionable puffery.").  "[T]hese statements are too general to cause a reasonable investor to rely upon them," and, as a result, do not violate securities laws.  *In re Australia & New Zealand Banking Group Ltd. Securities Litigation*, No. 08-cv-11278 (DLC), 2009 WL 4823923, at *11 (S.D.N.Y. Dec. 14, 2009) (internal quotations omitted).  Plaintiffs argue that these statements "are verifiable statements of fact and cannot simply be cast as optimistic statements."  Doc. 48 at 27.  However, as this Court has previously held, statements about a company being

"back to growth" are not sufficiently specific or concrete to mislead reasonable investors. *Villare*, 2021 WL 4311749, at *15 (internal quotations omitted).

> ii.   *Non-Actionable Opinion Statements*

Defendants also argue that the statements at issue are non-actionable opinions.  "A 'sincere statement of pure opinion is not an untrue statement of material fact, regardless of whether an investor can ultimately prove the belief wrong.'"  *Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 364 (S.D.N.Y. 2019), *aff'd sub nom. Cavalier Fundamental Growth Fund v. Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020) (quoting *Omnicare, Inc. v. Laborers District Council Constr. Industry Pension Fund*, 575 U.S. 175, 186 (2015)).  "Expressions of optimism and projections about the future are quintessential opinion statements."  *Id.* (quoting *Martin v. Quartermain*, 732 F. App'x 37, 40 n.1 (2d Cir. 2018) (summary order)).

An opinion statement, however, may give rise to liability under section 10(b) if either of the following is true:  (1) "if either 'the speaker did not hold the belief [Defendants] professed' or 'the supporting fact[s] [Defendants] supplied were untrue,'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare*, 575 U.S. at 185–86); or (2) if the "speaker omits information whose omission makes the statement misleading to a reasonable investor" even if the opinion is "sincerely held and otherwise true as a matter of fact."  *Id.* at 210.

The Supreme Court has "cautioned against an overly expansive reading of this standard, noting that '[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts,' and adding that '[a] reasonable investor does not expect that every fact known to an issuer supports its opinion statement.'"  *Id.* (quoting *Omnicare*, 575 U.S. at 189–90).  Accordingly, "a statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'"  *Id.* (quoting *Omnicare*, 575 U.S. at 189).  Moreover, the Supreme Court has emphasized

that "statements of opinions must be considered in the context in which they arise." *Aratana*, 315 F. Supp. 3d at 755. "'[T]he investor takes into account the customs and practices of the relevant industry,' and … 'an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame.'" *Sanofi*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 190).

 Here, many of Defendants' challenged statements are opinions, and Plaintiffs do not provide a substantive argument that could lead to a different conclusion. For example, Defendants prefaced the statements regarding Reebok, Violet Grey, NGG, and Net-a-Porter with qualifiers like "we expect," "we believe," "I've always felt," or "I think." ¶ 430 ("we believe that cash flow . . . will be sufficient"), ¶ 442 ("we expect a strong recovery"), ¶ 453 ("[w]e think [Net-a-Porter] is a great partnership"). Statements such as these are the quintessential non-actionable opinions. *In re Aratana Therapeutics Inc. Securities Litigation*, 315 F. Supp. 3d 737, 750-51, 758 (S.D.N.Y. 2018) (statements marked by qualifiers like "I think," "we expect," or "I believe" often "reflect judgments as to values that [are] not objectively determinable" and so are inactionable opinions) (alterations in original).

 The Court must then determine whether Plaintiffs satisfy either basis for establishing liability for opinion statements. *First*, Plaintiffs argue that even if Defendants' statements were opinions, they are nonetheless actionable because Defendants "lacked [a] basis for making those statements." *Omnicare,* 575 U.S. at 184–86, 196; Doc. 48 at 33. This argument is relevant to the first scenario under which an opinion statement could give rise to liability under Section 10(b)—that is, that the supporting facts that Defendants shared were untrue. While Plaintiffs attempt to argue that Defendants were blatantly lying about Violet Grey's business, NGG's internal controls, and Reebok's inventory, Doc. 48 at 33, the Supreme Court established that "a statement of opinion 'is not necessarily misleading when an issuer knows, but fails to

disclose, some fact cutting the other way.'" *Sanofi*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S. at 1329). Plaintiffs' allegations, in sum, are that the challenged statements were false or misleading because the Defendants did not include facts that could have undermined Defendants' objections. *Omnicare*, however, imposes no such disclosure requirements on issuers. *Id.*

*Second*, Plaintiffs put forth a very similar argument to allege that Defendants omitted relevant information when they made the challenged statements and therefore their statements were misleading. Doc. 48 at 33. Specifically, Plaintiffs note that, for example, Violet Grey's business was struggling, ¶¶ 162–69; Reebok's products were heavily discounted, and the brand had excess inventory, ¶¶ 170–84; and Farfetch had failed to remediate NGG's control weaknesses, ¶¶ 198–235. *See* Doc. 48 at 33. Plaintiffs further allege that the former employees knew that Defendants discussed these issues, ¶¶ 147–48, 158, 219-21, 462, 463, and therefore omitted relevant information in making the challenged statements.

The Court agrees with Defendants that they provided adequate disclosures and notes that "[t]he existence of financial challenges, particularly where Defendants had acknowledged these challenges and outlined efforts to mitigate them, does not render Defendants' optimistic opinion statements actionable." *In re Anheuser-Busch InBev SA/NV Securities Litigation*, No. 19-cv-5854 (AKH), 2020 WL 5819558, at *6 (S.D.N.Y. Sept. 29, 2020) (citing *Omnicare*, 575 U.S. at 189). Accordingly, even if the CAC had not been dismissed as constituting impermissible puzzle-pleading, the Court concludes that Plaintiffs have failed to allege a material misrepresentation or omission to support a claim under section 10(b).

### iii.  Non-Actionable Misrepresentations and Omissions

Plaintiffs, perhaps in a last-ditch effort to save the CAC from a finding of impermissible puzzle pleading, attempt to reorganize their allegations into six distinct

buckets: (1) omissions of Farfetch's deficient internal controls; (2) those concerning Farfetch's current state of affairs; (3) those concerning Farfetch's financial projections; (4) those concerning Farfetch's financial condition; (5) false affirmations of controls over financial reporting; and (6) overstated value of Farfetch's intangible assets. Doc. 48 at 19.

*First*, Plaintiff alleges that Farfetch's internal controls were in disarray throughout the Class Period and were never remediated prior to liquidation. *See* ¶¶ 198–235. However, the CAC concedes that "Farfetch first reported the material weaknesses within NGG . . . [on] March 4, 2021"—nearly one year *prior* to the start of the Class Period. ¶ 202; ¶ 219 ("[S]hareholders were threatening to pull their money out of Farfetch because of the longstanding material weakness at NGG."). These disclosures fully undermine Plaintiffs' claims regarding the weaknesses in NGG's internal controls. *Shemian v. Research In Motion Ltd.*, No. 11-cv-4068 (RJS), 2013 WL 1285779, at *20 (S.D.N.Y. Mar. 29, 2013) (dismissing claims where "Defendants *did* make disclosures" of alleged omission (emphasis in original)). Accordingly, the Court finds that Farfetch did not materially misrepresent the weaknesses in NGG's internal controls.

*Second*, Plaintiffs allege that Farfetch's acquisitions were overpriced, playing a significant role in the Company's financial struggles. Doc. 48 at 21. According to Plaintiffs, Defendants repeatedly misrepresented the state of affairs of its acquisitions and partners, namely NGG, Violet Grey, and Reebok.[25] *Id.* Defendants argue that these allegations are based on the personal opinions of former employees who were not directly involved with those acquisitions or partnerships. Doc. 50 at 10.

---

[25] Plaintiffs do not dispute Defendants' argument that their allegations about the Net-a-Porter acquisition are impermissible fraud-by-hindsight allegations. Doc. 44 at 33; *In re PetroChina*, 120 F. Supp. 3d at 366, *aff'd* (Mar. 21, 2016) ("[I]t is well-settled that 'fraud by hindsight' is not a cognizable theory of relief") (quoting *In re Longtop Financial Technologies Ltd. Securities Litigation*, 910 F. Supp. 2d 561, 579 (S.D.N.Y. 2012)). As such, that claim would not proceed even if the CAC had not been impermissibly puzzle-plead.

As discussed above, the Reebok statements are non-actionable puffery. With respect to NGG, Neves stated that "the consumer demand around [NGG brand] Off-White … remains very strong" during the Q2 2023 earnings call on August 27, 2023—21 months *after* Virgil Abloh's death in November 2021. ¶¶ 449–50; Doc. 48 at 21. Defendants argue that the allegation that Off-White sales severely dropped in the six to 12 months after Abloh's death says nothing about the state of Off-White three to nine months after the sales dropped. The Court finds that this statement was not false or misleading given Farfetch disclosed the "up-and-down performance in this business." *See, e.g.*, Doc. 45-2 at 20 ("the majority of New Guards' existing brands, including its largest brands, Off-White and Palm Angels, are currently focused on luxury streetwear and should consumer preferences for streetwear decline that could have a significant impact on our business"); Doc. 45-2 at 22 (same). *Police & Fire Retirement Systems of the City of Detroit v. La Quinta Holdings Inc.*, No. 16-cv-3068 (AJN), 2017 WL 4082482, at *6 (S.D.N.Y. Aug. 24, 2017), a*ff'd sub nom. Police & Fire Retirement Systems of City of Detroit v. La Quinta Holdings, Inc.*, 735 F. App'x 11 (2d Cir. 2018) (dismissing securities fraud claims in part because "all of this information [disclosed by the defendant and in the public domain], when combined, sufficiently apprised investors of the risks Plaintiff identifies.").

With respect to the Violet Grey, Plaintiffs assert that Phair's description of Violet Grey as "a cult favorite beauty destination" were false because of its "declining growth and depleted finances." ¶¶ 162–69; Doc. 48 at 21. The Court does not find it necessary to reach a conclusion on these statements since Defendants disclosed that Violet Grey "represented less than 1% of [Farfetch's] total assets and . . . revenue," ¶ 394, and, as such, it is unlikely that these statements swayed investors one way or another.

*Third*, while the Court does not find it necessary to address each of these individually, the Court reserves the discussion about Farfetch's FY 2022 and FY 2023

annual reports, for which Neves and Jordan provided signed Sarbanes-Oxley certifications, below in the Section 20(a) Liability section.[26]

### 2. Plaintiffs Do Not Allege a Strong Inference of Scienter

To satisfy the PSLRA's pleading requirements for scienter, a plaintiff must allege facts with particularity that would give rise "to a strong inference that the defendant acted with the required state of mind." *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). A "strong inference" that a defendant acted with a certain intent is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

This inquiry goes beyond the ordinary Rule 9(b) framework and requires courts to consider "not only inferences urged by the plaintiff ... but also competing inferences rationally drawn from the facts alleged." *Id.* "The relevant inquiry for the Court 'is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any *individual* allegation, scrutinized in isolation, meets that standard.'" *In re Magnum Hunter Resources Corp. Securities Litigation*, No. 13-cv-2668 (KBF), 2014 WL 2840152, at *17 (S.D.N.Y. June 23, 2014) (emphasis in original) (citing *Tellabs*, 551 U.S. at 322–23, 127).

A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the "motive and opportunity" to commit the alleged fraud, or (2) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006).

Plaintiffs contend that their allegations give rise to a strong inference of scienter that Defendants: (1) knew that the financial statements issued or disseminated in the

---

[26] Plaintiffs allege that Neves and Jordan provided signed Sarbanes-Oxley certifications and reports on internal controls over financial reporting that misstated the design and effectiveness of Farfetch's controls, falsely claiming they were designed appropriately and/or effective. ¶¶ 294–96, 393–95.

Farfetch name during the Class Period were false and/or materially misleading; (2) knew that such statements or documents would be issued or disseminated to the investing public; and (3) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Doc 34 at 168.  The Individual Defendants assert that Plaintiffs have not sufficiently pleaded a cognizable motive nor that requisite "correspondingly greater" showing of "conscious misbehavior or recklessness," when motive is absent.  Doc. 44 at 35–44.  As the Individual Defendants assert, Plaintiffs largely ignore the arguments in the motion to dismiss—that the Second Circuit requires particularized allegations showing conscious recklessness, which is a "state of mind approximating actual intent," that adequately plead motive requires a showing that the defendants benefitted in a concrete way, and that the Defendants did not engage in suspicious trading activity, as was initially proffered in the CAC, Doc. 44 at 35–44—and instead advance new theories of scienter not initially pled in the complaint.  Doc. 48 at 39–41; Doc. 50 at 15.

     *a.  Plaintiff's Allegations of Motive are Insufficient.*

To establish motive, the Plaintiffs must establish that the Individual Defendants engaged in "unusual" or "suspicious" trading activity, and the "mere fact that insider stock sales occurred does not suffice."  *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 772 (S.D.N.Y. 2019) (internal quotation marks omitted).  In the CAC, Plaintiffs allude to alleged "suspicious trading activity," ¶ 464, but they never specify what this activity was, nor do they dispute that the Defendants *increased* their stock during the Class Period.  Doc. 44 at 36–37.  The "purchase[ of] stock during the relevant period[] rebuts an inference of scienter."  *Turner v. MagicJack VocalTec, Ltd.*, No. 13-cv-0448 (RWS), 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014).

Plaintiffs advance two other theories to attempt to establish motive:  (1) that Farfetch committed fraud to ensure they would continue raising capital and (2) that the

Court should ignore the Individual Defendants' stock holdings and instead focus on their personal incentive to artificially inflate Farfetch's common stock price given Farfetch's compensation structure.  Doc. 48 at 40–41.

Both of these arguments are insufficient to establish motive.  The first of these allegations is "nothing more than the ordinary motives possessed by virtually all corporate insiders."  *In re Plug Power, Inc. Securities Litigation*, No. 21-cv-2004 (ER), 2022 WL 4631892, at *12 (S.D.N.Y. Sept. 29, 2022).  As this Court has previously pointed out, "courts in this district have generally found allegations regarding the desire to raise capital inadequate to plead scienter."  *Id.*  This Court has also established that allegations that corporate insiders were trying to conceal liquidity crises are insufficient to establish motive.  *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 212–13 (S.D.N.Y. 2020) (explaining that the desire for a company to appear profitable and to keep stock prices high to increase officer compensation do not suffice to establish a motive).  As for the second allegation, this Court has observed that "the desire for the corporation to . . . keep stock prices high to increase officer compensation . . . does not suffice to establish a motive."  *Plug Power*, 2022 WL 4631892, at *11.  Accordingly, Plaintiffs have failed to properly allege motive for any of the Individual Plaintiffs.

> b.  *Plaintiffs Allegations of Reckless Disregard or "Circumstantial" Scienter are Insufficient.*

When a plaintiff fails to allege a motive to commit fraud, the plaintiff's allegations that indicate a defendant's recklessness "must be correspondingly greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal citations omitted); *accord S. Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009).  Plaintiffs must plead conduct that is "highly unreasonable" or reflects "an extreme departure" from the standards of ordinary care.  *Board of Trustees of City of Ft. Lauderdale General Employees' Retirement System v. Mechel OAO*, 811 F. Supp. 2d 853, 869 (S.D.N.Y 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012).  This requires

pleading particularized facts that show the defendants had "knowledge of facts or access to information contradicting their public statements." *Kalnit*, 264 F.3d at 142. Plaintiffs "must specifically identify the reports or statements containing this information." *Mechel OAO*, 811 F. Supp. 2d at 869.

Under the "conscious misbehavior or recklessness" prong, to qualify as "strong," the inference of scienter from the facts alleged "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. If an inference of fraudulent intent is not "at least as compelling" as a contrary inference, it is inadequate, even in a "close case." *Slayton*, 604 F.3d at 777. An inference of scienter need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324 (quotation omitted); *see also City of Pontiac General Employees' Retirement System v. Lockheed Martin Corporation*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff."). "But generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard." *Campo v. Sears Holdings Corporation*, 635 F. Supp. 2d 323, 336 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010). "Thus, a complaint 'which fails to adduce any specific facts supporting an inference of knowledgeable participation in the alleged fraud, will not satisfy even a relaxed standard.'" *Faulkner v. Verizon Communications, Inc.,* 156 F. Supp. 2d 384, 393 (S.D.N.Y. 2001) (quoting *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987)).

Here, Plaintiffs allege that (1) former employees' reports describe the "specific and contradictory information" Defendants were aware of, (2) that the alleged misrepresentations and omissions were with respect to the most significant parts of Farfetch's business, (3) the Individual Defendants held themselves out as knowledgeable, and (4) the "suspicious" timing of executives' departure are sufficient to establish reckless disregard. ¶¶ 158, 220–25, 456–58, 472–81.

With regards to the first two points, Plaintiffs largely repeat their allegations of scienter based on the former employees' allegations, ¶¶ 54–65, and claims that these were red flags that Defendants had knowledge of at the time of the alleged misstatements.[27] Doc. 48 at 35.  To the extent that plaintiffs assert that defendants had access to contrary facts, the complaint must "specifically identify the reports or statements containing this information."  *In re General Electric Co. Securities Litigation*, 856 F. Supp. 2d 645, 659 (S.D.N.Y. 2012) (citation omitted).  "Recklessness in the scienter context[, however,] cannot be merely enhanced negligence."  *In re JP Morgan Chase Securities Litigation*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005).

Here, none of the former employees spoke with Neves or Phair, and only one of them, FE6, spoke with Jordan, *once*.  ¶¶ 219–20.  "[T]he law is abundantly clear that [in cases where the witnesses had no contact with the Individual Defendants, their] allegations are insufficient to support scienter."  *Wilbush v. Ambac Financial Group, Inc.*, 271 F. Supp. 3d 473, 497 (S.D.N.Y. 2017) (internal quotations omitted).  Consequently, only FE6's statements about Jordan's failure to disclose the alleged deficiencies in internal controls and at NGG merit further analysis.  The CAC alleges that, in April 2023, FE6 had a meeting with Jordan where Jordan acknowledged that shareholders were threatening to pull their money out of Farfetch because of the longstanding material weakness at NGG.  ¶ 219; Doc. 48 at 36.  At this meeting FE6 suggested a corrective action, which Jordan turned down.[28]  ¶¶ 220–2.  FE6 was put on a performance improvement plan about a month later, although it is unclear from the CAC why this

---

[27] The CAC alleges that the former employees had contradictory information regarding growth projections and poorly integrated acquisitions, the "VAT situation," and deficiencies in internal controls.  Doc. 48 at 34–6.  Specifically, Plaintiffs assert that during FE2's tenure at Farfetch, FE2 and their team had conversations with Farfetch's leadership about the negative impact the VAT issue was having on Farfetch's operating costs and liquidity as well as the lengthy wait times between submitting and receiving the tax credits.  ¶ 157–58.

[28] The parties express differing viewpoints as to whether this meeting constitutes more than differences in opinion.  Doc. 44 at 40–1; Doc. 48 at 36; Doc. 50 at 18.  The Court does not find this argument necessary to the determination of scienter.

action was taken, and since the internal controls team at Farfetch had been fired prior to FE6 being hired, Farfetch hired Deloitte to provide more resources and financial expertise to assist with the task. ¶¶ 220–23. Farfetch's statements regarding the internal controls and NGG were not false or misleading because Farfetch disclosed it was working on improving material weaknesses in internal controls and continued to update investors and analysts about the possible delays in their efforts to address the issues and for their remediation measures to take effect. ¶¶ 202, 295, 394, 442; Doc. 50 at 12.

FE6's allegations that Neves and Jordan made last-minute changes to the Q1 2023 internal control disclosure before it was published, ¶ 225; Doc. 50 at 32, likewise are insufficient to support an inference of scienter. Plaintiffs do not allege that making these changes was improper or incorrect, nor provide specificity as to what the changes were. *In re Canopy Growth Securities Litigation*, No. 23-cv-4302 (PAE), 2024 WL 3445436, at *14 (S.D.N.Y. July 17, 2024), *appeal withdrawn sub nom. In re Canopy Growth Securities Litigation*, No. 24-2121, 2024 WL 4763225 (2d Cir. Oct. 9, 2024) (finding against an inference of scienter where the allegations do "not establish what specific contradictory information the makers of the statements had and the connection (temporal or otherwise) between that information and the statements at issue"); *Abengoa*, 481 F. Supp. 3d at 209 (determining that former employee allegations were insufficient where "[t]here is nothing to suggest that . . . the method for correcting any discrepancies was inherently improper.").

Furthermore, Plaintiffs' remaining arguments also fail to plausibly allege that the Individual Defendants knew or should have known that the challenged statements were false or misleading, or otherwise provide evidence constituting strong circumstantial evidence of misbehaver or recklessness. Doc. 48 at 37–9.

*First*, Plaintiffs allege that the Individual Defendants had knowledge of the alleged misrepresentations and omissions, which concerned the most important lines of business at Farfetch, due to their positions. Doc. 48 at 37–8. However, the "core

operations" theory at most constitutes "supplemental support" for alleging scienter but does not independently establish scienter. *See New Orleans Employees Retirement System v. Celestica, Inc.*, 455 Fed. App'x. 10, 14 n. 3 (2d Cir. 2011) (summary order) (declining to decide whether the fact that the alleged misrepresentations related to the defendant's "core operations" was sufficient on its own to establish scienter but noting that the concept that "allegations of a company's core operations…can provide supplemental support for allegations of scienter, even if they cannot establish scienter independently" has support in the case law); *see also In re Wachovia Equity Securities Litigation*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) ("the Court considers 'core operations' allegations to constitute supplementary but not independently sufficient means to plead scienter."); *Freudenberg v. E*Trade Financial Corporation*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) (finding that the plaintiffs adequately plead scienter where one of many allegations was that the misstatements concerned the defendants' core operations).

*Second*, Plaintiffs allege that the Individual Defendants consistently held themselves out as knowledgeable about Farfetch's key financial topics and that their authority with which they spoke and "indicated that they either had actual knowledge of the subject matter discussed or were reckless to the likelihood of misleading investors." Doc. 48 at 38–9. However, to establish an inference of scienter, Plaintiff must do more than allege that the Individual Defendants had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions. *Lipow v. Net1 UEPS Technologies, Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) (citing *In re Nokia Oyj (Nokia Corp.) Securities Litigation*, 423 F. Supp. 2d 364, 406 (S.D.N.Y.2006) (holding that generalized allegations that the individual defendants "knew, or should have known, that they were misrepresenting material facts, based on their senior positions in the company" are insufficient to establish scienter)). "[C]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are

entitled to no weight." *City of Brockton Retirement System v. Avon Products, Inc.*, No. 11-cv-4665 (PGG), 2014 WL 4832321, at *19 (S.D.N.Y. 2014).

*Third*, Plaintiffs assert that the timing of the resignation of at least eight senior executives from August 2022 to November 2022 "suggests that Company executives were aware of Farfetch's true financial condition and some left to avoid liability." Doc. 48 at 39. As a general statement of law, resignations must be "highly unusual and suspicious" in order to support an inference of scienter. *In re Scottish Re Group Securities Litigation*, 524 F. Supp. 2d 370, n. 176 (S.D.N.Y. 2007). A resignation can be highly unusual or suspicious when independent facts point to the resignation being tied to the alleged fraud, that the resignation alerted the Individual Defendants to the fraud, or that scienter was otherwise evident. *Id.* at 394 (pointing to multiple resignations and evidence indicating that defendants' fraud was "tantamount to conscious misbehavior"). Here, Plaintiffs have not come remotely close to tying those resignations to the alleged fraud. The only resignation that Plaintiffs attempt to tie to the allegations is that of J. Michael Evan from the Board of Directors. Plaintiffs assert that signaled to investors, analysts and market experts that previous supporters were stepping back from the Company. ¶ 255. This statement, however, does not come close to being an indicium of highly unusual or suspicious circumstances and is therefore insufficient to support the required strong circumstantial evidence of scienter.

Therefore, for the reasons discussed above, Plaintiffs have not sufficiently alleged an inference of scienter "at least as strong as any opposing inference[.]" *In re Scottish,* 524 F. Supp. 2d at 383. Here, the "more compelling" inference is that the Individual Defendant believed that their disclosures regarding the NGG acquisition and their internal controls were sufficient. *See generally In re Bank of America AIG Disclosure Securities Litigation*, 980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) (rejecting a finding of recklessness where defendants reasonably believed they

had no disclosure obligations).  Accordingly, Plaintiffs' Section 10(b) and Rule 10(b)-5 claims as to the Individual Defendants are DISMISSED.

### 3. *Plaintiffs Have Not Adequately Pled Scheme Liability Under Rule 10b-5(a) and (c)*

Scheme liability arises when defendants engage in deceptive conduct in conjunction with deceptive statements.  *See Lorenzo v. SEC*, 587 U.S. 71, 78–82 (2019). To state a claim for scheme liability, a plaintiff must present facts showing (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance.  *Puddu v. 6D Glob. Technologies, Inc.*, No. 15-cv-8061 (AJN), 2021 WL 1198566, at *9 (S.D.N.Y. Mar. 30, 2021); *see also Menaldi v. Och-Ziff Capital management Group LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017); *In re Turquoise Hill Resources Limited Securities Litigation*, 625 F. Supp. 3d 164, 247 (S.D.N.Y. 2022).

Plaintiffs fail to plead scheme liability.  Defendants correctly point out that "the CAC contains exactly zero references to 'scheme liability,' let alone allegations in support of it."  Doc. 50 at 20.  Indeed, the word "scheme" appears only thrice in the entirety of the 186-page complaint.  ¶ 455 ("Defendants participated in the fraudulent scheme alleged herein by virtue of their possession of and/or access to information reflecting the true facts regarding Farfetch's financial health, liquidity strength, and internal controls over financial reporting."); ¶ 493 ("[T]he damages suffered by Plaintiffs and other members of the Class were foreseeably and proximately caused by Defendants' fraudulent scheme to artificially inflate Farfetch's stock prices and the subsequent significant declines in the value of Farfetch securities when Defendants' prior misrepresentations and omissions were revealed."); ¶ 516 ("Defendants violated Section 10(b) of the Exchange Act (15 U.S.C. §78j(b)) and Rule 10b-5 (17 C.F.R. §240.10b-5) in that they: (a) employed devices, schemes, and artifices to defraud…").  None of these instances come close to meeting the pleading requirement.  *See In re Teva Securities*

*Litigation*, 512 F. Supp. 3d 321, 337 (D. Conn. 2021) ("Courts rightly insist that a plaintiff who intends to bring a Rule 10b-5 claim based on both misstatement and scheme liability must do so clearly and specifically," typically "in two separate counts") (citing *In re Smith Barney Transfer Agent Litigation*, 884 F. Supp. 2d 152, 160–61 (S.D.N.Y. 2012)).

In their Opposition to the Motion to Dismiss, Plaintiffs raise a scheme liability claim for the first time, arguing that "Defendants' deceptive conduct goes beyond the dissemination of misstatements themselves." Doc. 48 at 17. Specifically, they allege that FE6 shared that Defendants required FE6 to sign off on Farfetch's internal controls for the Q1 2023 public financial reports even though the Defendants implemented last-minute changes, which limited the time FE6 had to understand what the changes were. ¶¶ 224–25. Plaintiffs then argue that Neves and Jordan both relied on these reports, and the allegedly misleading information contained therein, when discussing Farfetch's quarterly results with analysis and investors during the quarterly call. *See* ¶¶ 400–24; Doc. 48 at 17. They then argue that, according to FE6, Defendants misleadingly added "Internal Audit" to employee titles make it seem like Farfetch had a "legally required independent internal auditing function." Doc. 48 at 18. Plaintiffs allege that, as a result, Defendants "were able to artificially prop up the stock price, hide the Company's deficient internal controls and material risk of insolvency from the market, and raise over $2 billion between February 2020 and September 2023." Doc. 48 at 18.

As discussed above, Plaintiffs have not sufficiently pleaded scienter for Defendants. Therefore, Plaintiffs' scheme liability claims also fail as to them. *Menaldi v. Och-Ziff Capital management Group LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017) ("[s]cheme liability claims are subject to the PSLRA pleading standard with respect to scienter.").

### C. Section 20(a) Liability

Plaintiffs contend that the Individual Defendants were controlling persons of Farfetch during the Class Period and are liable to Plaintiffs for violations of Section 20(a) of the Securities Exchange Act. Doc. 34 ¶¶ 518–25.

"To assert a prima facie case under Section 20(a), a plaintiff 'must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.'" *Mechel*, 811 F. Supp. 2d at 882 (quoting *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)), *aff'd sub nom. Frederick*, 475 F. App'x 353. Because Plaintiffs have failed to allege a primary violation of the Exchange Act, their claim pursuant to Section 20(a) is also dismissed. *See Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 369 (S.D.N.Y. 2019), *aff'd sub nom. Cavalier Fundamental Growth Fund v. Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020).

## IV. LEAVE TO AMEND

The Second Circuit has instructed Courts not to dismiss a complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Shabazz v. Bezio*, 511 F. App'x. 28, 30 (2d Cir. 2013) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)) (internal quotation marks omitted). Here, Plaintiffs request that they be granted leave to amend their pleadings if the Court grants the motion to dismiss in whole or in part. Doc. 48 at 44. While the Court has already granted Plaintiffs the opportunity to amend their original Complaint, it was not in the context of a motion to dismiss and the Court has therefore not provided guidance as to how their claims may be adequately made. *In Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities*, LLC, 797 F.3d 160 (2d Cir. 2015), the Second Circuit reaffirmed that the "liberal spirit" of the Federal Rule of Civil Procedure 15 embodies a "strong preference for resolving disputes on the merits."

*See id.* at 190–91 (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011)). *Loreley* thus counsels strongly against the dismissal of claims with prejudice prior to "the benefit of a ruling" that highlights "the precise defects" of those claims. *Id.* at 190–91. Accordingly, Plaintiffs are granted leave to amend their complaint.

## V.    CONCLUSION

For the foregoing reasons, the Individual Defendant's motion to dismiss is GRANTED, and Defendants' request for oral argument is DENIED as moot. Plaintiffs may file a Second Consolidated Amended Complaint, if at all, by October 21, 2025. If they do not do so, the Individual Defendants will be terminated. The Clerk of the Court is respectfully directed to terminate the motions, Docs. 43 and 47.

It is SO ORDERED.


Dated:    September 30, 2025
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.