**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE FARFETCH LIMITED SECURITIES LITIGATION | Case No.: 1:23-cv-10982-ER-KHP<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br><u>JURY TRIAL DEMANDED</u> |

# TABLE OF CONTENTS


NATURE OF THE ACTION ..... 1

I. JURISDICTION AND VENUE ..... 4

II. PARTIES ..... 5

- A. Plaintiffs ..... 5
- B. Defendants ..... 6

III. FORMER EMPLOYEES CORROBORATING FACTUAL ALLEGATIONS ..... 9

IV. SUBSTANTIVE ALLEGATIONS ..... 11

- A. Farfetch and Its Post-IPO Acquisitions ..... 11
- B. Farfetch Takes on Significant Debt to Meet Its Liquidity Needs ..... 13
- C. Farfetch Temporarily Benefits from Pandemic-Related Boom in E-Commerce ..... 14
- D. Farfetch Repeats Its Acquisition Pattern to Simulate Growth and Generate Market Interest ..... 17
- E. Farfetch's Reorganizations and Cost Rationalizations Fell Well Short ..... 20
- F. Defendants' Scheme to Defraud Farfetch Investors and Note Holders ..... 26
- G. Defendants' Concealment of Farfetch's Growing Liquidity Crisis ..... 28
- H. The Truth Emerges, Causing Harm to Plaintiffs and Other Farfetch Investors ..... 32
- I. Post-Class Period Events and Disclosures ..... 35
  1. The Fraudulent Conveyance of the Farfetch Business is Completed ..... 35
  2. Coupang Drastically Decreases Farfetch's Reported Value and Confirms Unsustainable Cash Demand ..... 38
  3. Coupang Disposes of NGG's Brands and Submits It to Heavy Financial Restructuring ..... 40

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ..... 41

VI. CLASS ACTION ALLEGATIONS ..... 56

VII. LOSS CAUSATION AND ECONOMIC LOSS ..... 58

VIII. PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET ..... 59

IX. FF HOLDINGS IS LIABLE FOR FARFETCH'S STATEMENTS AND REMAINS FARFETCH'S SUCCESSOR-IN-INTEREST ..... 60

X. NO SAFE HARBOR ..... 64

XI. PRAYER FOR RELIEF ..... 69

XII. JURY TRIAL DEMANDED ..... 70

Co-Lead Plaintiffs Fernando Sulichin, individually and on behalf of Lyxor Overseas Holdings Ltd & Cinergy Advisors Ltd, and Yuanzhe Fu (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, allege the following based upon personal knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their attorneys, which included, *inter alia*, review and analysis of (a) public filings made by Farfetch Limited ("Farfetch" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) Intellia's public documents, conference calls, press releases, presentations, and stock chart; (c) securities analysts' reports and advisories concerning Farfetch and its subsidiaries; (d) interviews with former employees of Farfetch; industry reports and media pertaining to Farfetch and its operations; and (e) other publicly available documents and readily obtainable information.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most evidence supporting the allegations contained herein is known only to Defendants or is exclusively within their control.

## I. NATURE OF THE ACTION

1. This is a federal securities class action lawsuit brought on behalf of a class consisting of all persons and entities that purchased or otherwise acquired publicly traded Farfetch securities between December 1, 2022 and December 17, 2023, both inclusive (the "Class Period"), seeking to recover damages caused by Defendants' (defined below) violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, promulgated thereunder.[1]

[1] By an Order of the United States Bankruptcy Court for the District of Delaware dated August 5, 2024, all pending actions against Farfetch are stayed.

2. Farfetch was originally founded in 2007 as a technology company for the global luxury fashion industry. For more than a decade, Farfetch operated as a private company with a sole focus on developing and growing its low risk, high margin e-commerce marketplace connecting global luxury brands and retailers with customers from around the world. Farfetch was floated on the New York Strock Exchange ("NYSE") in September 2018 to much fanfare raising $1 billion in its Initial Public Offering ("IPO") and led to an $8 billion valuation. Then, seemingly overnight, the Company obliterated its defining and highly valued business model, exclusively focused on third-party sales facilitated by its marketplace platform, by conducting a spree of acquisitions of first-party retailers and wholesale distributors, to the tune of $1.6 billion. What followed on the heels of Farfetch's growth-by-acquisition transformation gives rise to the securities fraud allegations contained herein.

3. To pull off its transformation and buttress its position as a leader in the global luxury market, Farfetch needed cash – something it did not have an unlimited supply of. Indeed, after the first round of costly acquisitions in 2018 and 2019, Farfetch was running critically low. To boost its balance sheet, in 2020, Farfetch amassed $1,250 million in debt. After the Company's second round of costly acquisitions and strategic investments in 2022, followed by multiple periods of sequential negative growth, it once again found itself running critically low on cash. In October 2022, the Company's primary operating subsidiary entered into a credit agreement for $400 million which was subsequently enlarged in August 2023, for an additional $200 million.

4. Leading up to and throughout the Class Period, Farfetch repeatedly expressed its aggressive growth prospects and secure financial footing. Many of Farfetch's public statements during its post-acquisition phase focused on Gross Merchandise Value ("GMV"), the total value of all goods sold before any deductions for discounts, returns, or fees, serving as a key indicator

of an e-commerce platform's scale, sales volume, and growth; and Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA"), an earnings measure that is typically considered a good example of a company's cash income and ability to service debt (*i.e.*, profitability). During the Class Period, Farfetch's public statements also began to focus heavily on Free Cash Flow ("FCF"), a financial measure representing the cash flow generated after accounting for the money spent to maintain or expand a company's asset base (*i.e.*, capital expenditures), serving as a key indicator of its ability to repay creditors, issue dividends, or reinvest in the business.

5. Yet, unbeknownst the public, the fleeting spike in growth Farfetch experienced in 2020 and the first half of 2021 due to a temporal pandemic-driven boom in e-commerce merely provided a façade of profitability to a business riddled with inefficiencies, including significant overlap amongst the fragmented Group, and unsustainable operating expenses relating to, *inter alia*, a surplus of stale inventory and hundreds of millions of dollars in up-front costs to cover consumption taxes, or the Value Added Tax ("VAT"), on nearly every third-party sale completed on its marketplace platforms. As if these internal deficiencies were not bad enough, Farfetch routinely offered heavy discounts on products to drive sales (and reach its GMV goals), obliterating the Company's profit margins. Consequently, Farfetch was teetering on the edge of a full liquidity crisis, and based on later revelations, likely on the precipice of bankruptcy staved off only by the Company's billions of dollars in debt which were quickly running out.

6. Instead of telling investors, Defendants repeatedly assured the public that Farfetch's investments were sound and that the Company's balance sheet supported its second phase of growth focused on a return to profitability and positive free cash flow in 2023. Worse yet, while actively taking steps to conceal the Company's growing liquidity crisis, in December 2022, Defendants secretly commenced "Project Athena" – what initially began as undisclosed plans to

consummate a take-private transaction quickly devolved into efforts to secure a near-identical future for the Farfetch Business free of the financial obligations and liabilities held by the public entity, Farfetch. Despite engaging with dozens of potential third-party investors, however, there was little interest in the business as a whole because of its deteriorating financial condition. Consequently, with no actionable capital solution on the table, by the second half of 2023, Farfetch found itself in dire financial straits and its ability to fund its operations and meet near-term liquidity needs was in serious question. At this time, Farfetch formed a special committee and, in the fall 2023, undertook an extensive process to facilitate the sale of all Company assets through a single transaction that would secure a future for the business while also writing off $1 billion in debt.

7. Yet, up until August 2023, Defendants made numerous representations to the market suggesting that the course ahead for the Company was smooth sailing and it maintained a strong financial condition. That all came to a halt when Farfetch's stock price came tumbling down after a series of revelations that Farfetch was, in fact, not executing on its plan to profitability and positive free cash flow, previous guidances were not to be trusted, and ultimately that the business had been gutted and sold off for its parts to avoid insolvency.

8. Farfetch's public investors sustained significant investment losses as the Company's stock price plummeted. This lawsuit seeks to recover these losses sustained by Plaintiffs and other members of the Class caused by Defendants' violations of the federal securities laws alleged herein.

## II. JURISDICTION AND VENUE

9. The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

12. Venue is proper pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in this District.

13. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

14. Plaintiff Fernando Sulichin, individually and on behalf of Lyxor Overseas Holdings Ltd & Cinergy Advisors Ltd, as set forth in his previously filed certification (ECF No. 17-1), purchased Farfetch securities during the Class Period, and as a result was damaged thereby. Sulichin's certification evidencing his transactions is incorporated by reference herein.

15. Plaintiff Yuanzhe Fu, as set forth in her previously filed certification (*Ragan v. Farfetch Limited, et al.*, Case No. 1:24-cv-00532, ECF No. 38-2 (S.D.N.Y.)), purchased Farfetch securities during the Class Period, and as a result was damaged thereby. Fu's certification evidencing her transactions is incorporated by reference herein.

**B. <u>Defendants</u>**

16. Defendant Farfetch was, at all relevant times, an exempted company incorporated under the laws of the Cayman Islands, with its principal executive offices at The Bower, 211 Old Street London EC1V 9NR, United Kingdom. Farfetch, at all relevant times, maintained its North America headquarters at 30 West 21st Street, New York, NY 10010, and maintained CT Corporation as its agent for services of process in the United States, located at 28 Liberty Street, New York, NY 10005. At all relevant times, Farfetch's Class A ordinary shares traded in an efficient market, listed on the domestic exchange known as the New York Stock Exchange ("NYSE"), under the ticker symbol "FTCH."

17. Farfetch was, at all relevant times, a holding company with no operations of its own and, as such, it depended on its subsidiaries for cash to fund its operations and expenses, including future dividend payments, if any. Through its various subsidiaries and operating entities, Farfetch conducted business in the first- and third-party sale, wholesale, and distribution of luxury fashion worldwide through digital marketplace platforms, e-commerce websites, and physical storefronts.

18. Farfetch and its many subsidiaries are collectively referred to herein as the "Farfetch Group" or the "Group" and the collective operating assets and financial obligations of the Group are referred to herein as the "Farfetch Business."

19. Defendant FF Realisations plc (f/k/a Farfetch Holdings plc) ("FF Holdings") was incorporated on October 23, 2019, as a public limited company organized under the laws of England and Wales and a wholly owned direct subsidiary of Farfetch. FF Holdings is the successor of Farfetch as the holding company for the Farfetch Group's operations and assets (*i.e.*, the Farfetch Business). At all relevant times, FF Holdings and Farfetch shared executives and directors, including Defendants Neves, Phair, and Jordan, with James L. Maynard serving as its

corporate secretary (who also served as Farfetch's Chief Legal Officer). FF Holdings maintains its principal executive offices at Ship Canal House 8th Floor 98 King Street Manchester M2 4WU.

20. At all relevant times, Farfetch conducted business through FF Holdings, which directly or by way of its subsidiaries, including *inter alia*, Farfetch UK Limited, Farfetch Italia S.r.l., Farfetch.com Limited, Farfetch US Holdings, Inc. ("FF US"), Farfetch.com US LLC, New Guards Group Holding S.p.A. (NGG), and NGG Beauty S.r.l. ("NGG Beauty"), held the majority, if not all, of Farfetch's operating assets and financial obligations (*i.e.*, the Farfetch Business). In turn, FF Holdings was responsible for and/or controlled Farfetch's communications and the content therein. Consequently, FF Holdings "made" Farfetch's statements for the purposes of establishing liability under Section 10(b) of the Exchange Act.

21. Defendant José Manuel Ferreira Neves ("Neves") founded Farfetch in 2007 and at all relevant times, served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors. Mr. Neves has also served as a director of FF Holdings since November 13, 2023. At all relevant times, Mr. Neves, held 71.1% or greater voting control over Farfetch. Mr. Neves, therefore, maintained ultimate controlling authority over Farfetch and FF Holdings by virtue of holding the majority of voting rights in Farfetch.

22. Defendant Elliot Gilbert Jordan ("Jordan") joined Farfetch in 2015 as the Company's Chief Financial Officer ("CFO") and served in this position until his resignation, announced February 23, 2023, effective August 31, 2023. Since its October 2019 inception, Mr. Jordan served as one of two directors and CFO of FF Holdings until his departure in August 2023.

23. Defendant Stephanie Nadine Phair Kooij ("Phair") joined Farfetch in 2016 as the Company's Chief Strategy Officer ("CSO"), was promoted to Chief Customer Officer ("CCO") in 2019, and later assumed the role of Group President in August 2022, and Chair of New Guards

Group in June 2023. Since its October 2019 inception, Ms. Phair has served as one of two directors and CCO of FF Holdings.

24. Defendants Neves, Jordan, and Phair are collectively referred to herein as the "Individual Defendants." Farfetch, FF Holdings, and the Individual Defendants, are collectively referred to herein as "Defendants."

25. Each of the Individual Defendants directly participated in the management of Farfetch and its main operating subsidiary, FF Holdings. Each was directly involved in the day-to-day operations of Farfetch at the highest levels. Each possessed the power and authority to control the contents of Farfetch's SEC filings, press releases, and other market communications. Each was directly or indirectly involved in the oversight or implementation of Farfetch's business and/or finances. Each were provided with copies of Farfetch's SEC filings, press releases, or other public statements alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.

26. Because of their positions with Farfetch, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

27. As officers of a publicly-held company whose common stock was, at all relevant times, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and liquidity strength and to correct any previously-issued statements that had become materially misleading or untrue.

28. Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Farfetch's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. This scheme caused Plaintiffs and other shareholders to purchase Farfetch shares at artificially inflated prices during the Class Period.

29. The Individual Defendants were, at all relevant times, acting within their normal scopes of employment. Consequently, their intent and/or state of mind is imputed to Farfetch and FF Holdings under the doctrine of *respondeat superior* and common law principles of agency.

## IV. FORMER EMPLOYEES CORROBORATING FACTUAL ALLEGATIONS

30. Former Employee #1 ("FE1") worked at Farfetch from May 2021 to September 2022 as Director of eCommerce and Site Merchandising for Stadium Goods, a subsidiary of Farfetch acquired in December 2018. Toward the end of FE1's tenure, FE1 also took on the role of Vice President of Revenue at Stadium Goods. FE1 was responsible for overseeing Stadium Goods' sales and profitability goals as an e-commerce platform under the Farfetch Business. During the better part of FE1's employment, FE1 reported to Emmanuelle Saal, Vice President of Revenue and Digital Marketing for Stadium Goods. After FE1 took over as Vice President of Revenue, FE1 reported to Stadium Goods' Chief Financial Officer and Chief Operating Officer, Alejandra Silva, and Chief Executive Officer, Laura Sartor.

31. Former Employee #2 ("FE2") was Director of Global Indirect Tax at Farfetch from May 2021 to October 2023. As Director of Global Indirect Tax at Farfetch, FE2 was responsible for the oversight and filing of indirect taxes, which included sales taxes and value-added taxes (VAT), for business conducted in Europe, the United Kingdom, parts of the Middle East, and Singapore. FE2's team also prepared monthly reports about the status of indirect taxes at Farfetch,

which included information about taxes paid, taxes due, and forecasts for when tax credits would be refunded to Farfetch. FE2 was based in Portugal and reported to the Senior Vice President of Finance, Dave Murray, and then to Vice President of Financial Performance, Katie Cavanagh.[2]

32. Former Employee #3 ("FE3") worked in digital marketing at Farfetch from March 2018 to August 2022, and February 2023 to July 2023. FE3 held the following positions at Farfetch: Affiliates & Partnerships Executive from March 2018 to February 2019; Senior Affiliates & Partnerships Executive from February 2019 to March 2020; Affiliates & Partnerships Lead – Greater China from March 2020 to March 2021; Affiliates & Partnerships Manager from March 2021 to August 2022. While employed in their various roles in digital marketing at Farfetch, FE3's job involved planning and executing advertisement buys for online locations, including websites, social media, other sales platforms, search engines, etc. While at Farfetch between March 2018 and August 2022, FE3 was based out of the Company's Shanghai, China location.

33. In February 2023, FE3 returned to Farfetch as the Senior Digital Marketing Manager for NGGH++, which was the newly formed division of NGG to manage the Reebok acquisition. In this role, FE3 assisted with the transfer of the e-commerce platform of Reebok to Farfetch. As Senior Digital Marketing Manager, FE3 also was privy to Reebok sales and costs data provided by Adidas during the acquisition.

34. Former Employee #4 ("FE4") worked at Farfetch as Creative Manager from May 2021 to March 2022, and Production Operations Manager from March 2022 to June 2022. As the Creative Manager, FE4 managed the creative team, including photographers, stylists, and post-production employees, at the Company's Los Angeles photo studio. As Production Operations

[2] FE2 passed away after agreeing to participate in this litigation and providing the relevant accounts included herein.

Manager, FE4 oversaw all operations at the Company's Los Angeles studio. FE4 reported to the former Production Operations Manager, Terence Mahone, until FE4 took over Mahone's position, at which point they reported to Niten Kapadia, Vice President of Operations for North America and Managing Director for Violet Grey, following its acquisition in January 2022.

35. Former Employee #5 ("FE5") worked at as a senior member of Farfetch's Internal Controls team from April 2023 to September 2023. During FE5's tenure at Farfetch, FE5 reported to Benjamin Kaye, Director of Internal Controls and Chief Internal Auditor, who, in turn, reported to Karen Jackson, Vice President of Financial Controls, who, in turn, reported to Defendant Jordan.

## V. SUBSTANTIVE ALLEGATIONS

### A. Farfetch and Its Post-IPO Acquisitions

36. In the decade following its inception, Farfetch promoted itself based on its unique low risk, high yielding business model. During this time, Farfetch merely acted as the facilitator of sales, providing the digital platform for luxury retailers and brands to sell their own goods to consumers, allowing Farfetch to avoid taking on any of its own inventory (and associated costs and risks)—entirely unlike the more traditional first-party e-commerce wholesale or retail sellers.

37. In September 2018, Farfetch became a publicly traded company, with shares listed on the NYSE. At the time, investors and analysts were sold on a strategy of exponential growth akin to the growth achieved by similar digital platforms like Uber and Amazon, based on the Company's low risk, high margin third-party marketplace platform design. As such, Farfetch achieved a wildly successful IPO that raised over $1 billion and led to an $8 billion valuation.

38. Just three months after going public, however, Farfetch effectively turned its back on its unique and defining low cost, high yielding third-party marketplace business model, taking on significantly more first-party sales (and related risks and expenses) through a series of costly acquisitions of first-party luxury brand retailers and wholesale distributors.

39. Farfetch's seemingly overnight transformation began on December 12, 2018, when it announced the $250 million acquisition of Stadium Enterprises LLC (d/b/a Stadium Goods), a first-party online marketplace and in-store retailer specializing in new and deadstock (brand new, never-been-worn, second-hand) premium sneakers and streetwear products. Next, on February 28, 2019, Farfetch announced the $50 million acquisition of Toplife, a luxury e-commerce platform owned by a then-existing partner JD.com. Then, on August 8, 2019, Farfetch announced the $675 million acquisition of New Guards Group (NGG), an Italian luxury fashion house encapsulating numerous brands' design, production, first-party sales, and distribution. The NGG acquisition cost Farfetch roughly 67% of the capital raised in its IPO less than a year earlier.

40. Following these acquisitions, Farfetch reorganized its business structure into three pillars: (1) Digital Platform—mostly comprised of third-party and first-party transactions on the Farfetch Group's marketplace platforms; (2) Brand Platform—comprised of the production and wholesale distribution of brands owned and licensed by NGG; and (3) In-Store.

41. Yet, Farfetch's larger acquisitions such as Stadium Goods, NGG, and Browns (a British fashion and luxury goods retailer) continued to operate as standalone brands on the Farfetch marketplace platform, while also maintaining their own digital platforms, and physical storefronts, and were led by each of their own existing management teams.

42. Farfetch's post-IPO acquisition activity did not go unnoticed. Notably, the news of the NGG acquisition served as a catalyst for significant turnover in its shareholder base, wiping $2 billion off its market value in a single day. This concern stemmed from the added costs and increased risks that inevitably came with the expansion into first-party sales and wholesale distribution. For example, these acquisitions required an unprecedented outlay of cash including

for, *inter alia,* inventory purchases three to six months in advance and commitments to buy – obligating future cash – nine to 12 months ahead.

43. In addition, luxury brands routinely spend millions in marketing and visual merchandising to curate a one-of-a-kind shop floor experience prioritizing craftsmanship and exclusivity, which can be challenging to convey through an online platform. Online marketplaces, like Farfetch, then face the issue of balancing the brand's image of luxury and prestige in a digital environment while ensuring a seamless customer experience. As such, Farfetch's expansion into first-party online sales not only required it to spend more on marketing but also expanding its infrastructure and technology to enhance customer experience.

**B. Farfetch Takes on Significant Debt to Meet Its Liquidity Needs**

44. Farfetch's costly post-IPO acquisitions solidified its new reality of relying on exorbitant amounts of debt to meet its liquidity needs.

45. Prior to going public, Farfetch settled all its existing debts in 2017. Upon the completion of its IPO, Farfetch's cash and cash equivalents balance amounted to approximately $1,043.5 million as of September 30, 2018. Following its first round of post-IPO acquisitions, however, Farfetch's cash balance dropped to approximately $322.4 million as of December 31, 2019. Naturally, these acquisitions required money, and Farfetch did not have an unlimited supply.

46. On January 30, 2020, Farfetch announced that it had agreed to issue and sell, via a private placement, $250 million convertible senior notes in equal amounts to Tencent and Dragoneer Investment Group ("February 2020 Notes") to "supplement Farfetch's current liquidity position." The February 2020 Notes bore a 5.00% interest rate per year, payable quarterly, commencing on March 31, 2020, and would mature on December 31, 2025.

47. On April 30, 2020, Farfetch closed another private offering, this time of $400 million in convertible senior notes to Wilmington Trust, National Association ("April 2020 Notes"). The Notes bore an interest at a rate of 3.75% per year payable semi-annually in arrears on May 1 and November 1 of each year, beginning on November 1, 2020. The April 2020 Notes were senior, unsecured obligations of the Company, and were to mature on May 1, 2027.

48. On November 17, 2020, Farfetch completed the placement of convertible senior notes to Alibaba Group Holding Limited ("Alibaba") and Richemont for total gross proceeds of $600 million ($300 million each) ("November 2020 Notes"). The Notes were to mature on November 15, 2030, did not bear regular interest, and the principal amount did not accrete.

49. That same month, Alibaba and Richemont also notably agreed to invest $500 million ($250 million each) in Farfetch China, taking a combined 25% stake in a new joint venture that would include Farfetch's marketplace operations in the China region. On August 2, 2021, Farfetch announced that the $500 million strategic investment had been completed.

50. In sum, Farfetch amassed $1,250 million in debt in 2020 affording the Company a cash and cash equivalents balance of approximately $1,573.4 million by year end.

**C. <u>Farfetch Temporarily Benefits from Pandemic-Related Boom in E-Commerce</u>**

51. Investor and analyst concerns relating to Farfetch's dramatic shift in business model were temporarily stifled as trends in the luxury market shifted to more online sales with the spread of COVID-19 and resulting shutdowns implemented in most, if not all, of the Company's largest markets beginning in early 2020, continuing throughout that year, and into the first half of 2021.

52. Indeed, Farfetch's value peaked at approximately $24 billion in 2021 based on record high growth reporting. However, the Company's year did not end on the same high it started. By the second half of 2021, as many pandemic-related restrictions around the world were

lessened or lifted, the significant shift to online shopping seen across the luxury market began to soften and/or recede back towards pre-pandemic growth rates, negatively impacting Farfetch's growth, particularly in its two largest markets, the U.S. and China.

53. By the quarter ended September 30, 2021 ("Q3 2021"), Farfetch reported revenue and profits well below its own guidance for the period. Specifically, for Q3 2021 Farfetch's Digital Platform GMV grew only 23% (vs. prior guidance of +30%) and its adjusted EBITDA of $5.3 million fell short of prior $10 million outlook. Farfetch also reported its Digital Platform order contribution margin declined significantly to 26.6% (an all-time low), from 34.1% in the previous period, primarily due to an increase in demand generation expenses, which rose to 23% of platform services revenue, up from 18% just a year prior. At this time, Farfetch also lowered its outlook for the fourth quarter of 2021 ("Q4 2021") to Digital Platform GMV growth of 18-22% (vs. implied prior 22-37%) and adjusted EBITDA of $40 million (vs. implied prior $55-$77 million).

54. FE1 confirmed that these larger market trends leading to a decline in the online luxury industry were pushing the Company's sales down significantly. FE1 said it was clear to FE1 and the rest of the finance team at Stadium Goods that the Company's sky-high sales numbers realized during the pandemic were a thing of the past. FE1 added that the forecasts prepared within the Farfetch Group showed the platform would not see those high sales numbers again in 2022.

55. To make matters worse, Farfetch's balance sheet took a near-immediate hit when, in February 2022, Russia invaded Ukraine, resulting in the permanent termination of all operations in the Company's third largest market, including deliveries to Russian customers and the closure of its Russian offices. FE1 identified the loss of business in this region as a huge blow to Farfetch because, according to FE1, at the time of the shutdown, sales in Russia represented roughly 20 percent of the total sales on the Farfetch marketplace platform.

56. By the quarter ended March 31, 2022 ("Q1 2022"), Farfetch reported a mere 2% growth in GMV year-over-year ("y/y") (vs. +22% y/y in Q4 2021) and an adjusted EBITDA of negative $35.8 million (vs. +$36.1 million in Q4 2021). Further, Farfetch cut its fiscal year ("FY") 2022 guidance, revising its GMV outlook to +5-10% (vs. prior ~30%) and its Digital Platform order contribution margin guidance was lowered to 30% (vs. prior 33-35%) purportedly due to less efficient marketing spend. It also lowered adjusted EBITDA margin to 0-1% (vs. prior 1-2%).

57. Farfetch's downward shift in the China market was only magnified by the extreme reversed course seen in that region and the implementation of 0-tolerance restrictions or "zero-COVID" beginning in late March 2022 and continuing throughout the year. The zero-COVID strategy implemented at that time required a quarantine process and procedure for all parcels crossing the border into mainland China and in certain gateways, in addition to disinfection procedures for parcels, which led to longer lead times and higher shipping costs. Consequently, these policies had a near immediate impact on Farfetch's business in the region which primarily relied on cross-border businesses' product to be delivered to customers in China.

58. Another major blow to the Company's sales came after the untimely death of Off-White founder and creative director, Virgil Abloh. When Farfetch acquired NGG, Off-White was already one of the Group's top luxury brands. Abhol was a singular fashion superstar, one of the first Black designers to break into luxury fashion, and who created strong worldwide demand for his products. According to FE3, roughly 75 to 80 percent of NGG total sales came from Off-White [Abloh's label], despite NGG hosting a total of 10 luxury brands on its platform. Then, in November 2021, Abloh unexpectedly died at the age of 41 after quietly battling cancer. Due to the association that many buyers made between Off-White designs and Abloh, the brand lost significant appeal in the wake of his death, FE3 said. According to FE3, the Off-White business

tanked in the six to 12 months after Abloh's death. And because NGG had been primarily dependent on the Off-White business, the other brands were unable to offset this loss, FE3 said.

59. By the quarter ended June 30, 2022 ("Q2 2022"), Farfetch reported its first-ever Digital Platform GMV decline of 3.3% y/y and an adjusted EBITDA loss of $24.2 million, representing a negative 4.9% margin. The Company also reported a 2.4% y/y decline in Digital Platform order contribution margin to 31.7% due to higher customer acquisition and engagement expenses, cost inflation in paid channels and more media spend in higher-cost regions.

60. At this time, Farfetch again lowered its FY 2022 guidance, now projecting a Digital Platform GMV growth of 0-5% (vs. prior 5-10%), Brand Platform GMV growth of 0-10% (vs. prior 10-15%) and an adjusted EBITDA margin flat (vs. prior 0-1%). Notably, this was the Company's third straight guide-down, after declaring in November 2021 that its total GMV growth would exceed 30% in FY 2022.

61. For the quarter ended September 30, 2022 ("Q3 2022"), Farfetch again reported a decline in Digital Platform GMV at negative 5.0% y/y. And for the third time that year, Farfetch also cut its FY 2022 guidance due to its purported strategic pullback in the U.S. and other key markets. Specifically, it was now guiding Digital Platform GMV to a 5-7% decline (vs. prior 0-5% growth), with Brand Platform broadly flat (vs. prior +0-10%), and an adjusted EBITDA margin guided to negative 3-5% (vs. prior flat).

**D. Farfetch Repeats Its Acquisition Pattern to Simulate Growth and Generate Market Interest**

62. Instead of paring back to account for the slowing or stalled growth in its two largest markets, the complete wipe out all prospects for growth in its third largest market, and the decline in sales for the Company's top luxury brand, Off-White, coupled with its mounting operating costs

(increased 31% y/y in 2021 and 6% y/y in 2022), Farfetch took a play right out of the old handbook, doubling down on costly investments to simulate growth and generate market interest.

63. First, on January 28, 2022, Farfetch announced that it would be acquiring the luxury beauty retailer, Violet Grey, ahead of the launch of NGG Beauty scheduled for later in the year. Farfetch completed the acquisition for $49.4 million in cash, $1.3 million of reverse vesting shares, and $5 million of Farfetch RSUs based on Farfetch share price at the acquisition date.

64. According to FE4, however, even before the Violet Grey acquisition was complete, it was known that the company was struggling financially and needed funding to continue. Indeed, FE4 described Violet Grey's business by saying they were floundering. Shortly after the deal was finalized, Farfetch's Vice President of Operations for North America and Managing Director of Violet Grey, Niten Kapadia, met with FE4 and expressed to FE4 that the Violet Grey acquisition "was even messier than he thought" it would be. In the end, Farfetch's expansion into the beauty realm was short-lived. On August 17, 2023, less than a year and a half after its launch, Farfetch discontinued NGG Beauty and said it was "exploring strategic options for Violet Grey."

65. Next, on February 22, 2022, Farfetch announced that NGG had entered into a commercial agreement with Authentic Brands Group LLC (*i.e.*, Adidas) to become the exclusive partner to curate, create and bring to market Reebok's luxury collaborations, as well as a core operating partner for the brand across Europe, and distributor of premium Reebok products in the United States, Canada, Europe and certain other key markets. Pursuant to the agreement, however, NGG would not have control of the supply chain lifecycle of the products it distributed in Europe. NGG committed to minimum royalty payments of approximately $374 million over 11 years.

66. The addition of Reebok, however, came with significantly higher operating costs for the Company and negative or near negative margins on any product sold. According to FE3,

around April 2023 upon the completed integration of the Reebok e-commerce platform with Farfetch platform, FE3 had full access to the platform and was able to see Reebok's historical sales and cost data, which had not previously been available to FE3 as they were not on the finance team, but this was not new information. Specifically, FE3 was able to see that Adidas had been heavily discounting its Reebok products (up to 70 percent) which, in turn, revealed Farfetch had little to no room for profit margins at these discounted prices. In addition, according to FE3, the Company's marketing costs associated with Reebok were far higher than expected and cut so deeply into its margins that regardless of the price of Reebok product sold, discounted or not, Farfetch operated in the negative. FE3 acknowledged that they were in marketing, yet they were able to clearly see this in the sales and costs data from that time.

67. Lastly, in May 2022, Farfetch committed a $200 million equity investment in Neiman Marcus Group ("NMG"). Pursuant to this new partnership, the plan was for NMG to integrate Farfetch's e-commerce technology into the online experience of the NMG's owned department store, Bergdorf Goodman. The expectation set by the Company, throughout 2022, was that the NMG partnership would be a significant source of revenue and growth for Farfetch upon its completed integration in 2023. Unfortunately for investors, the purported benefits of this partnership would not come to fruition before Farfetch's full demise in the fourth quarter of 2023.

68. Consequently, after a year of dismal growth, booming operating expenses, and a spree of costly acquisitions and investments, by September 30, 2022, Farfetch's cash and cash equivalents balance had once again fallen critically low to approximately $487.4 million. As such, Farfetch again repeating familiar patterns, resorted to new lines of debt to meet its liquidity needs.

69. On October 20, 2022, Farfetch US Holdings, Inc. ("FF US"), an indirect subsidiary of Farfetch, as a direct subsidiary of FF Holdings, entered into a Credit Agreement with J.P.

Morgan Chase Bank, N.A., as administrative agent, Wilmington Trust, National Association, as collateral agent, J.P. Morgan Securities LLC, as the lead arranger and sole physical bookrunner, and certain banks and financial institutions party thereto as lenders and issuing banks. The Credit Agreement provided for a $400 million term loan facility (the "Term Loan") which was issued with a 6.50% original issue discount and was due and payable on October 20, 2027. The Term Loan amortized in quarterly installments of 0.25%, payable on the last business day of each quarter and on the Maturity Date, beginning with the quarter ending on March 31, 2023.

70. That same day, Farfetch signed an agreement with the holders of the February 2020 Notes to early repay these notes. On October 27, 2022, Farfetch repaid the February 2020 Notes early through the issuance of 4,611,848 Class A Ordinary shares and a cash payment of $32.5 million. This early repayment followed the early conversion of $39.1 million of the principal amount on May 17, 2021, settled with the issuance of 3,190,345 shares. Likewise, on August 6, 2021, a total of 7,013,405 shares were issued on early conversion of $85.9 million of the principal amount of February 2020 Notes. And on October 1, 2021, a total of 6,122,250 shares were issued on early conversion of $75.0 million of the principal amount of the February 2020 Notes.

71. Notably, at all relevant times, the Company's April 2020 Notes and November 2020 Notes (collectively, the "Convertible Notes") totaling $1 billion, remained outstanding.

72. Farfetch closed FY 2022 with approximately $734.2 million in cash.

## E. Farfetch's Reorganizations and Cost Rationalizations Fell Well Short

73. As set forth above, certain of Farfetch's most significant acquisitions, including Stadium Goods and NGG and the brands thereunder (like Off-White, Reebok, and Violet Grey), fell dramatically short of generating the expected revenue that would have been required to justify Farfetch's reported operating costs. As such, as growth continued to trend downward, during an investor call to discuss the Company's Q2 2022 results held on August 25, 2022, Defendant Neves

announced "organizational evolutions" purportedly made to better its position "to achieve [the Company's] platform long-term vision and reaccelerate growth in 2023, while also driving a more efficient operating structure."

74. This included the creation of two new roles at the Company: Chief Marketplace Officer, accountable for the performance of the Farfetch Group's marketplaces (excluding NGG); and Group President (Defendant Phair), whose role consisted of, *inter alia*, ensuring the 3 pillars of Farfecth "work together to deliver on Farfetch's mission to be the platform for luxury." Notably, the Company's Brand Platform (*i.e.*, NGG) was also reorganized with a single point of strategic accountability now reporting directly to Defendant Neves which was also Defendant Phair upon her appointment as Chair of NGG in June 2023.

75. Such efforts stemmed from the lack of integration amongst the Farfetch Group following each new post-IPO acquisition. As discussed above, the Farfetch subsidiaries (namely, Stadium Goods and NGG) continued to operate as standalone brands on the Farfetch marketplace platform, while also maintaining their own digital platforms, and physical storefronts, and were led by each of their own existing management teams. As such, as Defendant Neves keenly pointed out during the Q2 2022 call, under this fragmented approach, "[h]istorically, the marketplace ha[d] not had a single leader accountable for its entire P&L [profits and losses]."

76. Defendant Neves went on to note "[o]ne of the benefits of this work has been the identification of a number of duplications and overlaps across the previous arc. This means that we will be able to streamline our organization and reduce our headcount around overlapping functions and teams." In addition to restructuring the Company's headcount, cost rationalization efforts primarily focused on reducing marketing expenses. Neves claimed that these initiatives

would allow Farfetch to "drive cost efficiencies by scaling [its] business, enhancing [its] profitability and allowing [it] to invest in [its] technology and ops platforms at a larger scale."

77. However, these "strategic initiatives" fell well short of combating the main drivers of Farfetch's cash demand impacting profitability, namely swelling supply chain and inventory costs within NGG (including Reebok), and mounting Value Added Taxes ("VAT") on direct brand partnerships supplying roughly 70 to 80 percent of the third-party product on the Farfetch marketplace platform. Nor did they address the Farfetch Group's long-standing practice of heavily discounting products to boost sales resulting in dismal or non-existent margins for the Company.

78. For example, Farfetch was hit with significant inventory-related costs following the close of the Reebok deal in February 2022. FE3 explained that the space the Reebok inventory took was much larger than Farfetch expected. While FE3 was not involved in inventory management, FE3 learned of the inventory problems during meetings attended by other management on the NGG team overseeing the Reebok acquisition. FE3 also noted that having too much old inventory was problematic for the Company. According to FE3, old inventory was difficult to move because buyers wanted new designs, not last year's products. Consequently, the accumulation of unsellable inventory negatively impacted Farfetch's operating costs. And this problem only became more cumbersome over time.

79. Indeed, because the Company had so much old inventory occupying significant amounts of space in its warehouses, there was not enough room for new products, FE3 said. Due to the lack of space to store new products, Farfetch was consequently unable to launch new Reebok products on its platform, which limited its sales even further, FE3 said. For example, when Farfetch announced the Reebok deal in February 2022, one of the touted benefits was its exclusive opportunity to bring Adidas into the luxury space with the development of a premium line. Yet,

the full launch of products and collaborations from its premium line were pushed out and not expected until 2024. According to FE3, the inability to sell new Reebok products also prevented Farfetch from selling available items at full price, which would have helped improve its profit margins. Consequently, these surpluses of stale inventory continued to fuel the Company's cash out-flow, as well as cash in-flow problems throughout the Class Period.

80. Next, Farfetch historically relied on multi-brand boutiques to list luxury products on its marketplace platform. After going public in 2018, the Company prioritized direct brand e-concessions to secure supply. Through these direct brand partnerships, luxury brands would contract with Farfetch to list an agreed upon amount of inventory on its marketplace platform. As of August 2022, Farfetch had over 600 direct brand e-concessions. While these partnerships helped secure supply, they also added to Farfetch's growing cash demand. Specifically, FE2 explained how the increase in stock from direct brand e-concessions versus multi-brand boutique sales had vastly different implications for the Company's Value Added Taxes (VAT) payments and credits.

81. Under the multi-brand boutique model where customers bought directly from sellers, with Farfetch acting as merely the platform that connects the buyer and seller, Farfetch was not otherwise involved in the purchase of the item and therefore did not have to pay the VAT on the product sold. According to FE2, during their tenure (May 2021 to October 2023), only about 20 to 30 percent of the third-party sales on the Farfetch marketplace platform came from inventory offered and sold by multi-brand boutiques. The other, more predominant source of Farfetch's third-party sales came from inventory offered and sold by direct brand e-concessions, based on long-standing contracts with numerous luxury brands located in Europe. Under this model, Farfetch was technically considered the buyer of the product from the luxury brand that was ultimately being

sold to the customer on its platform. As a result, regardless of where the customer was located, Farfetch had to pay the VAT on the product because it was also located in Europe.

82. While the VAT paid by Farfetch might be refundable if the final customer was located outside of Europe, these types of transactions required Farfetch to request a refund for the VAT already paid, which according to FE2, could take anywhere from six months to a year to receive. FE2 noted that while many of the purchases on Farfetch's marketplace platform were from customers outside of Europe, most of the sellers were in Europe, especially France and Italy where the top luxury design houses are located, resulting in significantly high up-front VAT costs for Farfetch. Worse yet, if the final buyer was in Europe, then the VAT paid was a sunken cost.

83. FE2 described the Company's reliance on direct brand e-concessions for supply as not sustainable from a cash flow point of view. FE2 gave the following example to illustrate: if Farfetch is charging a 30% commission on the sale of a product, but the VAT is 23% – as it is in Italy – then the VAT payment reduces its commission to 7% right away. In a transaction when the commission rate is much lower, such as 8% – as FE2 saw on certain contracts with luxury brands – then at the point-of-sale when Farfetch is paying a 23% VAT, the Company is then at negative 15% – meaning its cost to facilitate the sale is now higher than its take rate. While in some instances the Company may be able to recoup those costs via tax refunds, that process, again, could take six to 12 months. In the meantime, the Company's cash flow is without that money.

84. FE1 also noted that not all sellers on the Stadium Goods or Farfetch marketplace platforms paid the same commission rates. FE1 explained high-end luxury brands often negotiated for a lower rate than those offered to a boutique luxury goods store because of the exposure that the luxury brand offered Farfetch by being on its platform. FE1 said that during their tenure with

the Company (May 2021 – September 2022), the lowest commission rates that FE1 saw at Farfetch were about 8 to 10 percent with the highest commissions rates being about 20 percent.

85. Throughout FE2's tenure at Farfetch (May 2021 to October 2023), FE2 and their team suggested to Farfetch leadership that the Company change its business model relating to direct brand e-concessions so that Farfetch was not paying so much out in VATs. Specifically, in 2022, FE2's team prepared a paper on all the tax risks posed by Farfetch's business model, which outlined all the VAT risks. FE2 said the paper was given to finance leadership, including Defendant Jordan. However, FE2 said Farfetch leadership did not want to change the model because it would have required them to renegotiate long-standing contracts with the luxury brands.

86. Overall, according to FE1, who was employed at Farfetch from May 2021 to September 2022 as Director of eCommerce and Site Merchandising as well as Vice President of Revenue for Stadium Goods, with or without the rampant application of product discounts, the profit margins on sales within the Farfetch Group, in particular Stadium Goods, were left "super, super thin," if not non-existent, after the Company's operating costs were added in.

87. Worse yet, to meet GMV goals set by Farfetch, FE1 said Stadium Goods often had to offer discounts on the platform to drive sales to even come close to the GMV goals. FE1 said this was the same tactic frequently used on the Farfetch platform to meet its GMV goals. The discounts, however, often cut into the commission fees Farfetch collected. FE1 provided the following example: say there is a pair of sneakers on the platform selling for $1,000, and the seller is paying a 20% commission to Farfetch on sales. When that item sells, Farfetch collects a $200 commission fee. However, if Stadium Goods or Farfetch decided to discount the item by 20%, the customer's $200 in savings in turn erases Farfetch's entire 20% commission.

88. This pattern of discounting products to produce sales on dismal or non-existent margins continued irrespective of Farfetch's reorganizations and cost rationalizations. According to FE5, around August 2023, they ran a simple revenues vs costs calculation of the Company's finances overall that revealed a significant portion of products were being sold with little to no, and even below, margin. Indeed, FE5 said their calculations indicated significant volumes were being sold at significant markdowns. FE5 said the profit margin calculation indicated extreme levels of discounted products. According to FE5, the discount amounts seen in these reports looked unreasonably high, uncontrollably high.

89. Consequently, as of the start of the Class Period (December 1, 2022), the writing on the wall was clear – the pandemic boom merely provided a façade of profitability to a business riddled with inefficiencies and unsustainable operating costs, teetering on the edge of a full liquidity crisis, and based on later revelations, likely on the precipice of bankruptcy staved off only by the Company's billions of dollars in debt which were quickly running out. And while these reorganizations and cost rationalizations were touted to the public as sufficient action to rectify Farfetch's balance sheet, they were no match for the main drivers of its cash outflow nor did they address the frequent use of discounts impacting the Company's cash inflow, eliminating any real possibility of achieving profitability and free cash flow in 2023 based on its current operations.

## F. Defendants' Scheme to Defraud Farfetch Investors and Note Holders

90. Operating on borrowed time, in December 2022, Defendants commenced "Project Athena" – the internal name for their concealed efforts to address the Company's growing liquidity crisis. What initially began as undisclosed plans to consummate a take-private transaction quickly devolved into efforts to secure a near-identical future for the Farfetch Business free of the financial obligations and liabilities held by the public entity, Farfetch.

91. Farfetch engaged long-time outside counsel, Latham &Watkins LLP ("Latham"), as the sole, or at least primary, counsel involved in Project Athena. Throughout the fourteen-month-long process, from December 2022 through January 2024, which ultimately culminated in the gutting of Farfetch of any value through the complete transfer of the Farfetch Business for little to no consideration, Latham provided legal advice to Farfetch, its Board of Directors, and its subsidiaries (*e.g.*, Defendants FF Holdings, Neves, Jordan, and Phair) every step of the way.

92. According to Kirkland & Ellis ("Kirkland"), counsel for Surpique LP (the transferee of the Farfetch Business), following the commencement of Project Athena, "Farfetch hired reputable advisory firms [including, J.P. Morgan, Evercore, Alix Partners, and Mourant & Ozannes] to pursue a marketing process over the course of a number of months. The advisors engaged with dozens of potential third-party investors (including owners of Surpique) and provided access to a virtual data room containing detailed financial information for both the business as a whole and its components."

93. Despite purportedly "dozens of parties signing confidentiality agreements to pursue further due diligence" of Farfetch, according to Kirkland, "only two provided a term sheet or nonbinding initial proposal for the business as a whole upon learning of its financial condition," including owners of Surpique. Worse yet, according to Kirkland, Farfetch did not consider either proposal to be an "actionable capital solution." Consequently, by the second half of 2023, as its financial condition worsened, "Farfetch's ability to remain a going concern and meet near-term liquidity needs was in serious question."

94. With little progress made on securing capital necessary for Farfetch to continue as is, by the fall of 2023, Project Athena morphed into a multi-faceted effort to dispose of Farfetch stock, while also securing a future for the business, preferably one in which it continued to operate

with little to no interruption. Indeed, according to Kirkland, "[d]uring the second half of 2023, the Farfetch [G]roup found itself in dire financial straits and faced with unexpectedly urgent and increasing financial issues and liquidity pressures[,] Farfetch formed a special committee and, in the fall, undertook an extensive process to identify potential solutions—including the potential sale of individual assets as well as a holistic transaction that would secure a future for the business."

95. As discussed in detail below, Defendants' efforts culminated in just that. The solution to Farfetch's undisclosed liquidity crisis devised through its months long Project Athena came to a head in December 2023 when the Company announced the disposal of all Farfetch assets in exchange for $500 million bridge loan to continue operations until the completion of the transfer.

### G. <u>Defendants' Concealment of Farfetch's Growing Liquidity Crisis</u>

96. As detailed above, by implementing and then repeating its growth-by-acquisition strategy, Farfetch spent enormous sums to acquire companies, often overpaying, and leaving the Company strapped for cash until it faced a potentially devastating liquidity crisis. During the Class Period, Defendants affirmatively took steps to conceal the Company's growing liquidity crisis in order to ensure continued access to financing and prop up the stock price (and value) of Farfetch long enough to secure a future for the Farfetch Business.

97. On the first day of the Class Period (December 1, 2022), Farfetch held its first Capital Markets Day ("CMD") since going public in 2018. During his opening remarks, Defendant Neves referred to the CMD as "great timing … because Farfetch is at a tipping point. We're at the point where we're going to start to leverage the investments of the [indiscernible] to continue on a path of growth, profitable growth and cash flow generation," adding that the CMD was "all about providing clarity to [investors] on the building blocks of that road map."

98. Mr. Neves went on to cover the history of Farfetch, its evolving business model, and spree of acquisitions leading to its then-present day three pillar structure recapping that, "[t]he

first 14 years were about investing to build the global platform for luxury and growing very fast to establish ourselves as clear leader in this vast online luxury space. … And the next phase is about profitable growth and strong cash generation, leveraging the investments that we've made so far." Neves concluded his opening remarks by declaring that, during the CMD, "[w]e will demonstrate how each pillar builds to a very exciting milestone, which is in clear line of sight, achieving $10 billion in GMV and 10% adjusted EBITDA by 2025."

99. Calling this Farfetch's "second stage of growth," Defendant Jordan walked through how Farfetch was rethinking, resetting and retooling the model go-forward, with a much heavier emphasis on profitability and positive free cash flow. According to Jordan, "[t]his is because [Farfetch] ha[s] invested heavily in the business to date. And these business investments are starting to pay off and are set to accelerate that return of investment, moving forward." He went on to declare that "[t]he first step [] in delivering $10 billion in GMV and 10% adjusted EBITDA profitability is returning to growth in 2023 and returning to positive adjusted EBITDA."

100. Before concluding his remarks, Defendant Jordan focused in on the Company's cash balance, which he described as "a very important measure as we move forward because we clearly want to see this growth and extra profitability flow through to strong free cash flows." According to Defendant Jordan, "[t]here's 4 key elements to the Farfetch cash operating model," including: (1) "profitable revenue growth, driving significant cash into the business;" (2) "using the unique dynamics of the marketplace model and our platform solutions model, driving a tailwind in working capital around our creditors;" (3) "focusing more on third-party moving forward versus first party and within the first-party business, making sure we have tight control over our inventory position including a fast stock turn across [NGG];" and (4) "low CapEx."

101. He then made the claim that "[w]e have delivered leverage across our operating cost base and our investments to date to deliver operating cost efficiencies and higher margins [and] … so the model works in terms of achieving all of our finance strategy at play. And now today, we have clear visibility that we will deliver not only growth, but sustained profitability and positive free cash flow moving forward."

102. Defendant Neves closed out the prepared remarks portion of the CMD by setting Farfetch apart from others in the industry claiming, "we're the only company that for 14 years has been investing in building the global platform for luxury." He went on to say:

> Farfetch has really invested in achieving this leadership position and having the building blocks for a new phase of growth, a new phase of profitable growth and cash generation. And today, we provided clarity on all the building blocks behind that growth, and you will have seen that our assumptions are very balanced. And with that, comes a milestone that we have clear sight, clear view and confidence about, which is this milestone of achieving $10 billion GMV at least 10% EBITDA profitability in 2025.

103. Consequently, Defendants' representations during the CMD created the false impression that Farfetch was committed and poised to achieve profitability and free cash flow through the organic growth of existing investments (*i.e.*, NGG, Reebok, Violet Grey, Stadium Goods, etc.), and that it had the means and ability to finance this growth through its existing balance sheet and available credit lines. In reality, Farfetch did not have the financial means nor ability to support its existing operations and service its debt and was experiencing a full liquidity crisis. Worse yet, as described above, Defendants were secretly pursuing alternative means for continuing through some sort of take-private transaction or disposition of the Company's assets.

104. Throughout the Class Period, Defendants continued to falsely assure investors of Farfetch's near-term and long-term liquidity strength, reinforced by its purported disciplined cost control and focused execution on its return to profitability and positive free cash flow in 2023. For example, on February 23, 2023, Farfetch held an investor call to discuss its quarterly and fiscal

results for the period December 31, 2022 ("Q4 2022") during which Defendant Neves discussed the Company's reorganizations and cost rationalizations completed in 2022 stating, in relevant part, "Farfetch begins the year as an even stronger and more efficient organization, which is why I'm more confident than ever about our prospects to deliver growth, profitability and positive free cash flow in 2023 and beyond."

105. Similarly, during the same call, Defendant Phair declared, in relevant part, that "[t]he work we've done throughout 2022 and the years prior, investing in our customer and in our partnerships with brands and boutiques puts us in a strong position to deliver on our 2023 goals."

106. And on March 8, 2023, Farfetch filed its FY 2022 financial report on Form 20-F providing, in relevant part: "We believe that our sources of liquidity and capital will be sufficient to meet our business needs for at least the next twelve months. We also expect these sources of liquidity will be sufficient to fund our long-term contractual obligations and capital needs."

107. Then, on May 18, 2023, Farfetch issued the quarterly results for the period ended March 31, 2023 ("Q1 2023"), which quoted Defendant Jordan as saying, "[w]e have delivered what we set out to achieve, with accelerating underlying growth, disciplined cost control and improved cash flows. We have successfully navigated through unprecedented macro challenges, and through continued focused execution, we remain on track to deliver a year of luxury market-beating growth, a return to profitability and positive free cash flow."

108. Yet, during FE5's tenure (April 2023 to September 2023), FE5 attended meetings with senior management (including Defendant Jordan) and Farfetch's legal team. In particular, according to FE5, within the first few weeks of starting at Farfetch, around mid-April 2023, FE5 had a meeting with Defendant Jordan. During this meeting, Defendant Jordan told FE5 that "large investor(s)" were threatening to pull their money out of Farfetch because of longstanding internal

deficiencies. FE5 said, in essence, the message from senior management and legal was that the Company could be forced to delist from the NYSE and/or might cease to exist by the end of the year. Such accounts indicate Defendant Jordan's acute awareness of the Company's dire financial condition in direct conflict with his public representations.

109. As the Company was internally grappling with the future of the business, on August 11, 2023 (announced August 17, 2023), FF US entered an amendment to the Credit Agreement, dated October 20, 2022, and as first amended on April 7, 2023, which provided for an additional $200 million delayed draw term loan facility (the "Amended Term Loan"). The Amended Term Loan was to be issued with a 5.60% original issue discount and, to the extent drawn, would amortize in quarterly instalments of 0.25% of the aggregate principal amount, and would be due and payable on October 20, 2027. On September 11, 2023, FF US borrowed the full $200 million.

110. On August 17, 2023, Farfetch also publicly claimed that the "cash flow generated from operations and our cash, cash equivalents and marketable securities balances, as well as borrowing arrangements, will be sufficient to meet our anticipated operating cash needs for at least the next twelve months."

### H. <u>The Truth Emerges, Causing Harm to Plaintiffs and Other Farfetch Investors</u>

111. The cracks, however, also began to emerge on August 17, 2023 when, during after-market hours, Farfetch issued a press release announcing its financial results for the quarter ended June 30, 2023 ("Q2 2023"). In addition to reporting below expectation results across the board, the Company announced a significant reduction in its FY 2023 guidance where the overall GMV was now expected to be $4.4 billion (vs. prior $4.9 billion), Digital Platform GMV at $3.85 billion (vs. prior $4.2 billion), Brand Platform GMV at $450 million (vs. prior $600 million), and an EBITDA margin at "up to 1%" (vs. prior +1-3%).

112. On August 18, 2023, during pre-market hours, media outlets reported that multiple analysts had downgraded Farfetch's shares based on its poor quarterly results and cut FY 2023 guidance. For example, an article published by investor news website *SeekingAlpha*, entitled "Farfetch slides 39% as analyst downgrades pour in" reported, in relevant part:

> JPMorgan downgraded Farfetch (NYSE:FTCH) to a Neutral rating from Overweight on Friday after taking in the retailer's Q2 earnings report, which included a miss on the revenue line, sluggish GMV growth, and guidance below expectations.
>
> Analyst Doug Anmuth [of J.P. Morgan] . . . noted that the "Year of Execution" is proving quite challenging given U.S. and China weakness, early Reebok partnership hiccups, and wholesale pressures.
>
> JPMorgan slashed its price target on FTCH to $6.00 from $15.00.
>
> Elsewhere on Wall Street, KeyBanc Capital Markets downgraded Farfetch (FTCH) to Sector Weight from Overweight on what it sees as a less clear path to profitability.
>
> Shares of Farfetch (FTCH) fell 38.66% in premarket action on Friday to $2.92 and are on a path to open at their lowest trading level ever.

113. Analyst UBS reported on the Company's "Weak quarter, weaker outlook…" and the subsequent steep decline in Farfetch's stock price noting, "[w]e think the stock reaction reflects a relatively optimistic view going into earnings, reduced 2023 guide that increases the uncertainty associated with the 2025 outlook; FTCH's inconsistent record at delivering to its guide, underlying business complexity, as well as opacity around key revenue drivers."

114. Following these Company revelations and market developments, Farfetch's stock price fell $2.15 per share, or 45.17%, to close at $2.61 per share on August 18, 2023.

115. Then, on November 28, 2023, after market hours, Farfetch announced that it would not be disclosing its financial results for the quarter ended September 31, 2023 ("Q3 2023"), which were originally scheduled to be reported on November 17, 2023. In addition, Farfetch canceled its related call with investors and analysts scheduled for the following day, November 29, 2023. The

Company also revealed that it would not be providing any forecasts or guidance going forward and that "prior forecasts or guidance should no longer be relied upon."

116. On this news, Farfetch stock price fell $1.13 per share, or 53.8%, to close at $0.97 per share on November 29, 2023.

117. Finally, on December 18, 2023, Farfetch revealed the agreement to transfer all of the business and assets of FF Holdings, Farfetch's main operating subsidiary and primary holder of all Company assets (*i.e.*, the Farfetch Business), to Coupang, Inc. ("Coupang"), in exchange for a $500 million bridge loan to continue operating until the consummation of the transfer (the "Transfer")—effectively gutting the publicly traded company of its assets for no consideration, leaving it unable to meet its debt obligations and stripping investors of any value for shares held.

118. Indeed, Farfetch revealed that, upon the consummation of the Transfer, it expected holders of Class A and B ordinary shares and its Convertible Notes "will not recover any of their outstanding investments in Farfetch", and that Farfetch would be "delisted from the NYSE" and "liquidated." The Company went on to disclose, in relevant part, that:

> Farfetch Limited and its financial advisors have conducted a thorough and extensive process to secure additional liquidity for Farfetch Limited and its subsidiaries. Without such liquidity, Farfetch Limited and its subsidiaries would have been unable to continue as a going concern. The Board is disappointed that the process has not resulted in a solution that ensures that Farfetch Limited, the listed entity, remains a going concern. However, the Board is pleased to see that FF PLC has successfully secured a solution that ensures the continued operations of its business and that it will continue to serve the network of brands, boutiques and consumers depending on the FARFETCH Marketplace every day.

119. In addition, Farfetch announced the resignation of all independent members of its Board of Directors and all committees thereof, effectively immediately, leaving Defendant Neves as its only Board member overseeing the Transfer and maintaining complete control over Farfetch.

120. Notably, pursuant to Paragraph 167 of the Companies Act (dated November 17, 2021), "[a]ny sale by the Company or its subsidiaries (together the 'Group') of all, or substantially

all, of the assets of the Group shall require the prior approval of the Shareholders by Special Resolution and in addition the prior approval by the board of the Directors."

121. A "Special Resolution" at Farfetch required the affirmative vote of no less than two-thirds (*i.e.*, 66.67%) of the votes permitted to be cast by persons present and voting at any such meeting. Each Farfetch Class A ordinary share was entitled to one vote, and each Class B ordinary share was entitled to 20 votes on all permitting matters. At all relevant times, Mr. Neves held approximately 71.1% of the aggregate voting power. Consequently, the immediate resignation of all independent Board members left approval of the Transfer solely in the hands of Mr. Neves.

122. On this news, Farfetch's share price fell $0.60 per share, or 93.75%, to close at $0.04 per share on December 20, 2023. Consequently, that same day, the NYSE commenced delisting proceedings for Farfetch's shares and trading was suspended, effective immediately.

123. As a result of Defendants' wrongful acts and deceptive conduct, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## I. <u>Post-Class Period Events and Disclosures</u>

### *1. The Fraudulent Conveyance of the Farfetch Business is Completed*

124. The Company's December 18, 2023 announcement disclosed the execution of (i) a Transaction Support Agreement ("TSA"), by and among, *inter alia*, FF Holdings, Farfetch, Surpique LP (f/k/a Athena Topco LP), and an ad hoc group of lenders (the "AHG") holding in excess of 80% of the outstanding aggregate principal amount of the Term Loans under the existing Credit Agreement, dated October 20, 2022, as amended on April 7, 2023, and as further amended on August 11, 2023; and (ii) a committed first lien delayed draw term loan facility in an aggregate principal amount of $500 million with certain direct and/or indirect subsidiaries of FF Holdings, including FF US, as borrowers and/or guarantors and Surpique and funds managed and/or advised

by Greenoaks Capital Partners LLC, as lender (the "Bridge Loan"). Pursuant to the TSA, the Bridge Loan was established as a tranche of delayed draw term loans on a pari passu basis with the Term Loans under the Credit Agreement.

125. According to Farfetch's announcement, in connection with the TSA, the parties agreed to support and implement a marketing process of the Farfetch Business, undertaken by J.P. Morgan on behalf of FF Holdings, with an exclusivity period through April 30, 2024 (the "Exclusivity Period"). The terms of the TSA, however, made the prospect of any competing transaction unlikely. Indeed, pursuant to the TSA, the Bridge Loan, except if the Transfer was consummated, was to become immediately due and payable, *inter alia*: (i) at the end of the Exclusivity Period, or (ii) in the event that a competing transaction was signed in relation to the Farfetch Business pursuant to the marketing process.

126. Alternatively, if the Transfer was consummated, the Bridge Loan (to the extent funded) was to be exchanged by Surpique for all the business and assets of FF Holdings (*i.e.*, the Farfetch Business) and any commitments to pay thereunder were otherwise terminated. Further, following the closing of the Transfer, one or more obligors under the Term Loans were to make an offer to repurchase 10% of the outstanding principal amount of the Term Loans (*i.e.*, $600 million) at par, pro rata amongst the lenders of the Term Loans (including J.P. Morgan).

127. As such, it comes as no surprise that, despite the Exclusivity Period extending to April 30, 2024, Farfetch announced that "following a robust marketing process undertaken by [J.P. Morgan] on behalf of FF [Holdings] for the sale of [the Farfetch Business], which process did not result in a proposal for a competing transaction, on January 30, 2024, Surpique [] consummated the purchase of [the Farfetch Business]" (*i.e.*, the Transfer).

128. Notably, Defendant Neves, as the sole Director and controlling shareholder of Farfetch, approved the Transfer without putting it to a vote. And as the Directors of FF Holdings, Defendants Neves and Phair appointed administrators from AlixPartners UK LLP, who upon appointment entered into a Sale and Purchase Agreement, dated as of January 30, 2024 (the "SPA"), with Surpique Acquisition Limited, a private limited company organized under the laws of England and Wales and an indirect, wholly owned subsidiary of Surpique, a Delaware limited partnership established for the sole purpose of acquiring all of the business and assets of FF Holdings, in connection with, Surpique Acquisition acquired the Farfetch Business.

129. In connection with the Transfer, Surpique converted the full amount outstanding under the Bridge Loan into equity in the Farfetch Business and invested a further $150 million, in the form of equity, into certain of the assets, bringing Surpique's total investment in the Farfetch Business to $300 million to date. Surpique also committed a further $200 million to the extent required for working capital and general corporate needs in the 12 months following the Transfer.

130. Following the Company's December 18, 2023 announcement, and upon the completion of the Transfer on January 30, 2024, the Farfetch Business continued operations as usual under the same name and substantially the same leadership, including Defendant Neves, while Farfetch, its investors, and Note holders were left with nothing.

131. As a reminder, as a holding company with no operations of its own, Farfetch funded its operations and expenses from the upstream cash distributions or payments collected from its subsidiaries. Through the completed Transfer, Farfetch effectively wrote off over $1 billion of debt obligations owed to it by way of the intercompany loans and was effectively deprived of its ownership and interests in the Farfetch Business as a whole which took place without any public

explanation in circumstances where, as recently as August 2023 – just five months earlier, Farfetch and the Individual Defendants had stated publicly that its business was in good financial health.

### 2. *Coupang Drastically Decreases Farfetch's Reported Value and Confirms Unsustainable Cash Demand*

132. On May 8, 2024, Coupang filed its quarterly results for the period ended March 31, 2024 ("Q1 2024") which provided, in relevant part, a fair value of the Farfetch Business as of the Transfer that drastically differed from the financial position provided by the Company in its last publicly issued Q2 2023 results, filed on August 17, 2023. Most notably is the variation between the companies' valuation of the Farfetch Business's intangible assets and its cash balance.

133. The Company's FY 2022 20-F defined "intangible assets" as:

> Intangible assets acquired separately are measured on initial recognition at cost. The cost of intangible assets acquired in a business combination is their fair value at the date of acquisition. Following initial recognition, intangible assets are carried at cost less any accumulated amortization and accumulated impairment losses. Internally generated intangibles, excluding capitalized development costs, are not capitalized and the related expenditure is reflected in profit or loss in the period in which the expenditure is incurred. The useful lives of intangible assets are assessed as either finite or indefinite.
>
> Intangible assets with finite lives are amortized over the useful economic life and assessed for impairment whenever there is an indication that the intangible asset may be impaired. The amortization period and the amortization method for an intangible asset with a finite useful life are reviewed at least at the end of each reporting period. Changes in the expected useful life or the expected pattern of consumption of future economic benefits embodied in the asset are considered to modify the amortization period or method, as appropriate, and are treated as changes in accounting estimates. The amortization expense on intangible assets with finite lives is recognized in the Consolidated statement of operations in the expense category that is consistent with the function of the intangible assets. Other than goodwill, there are no intangible assets with indefinite useful lives.

134. The Chart below demonstrates Coupang's valuation of the Farfetch Business as of January 29, 2024 versus Farfetch's valuation of the Farfetch Business as of June 30, 2023:

| | **Farfetch** | **Coupang** |
|---|---|---|
| **Assets** | (in thousands) | |
| Cash and Cash Equivalents | $453,820 | $126,000 |
| Accounts receivables, net | $ 501,225 | $288,000 |
| Inventories | $ 436,408 | $310,000 |
| Intangible assets | $1,503,925 | $325,000 |
| Right-of-use assets | $195,115 | $209,000 |
| Property and equipment, net | $92,632 | $95,000 |
| Other Current and Non-current assets | $314,829 | $451,000 |
| **Liabilities** | | |
| Accounts payable | $(829,662) | $(505,000) |
| Other current liabilities | $(139,614) | $(169,000) |
| Long-term debt | $(916,923) | $(557,000) |
| Operating lease obligations | $(194,584) | $(214,000) |
| Other non-current liabilities | $(811,000) | $(177,000) |
| **Net Assets** | **$606,171** | **$182,000** |

135. Coupang's Q1 2024 results also included the following chart depicting the Farfetch Business's "identifiable intangible assets acquired" as:

| (in thousands, except years) | **Weighted Average Useful Life** | **Estimated Fair Value** |
|---|---|---|
| Brand trademarks | 5 years | $130,000 |
| Customer relationships | 5 years | $34,000 |
| Supplier relationships | 15 years | $61,000 |
| Developed technology | 3 years | $38,000 |
| Brand licenses | 8 years | $62,000 |
| **Total intangible assets** | | **$325,000** |

136. For comparison, the Company's FY 2022 20-F assigned a net book value of $888,675 (in thousands) to its brand trademarks and domain names, providing, in relevant part:

> As of December 31, 2022, *Brands, Trademarks and domain names* primarily includes: the Off-White licensed brand with a net carrying amount of $311.3 million and a remaining life of 3 years, Stadium Goods brand with a net carrying amount of $86.0 million and a remaining life of 11 years, Heron Preston brand with a net carrying amount of $17.4 million and a remaining life of 4.6 years and Palm Angels brand with a net carrying amount of $111.0 million and a remaining useful life of 8.6 years.

137. Furthermore, Farfetch reported cash and cash equivalents of approximately $453.8 million as of June 30, 2023. Subsequently, on September 11, 2023, FF US borrowed an additional $200 million under the Credit Agreement, as amended on August 11, 2023. Then, pursuant to the Bridge Loan, dated December 18, 2023, drew an additional $350 million in debt prior to the Transfer. As noted above, Coupang reported a balance of a mere $126 million in cash and cash equivalents for the Farfetch Business as of the completed Transfer. Meaning, Farfetch burned through $877.8 million in cash and cash equivalents between July 1, 2023 and January 30, 2024.

### ***3. Coupang Disposes of NGG's Brands and Submits It to Heavy Financial Restructuring***

138. At all relevant times, NGG accounted for a significant portion of the Farfetch Business. Indeed, following the NGG acquisition, Farfetch completely reorganized its business structure, dedicating one of three segments to the production and wholesale distribution of brands owned and licensed by NGG (the Brand Platform), which was considered the second largest division of Farfetch. In addition, the sale of NGG brands on NGG's own platform and e-commerce website, in addition to its sales on the Farfetch marketplace platform, made up the majority of the Company's reported Digital Platform GMV. And lastly, the In-Store segment, which was composed of transactions conducted in the physical stores operated by the Company's various subsidiaries and certain brands in the NGG portfolio, was largely dominated by NGG sales.

139. Shortly after the Transfer of the Farfetch Business to Surpique, articles as early as January 2024 confirmed negotiations between Coupang and Style Capital regarding the potential sale of NGG but a deal never materialized.

140. Then, NGG began to gradually divest its leading brands and undergo a heavy financial restructuring process in Italy known as "Negotiated Composition for Business Crisis

Solution" (or "CNC"). First, on September 30, 2024, Bluestar Alliance, LLC announced that it had acquired NGG's leading brands, Off-White and Palm Angels, for an undisclosed amount.

141. Next, on or around November 19, 2024, NGG filed for CNC – a form of bankruptcy-like protection for companies in financial distress that allows for the company to remain active on the market while undergoing a heavy financial restructuring process in the hopes of avoiding a formal bankruptcy filing.

142. Notably, the news of NGG's CNC filing came shortly after the November 2024 announcement by Authentic Brands Group, the owner of Reebok, that it had terminated the partnership with NGG, claiming NGG owed over $300 million in royalties.

143. Subsequently, on March 21, 2025, co-founders Carlotta and Nicolò Oddi brought back the NGG-owned stake in their luxury knitwear brand, Alanui. And on April 11, 2025, co-founders Yoon Ahn and Verbal bought back the majority stake in their brand, Ambush, acquired by NGG in 2020.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS[3]

144. Throughout the Class Period, Defendants issued a series of materially false and misleading statements concerning Farfetch's liquidity strength and overall financial viability. These material misstatements caused Farfetch's stock price to be artificially inflated throughout the Class Period. When the truth was revealed, this artificial inflation dissipated and Farfetch's stock price declined, causing significant damages to Plaintiffs and Class Members.

[3] Plaintiffs have bolded and italicized the false and misleading portions of the statements identified in this section. To the extent that there is quoted language that is not bolded and italicized, such language is included to provide context and meaning to the emphasized portions.

**December 1, 2022 – Capital Markets Day**

145. On December 1, 2022, Farfetch hosted its first Capital Markets Day since going public in 2018, to discuss its current and historical operations and provide a go-forward strategy. During his opening remarks, Defendant Neves stated, in relevant part, that "[t]he first 14 years were about investing to build the global platform for luxury and growing very fast to establish ourselves as clear leader in this vast online luxury space. … And ***the next phase is about profitable growth and strong cash generation, leveraging the investments that we've made so far*** … ***achieving $10 billion in GMV and 10% adjusted EBITDA by 2025***."

146. Likewise, Defendant Jordan declared this Farfetch's "second stage of growth," with an emphasis on "***returning to growth in 2023 and returning to positive adjusted EBITDA***," claiming this possible because the Company's "***business investments are starting to pay off and are set to accelerate that return of investment, moving forward***."

147. Defendant Neves closed out the prepared remarks portion of the CMD claiming: "***Farfetch has really invested in*** … ***having the building blocks for a new phase of growth, a new phase of profitable growth and cash generation.*** … ***And with that, comes a milestone that we have clear sight, clear view and confidence about, which is this milestone of achieving $10 billion GMV at least 10% EBITDA profitability in 2025***."

148. The foregoing statements identified in ¶¶145-47 were materially false and misleading when made because they created the false impression that Farfetch was committed and poised to achieve profitability and free cash flow through the organic growth of existing investments (*i.e.*, NGG, Reebok, Violet Grey, Stadium Goods, etc.), and that it had the means and ability to finance this growth through its existing balance sheet and available credit lines. In reality, as discussed in detail in Section IV.D. – IV.F., *supra*, Farfetch's existing investments were

incapable of generating sufficient cash flow to fund its operations and service its debt, and as a result, the Company was on the verge of a full liquidity crisis not "a new phase of profitable growth and cash generation."

149. Further, as detailed in Section IV.F., *supra*, Defendant Neves did not hold the belief professed, specifically, that Farfetch's existing investments and balance sheet afforded Defendants with a "clear sight, clear view and confidence about," the stated "milestone of achieving $10 billion GMV at least 10% EBITDA profitability in 2025" as he was actively participating in efforts to secure alternative financing for the Company due to its poor financial condition.

150. Before concluding his remarks, Defendant Jordan focused in on "the Farfetch cash operating model," claiming "***[w]e have delivered leverage across our operating cost base and our investments to date to deliver operating cost efficiencies and higher margins***," to declare "***so the model works in terms of achieving all of our finance strategy at play. And now today, we have clear visibility that we will deliver not only growth, but sustained profitability and positive free cash flow moving forward***."

151. The foregoing statements identified in ¶150 were materially false and misleading when made because Defendants had not "delivered leverage across [Farfetch's] operating cost base and [its] investments to date to deliver operating cost efficiencies and higher margins." As detailed in Section IV.E., *supra*, the Company's reorganizations and cost rationalizations completed in 2022 did not address the primary drivers of its cash burn nor did they address the Farfetch Group's long-standing practice of heavily discounting products to boost sales, and as a result, Farfetch continued to operate on dismal or negative margins. Further, as detailed in Section IV.F., *supra*, Defendant Jordan did not hold the belief professed, specifically, that Defendants had "clear visibility that we will deliver … sustained profitability and positive free cash flow moving

forward" as he was actively participating in efforts to secure alternative financing for the Company due to its poor financial condition. And the supporting facts were untrue and/or materially contradicted undisclosed adverse facts. As detailed in Section IV.D. – IV.F., *supra*, Farfetch's existing cash operating model did not "work[] in terms of achieving all of [its] finance strategy at play," as its existing investments and available credit lines were incapable of generating sufficient cash flow to fund its operations and service its debt, and as a result, the Company was experiencing a full liquidity crisis.

**February 23, 2023 – Q4 2022 Financial Report**

152. On February 23, 2023, Farfetch issued a press release announcing the financial results for the quarter and fiscal year ended December 31, 2022 (the "Q4 2022 Earnings Release"). The Q4 2022 Earnings Release quoted Defendant Neves as saying, in relevant part:

> ***Farfetch enters 2023 as a significantly more efficient business following our strategic reorganization and cost rationalizations. Our solid start to the year gives me confidence 2023 will be a Year of Execution with growth building throughout the year as we comp the previous year's macro headwinds and launch exciting new partners to deliver strong growth, Adjusted EBITDA and positive free cash flow***.

153. That same day, Farfetch hosted a conference call with investors and analysts to discuss its Q4 2022 results (the "Q4 2022 Earnings Call"). During the call, Defendant Neves discussed the Company's reorganization and cost rationalization plans completed in 2022 stating, in relevant part, "***Farfetch begins the year as an even stronger and more efficient organization, which is why I'm more confident than ever about our prospects to deliver growth, profitability and positive free cash flow in 2023 and beyond***."

154. The foregoing statements identified in ¶¶152-53 were materially false and misleading when made because Farfetch did not enter 2023 as a "significantly more efficient business." As detailed in Section IV.E., *supra*, the Company's reorganizations and cost

rationalizations completed in 2022 did not address the primary drivers of its cash burn, and as a result, Farfetch had not "enter[ed] 2023 as a significantly more efficient business." Further, as detailed in Section IV.F., *supra*, Defendant Neves did not hold the belief professed, specifically, that Farfetch would "deliver strong [] Adjusted EBITDA and positive free cash flow" in 2023 as he was actively participating in efforts to secure alternative financing for the Company due to its poor financial condition and growing liquidity pressures. And the supporting facts were untrue and/or materially contradict undisclosed adverse facts. As detailed in Section IV.D. – IV.F., *supra*, Farfetch's existing investments were incapable of generating sufficient cash flow to fund its operations and service its debt, and as a result, the Company was experiencing a full liquidity crisis.

155. The Q4 2022 Earnings Release quoted Defendant Jordan as saying: "***I'm pleased to report our fourth quarter 2022 results which demonstrate that we*** continue to deliver solid underlying performance, are managing to navigate unprecedented external factors and ***are clearly focused on the actions needed to return the business to profitability and generating positive free cash flow in 2023***."

156. The foregoing statements identified in ¶155 were materially false and misleading when made because they created the false impression that Farfetch was committed and poised to achieve profitability and free cash flow through the organic growth of existing investments (*i.e.*, NGG, Reebok, Violet Grey, Stadium Goods, etc.), and that it had the means and ability to finance this growth through its existing balance sheet and available credit lines. In reality, as discussed in detail in Section IV.D. – IV.F., *supra*, Farfetch's existing investments were incapable of generating sufficient cash flow to fund its operations and service its debt, and as a result, the Company was experiencing a full liquidity crisis.

157. During the Q4 2022 Earnings Call, Defendant Neves stated, in relevant part, that, "[t]he investments we have made over the years to build out our platform infrastructure mean ***we now have the building blocks we need***, which when combined with our galvanized teams, means ***we have all the key elements to execute on our plan***."

158. Similarly, during the Q4 2022 Earnings Call, Defendant Phair declared, in relevant part, that "***[t]he work we've done throughout 2022 and the years prior, investing in our customer and in our partnerships with brands and boutiques puts us in a strong position to deliver on our 2023 goals***."

159. The foregoing statements identified in ¶¶157-58 were materially false and misleading when made because they created the false impression that Farfetch was committed and poised to achieve profitability and free cash flow through the organic growth of existing investments (*i.e.*, NGG, Reebok, Violet Grey, Stadium Goods, etc.), and that it had the means and ability to finance this growth through its existing balance sheet and available credit lines. In reality, as discussed in detail in Section IV.D. – IV.F., *supra*, Farfetch's existing investments were incapable of generating sufficient cash flow to fund its operations and service its debt, and as a result, the Company was experiencing a full liquidity crisis. As such, Defendants did not "have all the key elements" or "building blocks" needed nor were they "in a strong position to deliver" or execute their plan of returning the business to profitability and generating positive free cash flow in 2023.

160. During the Q4 2022 Earnings Call, Defendant Jordan also discussed the Company's near-term strategy stating, in relevant part, "our expectations for 2023 are unchanged with a return to GMV growth, operating cost leverage and adjusted EBITDA profitability, ***plus we have several***

***working capital initiatives in place. This will ensure we end the year with cash and cash equivalents in line with where we exited 2022***."

161. The foregoing statements identified in ¶160 were materially false and misleading when made because Defendants' "working capital initiatives" implemented in 2022 would not "ensure [the Company] end[s] the year with cash and cash equivalents in line with where [it] exited 2022." As detailed in Section IV.E., *supra*, the Company's "capital initiatives" implemented in 2022 did not address the primary drivers of its cash burn nor did they address the Farfetch Group's long-standing practice of heavily discounting products to boost sales, and as a result, Farfetch continued to operate on dismal or negative margins. Further, as detailed in Section IV.F., *supra*, Defendants were actively participating in efforts to secure alternative financing for the Company due to its growing liquidity pressures and dire financial straits. Thus, the supporting facts were untrue and/or materially contradicted undisclosed adverse facts.

**March 8, 2023 – FY 2022 Form 20-F**

162. On March 8, 2023, Farfetch filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operational results for the quarter and fiscal year ended December 31, 2022 (the "FY 2022 20-F"), signed and certified by Defendants Neves and Jordan.

163. The FY 2022 20-F provided, in relevant part: "***We believe that our sources of liquidity and capital will be sufficient to meet our business needs for at least the next twelve months. We also expect these sources of liquidity will be sufficient to fund our long-term contractual obligations and capital needs***."

164. Similarly, the FY 2022 20-F provided, in relevant part: "***We believe our sources of liquidity and capital will be sufficient to meet our operating financing needs for at least the next***

***12 months and will support debt repayments and our currently planned capital expenditure requirements over the near term and medium term***."

165. The foregoing statements identified in ¶¶163-64 were materially false and misleading when made because they materially misrepresented Farfetch's then-current financial condition. As detailed in Section IV.D. – IV.F., *supra*, Farfetch's existing sources of liquidity and capital were incapable of generating sufficient cash flow to fund its operations and services its debt in the near-term (never mind medium- or long-term), and as a result, the Company was already experiencing a full liquidity crisis. Further, as detailed in Section IV.F., *supra*, Defendants did not hold the belief professed as they were actively participating in efforts to secure alternative financing for the Company due to its poor financial condition and growing liquidity pressures.

**March 8, 2023 – Morgan Stanley Conference**

166. On March 8, 2023, Farfetch presented as the Morgan Stanley Technology, Media & Telecom Conference. During the conference, Equity Analyst, Lauren Elizabeth Cassel Schenk, asked about the Company's guidance to positive free cash flow in 2023: "Talk about the drivers there, especially working capital inventory as you think about Reebok coming on, clearing of the inventory is better?"

167. In response, Defendant Jordan confirmed "the goal is absolutely to deliver the same cash and cash equivalents at the end of the year as we started the year, which was $734 million," and added that:

> There will be some seasonality aspects of it. So Q1 is usually a working capital outflow. So investors should be prepared to see that we will have a reduction in that cash balance in Q1. But then as we trade through Q2, Q3 and Q4, it builds back up to that $734 million position. ***So that obviously means very strong free cash flows because we'll cover off interest and dividends and other sorts of things within that number.***

> It [] obviously starts with the GMV position and the profitability position. But as you say, ***there's a significant opportunity within our working capital, the balance sheet***. …

168. The foregoing statements identified in ¶167 were materially false and misleading when made because they materially misrepresented Farfetch's then-current financial condition as there was not "a significant opportunity within [the Company's] working capital, the balance sheet…" As detailed in Section IV.D. – IV.F., *supra*, Farfetch's existing sources of liquidity and capital were incapable of generating sufficient cash flow to fund its operations and services its debt, and as a result, the Company was already experiencing a full liquidity crisis and so "obviously" that does not mean "very strong free cash flows" to come. Further, as detailed in Section IV.F., *supra*, Defendants were actively participating in efforts to secure alternative financing for the Company due to its poor financial condition and growing liquidity pressures.

**March 14, 2023 – Bank of America Conference**

169. On March 14, 2023, Farfetch presented at the Bank of America 2023 Consumer & Retail Conference, during which Defendant Jordan discussed the Company's plan of execution in 2023. When discussing "the working capital outflow and inflow of the business," Defendant Jordan declared, in relevant part, that "***[w]e do expect that we'll close 2023 in the same cash and cash equivalents position as we opened, which was $734 million***."

170. The foregoing statements identified in ¶169 were materially false and misleading when made because they created the false impression that Farfetch was committed and poised to achieve profitability and free cash flow through the organic growth of existing investments (*i.e.*, NGG, Reebok, Violet Grey, Stadium Goods, etc.), and that it had the means and ability to finance this growth through its existing balance sheet and available credit lines. In reality, as discussed in detail in Section IV.D. – IV.F., *supra*, Farfetch's existing investments were incapable of generating sufficient cash flow to fund its operations and service its debt, and as a result, the Company was

experiencing a full liquidity crisis. Further, as detailed in Section IV.E., *supra*, the Company's "capital initiatives" implemented in 2022 did not address the primary drivers of its cash burn nor did they address the Farfetch Group's long-standing practice of heavily discounting products to boost sales, and as a result, Farfetch continued to operate on dismal or negative margins. And, as detailed in Section IV.F., *supra*, Defendants were actively participating in efforts to secure alternative means of financing due to its growing liquidity pressures and dire financial straits. Thus, the supporting facts were untrue and/or materially contradicted undisclosed adverse facts.

**May 18, 2023 – Q1 2023 Financial Report**

171. On May 18, 2023, Farfetch issued a press release announcing its financial results for the quarter ended March 31, 2023 (the "Q1 2023 Earnings Release") which quoted Defendant Neves, as stating, in relevant part:

> I am delighted to report that Farfetch was back to growth in [Q1] 2023. ***Our [Q1] results represent the first step towards achieving our plan for 2023, our Year of Execution,*** and demonstrate our strong execution in the face of continued macro headwinds. ***Our sequential improvement in GMV growth in the US and China***, our two largest markets . . . indicate the strength and resilience of our core business. ***This, on top of our recent launches of [inter alia] . . . Reebok*** . . . ***.confirm we remain on track to deliver on our plan for 2023***.

172. The Q1 2023 Earnings Release quoted Defendant Jordan as stating, in relevant part:

> ***We have delivered what we set out to achieve, with accelerating underlying growth, disciplined cost control and improved cash flows. We have successfully navigated through unprecedented macro challenges, and through continued focused execution, we remain on track to deliver a year of luxury market-beating growth, a return to profitability and positive free cash flow.***

173. That same day, Farfetch hosted a conference call with investors and analysts to discuss its Q1 2023 results (the "Q1 2023 Earnings Call"). During the call, Defendant Neves represented, in relevant part, that "***[w]e had set 2023 to be our year of execution. And I'm delighted that we are absolutely delivering as reflected in our Q1 results as well as recent milestone launches***."

174. The foregoing statements identified in ¶¶171-73 were materially false and misleading when made because they created the false impression that Farfetch was committed and poised to achieve profitability and free cash flow through the organic growth of existing investments (*i.e.*, NGG, Reebok, Violet Grey, Stadium Goods, etc.), and that it had the means and ability to finance this growth through its existing balance sheet and available credit lines. In reality, as discussed in detail in Section IV.D. – IV.F., *supra*, Farfetch's existing investments were incapable of generating sufficient cash flow to fund its operations and service its debt, and as a result, the Company was experiencing a full liquidity crisis. Further, as detailed in Section IV.F., *supra*, Defendants were actively participating in efforts to secure alternative financing for the Company due to its poor financial condition and growing liquidity pressures. Accordingly, Farfetch was not "on track to deliver … a return to profitability and positive free cash flow" but rather was on track to insolvency if no additional capital or strategic alternatives for the business were secured.

175. During the Question-and-Answer portion of the Q1 2023 Earnings Call, Douglas Till Anmuth, Managing Director of J.P. Morgan Chase & Co., Research Division inquired about the Company's quarterly growth in the U.S. market "[a]nd then just more broadly, as we are roughly halfway through 2Q, are you seeing the growth accelerate nicely on the easier comps and some of the new partnerships?" Defendant Neves responded, in relevant part:

> Look, we said that 2023 is our [year] of execution. … Q1 was a quarter where we were back to growth and a quarter of acceleration in our top [markets], both U.S. and China, but also other [markets]. And it was a quarter of launches in key launches, landmark launches, Reebok is live on budget and on schedule. And same with Ferragamo, we're on track with Neiman Marcus Group for the second half of this year, and we continue to make progress with Richemont well. So this makes us very, very confident about the rest of 2023, and ***we're on track to achieve our guidance back to*** growth, ***EBITDA profit and positive cash flow***. ***We've also implemented a number of initiatives, and we're very disciplined in terms of the***

> ***cost side of the business than the fixed cost … and with a number of actions well on track to end the year with as much cash, if not more, than what we started.***

176. The foregoing statements identified in ¶175 were materially false and misleading when made because they created the false impression that Farfetch was committed and poised to achieve profitability and free cash flow through the organic growth of existing investments (*i.e.*, NGG, Reebok, Violet Grey, Stadium Goods, etc.), and that it had the means and ability to finance this growth through its existing balance sheet and available credit lines. In reality, as discussed in detail in Section IV.D. – IV.F., *supra*, Farfetch's existing investments were incapable of generating sufficient cash flow to fund its operations and service its debt, and as a result, the Company was experiencing a full liquidity crisis and thus was not "on track to achieve [its] guidance back to … EBITDA profit and positive cash flow." Further, as detailed in Section IV.E., *supra*, the Company's "initiatives" implemented in 2022 did not address the primary drivers of its cash burn nor did they address the Farfetch Group's long-standing practice of heavily discounting products to boost sales, and as a result, Farfetch continued to operate on dismal or negative margins. Accordingly, Farfetch had not "on track to end the year with as much cash, if not more, than what [it] started" but rather was on track to insolvency if no additional capital or strategic alternatives for the business were secured.

**August 17, 2023 – Q2 2023 Financial Report**

177. On August 17, 2023, Farfetch issued a press release announcing its financial results for the quarter ended June 30, 2023 (the "Q2 2023 Earnings Release"). When discussing its "Liquidity and Capital Resources," the Q2 2023 Earnings Release stated, in relevant part, "***[w]e believe that cash flow generated from operations and our cash, cash equivalents and marketable securities balances, as well as borrowing arrangements, will be sufficient to meet our anticipated operating cash needs for at least the next twelve months***."

178. The foregoing statements identified in ¶177 were materially false and misleading when made because they materially misrepresented Farfetch's then-current financial condition. As detailed in Section IV.D. – IV.F., *supra*, Farfetch's existing sources of liquidity and capital were incapable of generating sufficient cash flow to fund its operations and services its debt in the near-term (never mind medium- or long-term), and as a result, the Company was already experiencing a full liquidity crisis. Further, as detailed in Section IV.F., *supra*, Defendants did not hold the belief professed as they were actively participating in efforts to secure alternative financing for the Company due to its poor financial condition and growing liquidity pressures.

179. The Q2 2023 Earnings Release quoted Defendant Neves as stating, in relevant part: "Our Q2 results show Farfetch is growing, becoming more efficient, and executing on our key strategic priorities. … ***2023 is set up to be a great year for Farfetch, toward strong GMV growth, Adjusted EBITDA profitability and positive free cash flow***."

180. The Q2 2023 Earnings Release also quoted Defendant Jordan, who represented that Farfetch's quarterly performance "***demonstrates our progress towards delivering profitable growth and positive free cash flow in 2023***," adding, in relevant part, "***[w]e enter the second half well positioned to achieve faster levels of growth, with a lower cost base and strong liquidity***."

181. The foregoing statements identified in ¶¶179-80 were materially false and misleading when made because they created the false impression that Farfetch was committed and poised to achieve profitability and free cash flow through the organic growth of existing investments (*i.e.*, NGG, Reebok, Violet Grey, Stadium Goods, etc.), and that it had the means and ability to finance this growth through its existing balance sheet and available credit lines. In reality, as discussed in detail in Section IV.D. – IV.F., *supra*, Farfetch's existing investments were incapable of generating sufficient cash flow to fund its operations and service its debt, and as a

result, the Company was experiencing a full liquidity crisis. Further, as detailed in Section IV.F., *supra*, Defendants were actively participating in efforts to secure alternative financing for the Company due to its poor financial condition and growing liquidity pressures. Accordingly, 2023 was not "set up to be a great year for Farfetch, toward … Adjusted EBITDA profitability and positive free cash flow" nor did Defendants "enter the second half well positioned to achieve faster levels of growth, with a lower cost base and strong liquidity" but rather it entered the second half teetering on the edge of insolvency if no additional capital or strategic alternatives for the business were secured.

182. That same day, Farfetch hosted a conference call with investors and analysts to discuss its Q2 2023 results (the "Q2 2023 Earnings Call"). During the call, Defendant Neves provided, in relevant part:

> I am delighted to be taking you through our ***Q2 results, a quarter which saw*** an acceleration of our Digital Platform growth as well as ***further progress across key strategic priorities for 2023. And thanks to the decisive actions we've already taken in terms of fixed costs, we are confident we remain on track to be adjusted EBITDA profitable and free cash flow positive for full year '23***.
>
> ***
>
> … ***Our key strategic initiatives remain on track. And thanks to the decisive actions we've already taken in terms of fixed costs, we are confident about our objective to be profitable at the adjusted EBITDA level and generate positive free cash flow for full year 2023***.

183. During the Q2 2023 Earnings Call, Defendant Jordan provided, in relevant part:

> Looking ahead, we are adjusting our near-term expectations across H2 to reflect an updated assessment of the luxury market in the U.S. and China. This means moderating our GMV growth expectations. ***However, our focus on operating the business off a lower cost base means we continue to expect to deliver profitability in 2023 with up to 1% adjusted EBITDA margin***.
>
> ***
>
> ***On cash, we expect to deliver positive free cash flow and have taken the opportunity to expand our existing term loan B facility with expected net proceeds***

> ***of approximately $180 million boosting our overall liquidity*. *We now expect to deliver cash and cash equivalents of over $800 million at year-end. This position is driven from higher GMV growth and profitability compared to H1 and further improvements in our working capital position, particularly within Q4***.

184. The foregoing statements identified in ¶¶182-83 were materially false and misleading when made because they created the false impression that Farfetch was committed and poised to achieve profitability and free cash flow through the organic growth of existing investments (*i.e.*, NGG, Reebok, Violet Grey, Stadium Goods, etc.), and that it had the means and ability to finance this growth through its existing balance sheet and available credit lines. In reality, as discussed in detail in Section IV.D. – IV.F., *supra*, Farfetch's existing investments were incapable of generating sufficient cash flow to fund its operations and service its debt, and as a result, the Company was experiencing a full liquidity crisis. Further, as detailed in Section IV.E., *supra*, the Company's "strategic initiatives" implemented in 2022 did not address the primary drivers of its cash burn nor did they address the Farfetch Group's long-standing practice of heavily discounting products to boost sales, and as a result, Farfetch continued to operate on dismal or negative margins. Accordingly, Farfetch was not "on track to be adjusted EBITDA profitable and free cash flow positive for full year '23" but rather was on track to insolvency if no additional capital or strategic alternatives for the business were secured.

185. During the Q2 2023 Earnings Call, Defendant Phair discussed recent developments within NGG providing, in relevant part, that:

> Going forward, we will also focus our resources and efforts on the brands with the greatest scale and profitability profile. As a result of these actions, direct G&A for full year 2023 at NGG is expected to decrease double-digit percentage as compared to our original expectations for the year, and ***we expect some of these savings to carry into 2024 for a stronger profitability profile***.
>
> ***
>
> … ***Overall, we continue to see significant strength within NGG, a business that has contributed to the growth and profitability of Farfetch***… We believe that

> brands within the NGG portfolio will continue to be forces of culture in the industry and that ***our recent organizational changes*** led by a very strong management team ***will also allow NGG to operate more efficiently, drive profitable growth*** and unlock further synergies with the overall Farfetch Group.

186. The foregoing statements identified in ¶185 were materially false and misleading when made because, as detailed in Section IV.E., *supra*, the Company's reorganizations and cost rationalizations implemented in 2022 did not address the primary drivers of its cash burn nor did they address the Farfetch Group's long-standing practice of heavily discounting products to boost sales, and as a result, Farfetch (including NGG) continued to operate on dismal or negative margins. Accordingly, these changes did not "allow NGG to operate more efficiently" or "drive profitable growth" nor did they support "a stronger profitability profile" to carry into 2024. Further, as detailed in Section IV.F., *supra*, Defendant Phair did not hold the belief professed, specifically, that they "continue[d] to see significant strength within NGG, a business that has contributed to the growth and profitability of Farfetch" as they were actively participating in efforts to dispose of all Company assets (including NGG).

## VII. CLASS ACTION ALLEGATIONS

187. Plaintiffs bring this action on behalf of all persons and entities who purchased or acquired publicly traded Farfetch securities during the Class Period. Excluded from the Class are the Individual Defendants, members of the immediate families of each Defendant, Farfetch (including its subsidiaries) and its officers and directors at all relevant times, any entity in which any excluded party has or had a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, heirs, successors or assigns of any such excluded party.

188. The members of the Class are so numerous that joinder of all members is impracticable. At all relevant times, Farfetch's stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only

through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Farfetch or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

189. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

190. Plaintiffs have and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

191. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants;

b. whether the price of Farfetch's securities during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

c. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

192. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII. LOSS CAUSATION AND ECONOMIC LOSS

193. The market for Farfetch's securities was open, well-developed, and efficient at all relevant times. As a result of Defendants' materially false and misleading statements, Farfetch's stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Farfetch stock relying on the integrity of the market and market information related to the Company and have been damaged thereby.

194. Defendants materially false and misleading statements about Farfetch's financial condition and liquidity strength constituted a scheme to deceive the market and a course of conduct that caused the price of Farfetch's stock to be artificially inflated throughout the Class Period. As the truth began to emerge through a series of corrective disclosures and/or materializations of the concealed risk, the prior artificial inflation was removed, and the price of Farfetch stock fell. Plaintiffs and other members of the Class suffered foreseeable economic losses, which were proximately caused by Defendants materially misleading the investing public.

195. The disclosures identified above on August 17, November 28, and December 18, 2023, as detailed in Section IV.H., *supra*, contradicted Defendants' fraudulent statements and/or revealed to the market (first, in part, and then, in whole) Farfetch's true financial condition and concealed liquidity crisis. Thus, Defendants' fraud proximately caused the decline in Farfetch's stock price when the truth emerged. As a result of their purchases of Farfetch stock during the Class Period at artificially inflated prices, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages under the federal securities laws.

196. The timing and magnitude of the price declines of Farfetch securities negate any inference that the loss suffered by Plaintiffs and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or company-specific facts unrelated to the

Defendants' fraudulent conduct. Therefore, the damages suffered by Plaintiffs and other members of the Class were foreseeably and proximately caused by Defendants' fraudulent scheme to artificially inflate Farfetch's stock prices and the subsequent significant declines in the value of Farfetch securities when Defendants' prior misrepresentations and omissions were revealed.

## IX. PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

197. Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. Farfetch securities traded in an efficient market;

d. the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Farfetch securities; and

e. Plaintiffs and the other members of the Class purchased Farfetch securities between the time Defendants misrepresented and/or failed to disclose material information and the time the truth was disclosed and/or risks materialized, without knowledge of the misrepresented or omitted facts.

198. At all relevant times, the market for Farfetch securities was an efficient market for the following reasons, among others:

a. Farfetch securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

b. During the Class Period, Farfetch securities were actively traded, demonstrating a strong presumption of an efficient market;

c. As a regulated issuer, Farfetch filed with the SEC periodic public reports during the Class Period;

d. Farfetch regularly communicated with public investors via established market communication mechanisms;

e. Farfetch was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports

was publicly available and entered the public marketplace; and

f. Unexpected material news about Farfetch was rapidly reflected in and incorporated into Farfetch's share price during the Class Period.

199. As a result of the foregoing, the market for Farfetch securities promptly digested current information regarding Farfetch from all publicly available sources and reflected such information in the Company's share price. Under these circumstances, all purchasers and acquirers of Farfetch securities during the Class Period suffered similar injury through their purchase of Farfetch securities at artificially inflated prices, and a presumption of reliance applies.

200. Alternatively, reliance need not be proven in this action because the action involves material omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because a reasonable investor would have considered Farfetch's financial statements, financial health, and adequacy of internal controls over financial reporting and related disclosures to be important when deciding whether to purchase and/or sell Farfetch securities.

## X. FF HOLDINGS IS LIABLE FOR FARFETCH'S STATEMENTS AND REMAINS FARFETCH'S SUCCESSOR-IN-INTEREST

201. FF Holdings is liable for Farfetch's fraudulent actions because the reorganization of Farfetch.com Limited ("Farfetch.com") and its subsidiaries was nothing more than a name change and continuation of Farfetch's business, undertaken to defraud Farfetch's creditors. At all relevant times, Farfetch was a holding company with no independent operations; FF Holdings was responsible for all action taken by Farfetch, including but not limited to its public statements.

202. Farfetch historically conducted its business through Farfetch.com. In connection with the Company's September 2018 IPO, Farfetch carried out reorganization transactions (the "Reorganization Transactions") whereby Farfetch.com became a wholly owned subsidiary of Farfetch, an exempted company incorporated with limited liability under the Companies Law (2018 Revision) of the Cayman Islands. The steps to restructure the Group had the effect of Farfetch being inserted above Farfetch.com as the holder of the Farfetch.com share capital. The Reorganization Transactions were treated as a capital reorganization. The Group was thereafter presented as if Farfetch had always owned Farfetch.com.

203. The Company's historical consolidated financial statements prior to the Reorganization Transactions reflected the results of operations of Farfetch.com and, following the Reorganization Transactions, reflected the results of operations of Farfetch. Farfetch's consolidated financial statements were the same as Farfetch.com's consolidated financial statements, as adjusted for the Reorganization Transactions. Following the Reorganization Transactions, the Company retroactively reflected the Reorganization Transactions in Farfetch's consolidated financial statements. Following the Reorganization Transactions, the Company's business was conducted through Farfetch and its subsidiaries.

204. The steps taken to restructure the Group were as follows. On September 18, 2018, all holders of warrants over Farfetch.com shares, except a holder of 189,995 warrants, exercised their warrants into the applicable class of shares and the outstanding shares of Farfetch.com and were exchanged for shares of Farfetch with equivalent rights. Following the exchange, the £0.10 British Pound Sterling dominated ordinary shares and the preference shares held by the shareholders of Farfetch were converted into $USD denominated $0.20 ordinary shares of Farfetch and subsequently exchanged, one for five, for $0.04 Class A ordinary shares and Class B ordinary

shares, as applicable. Outstanding options of Farfetch.com were released in exchange for the grant of options with equivalent rights over Class A ordinary shares of Farfetch.

205. The Company's FY 2020 20-F provided that: "except where the context otherwise requires or where otherwise indicated, the terms 'Farfetch,' the 'Company,' 'we,' 'us,' 'our,' 'our company' and 'our business' refer, prior to the Reorganization Transactions, to Farfetch.com and, after the Reorganization Transactions, to Farfetch Limited, in each case together with its consolidated subsidiaries as a consolidated entity."

206. The creation of FF Holdings, and its rise to power as the umbrella organization for all Farfetch.com's business and assets, was but a continuation of Farfetch's business. Defendant Neves controlled both entities and retained ultimate authority over each entity's respective actions.

207. Just like Farfetch.com before it, FF Holdings was a privately held company, wholly owned by Farfetch. With the reorganization of Farfetch's subsidiaries changing little but the name of its umbrella organization for its business and assets, and with Farfetch under immense pressure following the NGG acquisition and Farfetch's stock price at an all-time low following the IPO and at the time of the reorganization, the purpose of the reorganization was simple – to avoid liability to the extent possible. In such a setting, Farfetch knew that the assets available at Farfetch, by way of Farfetch.com following the Reorganization Transactions, would be put in jeopardy. In order to have the best chance at protecting these assets, Farfetch took the unprecedented step of dethroning itself and placing newly created FF Holdings in charge of all operations and assets of the Group.

208. Pursuant to the strategic report for the period ended December 31, 2020, filed by FF Holdings on August 31, 2021, with the Registrar of Companies for England and Wales, the reorganization was completed sometime between the incorporation of FF Holdings on October 23, 2019 and December 31, 2020. However, Farfetch's annual report for the fiscal year ended

December 31, 2020 (the FY 2020 20-F), filed with the SEC on March 4, 2021, made no mention of the reorganization and in fact, still listed Farfetch.com as a direct holding with FF Holdings listed as an indirect holding of Farfetch.

209. The Company's annual report for the fiscal year ended December 31, 2021 (the FY 2021 20-F), filed with the SEC on March 4, 2022, made no mention of the reorganization including the transfer of all business and assets to FF Holdings other than through the reclassification of Farfetch's direct and indirect holdings. For the first time, Farfetch no longer included Farfetch.com as a direct subsidiary, rather it listed FF Holdings as the only direct subsidiary of Farfetch.

210. In addition, the FY 2021 20-F limited its acknowledgement of the Reorganization Transactions and capital organization of Farfetch and Farfetch.com merely stating, "On May 15, 2018, Farfetch Limited was incorporated under the laws of the Cayman Islands to become the holding company of Farfetch.com Limited and its subsidiaries. When we refer to the 'Consolidated Group' or 'Group' we are referring to Farfetch Limited and its consolidated subsidiaries."

211. Numerous facts lead to the conclusion that the transfer of all business and assets to FF Holdings was fraudulent. To begin with, there is no indication that ***any*** consideration, let alone adequate or fair consideration, was provided by FF Holdings in exchange for the business and assets it received from Farfetch. Rather, the reorganization was merely a transfer of assets and business from one of Farfetch's holding companies to another, with Farfetch controlling the property both before and after the conveyance, like a person transferring money from her checking account right to her own savings account. And because FF Holdings had merely taken Farfetch.com's place as the consolidator of the entire Farfetch Business, the entities involved in the reorganization not only share a close relationship with each other but are essentially one and the same. Further, the reorganization was highly unusual in that Farfetch.com was the flagship

company from which the larger Farfetch holding company was born, only to be hastily pushed aside at the same time Defendants' make a blatant deviation from the Company's foundational business model, jeopardizing the entire operation.

212. Furthermore, Defendants knew and intended that the agreement to transfer all business and assets of FF Holdings to Coupang announced in December 2023 would leave Farfetch with insufficient funds to pay back the debts owed to creditors, including losses suffered by Plaintiffs and other members of the Class.

## XI. NO SAFE HARBOR

213. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the misrepresentations and/or omissions alleged in this Complaint. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

214. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Farfetch who knew that the "forward-looking statement" was false or materially misleading. Alternatively, none of the historic or present-tense statements made by the Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to

or stated to be dependent on those historic or present-tense statements when made.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
**(*Against All Defendants*)**

215. Plaintiffs incorporate and re-allege each and every preceding paragraph as though fully set forth herein. This Count is alleged against all Defendants.

216. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other Class members to purchase Farfetch securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

217. In violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers and acquirers of Farfetch securities during the Class Period in an effort to maintain artificially high market prices for Farfetch securities. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

218. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Farfetch's financial condition and liquidity strength.

219. These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Farfetch's value, performance, and continued financial viability, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Farfetch's financial condition and liquidity strength under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Farfetch's common stock during the Class Period.

220. The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendants were high-level executives and/or directors at Farfetch and/or FF Holdings during the Class Period and members of each entity's management team or had control thereof; (2) each Individual Defendant, by virtue of his/her responsibilities and activities as a senior officer and/or director of Farfetch and/or FF Holdings, was privy to and participated in the creation, development and reporting of Farfetch's SEC filings and public statements concerning the Company's financial condition and liquidity strength; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of and had access to other members of Farfetch's management team, internal reports, and other data and information about Farfetch's operations and finances, at all relevant times; and (4) each Individual Defendant was aware of Farfetch's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

221. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing risks associated with Farfetch's liquidity crisis from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' misrepresentations concerning the fundamental problems and risks inherent in Farfetch's existing investments and its growing liquidity problems throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

222. Plaintiffs and other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Farfetch securities. Plaintiffs and other members of the Class would not have purchased Farfetch securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Defendants' misleading statements and/or omissions.

223. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Farfetch securities during the Class Period.

224. By operation of law as a successor to Defendant Farfetch, Defendant FF Holdings is jointly and severally liable with its co-defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### (*Against the Individual Defendants*)

225. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein. This Count is alleged against the Individual Defendants.

226. The Individual Defendants acted as controlling persons of Farfetch within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Farfetch's operations and/or intimate knowledge of the materially false and misleading information filed by Farfetch with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Farfetch, including the content and dissemination of the various statements that Plaintiffs contend were materially false and misleading when made. The Individual Defendants were provided with or had unlimited access to copies of Farfetch's sales and costs data, results, reports, press releases, public filings and other statements alleged by Plaintiffs to have been false or misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

227. In particular, during the Class Period, each Individual Defendant participated in the operation and management of Farfetch, had a direct and supervisory involvement in the Company's day-to-day operations, and conducted and participated, directly and indirectly, in the conduct of Farfetch's business affairs. Because of their senior positions, the Individual Defendants are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

228. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Farfetch's Class A redeemable shares, additional paid-in capital, accumulated loss, and shareholders' equity, and to promptly correct any public statements issued by Farfetch which had become materially false or misleading. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Farfetch securities.

229. Each of the Individual Defendants, therefore, acted as a controlling person of Farfetch. By reason of their senior management positions and/or being directors or controlling shareholders of Farfetch, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Farfetch to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Farfetch and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

230. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Farfetch and/or FF Holdings.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A. Determining this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as Class Representatives, and designating Co-Lead Counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as

a result of Defendants' wrongdoing, in an amount to be proven at trial, together with prejudgment and post-judgment interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

## XIII. JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial.

Dated: November 3, 2025

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*
Adam M. Apton
Devyn R. Glass (*pro hac vice* forthcoming)
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
aapton@zlk.com
dglass@zlk.com

*Counsel for Co-Lead Plaintiff Fernando Sulichin and Co-Lead Counsel for the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Lucas E. Gilmore (admitted *pro hac vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
lucasg@hbsslaw.com
reed@hbsslaw.com

*Counsel for Co-Lead Plaintiff Yuanzhe Fu and Co-Lead Counsel for the Class*