**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE FARFETCH LIMITED SECURITIES LITIGATION | Case No.: 1:23-cv-10982-ER-KHP [rel. 1:24-cv-00532-ER] |
| THIS DOCUMENT RELATES TO:<br><br>*ALL ACTIONS* | |

**PLAINTIFFS' OPPOSITION TO THE INDIVIDUAL DEFENDANTS' MOTION TO
DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................................ 1

II. SUMMARY OF THE FACTS .......................................................................... 2

    A.  Farfetch's business model and expansion strategy led to mounting financial strain. ................................................................................. 2

    B.  Defendants publicly assured investors that Farfetch was financially secure and self-funding. ..................................................................... 2

    C.  At the same time, Defendants initiated and pursued Project Athena. ..................... 3

    D.  The truth about Farfetch's financial condition and strategic direction emerges. ................................................................................ 4

III. ARGUMENT .................................................................................................... 6

    A.  The Complaint adequately alleges materially misleading statements. ................................................................................................ 6

        1.  The SAC does not rely on fraud by hindsight. .......................... 6

        2.  Defendants' statements conveyed present financial conditions, not forward-looking statements or mere optimism. ................................................................................... 8

            a.  The PSLRA safe harbor does not protect Defendants' misrepresentations and omissions of known contemporaneous facts. ....................................... 9

            b.  Defendants' "opinion" statements omitted material facts about their knowledge that conflicted with the story they told investors. ................................................. 11

            c.  Defendants' assurances of sufficient liquidity and self-funding were not inactionable confidence or puffery. ................................................................................ 12

        3.  Defendants' concealment of Project Athena rendered their public statements misleading. ........................................... 14

            a.  Project Athena was a formal strategic process, not a hypothetical contingency. .......................................... 14

            b.  The concealed process was inconsistent with Defendants' public liquidity assurances. ....................... 15

     c.  A reasonable investor would have considered the omitted information material. ....................................... 16

  B. The SAC adequately alleges a strong inference of scienter. ................................ 16

    1. Defendants' direct participation in Project Athena establishes scienter. ................................................................................. 17

    2. Defendants had the motive and opportunity to commit fraud. ...................................................................................................... 18

    3. Additional allegations support the inference of scienter. .......................... 20

    4. Defendants' stock trading does not negate scienter. ................................. 21

    5. Defendants' non-fraudulent inference is not more compelling than the inference of scienter. ................................................. 22

  C. Plaintiffs adequately allege scheme liability. .......................................................... 23

  D. The SAC adequately pleads "Control Person" liability under Section 20(a). ................................................................................................................. 25

IV. CONCLUSION ....................................................................................................................... 25

WORD COUNT COMPLIANCE CERTIFICATE ......................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec., LLC*,
2005 WL 2385854 (S.D.N.Y. Sept. 26, 2005)..........................................................................7

*Alpha Cap. Anstalt v. Schwell Wimpfheimer & Assocs. LLP*,
2018 WL 1627266 (S.D.N.Y. Mar. 30, 2018) ....................................................................24, 25

*In re Anheuser-Busch InBev SA/NV Sec. Litig.*,
2020 WL 5819558 (S.D.N.Y. Sept. 29, 2020)........................................................................10

*Ashland Inc. v. Morgan Stanley & Co.*,
652 F.3d 333 (2d Cir. 2011)....................................................................................................10

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F.Supp.2d 474 (S.D.N.Y. 2004).........................................................................................7

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F.Supp.2d 564 (S.D.N.Y. 2013).......................................................................................10

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).................................................................................................................16

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
763 F.Supp.2d 423 (S.D.N.Y. 2011)......................................................................................6, 7

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017).......................................................................................10

*BISYS Sec. Litig.*,
397 F.Supp.2d 430 (S.D.N.Y. 2005).......................................................................................21

*In re DRDGOLD Ltd. Sec. Litig.*,
472 F. Supp. 2d 562 (S.D.N.Y. 2007).....................................................................................10

*In re Gen. Elec. Co. Sec. Litig.*,
857 F.Supp.2d 367 (S.D.N.Y. 2012).......................................................................................23

*Ho v. Duoyuan Glob. Water, Inc.*,
887 F.Supp.2d 547 (S.D.N.Y. 2012).......................................................................................18

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ................................................................................................19

*Jones v. Perez*,
550 F. App'x 24 (2d Cir. 2013) ..............................................................................................10

*Karimi v. Deutsche Bank Aktiengesellschaft*,
607 F.Supp.3d 381 (S.D.N.Y. 2022)...................................................................................8

*Leone v. ASP Isotopes Inc.*,
2025 WL 3484821 (S.D.N.Y. Dec. 4, 2025) .....................................................................19

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2nd Cir. 2015).............................................................................................25

*Lorenzo v. Sec. & Exch. Comm'n*,
587 U.S. 71 (2019).............................................................................................................23

*Meyer v. Jinkosolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014)...............................................................................................10

*In re MINISO Grp. Holding Ltd. Sec. Litig.*,
2024 WL 759246 (S.D.N.Y. Feb. 23, 2024).......................................................................10

*New Orleans Emp. Ret. Sys. v. Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011) .........................................................................................20

*In re Nortel Networks Corp. Secs. Litig.*,
238 F.Supp.2d 613 (S.D.N.Y. 2003)..................................................................................11

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000).........................................................................................11, 12

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F.Supp.3d 16 (S.D.N.Y. 2019) ...................................................................................20

*Omnicare, Inc. v. Laborers Dist. Council*,
575 U.S. 175 (2015)...........................................................................................................12

*Oneida Sav. Bank v. Uni-Ter Underwriting Mgmt. Corp.*,
2014 WL 4678046 (N.D.N.Y. Sept. 18, 2014)...................................................................19

*In re Oxford Health Plans, Inc.*,
187 F.R.D. 133 (S.D.N.Y. 1999) .......................................................................................21

*P. Stolz Fam. P'Ship L.P. v. Daum*,
355 F.3d 92 (2d Cir. 2004)...................................................................................................9

*In re Pareteum Sec. Litig.*,
2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021).....................................................................21

*In re Plug Power, Inc. Sec. Litig.*,
2022 WL 4631892 (S.D.N.Y. Sept. 29, 2022)....................................................................19

*Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*,
    2017 WL 4082482 (S.D.N.Y. Aug. 24, 2017)................................................................10

*Ret. Sys. v. MF Glob., Ltd.*,
    620 F.3d 137 (2d Cir. 2010)...........................................................................................9

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ........................................................................................21

*Setzer v. Omega Healthcare Invs., Inc.*,
    968 F.3d 204 (2d Cir. 2020)............................................................................................6

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
    348 F.Supp.3d 313 (S.D.N.Y. 2018)..............................................................................19

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010)..........................................................................................10

*Solow v. Citigroup, Inc.*,
    827 F.Supp.2d 280 (S.D.N.Y. 2011)................................................................9, 11, 12, 13

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
    33 F.Supp.3d 401 (S.D.N.Y. 2014) ...............................................................................25

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
    2024 WL 456745 (S.D.N.Y. Feb. 5, 2024)....................................................................20

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)..................................................................................................17, 23

*Villare v. Abiomed, Inc.*,
    2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021)...............................................................10

*In re Vivendi Universal, S.A.*,
    2004 WL 876050 (S.D.N.Y. Apr. 22, 2004).....................................................................7

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)....................................................................................8, 9, 12, 16

*zCap Equity Fund LLC v. LuxUrban Hotels Inc.*,
    792 F.Supp.3d 407 (S.D.N.Y. 2025)..............................................................................18

**STATUTES**

15 U.S.C. § 78u-4(b)(2)(A)...............................................................................................16

15 U.S.C. § 78u-5(c)(1)(A)(i) ..............................................................................................9

**OTHER AUTHORITIES**

Rule 10b-5(a) and (c) ................................................................................................................23

Rule 10b-5(b) ...........................................................................................................................25

Rule 12 .......................................................................................................................................7

## I.    INTRODUCTION

The Court dismissed the CAC for failure to adequately plead falsity and scienter. *See* ECF No. 73. The Second Amended Complaint ("SAC") (ECF No. 78, cited as "¶_") cures both deficiencies. As to falsity, Plaintiffs no longer focus on statements about being "on track," "back to growth," or having "confidence" in long-term targets. Instead, the SAC alleges a discrete category of concrete, factual representations: that Farfetch was self-funding and did not need external capital. And it identifies a single contemporaneous fact that rendered those representations misleading when made: Defendants' undisclosed initiation and pursuit of Project Athena, a formal process to raise capital or sell the business, beginning the same month as the assurances. ¶¶ 90-95. Put simply, Defendants told investors they did not need outside capital while actively seeking outside capital.

Plaintiffs' scienter allegations are also different. Unlike the CAC's scienter allegations about Defendants' desire to raise capital or keep stock prices high, the SAC now makes clear that Defendants' scienter is established by their direct, personal participation in Project Athena—the very process they concealed. ¶¶ 90-95, 108, 128. Defendant Neves initiated and directed Project Athena as sole Director and controlling shareholder. ¶ 128. Defendant Jordan, as CFO, acknowledged to FE5 that large investors were threatening to withdraw funds. ¶ 108. Defendant Phair, along with Neves, appointed the administrators who executed the Transfer. ¶ 128. This is knowledge from participation.

Rather than grapple with what the SAC actually alleges, Defendants relitigate the CAC, arguing that Plaintiffs still rely on recycled FE allegations, corporate-position inference, and stock retention. But those are no longer Plaintiffs' theories: the SAC's allegations rest on Defendants' conduct, not inference from their positions. The motion to dismiss should be denied.

## II.    SUMMARY OF THE FACTS

**A.    Farfetch's business model and expansion strategy led to mounting financial strain.**

Farfetch operated a global luxury e-commerce marketplace connecting brands and boutiques with consumers. ¶¶ 36-37. Rather than owning inventory at scale, the Company acted as an asset-light platform earning commissions on gross merchandise value ("GMV"). *Id*. To scale, Farfetch pursued aggressive acquisitions that increased its operational complexity and cost structure. ¶¶ 38-43, 63-67. In response, management pivoted its public narrative toward cost control and "disciplined execution" to stabilize cash flow. ¶¶ 104-07. This shift framed the Company's subsequent—and misleading—assurances regarding its liquidity and self-funding capabilities.

**B.    Defendants publicly assured investors that Farfetch was financially secure and self-funding.**

From late 2022 through 2023, Defendants repeatedly used earnings calls and investor conferences to broadcast a narrative of financial stability and adequate liquidity. ¶¶ 96–110. On the first day of the Class Period (December 1, 2022), Defendant Neves emphasized Farfetch's ability "to leverage [its] investments," and that the CMD was "all about providing clarity to [investors] on the building blocks of that road map." ¶ 97. Defendant Jordan claimed that Farfetch's "business investments are starting to pay off," that "the model works," and that "now today, we have clear visibility that we will deliver not only growth, but sustained profitability and positive free cash flow moving forward." ¶¶ 99, 101. These assurances were a façade. Behind the scenes, *that very same month*, Farfetch began exploring a sale of the Company to address a liquidity crisis it had just denied existed. ¶ 90.

Despite the ongoing secret sale process deemed internally as "Project Athena," Defendants spent February 2023 doubling down on claims of Farfetch's financial stability. ¶¶ 104-05.

Defendants claimed the Company had taken decisive steps to improve cash flow, with Defendant Neves declaring that "Farfetch begins the year as an even stronger and more efficient organization[.]" *Id*. Defendants represented that Farfetch was on track to generate free cash flow and that its balance sheet provided sufficient flexibility to execute its business plan without additional financing. *Id*. While Defendants represented that no additional financing was needed, they were privately pursuing a sale and emergency financing to prevent a total liquidity crisis. ¶¶ 90-95.

Indeed, throughout 2023, Defendants reiterated that Farfetch did not require additional financing to continue operating. ¶¶ 106-07, 110, 152-85. They told investors that Farfetch was focused on disciplined execution rather than capital raising and that the Company's existing liquidity was sufficient to fund its operations. *Id*. Defendants attributed Farfetch's financial outlook to controllable operational factors, including cost reductions, integration of prior acquisitions, and favorable macroeconomic trends, reinforcing the message that Farfetch could meet its goals without resorting to asset sales or other extraordinary transactions. ¶¶ 97–103. Defendants also framed 2023 as a "year of execution," emphasizing operational discipline, margin improvement, and long-term value creation rather than liquidity management or capital preservation. ¶¶ 112, 152, 171, 173, 175. In short, Defendants' statements conveyed that Farfetch was financially self-sufficient and faced no pressure to pursue extraordinary measures. The opposite was true.

## C.    At the same time, Defendants initiated and pursued Project Athena.

While making these public assurances, Defendants had already initiated a confidential strategic process known internally as "Project Athena." ¶¶ 90-95. Project Athena was formed in December 2022, the exact same month as the CMD where Defendants delivered those assurances. ¶¶ 90, 97-102.

Project Athena was not a speculative contingency plan, and its purpose was explicit: to evaluate and pursue transactions that would fundamentally alter Farfetch's ownership or asset structure, including a take-private or significant asset sale that would relieve Farfetch of its obligations as a public company—obligations to the very shareholders Defendants were simultaneously reassuring. ¶¶ 90-94. Farfetch engaged major advisory firms, including J.P. Morgan, to approach dozens of potential investors. *Id.*

Defendants initiated Project Athena in response to Farfetch's deteriorating financial condition and mounting liquidity constraints, notwithstanding their public statements to the contrary. ¶ 90. Based on this project, Defendants recognized internally that Farfetch's financial position was far weaker than portrayed publicly and that extraordinary measures might be required to sustain the business. ¶¶ 93-94.

Defendant Neves, who was the sole Director and controlling shareholder of Farfetch, was directly involved in Project Athena. ¶ 128. Defendant Jordan, as CFO, was aware of the liquidity pressures driving Project Athena: he explicitly acknowledged to FE5 that "large investor(s)" were threatening to pull money from the Company. ¶ 108. And Defendant Phair, along with Defendant Neves, was responsible for appointing administrators who entered into the sale agreement that transferred the Farfetch business to Surpique. ¶ 128. These same individuals were responsible for the public statements described above. ¶¶ 144–86.

Project Athena continued throughout 2023, overlapping entirely with the period of Defendants' public assurances. ¶¶ 90-110.

**D.    The truth about Farfetch's financial condition and strategic direction emerges.**

Beginning in August 2023, Farfetch's public disclosures began to reveal financial conditions that diverged sharply from Defendants' earlier assurances of liquidity sufficiency and self-funding.

-4-

First, on August 17, 2023, Farfetch disclosed financial results reflecting continued losses, negative free cash flow, and increasing pressure on the Company's liquidity position. ¶ 111. These results contradicted Defendants' prior assurances that Farfetch could fund operations from existing resources. These revelations, coupled with analysts' downgrades, led to a dramatic 45% decline in Farfetch's stock price over a single trading day. ¶¶ 112-14.

Then, on November 28, 2023, Farfetch announced it would not be releasing its Q3 2023 financial results or providing any future guidance. ¶ 115. Farfetch explained that its previous forecasts and guidance were explicitly deemed unreliable, raising serious concerns about its financial health and future prospects. *Id.* This abrupt decision, made after market hours, sent shockwaves through the investment community, as Farfetch's stock price fell 53%. ¶ 116.

Finally, on December 18, 2023, Farfetch revealed the results of its year-long secret efforts: that it would be transferring its core business to Coupang in exchange for a $500 million bridge loan, which materially altered the Company's ownership structure and strategic direction. ¶ 117. The announcement revealed more than financial distress—investors already knew Farfetch faced challenges. What they learned on December 18 was that Defendants had spent the prior year pursuing a transaction fundamentally inconsistent with the narrative of stability and self-sufficiency they had been selling. ¶¶ 117-18.

The nature of the transaction—effectively transferring control of key assets and reducing Farfetch's obligations as a public company—demonstrated that extraordinary measures were required to sustain the business. ¶ 118. This move effectively gutted the Company, leaving shareholders with significant losses and the Company itself facing liquidation. ¶ 118. On this news, Farfetch's share price fell 93.75%, to close at $0.04 per share on December 20, 2023. ¶ 122.

Consequently, that same day, the NYSE commenced delisting proceedings for Farfetch's Class A ordinary shares and trading was suspended, effective immediately. *Id*.

### III.    ARGUMENT

**A.    The Complaint adequately alleges materially misleading statements.**

Defendants' motion to dismiss rests on a mischaracterization of both the challenged statements and the omission alleged. This is not a case about failed predictions, disappointed expectations, or business judgments second-guessed after the fact. Mot. at 1-2, 9-10, 12-13, 16-18, 19-21, 24-25. Rather, this case is about Defendants' decision to construct a fraudulent façade: publicly touting Farfetch's liquidity while secretly executing a terminal sale process and scrambling for the very emergency capital they told investors they did not need.

Second Circuit law holds that once a company speaks on a subject, it must disclose material facts necessary to make those statements not misleading. *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020) (noting a duty to disclose omitted facts "when there is … a corporate statement that would otherwise be inaccurate, incomplete, or misleading."). The SAC alleges that Defendants' undisclosed pursuit of Project Athena rendered their public liquidity assurances misleading, that the omitted information was material to reasonable investors, and that the claims rest on contemporaneous facts—not hindsight. *See In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F.Supp.2d 423, 497 (S.D.N.Y. 2011) (misleading statements regarding company's liquidity crisis actionable).

**1.    The SAC does not rely on fraud by hindsight.**

Defendants erroneously contend that Plaintiffs' claims amount to fraud by hindsight: an effort to reframe later financial distress as evidence of earlier fraud. Mot. at 19-21. But as is the case here, "[t]he incantation of fraud-by-hindsight will not defeat an allegation of

-6-

misrepresentations and omissions that were misleading and false at the time they were made." *In re Bear Stearns*, 763 F.Supp.2d at 487.

The SAC identifies contemporaneous facts known to Defendants that rendered Defendants' statements about self-funding and stability false when made: namely, their initiation and pursuit of Project Athena, a secret sale process triggered by the terminal financial distress they were publicly denying. ¶¶ 90-95. Courts in this District have repeatedly distinguished between impermissible hindsight pleading and permissible allegations grounded in contemporaneous conduct, as is the case here. *See id.*; *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 494–495 (S.D.N.Y. 2004) (rejecting defendants' fraud-by-hindsight claim where plaintiffs alleged that "the company failed to take into account information that was available to it"); *AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec., LLC*, 2005 WL 2385854, at *12 (S.D.N.Y. Sept. 26, 2005) (amended complaint resolved fraud-by-hindsight concerns by alleging additional contemporaneous facts); *In re Vivendi Universal, S.A.*, 2004 WL 876050, at *6 (S.D.N.Y. Apr. 22, 2004) (rejecting defendant's contention that "plaintiffs' allegations of a 'liquidity crisis' constitute pleading fraud by hindsight"). Plaintiffs' allegations fall squarely in the latter category.

Defendants try to narrow the temporal focus to the "second half of 2023," citing the Kirkland letter's description of events during that period, while simultaneously arguing that the letter "deserves no weight." Mot. at 14. The "weight" that this letter deserves is not a proper subject for a Rule 12 challenge.[1] Moreover, the SAC alleges (and the Kirkland letter does not negate) that Project Athena began in December 2022, contemporaneous with the CMD assurances. ¶ 90. The

---

[1] Defendants cite a case discounting FE testimony. *See* Mot. at 14 (citing *In re China Mobile Games & Ent. Grp., Ltd Sec. Litig.*, 2016 WL 922711, at *4 (S.D.N.Y. Mar. 7, 2016)); *see also* Order at 39-40. But that case does not establish whether it is proper for the Court to assign (or not) evidentiary weight to the Kirkland letter.

Kirkland letter describes the culmination of a year-long process, not its inception. ¶ 94. Defendants' attempt to recharacterize this as a hindsight case ignores the SAC's actual allegations.

Nor does it matter that companies sometimes explore strategic alternatives as a matter of routine corporate governance. Mot. at 15 n.8. The SAC does not allege that exploring options is inherently fraudulent. It alleges that *these particular* Defendants, at *this particular* time, publicly assured investors that Farfetch was self-funding and did not need external capital, while secretly pursuing a process whose entire purpose was to raise external capital or sell the business due to the company's dire condition. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240–41 (2d Cir. 2016) (once company spoke optimistically about strategic plans, it could not conceal the fact that it was simultaneously pursuing financing alternatives). The contradiction is not between "exploring options" and being "financially healthy"; it is between "we don't need outside capital" and "we are actively seeking outside capital." *See Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F.Supp.3d 381, 392 (S.D.N.Y. 2022) (statements actionable where they are "at odds" with "what was actually going on").

The existence of Project Athena differentiates this case from the ones Defendants cite. *See* Mot. at 12-13. These cases do not involve statements concealing a known but undisclosed business strategy, such as Project Athena. Instead, they involve scenarios where the defendants provided generally accurate descriptions of business operations.

### 2. Defendants' statements conveyed present financial conditions, not forward-looking statements or mere optimism.

Defendants argue that the challenged statements are non-actionable because they are forward-looking and protected by the PSLRA safe harbor, or consist of opinions or puffery. Mot. at 9-19. That framing is inconsistent with both the content of the statements and governing law.

### a.    The PSLRA safe harbor does not protect Defendants' misrepresentations and omissions of known contemporaneous facts.

Defendants invoke the PSLRA safe harbor, arguing that their statements were forward-looking and accompanied by cautionary language. Mot. at 9-16. That argument fails for two independent reasons.

*First*, the safe harbor does not apply to statements of present or historical fact. *See Vivendi*, 838 F.3d at 246-47; *P. Stolz Fam. P'Ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("Historical or present fact … is a different matter. Such facts exist and are known; they are not unforeseen or contingent."). Further, "[a] statement may contain some elements that look forward and others that do not," and "forward-looking elements" may be "severable" from "non-forward-looking" elements. *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010). Defendants' assurances of Farfetch's sufficient liquidity and self-funding communicate current conditions, not future expectations. ¶¶ 96-110; *see also Solow v. Citigroup, Inc.*, 827 F.Supp.2d 280, 288 (S.D.N.Y. 2011) (falsity alleged where defendant claimed sufficient liquidity to meet all debt obligations).

*Second*, even where statements have a forward-looking component, the safe harbor does not apply if the statement was not "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[.]" 15 U.S.C. § 78u-5(c)(1)(A)(i). Defendants here cite cautionary language adjacent to challenged statements warning that Farfetch may need additional financing in the future, arguing no reasonable investor could have been misled. Mot. at 10-12. But the SAC alleges that Defendants initiated Project Athena in December 2022 and actively pursued capital-raising

transactions throughout the period of their public assurances. ¶¶ 90-95.[2] Risk factors warning of *possible* future financing needs do not cure the omission of *present* capital-raising efforts. Disclosing that something might happen someday is not equivalent to disclosing that it is already happening, and Defendants cannot disclaim knowledge of a process they themselves launched. *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (cautionary language insufficient where it warns of risks as hypotheticals even though they have already materialized). A generic caution that the company may have to obtain additional financing does not alert investors that management has *already* engaged J.P. Morgan and approached dozens of potential investors. No amount of generic caution about macroeconomic uncertainty can cure the concealment of that known, contemporaneous conduct. The safe harbor protects against unforeseen contingencies, not concealed present conduct, and distinguishes this case from those cited by Defendants.[3]

Defendants argue that Plaintiffs merely recycle FE allegations the Court previously found insufficient. Mot. at 12-13. But the SAC's falsity theory does not depend on the FE allegations.

---

[2] Defendants cite inapposite cases where (i) plaintiffs failed to adequately allege that the risk factors had already materialized at the time the cautionary statements were made (*Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 338 (2d Cir. 2011); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 84 (S.D.N.Y. 2017); *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 568, 573 (S.D.N.Y. 2007); *In re MINISO Grp. Holding Ltd. Sec. Litig.*, 2024 WL 759246, at *17 (S.D.N.Y. Feb. 23, 2024); *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *18 (S.D.N.Y. Sept. 21, 2021); *In re Anheuser-Busch InBev SA/NV Sec. Litig.*, 2020 WL 5819558, at *6 (S.D.N.Y. Sept. 29, 2020); *Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*, 2017 WL 4082482, at *6 (S.D.N.Y. Aug. 24, 2017)); (ii) the defendants "promptly disclosed" actualized risks (*In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F.Supp.2d 564, 580 (S.D.N.Y. 2013)); and (iii) the court held that the safe harbor did *not* apply to a statement where, like here throughout the Class Period, the cautionary language remained the same while the situation deteriorated (*Slayton v. Am. Exp. Co.*, 604 F.3d 758, 770-73 (2d Cir. 2010)). Mot. at 12, 13-14.

[3] By contrast, Defendants' cited cases do not concern present-tense, specific, and verifiably false statements. *See* Mot. at 9 (citing *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *18-19 (S.D.N.Y. Apr. 2, 2020) (holding that present-tense statements "provide[d] no specific information as to [defendant's] current circumstances")); *Jones v. Perez*, 550 F. App'x 24, 27 (2d Cir. 2013) (concerning "expectations" about cash balance).

The core contemporaneous fact rendering Defendants' statements misleading is Project Athena, a formal strategic process that the CAC did not plead. The FE allegations provide additional context about Farfetch's operational challenges, but the actionable conduct is Defendants' concealment of Project Athena while publicly assuring investors of self-sufficiency.

### b.    Defendants' "opinion" statements omitted material facts about their knowledge that conflicted with the story they told investors.

Defendants argue that statements qualified by "we believe" or "we expect" are non-actionable opinions. Mot. at 16-18; *see also* Appendix A at 10 ("We believe that our sources of liquidity and capital will be sufficient to meet our business needs for at least the next twelve months. We also expect these sources of liquidity will be sufficient to fund our long-term contractual obligations and capital needs."). It is improper to characterize claims as opinions when the speakers are aware of contradicting material facts. *See In re Nortel Networks Corp. Secs. Litig.*, 238 F.Supp.2d 613, 627-28 (S.D.N.Y. 2003) (statements regarding expected revenues were not "soft opinion[s]" because they were made with "actual knowledge" of "adverse contrary facts"). And Defendants paint with too broad a brush when they assert that the use of words like "believe," "expect," or "strong" are categorically nonactionable, particularly when the statement contradicts then-existing facts.[4] *See Solow v. Citigroup, Inc.*, 827 F.Supp.2d 280, 288 (S.D.N.Y. 2011) (claim that defendant's "cash position is very strong" actionable); *see also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (stating inventory "in good shape" or "under control" actionable when the contrary was true).

But even accepting the characterization of certain statements as opinions, they are actionable under *Omnicare*'s third prong: an opinion is misleading if it "omit[s] material facts

---

[4] *See* Mot. at 16 (citing cases).

about the speaker's inquiry or knowledge that conflict with what a reasonable investor would take from the statement." *Omnicare, Inc. v. Laborers Dist. Council*, 575 U.S. 175, 189 (2015).

A reasonable investor hearing that Defendants "believed" Farfetch had sufficient liquidity and did not need external capital would assume that Defendants were not simultaneously pursuing a process to raise capital or sell the business due to a liquidity crisis. *Cf. Novak*, 216 F.3d at 315 ("Here, the complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true."). The existence of Project Athena is precisely the kind of omitted fact about the speaker's knowledge that renders an opinion misleading under *Omnicare*'s third prong.

### c.  Defendants' assurances of sufficient liquidity and self-funding were not inactionable confidence or puffery.

The SAC alleges that Defendants repeatedly told investors that Farfetch had sufficient liquidity, was self-funding, and did not need to raise additional capital to execute its strategy. ¶¶ 96-110, 152-85. These were not abstract expressions of confidence or puffery (*see* Mot. at 18-19): they were concrete representations about Farfetch's current capital resources, cash position, and ability to operate without external financing. *See Solow*, 827 F.Supp.2d at 288; *Novak*, 216 F.3d at 315.

Indeed, statements regarding liquidity, cash sufficiency, and funding needs are paradigmatic statements of present condition. Courts in this Circuit consistently hold that representations that a company has ample liquidity, is well capitalized, or can fund operations without raising capital convey factual information about the company's current financial posture. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240–41 (2d Cir. 2016) (statements suggesting company was financially healthy actionable where undisclosed liquidity risks existed); *JinkoSolar*,

761 F.3d at 251–52 (statements about compliance and operations actionable where contemporaneous facts rendered them misleading). And analysts treated these representations as material: when Farfetch disclosed results contradicting Defendants' liquidity and profitability assurances, analysts immediately downgraded the stock, citing the gap between Defendants' "Year of Execution" narrative and actual performance. ¶ 112.

Defendants attempt to recast these assurances as mere "plans" or "goals." Mot. at 9, 19. But telling investors that the Company is presently self-funding and does not need outside capital is not a prediction (¶¶ 106, 110, 163-64, 177); it is a representation about current circumstances. To wit: a statement that the Company has sufficient liquidity for the next 12 months necessarily represents that it has sufficient liquidity *now*. *See Solow*, 827 F.Supp.2d at 288.[5] Whether the Company is already pursuing capital-raising alternatives bears directly on the truth of that representation.

To be clear, Plaintiffs do not rest their claims on generalized expressions of optimism. *See* Order at 28-30. Statements that Farfetch was "on track" or that Defendants had "confidence" in long-term targets may be non-actionable puffery in isolation. But the actionable statements here are different in kind: concrete representations that Farfetch *presently* had sufficient liquidity, *was* self-funding, and *did not need* external capital. Those are not expressions of hope about the future; they are assertions about current financial condition that were rendered misleading by Defendants' contemporaneous pursuit of Project Athena.

---

[5] This same logic distinguishes the case at bar from the cases Defendants cite. *See* Mot. at 19 (citing *Steamfitters Local 499 Pension Plan v. Skechers U.S.A., Inc.*, 412 F.Supp.3d 353, 366 (S.D.N.Y. Sept. 23, 2019), and *In re Nokia Oyj Sec. Litig.*, 423 F.Supp.2d 364, 398 (S.D.N.Y. 2006)).

Defendants argue that Plaintiffs improperly rely on the "impression" created by their statements rather than words actually spoken. Mot. at 15-16. But Plaintiffs do not ask the Court to adopt a subjective interpretation. They point to concrete representations (that Farfetch was self-funding and did not need capital (¶¶ 106, 110, 163-64, 177)) that were directly contradicted by Defendants' contemporaneous pursuit of Project Athena. That is not a matter of impression; it is a matter of fact.

### 3. Defendants' concealment of Project Athena rendered their public statements misleading.

Defendants next argue that they had no duty to disclose Project Athena, characterizing it as an unconsummated transaction that companies are not required to announce. Mot. at 14-15. The SAC alleges otherwise.

#### a. Project Athena was a formal strategic process, not a hypothetical contingency.

The SAC pleads that Project Athena was conceived, approved, and pursued as a defined strategic initiative beginning in December 2022. ¶ 90. It was not an abstract brainstorming exercise or a shelf-ready contingency. It involved concrete steps, defined objectives, and engagement with potential transaction counterparties. These allegations distinguish this case from those in which courts have held that companies need not disclose preliminary or speculative discussions.

Courts in this Circuit draw a clear line between vague internal deliberations and formal strategic processes. In *In re Time Warner Inc. Sec. Litig.*, the Second Circuit held that "when a corporation is pursuing a specific business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration." 9 F.3d 259, 268 (2d Cir. 1993). Project Athena, as alleged, easily meets that standard.

-14-

Defendants argue in a footnote that a take-private transaction is "incompatible" with the claim that Farfetch was financially distressed, because no rational buyer would acquire a failing company. Mot. at 15 n.8. That argument misunderstands the SAC's allegations. Project Athena's purpose was not to find a buyer willing to assume Farfetch's public-company obligations; it was to transfer the business *free of* those obligations—including obligations to the very shareholders Defendants were reassuring. ¶ 90. The transaction that ultimately occurred is consistent with that alleged purpose.

Defendants' cases holding there is no duty to disclose preliminary merger discussions are equally unavailing. *See* Mot. at 15 n.8 (citing *Kraft v. Third Coast Midstream*, 2021 WL 860987, at *14 (S.D.N.Y. Mar. 8, 2021); *Guevoura Fund v. Silverman*, 2016 WL 4939372, at *8-9 (S.D.N.Y. Sept. 12, 2016)). This is not a case about failing to announce a potential deal. It is a case about affirmatively assuring investors of financial self-sufficiency while secretly pursuing the opposite. The duty to disclose arose not from the mere existence of discussions, but from the decision to speak about the very subject those discussions contradicted.

Defendants' effort to characterize Project Athena as routine contingency planning ignores the pleaded facts. The SAC alleges that the project had a specific purpose (to raise capital through privatization or asset sales) and that it was pursued contemporaneously with public assurances denying the need for such measures.

### b. The concealed process was inconsistent with Defendants' public liquidity assurances.

The materiality of Project Athena flows directly from the mismatch between what Defendants told investors and what they were doing internally. Defendants did not merely fail to volunteer information about strategic alternatives; they affirmatively told investors that Farfetch was financially secure, self-funding, and not in need of external capital. The undisclosed pursuit

of Project Athena, whose sole purpose was to raise capital through extraordinary transactions, undercut those assurances.

Courts routinely find omissions actionable where undisclosed internal actions contradict public representations. In *JinkoSolar*, the Second Circuit held that statements touting operational compliance were misleading where the company concealed known violations. 761 F.3d at 251–52. A similar principle applies here: when a defendant's internal conduct contradicts its public narrative, the omission is actionable. Here, Defendants' pursuit of Project Athena directly contradicted their assurances of financial self-sufficiency.

### c.    A reasonable investor would have considered the omitted information material.

Materiality turns on whether there is "a substantial likelihood" that a reasonable investor would consider the omitted information to significantly alter the total mix of information made available. *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988). At the pleading stage, Plaintiffs need only plausibly allege materiality, not prove it.

The existence of a formal process to take the company private or sell assets would unquestionably matter to a reasonable investor evaluating Farfetch's liquidity, risk profile, and valuation. Indeed, courts have repeatedly held that information about a company's pursuit of significant strategic alternatives can be material when it bears on the company's financial condition. *See Vivendi*, 838 F.3d at 239; *Time Warner*, 9 F.3d at 268. Investors rely on management's representations about capital sufficiency precisely because those statements signal whether extraordinary measures may be forthcoming.

## B.    The SAC adequately alleges a strong inference of scienter.

To plead scienter, a plaintiff must allege facts giving rise to a "strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). A "strong inference"

-16-

is understood to be an inference that is "cogent and compelling" or "*at least as likely as* any plausible opposing inference." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324-29 (2007) (emphasis in original). That inference "need not be irrefutable … or even the most plausible," no "smoking-gun" required. *Id*. Thus, the "inquiry … is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original). Plaintiffs meet that standard here.

### 1.    Defendants' direct participation in Project Athena establishes scienter.

The SAC's scienter allegations do not rest on inference from corporate position or hindsight from later failure. They rest on a straightforward proposition: Defendants personally participated in Project Athena, a formal process to raise capital or sell the business, while simultaneously assuring investors that Farfetch was self-funding and did not need external capital. Defendants cannot claim ignorance of a process they themselves initiated and directed.

**Defendant Neves** was the sole Director and controlling shareholder of Farfetch and was directly involved in Project Athena from its inception in December 2022. ¶ 128. He approved the engagement of J.P. Morgan and other advisors to pursue a take-private transaction or asset sale. ¶¶ 90-91. He was responsible for appointing the administrators who ultimately entered into the Transfer agreement. ¶ 128. Throughout this period, Neves publicly assured investors that Farfetch was "an even stronger and more efficient organization" and that the Company's "next phase" was "about profitable growth and strong cash generation[.]" ¶¶ 98, 104. Those assurances were made while Neves was directing a process whose very existence contradicted them.

**Defendant Jordan**, as CFO, was aware of the liquidity pressures driving Project Athena. In April 2023, weeks before publicly stating that Farfetch was "on track" to deliver positive free cash flow, Jordan explicitly acknowledged to FE5 that "large investor(s)" were threatening to pull

money from the Company. ¶ 108. Jordan also received, in 2022, a paper prepared by the Global Indirect Tax team outlining the VAT risks draining Farfetch's cash. ¶ 85. He cannot plausibly claim ignorance of the capital-raising process that his own finance team was supporting.

**Defendant Phair**, along with Neves, was responsible for appointing the administrators who entered into the Transfer agreement. ¶ 128. As of Q2 2022, Phair was made accountable for the entire Farfetch Group's profit and losses, reporting directly to Neves. ¶ 74. In February 2023, Phair publicly stated that Farfetch was "in a strong position to deliver on our 2023 goals." ¶ 105. She made these statements while the Company was actively pursuing Project Athena.

Each Individual Defendant was thus directly involved in the very process they concealed from investors. This is not an inference that executives "must have known" because of their positions—it is an allegation that they *did* know because they *participated*. That distinction is critical. *See, e.g., zCap Equity Fund LLC v. LuxUrban Hotels Inc*., 792 F.Supp.3d 407, 441 (S.D.N.Y. 2025) (concluding plaintiff adequately alleged co-CEOs had actual knowledge of falsity where alleged that they were directly involved in relevant transactions); *Ho v. Duoyuan Glob. Water, Inc.,* 887 F.Supp.2d 547, 575 (S.D.N.Y. 2012) ("Knowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued.").

### 2. Defendants had the motive and opportunity to commit fraud.

Farfetch had a concrete motive to overstate its financial condition: to stave off bankruptcy and maintain its credit access long enough to complete Project Athena. The SAC alleges that Farfetch needed to preserve its relationship with J.P. Morgan, which was simultaneously advising on Project Athena and providing credit facilities, to fund operations through the completion of the undisclosed transaction. ¶ 109. Had investors known the truth about Farfetch's liquidity position

and capital-raising efforts, the Company's stock price and credit access would have suffered, jeopardizing the Transfer before it could be completed. ¶ 118.

This is not a generic allegation that executives wanted to keep their jobs or that companies prefer higher stock prices. It is a specific allegation that the fraud enabled a specific transaction. Courts routinely find such allegations sufficient. *See, e.g.*, *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (scienter based on motive "to improve the prospects of an increased credit line … to fund its … business plan"). "Courts often find allegations of motive adequate when a company is in dire need of funds for survival." *Leone v. ASP Isotopes Inc.*, 2025 WL 3484821, at *21 (S.D.N.Y. Dec. 4, 2025) (citing *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020) ("That makes sense: An executive at a company that will go belly up if it fails to fundraise has different incentives from a generic corporate insider. One salient difference is that the former executive has a stronger incentive to bet the farm in a reckless gamble because the alternative is certain failure.")); *see also Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F.Supp.3d 313, 326 (S.D.N.Y. 2018) (motive alleged by company's "dependence on sales of its stock to cover its operating losses."); *Oneida Sav. Bank v. Uni-Ter Underwriting Mgmt. Corp.*, 2014 WL 4678046, at *14 (N.D.N.Y. Sept. 18, 2014) (scienter based on motive to issue indentures specifically in order to delay insolvency and thereby continue receiving management fees).[6]

---

[6] Unlike *In re Plug Power, Inc. Sec. Litig.*, 2022 WL 4631892 (S.D.N.Y. Sept. 29, 2022), where plaintiffs alleged only generic motives and defendants faced no acute financial distress, Farfetch's liquidity crisis, minimal revenue, and sustained negative cash flow place this case at the opposite end of the spectrum.

**3.      Additional allegations support the inference of scienter.**

Beyond Defendants' direct participation in Project Athena, the SAC alleges additional facts supporting the inference that Defendants knew their public statements were misleading.

**The FE allegations provide context.** While Plaintiffs' scienter theory does not depend on the former employee allegations, they reinforce the picture of a company whose leadership knew of mounting financial pressures. FE2, Director of Global Indirect Tax, prepared a paper on all tax risks posed by Farfetch's business model in 2022, which was given to Defendant Jordan. ¶ 85. FE5, a senior member of Internal Controls, reported that as of April 2023, the message from senior management was that Farfetch could be forced to delist from the NYSE and/or might cease to exist by the end of the year. ¶ 108. FE5 also ran a revenues-versus-costs calculation in August 2023 revealing that a significant portion of products were being sold with little to no margin. ¶ 88. These allegations corroborate that Defendants had access to information contradicting their public narrative of financial strength.

**The fraud touched core operations.** The alleged omissions concerned Farfetch's liquidity, capital structure, and strategic direction, which are matters central to the Company's business and survival. Courts routinely infer that executives "are likely to know more about things central to their business." *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *5 (S.D.N.Y. Feb. 5, 2024). Farfetch's Brand Platform, encompassing NGG brands, was the second largest division of the Company. ¶ 138. Direct brand partnerships supplied roughly 70 to 80 percent of third-party product on the Farfetch marketplace. ¶ 77. The importance of these operations to Farfetch's business supports the inference that Defendants were aware of the challenges threatening it. *See New Orleans Emp. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 & n.3 (2d Cir. 2011); *see also Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367

F.Supp.3d 16, 37-38 (S.D.N.Y. 2019) (inferring scienter from allegations of fraud in the defendant's "primary profit engine").

**The temporal proximity supports scienter.** The Class Period statements were made between December 2022 and August 2023. By August 17, 2023, Farfetch was already disclosing results that contradicted prior assurances. ¶¶ 111-14. By December 2023, the Company revealed it had been pursuing Project Athena for the entire year. ¶¶ 117-22. The close proximity between Defendants' assurances and the corrective disclosures supports the inference that Defendants knew the truth earlier. *See In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021).

### 4.    Defendants' stock trading does not negate scienter.

Defendants argue that the Individual Defendants' retention of stock holdings during the Class Period rebuts any inference of scienter. Mot. at 21-22. That argument fails on the facts.

Defendant Jordan sold 140,527 shares in August 2023, netting over $400,000. ECF No. 81-20. Defendant Phair sold 6,500 shares the same month, netting approximately $35,000. ECF No. 81-19. Notably, there is no record of any other sales by Jordan or Phair at any point in their tenure at Farfetch. The timing of these unprecedented sales, surrounding the first corrective disclosure, supports rather than negates the inference of scienter. *See In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) ("Trades made a short time before a negative public announcement are suspiciously timed.").[7]

---

[7] *See also BISYS Sec. Litig.*, 397 F.Supp.2d 430, 444-45 (S.D.N.Y. 2005) (explaining that timing is more suspicious where defendants' stock sales are "clustered at [the] end [of the putative class period], when insiders theoretically would have rushed to cash out before the fraud was revealed and stock prices plummeted"); *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (insider sales that were "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information" indicative of scienter).

As for Defendant Neves, his total holdings decreased during the Class Period due to forfeitures, and by the end of the period, his shares were held by a holding company (TGF Participations Limited) rather than in his own name. This does not reflect confidence in Farfetch's prospects.

| Reported Holdings As of: | Shares Held by Mr. Neves | Shares Held by TGF | Options & RSUs[8] | Total[9] |
|---|---|---|---|---|
| February 11, 2022 | 97,355 | - | 4,397,982 | 4,495,337 |
| December 31, 2022 | 381,272 | 156,150 | 6,496,184 | 7,033,606 |
| December 31, 2023 | - | 565,438 | 6,452,705 | 7,018,143 |

Defendants' trading activity thus does not support the non-culpable inference they urge; to the contrary, Defendants' trading history bolsters Plaintiffs' alleged inference of scienter.

### 5. Defendants' non-fraudulent inference is not more compelling than the inference of scienter.

Defendants' implicit alternative narrative is that they genuinely believed Farfetch was financially self-sufficient and simply failed to foresee the Company's later distress. That narrative is implausible given the SAC's allegations.

Defendants did not merely fail to predict the future. They initiated Project Athena in December 2022, the same month they assured investors of Farfetch's financial strength. ¶ 90. They engaged J.P. Morgan and approached dozens of potential investors. ¶ 92. They pursued a transaction designed to transfer the business free of public-company obligations. ¶ 117. And throughout this process, they continued to tell investors that Farfetch did not need external capital. ¶¶ 96-110.

---

[8] Represents Class A shares Mr. Neves had the right to acquire through the exercise of RSUs or stock options that were currently vested or vested within sixty days of December 31, 2021, December 31, 2022, and December 31, 2023, respectively. *See* ECF No. 81-3 at 117; ECF No. 81-12 at 121; ECF No. 81-22 at 6.

[9] The number reflected does not include 42,858,080 Class B shares exchangeable for Class A shares on a one-for-one basis held of record by TGF.

The notion that Defendants were somehow ignorant of the process they were directing defies common sense and logic. *See In re Gen. Elec. Co. Sec. Litig.*, 857 F.Supp.2d 367, 395 (S.D.N.Y. 2012) ("[S]urely an inference of knowledge may be appropriate... where it would be absurd to suggest that management was without knowledge of the matter.").

Taken collectively, the SAC's allegations give rise to a strong inference of scienter that is at least as compelling as any opposing inference. *Tellabs*, 551 U.S. at 324. Defendants' motion to dismiss the scienter allegations should be denied.

**C.    Plaintiffs adequately allege scheme liability.**

Defendants argue that Plaintiffs' scheme liability claim fails because it merely repackages the alleged misstatements and omissions. That argument misunderstands both the nature of Plaintiffs' allegations and the governing law. The SAC pleads a cohesive, deceptive course of conduct that goes beyond isolated statements and independently supports liability under Rule 10b-5(a) and (c).

Scheme liability attaches where defendants engage in a deceptive course of conduct that has the principal purpose and effect of misleading investors, even where that conduct overlaps with misstatements or omissions. *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 79-82 (2019). The SAC alleges a coordinated course of deceptive conduct with two components: (1) the active pursuit of Project Athena—engaging advisors, approaching investors, and negotiating a transaction to transfer the business; and (2) the simultaneous, repeated reinforcement of a public narrative denying any need for such measures. Neither component alone constitutes the scheme; the scheme is their deliberate combination.

First, Defendants argue that the SAC fails to follow the Court's "clear instruction" to plead scheme liability in a "separate count[.]" Mot. at 25 (quoting Order at 44). But the Court's instruction was that any scheme claim must be pleaded "clearly and specifically," not that it must

appear under a particular caption. Order at 44. The SAC's allegations clearly and specifically describe a coordinated course of deceptive conduct: promoting a narrative of financial self-sufficiency while secretly pursuing Project Athena. Whether labeled as a separate count or integrated into the Section 10(b) claim, the scheme is adequately pleaded.

Second, Defendants argue that scheme liability fails because scienter is not adequately pleaded. Mot. at 25. As discussed above, the SAC adequately alleges scienter based on Defendants' direct knowledge of and participation in Project Athena. Because scienter is adequately pleaded, this argument provides no independent basis for dismissal. See *supra*, § III(B).

Third, Defendants argue that contemplating a take-private or raising capital is not "inherently deceptive." Mot. at 25. But the SAC does not allege that those acts, standing alone, were deceptive. The deceptive conduct here was not merely "exploring alternatives"—it was pursuing a transaction specifically designed to eliminate shareholder value while simultaneously telling those shareholders to hold. Project Athena's purpose was to transfer the business free of obligations to public shareholders—obligations to the very investors Defendants were reassuring. ¶¶ 90-95. Defendants did not passively fail to disclose; they actively engaged advisors, approached dozens of investors, and engineered an exit for themselves while telling investors there was no need to worry. That coordinated course of conduct, maintained over the course of a year, is the scheme. Defendants were not quietly planning for contingencies; they were working toward an outcome that would wipe out shareholder investment while publicly urging those shareholders to stay the course.

Defendants cite *Alpha Cap. Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, 2018 WL 1627266, at *11 (S.D.N.Y. Mar. 30, 2018), for the proposition that raising capital is not inherently deceptive. Mot. at 25. But *Alpha Capital* involved a defendant who helped a company raise capital

through private sales, and there was no allegation that the defendant simultaneously told investors the company did not need capital. 2018 WL 1627266, at *11. Here, the deception is not the capital-raising itself; it is secretly pursuing capital-raising while publicly denying any need for it.

Defendants contend that Plaintiffs' scheme claim merely duplicates the misstatement and omission allegations. Courts in this Circuit reject that categorical approach. While scheme liability cannot rest solely on the same misstatements alleged under Rule 10b-5(b), it may be based on "conduct beyond the misstatements themselves," including deceptive acts that further a fraudulent course of conduct. *SEC v. Rio Tinto plc*, 41 F.4th 47, 54–55 (2d Cir. 2022).

Thus, Plaintiffs' scheme liability claim is properly pleaded and should not be dismissed.

**D.    The SAC adequately pleads "Control Person" liability under Section 20(a).**

Defendants do not dispute their status as "Control Persons" over Farfetch. Instead, they move to dismiss Plaintiffs' Section 20(a) claim on the ground that the SAC fails to allege a primary violation or culpable participation. Mot. at 25. As set forth above, because the SAC adequately alleges primary violations of Section 10(b), Defendants' motion to dismiss the Section 20(a) claim should be denied. *See Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F.Supp.3d 401, 437 (S.D.N.Y. 2014).

### IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied in its entirety.[10]

---

[10] Alternatively, if the Court grants Defendants' Motion in whole or in part, Plaintiffs respectfully request leave to amend the pleadings. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189-90 (2nd Cir. 2015).

Dated: February 2, 2026

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

/s/ Lucas E. Gilmore
Lucas E. Gilmore (admitted *pro hac vice*)
Reed R. Kathrein (*pro hac vice* forthcoming)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
lucasg@hbsslaw.com
reed@hbsslaw.com

Nathan Emmons (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 North Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4957
Facsimile:  (708) 628-4950
nathane@hbsslaw.com

*Counsel for* Co-*Lead Plaintiff Yuanzhe Fu and Co-Lead Counsel for the Class*

Adam M. Apton
LEVI & KORSINSKY, LLP
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile:  (212) 363-7171
aapton@zlk.com

*Counsel for Co-Lead Plaintiff Fernando Sulichin and Co-Lead Counsel for the Class*

-26-

## WORD COUNT COMPLIANCE CERTIFICATE

I, Lucas E. Gilmore, certify that this brief complies with Local Civil Rule 7.1(c).

I further certify that, in preparation of this brief, I used Microsoft Word, and that this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations in the following word court.

I further certify that the above-referenced brief contains 7,542 words.

/s/      *Lucas E. Gilmore*
Lucas E. Gilmore

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: February 2, 2026                    /s/     *Lucas E. Gilmore*
                                           Lucas E. Gilmore